UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NUVASIVE, INC.                              )
                                            )
            Plaintiff,                      )
                                            )
v.                                          )      Civil Case No. 6:17-cv-2206-orl-18-GJK
                                            )
ABSOLUTE MEDICAL, LLC, GREG                 )      INJUNCTIVE RELIEF SOUGHT
SOUFLERIS, and DAVE HAWLEY,                 )
                                            )
            Defendants,                     )
                                            )

### DECLARATION OF KIRK TYREE

Under penalty of perjury and pursuant to 28 U.S.C. Section 1746, Declarant, Kirk Tyree,

states that:

1.      My name is Kirk Tyree. I am above the age of 18 and am fully competent to give

the testimony contained in this Declaration, all of which comes from my personal knowledge and

my May 21, 2018 discovery and review of NuVasive's corporate documents.

2.      I am employed by NuVasive, Inc. ("NuVasive") as Director, Legal Affairs.

3.      **Exhibit A** to this Declaration is a copy of the Exclusive Sales Representative

Agreement that Absolute Medical, LLC ("Absolute Medical") signed with NuVasive and which

became effective on February 14, 2013 (the "2013 Agreement"). Section 6.13 of the 2013

Agreement requires Absolute Medical to, among other things, enter into agreements with its

sales personnel which contain certain non-competition and non-solicitation obligations.

4.      Upon my review of NuVasive corporate records and information and belief:

   a. **Exhibit B** to this Declaration is an exemplar of the 2013 Independent
      Contractor Agreement (the "Absolute Contractor Agreement") that Absolute
      Medical entered into with its independent sales representatives to, among other
      things, comply with the obligations contained in Section 6.13 of the 2013
      Agreement;

731054.2/020170439

EXHIBIT

7

tabbies

b. **Exhibit C** is a copy of an executed signature page to the Absolute Contractor Agreement between Absolute Medical and Dave Hawley; and

c. **Exhibit D** is a copy of an executed signature page to the Absolute Contractor Agreement between Absolute Medical and Ryan Miller.

5.     Based on my review of NuVasive's corporate records, the executed signature pages of Dave Hawley and Ryan Miller (**Exhibits C** and **D**) are identical to the signature page contained in the exemplar Absolute Contractor Agreement (**Exhibit B**). Therefore, I reasonably believe that Dave Hawley and Ryan Miller executed Absolute Contractor Agreements.

Further, this Declarant sayeth not.

I declare under penalty of perjury the foregoing is true and correct.

Date: May 22, 2018                                   _____
                                                     Kirk Tyree



**NUVASIVE®**
*Speed of Innovation®*

## EXCLUSIVE SALES REPRESENTATIVE AGREEMENT

This EXCLUSIVE SALES REPRESENTATIVE AGREEMENT (the "Agreement") is entered into effective as of February 14, 2013 ("Effective Date") by and between NuVasive, Inc., a Delaware corporation with principal offices at 7475 Lusk Boulevard, San Diego, California 92121 ("NuVasive"), and Absolute Medical LLC, a Florida limited liability corporation with a principal place of business at 213 Villa Di Este Terrace #105, Lake Mary, Florida 32746 ("Representative") (each a "Party" and collectively "the Parties").

1. **DEFINITIONS**

    1.1 "Products" means those products listed in **Exhibit A** attached hereto. Products subject to this Agreement may be changed, discontinued or added by NuVasive, at its sole discretion, so long as such change, discontinuation and/or addition similarly affects, or would otherwise put Representative in line with, the product offering for other similarly situated sales representatives of NuVasive. Such change, discontinuation and/or addition shall be effective thirty (30) days after delivery by NuVasive to Representative of a new **Exhibit A**.

    1.2 "Territory" means the geographic areas and/or specific institutions listed on **Exhibit B** hereto. The Territory may be increased or decreased by agreement of the Parties in writing. NuVasive may, in its sole discretion, decrease the Territory if (i) the Territory is not sufficiently covered by sufficient representation in accordance with the sales action plan agreed to by the Parties and delivered pursuant with Section 6.4, (ii) Representative is in violation of Section 6.12, 6.14 or 6.15 of this Agreement, (iii) Representative is in Poor Standing, or (iv) NuVasive pays Representative an amount equal to the then-current Stated Percentage with respect to the sales generated (based on either the sales generated in the prior calendar year or the twelve (12) months following decrease in Territory, as determined in the sole discretion of NuVasive) in the portion of the Territory that is being decreased from Representative.

2. **APPOINTMENT AND AUTHORITY OF REPRESENTATIVE**

    2.1 Exclusive Sales Representative. Subject to the terms and conditions herein, NuVasive hereby appoints Representative as NuVasive's exclusive sales representative for Products in the Territory, and Representative hereby accepts such appointment. Representative's sole authority shall be to solicit orders for Products in the Territory in accordance with the terms of this Agreement. Representative shall not have the authority to make any commitments whatsoever on behalf of NuVasive.

    2.2 Territorial Limitation. Representative shall not, directly or indirectly, (i) advertise or promote any Products outside the Territory; (ii) solicit or procure any orders for Products from outside the Territory; or (iii) otherwise act as NuVasive's representative with respect to the Products outside the Territory, without the prior written consent of NuVasive. Representative may only submit and procure orders from customers located and taking delivery of Products within the Territory. Representative shall maintain sufficient representation in all spine hospitals and clinics in the Territory and shall promptly replace any sales representatives that leave Representative's organization while the Agreement is in force. Any accounts or portions of the Territory without sufficient representation may at NuVasive's discretion be moved to a non-exclusive status (notwithstanding Section 2.1) or removed from the Territory.



**EXHIBIT**

**A**

2.3 <u>Independent Contractors</u>. The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either Party the power to direct and control the day-to-day activities of the other Party, (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Representative to create or assume any obligation on behalf of NuVasive for any purpose whatsoever. All financial and other obligations associated with each Party's business and its performance of obligations under this Agreement are the sole responsibility of the respective Party. Each Party shall be solely responsible for, and shall indemnify and hold the other Party free and harmless from, any and all claims, actions, proceedings, damages, liability, costs and expense (including reasonable attorneys' fees) arising out of the acts of its employees or its agents. For the avoidance of doubt, with respect to its sales representatives, Representative shall be solely responsible for hiring, promoting, discharging, scheduling appointments, establishing pay scales and/or other remuneration, remunerating, reimbursing for work-related expenses, implementing discipline and any other action directly related to the employment of such sales representatives.

2.4 <u>Conflicts of Interest.</u> Representative represents and warrants to NuVasive that it does not (nor does any entity or person affiliated with it) currently represent or promote any lines or products that are competitive with any NuVasive Product, and that it shall not (nor shall any entity or person affiliated with it) during the Term, directly or indirectly, represent, promote, sell or otherwise commercialize within the Territory (i) any lines or products that are competitive with any Product covered by this Agreement or (ii) any non-NuVasive products for use in spine surgery. Further, during the Term, Representative shall not, directly or indirectly, represent, promote, sell or otherwise commercialize any products (other than the Products) without the written consent of NuVasive. In addition, Representative represents that its performance of all the terms of this Agreement and as an agent of NuVasive does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by it in confidence or in trust prior to its engagement by NuVasive, and Representative agrees not to disclose to NuVasive any confidential or proprietary information or material belonging to any previous employers or other entities with whom Representative has been involved. Representative represents and warrants that it has not entered into (and is not bound by) any agreement, either written or oral, that is in conflict herewith or in conflict with the engagement contemplated hereby.

2.5 <u>Corporate Compliance.</u> Representative agrees and warrants that it will cooperate fully with NuVasive personnel in all respects with regard to performing the obligations of this Agreement, including participating in requested teleconferences, meetings, and travel, and providing sales target and sales forecasting information to NuVasive upon reasonable request.

3.   **COMMISSION**

3.1 <u>Sole Compensation</u>. Representative's sole compensation under the terms of this Agreement shall be (i) a commission ("Commission") based on Net Sales (as defined in Section 3.2 below) of Products resulting from Representative's procurement of orders therefore pursuant to this Agreement, in accordance with the schedule set forth in **Exhibit C** hereto and (ii) $300,000 paid in accordance with the schedule set forth in **Exhibit D** hereto.

3.2 <u>Basis of Commission</u>. The Commission shall apply to all Product orders (i) procured by Representative from customers within the Territory in accordance with this Agreement; (ii) that have been accepted by NuVasive; and (iii) for which shipment of Products and recognition of revenue by NuVasive has occurred. Commissions shall be computed based on "Net Sales" which shall, for purposes of this Agreement, be defined as the dollar amount actually received by NuVasive from a customer for the sales of the Product(s), less charges for shipping, handling, freight, taxes, C.O.D.

charges, insurance, tariffs and duties, cash and trade discounts, rebates, charge back payments to managed healthcare organizations, amounts allowed or credited for returns, uncollected or uncollectable amounts, services, and the like. The Territory may be subdivided into regions if set forth as such on **Exhibit B, Exhibit C** or **Exhibit E** (as updated from time to time by NuVasive). Separate Quota Commitments may be designated for each such region.

3.3 <u>Time and Manner of Payment</u>. The Commission pursuant to Section 3 on a given order shall be due and payable thirty (30) days after the end of the calendar month in which NuVasive invoices and ships that order.

3.4 <u>Commission Charge Back</u>. NuVasive shall have the absolute right to set such cash discounts, to make such allowances and adjustments, to accept such returns from its customers, and to write off as bad debts such overdue customer accounts as it deems advisable in its discretion. In each such case, NuVasive shall charge back to Representative's account any Commission previously paid or credited to it with respect to such cash discounts, allowances, adjustments, returns or bad debts. Representative also agrees to accept charges for: (i) pricing arrangements (or side deals) not approved by NuVasive; (ii) lost, damaged or missing inventory; (iii) failure to comply with NuVasive's communicated policies, e.g., inventory management policy (i.e. carrying charges for excess inventory levels) and prohibition of "house accounts"; and (iv) courier charges for the delivery of Products when NuVasive standard method of shipping was available.

3.5 <u>Monthly Statements</u>. NuVasive shall submit to Representative monthly statements of the Commissions due and payable to Representative under the terms of this Agreement, with reference to the specific invoices on which the Commissions are being paid.

3.6 <u>Potential Bonus Payments.</u>  NuVasive may, from time to time and in its sole discretion, pay bonuses as separately outlined by Sales Administration for the achievement of peak sales performance and as part of special product roll-outs and initiatives.

4.    **SALE OF THE PRODUCTS**

4.1 <u>Prices and Terms of Sale</u>. NuVasive shall provide Representative with copies of its current price lists, its delivery schedules, and its standard terms and conditions of sale, as established from time to time. NuVasive's current terms and conditions of sale are attached hereto as **Exhibit F**, which may be amended from time to time in the sole discretion of NuVasive (the "Terms and Conditions"). Representative shall quote to customers only those authorized prices, delivery schedules, and terms and conditions, and shall have no authority to quote or offer any discount to such prices or change any such terms and conditions, without the prior written consent of NuVasive. NuVasive may change the prices, delivery schedules, and terms and conditions, at any time and from time to time, such changes to be effective thirty (30) days after delivery by NuVasive to Representative of written notice of any such changes. Each order for a Product shall be governed by the prices, delivery schedules, and terms and conditions in effect at the time the order is accepted by NuVasive, and all quotations by Representative shall contain a statement to that effect.

4.2 <u>Orders; Acceptance</u>. All orders for the Products shall be in writing, and the originals shall be submitted to NuVasive. NuVasive shall promptly furnish to Representative informational copies of all commissionable orders sent by customers in the Territory. All orders obtained by Representative shall be subject to acceptance by NuVasive at its sole discretion. Representative shall have no authority to make any acceptance or delivery commitments to customers. NuVasive agrees that its normal business practice is to accept all bona fide orders for Products, subject to availability and NuVasive's credit and ordering policies.

4.3 <u>Collection</u>. It is expressly understood by Representative that full responsibility for all collection rests with NuVasive, provided, at NuVasive's request, Representative will assist NuVasive in the collection of any accounts receivable of NuVasive.

5.   **WARRANTY**

5.1 <u>Customer Warranty</u>. Any warranty for the Products shall run directly from NuVasive to the customer, and pursuant to the warranty the customer shall return any allegedly defective Products to NuVasive. Representative shall have no authority to accept any returned Products.

5.2 <u>Warranty Terms</u>. All warranty claims shall be governed by the Terms and Conditions.

6.   **ADDITIONAL OBLIGATIONS OF REPRESENTATIVE**

6.1   <u>Quota Commitment</u>. Representative shall solicit orders that are submitted to NuVasive in accordance with this Agreement for the quantity of Products set forth in **Exhibit E** attached hereto ("Quota Commitment"). The Quota Commitment shall be determined, based on dialogue with Representative, by NuVasive in its sole discretion and delivered to Representative within thirty (30) days of the end of each calendar year, or as may be delivered to Representative by NuVasive from time to time (it being understood that NuVasive intends to deliver a Quota Commitment at intervals more frequently than annually only with respect to newly introduced products). If Representative (i) fails to secure orders for ninety-five percent (95%) of its aggregate Quota Commitment in any two consecutive calendar quarters, or (ii) fails to secure orders for ninety-five percent (95%) of its aggregate Quota Commitment for any given calendar year, then Representative shall be deemed in "Poor Standing" and NuVasive may, at its discretion and without prejudice to any other rights NuVasive may have under this Agreement, terminate Representative's exclusivity granted in Section 2.1 herein and appoint one or more additional representatives for sale of Products in the Territory, reduce the Territory per Section 1.2, and/or terminate the Agreement at will per Section 11.3. If Representative is deemed to be in Poor Standing, Representative may regain good standing (and no longer be deemed in Poor Standing): (a) by achieving its aggregate Quota Commitment for a calendar quarter or the calendar year, or (b) as of the January 1st following the year in which Representative is deemed to be in Poor Standing unless Representative is, within fifteen (15) days of the end of the year, (1) notified by NuVasive that it is in Poor Standing, or (2) provided with a corrective sales plan by NuVasive. If NuVasive provides a corrective sales plan as set forth in the prior sentence, then Representative shall be deemed in Poor Standing until Representative has successfully completed the corrective sales plan, as determined in the sole discretion of NuVasive. For the avoidance of doubt, Representative shall not be in Poor Standing as of the Effective Date. Orders fulfilling the Quota Commitment shall be based on bona fide orders submitted to NuVasive that would, upon acceptance by NuVasive, qualify for the payment of a Commission to Representative. The Territory may be subdivided into regions if set forth as such on **Exhibit B**, **Exhibit C** or **Exhibit E** (as updated from time to time by NuVasive). Separate Quota Commitments may be designated for each such region.

6.2   <u>Representative Infrastructure and Promotion of the Products</u>. NuVasive and Representative acknowledge and agree that development of proper infrastructure on the part of Representative is vital for the success of the business. NuVasive will work with Representative to develop and refine expectations for business investments to be made by Representative for the purpose of expanding its infrastructure (e.g., overseeing operations, operational activities, adding personnel with specialized skills, investing in new markets, computer systems and software, inventory tracking and management, etc.) (the "Infrastructure Investments"). The Infrastructure Investments required by NuVasive will be reasonable in scope and expense and will be supported with resources from NuVasive. As the Infrastructure Investments are defined and communicated to Representative from

-4-

time to time, Representative agrees to comply with the Infrastructure Investments and agrees that failure to do so shall entitle NuVasive to appropriately redefine the Territory and/or terminate Representative's exclusivity.  Representative acknowledges and agrees to maintain sufficient personnel to effectively and consistently promote the sale of the Products as contemplated by the Agreement, with a focus on selling a complete mix of the various Products. Representative shall also provide sufficient promotional support to its sales representatives in order to promote the Products in their assigned territories. Representative agrees not to sell all or any part of the Promotional Materials of Section 7.2 to any third party without the prior written consent of NuVasive.  Representative shall use the Promotional Materials of Section 7.2 solely to demonstrate and promote the Products to bona fide customers considering ordering such Products in strict accordance with all the terms of this Agreement and solely to the extent necessary to fulfill the purposes of this Agreement.

6.3     Territorial Responsibility.  Representative shall assign its entire Territory to individual sales representatives, shall set individual quotas for each representative, and shall communicate all such information to NuVasive on an ongoing basis.

6.4     Sales Action Plans.  Representative shall provide to NuVasive, within thirty (30) days following the end of each calendar year, an annual sales objectives plan detailing Representative's sales goals and execution strategies for the coming year.  In addition, Representative shall deliver to NuVasive, by the fifth (5th) day of each calendar month, a monthly action plan detailing Representative's sales history, revised sales plans and strategies.

6.5     Audit.  Upon reasonable request by NuVasive, Representative agrees to furnish a full and detailed statement of NuVasive's business and in Territory but only to the extent it relates to this Agreement, including without limitation to matters related to Sections 6.10 and 6.13 herein.  NuVasive shall have the right during normal business hours and upon thirty (30) days prior written notice to audit Representative's records relative to NuVasive's business (including basic financial information of Representative) and verify any Representative statement sent to NuVasive.

6.6     Demonstration and Staff Training.  NuVasive agrees to provide Representative and its personnel with adequate training regarding the use and operation of the Products, and to also provide its staff and personnel with regular training regarding any updates to the Products.  Representative agrees to attend (and have its applicable employees and contractors attend within 90 days of date of hire by Representative) training as requested by NuVasive.  Representative agrees (i) that all of its applicable employees and contractors will attend NuVasive's sales training course within six (6) months of execution of this Agreement and (ii) to implement a sales training plan agreed upon by Representative and NuVasive's sales management that takes full use of training courses and provides regular and thorough training to entire sales team.  Representative also agrees to meet NuVasive's requirements for attendance and participation in NuVasive's Marquis Visit Program, which shall include an annual quota for MVPs to be scheduled by Representative.   Costs associated with attendance at training events shall be borne by Representative.

6.7     Product Complaints.  Representative represents and warrants that Representative shall: (i) promptly investigate and monitor all customer and/or regulatory complaints and/or correspondence concerning the use of the Products in the Territory; (ii) immediately notify NuVasive of all such complaints and/or correspondence; (iii) assign to NuVasive all rights (including intellectual property rights), title and interests in and to any customer feedback with regard to the Products, and (iv) take any and all such actions to ensure such assignment is effected, upon reasonable request of NuVasive.

6.8     Representations; Marketing.  Representative represents and warrants it shall not make any false or misleading representations to customers or others regarding NuVasive or the Products, or

about NuVasive competitors or competitor products. Representative represents and warrants that it shall not make any representations, warranties or guarantees with respect to the specifications, features or capabilities of the Products that are not consistent with, or otherwise expand upon the claims in, the Promotional Materials or other documentation supplied by NuVasive. Representative represents and warrants that it shall use only the Promotional Materials supplied by NuVasive in its promotion of the Products. Representative represents and warrants that in no event shall Representative make any guarantee or warranty concerning the Products that is inconsistent with, or otherwise expands upon, NuVasive's standard limited warranty or on behalf of any vendor or supplier of NuVasive. Representative represents and warrants that it shall promote and market the Products in accordance with the training provided by NuVasive.

6.9     Notice of Changes. Representative shall promptly advise NuVasive of (i) any changes in Representative' status, organization, personnel, and similar matters, (ii) any changes in the key personnel, organization, and status of any major customers of NuVasive in the Territory, and (iii) any political, financial, legislative, industrial or other events in the Territory that could affect the mutual business interests of Representative and NuVasive, whether harmful or beneficial.

6.10    Compliance with Laws and Policies. Representative represents and warrants that it will comply with all applicable federal, state, local, municipal, regulatory and/or governmental agency laws, statutes, regulations, edicts, guidance, directives, and ordinances, including, without limitation, (a) the Social Security Act; (b) HIPAA, (c) all federal and state health care anti-fraud, anti-kickback and abuse laws such as 42 U.S.C. § 1320a-7b(b); (d) the Federal Food, Drug, and Cosmetic Act and its implementing regulations; (e) all rules, regulations, and guidance of the FDA; and (f) all rules and regulations of the Center for Medicare and Medicaid Services (CMS). Without limiting the generality of the foregoing, except to the extent allowed by applicable law, Representative will make no offer, payment or other inducement, whether directly or indirectly, to induce the referral of business, the purchase, lease or order of any item or service, or the recommending of the purchase, lease or order of any item or service. Representative will comply, and will ensure its personnel carrying out activities under this Agreement comply, with all operating and compliance policies of Nuvasive, including (without limitation) the MDMA Code of Conduct on Interactions with Healthcare Providers (a copy of which is attached as **Exhibit G** hereto), NuVasive's Code of Ethical Business Conduct, NuVasive's Global Business Ethics Program, Insider Trading Policy and Inventory Management Policy (relating to wide variety of inventory management issues, including without limitation inventory investment, accountability for inventory management (such as cost-sharing) and consignment inventory), as such policies may be created and updated from time to time, and including any applicable training requirements with respect to such policies. Additionally, on not less than an annual basis, Representative shall certify to compliance with the Healthcare Compliance Guide by submitting a Certification of Compliance to NuVasive that Representative is in compliance with this Section 6.10 and any other compliance terms in this Agreement in a form acceptable to NuVasive.

6.11    Sales Representatives. NuVasive may elect to interview candidates for sales representative positions and to approve or disapprove such candidates based upon the hiring profile; provided, however, that such approval or disapproval does not affect Representative's authority to making hiring or other employment decisions. NuVasive shall have the right to approve how such sales representatives are trained and deployed. Representative shall compensate its sales representatives in its discretion.

6.12    Regulatory Compliance. Representative will not alter or modify the Product(s) in any way prior to delivery to Customers. Representative shall at all times conduct its activities on behalf of NuVasive in accordance with the labeling limitations on the Products, the terms of this Agreement, NuVasive's written policies and procedures, and in compliance with applicable state and federal laws

in effect from time to time, including the FDA's quality system regulations (QSR), Adverse Event Reporting System (AERS) and/or current good manufacturing practice (cGMP) regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures. Representative shall provide NuVasive with such information and data as may be requested by Company pursuant to this Agreement.

6.13    Agreement Regarding Competitive Products; Non-Solicitation.  During the Term and for a period of one (1) year following the expiration or termination hereof, neither Representative nor any of Representatives' partners, employees, sub-contractors, sales personnel (whether employees of Representative or independent contractors), affiliates or agents (nor any entity in which Representative has an ownership interest) (each a "Representative Affiliate") shall (i) develop, represent, promote or otherwise try to sell within the Territory any lines or products that, in the Company's reasonable judgment, compete with the Products covered by this Agreement, (ii) solicit (directly or indirectly) any current or former customers of NuVasive to purchase any products or lines that are, in the Company's reasonable judgment, competitive with the Products covered by this Agreement, or (iii) solicit or offer work to, directly or indirectly, any of NuVasive's employees, agents or representatives. Representative represents and warrants that (A) each Representative Affiliate engaged by it on the date of execution hereof has executed an agreement (a "Compliance Agreement") in form and substance sufficient to contractually obligate such person or entity to comply with the restrictions contained in this Section 6.13, (B) each person or entity who becomes a Representative Affiliate in the future shall execute a Compliance Agreement prior to performing any services for the benefit of NuVasive, (C) each Compliance Agreement will name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 6.13, and (d) it will vigorously enforce the restrictions contained in this Section 6.13 and each Compliance Agreement at its own cost (and in the event Representative fails to adequately enforce such restrictions, NuVasive may do so at Representative's cost).  Representative shall provide NuVasive a copy of each Compliance Agreement with respect to each Representative Affiliate immediately upon such person or entity becoming a Representative Affiliate. In addition, notwithstanding Section 12.1, this Section 6.13 shall be interpreted and enforced in accordance with the laws of the state in which Representative last resides while performing services for NuVasive, without regard to the conflict of laws provisions of said state. Each Compliance Agreement shall require all sales representatives to comply with the terms of Sections 6.10 and 6.12 hereof, and each such Compliance Agreement shall be provided to NuVasive. The one (1) year period during which the restrictions of this Section are applicable shall toll for any period of time in which Representative is not in compliance herewith.

NuVasive and Representative acknowledge and agree that the foregoing non-competition covenants are reasonable and necessary to protect the legitimate interests of NuVasive, including without limitation, the protection of Confidential Information. Representative further acknowledges and agrees that such covenants are an essential part of, and consideration for, NuVasive's promises contained in this Agreement.

6.14    Debarment. Representative represents and warrants that neither it nor any of its personnel carrying out activities under this Agreement  have been nor are debarred, suspended, excluded or are otherwise ineligible under Section 306 of the Federal Food, Drug and Cosmetic Act (as amended by the Generic Drug Enforcement Act of 1992), 21 U.S.C. § 336, or are listed on any applicable federal exclusion list including the then-current: (a) HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); (b) General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov); and (c) FDA Debarment List (available through the internet at http://www.fda.gov/ora/compliance_ref/debar/).

6.15     Interaction with Health Care Professionals.  Representative represents and warrants that neither it nor any of its personnel carrying out activities under this Agreement currently have any form of compensation arrangement with any Health Care Professional other than an agreement to purchase product.  Representative agrees that neither it nor any of its personnel shall  enter into, any arrangement (e.g., grants, donations, sponsorships, reimbursement of expenses, etc.) or agreement, oral or written, with a Health Care Professional, other than for the purchase of product without the express prior written consent of NuVasive's Compliance Officer or his/her designee.  A breach of this provision shall be cause for NuVasive to terminate this Agreement at will.

6.16     Insurance. During the Term, Representative shall maintain in full force and effect one or more policies of the following insurance coverage of not less than the following amounts: (i) General Liability - Two Million Dollars ($2,000,000) aggregate, One Million Dollars ($1,000,000) Bodily Injury/Property Damage per occurrence, One Million Dollars ($1,000,000) Personal and Advertising Injury, One Hundred Thousand Dollars ($100,000) Damage to Rented Premises, Ten Thousand Dollars ($10,000) Premises Medical Payments; (ii) Property Coverage equal to replacement value of property owned along with extra expense coverage to cover period of time to replace office premises; (iii) Professional Liability: One Million Dollars ($1,000,000) aggregate and per occurrence; (iv) Automobile Liability for owned, non-owned and hired autos (as applicable) – One Million Dollars ($1,000,000) per accident; and (v) Workers Compensation sufficient to meet statutory required benefits of the state in which your employees are domiciled; all from carrier(s) reasonably acceptable to NuVasive. On an ongoing basis, Representative shall provide NuVasive with one or more certificates of insurance showing that Representative maintains insurance in accordance with this Section 6.16. Such certificates shall confirm that NuVasive has been named as an additional insured on Representative's insurance policies by endorsement to such policies and shall provide that there shall be no cancellation or reduction in coverage without thirty (30) days' prior written notice to NuVasive.

7.     **ADDITIONAL OBLIGATIONS OF NUVASIVE**

7.1     Training by NuVasive.  NuVasive shall provide sales and compliance training to Representative's personnel at periodic intervals, with the frequency and content of the training to be determined by NuVasive.  When possible, such training shall be given at Representative's facilities, but it may be necessary to provide combined training at a geographically central location near but not in the Territory. Travel and expenses associated with attendance by Representative and Representative's personnel shall be borne by Representative. Representative shall sign all certifications confirming its training as may be requested by NuVasive.

7.2     Promotional Materials.  NuVasive shall provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures, instructional material, advertising literature, product samples, and other Product data ("Promotional Materials").  NuVasive may charge Representative for such materials. Representative shall not add, delete, or modify any language in the Promotions Materials in any manner, except for adding Representative contact information. Under no circumstances shall Representative use any other promotional material or literature regarding the Products without the prior written consent of NuVasive.

7.3     Telephone Marketing and Technical Support.  NuVasive shall provide a reasonable level of technical support in English to personnel of Representative who have been trained by NuVasive during its normal business hours to answer Representative's questions related to the Products. NuVasive will also provide assistance to Representative regarding sales administration, hiring, and implementation of sales plans.

8.    **INDEMNITY**

Subject to all of the Conditions set forth in this Section 8, NuVasive shall defend, indemnify and hold harmless Representative and its employees and agents, from and against any and all causes of action, claims, suits, proceedings, damages and judgments by third parties (collectively, "Claims"), to the extent that such Claims are based primarily on an alleged manufacturing or design defect in a Product sold by Representative. In the event that any Claim is asserted against Representative, Representative shall provide written notice to NuVasive within (10) days after learning of such Claim. NuVasive will have the right to select counsel, and conduct and control at its expense the defense against and settlement of such Claim in its own name, or if necessary in Representative's name and NuVasive's defense counsel may act on Representative's behalf regardless of whether such Claim has also been asserted against NuVasive. Representative will cooperate with and make available to NuVasive such assistance and information as may be reasonably requested by NuVasive, and Representative will have the right to participate in the defense, including representation by independent counsel, at Representative's expense, provided that under such circumstances Representative will have the right to compromise and settle the Claim only with the prior written consent of NuVasive. If, in connection with any Claim it is determined by NuVasive that Representative acted beyond its authority, or failed to comply with any of its material obligations under this Agreement, NuVasive shall be immediately relieved of its obligations to Representative under this Section 8.

9.    **TRADEMARKS**

9.1 Use. NuVasive hereby grants to Representative the non-exclusive, non-transferable, limited right and license for the Term to indicate to the public that it is an authorized representative of the Products and to advertise (within the Territory) such Products under the trademarks, service marks, logos, and trade names that NuVasive may adopt from time to time ("Trademarks"). Representative shall not alter or remove any Trademark applied to the Products. Except as set forth in this Section 9, nothing contained in this Agreement shall grant to Representative any right, title or interest in the Trademarks. At no time during or after the Term shall Representative challenge or assist others to challenge NuVasive's ownership of its Trademarks or attempt or assist others to attempt to register any trademarks, marks or trade names confusingly similar to those of NuVasive. Should NuVasive notify Representative that the use of any Trademarks violates the then in effect Trademark guidelines ("Trademark Guidelines") established by NuVasive, Representative shall bring such use into conformance with the Trademark Guidelines and shall provide to NuVasive a specimen of such conforming use. Notwithstanding the foregoing, NuVasive, at its discretion, may terminate this trademark license when it determines that Representative is using the Trademarks in a manner that violates NuVasive's then in effect Trademark Guidelines. Promptly following termination or expiration of this Agreement for any reason, Representative shall take all actions necessary to transfer and assign to NuVasive all rights, title and interest in and to the Trademarks and goodwill related thereto which Representative may have acquired as a result of this Agreement and shall promptly discontinue all uses of the Trademarks. Representative shall cooperate with NuVasive, at NuVasive's expense, to register the Trademarks in any jurisdiction, including executing appropriate documents and otherwise assisting NuVasive.

9.2 Approval of Representations. All representations of the Trademarks that Representative intends to use (including without limitation in any catalogue or other marketing collateral) shall first be submitted to NuVasive for written approval (which shall not be unreasonably withheld) of design, color, and other details. Representative may not mark the Products or Product packaging materials with its own trademarks, service marks, trade names, or logos or those of any third party ("Other Marks") without the prior written consent of NuVasive. If any of NuVasive's Trademarks are to be

used in conjunction with Other Marks on or in relation to the Products, then the Trademarks shall be presented equally legibly, equally prominently, and of greater size than the other but nevertheless separated from the Other Marks so that the Trademarks and the Other Marks each appears to be a mark in its own right, distinct from one another.

10.    **CONFIDENTIALITY**

10.1 Confidential Information. "Confidential Information" means the proprietary or confidential information of NuVasive which is disclosed to Representative, whether before or after the Effective Date, and (a) if disclosed in writing, is marked as confidential at the time of disclosure, or (b) if disclosed orally or in other intangible form, is identified and treated as confidential at time of disclosure and identified in writing and marked confidential within thirty (30) days after disclosure and relates to products, plans, designs, costs, prices, finances, marketing plans, business opportunities, personnel, research, development, know-how, trade secrets, inventions, blueprints, techniques, processes, algorithms, software programs, schematics, designs, contracts, customer lists, procedures, formulae, patent applications and other information relating to NuVasive's business, services, processes or technology. Confidential Information shall not include information that Representative proves: (i) was known by Representative or was publicly available prior to disclosure by NuVasive to Representative; (ii) became publicly available after disclosure by NuVasive to Representative through no act of Representative; (iii) is hereafter rightfully furnished to Representative by a third party without confidentiality restriction; or (iv) is disclosed with the prior written consent of NuVasive or as expressly authorized under this Agreement.

10.2 Non-Disclosure. Parties shall not, except as otherwise expressly provided herein, use, disclose, disseminate or otherwise allow access to the Confidential Information of the other Party to anyone other than to employees that have a need to know such Confidential Information to implement this Agreement and who are bound by written confidentiality obligations with provisions no less stringent than those contained in this Section 10. Each Party shall prevent unauthorized disclosure or use of the Confidential Information of the other Party. Parties shall execute all documents and otherwise shall take all necessary steps to ensure that each be able to enforce rights hereunder pertaining to Confidential Information. Parties shall be responsible for any breach of this Section 10.2 by employees, contractors or agents.

10.3 Ownership. Representative acknowledges and agrees that NuVasive (or its licensors) owns all rights, title and interests, including intellectual property rights, in and to NuVasive's Confidential Information.

10.4 Notification. If Representative learns or believes that any person who has had access to the Confidential Information of NuVasive has violated or intends to violate this Agreement, Representative shall immediately notify NuVasive and shall cooperate with NuVasive in seeking injunctive or other equitable relief against any such person.

10.5 Exceptions. Representative may disclose the Confidential Information of NuVasive, only if such disclosure is required by law, provided that Representative promptly notifies NuVasive to allow intervention by NuVasive (prior to the disclosure), cooperates with NuVasive to contest or minimize the disclosure (including application for a protective order) at NuVasive's expense and limits such disclosure to the party entitled to receive the Confidential Information and to the scope of the legal requirement. Notwithstanding the foregoing, any Confidential Information disclosed pursuant to this Section 10.5 shall otherwise continue to be treated as Confidential Information hereunder. Notwithstanding anything to the contrary, Representative must obtain the consent of NuVasive prior to disclosure of this Agreement to any third party.

10.6 <u>Confidentiality of Agreement</u>. Representative shall not disclose any term of this Agreement or announce the existence of this Agreement without the prior written consent of NuVasive.

10.7 <u>Reproduction of Confidential Information</u>. Confidential Information shall not be reproduced except as required to implement this Agreement. Any reproduction or derivative of any Confidential Information of NuVasive by Representative shall remain the property of NuVasive and shall contain all confidential or proprietary notices or legends which appear on the original.

10.8 <u>Equitable Remedies</u>. Any unauthorized disclosure or use of Confidential Information by Parties shall be a material breach of this Agreement, and Parties shall be entitled to all remedies available under law or in equity, including without limitation injunctive relief without the need to post a bond therefor.

11. **TERM AND TERMINATION**

11.1 <u>Term</u>. This Agreement shall take effect on the Effective Date and continue in force for a term beginning on the Effective Date and ending on December 31, 2013 ("Term"), unless sooner terminated under the provisions of this Section 11. Representative understands and agrees that following termination for any reason, Representative will be responsible for returning any outstanding inventory items and will be held responsible for missing items.

11.2 <u>Termination for Cause</u>. (i) If either party defaults in the performance of any provision of this Agreement, then the non-defaulting party may give written notice to the defaulting party that if the default is not cured within thirty (30) days the Agreement (except for breaches of Section 2.5, 6.1, 9, 10 or 12.3, in which case such termination shall be immediate upon notice) will be terminated. Such thirty (30) day notice period shall not be required if the breach by its nature cannot by its nature be cured within thirty (30) days.

11.3 <u>Termination At Will</u>. NuVasive shall have the right to terminate this Agreement at will if Representative is deemed to be in "Poor Standing" per Section 6.1. NuVasive shall also have (i) the right to terminate this Agreement at will if Representative breaches a term of this Agreement at any time on or prior to 90 days from the date of this Agreement, and (ii) the termination right described in Sections 6.15 and 11.6.

11.4 <u>Termination for Insolvency</u>. This Agreement may be terminated by either Party without notice (i) due to insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of the other Party, (ii) upon either Party making an assignment for the benefit of creditors, or (iii) upon either Party's dissolution or ceasing to do business.

11.5 <u>Effect of Termination</u>.

(a) <u>Accrued Obligations</u>. Termination shall not relieve either party of obligations incurred prior to the effective date of such termination.

(b) <u>Return of Materials</u>. All trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, samples, literature, sales aids of every kind and NuVasive Confidential Information shall remain the property of NuVasive. Within ten (10) days after the termination of this Agreement, Representative shall prepare all such items in its possession for shipment, as NuVasive may direct, at NuVasive's reasonable expense. Representative shall not make, use, dispose of or retain any copies or

-11-

derivatives of any NuVasive Confidential Information in any form.  Effective upon the termination of this Agreement, Representative shall cease to use all Trademarks. Representative shall comply with all requests from Nuvasive regarding the return of inventory, Products, samples, etc.

(c)     Additional Commissions.  In addition to any commissions already earned by Representative but not yet paid by NuVasive under the terms of Section 3 above, NuVasive shall pay commissions to Representative on all orders from the Territory that were accepted by NuVasive within thirty (30) days after the date of termination of this Agreement and for which NuVasive receives payment within sixty (60) days after the date of termination of this Agreement.

(d)     If NuVasive should terminate this Agreement due to a material breach by Representative of any of their obligations under Section 2.4, 6.13, 6.15, 9 or 10 of this Agreement, then in addition to any other legal or equitable remedies available to NuVasive, NuVasive shall have the right in its sole discretion and for no additional consideration to Representative: to direct Representative to immediately assign to NuVasive all Compliance Agreements or similar agreements described in Section 6.13 above; and to solicit, contract with, or hire any sales representatives of Representative.

11.6 Change of Control.  In the event that NuVasive undergoes a merger, acquisition, consolidation, a sale of all or substantially all of NuVasive's assets, or a majority in voting power of NuVasive's then-outstanding voting securities are acquired by a third party (each a "Change of Control"), NuVasive and the successor in interest or acquiring party (the "Acquiring Party") shall have the right to terminate this Agreement at any point from thirty (30) days before the occurrence such event and up to twelve (12) months after such event (the "Termination Right").

In connection with a Change of Control, Representative shall be entitled to a payment of up to the Stated Percentage (the "Change of Control Payment").  The Change of Control Payment, to the extent paid, shall be paid as follows: one half of the Change of Control Payment shall be paid promptly following the closing of the Change of Control (the "First Payment"), and the remaining portion of the Change of Control Payment shall be paid promptly following the termination of this Agreement pursuant to exercise by NuVasive or the Acquiring Party of the Termination Right (the "Second Payment").

Notwithstanding the foregoing, the Change of Control Payment shall only be required if Representative: (i) is currently engaged as a Representative; (ii) is not in Poor Standing; and (iii) is not in breach of a material provision of this Agreement (including, but not limited to, Section 6.13); provided, however, if NuVasive is not required to make the Change of Control Payment solely due to subsection (ii) of this paragraph, Representative shall be entitled to half of the First Payment and half of the Second Payment (in accordance with the terms set forth in this Section 11.6).

For purposes hereof, the "Stated Percentage" shall equal five percent (5%) of (a) all annualized sales generated by Representative pursuant to this Agreement (and in the Territory) minus (b) $10,600,000 which represents Product orders procured from customers within the Territory for the fiscal year ended December 31, 2012.

11.7 Additional Provisions Regarding Change of Control.  In the event the Second Payment is made, all Compliance Agreements (or similar agreements then in effect) shall be immediately assigned to NuVasive or the Acquiring Party (at NuVasive's discretion) and all other reasonable steps (not to include significant cash payments by Representative) shall be taken by Representative to ensure that

the services of all Representative Affiliates are continued uninterrupted on behalf of the Acquiring Party or NuVasive (as appropriate). Further, NuVasive may at any time Representative is in Poor Standing, upon payment of the Stated Percentage, elect to terminate this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps (not to include significant cash payments by Representative) be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of Nuvasive).

11.8 <u>Survival</u>.  The provisions of Section 5, Section 6.13, Section 8, Section 9 (except for the grant of rights and licenses by NuVasive), and Sections 10-12 shall survive the expiration or termination of this Agreement for any reason.  All other rights and obligations of the parties shall cease upon termination of this Agreement.

12.  **MISCELLANEOUS**

12.1 <u>Governing Law and Jurisdiction</u>.

(a)  Other than with respect to Section 6.13 hereof, this Agreement is entered into in and shall be governed, construed and enforced in all respects solely and exclusively under the laws of the State of California, USA without giving effect to any law which would result in the application of a different body of law.  Any and all suits hereunder shall be brought and resolved solely and exclusively in, and the parties hereby irrevocably consent to the exclusive jurisdiction and proper venue of, the state and federal courts located in the County of San Diego, State of California, USA, and waive any objections thereto based on any ground including improper venue or Forum Non-Conveniens.  The parties agree that any process directed to any of them in any such litigation may be served outside the State of California, USA, with the same force and effect as if the service had been made within the State of California, USA, and that service of process may be effected in accordance with Section 12.2 hereof.  Any decision rendered by such court shall be binding, final and conclusive upon the parties, and a judgment thereon may be entered in, and enforced by, any court having jurisdiction over the party against which an award is entered or the location of such party's assets.

(b)  The prevailing party in any action or suit shall be entitled to recover all costs it incurred in connection therewith, including, without limitation, reasonable attorneys' fees.

(c)  Notwithstanding anything to the contrary herein, each party shall be entitled to seek injunctive or other equitable relief, wherever such party deems appropriate in any jurisdiction, in order to preserve or enforce such party's rights for any breach or threatened breach of the other party of Articles 6, 9, 10 and 12.5.  Each party agrees that: such Sections are necessary and reasonable to protect the other party and its business, any violation of these provisions could cause irreparable injury to the other party for which money damages would be inadequate, and as a result, the other party will be entitled to seek and obtain injunctive relief against the breach or threatened breach of the provisions of such Sections without the necessity of posting bond or proving actual damages.  The parties agree that the remedies set forth in this Section 12.1(c) are in addition to and in no way preclude any other remedies or actions that may be available at law or under this Agreement.

12.2 <u>Notices</u>.  Any notice required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested, addressed to the other party at

-13-

the address shown below or such other address for which such party gives notice hereunder.  Such notice shall be deemed to have been given three (3) days after deposit in the mail.

To NuVasive:       NuVasive, Inc.
                   7475 Lusk Boulevard
                   San Diego, California  92121
                   Attention: Legal Department

To Representative: Absolute Medical LLC
                   213 Villa Di Este Terrace #105
                   Lake Mary, Florida 32746
                   Attention: Greg Soufleris

12.3  Assignment.  Representative may assign or transfer this Agreement or any of its rights and obligations under this Agreement only upon the prior written consent of NuVasive, which shall not be unreasonably denied.

12.4  Property Rights.  Representative agree that NuVasive owns all right, title, and interest in the product lines that include the Products and in all of NuVasive's patents, trademarks, trade names, inventions, copyrights, know-how, and trade secrets relating to the design, manufacture, operation or service of the Products.  The use by Representative of any of these property rights is authorized only for the purposes herein set forth, and upon termination or expiration of this Agreement such authorization shall cease.

12.5  Indemnification.

(a)    Representative shall indemnify, defend and hold harmless NuVasive and its directors, officers, employees and agents from any loss, cost, liability or expense, including attorneys' fees, that NuVasive incurs or becomes liable for arising out of any breach by Representative of any of its representations, warranties and covenants contained herein and any acts or omissions of Representative or its employees and agents relating to the performance of this Agreement.

(b)    NuVasive shall indemnify, defend and hold harmless Representative and its directors, officers, employees and agents from any loss, cost, liability or expense, including attorneys' fees, that Representative incurs or becomes liable for arising out of any breach by NuVasive of any of its representations, warranties and covenants contained herein and any acts or omissions of NuVasive or its employees and agents relating to the performance of this Agreement.

12.6  Severability.  If any provision(s) of this Agreement shall be held invalid, illegal or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall be valid and enforceable and the parties shall negotiate in good faith a substitute, valid and enforceable provision which most nearly effects the parties' intent in entering into this Agreement.

12.7  Modification; Waiver.  This Agreement may not be altered, amended or modified in any way except in a writing signed by both parties.  The failure of a party to enforce any provision of the Agreement shall not be construed to be a waiver of the right of such party to thereafter enforce that provision or any other provision or right.

-14-

12.8 <u>Entire Agreement</u>.  This Agreement and the exhibits hereto represent and constitute the sole, final and entire agreement between the parties, and supersedes and merges all prior negotiations, agreements and understandings, oral or written, with respect to the matters covered by this Agreement, including (without limitation) the prior Exclusive Sales Representative Agreement executed by the Parties.

12.9 <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.  The parties agree that a facsimile may be executed as an original.

12.10    <u>Advice of Counsel</u>.  Each of the parties to this Agreement represent that they have had the opportunity to seek the advice of counsel with respect to the negotiation and execution of this Agreement.  Representative further represents that it has executed this Agreement of its own free will and is not relying on counsel for NuVasive with respect to any portion of this Agreement.

12.11    <u>No Implied Licenses</u>.  Except as explicitly set forth herein, Representative is not granted any explicit or implied licenses in this Agreement.

12.12    <u>Representations and Warranties</u>.

(a)    <u>Corporate Power</u>.  Representative is duly organized and validly existing under the laws of its state of incorporation (as set forth on the first page of this Agreement) and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof.

(b)    <u>Due Authorization</u>. Representative is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder.  The person executing this Agreement on Representative's behalf has been duly authorized to do so by all requisite corporate action.

(c)    <u>Binding Agreement</u>. This Agreement is a legal and valid obligation binding upon the Parties and enforceable in accordance with its terms.  The execution, delivery and performance of this Agreement by the Parties does not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, nor violate any material law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

12.13    <u>Compliance</u>.  Representative agrees to maintain all records required to substantiate compliance with all such laws, regulations, policies, procedures and guidelines and terms of this Agreement for the term of the Agreement plus an additional six years.  Representative shall not in any way disparage NuVasive, its products, or its agents or employees, including, without limitation, taking any action or making any statement the intent or reasonably foreseeable effect of which is to impugn or injure the reputation or goodwill of NuVasive or any of its agents or employees.

This AGREEMENT is entered into and binding upon the Parties as of the Effective Date:

**NUVASIVE, INC.**                                   **ABSOLUTE MEDICAL LLC**

By: _____          By: _____
Matt Link, Executive Vice President,  US Sales        Greg Soufleris

EXHIBIT A
PRODUCTS

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

Products: **All NuVasive Products**

EXHIBIT B
TERRITORY

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

**Territory:**

The following counties in the State of Florida:

| | | |
|---|---|---|
| Flagler | Brevard | Martin |
| Volusia | Osceola | St. Lucie |
| Lake (with the exception of Clermont ambulatory Surgical Center) | Orange | |
| Seminole | Highlands | |
| Palm Beach:  with the exception of the following hospital:  Lake Worth Surgical Center | Indian River | |

The following hospitals in Broward County, Florida:
Advanced Orthopedics
North Broward Medical Center

The following hospital in Miami-Dade County, Florida:
The Gable Surgical Center

The following hospital in Polk County, Florida:
Heart of Florida Regional Medical Center, Davenport, FL

EXHIBIT C
COMMISSIONS

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

Commissions for Exclusive Representatives (stretch amounts paid quarterly):

|  | **2013** |
|---|---|
| Flat commission on all sales up to $10,600,000 (2012 sales in the Territory) | 15% |
| Flat commission on all sales between $10,600,001 and the aggregate Quota Commitment | 18% |
| Additional commission on all incremental sales in excess of Quota Commitment should Distributor achieve aggregate quarterly Quota Commitment but not quarterly Quota Commitment in each product category. | 19% |
| Additional commission on all incremental sales in excess of Quota Commitment should Distributor achieve aggregate quarterly Quota Commitment AND quarterly Quota Commitment in each product category. | 20% |

In addition, upon the achievement in $10,600,000 of Net Sales in the Territory, Representative shall be paid an additional $18,000.

(Above commissions exclude fees/loaner charges, which shall be paid at 20%).

NuVasive reserves the right to introduce new products with different commission structures.

EXHIBIT D
ADDITIONAL COMPENSATION

Within fifteen days of the completion of the milestones set forth below within the timeframe set forth below, such completion to be determined in the reasonable discretion of NuVasive, NuVasive shall pay to Distributor the following amounts.

Within seven (7) days of the Effective Date:

1. $50,000 upon the successful establishment of Distributors legal entity and the execution the Compliance Agreements for Distributor's employees/contractors.

2. $10,000 upon completion of compensation plans for the Distributor sales team.

Within thirty (30) days of the Effective Date:

3. $25,000 for the completion, in collaboration NuVasive's Sales Director, Southeast, of an updated business plan.

4. $35,000 for the completion of comprehensive recruiting, hiring and expansion plan.

Within sixty (60) days of the Effective Date:

5. $50,000 for the establishment of internal infrastructure to support case scheduling, asset management, etc., specifically to include:
   a. IT Infrastructure (iPad implementation, Email System etc.)
   b. Adoption of NuVasive Mobile Charge Sheet and Salesforce.com

6. $50,000 for the successful collaboration and development of a case management and asset management program and associated metrics.

Within ninety (90) days of the Effective Date:

7. $25,000 for the completion of a new distributor training program, such training program to include training on:
   c. Compliance
   d. Sales Administration
   e. Legal
   f. Sales Training
   g. Leadership Development
   h. Hiring and Recruiting

Within one hundred and twenty (120) days of the Effective Date:

8. $55,000 upon the execution of hiring and recruiting plan as set forth in Number 4 above.

-20-

EXHIBIT E
2013 QUOTA COMMITMENT

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

EXHIBIT F

TERMS AND CONDITIONS OF SALE

[see attached]

## TERMS AND CONDITIONS OF SALE

These terms and conditions govern the sale of all products ("Products") by NuVasive®, Inc. ("Seller") to the party issuing an order for Products hereunder ("Buyer") and apply notwithstanding any conflicting, contrary or additional terms and conditions in any purchase order or other document or communication. These terms and conditions constitute the sole, final and entire agreement between Seller and Buyer and supersede all other agreements between them regarding the subject matter hereof. These terms and conditions may only be waived or modified in a written agreement signed by an authorized representative of Seller. Neither Seller's acknowledgement of a purchase order nor Seller's failure to object to conflicting, contrary or additional terms and conditions in a purchase order shall be deemed an acceptance of such terms and conditions or a waiver of the provisions hereof.

1.  Orders and Acceptance.  Orders shall be initiated by Buyer issuing a purchase order to Seller.  Orders shall identify the Products, unit quantities, descriptions, applicable prices and requested delivery dates.  All orders are subject to acceptance by Seller. Accepted orders may not be cancelled except upon Seller's written approval, which may, at Seller's discretion, be subject to Buyer's payment of Seller's reasonable cancellation charges. ORDERS SHALL BE BINDING ONLY UPON BUYER, AND SHALL CEASE TO BE BINDING ONLY IF AND WHEN EXPRESSLY REJECTED BY SELLER.  ONLY ACCEPTED ORDERS SHALL BE BINDING UPON BOTH SELLER AND BUYER.  All prices for Products, including for the use of Loaned Products (defined below), shall be in accordance with Seller's list pricing, unless modified in a written agreement signed by an authorized representative of Seller.

2.  Terms and Method of Payment.  Payments shall be due upon receipt of invoice and shall be made solely in U.S. dollars in immediately available funds.  If payment is not received by Seller within thirty (30) calendar days following the date of invoice, the unpaid balance will accrue interest from the date due until the date paid at a rate of one and one half percent (1.5%) per month, or the maximum rate allowed under applicable law, whichever is less.  If in the judgment of Seller the financial condition of Buyer, at any time, does not justify continuance of production or shipment on the terms of payment specified, Seller may require full or partial payment of any completed delivery prior to delivery of any subsequent orders.

3.  Title and Delivery.
(A) Products shall be delivered FCA (Incoterms 2000) point of shipment.  Title and risk of loss or damage in the Products shall pass to Buyer upon Seller's tender of the Products to a carrier for shipment.  If loss or damage occurs during shipment, Buyer shall not be relieved of its obligation to pay costs of insurance, transportation, import duties, taxes or any other expenses incurred for licenses or clearances required at port of entry and destination.  A security interest in the Products shall be retained by Seller until receipt of payment in full from Buyer. Seller shall use commercially reasonable efforts to meet Buyer's requested delivery schedule.
(B) Seller agrees to provide Buyer with loaned instruments and products ("Loaned Products") for use by Buyer with the Products.  Seller is and shall be at all times the sole owner of the Loaned Products.  Buyer has no right to sell, transfer, assign, pledge or otherwise encumber the Loaned Products without prior written approval by Seller.  Buyer shall bear all risks of loss or damage to the Loaned Products (and all associated costs or expenses) from any cause from the date of delivery to Buyer until returned to Seller, unless such loss or damage results from the negligence of Seller.

4.  Warranty and Remedies.
(A) Seller warrants that: (1) each Product or Loaned Product shall conform to its published specifications upon shipment to Buyer; and (2) for a period of one (1) year from the date of delivery, the software included in any Product will materially conform to Seller's then-current documentation for such software and the media containing such software (but not the software itself) is free from physical defects (the "Limited Warranty").
(B)  EXCEPT FOR THE EXPRESS LIMITED WARRANTY IN SECTION 4(A), TO THE MAXIMUM EXTENT ALLOWABLE UNDER APPLICABLE LAW, SELLER DISCLAIMS ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, STATUTORY OR OTHERWISE (INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE) IN CONNECTION WITH ANY PRODUCT OR LOANED PRODUCT.  Seller assumes no liability for faulty or improper application or use of any Product or Loaned Product or improper use of any Product or Loaned Product in combination with any other products.
(C)  With respect to Products or Loaned Products which do not conform to their published specifications, Seller will repair or, at its option, replace any non-conforming Products or Loaned Products and return the subject or replacement Products or Loaned Products to Buyer without charge.  All Products returned under warranty must be accompanied by a written explanation of the non-conformance. SUCH REPAIR OR REPLACEMENT IS BUYER'S ONLY REMEDY AND SELLER'S ONLY LIABILITY AND OBLIGATION FOR BREACH OF WARRANTY HEREUNDER.
(D)  NOTWITHSTANDING ANYTHING ELSE HEREIN, SELLER WILL NOT BE LIABLE HEREUNDER OR OTHERWISE IN CONNECTION WITH ANY PRODUCT OR LOANED PRODUCTS, UNDER ANY LEGAL OR EQUITABLE THEORY, WHETHER IN CONTRACT, TORT OR OTHERWISE (INCLUDING NEGLIGENCE OR STRICT LIABILITY): (I) FOR ANY AMOUNT EXCEEDING THE AMOUNT PAID BY BUYER TO SELLER FOR THE ORDER GIVING RISE TO SUCH LIABILITY; (II) FOR ANY PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR (III) ANY LOSS OF DATA, LOST PROFITS, LOST OPPORTUNITY OR LOST REVENUE, WHETHER CHARACTERIZED AS DIRECT DAMAGES OR OTHERWISE.

5.  Taxes.  Seller's prices are exclusive of all taxes.  Responsibility for all customs duties, charges, sales tax, value-added tax, and any other taxes imposed by any taxing authority on the sale or use of any of the Products or Loaned Products (excluding any taxes solely on Seller's income) shall be borne solely by Buyer.  If Buyer is tax-exempt, Buyer shall, prior to purchase, furnish Seller with any documents necessary to demonstrate its tax-exempt status.  Providing such documentation, however, does not relieve Buyer of its obligations to pay taxes in this Section 5, if applicable.

6.  Compliance with Law.  Buyer represents, warrants and covenants that, at all times, Buyer's use, distribution, sale, marketing, advertising, import and export of all Products and Loaned Products will comply with all applicable laws, rules, regulations and industry standards of the United States and of any other applicable jurisdiction, anti-kickback laws, physician referral laws, including the U.S. Foreign Corrupt Practices Act and all applicable export laws, restrictions, and regulations of the United States or any applicable foreign government, agency or authority.  Buyer will not export or re-export, or authorize the export or re-export of any Product or Loaned Product, technology or information it obtains or learns from Seller (or any direct product thereof) in violation of any such laws, restrictions or regulations.  Buyer shall obtain and bear all expenses relating to any necessary licenses and/or exemptions with respect to the export from the USA of the Products or Loaned Products, or the import of the Products or Loaned Products to any location in compliance with all applicable laws and regulations.

7.  Intellectual Property Ownership.  Buyer acknowledges that the Products and Loaned Products incorporate technology that are subject to Seller's Intellectual Property Rights, and that such technology is not sold to Buyer and is only licensed to Buyer for use solely as incorporated and/or embedded into the Product or Loaned Product. Other than the foregoing license, Seller or its licensors shall retain all Intellectual Property Rights and interests in and to or underlying the Products or Loaned Products and nothing herein shall be construed to grant Buyer a license of any kind to any Intellectual Property Rights of Seller.  To the maximum extent allowable under applicable law, Buyer agrees that it shall not, directly or indirectly through any third party, reverse engineer, decompile, duplicate or translate any Product or Loaned Product or seek to reveal the trade secret or know how underlying any Product or Loaned Product.  "Intellectual Property" or "Intellectual Property Rights" as used herein collectively means any and all patents, copyrights, trademarks, trade secrets, mask works, moral rights, know-how or any other proprietary right, and any applications for the foregoing, under the laws of the United States, any other jurisdiction, the European Union, or any other bi-lateral or multi-lateral treaty regime.

8. Return/Upgrade Policy. EXCEPT WITH RESPECT TO BIOLOGIC PRODUCTS, Buyer shall be able to return any unused Products for full credit within sixty (60) days of delivery; provided, however, that Buyer will be charged a 30% restocking fee for all unused Products returned after ten (10) days of delivery; provided further, that all returns include a Returns Material Authorization (RMA) number, which can be obtained from NuVasive customer service. Buyer will not be able to return any Products after sixty (60) days of delivery. Any Instrumentation Product purchased by Buyer from Seller may be upgraded for a newer model developed by Seller (if such model was not available at the time of purchase) within three (3) years of the delivery date or the original Instrumentation Product in accordance with the following: (a) for the first year after the delivery date, Buyer shall receive 100% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgraded instrumentation; (b) for the second year after the delivery date, Buyer shall receive 50% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgrade instrumentation; and (c) for the third year after the delivery date, Buyer shall receive 25% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgraded instrumentation.

9. Software Maintenance/Updates. For a period of one (1) year from the date of delivery of a Product containing software, Seller will provide Buyer with software updates and support services. Support services consist of the following: (a) technical support by telephone twenty-four (24) hours a day, year-round, at Seller's support line at 1-877-348-5511 from the United States and at 1-858-909-1800 internationally; and (b) if Buyer reports a software problem to Seller, and Seller confirms that the problem exists in Seller's Product, Seller will use its best efforts to promptly correct or supply a work-around for the error if it substantially degrades the performance of the Product, and to correct other significant errors in future software releases.

10. Discounts and Rebates. Buyer shall disclose any discounts or other reductions in price received under this Agreement as required under Section 1128B(b)(3)(A) of the Social Security Act [42 U.S.C. 1320a-7b(b)(3)(A)] to any state or federal program which provides cost or charge-based reimbursement to Buyer for the Products purchased under this Agreement.

11. Miscellaneous. Failure by Seller to insist upon performance of any term or condition set forth herein shall not be construed as a waiver of such terms and conditions and shall not affect the right of Seller thereafter to enforce each and every term and condition. These terms and conditions and all disputes arising out of or related to these terms and conditions shall be solely and exclusively construed and governed in accordance with the laws of the State of California, USA, without application of any law that would result in the application of a different body of law. The UN Convention on Contracts for the International Sale of Goods is hereby expressly excluded and shall not apply to these terms and conditions. Any and all suits hereunder shall be brought and resolved solely and exclusively in, and the parties hereby irrevocably consent to the exclusive jurisdiction and proper venue of, the state and federal courts located in the County of San Diego, State of California, USA, and waive any objections thereto based on any ground including improper venue or Forum Non-Conveniens. These terms and conditions shall be binding upon and inure to the benefit of the parties, and their successors, and permitted assigns. If one or more provisions in these terms and conditions are ruled entirely or partly invalid or unenforceable by any court or governmental authority of competent jurisdiction, then the remaining portions hereof shall remain valid and the parties shall reform the provision(s) to the minimum extent necessary to render them valid and enforceable in conformity with the parties' intent as manifested herein. Any rights to accrued payments and Sections 2, 4(B), 4(D), 5, 6, 7, and 11 shall survive the expiration of these terms and conditions.

EXHIBIT G

MDMA Code of Conduct on Interactions with Healthcare Providers

## 2013 INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT, made this 13th day of February, 2013, by and between ABSOLUTE MEDICAL LLC, a Florida corporation (hereinafter referred to as "Agent"), whose address is 213 Villa Di Este Terrace #105, Lake Mary, FL 32746 and, **Steve Madsen Pro.** (hereinafter referred to as "Independent Contractor"), whose address is **112 S Hampton Dr., Jupiter, FL 33458**.

### WITNESSETH:

WHEREAS, Agent is in the business of selling surgical and non-surgical spinal products and implants related to spinal surgery, including, but not limited to spinal implants, access instruments, such as retractors, graphing material, biological products, and other products, which are more fully described on Schedule B (the "Products") in the territory set forth in Schedule A attached hereto, hereinafter referred to as "Agent's Territory" by one or more manufacturers who supply the Products to Agent ("Manufacturer");

WHEREAS, Agent desires to engage Independent Contractor to provide the services described in Schedule B (the "Services") and Independent Contractor desires to accept such engagement, all on the terms and conditions set forth herein;

WHEREAS, Independent Contractor seeks to be engaged by Agent as an independent contractor to provide the Services described in Schedule B in the designated territory (set forth in Schedule C)(the "Territory") and earn a commission as set forth in Schedule D for such services; and

WHEREAS, as a material inducement for Agent to enter into this Agreement is Independent Contractor's agreement to be bound by all of the terms and conditions contained herein in particular the provisions of Section 12 below.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto agree as follows:

1.     Relationship of Parties.

(a)     The parties to this Agreement intend that the relationship between them be that of corporation and independent contractor. Independent Contractor is an independent contractor of the Agent. The parties do not intend to create a partnership, joint venture or employer/employee relationship.

(b)     Agent shall not have the right to require Independent Contractor to do anything that would jeopardize the relationship of independent contractor between

1

Initial


EXHIBIT
**B**

Agent and Independent Contractor.  Likewise, Independent Contractor shall not conduct his/her business in any way  which will give rise to an employer/employee relationship between the parties.

(c)     Independent Contractor shall perform the duties described in Schedule B at a location of the Independent Contractor's choosing. Independent Contractor shall be responsible for all costs associated with maintaining that location.

(d)     The Agent shall not require that Independent Contractor work specified hours or days and the Independent Contractor shall set his own schedule. Independent Contractor shall have no fixed hours, no established routines or routes, nor be required to cover the Territory within a specified time frame. Independent Contractor has discretion regarding when and how to perform his or her duties and responsibilities described in Schedule B.

(e)     None of the benefits provided by the Agent to its employees are available to the Independent Contractor, including vacation pay, sick pay, insurance, or retirement benefits.

(f)     Agent shall not withhold any local, state, or federal income tax, social security, or other withholdings required of employees from commissions paid to Independent Contractor.  Independent Contractor shall indemnify and hold Agent harmless against any of the costs specified in this paragraph.

(g)     Independent Contractor is responsible for hiring, paying, and supervising any staff that he or she may hire. Independent Contractor shall ensure that all of his/her employees, agents and independent contractors rendering services hereunder meet the obligations specified herein. The Independent Contractor, his/her employees and agents shall, at all times, exercise complete discretion and independent professional judgment in the performance of the services provided hereunder.  Independent Contractor shall indemnify and hold Agent harmless against any costs or expenses that are incurred by Agent as a result of any actions of Independent Contractor's employees, agents and independent contractors.

(h)     Independent Contractor agrees to be solely and entirely responsible for his/her acts and for the acts of his/her employees and agents, and for paying any taxes and insurances required by law.  Independent Contractor shall indemnify and hold Agent harmless against same.

(i)     Independent Contractor may work for other entities while engaged as Agent's independent contractor so long as that work does not interfere with Independent Contractor's performance of the duties described in Schedule B and does not conflict with Section 12 below.

2.     Independent Contractor.  Agent hereby engages Independent Contractor as an independent contractor to provide the Services in the territory described in Schedule C

2

Initial_____

attached hereto and made a part hereof (the "Territory").  The products that are included in the product groups sold by the independent contractors employed by Agent are listed on Schedule B and are sold by the independent contractors and field support representatives exclusive of any other products whatsoever.  Independent Contractor hereby accepts such engagement, all subject to the conditions, limitations and provisions set forth in this Agreement.  Agent reserves the right to review and modify from time to time the Territory and the duties of engagement, and limit, expand or otherwise change the Territory and the duties of engagement.

3.      Term of Agreement.  This Agreement shall commence on the Effective Date and shall continue for one (1) year from the Effective Date.  Unless either party provides written notice of not less than thirty (30) days from expiration of the Term that it wishes to terminate this Agreement, then this Agreement shall automatically renew for a period of one (1) year.  The term shall thereafter automatically renew for successive one (1) year periods unless thirty (30) days notice is provided.  This Agreement may also be earlier terminated by either party in accordance with Section 9 hereof.

4.      Covenants of Independent Contractor.  Independent Contractor covenants to Agent that at all times during the term of this Agreement:

        (a)     Independent Contractor shall use his/her best efforts to work with the Independent Contractor's and field support representatives to advertise, promote and sell the Products and to develop, maintain and regularly increase a substantial volume of sales within the Territory to existing and new customers in order to achieve maximum market penetration.

        (b)     Independent Contractor shall distribute only literature, brochures and other promotional materials (collectively, the "Promotional Materials") which have been provided to Independent Contractor by Agent or by Manufacturer and shall distribute Promotional Materials only to Independent Contractors of the Agent, field support representatives, existing customers and potential customers of the Products.

        (c)     Except as set forth in Promotional Materials or on Products provided to Independent Contractor, he/she shall not use Manufacturer(s)' name, trademarks, service marks or logos under any circumstances, unless Independent Contractor obtains prior written approval from Agent.  Nothing contained in this Agreement is intended to give Independent Contractor any license to use any of the foregoing.

        (d)     Independent Contractor shall store all of the Products delivered to him/her at the location set forth on the first page of this Agreement or at such other locations within Independent Contractor's Territory approved by Agent in writing in advance. Independent Contractor shall use his/her best efforts to safeguard all Products in his/her possession or control and to protect such Products from damage and theft, as well as maintain an inventory of Products in Independent Contractor's possession.

3

Initial_____

(e)      Independent Contractor shall not: (i) knowingly sell or deliver, directly or indirectly, any Products for use or resale outside Independent Contractor's Territory; (ii) solicit orders for Products from customers outside Independent Contractor's Territory through any means; or (iii) establish an office outside Independent Contractor's Territory for sale of the Products.

(f)      Independent Contractor shall not make representations to customers or potential customers or third parties that would be detrimental to either Agent or Manufacturer.

(g)      Independent Contractor shall not alter, in any way, the original packages of any Products or repackage any Products or ship any Products in damaged packages which could affect the sterility or fitness for use of the Product.  Should Independent Contractor come into possession of any Products which need to be repackaged, he/she shall return same to Manufacturer with notice to Agent.

(h)      Upon advance notice and during normal business hours Independent Contractor shall permit Agent to visit and inspect Independent Contractor's premises and inspect the Products in his/her possession or control.

(i)      Independent Contractor shall participate, assist and cooperate with Agent in the collection of customer accounts receivable as may be requested by Agent from time to time.

(j)      Independent Contractor shall not encumber, rent, sell, create a security interest in or otherwise transfer or dispose of any Products in Independent Contractor's possession or control.

(k)      Independent Contractor shall execute, alone or with Agent, any UCC financing statement or other documents requested by Agent to protect the ownership interests of Manufacturer in the Products against the interests of third persons.

(l)      Independent Contractor shall not make any false or misleading representations or statements to any person with respect to Agent, Manufacturer or the Products.  Furthermore, Independent Contractor shall not make any express or implied warranties to any customers or prospective customers with respect to the Products which are in any way inconsistent with the Promotional Materials.   Furthermore, Independent Contractor shall not make any express or implied warranties to customers or potential customers or any other party regarding the Products which are not included in Manufacturer's then current printed materials without Agent's prior written consent in each instance.

(m)      Independent Contractor shall not enter into any agreement for or on behalf of Agent or Manufacturer, create any obligation on behalf of Agent or Manufacturer, or otherwise attempt to bind or obligate Agent or Manufacturer in any manner.

4

Initial_____

(n)     Independent Contractor shall comply with all of the terms and conditions of engagement, and all of Agent's instructions and requirements which may be stated by Agent, orally or in writing, from time to time.

5.     Covenants of Agent.  Agent covenants to Independent Contractor that at all times during the term of this Agreement:

(a)     In the event of limited product availability, Agent shall distribute Products to Agent's independent contractors according to Agent's sole discretion.

(b)     Agent shall make reasonable efforts to fill each order of Independent Contractor for Products that Agent approves, but shall not be liable in any respect for a failure to ship or for a delay in shipment of Products.

6.     Business Plan.  From time to time while Independent Contractor is serving as an independent contractor for Agent pursuant hereto, Agent may require that Independent Contractor submit to Agent a "Business Plan" covering a period of time between six (6) months to one (1) year.  The Business Plan shall include a sales forecast by product groups, a list of target accounts, a description of Independent Contractor's proposed marketing and sales strategy and other relevant data as may be requested by Agent. Based on such Business Plan and Independent Contractor's prior performance, Independent Contractor and Agent shall establish a sales goal for Independent Contractor for the period covered by the Business Plan. It is entirely within Independent Contractor's discretion how to reach his or her sales goal.

7.     Orders, Commissions, Benefits, Delivery and Expenses.

(a)     Independent Contractor hereby acknowledges that title to any Products delivered to Independent Contractor pursuant to this Agreement shall remain in Manufacturer until sold to a customer in the ordinary course of business. Notwithstanding the foregoing, Independent Contractor shall be liable for all lost or damaged inventory.

(b)     Provided Independent Contractor is not in breach of any obligations under this Agreement, Agent shall pay to Independent Contractor the commissions described in Schedule D attached hereto which are subject to modification upon thirty days notice to Independent Contractor.

(c)     Independent Contractor shall not be entitled to receive any other compensation or consideration from Agent for the performance of its duties hereunder.

(d)     Agent, upon approval from Manufacturer, shall establish prices for Products to be sold in Agent's Territory.

(e)     Independent Contractor shall obtain the prior written approval of Agent with respect to the credit rating of a new customer prior to the shipment of any Products

5

Initial_____

to such customer.   Upon receipt of verbal instructions from Agent, which shall be confirmed in writing, Independent Contractor shall cease delivery of any Products to a customer which has failed to make payments to Manufacturer in accordance with Manufacturer's billing requirements at such time.

(f)     Independent Contractor shall bear all costs and expenses of conducting his/her business relating to the sale of the Products in Independent Contractor's Territory, including but not limited to, travel, sales expenses and entertainment.

8.     Changes to Products, Parts and Policies.    Unless otherwise provided by applicable law:

(a)     Manufacturer may at any time modify or discontinue selling any Product and Independent Contractor shall have no claim against Agent or Manufacturer for failure to furnish Products of the type previously sold.

(b)     Manufacturer may at any time change warranty or service policies without incurring any liability to Independent Contractor.

9.     Termination of Agreement.

(a)     This Agreement may be terminated by either party at any time, with or without cause, by providing not less than fifteen (15) days written notice to the other party.  This Agreement may otherwise be terminated by either party if the other party:

(i)     commits a breach of any provision of this Agreement, or a breach of any provision of any other agreement or written obligation heretofore or hereafter in effect between Agent and Independent Contractor (collectively, the "Other Agreements"), which is not cured within five (5) days after receipt of written notice thereof by the other party;

(ii)     makes a material false representation, report or claim in connection with the performance of their obligations under this Agreement or any Other Agreement;

(iii)     ceases to carry on business in the ordinary course;

(iv)     violates any provision of Section 12 of this Agreement;

(v)     becomes insolvent, liquidates, is adjudicated a bankrupt, files a bankruptcy petition, makes an assignment for the benefit of creditors, invokes the provisions of any law for the relief of debtors, or files or has filed against them any similar proceeding; or

(vi)     commits any act or omission by Independent Contractor or any employee, independent contractor or other agent of Independent Contractor that might be construed as a violation of the federal Stark law, federal false claims act, federal anti-kickback statute, federal Health

6

Insurance and Portability Act provisions, federal civil money penalties statute, laws, rules and regulations pertaining to Medicare or Medicaid, similar state laws or of criminal acts of a violent nature or relating to the practice of medicine.

A termination based upon subsections (ii)-(vi) above shall be effective immediately.

(b)    Upon termination of this Agreement for any reason, with or without cause, Independent Contractor shall immediately deliver to Agent all price lists, customer lists, catalogues, literature and any other dated and printed materials relating to the sale of the Products in Independent Contractor's possession, custody or control, on the effective date of the termination, including but not limited to, Promotional Materials.

(c)    Upon termination of this Agreement for any reason, with or without cause, Independent Contractor shall, within ten (10) days after the Termination Date, deliver as directed by Agent all Products then in his/her possession or control and a list of all then currently scheduled surgeries.   In addition, Independent Contractor shall promptly supply Agent with a current list of the locations of any Products not in Independent Contractor's possession or control.   Agent shall have the right to deduct from any compensation due to Independent Contractor: (i) the replacement cost of any Products previously delivered to Independent Contractor which have not been either sold to a customer or delivered to Agent in accordance herewith; (ii) the replacement cost of any Products returned to Agent which are deemed unacceptable by reason of their damaged condition; and (iii) the amount of any repackaging and refinishing charges.   If the amount owed by Independent Contractor to Agent exceeds the commissions owed by Agent to Independent Contractor, then Independent Contractor shall be liable for the deficiency.   Such amount shall be due to Agent within ten (10) days after the termination of this Agreement.   Failure to remit said amount shall entitle Agent to default interest on the outstanding amounts at the maximum allowable rate.

(d)    The termination of this Agreement shall not relieve a party from any obligations or liability to the other party incurred prior to termination nor shall a termination of this Agreement by a party be in lieu of any other remedies which may be available to such party under this Agreement, at law or in equity.

(e)    For calculation of compensation due as of the date of termination, Independent Contractor shall be entitled to compensation only for any Products surgically implanted prior to the effective date of termination.   Independent Contractor shall not receive any compensation for Products surgically implanted after termination. Any draws payable to Independent Contractor shall cease upon termination, if applicable.

10.    <u>Returns</u>.   Product returns during the term of this Agreement, other than in accordance with Section 8 hereof, must be approved by Manufacturer in advance in accordance with Manufacturer's then current "Return Goods Policy".

7

Initial_____

11.   _Force Majeure._  Agent shall not be liable to Independent Contractor on account of any failure or delay in performing its obligations under this Agreement, including without limitation, any failure or delay in delivering the Products to Independent Contractor or his/her customers, where such failure or delay results, directly or indirectly, wholly or partially, from any cause beyond its control, including by way of illustration but not by way of limitation, any acts of God, acts of governments, curtailment of utility services, floods, fires, shortages of material, war, insurrection, strikes or other labor difficulties, production difficulties in Manufacturer's factories or those of its suppliers, or delays or failure of transportation facilities.

12.   _Confidentiality, Noncompetition; Competitive Products._

(a)   (i)   During the term of this Agreement, Independent Contractor shall not manufacture, sell, market, attend surgeries using, or deliver any product, or participate in any manner in such activities, whether personally or through a fictitious name, corporation, partnership or other legal entity if such product is in competition with any product manufactured, sold, marketed or distributed for sale by Manufacturer; nor shall Independent Contractor manufacture, sell, market, or deliver any non-competitive products that are used in spinal surgery.  For purposes of this Section 12, a product is "competitive" if it is technologically feasible to use in place of or as a substitute for another, irrespective of the nature or extent of activity of such products in the existing market.

(ii)   During the term of this Agreement and for a period of one (1) year following the effective date of termination under Section 9 or Section 3 of this Agreement for any reason whatsoever (the "Termination Date"), Independent Contractor shall not directly or indirectly, as an individual, proprietor, partner, venturer, stockholder, director, officer, consultant, employee, independent contractor, agent or in any other capacity:

(1)   Engage or participate, directly or indirectly, in the sale, manufacture, or marketing of any spinal surgical devices offered by Agent or any of Agent's Manufacturer(s) (except for sales made on behalf of Agent pursuant to this Agreement during its term;

(2)   (a) work for, provide services to, engage in or assist others to engage in or have interest in any business which competes with the Agent and/or Manufacturer(s); (b) otherwise engage in any activities of the type in which he/she is engaged on behalf of Agent including, without limitation, the representation of any manufacturer, seller, or marketer of medical device products that are the same as or that are competitive with any Manufacturers' products or; (c) enter into any compensation arrangement, sale of his/her business, distribution of assets, or any other transaction relating to the manufacture, distribution, promotion or sale of products which directly or indirectly compete with any Manufacturers' product.  The territorial scope of this restriction shall be limited to the geographical county(ies) covered by Independent Contractor and in which Independent Contractor solicited customers, covered cases, or

8

sold any product on behalf of Agent at any time during the twelve (12) month period preceding the end of his/her engagement with Agent.

(3) solicit, serve, divert, sell to, or accept business from or attend surgeries of or assist any person in so soliciting, serving, selling to, diverting or accepting business from or attending surgeries of any "Protected Customer" of the Ageny or in any way attempt to influence or persuade such customers to alter or terminate their business relationship with Agent or to refrain from purchasing any products offered by Agent.   The term "Protected Customer" refers to any physician, hospital or medical facility that purchased or utilized in surgery any Product or any other product sold or distributed by Agent and/or a Manufacturer and/or their employees, representatives and independent contractors during the twelve month period preceding termination of his/her engagement with Agent. ; or

(1) Solicit the employment of, hire, retain or engage, or cause any person or entity with which Independent Contractor is affiliated to solicit the employment of, hire, retain or engage, any employee, independent contractor or other agent of Agent or Manufacturer who had a relationship with Agent or Manufacturer at any time during the term of this Agreement.   This restriction shall also apply to employees, independent contractors and other agents of Independent Contractor who have or had a relationship with Independent Contractor any time during the term of this Agreement which Agent or Manufacturer  employs or retains during the term of this Agreement and within one month of its termination.

(b) (i) During the term hereof and after the termination of this Agreement for any reason whatsoever, Independent Contractor shall not at any time directly or indirectly disclose to any individual, corporation, partnership or other entity any "confidential information" (as hereinafter defined) or trade secrets of or relating to Agent or Manufacturer.

(ii) For purposes of this Agreement, "confidential information" means information disclosed or known to Independent Contractor or as a consequence of or through the performance of his/her obligations under this Agreement (including information conceived, originated, discovered or developed by Independent Contractor), not generally known in the industry, about Agent's or Manufacturer's business, processes, apparatus, products, research, research programs, customers, pricing, financial data and business plans, and shall include the list of Agent's customers and their contact information (address and telephone numbers).

(c) During the term of Independent Contractor's service to the Agent, Independent Contractor shall not, directly or indirectly on such person's own behalf or as an employee, independent contractor, agent, partner, owner, officer, director of any person or entity or any other capacity, employ, retain or contract with any person or entity who directly or indirectly: (i) sells, offers for sale, promotes, distributes, represents, receives or solicits orders for or attends surgeries utilizing any Competitive Products; or (ii) accepts compensation of any kind from any person or entity providing or

9

Initial_____

engaging in the sale, promotion, distribution or representation of any Competitive Products. Furthermore, Independent Contractor shall not directly or indirectly represent any Competitive Products without the Agent's written consent.

(d)     Independent Contractor recognizes and acknowledges that the limitations set forth in this Section 12 are properly required for the adequate protection and benefit of the business of Agent, and that Agent will be irreparably harmed by the breach of this Section 12. In addition to any other available remedies, Agent shall have the right to have the provisions of this Section 12 enforced by temporary or permanent injunction in a court of competent jurisdiction.

(e)     Independent Contractor agrees that in the event that any of the provisions of this Section 12 are found by a court of competent jurisdiction to exceed the time and geographic limitations enforceable under applicable law, such provisions shall be automatically reformed to establish the maximum time or geographic limitations permitted by law, or, if not capable of such reformation deemed null and void. Moreover, the parties agree that the durational restrictions contained in these covenants shall be tolled during any period of violation.

(f)     In the event that Independent Contractor desires to be released from the restrictions contained in Sections A(ii) (1) – (3), he/she may pay Agent the sum of three times the sum Agent has received as a result of Independent Contractor's sale of Products during the twelve month period immediately preceding termination of the Agreement.

The terms and conditions of this Section 12 shall survive the expiration or termination of this Agreement.

13.   Indemnification. Each of Agent and Independent Contractor (the "indemnitor") shall indemnify, defend and hold the other harmless from and against any liability, loss, costs, expenses (including without limitation attorney's fees and costs) or damages howsoever caused by reason of any injury (whether to body, property, or personal or business character or reputation) sustained by any person or to property, by reason of any breach of this Agreement, neglect, default, or omission by the indemnitor or its agents, employees or other representatives.

14.   Damages. Agent shall not be liable for any incidental, consequential, special or punitive damages for a failure to fill an order, delay in shipment or delivery, or any other act or omission.

15.   Entire Agreement. This Agreement constitutes the entire Agreement between the parties relating to the matters covered by this Agreement and supersedes all prior agreements, whether written or oral. No modifications or waiver of any part of this Agreement shall be binding upon either party unless in writing executed by both parties.

Initial_____

16.    <u>Severability</u>.   If any term or provision of this Agreement shall be determined invalid or unenforceable to any extent or in any application, then the remainder of this Agreement and of such term or provision except to such extent or in such application, shall not be affected thereby, and each and every term and provision of this Agreement shall be enforced to the fullest extent and in the broadest application permitted by law. Further pertaining to the restrictions contained in Section 12 hereof, while said restrictions are considered by the parties hereto to be reasonable in all circumstances, it is recognized that restrictions of the nature set forth herein may fail for reasons unforeseen and accordingly it is hereby agreed and declared that if any of such restrictions shall be deemed or adjudged to be void or voidable as going beyond what is reasonable in all the circumstances, for the protection of the Agent's business, then such restrictions shall not thereby be terminated, but shall be deemed amended to the extent required to render such restrictions valid and enforceable.

17.    <u>Notice</u>.   Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by pre-paid certified mail, return receipt requested or by Federal Express or other similar overnight delivery service providing proof of delivery, to the other party at the address set forth on the first page of this Agreement.  All notices shall be effective upon mailing as set forth above.

18.    <u>Governing Law, Jurisdiction</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. Any action or proceeding shall be brought in the courts of Broward County, Florida.

19.    <u>Headings</u>.   The headings in the Sections of this Agreement are inserted for convenience only and shall not constitute a part hereof.

20.    <u>Customer Goodwill</u>.   I agree that a portion of the consideration to be provided by Agent under this agreement is in exchange for any goodwill I may currently have with physicians, hospitals and other medical providers and their staff and hereby transfer that goodwill to Agent for its future benefit.

21.    <u>Binding Nature</u>.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, representatives and permitted assigns.  Independent Contractor shall not assign this Agreement or any portion thereof without the express written permission of Agent.

22.    <u>Construction</u>.   The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

23.    <u>Further Assurances</u>.   Each of the parties hereto shall execute any and all further or additional instruments or documents as the other party may reasonably request in order to give effect to the agreements contained herein.

11

Initial_____

24.   Prevailing Party Attorneys' Fees.   The prevailing party in any action or proceeding brought by either party relating to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the other, including costs and fees on appeal.

25.   Individual Obligor.   Agent recognizes that Independent Contractor may do business via a corporation or other business entity. Agent, however, is, in part, contracting for the specific services of the individual executing this Agreement. Accordingly, to the extent that the Independent Contractor is identified as a business entity in the opening paragraph of this Agreement, by executing this Agreement, the individual signatory confirms that he is also individually bound by all of its terms and conditions.

IN WITNESS WHEREOF the parties hereto have set their hands the day and year first above written.

ABSOLUTE MEDICAL LLC                    INDEPENDENT CONTRACTOR


By: _____       _____

GREG SOUFLERIS, Principal Agent         Print Name: _____
                                        Individually and on behalf of Independent
                                        Contractor

12

Initial_____

## SCHEDULE A

**Agent's Territory**

Volusia

Orange

Seminole

Lake

Osceola

Brevard

Indian River

St. Lucie

Okeechobee

Highland

Martin

Palm Beach

North Broward

13

Initial_____

## SCHEDULE B

### [Services and Products]

<u>INDEPENDENT CONTRACTOR'S SERVICES:</u>

<u>SALES REPRESENTATIVE:</u>

The FSR is responsible for providing coverage for all surgeries in an assigned geography. Coverage includes but is not limited to coordinating scheduling, ordering and delivering inventory, in-servicing hospital staff and surgeons on products, intra-operative product technical support, delivering accurate charge sheets and cleaning and pick-up of inventory. An FSR is expected to represent the Agent in a professional manner and to be regarded as an asset by the surgical and nursing staff.

The SR is responsible for the duties described above for an FSR, and, in addition, the SR will vigorously pursue the sale of products in a defined geography. Sales duties will include but are not limited to sales forecasting, geography landscaping, prospecting, product presentation and business requesting. The SR will track purchase orders and invoices for the Agent as well as

<u>PRODUCTS:</u>

Spinal surgical products including but not limited to spinal implants, biologics, bone cement, allograft, neurophysiological monitoring equipment, disposables, hemostasis products, surgical instruments i.e. retractors, hand instruments etc.

14

Initial_____

## SCHEDULE D

## [Commissions]

## 2013 Compensation Plan

- **$5,500 per month**

16

Initial_____

24.   Prevailing Party Attorneys' Fees.   The prevailing party in any action or proceeding brought by either party relating to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the other, including costs and fees on appeal.

25.   Individual Obligor.   Agent recognizes that Independent Contractor may do business via a corporation or other business entity. Agent, however, is, in part, contracting for the specific services of the individual executing this Agreement. Accordingly, to the extent that the Independent Contractor is identified as a business entity in the opening paragraph of this Agreement, by executing this Agreement, the individual signatory confirms that he is also individually bound by all of its terms and conditions.

IN WITNESS WHEREOF the parties hereto have set their hands the day and year first above written.

ABSOLUTE MEDICAL LLC                      INDEPENDENT CONTRACTOR

By: _____                      _____

GREG SOUFLERIS, Principal Agent           Print Name: _DAVE HAWLEY_
                                          Individually and on behalf of Independent
                                          Contractor

12

Initial _DH_

EXHIBIT
C

24.     <u>Prevailing Party Attorneys' Fees</u>.     The prevailing party in any action or proceeding brought by either party relating to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the other, including costs and fees on appeal.

25.     <u>Individual Obligor</u>.   Agent recognizes that Independent Contractor may do business via a corporation or other business entity. Agent, however, is, in part, contracting for the specific services of the individual executing this Agreement. Accordingly, to the extent that the Independent Contractor is identified as a business entity in the opening paragraph of this Agreement, by executing this Agreement, the individual signatory confirms that he is also individually bound by all of its terms and conditions.

IN WITNESS WHEREOF the parties hereto have set their hands the day and year first above written.

ABSOLUTE MEDICAL LLC                    INDEPENDENT CONTRACTOR

By: _____            _____

GREG SOUFLERIS, Principal Agent         Print Name: R/AN MILLER
                                        Individually and on behalf of Independent
                                        Contractor

12

Initial_____

EXHIBIT
D