# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| NUVASIVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 6:17-cv-2206-Orl-41GJK |
| | ) | |
| ABSOLUTE MEDICAL, LLC, ABSOLUTE | ) | |
| MEDICAL SYSTEMS, LLC, GREG | ) | INJUNCTIVE RELIEF SOUGHT |
| SOUFLERIS, DAVE HAWLEY, and RYAN | ) | |
| MILLER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Through its attorneys of record, and for its First Amended Complaint for Injunctive Relief and Damages against Absolute Medical, LLC ("Absolute Medical"), Absolute Medical Systems, LLC ("AMS"), Greg Soufleris ("Soufleris"), Dave Hawley ("Hawley"), and Ryan Miller ("Miller"), Plaintiff, NuVasive, Inc. ("NuVasive"), states that:

## NATURE OF ACTION

1.  Defendants—an exclusive distributor of NuVasive's products (Absolute Medical), that exclusive distributor's successor in interest (AMS), the owner of those distributors (Soufleris), and two of the distributors' sales representatives (Hawley and Miller)—are unfairly competing with NuVasive.

2.  The exclusive distributor (Absolute Medical) breached numerous contractual obligations imposed on it by, without limitation:

   a.  attempting to terminate the contract between it and NuVasive without cause;

b.  failing to maintain sufficient personnel to service its sales territory;

c.  failing to inform NuVasive that it is distributing competitive products;

d.  failing to comply with its reasonable non-compete and non-solicit obligations; and

e.  failing to ensure that its former sales representatives comply with their reasonable non-compete and non-solicit obligations.

3.      In an attempt to avoid the exclusive distributor's contractual obligations, its owner (Soufleris)—who is actively seeking to convert NuVasive's business to one of its direct competitors and is personally liable for the exclusive distributor's contractual breaches and his own wrongful acts—formed the exclusive distributor's successor in interest (AMS), transferred the exclusive distributor's assets to the successor in interest and/or other entities he controls, and dissolved the exclusive distributor.

4.      The exclusive distributor's sales representatives (Hawley and Miller) are now affiliated with the exclusive distributor's successor in interest.  They are selling products manufactured by one of NuVasive's competitors to the same surgeons they serviced on behalf of the exclusive distributor.

5.      NuVasive asks this Court to: (a) issue temporary, preliminary, and permanent injunctions which require the exclusive distributor and its successor in interest to comply with the contractual obligations imposed on them by the exclusive distributor's contract with NuVasive; (b) issue temporary, preliminary, and permanent injunctions which require the sales representatives to comply with their contractual obligations; (c) award it damages against the exclusive distributor's successor in interest, the distributors' owner and sales

representatives; and (d) transfer its claims for damages against the exclusive distributor to binding arbitration in San Diego, California.

## THE PARTIES

6.      NuVasive is an innovative medical company that focuses on products and processes that treat spinal disease.  It is a citizen of Delaware and California.  It is incorporated under the laws of Delaware, and maintains its principal place of business in San Diego, California.

7.      Absolute Medical is a single-member Florida limited liability company. Soufleris, a citizen of Florida, is Absolute Medical's sole member.  Thus, Absolute Medical is a citizen of Florida that maintains its principal place of business in Heathrow, Florida. Absolute Medical's latest filings with the Florida Secretary of State identify the address of its principal office as 382 Devon Place, Heathrow, Florida, which was Soufleris' residence until spring 2017.

8.      The relationship between NuVasive and Absolute Medical is governed by the January 1, 2017 Exclusive Sales Representative Agreement as amended by the July 1, 2017 Territory Transition Agreement (collectively, the "Agreement").  NuVasive attaches a copy of the Agreement as **Exhibit 1**.

9.      Absolute Medical is contractually prohibited from, among other things, distributing products used to treat spinal disease that are not designed, manufactured, and marketed by NuVasive without obtaining NuVasive's written consent to do so.

10.     Soufleris utilized his former residence at 382 Devon Place in Heathrow, Florida, as the principal address for the companies he owns and/or controls until he sold that

property on or about March 31, 2017.  He then purchased a one-bedroom condominium located at 8901 Lee Vista Blvd., #3003, in Orlando, Florida, on or about September 16, 2017, and now utilizes that location as the principal address of his companies including, without limitation, AMS, The Absolute Group, Inc., Absolute Ortho Inc., and Blackfin Funds, Inc.

11.     Upon information and belief, Absolute Medical conducted business out of 8901 Lee Vista Boulevard from the time Soufleris vacated 382 Devon Place until he dissolved it in February 2018.

12.     On November 30, 2017, Soufleris formed AMS, which is a distributor of products used to treat spinal disease that are designed, manufactured, and marketed by, without limitation, NuVasive's competitor, Alphatec Spine, Inc. ("Alphatec").

13.     AMS is a single-member Florida limited liability company.  Soufleris, a citizen of Florida, is Absolute Medical's sole member, making AMS a citizen of Florida.  Its filings with the Florida Secretary of State identify its principal place of business as 8901 Lee Vista Blvd., #3003, Orlando, Florida.

14.     Soufleris formed AMS to avoid certain non-competition and non-solicitation obligations that Absolute Medical owes to NuVasive.

15.     Absolute Medical was solvent when it stopped conducting business.  Upon information and belief, as part of the process of dissolving Absolute Medical, Soufleris transferred significant amounts of money from Absolute Medical's accounts into other businesses, including, without limitation, AMS.

## AMS IS ABSOLUTE MEDICAL'S SUCCESSOR IN INTEREST

16.     Soufleris is a citizen of the State of Florida who resides at 10525 Cromwell

4

Grove Terrace, Orlando, Florida 32827.  He is the sole member, president, and registered agent of Absolute Medical and AMS.

17.     Soufleris exercises complete control and dominion over Absolute Medical, AMS, and other companies.  In fact, he is the alter ego of those entities.

18.     Soufleris utilizes the same email address (gsoufleris@absolute-med.com) and telephone number (954-868-4492) in his work for AMS that he used for Absolute Medical.

19.     Hawley was a sales representative for Absolute Medical who is now a sales representative for AMS.  He is a citizen of the State of Florida who resides at 3004 Sherwood Road, Orlando, Florida.

20.     Hawley utilizes the same email address (dhawley@absolute-med.com) and telephone number (941-650-8629) in his work for AMS that he used while affiliated with Absolute Medical.

21.     Miller was a sales representative for Absolute Medical who is now a sales representative for AMS.  He is a citizen of the State of Florida who, upon information and belief, resides at 507 South Hyer Avenue, Orlando, Florida.

22.     Miller utilizes the same email address (rmiller@absolute-med.com) and telephone number in his work for AMS that he used while affiliated with Absolute Medical.

23.     Soufleris, Hawley, and Miller now sell products on AMS' behalf that compete with NuVasive's products to the same customers they sold NuVasive's products on Absolute Medical's behalf.

24.     Absolute Medical's executive administrator, Daneri Edelson, now performs a similar role for AMS.

## JURISDICTION, VENUE, AND GOVERNING LAW

25.     This Court has original jurisdiction of this case under 28 U.S.C. § 1332 because this is a civil action between citizens of different states in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

26.     Venue for NuVasive's request for equitable relief is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391 as: (a) all Defendants reside in this judicial district; and (b) a substantial part of the events or omissions giving rise to the claim occurred in this district.

27.     Paragraph 12.01 of the Agreement and paragraph 13 of the Transition Agreement provide that they "shall be governed by and construed in accordance with the laws of the State of Delaware, without giving any effect to the choice of law principles thereunder."

28.     Paragraph 12.02 of the Agreement and paragraph 13 of the Transition Agreement require NuVasive and Absolute Medical to submit all disputes to binding arbitration in San Diego, California, other than requests for injunctive or other equitable relief which may proceed pending arbitration.

29.     Neither the Agreement nor the Transition Agreement requires NuVasive to submit its claims against AMS, Soufleris, Hawley, or Miller to arbitration.

## ALLEGATIONS RELATING TO ALL COUNTS

**A.     NuVasive's Business**

30.     NuVasive markets its products through its exclusive sales force which consists of directly-employed personnel and exclusive sales agents.  NuVasive invests substantial

funds into providing this sales force with extraordinary, specialized, comprehensive, and industry-leading training. This training supplies NuVasive's sales force with a deep understanding of NuVasive's products, methodology, trade secrets, and other valuable confidential or proprietary information.

31.     NuVasive's investments in its sales force allows it to favorably represent the company and create goodwill with potential and existing NuVasive customers. This goodwill, arising from the substantial customer relationships developed between NuVasive's sales force and its customers, belongs to NuVasive.

**B.     Absolute Medical's Contractual Obligations to NuVasive**

32.     Absolute Medical became an exclusive distributor of NuVasive's products on January 1, 2013. At that time, its relationship with NuVasive was governed by the February 14, 2013 Exclusive Sales Representative Agreement (the "2013 Agreement"). NuVasive attaches a copy of the 2013 Agreement as **Exhibit 2**.

33.     Absolute Medical's principal place of business was 213 Villa Di Este Terrace, #105, Lake Mary, Florida, when it entered into the 2013 Agreement. This address was also Soufleris' residence at that time.

34.     Section 6.13 of the 2013 Agreement required Absolute Medical's sales representatives including, without limitation, Hawley and Miller, to sign "Compliance Agreements" which contain confidentiality, non-solicitation, and non-competition obligations. Absolute Medical complied with this obligation by requiring Hawley and Miller (and others) to sign 2013 Independent Contractor Agreements (the "2013 ICAs"). NuVasive

attaches an exemplar copy of the 2013 ICA and copies of Hawley's and Miller's signature pages to their 2013 ICAs as collective **Exhibit 3**.

35.     Section 12 of the 2013 ICAs contains Hawley's and Miller's non-solicitation and non-competition obligations.  These obligations are reasonable and enforceable as their temporal restriction is only one year and their geographic restriction is limited to the counties in which they provided services to Absolute Medical.

36.     Neither Absolute Medical nor Hawley or Miller terminated the 2013 ICAs in accordance with their terms and conditions.  Accordingly, Hawley's and Miller's 2013 ICAs remain in full force and effect.

37.     On January 1, 2017, Absolute Medical and NuVasive entered into the Agreement, which, among other things, required Absolute Medical to continue exclusively distributing NuVasive's products for five years.

38.     Section 5.03 of the Agreement requires Absolute Medical to retain a staff of sales representatives ("Representative Affiliates") to promote NuVasive's products in its sales territory.

39.     Section 5.04 of the Agreement requires Absolute Medical to "promptly advise NuVasive of . . . any changes in [Absolute Medical's] status, organization, personnel, and similar matters . . ."

40.     Like all NuVasive exclusive distributors, Absolute Medical (and Absolute Medical's Representative Affiliates) receives NuVasive's extraordinary, industry-leading training, has access to and knowledge of NuVasive's trade secrets and other proprietary information, and is the face of NuVasive to customers within its sales territory.  Accordingly,

to protect its legitimate business interests, NuVasive required that Absolute Medical agree to certain reasonable confidentiality, non-competition, and non-solicitation obligations as a condition of NuVasive allowing Absolute Medical to sell its products.

41.     Section 5.09(a) of the Agreement requires Absolute Medical to: (a) identify all products and services that it and its Representative Affiliates promote; and (b) update that list of products and services as needed.  It provides:

> Representative has identified in **Exhibit G** all products and services for which Representative or Representative Affiliates (directly or indirectly) act as a sales representative, agent, employee, or similar position.  Representative shall update **Exhibit G** so that it is complete and accurate at all times and Representative agrees that failure to update **Exhibit G** shall constitute a material breach of the Agreement and may result in NuVasive exercising its rights under Section 9.03.

42.     Section 5.09(c) of the Agreement imposes reasonable non-competition and non-solicitation obligations on Absolute Medical.  It provides:

> During the Term and for a period of twelve (12) months thereafter, Representative and Representative Affiliates shall not (i) represent, promote, sell, solicit, or otherwise commercialize (directly or indirectly) any products or services that are, in NuVasive's reasonable judgment, competitive with any of NuVasive's products or services (including the Products) without the prior written consent of NuVasive, (ii) solicit, encourage, or induce, or cause to be solicited, encouraged or induced (directly or indirectly) any Restricted Persons within the Territory, to terminate or adversely modify any business relationship with NuVasive, or not to proceed with, or enter into, any business relationship with NuVasive, nor otherwise interfere with any business relationship between NuVasive, and any Restricted Persons within the Territory, or (iii) solicit or offer to work (directly or indirectly) or hire any of NuVasive's employees, agents or representatives.  The twelve (12) month period during which the restrictions of this Section are applicable after the Term shall toll for any period of time in which Representative is not in compliance herewith.

43.     Section 5.09(e) of the Agreement requires Absolute Medical to ensure that its Representative Affiliates enter into non-competition and non-solicitation agreements.   It provides:

> Representative (i) represents, warrants and covenants that each Representative Affiliate engaged by it as of the Effective Date or any time thereafter during the Term, will have executed an agreement in form and substance sufficient to contractually obligate such person or entity to comply with the restrictions contained in this Section 5.09 prior to performing any services for the benefit of NuVasive, or Promoting the Products or receiving any information regarding the Products (a "**Compliance Agreement**"), (ii) shall cause each Compliance Agreement to name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 5.09, and (iii) will vigorously enforce the restrictions contained in this Section 5.09 and each Compliance Agreement at its own cost (and in the event Representative fails to adequately enforce such restrictions, NuVasive may do so at Representative's cost).   Representative shall provide NuVasive a copy of each Compliance Agreement with respect to each Representative Affiliate immediately upon such person or entity becoming a Representative Affiliate.   Each Compliance Agreement shall require all sales representatives to comply with the terms of Section 5.08 and Section 5.09 hereof.   Representative shall be liable to NuVasive for any breaches by the Representative Affiliate of the Compliance Agreement.

44.     The restrictive covenants described in the preceding two paragraphs are reasonable because:  (a) their temporal restrictions are limited to the term of the Agreement plus the following twelve months after that term concludes; and (b) their geographic restrictions are limited to Absolute Medical's NuVasive sales territory.

45.     Section 8.01 of the Agreement imposes confidentiality obligations on Absolute Medical.  It provides:

> Non-Disclosure.  Each Party shall not, except as otherwise expressly provided herein, use, disclose, disseminate or otherwise allow access to the Confidential Information of the other Party to anyone other than to employees that have a need to know such Confidential Information to implement this Agreement and who are bound by written confidentiality obligations with provisions no less stringent than those contained in this Article VIII.  Each

Party shall prevent unauthorized disclosure or use of the Confidential Information of the other Party.  Each Party shall execute all documents and otherwise shall take all necessary steps to ensure that each be able to enforce rights hereunder pertaining to Confidential Information.  Each Party shall be responsible for any breach of this Section 8.01 by employees, contractors or agents.

46.     Section 10.01 of the Agreement provides, in relevant part:

Indemnification by Representative.  Representative shall indemnify, defend and hold harmless NuVasive and its present and former, direct and indirect, subsidiaries, affiliates, employees, officers, directors, stockholders, members, agents, representatives, and permitted successors and permitted assigns (each a "**NuVasive Indemnitee**") from and against…subject to Section 10.03, any Litigation Costs incurred by a NuVasive Indemnitee while investigating or conducting the defense of any Claim, in any such case, solely to the extent such Claim is directly based on or directly arises out of or from any breach by Representative of any of its representations, warranties and covenants under this Agreement…the gross negligence and willful misconduct of Representative or any Representative Affiliates…

47.     Section 12.04 of the Agreement provides:

Further Assurances.  On NuVasive's request, Representative shall, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, necessary to give full effect to this Agreement.

## C.     Absolute Medical's Breaches its Contractual Obligations

48.     In a November 27, 2017, email, Soufleris notified NuVasive of Absolute Medical's intent to resign from its "partnership" with NuVasive.  NuVasive attaches a copy of this email as **Exhibit 4**.

49.     The Agreement's terms do not allow Absolute Medical to terminate it without cause.

50.     Article IX of the Agreement contains the only grounds for Absolute Medical to terminate it.  None of those grounds are relevant.

51.     NuVasive has not terminated the Agreement.

52.     In a December 5, 2017 email, Absolute Medical's counsel stated that three Representative Affiliates—Hawley, Miller, and Brandon Gottstein ("Gottstein")—resigned from Absolute Medical.  NuVasive attaches a copy of this email as **Exhibit 5**.

53.     Gottstein worked for Absolute Medical from April 2016 through December 2017 as a field support representative.  He now works for Alphatec as a sales representative. Upon information and belief, Absolute Medical required Gottstein to sign an agreement which contains reasonable non-compete and non-solicit obligations.

54.     Hawley, Miller, and Gottstein are soliciting business from, and performing services for, the same customers they solicited business and performed services on NuVasive's behalf.  The only difference is that they now sell products marketed by Alphatec on behalf of AMS.

55.     Like Soufleris, Hawley, and Miller, Gottstein utilizes the same telephone number and email address in his work for AMS that he utilized in his work for Absolute Medical.

56.     Contrary to the obligations imposed on it by Section 5.09(e) of the Agreement, Absolute Medical has taken no steps to stop Hawley and Miller from violating their contractual obligations not to solicit or service the customers they solicited or serviced on Absolute Medical's behalf.  Indeed, Absolute Medical refused to even provide NuVasive with copies of their 2013 ICAs and consistently (and erroneously) denied, both informally and in discovery responses, the existence of those agreements.

57.     Absolute Medical has taken no steps to stop Gottstein from violating his non-competition and non-solicitation obligations, and denies that such an agreement exists.

58.     Since forming AMS, Soufleris has solicited business from at least two of Absolute Medical's customers on behalf of AMS and Alphatec.

59.     On AMS' behalf, Miller and Soufleris attended a December 6, 2017 dinner with one of Absolute Medical's surgeon-customers and asked that surgeon-customer to try Alphatec's products.

60.     On December 12, 2017, Hawley utilized his Absolute Medical email address to send a message to Alphatec regarding custom instruments needed by a surgeon to whom he (through Absolute Medical) regularly sold NuVasive products.  This email:

    a.  provided Alphatec with precise descriptions of the instruments; and

    b.  upon information and belief, promised to send the custom instruments NuVasive previously made for the surgeon to Alphatec so that Alphatec could copy them.

NuVasive attaches a copy of this email as **Exhibit 6**.

61.     Soufleris had dinner with the surgeon-customer referenced in the preceding paragraph as recently as the first or second week in May 2018.

62.     On May 24, 2018, NuVasive discovered custom instruments it created for the surgeon-customer referenced in the preceding two paragraphs at Florida Hospital Orlando. The custom instruments were sterilized and prepared to be used in a surgery.  No NuVasive representative requested that the custom instruments be sterilized and prepped for surgery. Upon information and belief, Hawley or another AMS sales representative: (a) arranged for the custom instruments to be sterilized and prepared for surgery, and (b) intended to use the

custom instruments in a surgery where the surgeon-customer would utilize non-NuVasive implants.

63.     To date, Absolute Medical has not updated Exhibit G to the Agreement or otherwise informed NuVasive that it is working with competitive companies.

64.     As a result of Defendants' violations of their contractual obligations, AMS (through Soufleris, Hawley, and Miller) converted nearly all of NuVasive's business within Absolute Medical's sales territory to Alphatec.

### COUNT I (Breach of Contract—Injunctive Relief against Absolute Medical)

65.     NuVasive incorporates the allegations contained in paragraphs 1 through 64.

66.     The Agreement, including, without limitation, Sections 5.09 and 8.01, is a valid and enforceable contract.

67.     The geographic and temporal restrictions contained in Section 5.09 are reasonable.

68.     Even if Section 5.09 were overbroad, the Agreement and Delaware law allow the Courts to make reasonable alterations so that it protects NuVasive's interests.

69.     NuVasive fully performed all of the obligations imposed on it by the Agreement.

70.     Absolute Medical breached or intends to breach many of the obligations the Agreement imposes on it by the Agreement by, without limitation:

  a. attempting to unilaterally terminate the Agreement;

  b. not enforcing Hawley's and Miller's non-compete and non-solicit obligations or, alternatively, releasing Hawley and Miller from their non-compete and non-solicit obligations without NuVasive's permission;

      c.  soliciting business on Alphatec's behalf; and

      d.  not updating Exhibit G to the Agreement.

71.    There is a reasonable probability that NuVasive will prevail on the merits of this action as Absolute Medical is breaching and/or threatening to breach valid and enforceable contractual obligations.

72.    NuVasive will be irreparably harmed if the Court does not require Absolute Medical to specifically perform the obligations imposed on it by the Agreement (or at least comply with its non-competition and non-solicitation obligations) as it will, without limitation, likely: (a) lose its goodwill with the customers in Absolute Medical's sales territory; and (b) lose sales to those customers.  Additionally, Absolute Medical's failure to fully perform its contractual obligations left NuVasive with insufficient sales personnel to fully service its business in Absolute Medical's sales territory, and further assisted AMS' illegal conversion of that business.

73.    No legal remedy can fully compensate NuVasive for the harm Absolute Medical's actions are causing.  NuVasive bargained for a five-year relationship with Absolute Medical, and now Absolute Medical works for one of NuVasive's competitors in the same territory it is contractually obligated to work for NuVasive.

74.    The balance of equities tips in favor of issuing the requested injunction because it will not harm Absolute Medical, as Absolute Medical is contractually obligated to perform all of the tasks identified in the Agreement.

75.    Issuing the requested injunction will benefit the public's interest as the public has an interest in seeing contracts enforced as written.

## COUNT II (Breach of Contract—Damages/Arbitration against Absolute Medical)

76.     NuVasive incorporates the allegations contained in paragraphs 1 through 75.

77.     The Agreement is a valid and enforceable contract.

78.     Absolute Medical breached or intends to breach the obligations imposed on it by the Agreement by, without limitation:

> a. attempting to unilaterally terminate the Agreement;
>
> b. not enforcing its sales representatives' non-competition and non-solicitation obligations;
>
> c. falsely representing to NuVasive that its sales representatives are not subject to non-competition and non-solicitation obligations;
>
> d. soliciting business on Alphatec's behalf without updating Exhibit G to the Agreement; and
>
> e. converting NuVasive's business to Alphatec.

79.     Absolute Medical's breaches of the Agreement caused NuVasive to incur significant damages.

80.     Pursuant to 9 U.S.C. § 4, this Court should order NuVasive's breach of contract claim for damages against Absolute Medical to arbitration in the manner provided for in the Agreement.

## COUNT III (Breach of Contract—Injunctive Relief and Damages against AMS)

81.     NuVasive incorporates the allegations contained in paragraphs 1 through 80.

82.     AMS is Absolute Medical's successor in interest.  Soufleris formed AMS— which is a continuation and/or a reincarnation of Absolute Medical—to fraudulently avoid the contractual obligations Absolute Medical owes NuVasive.

83.     Like Absolute Medical, AMS sells products utilized in spine surgeries to surgeons and medical facilities.

84.     Soufleris formed AMS on November 30, 2017—three days after the November 27, 2017 email to NuVasive which purported to "resign" Absolute Medical from the Agreement.

85.     Absolute Medical was solvent when Soufleris formed AMS and began the process of dissolving Absolute Medical.  Upon information and belief, Soufleris transferred several hundreds of thousands of dollars from Absolute Medical to AMS or other entities before dissolving Absolute Medical.

86.     Absolute Medical and AMS use the same attorneys.

87.     Absolute Medical and AMS use the same accounting system.

88.     Absolute Medical and AMS utilize the same computers, telephones, and other office equipment.

89.     Absolute Medical and AMS have a substantially common identity of owners, employees, and independent contractors.

90.     Soufleris is the sole member, registered agent, and "president" of AMS and Absolute Medical.

91.     Soufleris, at least three of AMS' sales representatives—Hawley, Miller, and Gottstein—and AMS' executive administrator worked for Absolute Medical immediately before joining AMS.

92.     AMS' owner, employees, and independent contractors who were affiliated with Absolute Medical utilize the same telephone numbers and email addresses that they used to conduct business on Absolute Medical's behalf.

93.     Absolute Medical last sold a NuVasive product on or about December 3, 2017, and claims it sold no Alphatec products.

94.     AMS never sold NuVasive products, and first sold an Alphatec product on or about December 5, 2017.

95.     Absolute Medical stopped doing business in December 2017, when Soufleris began the process of dissolving it.

96.     AMS sells Aphatec's products to the same customers Absolute Medical sold NuVasive's products and possesses communications with every surgeon to whom Absolute Medical sold NuVasive products in November 2017.

97.     As Absolute Medical's successor in interest, NuVasive is entitled to the same equitable and legal remedies against AMS that it is entitled to against Absolute Medical.

**COUNT IV (Breach of Contract—Injunctive Relief and Damages against Hawley and Miller)**

98.     NuVasive incorporates the allegations contained in paragraphs 1 through 64.

99.     The non-competition and non-solicitation obligations in Hawley's and Miller's 2013 ICAs are reasonable and enforceable as:  (a) their temporal restriction is for only one year; and (b) their geographic restriction is limited to the territories they serviced for Absolute Medical.

100.    Neither Hawley nor Miller are complying with the non-competition and non-solicitation obligations in their 2013 ICAs.

101.    Hawley's and Miller's breaches of their 2013 ICAs harmed NuVasive in that they allowed AMS to convert the vast majority of the business in Absolute Medical's sales territory to Alphatec.  Further, these breaches continue to irreparably harm NuVasive as their established relationships with their customers make it more difficult for NuVasive to win back the business of those customers.

102.    No legal remedy can fully compensate NuVasive for the harm Hawley's and Millers' actions are causing.  They are rapidly converting NuVasive's business in their sales territories and will continue to do so if not enjoined.

103.    The balance of equities tips in favor of enjoining Hawley and Miller from violating the non-competition and non-solicitation obligations.  Doing so will not harm them because Absolute Medical remains able to sell NuVasive's products for the remainder of the Agreement's five year term.  Accordingly, if the injunction issues, Hawley and Miller could continue selling products used in spinal surgery (albeit NuVasive's products through Absolute Medical) to the same surgeons and medical facilities they now service in violation of their non-competition and non-solicitation obligations.  On the other hand, not issuing the requested injunction will cause NuVasive irreparable harm as Hawley and Miller will continue to unfairly compete with it.

104.    Issuing the requested injunction will benefit the public's interest as the public has interests in: (a) seeing contracts enforced as written; and (b) fostering fair competition.

105.    NuVasive is entitled to recover monetary damages against Hawley and Miller, and is also entitled to temporary, preliminary, and permanent injunctions which prohibit them from violating their 2013 ICAs.

**COUNT V (Conversion against Hawley and AMS)**

106.   Upon information and belief, after leaving Absolute Medical and joining AMS, Hawley (or other AMS sales representatives) exercised dominion over the custom instruments referenced in paragraphs 61 and 63.

107.   Hawley (or other AMS sales representatives) did not have the right to exercise dominion over the custom instruments.

108.   Hawley's (or other AMS sales representatives') conversion of NuVasive's custom surgical instruments harmed NuVasive and caused it to suffer monetary damages.

**COUNT VI (Statutory Individual Liability against Soufleris)**

109.   NuVasive incorporates the allegations contained in paragraphs 1 through 25 and 82 through 98.

110.   Absolute Medical is a limited liability company formed and existing under the Florida Revised Limited Liability Company Act, Fla. Stat. §§ 605.0101, *et seq.*

111.   As Absolute Medical's sole member, Soufleris owes Absolute Medical certain duties, including without limitation, fiduciary duties of loyalty and care.

112.   Soufleris breached his fiduciary duties of loyalty to Absolute Medical by, without limitation:

    a.   dissolving Absolute Medical;

    b.   transferring Absolute Medical's assets to AMS or other companies he owns and/or controls;

    c.   forming AMS to avoid Absolute Medical's obligations to NuVasive and, in effect, compete with Absolute Medical;

    d.   precluding Absolute Medical from complying with its contractual obligations to NuVasive; and

  e. intentionally subjecting Absolute Medical to liability.

  113. Soufleris' actions and failures to act on behalf of Absolute Medical constitute breaches and/or failures to perform the duties he owes to Absolute Medical.

  114. Soufleris' breaches and/or failures to perform constitute, without limitation, transactions from which Soufleris derived improper personal benefits, directly and indirectly.

  115. Pursuant to the Florida Revised Limited Liability Company Act, § 605.04093, Soufleris is personally liable for the monetary damages Absolute Medical owes NuVasive, and should be subjected to any injunctive relief the Court issues against Absolute Medical.

### COUNT VII (Piercing the Corporate Veil against Soufleris)

  116. NuVasive incorporates the allegations contained in paragraphs 1 through 25, 82 through 98, and 110 through 115.

  117. Soufleris dominates and exercises complete control over Absolute Medical and AMS to the extent that their independence is non-existent and Soufleris is, in fact, their alter ego.

  118. Soufleris fraudulently and/or improperly organized and used Absolute Medical and AMS to mislead and/or defraud NuVasive in an attempt to, without limitation, evade Absolute Medical's existing personal liability to NuVasive.

  119. Soufleris' fraudulent and improper use of the corporate form is the proximate cause of the damages NuVasive incurred and continues to incur as a result of Absolute Medical's breach of its obligations under the Agreement and AMS' unfair competition with it.

120.    This Court should disregard the corporate form and hold Soufleris personally liable for any judgment rendered against Absolute Medical and/or AMS in this matter, and extend any injunctions it issues against them to Soufleris.

## COUNT VIII (Florida Deceptive and Unfair Trade Practices Act against all Defendants)

121.    NuVasive incorporates the allegations contained in paragraphs 1 through 120.

122.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Annotated Statues §§ 501.201, *et seq.*, makes unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful.

123.    Any person aggrieved by a violation of the FDUTPA may bring a private action to obtain declaratory and injunctive relief and any person who has suffered a loss by a violation of the FDUTPA may recover damages, as well as attorney's fees and costs, on account of that loss.

124.    Absolute Medical and Soufleris have violated the FDUTPA by, without limitation: (i) unfairly competing with NuVasive by soliciting business on Alphatec's behalf, and (ii) engaging in unfair and/or deceptive acts and practices by, without limitation:

   a.    attempting to unilaterally terminate the Agreement;

   b.    not enforcing Hawley's and Miller's non-compete and non-solicit obligations or, alternatively, releasing Hawley and Miller from their non-compete and non-solicit obligations without NuVasive's permission; and

   c.    soliciting business on Alphatec's behalf without updating Exhibit G to the Agreement.

125.    Upon information and belief, Hawley has violated the FDUTPA by unfairly competing with NuVasive and engaging in unfair and/or deceptive acts and practices by shipping custom surgical instruments that NuVasive created and owned to Alphatec so that Alphatec could create substantially identical instruments.

126.    Defendants' violations of the FDUTPA have aggrieved NuVasive and caused it to suffer damages.

### COUNT IX (Tortious Interference with Business Relationships against Soufleris)

127.    NuVasive incorporates the allegations contained in paragraphs 1 through 126.

128.    Business relationships exist between NuVasive and its surgeon-customers who purchase and utilize its products via its exclusive distributor Absolute Medical.

129.    Soufleris possessed actual knowledge of these business relationships at the time he began soliciting business from NuVasive's surgeon-customers.

130.    Soufleris' solicitation of NuVasive's surgeon-customers was, and is, an intentional and unjustified interference with NuVasive's business relationship with its surgeon-customers.

131.    NuVasive has incurred, and continues to incur, damages due to Soufleris' tortious interference with NuVasive's business relationship with its surgeon-customers.

### PRAYER FOR RELIEF

WHEREFORE, NuVasive respectfully requests that this Court:

A.    Issue a preliminary and final injunction which requires Absolute Medical to comply with all of the contractual obligations it owes to NuVasive including, without limitation:

1. fulfilling its contractual obligations for the entire term of the Agreement;

2. providing NuVasive with copies of the current and former Representative Affiliates' Compliance Agreements;

3. enforcing the former Representative Affiliates' Compliance Agreements or pay to NuVasive the reasonable costs (including reasonable attorneys' fees) it incurs in prosecuting those actions; and

4. not competing with NuVasive within its sales territory.

B.     Extend any injunction issued to Absolute Medical to cover AMS, Soufleris, Miller, and Hawley or, alternatively, temporarily, preliminarily, and permanently enjoin AMS, Soufleris, Miller, and Hawley from competing with NuVasive in Absolute Medical's NuVasive sales territory;

C.     Award NuVasive the reasonable costs, including attorneys' fees, it incurs in obtaining the requested equitable relief;

D.     Award NuVasive monetary damages against AMS, Miller, and Hawley in the amount of at least $8,000,000.00 for Absolute Medical's, Miller's, and Hawley's violations of their contractual obligations;

E.     Compel NuVasive's claim for monetary damages against Absolute Medical to binding arbitration;

F.     Award any and all relief, including without limitation declaratory relief, injunctive relief and monetary damages, attorney's fees and costs, available to NuVasive under the FDUTPA;

G.     Disregard the corporate form and hold Soufleris personally liable for NuVasive's damages pursuant to the Florida Revised Limited Liability Company Act and/or the doctrine of piercing the veil; and

H.      Grant any other further and general relief it deems just and proper.

Respectfully submitted,

*s/Diana Evans*
Diana Evans (Fla. Bar No. 98945)
Dnevans@bradley.com
R. Craig Mayfield (Fla. Bar No. 0429643)
cmayfield@bradley.com
Bradley Arant Boult Cummings LLP
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Tel: (813) 559-5500
Fax: (813) 229-5946

Christopher W. Cardwell, Esq. (*pro hac vice*)
M. Thomas McFarland, Esq. (*pro hac vice*)
GULLETT,   SANFORD,   ROBINSON   &
MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, TN 37201
(615) 244-4994 (Telephone)
(615) 256-6339 (Facsimile)
ccardwell@gsrm.com
tmcfarland@gsrm.com

*Attorneys for Plaintiff NuVasive, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system. The party or parties served are as follows:

Bryan Busch
Adams and Reese LLP
3424 Peachtree Road, NE, Suite 1600
Atlanta, GA 30326
Phone: (470) 427-3702
Fax: (470) 427-3676
bryan.busch@arlaw.com
*Attorney for Defendants*

Laura H. Mirmelli
Adams and Reese LLP
3424 Peachtree Road, NE, Suite 1600
Atlanta, GA 30326
Phone: (470) 427-3716
Fax: (404) 500-5975
laura.mirmelli@arlaw.com
*Attorney for Defendants*

Chantal M. Pillay
Adams and Reese LLP
350 E. Las Olas Boulevard, Suite 1110
Ft. Lauderdale, FL  33301
Phone: (954) 541-5390
Chantal.pillay@arlaw.com
*Attorney for Defendants*

Louis M. Ursini
Adams and Reese LLP
101 E. Kennedy Boulevard, Suite 4000
Tampa, FL  33602
Phone:  (813) 227-5536
Fax:  (813) 227-56-36
Louis.ursini@arlaw.com
*Attorney for Defendants*

s/*Diana Evans*
Diana Evans

*Attorney for NuVasive, Inc.*

## Exclusive Sales Representative Agreement
### Key Terms Summary

| Sales Representative Contact | | NuVasive Contact | |
|---|---|---|---|
| Address: | 382 Devon Place | Address: | 7475 Lusk Boulevard |
| City, State, ZIP: | Heathrow, FL 32746 | City, State, ZIP: | San Diego, CA 92121 |
| Attn: | Greg Soufleris | Attn: | Legal Department |
| Phone: | (954) 868-4492 | Phone: | (858) 909-1800 |
| Email: | gsoufleris@absolute-med.com | Email: | contracts@nuvasive.com |

| Products | Stated Percentage |
|---|---|
| All NuVasive Products, excluding products manufactured by NuVasive Specialized Orthopedics™, Inc. (except for MAGEC® products) | 10% |

| Effective Date | Term of the Agreement | Territory |
|---|---|---|
| January 1, 2017 | 5 years | Listed on Exhibit B |

This **Key Terms Summary**, together with:

- the **Terms and Conditions**
- **Exhibit A** (Definitions)
- **Exhibit B** (Territory)
- **Exhibit C** (Commissions)
- **Exhibit D** (Shared Services)
- **Exhibit E** (Sales Training Course Catalog)
- **Exhibit F** (Certification of Compliance)
- **Exhibit G** (Other Products/Services Solicited by Representative or a Representative Affiliate)

is entered into as of the Effective Date by and between NuVasive, Inc., a Delaware corporation ("**NuVasive**"), and Absolute Medical LLC, a Florida limited liability company ("**Representative**") (collectively the "**Parties**" and each a "**Party**"). The above exhibits shall each be referred to as an "**Exhibit.**" The **Key Terms Summary**, the **Terms and Conditions**, the **Exhibits**, and any addendums attached hereto shall collectively be referred to as the "**Agreement.**" Capitalized terms used in this Agreement shall have the meaning set forth in **Exhibit A** (Definitions). By signing below, each Party acknowledges that it has read and agreed to the terms set forth in this Agreement, and the signatory below is authorized to execute this Agreement on behalf of its respective Party.

| NuVasive, Inc. | Absolute Medical LLC |
|---|---|
| Signature: | Signature: |
| Print Name: Matt Link | Print Name: Greg Soufleris |
| Title: President, US Commercial | Title: *president* |

US-DOCS\84509981.8


**EXHIBIT**
**1**

## TERMS AND CONDITIONS

### ARTICLE I.
### APPOINTMENT AND AUTHORITY OF REPRESENTATIVE

Section 1.01    Exclusive Sales Representative. Subject to the terms and conditions herein, NuVasive hereby appoints Representative as NuVasive's exclusive sales representative to solicit orders for and Promote Products in the Territory during the Term, and Representative hereby accepts such appointment. Representative shall be NuVasive's sole representative that will solicit orders for and Promote Products in the Territory during the Term.

Section 1.02    Representative Limitations. Representative shall not (directly or indirectly) (a) advertise or Promote any Products outside the Territory, (b) solicit or procure any orders for Products from outside the Territory, (c) otherwise act as NuVasive's representative with respect to the Products outside the Territory, or (d) advertise or Promote any NuVasive products other than the Products, without the prior written consent of NuVasive. Representative shall promptly forward to NuVasive any and all inquiries relating to the Products received by Representative from outside the Territory. Representative may only submit and procure orders from customers located and taking delivery of Products within the Territory.

Section 1.03    Quota Commitment. Representative shall solicit orders for at least the quantity of Products set forth in the quota commitments provided by NuVasive to Representative in writing (the "**Quota Commitments**"). NuVasive will provide the Quota Commitment for the first full calendar year of the Agreement within thirty (30) calendar days after the Effective Date. Quota Commitments for subsequent calendar years during the Term shall be determined by NuVasive in its sole discretion based on dialogue with Representative, and delivered to Representative within thirty (30) days of the start of each applicable calendar year during the Term. NuVasive may deliver a Quota Commitment to Representative at intervals more frequently than annually, including with respect to newly introduced Products and/or modifications to the Territory. Representative acknowledges and agrees that (a) if the Territory is subdivided into regions as set forth in **Exhibit B**, then NuVasive may designate separate Quota Commitments for each such region, and (b) each Quota Commitment may set forth quota commitments for the calendar year as well as for each calendar quarter within such calendar year. The only orders that shall count towards the Quota Commitment shall be bona fide orders properly submitted by Representative to NuVasive in accordance with the Agreement and that that would, upon acceptance by NuVasive, qualify for the payment of a Commission to Representative.

Section 1.04    Poor Standing. If Representative fails to secure orders for (a) eighty-seven percent (87%) of its Quota Commitment in any calendar quarter, (b) ninety-three percent (93%) of its Quota Commitment in any two consecutive calendar quarters, or (c) ninety-five percent (95%) of its aggregate Quota Commitment for any given calendar year; then in each case Representative shall be deemed in "**Poor Standing**" and NuVasive may, at its discretion and without prejudice to any other rights NuVasive may have under this Agreement, exercise its rights under Section 9.03 until such time as Representative fulfills 100% of its Quota Commitment for a calendar quarter.

Section 1.05    Independent Contractors. The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (a) give either Party the power to direct and control the day-to-day activities of the other Party, (b) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (c) allow Representative to create or assume any obligation on behalf of NuVasive, or otherwise bind NuVasive, for any purpose whatsoever. Because Representative is an independent contractor, NuVasive will not withhold or make payments for social security, make unemployment

insurance or disability insurance contributions, or obtain workers' compensation insurance on Representative's behalf or provide Representative any benefits that would be equivalent to benefits that NuVasive provides its employees. All financial and other obligations associated with each Party's business and its performance of obligations under this Agreement are the sole responsibility of the respective Party. Each Party shall be solely responsible for all of the acts of its employees or its agents. For the avoidance of doubt, with respect to its sales representatives, Representative shall be solely responsible for hiring, promoting, discharging, scheduling appointments, establishing pay scales and/or other remuneration, remunerating, reimbursing for work-related expenses, implementing discipline and any other action directly related to the employment of such sales representatives. Notwithstanding anything contained herein to the contrary, Representative will cooperate fully with NuVasive personnel in all respects with regard to performing the obligations of this Agreement, including participating in requested teleconferences, meetings and travel, and providing sales target and sales forecasting information to NuVasive upon reasonable request.

## ARTICLE II.
## COMMISSIONS

Section 2.01   Sole Compensation.   Representative's sole compensation for its performance under this Agreement shall be a commission ("**Commission**") based on Net Sales of Products resulting from Representative's procurement of orders pursuant to this Agreement, determined in accordance with **Exhibit C** attached hereto.

Section 2.02   Basis of Commission.   The Commission shall apply solely to Product orders (a) procured by Representative from customers within the Territory in accordance with this Agreement, (b) that have been accepted by NuVasive in its sole discretion, and (c) for which shipment of Products and recognition of revenue by NuVasive has occurred. For clarification, the Commission shall not apply with respect to (i) any sale made to any customer outside the Territory, or (ii) any sale made in violation of this Agreement or applicable law.

Section 2.03   Time and Manner of Payment.   The undisputed portion of the Commission pursuant to Article II on a given order shall be due and payable thirty (30) calendar days after the end of the calendar month in which NuVasive invoices and ships that order. Any disputed portion of the Commission pursuant to Article II on a given order shall be due and payable thirty (30) calendar days after the calendar month in which a payment determination is made.

Section 2.04   Commission Charge Back.   NuVasive shall have the absolute right to (a) withhold any disputed amounts otherwise payable as Commission and (b) set cash discounts, make allowances and adjustments to customer orders, accept returns from its customers, and write off as bad debts any overdue customer accounts as NuVasive deems advisable in its discretion. In each such case, NuVasive shall charge back to Representative's account, and/or withhold from payment of any future Commissions, any Commission previously paid or credited to it with respect to such cash discounts, allowances, adjustments, returns or bad debts. Representative also agrees to accept charges for: (i) pricing arrangements or side deals not approved by NuVasive; (ii) lost, damaged or missing inventory entrusted to Representative; (iii) operating expenses (including but not limited to set rent and freight) in excess of the contribution margin targets as communicated to Representative from time to time and determined by NuVasive in its sole discretion; and (iv) Representative's failure to comply with its obligations under this Agreement and/or NuVasive policies (e.g., NuVasive's inventory management policy and pricing policy as updated from time to time).

Section 2.05   Monthly Statements.   NuVasive shall submit or otherwise make available (electronically or by other means) to Representative monthly statements of the Commissions due and

payable to Representative under the terms of this Agreement, with reference to the specific invoices on which the Commissions are being paid (the "**Monthly Statement**").

Section 2.06    Disputes.    Representative shall notify NuVasive in writing of any dispute regarding any Monthly Statement (along with substantiating documentation and a reasonably detailed description of the dispute) within ten (10) calendar days from the Representative's receipt of such Monthly Statement. Representative will be deemed to have accepted all Monthly Statements for which NuVasive does not receive timely written notification of disputes. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Notwithstanding anything to the contrary, Representative shall continue performing its obligations under this Agreement during any such dispute.

## ARTICLE III.
### PRICING

Section 3.01    Prices and Terms of Sale.    NuVasive shall provide or otherwise make available (electronically or by other means) to Representative copies of its current price lists, its delivery schedules, and its standard Terms and Conditions of Sale, each of which may be established and amended from time to time in the sole discretion of NuVasive (the "**Terms and Conditions of Sale**"). Representative shall quote to customers only the then current authorized prices, delivery schedules, and Terms and Conditions of Sale, and shall have no authority to quote or offer any discount to such prices or change any such Terms and Conditions of Sale, without the prior written consent of NuVasive. NuVasive may change the prices, delivery schedules, and Terms and Conditions of Sale, at any time and from time to time, such changes to be effective thirty (30) days after delivery by NuVasive to Representative of written notice of any such changes; provided that, such changes shall be effective immediately with respect to any new customers during such thirty (30) day period. Each order for a Product shall be governed by the prices, delivery schedules, and Terms and Conditions of Sale in effect at the time the order is accepted by NuVasive, and all quotations by Representative shall contain a statement to that effect.

Section 3.02    Orders; Acceptance.    All orders from customers for the Products shall be in writing, and the originals shall be submitted directly by the customer to NuVasive. All orders obtained by Representative shall be subject to acceptance by NuVasive at its sole discretion. Representative shall have no authority to make any acceptance or delivery commitments to customers.

Section 3.03    Collection.    Representative acknowledges and agrees that Representative shall not take any action with respect to collection from customers, provided that, at NuVasive's request, Representative will assist NuVasive in the collection of any accounts receivable of NuVasive.

## ARTICLE IV.
### WARRANTY

Section 4.01    Customer Warranty.    Any warranty for the Products shall be limited to those set forth in the then current Terms and Conditions of Sale and shall run directly from NuVasive to the customer, and pursuant to the warranty the customer shall return any allegedly defective Products directly to NuVasive. Representative shall not (a) modify or change any such warranty terms and conditions, (b) make any false or misleading representations or statements to customers or others regarding NuVasive or the Products, or about NuVasive competitors or competitor products, or (c) make any representations, warranties or guarantees with respect to the specifications, features or capabilities of the Products that are not consistent with the Promotional Materials supplied by NuVasive. In the event that Representative does make any such false, additional or inconsistent representations, statements, warranties or guarantees in violation of this Agreement, then without limiting NuVasive's other remedies for such violation,

Representative shall be solely responsible for any liability resulting from any such actions. Representative shall have no authority to accept any returned Products.

**Section 4.02    Disclaimer of Warranties.** Except for the warranties provided to customers in the Terms and Conditions of Sale, NuVasive makes no other representation or warranty of any kind or nature whether express or implied with respect to the Products or any NuVasive Trademarks, and NuVasive hereby expressly disclaims all other representations or warranties, express or implied, including implied warranties of merchantability, fitness for a particular purpose, noninfringement and title, and any warranties arising from a course of dealing, usage, or trade practice. Representative understands and agrees that the disclaimer of warranties in this Agreement is a fundamental part of this Agreement and that Nuvasive would not agree to enter this Agreement without such disclaimer.

## ARTICLE V.
## ADDITIONAL REPRESENTATIVE OBLIGATIONS

Section 5.01    Delivery of Product to Customer. If any Products are delivered directly from NuVasive to Representative, Representative shall deliver such Products to customers using NuVasive's documented and appropriate procedures for handling, storage, packing, preservation and delivery, and in accordance with any written instruction provided by NuVasive. Subject to applicable law, Representative or one of Representative's Affiliates shall attend all surgical cases in the Territory that utilize the Products.

Section 5.02    Sales Action Plans. Representative shall provide to NuVasive, within thirty (30) calendar days following the end of each calendar year, an annual sales action plan detailing Representative's sales goals and execution strategies for the coming year. In addition, Representative shall deliver to NuVasive, by the fifth (5th) day of each calendar quarter, a quarterly action plan detailing Representative's sales history, revised sales plans and strategies for such quarter. The format of such reporting will be determined by NuVasive.

Section 5.03    Representative Infrastructure and Promotion of the Products. NuVasive and Representative acknowledge and agree that development of proper infrastructure on the part of Representative is vital for the success of the business. Representative will make business investments for the purpose of expanding its infrastructure in order to fulfill its responsibilities under this Agreement (the "**Infrastructure Investments**"). The Infrastructure Investments required by NuVasive will be supported with resources from NuVasive, as determined by NuVasive in its sole discretion. As the Infrastructure Investments are defined and communicated to Representative from time to time, Representative agrees to comply with the Infrastructure Investments and agrees that failure to do so shall entitle NuVasive to charge Representative for fines and/or costs, in addition to the other rights contained herein. Representative acknowledges and agrees to maintain sufficient personnel (including the replacement of personnel that are terminated or otherwise leave Representative's employ during the Term) to effectively and consistently Promote the Products to all hospitals and clinics in the Territory as contemplated by the Agreement, with a focus on selling a complete mix of the various Products. Representative shall also provide sufficient support to its sales representatives in order to enable them to effectively Promote the Products in their assigned territories. Any accounts or portions of the Territory without sufficient representation may, at NuVasive's sole discretion, be immediately moved to a non-exclusive status (notwithstanding the exclusive rights granted in Section 1.01) or removed from the Territory under Section 9.03.

Section 5.04    Notice of Changes. Representative shall promptly advise NuVasive of (a) any changes in Representative's status, organization, personnel, and similar matters, (b) any changes in the

key personnel, organization, and status of any major customers of NuVasive in the Territory, and (c) any political, financial, legislative, industrial or other events in the Territory that could affect the mutual business interests of Representative and NuVasive, whether harmful or beneficial.

Section 5.05 · Shared Services. NuVasive and Representative agree that NuVasive shall provide Representative with certain services relating to Representative's Promotion of Products in the Territory ("**Shared Services**"). These Shared Services and costs related to such Shared Services are detailed in **Exhibit D. Exhibit D** may be modified, updated or supplemented by NuVasive from time to time in its sole discretion.

Section 5.06    Product Complaints. Representative shall: (a) promptly investigate and monitor all customer and/or regulatory complaints and correspondence concerning the use of the Products in the Territory and (b) immediately notify NuVasive of all such complaints and correspondence. Representative hereby assigns to NuVasive all of its rights (including intellectual property rights), title and interests in and to any customer feedback with regard to the Products.

Section 5.07    Representations; Marketing. Representative shall Promote the Products solely in accordance with the training provided by NuVasive. NuVasive shall provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures, instructional material, advertising literature, product samples, and other Product data as outlined in **Exhibit D** ("**Promotional Materials**"). Representative shall use only the Promotional Materials supplied by NuVasive in its Promotion of the Products unless NuVasive approves otherwise in writing, and Representative shall not add, delete, or modify any language in the Promotional Materials in any manner, except for adding Representative's contact information. The Promotional Materials may not be distributed or transferred to any third party other than bona fide customers in the Territory who are considering ordering the Products.

Section 5.08    Compliance with Laws and Policies. Representative will comply with all applicable federal, state, local, municipal, regulatory and/or governmental agency laws, statutes, regulations, edicts, guidance, directives, and ordinances, including, but not limited to: (a) the Social Security Act; (b) the Health Insurance Portability and Accountability Act; (c) all federal and state health care anti-fraud, anti-bribery anti-kickback and abuse laws such as 42 U.S.C. § 1320a-7b(b); (d) the Federal Food, Drug, and Cosmetic Act and its implementing regulations, (e) all rules, regulations, and guidance of the FDA; (f) all rules and regulations of the Center for Medicare and Medicaid Services; and (g) applicable local, state and federal wage and hour laws, statutes, rules and regulations. Without limiting the generality of the foregoing, except to the extent allowed by applicable law, Representative will make no offer, payment or other inducement (whether directly or indirectly) to induce the referral of business, the purchase, lease or order of any item or service, or the recommending of the purchase, lease or order of any item or service. Representative will comply, and will ensure its personnel carrying out activities under this Agreement comply, with all operating and compliance policies of NuVasive, including the Medical Device Manufacturers Association Code of Conduct on Interactions with Healthcare Providers, the NuVasive Code of Ethical Business Conduct, the NuVasive Global Business Ethics and Compliance Program, including the U.S. Healthcare Compliance Policy Guide, NuVasive's Insider Trading Policy and Inventory Management Policy (if any, relating to wide variety of inventory management issues, including inventory investment, accountability for inventory management (such as cost-sharing) and consignment inventory), as such policies may be created, updated and provided to Representative from time to time, and including any applicable training requirements with respect to such policies. Additionally, on not less than an annual basis, Representative shall certify to compliance with the U.S. Healthcare Compliance Policy Guide by submitting a Certification of Compliance (in such form as attached hereto as **Exhibit F**) to NuVasive that Representative is in compliance with this Section 5.08 and any other compliance terms in this Agreement in a form acceptable to NuVasive. Representative shall

provide on a timely basis, to be determined by NuVasive, all information of Representative and Representative Affiliates to comply with the Physician Payments Sunshine Act and/or any similar state law. Representative shall at all times conduct its activities on behalf of NuVasive in accordance with the labeling limitations on the Products, the terms of this Agreement, NuVasive's written policies and procedures, and in compliance with applicable state and federal laws in effect from time to time, including the FDA's quality system regulations, Adverse Event Reporting System and/or current good manufacturing practice regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures. Representative shall provide NuVasive with such information and data as may be requested by NuVasive pursuant to this Agreement.

Section 5.09    Competitive Products; Non-Solicitation.

(a) Representative has identified in **Exhibit G** all products and services for which Representative or Representative Affiliates (directly or indirectly) act as a sales representative, agent, employee, or similar position. Representative shall update **Exhibit G** so that it is complete and accurate at all times and Representative agrees that failure to update **Exhibit G** shall constitute a material breach of the Agreement and may result in NuVasive exercising its rights under Section 9.03.

(b) Representative represents and warrants to NuVasive that, as of the Effective Date, it does not (nor does any Representative Affiliate or any other entity or person affiliated with Representative or a Representative Affiliate) currently represent, promote, sell, solicit, or otherwise commercialize (directly or indirectly) any products or services that are competitive with any NuVasive product or service (including the Products).

(c) During the Term and for a period of twelve (12) months thereafter, Representative and Representative Affiliates shall not (i) represent, promote, sell, solicit, or otherwise commercialize (directly or indirectly) any products or services that are, in NuVasive's reasonable judgment, competitive with any of NuVasive's products or services (including the Products) without the prior written consent of NuVasive, (ii) solicit, encourage, or induce, or cause to be solicited, encouraged or induced (directly or indirectly) any Restricted Persons within the Territory, to terminate or adversely modify any business relationship with NuVasive, or not to proceed with, or enter into, any business relationship with NuVasive, nor otherwise interfere with any business relationship between NuVasive, and any Restricted Persons within the Territory, or (iii) solicit or offer to work (directly or indirectly) or hire any of NuVasive's employees, agents or representatives. The twelve (12) month period during which the restrictions of this Section are applicable after the Term shall toll for any period of time in which Representative is not in compliance herewith.

(d) If after the Effective Date, (i) NuVasive releases a new product or service (including a new Product) that is competitive with a product or service that Representative or a Representative Affiliate at the time represents, promotes, solicits or otherwise commercializes, or (ii) Representative acquires a new Representative Affiliate, and such Representative Affiliate is engaged in the representation, promotion, sale, solicitation, or commercialization (directly or indirectly) of any products or services that are, in NuVasive's reasonable judgment, competitive with any of NuVasive's products or services (including the Products); then in each case Representative shall cease, and shall cause its Representative Affiliates to cease, such activities with respect to such competitive products within ninety (90) calendar days of the date such new product or service is released in the case of (i), or the acquisition of the new Representative Affiliate in the case of (ii).

(e) Representative (i) represents, warrants and covenants that each Representative Affiliate engaged by it as of the Effective Date or any time thereafter during the Term, will have executed an agreement in form and substance sufficient to contractually obligate such person or entity to comply with

the restrictions contained in this Section 5.09 prior to performing any services for the benefit of NuVasive, or Promoting the Products or receiving any information regarding the Products (a "Compliance Agreement"), (ii) shall cause each Compliance Agreement to name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 5.09, and (iii) will vigorously enforce the restrictions contained in this Section 5.09 and each Compliance Agreement at its own cost (and in the event Representative fails to adequately enforce such restrictions, NuVasive may do so at Representative's cost). Representative shall provide NuVasive a copy of each Compliance Agreement with respect to each Representative Affiliate immediately upon such person or entity becoming a Representative Affiliate. Each Compliance Agreement shall require all sales representatives to comply with the terms of Section 5.08 and Section 5.09 hereof. Representative shall be liable to NuVasive for any breaches by the Representative Affiliate of the Compliance Agreement.

(f) Representative acknowledges and agrees that the foregoing non-competition obligations are reasonable and necessary to protect the legitimate interests of NuVasive, including the protection of NuVasive's Confidential Information. Representative further acknowledges and agrees that such obligations are an essential part of, and consideration for, NuVasive's promises contained in this Agreement.

Section 5.10    Non-Disparagement.    Representative shall not in any way disparage NuVasive, its products, or its agents or employees, including, without limitation, taking any action or making any statement the intent or reasonably foreseeable effect of which is to impugn or injure the reputation or goodwill of NuVasive or any of its agents or employees. The Parties acknowledge and agree that Representative shall not be deemed to have violated the foregoing if Representative provides truthful testimony pursuant to a valid subpoena or court order or as otherwise required by law.

## ARTICLE VI.
### REPRESENTATIONS AND WARRANTIES OF REPRESENTATIVE

Section 6.01    Corporate Power.    Representative represents, warrants and covenants that: (a) it is duly organized and validly existing under the laws of its state of incorporation; (b) it has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof; (c) it is qualified and licensed to do business and is in good standing in every jurisdiction where such qualification and licensing is required; and (d) the person executing this Agreement on Representative's behalf has been duly authorized to do so by all requisite corporate action.

Section 6.02    Binding Agreement.    This Agreement is a legal and valid obligation binding upon the Parties and enforceable in accordance with its terms. The execution, delivery and performance of this Agreement by the Parties do not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, nor violate any material law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

Section 6.03    Non-Contravention.    Representative represents, warrants and covenants that its performance of all the provisions of this Agreement and as an agent of NuVasive does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by it in confidence or in trust prior to its engagement by NuVasive, and Representative agrees not to disclose to NuVasive any confidential or proprietary information or material belonging to any previous employers or other entities with whom Representative has been involved. Representative represents and warrants that it has not entered into (and is not bound by) any agreement, either written or oral, that is in conflict herewith or in conflict with the engagement contemplated hereby. Representative further represents, warrants and covenants that it will not (directly or indirectly) engage in the development of products or intellectual property that are for use in (or applicable to) any products or services that are competitive

with NuVasive's products or services, and that Representative has disclosed to NuVasive all relevant details regarding any such development activity that occurred in the past.

Section 6.04    Debarment.    Representative represents, warrants and covenants that neither it nor any Representative Affiliate have been nor are debarred, suspended, excluded or are otherwise ineligible under Section 306 of the Federal Food, Drug and Cosmetic Act (as amended by the Generic Drug Enforcement Act of 1992) or are listed on any applicable federal exclusion list including the then-current: (a) HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov), (b) General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov); and (c) FDA Debarment List (available through the Internet at http://www.fda.gov/ora/compliance_ref/debar/).

Section 6.05    Interaction with Health Care Providers.    Representative represents, warrants and covenants that neither it nor any Representative Affiliate have any arrangement (e.g., grants, donations, sponsorships, reimbursement of expenses, etc.) or agreement, oral or written, with a Health Care Provider, other than for the purchase of Products. Representative will not enter into any arrangement or agreement with a Health Care Provider without the express prior written consent of NuVasive's Compliance Officer or his/her designee.

## ARTICLE VII.
## INTELLECTUAL PROPERTY

Section 7.01    Use.    Subject to the terms of this Agreement, NuVasive hereby grants to Representative a non-exclusive, non-transferable, non-sublicensable, limited, revocable license during the Term to use those trademarks, service marks, logos, and trade names that NuVasive may specify to Representative from time to time ("**NuVasive Trademarks**") for use solely in connection with the Promotion of the Products in the Territory pursuant to the terms of this Agreement. Representative shall have no further rights or interest in such NuVasive Trademarks. Representative shall fully comply with all written guidelines communicated by NuVasive concerning the use of the NuVasive Trademarks ("**Trademark Guidelines**"). Should NuVasive notify Representative that the use of any NuVasive Trademarks violate the then in effect Trademark Guidelines, Representative shall bring such use into conformance with the Trademark Guidelines and shall provide to NuVasive a specimen of such conforming use. Notwithstanding the foregoing, NuVasive, at its discretion, may terminate this trademark license if it determines that Representative is using the NuVasive Trademarks in a manner that violates said guidelines. Representative shall cooperate with NuVasive, at NuVasive's expense, to register the NuVasive Trademarks in any jurisdiction, including executing appropriate documents and otherwise assisting NuVasive. Representative will immediately bring to the attention of NuVasive any improper or wrongful use of NuVasive's Trademarks, emblems, designs or other similar intellectual property rights which come to the notice of Representative and will in the performance of its duties under this Agreement use reasonable efforts to safeguard the property rights and interests of NuVasive. All goodwill arising out of any uses of the NuVasive Trademarks will inure solely to the benefit of NuVasive.

Section 7.02    Quality Control and Approval of Representations.    All representations of the NuVasive Trademarks that Representative intends to use (including in any catalogue or other marketing collateral) shall first be submitted to NuVasive for written approval (which shall not be unreasonably withheld) of design, color, and other details. Representative may not mark the Products or Product packaging materials with its own trademarks, service marks, trade names, or logos or those of any third party. Nothing in this section shall limit the restriction in Section 5.07 that Representative shall only use the Promotional Materials supplied by NuVasive in its Promotion of the Products unless otherwise agreed by NuVasive in writing.

Section 7.03    Property Rights. Representative agree that NuVasive owns all right, title, and interest in the product lines that include the Products and in all of NuVasive's Intellectual Property relating to the design, manufacture, operation or service of the Products. The use by Representative of any of these property rights is authorized only for the purposes herein set forth, and upon termination or expiration of this Agreement such authorization shall cease.

Section 7.04    Prohibited Acts. At no time during or after the Term shall Representative:

(a) take any action that may interfere with any of NuVasive's rights in or to NuVasive's Intellectual Property;

(b) challenge or assist others to challenge NuVasive's ownership of the NuVasive Trademarks or other right in NuVasive's Intellectual Property;

(c) attempt or assist others to attempt to register any trademarks, marks or trade names confusingly similar to NuVasive's Intellectual Property;

(d) register or apply for registrations, anywhere in the world, for the NuVasive Trademarks or domain names or any other trademark or domain name that is similar to the NuVasive Trademarks or that incorporates any of the NuVasive Trademarks in whole or in confusingly similar part;

(e) use any mark, anywhere, that is confusingly similar to NuVasive's Trademarks;

(f) engage in any action that tends to disparage, dilute the value of, or reflect negatively on the Product or any NuVasive Trademark;

(g) misappropriate any of NuVasive's Intellectual Property; or

(h) alter, obscure or remove any of the NuVasive Trademarks or any intellectual property rights notices placed on the products purchased under this Agreement (including Products), marketing materials or other materials that NuVasive may provide.

## ARTICLE VIII.
## CONFIDENTIALITY

Section 8.01    Non-Disclosure. Each Party shall not, except as otherwise expressly provided herein, use, disclose, disseminate or otherwise allow access to the Confidential Information of the other Party to anyone other than to employees that have a need to know such Confidential Information to implement this Agreement and who are bound by written confidentiality obligations with provisions no less stringent than those contained in this Article VIII. Each Party shall prevent unauthorized disclosure or use of the Confidential Information of the other Party. Each Party shall execute all documents and otherwise shall take all necessary steps to ensure that each be able to enforce rights hereunder pertaining to Confidential Information. Each Party shall be responsible for any breach of this Section 8.01 by employees, contractors or agents.

Section 8.02    Ownership. As between the Parties, each receiving Party acknowledges and agrees that the disclosing Party (or its licensors) owns all rights, title and interests, including Intellectual Property Rights, in and to the disclosing Party's Confidential Information.

Section 8.03     Notification. If a Party learns or believes that any person who has had access to the Confidential Information of the other Party has violated or intends to violate this Agreement, the receiving Party shall immediately notify the other Party and shall cooperate with the other Party in seeking injunctive or other equitable relief against any such person. ·

Section 8.04     Exceptions. Neither Party shall disclose the Confidential Information of the disclosing party to any third party without prior written consent of the disclosing party. This obligation is subject to the following exceptions: (a) disclosure by the Parties and their Affiliates is permissible if required by government or court order, discovery request, or subpoena in pending litigation provided that: (i) the Party disclosing the information first gives the other Party prior written notice in order to enable that Party to seek a protective order or motion to quash (or other equivalent protection), such permissible disclosure limited to the Confidential Information legally required to be disclosed, and (ii) any such disclosure is subject to protective order, with such permissible disclosure protected under an "Outside Attorneys Eyes Only" or higher confidentiality designation; (b) disclosure by the Parties and their Affiliates is permissible if otherwise required by any applicable securities exchange rules or regulations, such permissible disclosure limited to Confidential Information legally required to be disclosed; and (c) the Parties and their Affiliates may disclose Confidential Information the extent reasonably necessary, on a confidential basis, to their accountants, attorneys, financial advisors, and entities with audit rights.

Section 8.05     Reproduction of Confidential Information. Confidential Information shall not be reproduced except as required to implement this Agreement. Any reproduction or derivative of any Confidential Information of the disclosing Party by the receiving Party shall remain the property of the disclosing Party and shall contain all confidential or proprietary notices or legends which appear on the original.

Section 8.06     Equitable Remedies. Any unauthorized disclosure or use of Confidential Information by Parties shall be a material breach of this Agreement, and Parties shall be entitled to all remedies available under law or in equity, including injunctive relief without the need to post a bond therefor.

## ARTICLE IX.
## TERM

Section 9.01     Term. Unless terminated earlier as provided in this Agreement, the term of this Agreement commences on the Effective Date, and shall continue for the period set forth in the "Term of the Agreement" field of the Key Terms Summary (the "Term").

· Section 9.02     Termination by Either Party for Material Breach. If either Party materially breaches any provision of this Agreement, and such breach is not cured within thirty (30) calendar days following the delivery of written notice of such breach by the non-breaching Party to the breaching Party (provided that, such thirty (30) day notice period shall not be required if the breach by its nature cannot be cured within thirty (30) days), then the non-breaching Party may terminate this Agreement immediately upon delivery of written notice, and if the non-breaching Party is NuVasive, then NuVasive shall also have the right, in its sole discretion, to modify the Territory or terminate Representative's exclusivity with respect to a Territory.

Section 9.03     Termination by NuVasive/Modification of Territory. NuVasive may, in its sole discretion and upon delivery of written notice to Representative, modify the Territory, terminate Representative's exclusivity with respect to the Territory (or any portion thereof), or terminate this Agreement: (a) if the Territory is not sufficiently covered by sufficient Representative representation in accordance with the sales action plan agreed to by the Parties and delivered pursuant to Section 5.02; (b)

if Representative breaches any of the provisions of Section 5.08, Section 5.09, Section 5.10, Section 6.04, Section 6.05, or Section 12.05 of this Agreement; (c) if Representative is in Poor Standing but only if NuVasive pays Representative the then-current Stated Percentage Amount for the portion of the Territory that is being removed or made non-exclusive (or in the entire Territory if this Agreement is being terminated hereunder); (d) if Representative fails to make the Infrastructure Investments in accordance with Section 5.03; (e) if NuVasive undergoes a Change of Control, but only if such termination right is exercised by NuVasive and/or its successor-in-interest or acquiring party at any time within twelve (12) months of such Change of Control, and provided further that, in order to exercise such termination right under this Section 9.03(e), NuVasive must also pay Representative the Stated Percentage Amount for the portion of the Territory that is being removed (or in the entire Territory if this Agreement is being terminated hereunder); or (f) if Representative undergoes a Change of Control.

Section 9.04    Termination for Insolvency.    This Agreement may be terminated by either Party without notice: (a) upon the other Party making an assignment for the benefit of creditors; (b) upon the other Party's dissolution or ceasing to do business; (c) if the other Party makes, applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property; (d) if the other Party is generally unable to pay its debts as they become due; or (e) if the other Party has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law.

Section 9.05    Effect of Terminations.

(a) Accrued Obligations.    Termination or expiration of this Agreement shall not relieve either Party of obligations incurred prior to the effective date of such termination or expiration.

(b) Return of Materials.    All NuVasive Intellectual Property, Promotional Materials, Products, designs, drawings, formulas or other data, photographs, samples, literature, sales aids of every kind and NuVasive Confidential Information shall remain the property of NuVasive. Within ten (10) calendar days after the termination or expiration of this Agreement, Representative shall prepare all such items in its possession for shipment, as NuVasive may direct, at NuVasive's reasonable expense. Upon termination or expiration of this Agreement, Representative shall not make, use, dispose of or retain any copies or derivatives of any NuVasive Confidential Information in any form. Effective upon the termination or expiration of this Agreement, Representative shall cease to use all NuVasive Trademarks. Representative shall comply with all requests from NuVasive regarding the return of inventory, Products, Promotional Materials, samples, and other NuVasive property. For clarity, all Compliance Agreements and customer relationships belong to NuVasive and shall be retained by NuVasive after termination or expiration of this Agreement.

(c) Additional Commissions.    In addition to any commissions already earned by Representative but not yet paid by NuVasive under the terms of Article II above, NuVasive shall pay commissions to Representative on all orders from the Territory that were accepted by NuVasive within thirty (30) calendar days after the date of termination or expiration of this Agreement and for which NuVasive receives payment within sixty (60) calendar days after the date of termination or expiration of this Agreement.

(d) No Other Compensation.    NuVasive shall not, by reason of the termination or expiration of this Agreement, be liable to Representative for compensation, indemnification, reimbursement or damages on account of any loss of prospective profits or anticipated sales or on account of expenditures, investments, leases or commitments made in connection with this Agreement or the anticipation of extended performance hereunder.

Section 9.06    Treatment of Representative Affiliates Upon Termination, Expiration or Modification of Territory. In the event that: (a) this Agreement is terminated or expires for any reason; (b) the Territory is modified, for any reason; or (c) NuVasive exercises any of its rights under Section 9.03, then in each case: (i) NuVasive shall have the right to hire, employ, or otherwise engage any Representative Affiliates providing services within the Territory (or in the case of a modification, such portion of the Territory that is removed or made non-exclusive) on terms determined by NuVasive in its sole discretion; (ii) at the request of NuVasive, all Compliance Agreements (or similar agreements then in effect) designated by NuVasive for Representative Affiliates within the Territory (or in the case of a modification, such portion of the Territory that is removed or made non-exclusive), as applicable, shall be automatically and immediately assigned to NuVasive; and (iii) Representative shall take all other reasonable steps to ensure that the services of all such Representative Affiliates engaged by NuVasive are continued uninterrupted on behalf of NuVasive, including, without limitation, releasing Representative Affiliates from any non-compete and other restrictive covenants between Representative and the Representative Affiliate that would otherwise restrict NuVasive from hiring or contracting with such Representative Affiliate. Representative shall not challenge or dispute, and waives any claim arising out of, the hiring, employment or engagement of such Representative Affiliate by NuVasive as set forth in this Section 9.06, including asserting any claim based upon any restrictive covenants agreed to between Representative and such Representative Affiliate.

Section 9.07    Survival. The provisions of Article IV, Section 5.09(c) (for the period specified therein), Section 5.10, Article VI, Article VII (except for the grant of rights and licenses by NuVasive), . Article VIII, Article IX, Article X, Article XI (for the period specified therein), and Article XII shall survive the termination or expiration of this Agreement for any reason. All other rights and obligations of the Parties shall cease upon termination or expiration of this Agreement.

### ARTICLE X.
### INDEMNITY

Section 10.01    Indemnification by Representative. Representative shall indemnify, defend and hold harmless NuVasive and its present and former, direct and indirect, subsidiaries, affiliates, employees, officers, directors, stockholders, members, agents, representatives, and permitted successors and permitted assigns (each a "**NuVasive Indemnitee**") from and against (a) any and all Losses finally awarded to a third party by a court of competent jurisdiction or agreed to in a settlement approved by Representative that result from any Claim made or brought against a NuVasive Indemnitee, and (b) subject to Section 10.03, any Litigation Costs incurred by a NuVasive Indemnitee while investigating or conducting the defense of any Claim, in any such case (a) and (b), solely to the extent such Claim is directly based on or directly arises out of or from (i) any breach by Representative of any of its representations, warranties and covenants under this Agreement; (ii) any bodily injury, death of any person or damage to real or tangible personal property caused by the acts or omissions of Representative or any Representative Affiliate; or (iii) the gross negligence and willful misconduct of Representative or any Representative Affiliate, provided, however, that such indemnification right shall not apply to any Losses or Litigation Costs to the extent directly attributable to: (x) the negligence, reckless misconduct, or intentional misconduct of a NuVasive Indemnitee, or (y) a claim for which NuVasive is obligated to indemnify a Representative Indemnitee under Section 10.02.

Section 10.02    Indemnification by NuVasive. NuVasive shall indemnify, defend and hold harmless Representative and its directors, officers, employees and agents (each a "**Representative Indemnitee**") from and against (a) any and all Losses finally awarded to a third party by a court of competent jurisdiction or agreed to in a settlement approved by NuVasive, and (b) subject to Section 10.03, any Litigation Costs incurred by a Representative Indemnitee while investigating or conducting the defense of any Claim, in any such case (a) and (b), solely to the extent such Claim is directly based on or

directly arises out of (i) an alleged manufacturing or design defect in a Product or (ii) any Product infringing upon or misappropriating any intellectual property rights of such third party, provided, however, that such indemnification right shall not apply to any Losses or Litigation Costs to the extent directly attributable to: (x) the negligence, reckless misconduct, or intentional misconduct of a Representative Indemnitee; (y) the modification or alteration of the Products by or on behalf of a Representative Indemnitee in a manner not approved in writing by NuVasive; or (z) a claim for which Representative is obligated to indemnify a NuVasive Indemnitee under Section 10.01. If, in connection with any Claim, it is determined by NuVasive that Representative acted beyond its authority, or failed to comply with any of its material obligations under this Agreement, NuVasive shall be immediately relieved of its obligations to Representative under this Section 10.02.

Section 10.03 Indemnification Procedure. Promptly after receipt by a Party seeking indemnification under this Article X (an "**Indemnitee**") of notice of any pending or threatened Claim against it, such Indemnitee shall give written notice to the Party from whom the Indemnitee is entitled to seek indemnification pursuant to this Article X (the "**Indemnifying Party**") of the commencement thereof; provided that, the failure to notify the Indemnifying Party shall not relieve it of any liability that it may have to any Indemnitee hereunder, except to the extent the Indemnifying Party demonstrates that it is materially prejudiced thereby. The Indemnifying Party shall be entitled to participate in the defense of such Claim and, to the extent that it elects within seven (7) calendar days of its receipt of notice of the Claim from the Indemnitee, to assume control of the defense and settlement of such Claim (unless (a) the Indemnifying Party is also a party to such proceeding and the Indemnifying Party has asserted a cross claim against the Indemnitee or a court has otherwise determined that such that joint representation would be inappropriate, or (b) the Indemnifying Party fails to provide reasonable assurance to the Indemnitee of its financial capacity to defend the Indemnitee in such proceeding) with counsel reasonably satisfactory to the Indemnitee and, after notice from the Indemnifying Party to the Indemnitee of its election to assume the defense of such Claim, the Indemnifying Party shall not, as long as it diligently conducts such defense, be liable to the Indemnitee for any Litigation Costs subsequently incurred by the Indemnitee. No compromise or settlement of any Claim may be effected by the Indemnifying Party without the Indemnitee's written consent, which consent shall not be unreasonably withheld or delayed, provided no consent shall be required if: (i) there is no finding or admission of any violation of law or any violation of the rights of any person and no effect on any other claims that may be made against the Indemnitee; (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party; and (iii) the Indemnitee's rights under this Agreement are not restricted by such compromise or settlement.

Section 10.04 LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NUVASIVE SHALL NOT BE LIABLE TO REPRESENTATIVE OR TO ANY ENTITY OR PERSON CLAIMING THROUGH OR UNDER REPRESENTATIVE FOR ANY LOSS OF PROFIT OR INCOME OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES OF ANY KIND, WHETHER IN AN ACTION FOR CONTRACT, TORT, OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT, EVEN IF NUVASIVE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NUVASIVE'S MAXIMUM LIABILITY TO REPRESENTATIVE FOR ANY CLAIM UNDER THIS AGREEMENT SHALL NOT EXCEED THE AMOUNTS PAID OR PAYABLE TO REPRESENTATIVE BY NUVASIVE HEREUNDER DURING THE SIX (6) MONTH PERIOD PRIOR TO THE MONTH IN WHICH THE EVENT GIVING RISE TO THE CLAIM OCCURRED. REPRESENTATIVE ACKNOWLEDGES THAT THESE LIMITATIONS OF LIABILITY ARE AN ESSENTIAL ELEMENT OF THE BARGAIN BETWEEN THE PARTIES AND IN THEIR ABSENCE THE TERMS AND CONDITIONS OF THIS AGREEMENT WOULD BE SUBSTANTIALLY DIFFERENT.

Section 10.05 Set-off Right. NuVasive may withhold payment of any amounts due and payable under this Agreement by reason of any set-off of any claim or dispute with Representative, whether

relating to Representative's indemnification obligations breach, bankruptcy or otherwise. For the avoidance of doubt, the withholding of payment shall not relieve Representative of its obligations arising under this Agreement.

Section 10.06  Insurance.  During the Term and for a period of two (2) years thereafter, Representative shall maintain in full force and effect the following insurance coverage of not less than the following amounts: (a) General Liability including Products/Completed Operations Liability – Two Million Dollars ($2,000,000) aggregate, One Million Dollars ($1,000,000) Bodily Injury/Property Damage per occurrence, One Million Dollars ($1,000,000) Personal and Advertising Injury, One Hundred Thousand Dollars ($100,000) Damage to Rented Premises, Ten Thousand Dollars ($10,000) Premises Medical Payments; (b) Property Coverage equal to replacement value of property owned along with extra expense coverage to cover period of time to replace office premises; (c) Professional Liability – One Million Dollars ($1,000,000) aggregate and per occurrence; (d) Automobile Liability for owned, non-owned and hired autos (as applicable) – One Million Dollars ($1,000,000) per accident; and (e) Workers Compensation sufficient to meet statutory required benefits of the state in which your employees are domiciled; all from carrier(s) reasonably acceptable to NuVasive. On an ongoing basis, Representative shall provide NuVasive with one or more certificates of insurance showing that Representative maintains insurance in accordance with this Section 10.06. Such certificates shall confirm that NuVasive has been named as an additional insured on Representative's insurance policies by endorsement to such policies and shall provide that there shall be no cancellation or reduction in coverage without thirty (30) calendar days' prior written notice to NuVasive.

## ARTICLE XI.
## RECORDS AND AUDITS

Section 11.01  Records and Audits.  During the Term plus an additional six (6) years after its expiration or termination, Representative agrees to maintain all records required to substantiate Representative's compliance with the provisions of this Agreement and with all laws, regulations, policies, procedures and guidelines related to Representative's performance of its obligations under this Agreement, including Representative's required Infrastructure Investment. Upon reasonable request by NuVasive, Representative agrees to furnish a full and detailed statement of such records and NuVasive's business in the Territory. NuVasive shall have the right during normal business hours and upon thirty (30) calendar days' prior written notice to audit Representative's and Representative Affiliate's records relative to NuVasive's business (including basic financial information of Representative) activities applicable to this Agreement and verify any Representative or Representative Affiliate statement sent to NuVasive.

## ARTICLE XII.
## MISCELLANEOUS

Section 12.01  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving any effect to the choice of law principles thereunder. The Parties agree that the U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

Section 12.02  Dispute Resolution.  Any controversy, dispute or question arising out of or in connection with this Agreement, or related to the interpretation, performance or non-performance of this Agreement or any breach hereof, shall be fully and finally resolved by binding arbitration conducted before a single neutral arbitrator from AAA in San Diego, California pursuant to the then current commercial dispute rules of the AAA (which can be accessed at www.adr.com), provided, however that if the dispute or claim involves a Party seeking at least one million dollars ($1,000,000) from the other

Party, then the arbitration will be conducted by a panel of three arbitrators from AAA, with one arbitrator chosen by each of the Parties and the third appointed by the other two arbitrators. The arbitrator(s) shall permit adequate discovery. In addition, the arbitrator(s) shall be empowered to award all remedies otherwise available in a court of competent jurisdiction. Any judgment rendered by the arbitrator(s) may be entered by any court of competent jurisdiction. The arbitrator(s) shall issue an award in writing and state the essential findings and conclusions on which the award is based. By executing this Agreement, the Parties are both waiving the right to a jury trial with respect to any such disputes. In all other jurisdictions the Parties shall split the costs of the arbitrator, forum and filings fees equally. Each Party shall bear its own respective attorneys' fees and all other costs, unless otherwise provided by law and awarded by the arbitrator(s). This arbitration section does not include claims that, by law, may not be subject to mandatory arbitration. Nothing contained in this Agreement shall in any way deprive either Party of its right to obtain injunctions or other equitable relief from a court of competent jurisdiction, including preliminary relief, pending arbitration

Section 12.03 Notices. Any notices required or permitted hereunder shall be given to the appropriate Party at the address specified in the **Key Terms Summary** or at such other address as the Party shall specify in writing. Such notice shall be in writing and shall be deemed given: (a) upon personal delivery to the appropriate address; (b) if it is delivered by email, when the recipient, by an email sent to the email address for the sender provided in the **Key Terms Summary** or by a notice delivered by another method in accordance with this Section 12.03, acknowledges having received that email; (c) upon delivery by facsimile transmission with receipt confirmed; (d) if sent by certified or registered mail, postage prepaid, three (3) calendar days after the date of mailing; or (e) if sent by overnight courier, the next business day such courier regularly makes deliveries.

· Section 12.04 Further Assurances. On NuVasive's request, Representative shall, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, necessary to give full effect to this Agreement.

Section 12.05 Assignment by Representative. Representative may not assign or transfer this Agreement or assign, transfer, or delegate any of its rights and obligations under this Agreement, including in connection with any Change of Control, without the prior written consent of NuVasive, which may be withheld, denied, or conditioned in the sole discretion of NuVasive. Any purported assignment or delegation in violation of this Section is null and void. No assignment or delegation relieves Representative of any of its obligations under this Agreement.

Section 12.06 Assignment by NuVasive. NuVasive may assign any of its rights or delegate any of its obligations without notice to, or the consent of, Representative, including in connection with any Change of Control.

Section 12.07 Severability. If any provision(s) of this Agreement shall be held invalid, illegal or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall be valid and enforceable and the Parties shall negotiate in good faith a substitute, valid and enforceable provision which most nearly effects the Parties' intent in entering into this Agreement. If a court holds that the duration, scope, geographic range, or any other restriction stated in any provision of this Agreement is unreasonable under circumstances then existing, the Parties agree that the maximum duration, scope, geographic range, or other restriction that the court deems reasonable under such circumstances will be substituted and that the court will have the power to revise any of those restrictions to cover the maximum period, scope, geographic range, and/or other restriction permitted by law.

Section 12.08 Modification; Waiver. This Agreement may not be altered, amended or modified in any way except in a writing signed by both Parties. The failure of a Party to enforce any provision of

the Agreement shall not be construed to be a waiver of the right of such Party to thereafter enforce that provision or any other provision or right.

Section 12.09   Entire Agreement. This Agreement and the exhibits hereto, as listed in the **Key Terms Summary**, represent and constitute the sole, final and entire agreement between the Parties, and supersedes and merges all prior negotiations, agreements and understandings, oral or written, with respect to the matters covered by this Agreement, including any prior Exclusive Sales Representative Agreement executed by the Parties.

Section 12.10   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. The Parties agree that a facsimile or electronic pdf may be executed as an original.

Section 12.11   Advice of Counsel. Each of the Parties represent that they have had the opportunity to seek the advice of counsel with respect to the negotiation and execution of this Agreement. Representative further represents that it has executed this Agreement of its own free will and is not relying on counsel for NuVasive with respect to any portion of this Agreement.

Section 12.12   Interpretation. Each Party acknowledges and agrees that (a) any applicable rule of construction to the effect that ambiguities are to be resolved against a drafting Party shall not be applied in connection with the construction or interpretation of this Agreement or any provision hereof; (b) no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement; (c) "including" (and any of its derivative forms) meaning including without limitation; (d) "may" means has the right but not the obligation to do something and "may not" means does not have the right to do something; and (e) "will" and "shall" are expressions of command, not merely expressions of future intent or expectation.

Section 12.13   Headings. The headings used in this agreement are for convenience of reference only and shall not affect the construction of or be taken into consideration in interpreting this Agreement.

Section 12.14   No Implied Licenses. Except as explicitly set forth herein, Representative is not granted any explicit or implied licenses in this Agreement.

## EXHIBIT A

### DEFINITIONS

1. "**AAA**" means the American Arbitration Association.

2. "**Agreement**" has the meaning set forth in the **Key Terms Summary**.

3. "**Change of Control**" means any merger, consolidation or acquisition of a Party, with by or into another corporation, person or entity, the sale of all or substantially all of the assets of the Party, or any change in the ownership of more than 50% of the voting stock of a Party in one or more related transactions.

4. "**Claim**" shall mean any charge, allegation, notice, civil, criminal or administrative claim, demand, complaint, cause of action, suit, proceeding, arbitration, hearing or investigation.

5. "**Commission**" has the meaning set forth in Section 2.01.

6. "**Compliance Agreement**" has the meaning set forth in Section 5.09.

7. "**Confidential Information**" means the proprietary or confidential information of a Party which is disclosed to the receiving Party, whether before or after the Effective Date, and (a) if disclosed in writing, is either marked as confidential or is known, understood or reasonably expected to be confidential at the time of disclosure, or (b) if disclosed orally or in other intangible form, is either identified and treated as confidential at time of disclosure, or is known, understood or reasonably expected to be confidential at the time of disclosure, or is, without limiting the foregoing, identified in writing and marked confidential within thirty (30) calendar days after disclosure and relates to products, plans, designs, costs, prices, finances, marketing plans, business opportunities, personnel, research, development, know-how, trade secrets, inventions, blueprints, techniques, processes, algorithms, software programs, schematics, designs, contracts, customer lists, procedures, formulae, patent applications and other information relating to the Party's business, services, processes or technology. Confidential Information shall also include the terms of this Agreement. Confidential Information shall not include information that the receiving Party proves: (i) was known by receiving Party or was publicly available prior to disclosure by the disclosing Party to the receiving Party; (ii) became publicly available after disclosure by the disclosing Party to the receiving Party through no act of the receiving Party; (iii) is hereafter rightfully furnished to the receiving Party by a third party without confidentiality restriction; (iv) was independently developed by the receiving Party without reference to, or use of, the receiving Party's Confidential Information; or (v) is disclosed with the prior written consent of the disclosing Party or as expressly authorized under this Agreement.

8. "**Effective Date**" means the effective date set forth in the **Key Terms Summary**.

9. "**Exhibit**" has the meaning set forth in the **Key Terms Summary**.

10. "**FDA**" means the U.S. Food and Drug Administration.

11. "**Health Care Provider**" means the definition of "health care provider" as set forth in 29 CFR 825.125.

12. "**Indemnifying Party**" has the meaning set forth in Section 10.03.

13. "**Indemnitee**" has the meaning set forth in Section 10.03.

14. "**Infrastructure Investments**" has the meaning set forth in Section 5.03.

15. "**Intellectual Property**" or "**Intellectual Property Rights**" as used herein collectively means any and all patents, copyrights, trademarks, trade secrets, mask works, moral rights, know-how or any other proprietary right, and any applications for the foregoing, under the laws of the United States, or any other governmental jurisdiction (including the European Union).

16. "**Litigation Costs**" means any direct out-of-pocket costs and expenses (including reasonable attorneys' fees).

17. "**Losses**" means any claims, costs, damages, losses, liabilities, fines, penalties, and expenses.

18. "**Monthly Statement**" has the meaning set forth in Section 2.05.

19. "**MVP**" has the meaning set forth in **Exhibit D**.

20. "**Net Sales**" means the dollar amount actually received by NuVasive from a customer for the sales of the Product(s), less charges for shipping, handling, freight, taxes, C.O.D. charges, insurance, tariffs and duties, cash and trade discounts, rebates, charge back payments to managed healthcare organizations, GPO administrative fees, amounts allowed or credited for returns, uncollected or uncollectable amounts, services, taxes imposed upon the sale of the Products, and any other deductions permitted under Generally Accepted Accounting Principles (GAAP) to calculate net sales.

21. "**NuVasive Indemnitee**" has the meaning set forth in Section 10.01.

22. "**NuVasive Trademarks**" has the meaning set forth in Section 7.01.

23. "**Party**" and "**Parties**" has the meaning set forth in the **Key Terms Summary**.

24. "**Poor Standing**" has the meaning set forth in Section 1.04.

25. "**Products**" means the products listed in the **Key Terms Summary**. Products subject to this Agreement may be changed, discontinued or added by NuVasive at its sole discretion upon thirty (30) calendar day's prior written notice to NuVasive.

26. "**Promote**," "**Promotional**" and "**Promotion**," and any variants of any of the foregoing, mean those activities to be undertaken by Representative and its authorized personnel to solicit orders for, encourage sales and appropriate use of the Product, including contacting customers in the Territory, and other forms of advertising, marketing, promotional and solicitation efforts.

27. "**Promotional Materials**" has the meaning set forth in Section 5.07.

28. "**Quota Commitments**" has the meaning set forth in Section 1.03.

29. "**Representative**" means the Representative listed in the **Key Terms Summary**.

30. "**Representative Affiliate**" means Representative's partners, employees, sub-contractors, sales personnel (whether employees of Representative or independent contractors), affiliates or agents who have provided services pursuant to this Agreement or have received information from Representative related to the Products.

31. "**Representative Indemnitee**" has the meaning set forth in Section 10.02.

32. "**Restricted Persons**" means any current, former, or prospective customers, group purchasing organizations, integrated health networks, hospitals, hospital groups, surgeons, physicians, or billing services with which NuVasive or an affiliate of NuVasive has a business relationship.

33. "**Shared Services**" has the meaning set forth in Section 5.05.

34. "**Stated Percentage**" equals the percentage listed in the **Key Terms Summary**.

35. "**Stated Percentage Amount**" means the amount equal to the Stated Percentage of all Net Sales generated in the Territory (or portion thereof, as applicable) by Representative pursuant to the Agreement during the most recently-completed twelve month period.

36. "**Term**" has the meaning set forth in Section 9:01.

37. "**Terms and Conditions of Sale**" has the meaning set forth in Section 3.01.

38. "**Territory**" means the territories specified in **Exhibit B**.

39. "**Trademark Guidelines**" has the meaning set forth in Section 7.01.

## **EXHIBIT B**

## **TERRITORY**

The following counties in the State of Florida: Flagler, Volusia, Lake, Seminole, Palm Beach, Brevard, Osceola, Orange, Highlands, Indian River, Martin and St. Lucie.

The following hospitals in Broward County, Florida: Advanced Orthopedics, Beth Israel Surgical Center and North Broward General.

The following hospital in Miami-Dade County Florida: The Gable Surgical Center.

The following hospital in Polk County, Florida: Heart of Florida Regional Medical Center.

## EXHIBIT C

### COMMISSIONS

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement between NuVasive and Representative. Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

## Calendar Year 2017 Commissions (Excluding Commission for MAGEC® Products)

| Monthly Commission Rate | |
|---|---|
| Osteocel Pro, Osteocel Plus, Propel | |
| • Stocking | 19.00% |
| • Non-Stocking | 16.00% |
| All other allograft Products | 19.00% |
| All other NuVasive Products[1] | 20.00% |
| QTR PTO Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics) | |
| >=105% of Quota Commitment | 2.00% |
| >=100% of Quota Commitment | 0.75% |
| | |
| Quarterly Growth Bonus (Paid on same quarter Net Sales in excess of the prior year (if any), excluding Net Sales of MAGEC and allograft/biologics) | 10.00% |

## Calendar Years 2018-2019 Commissions (Excluding Commission for MAGEC® Products)

| Monthly Commission Rate | |
|---|---|
| Osteocel Pro, Osteocel Plus, Propel | |
| • Stocking | 18.00% |
| • Non-Stocking | 16.00% |
| All other allograft Products | 18.00% |
| All other NuVasive Products[1] | 19.00% |
| QTR PTO Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics) | |
| >=110% of Quota Commitment | 3.50% |
| >=108% of Quota Commitment | 3.00% |
| >=105% of Quota Commitment | 2.50% |
| >=100% of Quota Commitment | 1.50% |
| | |
| Quarterly Growth Bonus (Paid on same quarter Net Sales in excess of the prior year (if any), excluding Net Sales of MAGEC and allograft/biologics) | 10.00% |

**Calendar Years 2020-2021 Commissions (Excluding Commission for MAGEC® Products)**

| | |
|---|---|
| **Monthly Commission Rate** | |
| Osteocel Pro, Osteocel Plus, Propel | |
| • Stocking | 18.00% |
| • Non-Stocking | 16.00% |
| All other allograft Products | 18.00% |
| All other NuVasive Products[1] | 18.00% |
| **QTR PTQ Bonus (Paid on Net Sales from $1, excluding all Net Sales of MAGEC and allograft/biologics)** | |
| >=110% of Quota Commitment | 4.00% |
| >=108% of Quota Commitment | 3.00% |
| >=105% of Quota Commitment | 2.50% |
| >=100% of Quota Commitment | 1.50% |
| **Quarterly Growth Bonus (Paid on same quarter Net Sales in excess of the prior year (if any), excluding Net Sales of MAGEC and allograft/biologics)** | 10.00% |

[1] *Calendar year 2017*: In existing accounts of Representative that currently are or become an NCS Account: a monthly commission rate of 18% will be paid for NCS module configuration products and 20% for all other IOS disposables. In any new account of Representative which is or becomes an NCS Account: a monthly commission rate of 9% will be paid for NCS module configuration products and 20% for all other IOS disposables. For any account of Representative which is not also an NCS Account: a monthly commission rate of 20% will be paid for all IOS disposables. The determination of "existing accounts" and "new accounts" of Representative will be determined by NuVasive as of the Effective Date.

*Calendar years 2018-2021*: NuVasive reserves the right to change the commission rates for IOS disposables upon 60 days written notice.

"NCS" means NuVasive Clinical Services, Inc. An "NCS Account" means any hospital or medical center which utilizes the services of NCS.

Commissions to be paid are determined by applying the appropriate commission rate to Net Sales (as described in Section 2.01 and Section 2.02 of the Agreement). Achievement of each of the QTR PTQ Bonus and Quarterly Growth Bonus is determined by measuring Net Sales of Product(s) (excluding all Net Sales of MAGEC).

Sales of Osteocel Pro, Osteocel Plus and Propel shall only be deemed "Stocking" sales if NuVasive receives a purchase order or valid purchase order number for the respective Product prior to shipping such Product, as evidenced by NuVasive's actual records (and the order is otherwise in accordance with the requirements of Section 3.02).

In the event the Territory is modified, then the Quarterly Growth Bonus opportunity may be amended or modified by NuVasive. The Quarterly Growth Bonus will not be retroactively applied

back to dollar one, but instead is an incremental increase to the monthly commission rate for all Net Sales made in a quarter that are in excess of the same prior-year quarter.

NuVasive reserves the right to introduce new Products with different Commission structures.

### Calendar year 2017 Commission for MAGEC Products

Representative's sole compensation for procurement of orders for MAGEC Products pursuant to the Agreement shall be a commission of 15.0% on Net Sales of MAGEC Products resulting from Representative's procurement of orders therefore (the "**MAGEC Commission**"). The terms and conditions set forth in Section 2.01 and Section 2.02 of the Agreement applicable to the Commission for non-MAGEC Products shall apply to the MAGEC Commission.

For the avoidance of doubt, sales of MAGEC Products shall not count towards Representative's achievement of the Quota Commitment or the determination of Representative's QTR PTQ Bonus or Quarterly Growth Bonus, if any.

## EXHIBIT D

### SHARED SERVICES.

NuVasive and Representative agree that the following Shared Services are beneficial to the efficient operation of their respective businesses. The Shared Services listed below are not meant to be exhaustive. Shared Services (and the costs relating to such Shared Services) may be modified, updated, added, supplemented or terminated in NuVasive's sole discretion with or without notice.

| Shared Service | Description |
|---|---|
| Recruiting | NuVasive agrees to post Representative job openings (as requested by Representative) on the NuVasive.com career page, subject to certain conditions as may be communicated to Representative from time to time by NuVasive. Access to this Shared Service is included in the base commission paid to Representative by NuVasive and may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
| Staff training | NuVasive agrees to provide Representative and its personnel with product, sales and professional development training programs and materials related to the Products as set forth in the Sales Training Course Catalog attached hereto as **Exhibit E**, which **Exhibit E** may be modified, updated or supplemented by NuVasive from time to time. Representative agrees (a) that all of its applicable employees and contractors engaged in Promoting or otherwise soliciting orders for the Products will complete NuVasive's sales training courses and program as outlined in **Exhibit E** within the timelines set forth therein, and (b) to implement a sales training plan agreed upon by Representative and NuVasive's sales management that makes full use of NuVasive's training courses and provides regular and thorough training to Representative's entire sales team. Representative shall sign all certifications confirming its applicable employees' and contractors' completion of such training, as may be requested by NuVasive. Access to this Shared Service is included in the base commission paid to Representative by NuVasive. Representative agrees to pay all costs for Representative and Representative Affiliate travel relating to staff training. |
| Data analytics | NuVasive agrees to provide Representative with data analytics support (e.g. sales performance, customer segmentation, competitive hiring modeling quota workbooks). Access to this Shared Service is included in the base commission paid to Representative by NuVasive and may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
| Software licenses | NuVasive agrees to provide Representative with required licenses to access NuVasive systems (e.g. CRM, SAP, Tableau). Access to this Shared Service is included in the base commission paid to Representative by NuVasive. NuVasive may modify, update, supplement or terminate Representative access to such NuVasive systems in its sole discretion with or without notice. |
| IT help desk | NuVasive agrees to provide reasonable IT help desk support for NuVasive systems. Access to this Shared Service is included in the base commission paid to Representative by |

| | NuVasive and may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
|---|---|
| Promotional Materials | NuVasive shall provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures, instructional material, advertising literature, product samples, and other Product data at Representative's cost. Access to this Shared Service may be modified, updated, supplemented or terminated by NuVasive in its sole discretion with or without notice. |
| Market development team support | NuVasive may provide market development team resources to Representative to support various initiatives, including, but not limited to, new surgeon conversion, market penetration, clinical training and new product launches. Representative and NuVasive agree to share in market development team costs as determined on a case by case basis by NuVasive in its sole discretion. Access to this Shared Service may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |
| MVP participation | Representative agrees to meet NuVasive's requirements for attendance and participation in NuVasive's Marquis Visit Program ("**MVP**") as communicated by NuVasive to Representative from time to time. Representative and NuVasive agree to share in MVP training costs as determined by NuVasive in its sole discretion. Access to this Shared Service may be modified, updated, supplemented or terminated in NuVasive's sole discretion with or without notice. |

## EXHIBIT E

## SALES TRAINING COURSE CATALOG



Sales Training
Course Catalog 0628

## EXHIBIT F

### FORM OF CERTIFICATION OF COMPLIANCE

#### [SEE ATTACHED]

## EXHIBIT G

### OTHER PRODUCTS/SERVICES SOLICITED, SOLD OR MARKETED BY REPRESENTATIVE OR REPRESENTATIVE AFFILIATES

## TERRITORY TRANSITION AGREEMENT

This TERRITORY TRANSITION AGREEMENT (the "Transition Agreement"), is entered into as of August 17, 2017 and is effective as of July 1, 2017 (the "TTA Effective Date"), by and between NUVASIVE, INC., a Delaware corporation ("NuVasive"), and ABSOLUTE MEDICAL LLC, a Florida limited liability company (on behalf of itself, its affiliated entities and its employees, officers, agents and representatives, "Representative"). Representative and NuVasive are referred to herein individually as a "Party" and collectively as the "Parties".

### Background

WHEREAS, the Parties have entered into that certain Exclusive Sales Representative Agreement dated January 1, 2017, as amended from time to time (the "Sales Agreement"); and

WHEREAS, the Parties desire to reduce the Territory (as defined in the Sales Agreement) in certain respects.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the Parties hereto, NuVasive and Representative agree as follows.

### Agreement

1.  **Definitions:** Capitalized terms not otherwise defined in this Transition Agreement shall have the meanings given to them in the Sales Agreement.

2.  **Territory Transition:**

    (a)  Upon the TTA Effective Date, Representative shall transition the business conducted by Representative in the territory set forth on **Annex I** attached hereto (the "Reduced Territory") to Skyway Surgical, Inc. (or its affiliates) (the "Transition"). Representative will cease acting as a distributor/agent for NuVasive in the Reduced Territory as of the TTA Effective Date.

    (b)  In order to effectuate the foregoing and to remove such Reduced Territory from the "Territory" under the Sales Agreement, the Parties agree that, as of the TTA Effective Date:

        (i)  "Exhibit B, Territory" to the Sales Agreement, shall be amended and restated in its entirety as set forth on **Annex II** attached hereto; and

        (ii) all references in the Sales Agreement to the "Territory" shall mean the "Territory" as provided in such amended and restated Exhibit B set forth on **Annex II.**

3.  **Consideration:** In consideration of the covenants, terms and conditions set forth herein and for the transfer of the customer-relationships, the release of the Sales Reps (set forth in Section 7) and other goodwill associated with Representative's business that is a material part of the value of the

Transition, NuVasive shall make a payment to Representative on or prior to August 25, 2017 in an amount equal to $636,403.

4. **Additional Payment under Sales Agreement:** NuVasive shall make a payment to Representative of previously deferred commissions under the Sales Agreement on or prior to August 25, 2017 in an amount equal to $40,792. Notwithstanding the foregoing, this payment of deferred commissions shall not be construed as a waiver by NuVasive with respect to any other term, provision, or condition of the Sales Agreement, including but not limited to Section 2.02 (Basis of Commission) and Section 2.04 (Commission Charge Back). NuVasive shall have the right to defer future Commissions in accordance with the Sales Agreement.

5. **Amendments to Sales Agreement:**

    (a) *Stated Percentage Letter Agreement.* The Parties shall execute the Stated Percentage Letter Agreement attached hereto as **Annex III** as of the date hereof; and

    (b) *Quota under the Sales Agreement.* The Parties shall execute the Revised Quota Letter attached hereto as **Annex IV** as of the date hereof.

6. **Transition Activities:** The Parties hereby agree to undertake the following activities on or prior to August 25, 2017:

    (a) *Return of Inventory in the Reduced Territory.* Any and all Products that NuVasive has supplied to Representative for use in the Reduced Territory which have not been sold to third parties shall be promptly returned by Representative to NuVasive in full saleable condition, but shall remain in the custody of Representative's sales and/or service personnel in the Reduced Territory that transition to Skyway Surgical, Inc. (or its affiliates).

    (b) *Business Plan.* Representative shall prepare and furnish to NuVasive a business plan that accurately summarizes all of Representative's existing business, customers, employees and/or agents, commission plans, and other pertinent matters related to serving as the sales representative for Products in the Reduced Territory.

    (c) *Meetings.* Representative shall meet with NuVasive's Leader, U.S. Commercial, and/or Sales Vice Presidents, at such times and places as reasonably requested thereby, to provide advisory services regarding the Transition; *provided, however,* that, if any such meeting is outside of the Reduced Territory, then any reasonable and related transportation and lodging costs shall be at the expense of NuVasive.

    (d) *Announcements.* Representative agrees to conduct any and all messaging regarding the Transition only as authorized and directed by NuVasive's Leader, U.S. Commercial, and/or Sales Vice Presidents (it being understood that at no point shall Representative disclose the financial terms hereof).

7. **Release of Sales Representatives:** Effective as of July 1, 2017, Representative hereby releases Casey Camero, Matt Camero and Evan Menjivar (the "Sales Reps") from all restrictive covenants

as between such Sales Reps and Representative solely with respect to NuVasive's or Skyway Surgical, Inc.'s (or its affiliates) ability to employ or contract with the Sales Reps and agrees to take all other actions necessary for NuVasive or Skyway Surgical, Inc.'s (or its affiliates) to employ or contract with such Sales Reps. Representative hereby covenants and agrees to take all such actions and to execute all such documents as may be reasonably necessary to implement the provisions and intentions of this Section 7 of this Transition Agreement.

8. **Restrictive Covenants.** During the Term (as defined in the Sales Agreement) and for a period of twelve (12) months thereafter, Representative and Representative Affiliates not released by Representative pursuant to this Transition Agreement shall not solicit, encourage, or induce, or cause to be solicited, encouraged or induced (directly or indirectly) any Restricted Persons within the Reduced Territory, to terminate or adversely modify any business relationship with NuVasive or its affiliates, or not to proceed with, or enter into, any business relationship with NuVasive or its affiliates, nor otherwise interfere with any business relationship between NuVasive or its affiliates, and any Restricted Persons within the Reduced Territory.

9. **Relationship.** The relationship of Representative to NuVasive shall continue to be that of an independent contractor. Representative understands and agrees that it will not be an employee of NuVasive under this Transition Agreement and that no employer-employee relationship will exist between Representative and NuVasive on account of this Transition Agreement. Furthermore, this Transition Agreement shall in no way render Representative a partner, agent of, or joint venture with NuVasive for any purpose.

10. **Taxes.** Representative shall be solely responsible for payment of all taxes, interest, or penalties resulting from any and all amounts paid hereunder. NuVasive shall not be responsible for withholding taxes with respect to any compensation Representative receives under this Transition Agreement. Representative shall have no claim against NuVasive under this Transition Agreement or otherwise for vacation pay, sick leave, retirement benefits, social security, workers' compensation, health or disability benefits, unemployment insurance benefits, or other employee benefits of any kind arising out of this Transition Agreement.

11. **Strict Confidentiality.** Representative acknowledges and agrees that (a) the terms and conditions of this Transition Agreement are strictly confidential and proprietary as related to NuVasive's business, and (b) disclosure of such terms could cause material harm to NuVasive's business. Accordingly, Representative, as a material inducement to NuVasive's willingness to enter into this Transition Agreement, hereby agrees to refrain from disclosing, or causing to be disclosed, any of the terms of this Transition Agreement to any third party or (including other employees, consultants or members of NuVasive's sales team); *provided, however,* that the foregoing shall not prohibit (i) Representative from making confidential communication with its legal or financial counsel, or (ii) the Parties from generally disclosing - consistent with the terms and conditions of this Transition Agreement (and without any reference to associated compensation) - that the Transition has occurred.

12. **Waiver and Release of Claims Relating to the Reduced Territory.** As consideration for the conditions, commitments and all obligations contained herein each Party hereby releases and forever discharges the other Party, including any officers, directors, employees, agents, representatives, affiliates, successors, predecessors, attorneys and assigns, whether past, present or future, from any and all manners of action, causes of action, suits, debts, losses, liabilities,

obligations, liens, sums of money, accounts, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, expenses, claims and demands, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, statute, law, equity or otherwise, which a Party had or have, upon or by reason of any fact, matter, cause or thing whatsoever, arising out of or relating to the Reduced Territory.

Each Party understands that it may later discover claims or facts that may be different from, or in addition to, those that it now knows or believes to exist regarding the subject matter of the release contained in this Section 12, and which, if known at the time of signing this Transition Agreement, may have materially affected this Transition Agreement and such Party's decision to enter into it and grant the release contained in this Section 12. Nevertheless, each Party intends to fully, finally and forever settle and release all claims that now exist, may exist or previously existed, as set forth in the release contained in this Section 12, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. Each Party hereby waives any right or claim that might arise as a result of such different or additional claims or facts. Each Party has been made aware of, and understands, the provisions of California Civil Code Section 1542 ("Section 1542"), which provides:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

Each Party expressly, knowingly and intentionally waives any and all rights, benefits and protections of Section 1542 and of any other state or federal statute or common law principle limiting the scope of a general release.

For clarity, nothing in this Section 12 shall be deemed to be a waiver or release by Representative of any rights to payments under this Transition Agreement.

13. **Governing Law; Arbitration.** This Transition Agreement is effective as of the TTA Effective Date and shall be governed, construed and enforced in all respects solely and exclusively under the laws of the State of Delaware, without giving any effect to the choice of law principles thereunder. The Parties agree that the U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Transition Agreement. Any controversy, dispute or question arising out of or in connection with this Transition Agreement, or related to the interpretation, performance or non-performance of this Transition Agreement or any breach hereof, shall be fully and finally resolved by binding arbitration conducted before a single neutral arbitrator from AAA in San Diego, California pursuant to the then current commercial dispute rules of the AAA (which can be accessed at www.adr.com), provided, however that if the dispute or claim involves a Party seeking at least one million dollars ($1,000,000) from the other Party, then the arbitration will be conducted by a panel of three arbitrators from AAA, with one arbitrator chosen by each of the Parties and the third appointed by the other two arbitrators. The arbitrator(s) shall permit adequate discovery. In addition, the arbitrator(s) shall be empowered to award all remedies otherwise available in a court of competent jurisdiction. Any judgment rendered by the arbitrator(s) may be entered by any court of competent jurisdiction. The arbitrator(s) shall issue an award in writing and state the essential findings and conclusions on which the award is based.

Page 4 of 7
*(including the signature page, but excluding all exhibits)*

By executing this Transition Agreement, the Parties are both waiving the right to a jury trial with respect to such disputes. In all other jurisdictions the Parties shall split the costs of the arbitrator, forum and filings fees equally. Each Party shall bear its own respective attorneys' fees and all other costs, unless otherwise provided by law and awarded by the arbitrator(s). This arbitration section does not include claims that, by law, may not be subject to mandatory arbitration. Nothing contained in this Transition Agreement shall in any way deprive either Party of its right to obtain injunctions or other equitable relief from a court of competent jurisdiction, including preliminary relief, pending arbitration.

14. **Assignment:** NuVasive may assign this Transition Agreement, any of its rights hereunder or delegate any of its obligations hereunder without notice to, or the consent of, Representative. Representative may not assign or transfer this Transition Agreement or assign, transfer, or delegate any of its rights and obligations under this Transition Agreement without the prior written consent of NuVasive, which may be withheld, denied, or conditioned in the sole discretion of NuVasive. Any purported assignment or delegation in violation of this Section is null and void. No assignment or delegation relieves Representative of any of its obligations under this Transition Agreement. .

15. **Severability:** If any provision(s) of this Transition Agreement shall be held invalid, illegal or unenforceable by a court of competent jurisdiction, the remainder of the Transition Agreement shall be valid and enforceable and the Parties shall negotiate in good faith a substitute, valid and enforceable provision which most nearly effects the Parties' intent in entering into this Transition Agreement. If a court holds that the duration, scope, geographic range, or any other restriction stated in any provision of this Transition Agreement is unreasonable under circumstances then existing, the Parties agree that the maximum duration, scope, geographic range, or other restriction that the court deems reasonable under such circumstances will be substituted and that the court will have the power to revise any of those restrictions to cover the maximum period, scope, geographic range, and/or other restriction permitted by law.

16. **Advice of Counsel:** Each of the Parties represent that they have had the opportunity to seek the advice of counsel with respect to the negotiation and execution of this Transition Agreement. Representative further represents that it has executed this Transition Agreement of its own free will and is not relying on counsel for NuVasive with respect to any portion of this Transition Agreement.

17. **Interpretation:** Each Party acknowledges and agrees that (a) any applicable rule of construction to the effect that ambiguities are to be resolved against a drafting Party shall not be applied in connection with the construction or interpretation of this Transition Agreement or any provision hereof; (b) no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Transition Agreement; (c) "including" (and any of its derivative forms) meaning including without limitation; (d) "may" means has the right but not the obligation to do something and "may not" means does not have the right to do something; and (e) "will" and "shall" are expressions of command, not merely expressions of future intent or expectation.

18. **Counterparts; Execution:** This Transition Agreement may be signed in two or more counterparts, all of which together shall constitute one and the same agreement, binding on the Parties as if each had signed the same document. Signatures to this Transition Agreement may be made via electronic signature (.pdf format included).

19. **No Other Modifications:** Except as expressly modified herein, the terms of the Sales Agreement will remain in full force and effect.

*{Signature page to follow}*

This **TERRITORY TRANSITION AGREEMENT** is entered into and binding upon the Parties as of the TTA Effective Date:

NUVASIVE, INC.

By: _____
Name: Paul McClintock
Title: Leader, U.S. Commercial

ABSOLUTE MEDICAL LLC

By: _____
GREG SOUFLERIS
Authorized Signatory

## ANNEX I

### Reduced Territory

The Reduced Territory shall constitute the following:

- The following medical centers and hospital in Brevard County, Florida: Wuesthoff Medical Center Melbourne; Holmes Regional Medical Center, and Palm Bay Hospital;

- Indian River County, Florida;

- Martin County, Florida;

- Palm Beach County, Florida;

- St. Lucie County, Florida;

- The Gable Surgical Center located in Miami-Dare County, Florida; and

- The following hospitals in Broward County, Florida: Advanced Orthopedics, Beth Israel Surgical Center and North Broward General.

## ANNEX II

The content of this ANNEX II is incorporated by reference into and completely amends and restates the content set forth in Exhibit B to the Sales Agreement as follows:

## "EXHIBIT B

## TERRITORY

- The following counties in the State of Florida: Flagler, Volnsia, Lake, Seminole, Osceola, Orange, Highlands;

- The county of Brevard in the State of Florida, excluding Wuesthoff Medical Center Melbourne; Holmes Regional Medical Center, and Palm Bay Hospital;*

- The following hospital in Polk County, Florida: Heart of Florida Regional Medical Center.

* For clarity, the Territory shall include Wuesthoff Medical Center Rockledge."

**ANNEX III**

August ___, 2017

Absolute Medical, LLC
382 Devon Place
Heathrow, FL 32746
Attn: Greg Soufleris

**Re: Stated Percentage Amount**

Dear Greg,

Reference is made to the Exclusive Sales Representative Agreement, by and between NuVasive, Inc. and Absolute Medical, LLC, effective as of January 1, 2017, as amended from time to time (the "**Agreement**"). Capitalized terms used in this letter but not otherwise defined shall have the meaning ascribed to such terms in the Agreement.

Pursuant to the Key Terms Summary under the Agreement, the Stated Percentage is defined at 10%. The parties hereby agree that the Stated Percentage under the Agreement shall be increased from 10% up to a maximum of 14% upon the achievement of growth in the Territory (as amended pursuant to that certain Territory Transition Agreement dated as of even date herewith) pursuant to the following formula:

Effective as of January 1, 2019, the "Stated Percentage" shall equal the 2018 Growth Modifier.

*Where:*

"2018 Growth Modifier" =

If 2018 GP < 12%, then 2018 Growth Modifier = 10%;

If 2018 GP ≥ 12%, then 2018 Growth Modifier = 11%;

If 2018 GP ≥ 14%, then 2018 Growth Modifier = 12%;

If 2018 GP ≥ 16%, then 2018 Growth Modifier = 13%;

If 2018 GP ≥ 18%, then 2018 Growth Modifier = 14%;

*Defined Terms for 2018 Growth Modifier formula:*

NS18 = Net Sales in the Territory in calendar year 2018.

NS17 = Net Sales in the Territory in calendar year 2017.

$$2018 \ GP = \frac{NS18 - NS17}{NS17}$$

Please confirm your acknowledgment and agreement to be bound by this letter agreement by countersigning below and sending a copy of the same back to my attention. For clarity, other than with respect to amending the Stated Percentage under the Agreement, all other terms and provisions of the Agreement remain in effect without modification.

Sincerely,

_____

NuVasive, Inc.

**Agreed and Acknowledged:**

Absolute Medical LLC

By:_____

    Greg Soufleris
    Authorized Signatory

ANNEX IV

August ___, 2017

Absolute Medical, LLC
382 Devon Place
Heathrow, FL 32746
Attn: Greg Soufleris

### Re: Revised Quota for Q3 2017 and Q4 2017

Dear Greg,

Reference is made to: (a) the Exclusive Sales Representative Agreement, by and between NuVasive, Inc. and Absolute Medical, LLC, effective as of January 1, 2017, as amended from time to time (the "Sales Agreement"), and (b) the Territory Transition Agreement, by and between NuVasive, Inc. and Absolute Medical, LLC, effective as of July 1, 2017 (the "Transition Agreement"). Capitalized terms used in this letter but not otherwise defined shall have the meaning ascribed to such terms in the Sales Agreement.

In connection with reduction in Territory pursuant to the Transition Agreement and in accordance with Section 1.03 of the Sales Agreement, the parties hereby agree that the Quota Commitment for the Territory as of the date hereof shall be as follows:

| Period | Quota Commitment |
|---|---|
| July 1, 2017 – September 30, 2017 | $2,345,760 |
| October 1, 2017 – December 31, 2017 | $2,576,080 |

Please confirm your acknowledgment and agreement to be bound by this letter agreement by countersigning below and sending a copy of the same back to my attention. For clarity, other than with respect to amending the Stated Percentage under the Agreement, all other terms and provisions of the Agreement remain in effect without modification.

Sincerely,

_____
NuVasive, Inc.

**Agreed and Acknowledged:**

Absolute Medical LLC

By:_____
    Greg Soufleris
    Authorized Signatory



### EXCLUSIVE SALES REPRESENTATIVE AGREEMENT

This EXCLUSIVE SALES REPRESENTATIVE AGREEMENT (the "Agreement") is entered into effective as of February 14, 2013 ("Effective Date") by and between NuVasive, Inc., a Delaware corporation with principal offices at 7475 Lusk Boulevard, San Diego, California 92121 ("NuVasive"), and Absolute Medical LLC, a Florida limited liability corporation with a principal place of business at 213 Villa Di Este Terrace #105, Lake Mary, Florida 32746 ("Representative") (each a "Party" and collectively "the Parties").

1.  **DEFINITIONS**

1.1 "Products" means those products listed in **Exhibit A** attached hereto. Products subject to this Agreement may be changed, discontinued or added by NuVasive, at its sole discretion, so long as such change, discontinuation and/or addition similarly affects, or would otherwise put Representative in line with, the product offering for other similarly situated sales representatives of NuVasive. Such change, discontinuation and/or addition shall be effective thirty (30) days after delivery by NuVasive to Representative of a new **Exhibit A**.

1.2 "Territory" means the geographic areas and/or specific institutions listed on **Exhibit B** hereto. The Territory may be increased or decreased by agreement of the Parties in writing. NuVasive may, in its sole discretion, decrease the Territory if (i) the Territory is not sufficiently covered by sufficient representation in accordance with the sales action plan agreed to by the Parties and delivered pursuant with Section 6.4, (ii) Representative is in violation of Section 6.12, 6.14 or 6.15 of this Agreement, (iii) Representative is in Poor Standing, or (iv) NuVasive pays Representative an amount equal to the then-current Stated Percentage with respect to the sales generated (based on either the sales generated in the prior calendar year or the twelve (12) months following decrease in Territory, as determined in the sole discretion of NuVasive) in the portion of the Territory that is being decreased from Representative.

2.  **APPOINTMENT AND AUTHORITY OF REPRESENTATIVE**

2.1 Exclusive Sales Representative. Subject to the terms and conditions herein, NuVasive hereby appoints Representative as NuVasive's exclusive sales representative for Products in the Territory, and Representative hereby accepts such appointment. Representative's sole authority shall be to solicit orders for Products in the Territory in accordance with the terms of this Agreement. Representative shall not have the authority to make any commitments whatsoever on behalf of NuVasive.

2.2 Territorial Limitation. Representative shall not, directly or indirectly, (i) advertise or promote any Products outside the Territory; (ii) solicit or procure any orders for Products from outside the Territory; or (iii) otherwise act as NuVasive's representative with respect to the Products outside the Territory, without the prior written consent of NuVasive. Representative may only submit and procure orders from customers located and taking delivery of Products within the Territory. Representative shall maintain sufficient representation in all spine hospitals and clinics in the Territory and shall promptly replace any sales representatives that leave Representative's organization while the Agreement is in force. Any accounts or portions of the Territory without sufficient representation may at NuVasive's discretion be moved to a non-exclusive status (notwithstanding Section 2.1) or removed from the Territory.



2.3 Independent Contractors. The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either Party the power to direct and control the day-to-day activities of the other Party, (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Representative to create or assume any obligation on behalf of NuVasive for any purpose whatsoever. All financial and other obligations associated with each Party's business and its performance of obligations under this Agreement are the sole responsibility of the respective Party. Each Party shall be solely responsible for, and shall indemnify and hold the other Party free and harmless from, any and all claims, actions, proceedings, damages, liability, costs and expense (including reasonable attorneys' fees) arising out of the acts of its employees or its agents. For the avoidance of doubt, with respect to its sales representatives, Representative shall be solely responsible for hiring, promoting, discharging, scheduling appointments, establishing pay scales and/or other remuneration, remunerating, reimbursing for work-related expenses, implementing discipline and any other action directly related to the employment of such sales representatives.

2.4 Conflicts of Interest. Representative represents and warrants to NuVasive that it does not (nor does any entity or person affiliated with it) currently represent or promote any lines or products that are competitive with any NuVasive Product, and that it shall not (nor shall any entity or person affiliated with it) during the Term, directly or indirectly, represent, promote, sell or otherwise commercialize within the Territory (i) any lines or products that are competitive with any Product covered by this Agreement or (ii) any non-NuVasive products for use in spine surgery. Further, during the Term, Representative shall not, directly or indirectly, represent, promote, sell or otherwise commercialize any products (other than the Products) without the written consent of NuVasive. In addition, Representative represents that its performance of all the terms of this Agreement and as an agent of NuVasive does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by it in confidence or in trust prior to its engagement by NuVasive, and Representative agrees not to disclose to NuVasive any confidential or proprietary information or material belonging to any previous employers or other entities with whom Representative has been involved. Representative represents and warrants that it has not entered into (and is not bound by) any agreement, either written or oral, that is in conflict herewith or in conflict with the engagement contemplated hereby.

2.5 Corporate Compliance. Representative agrees and warrants that it will cooperate fully with NuVasive personnel in all respects with regard to performing the obligations of this Agreement, including participating in requested teleconferences, meetings, and travel, and providing sales target and sales forecasting information to NuVasive upon reasonable request.

3.    **COMMISSION**

3.1 Sole Compensation. Representative's sole compensation under the terms of this Agreement shall be (i) a commission ("Commission") based on Net Sales (as defined in Section 3.2 below) of Products resulting from Representative's procurement of orders therefore pursuant to this Agreement, in accordance with the schedule set forth in Exhibit C hereto and (ii) $300,000 paid in accordance with the schedule set forth in Exhibit D hereto.

3.2 Basis of Commission. The Commission shall apply to all Product orders (i) procured by Representative from customers within the Territory in accordance with this Agreement; (ii) that have been accepted by NuVasive; and (iii) for which shipment of Products and recognition of revenue by NuVasive has occurred. Commissions shall be computed based on "Net Sales" which shall, for purposes of this Agreement, be defined as the dollar amount actually received by NuVasive from a customer for the sales of the Product(s), less charges for shipping, handling, freight, taxes, C.O.D.

-2-

charges, insurance, tariffs and duties, cash and trade discounts, rebates, charge back payments to managed healthcare organizations, amounts allowed or credited for returns, uncollected or uncollectable amounts, services, and the like. The Territory may be subdivided into regions if set forth as such on **Exhibit B**, **Exhibit C** or **Exhibit E** (as updated from time to time by NuVasive). Separate Quota Commitments may be designated for each such region.

3.3 Time and Manner of Payment. The Commission pursuant to Section 3 on a given order shall be due and payable thirty (30) days after the end of the calendar month in which NuVasive invoices and ships that order.

3.4 Commission Charge Back. NuVasive shall have the absolute right to set such cash discounts, to make such allowances and adjustments, to accept such returns from its customers, and to write off as bad debts such overdue customer accounts as it deems advisable in its discretion. In each such case, NuVasive shall charge back to Representative's account any Commission previously paid or credited to it with respect to such cash discounts, allowances, adjustments, returns or bad debts. Representative also agrees to accept charges for: (i) pricing arrangements (or side deals) not approved by NuVasive; (ii) lost, damaged or missing inventory; (iii) failure to comply with NuVasive's communicated policies, e.g., inventory management policy (i.e. carrying charges for excess inventory levels) and prohibition of "house accounts"; and (iv) courier charges for the delivery of Products when NuVasive standard method of shipping was available.

3.5 Monthly Statements. NuVasive shall submit to Representative monthly statements of the Commissions due and payable to Representative under the terms of this Agreement, with reference to the specific invoices on which the Commissions are being paid.

3.6 Potential Bonus Payments. NuVasive may, from time to time and in its sole discretion, pay bonuses as separately outlined by Sales Administration for the achievement of peak sales performance and as part of special product roll-outs and initiatives.

4.   **SALE OF THE PRODUCTS**

4.1 Prices and Terms of Sale. NuVasive shall provide Representative with copies of its current price lists, its delivery schedules, and its standard terms and conditions of sale, as established from time to time. NuVasive's current terms and conditions of sale are attached hereto as **Exhibit F**, which may be amended from time to time in the sole discretion of NuVasive (the "Terms and Conditions"). Representative shall quote to customers only those authorized prices, delivery schedules, and terms and conditions, and shall have no authority to quote or offer any discount to such prices or change any such terms and conditions, without the prior written consent of NuVasive. NuVasive may change the prices, delivery schedules, and terms and conditions, at any time and from time to time, such changes to be effective thirty (30) days after delivery by NuVasive to Representative of written notice of any such changes. Each order for a Product shall be governed by the prices, delivery schedules, and terms and conditions in effect at the time the order is accepted by NuVasive, and all quotations by Representative shall contain a statement to that effect.

4.2 Orders; Acceptance. All orders for the Products shall be in writing, and the originals shall be submitted to NuVasive. NuVasive shall promptly furnish to Representative informational copies of all commissionable orders sent by customers in the Territory. All orders obtained by Representative shall be subject to acceptance by NuVasive at its sole discretion. Representative shall have no authority to make any acceptance or delivery commitments to customers. NuVasive agrees that its normal business practice is to accept all bona fide orders for Products, subject to availability and NuVasive's credit and ordering policies.

-3-

4.3 Collection. It is expressly understood by Representative that full responsibility for all collection rests with NuVasive, provided, at NuVasive's request, Representative will assist NuVasive in the collection of any accounts receivable of NuVasive.

5. **WARRANTY**

5.1 Customer Warranty. Any warranty for the Products shall run directly from NuVasive to the customer, and pursuant to the warranty the customer shall return any allegedly defective Products to NuVasive. Representative shall have no authority to accept any returned Products.

5.2 Warranty Terms. All warranty claims shall be governed by the Terms and Conditions.

6. **ADDITIONAL OBLIGATIONS OF REPRESENTATIVE**

6.1 · Quota Commitment. Representative shall solicit orders that are submitted to NuVasive in accordance with this Agreement for the quantity of Products set forth in **Exhibit E** attached hereto ("Quota Commitment"). The Quota Commitment shall be determined, based on dialogue with Representative, by NuVasive in its sole discretion and delivered to Representative within thirty (30) days of the end of each calendar year, or as may be delivered to Representative by NuVasive from time to time (it being understood that NuVasive intends to deliver a Quota Commitment at intervals more frequently than annually only with respect to newly introduced products). If Representative (i) fails to secure orders for ninety-five percent (95%) of its aggregate Quota Commitment in any two consecutive calendar quarters, or (ii) fails to secure orders for ninety-five percent (95%) of its aggregate Quota Commitment for any given calendar year, then Representative shall be deemed in "Poor Standing" and NuVasive may, at its discretion and without prejudice to any other rights NuVasive may have under this Agreement, terminate Representative's exclusivity granted in Section 2.1 herein and appoint one or more additional representatives for sale of Products in the Territory, reduce the Territory per Section 1.2, and/or terminate the Agreement at will per Section 11.3. If Representative is deemed to be in Poor Standing, Representative may regain good standing (and no longer be deemed in Poor Standing): (a) by achieving its aggregate Quota Commitment for a calendar quarter or the calendar year, or (b) as of the January 1st following the year in which Representative is deemed to be in Poor Standing unless Representative is, within fifteen (15) days of the end of the year, (1) notified by NuVasive that it is in Poor Standing, or (2) provided with a corrective sales plan by NuVasive. If NuVasive provides a corrective sales plan as set forth in the prior sentence, then Representative shall be deemed in Poor Standing until Representative has successfully completed the corrective sales plan, as determined in the sole discretion of NuVasive. For the avoidance of doubt, Representative shall not be in Poor Standing as of the Effective Date. Orders fulfilling the Quota Commitment shall be based on bona fide orders submitted to NuVasive that would, upon acceptance by NuVasive, qualify for the payment of a Commission to Representative. The Territory may be subdivided into regions if set forth as such on **Exhibit B, Exhibit C or Exhibit E** (as updated from time to time by NuVasive). Separate Quota Commitments may be designated for each such region.

6.2 Representative Infrastructure and Promotion of the Products. NuVasive and Representative acknowledge and agree that development of proper infrastructure on the part of Representative is vital for the success of the business. NuVasive will work with Representative to develop and refine expectations for business investments to be made by Representative for the purpose of expanding its infrastructure (e.g., overseeing operations, operational activities, adding personnel with specialized skills, investing in new markets, computer systems and software, inventory tracking and management, etc.) (the "Infrastructure Investments"). The Infrastructure Investments required by NuVasive will be reasonable in scope and expense and will be supported with resources from NuVasive. As the Infrastructure Investments are defined and communicated to Representative from

-4-

time to time, Representative agrees to comply with the Infrastructure Investments and agrees that failure to do so shall entitle NuVasive to appropriately redefine the Territory and/or terminate Representative's exclusivity. Representative acknowledges and agrees to maintain sufficient personnel to effectively and consistently promote the sale of the Products as contemplated by the Agreement, with a focus on selling a complete mix of the various Products. Representative shall also provide sufficient promotional support to its sales representatives in order to promote the Products in their assigned territories. Representative agrees not to sell all or any part of the Promotional Materials of Section 7.2 to any third party without the prior written consent of NuVasive. Representative shall use the Promotional Materials of Section 7.2 solely to demonstrate and promote the Products to bona fide customers considering ordering such Products in strict accordance with all the terms of this Agreement and solely to the extent necessary to fulfill the purposes of this Agreement.

6.3      Territorial Responsibility. Representative shall assign its entire Territory to individual sales representatives, shall set individual quotas for each representative, and shall communicate all such information to NuVasive on an ongoing basis.

6.4      Sales Action Plans. Representative shall provide to NuVasive, within thirty (30) days following the end of each calendar year, an annual sales objectives plan detailing Representative's sales goals and execution strategies for the coming year. In addition, Representative shall deliver to NuVasive, by the fifth (5th) day of each calendar month, a monthly action plan detailing Representative's sales history, revised sales plans and strategies.

6.5      Audit. Upon reasonable request by NuVasive, Representative agrees to furnish a full and detailed statement of NuVasive's business and in Territory but only to the extent it relates to this Agreement, including without limitation to matters related to Sections 6.10 and 6.13 herein. NuVasive shall have the right during normal business hours and upon thirty (30) days prior written notice to audit Representative's records relative to NuVasive's business (including basic financial information of Representative) and verify any Representative statement sent to NuVasive.

6.6      Demonstration and Staff Training. NuVasive agrees to provide Representative and its personnel with adequate training regarding the use and operation of the Products, and to also provide its staff and personnel with regular training regarding any updates to the Products. Representative agrees to attend (and have its applicable employees and contractors attend within 90 days of date of hire by Representative) training as requested by NuVasive. Representative agrees (i) that all of its applicable employees and contractors will attend NuVasive's sales training course within six (6) months of execution of this Agreement and (ii) to implement a sales training plan agreed upon by Representative and NuVasive's sales management that takes full use of training courses and provides regular and thorough training to entire sales team. Representative also agrees to meet NuVasive's requirements for attendance and participation in NuVasive's Marquis Visit Program, which shall include an annual quota for MVPs to be scheduled by Representative. Costs associated with attendance at training events shall be borne by Representative.

6.7      Product Complaints. Representative represents and warrants that Representative shall: (i) promptly investigate and monitor all customer and/or regulatory complaints and/or correspondence concerning the use of the Products in the Territory; (ii) immediately notify NuVasive of all such complaints and/or correspondence; (iii) assign to NuVasive all rights (including intellectual property rights), title and interests in and to any customer feedback with regard to the Products, and (iv) take any and all such actions to ensure such assignment is effected, upon reasonable request of NuVasive.

6.8      Representations; Marketing. Representative represents and warrants it shall not make any false or misleading representations to customers or others regarding NuVasive or the Products, or

-5-

about NuVasive competitors or competitor products. Representative represents and warrants that it shall not make any representations, warranties or guarantees with respect to the specifications, features or capabilities of the Products that are not consistent with, or otherwise expand upon the claims in, the Promotional Materials or other documentation supplied by NuVasive. Representative represents and warrants that it shall use only the Promotional Materials supplied by NuVasive in its promotion of the Products. Representative represents and warrants that in no event shall Representative make any guarantee or warranty concerning the Products that is inconsistent with, or otherwise expands upon, NuVasive's standard limited warranty or on behalf of any vendor or supplier of NuVasive. Representative represents and warrants that it shall promote and market the Products in accordance with the training provided by NuVasive.

6.9     Notice of Changes. Representative shall promptly advise NuVasive of (i) any changes in Representative' status, organization, personnel, and similar matters, (ii) any changes in the key personnel, organization, and status of any major customers of NuVasive in the Territory, and (iii) any political, financial, legislative, industrial or other events in the Territory that could affect the mutual business interests of Representative and NuVasive, whether harmful or beneficial.

6.10    Compliance with Laws and Policies. Representative represents and warrants that it will comply with all applicable federal, state, local, municipal, regulatory and/or governmental agency laws, statutes, regulations, edicts, guidance, directives, and ordinances, including, without limitation, (a) the Social Security Act; (b) HIPAA, (c) all federal and state health care anti-fraud, anti-kickback and abuse laws such as 42 U.S.C. § 1320a-7b(b); (d) the Federal Food, Drug, and Cosmetic Act and its implementing regulations; (e) all rules, regulations, and guidance of the FDA; and (f) all rules and regulations of the Center for Medicare and Medicaid Services (CMS). Without limiting the generality of the foregoing, except to the extent allowed by applicable law, Representative will make no offer, payment or other inducement, whether directly or indirectly, to induce the referral of business, the purchase, lease or order of any item or service, or the recommending of the purchase, lease or order of any item or service. Representative will comply, and will ensure its personnel carrying out activities under this Agreement comply, with all operating and compliance policies of Nuvasive, including (without limitation) the MDMA Code of Conduct on Interactions with Healthcare Providers (a copy of which is attached as **Exhibit G** hereto), NuVasive's Code of Ethical Business Conduct, NuVasive's Global Business Ethics Program, Insider Trading Policy and Inventory Management Policy (relating to wide variety of inventory management issues, including without limitation inventory investment, accountability for inventory management (such as cost-sharing) and consignment inventory), as such policies may be created and updated from time to time, and including any applicable training requirements with respect to such policies. Additionally, on not less than an annual basis, Representative shall certify to compliance with the Healthcare Compliance Guide by submitting a Certification of Compliance to NuVasive that Representative is in compliance with this Section 6.10 and any other compliance terms in this Agreement in a form acceptable to NuVasive.

6.11    Sales Representatives. NuVasive may elect to interview candidates for sales representative positions and to approve or disapprove such candidates based upon the hiring profile; provided, however, that such approval or disapproval does not affect Representative's authority to making hiring or other employment decisions. NuVasive shall have the right to approve how such sales representatives are trained and deployed. Representative shall compensate its sales representatives in its discretion.

6.12    Regulatory Compliance. Representative will not alter or modify the Product(s) in any way prior to delivery to Customers. Representative shall at all times conduct its activities on behalf of NuVasive in accordance with the labeling limitations on the Products, the terms of this Agreement, NuVasive's written policies and procedures, and in compliance with applicable state and federal laws

in effect from time to time, including the FDA's quality system regulations (QSR), Adverse Event Reporting System (AERS) and/or current good manufacturing practice (cGMP) regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures. Representative shall provide NuVasive with such information and data as may be requested by Company pursuant to this Agreement.

6.13    Agreement Regarding Competitive Products; Non-Solicitation. During the Term and for a period of one (1) year following the expiration or termination hereof, neither Representative nor any of Representatives' partners, employees, sub-contractors, sales personnel (whether employees of Representative or independent contractors), affiliates or agents (nor any entity in which Representative has an ownership interest) (each a "Representative Affiliate") shall (i) develop, represent, promote or otherwise try to sell within the Territory any lines or products that, in the Company's reasonable judgment, compete with the Products covered by this Agreement, (ii) solicit (directly or indirectly) any current or former customers of NuVasive to purchase any products or lines that are, in the Company's reasonable judgment, competitive with the Products covered by this Agreement, or (iii) solicit or offer work to, directly or indirectly, any of NuVasive's employees, agents or representatives. Representative represents and warrants that (A) each Representative Affiliate engaged by it on the date of execution hereof has executed an agreement (a "Compliance Agreement") in form and substance sufficient to contractually obligate such person or entity to comply with the restrictions contained in this Section 6.13, (B) each person or entity who becomes a Representative Affiliate in the future shall execute a Compliance Agreement prior to performing any services for the benefit of NuVasive, (C) each Compliance Agreement will name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 6.13, and (d) it will vigorously enforce the restrictions contained in this Section 6.13 and each Compliance Agreement at its own cost (and in the event Representative fails to adequately enforce such restrictions, NuVasive may do so at Representative's cost). Representative shall provide NuVasive a copy of each Compliance Agreement with respect to each Representative Affiliate immediately upon such person or entity becoming a Representative Affiliate. In addition, notwithstanding Section 12.1, this Section 6.13 shall be interpreted and enforced in accordance with the laws of the state in which Representative last resides while performing services for NuVasive, without regard to the conflict of laws provisions of said state. Each Compliance Agreement shall require all sales representatives to comply with the terms of Sections 6.10 and 6.12 hereof, and each such Compliance Agreement shall be provided to NuVasive. The one (1) year period during which the restrictions of this Section are applicable shall toll for any period of time in which Representative is not in compliance herewith.

NuVasive and Representative acknowledge and agree that the foregoing non-competition covenants are reasonable and necessary to protect the legitimate interests of NuVasive, including without limitation, the protection of Confidential Information. Representative further acknowledges and agrees that such covenants are an essential part of, and consideration for, NuVasive's promises contained in this Agreement.

6.14    Debarment. Representative represents and warrants that neither it nor any of its personnel carrying out activities under this Agreement have been nor are debarred, suspended, excluded or are otherwise ineligible under Section 306 of the Federal Food, Drug and Cosmetic Act (as amended by the Generic Drug Enforcement Act of 1992), 21 U.S.C. § 336, or are listed on any applicable federal exclusion list including the then-current: (a) HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); (b) General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov); and (c) FDA Debarment List (available through the internet at http://www.fda.gov/ora/compliance_ref/debar/).

6.15   Interaction with Health Care Professionals. Representative represents and warrants that neither it nor any of its personnel carrying out activities under this Agreement currently have any form of compensation arrangement with any Health Care Professional other than an agreement to purchase product. Representative agrees that neither it nor any of its personnel shall enter into, any arrangement (e.g., grants, donations, sponsorships, reimbursement of expenses, etc.) or agreement, oral or written, with a Health Care Professional, other than for the purchase of product without the express prior written consent of NuVasive's Compliance Officer or his/her designee. A breach of this provision shall be cause for NuVasive to terminate this Agreement at will.

6.16   Insurance. During the Term, Representative shall maintain in full force and effect one or more policies of the following insurance coverage of not less than the following amounts: (i) General Liability - Two Million Dollars ($2,000,000) aggregate, One Million Dollars ($1,000,000) Bodily Injury/Property Damage per occurrence, One Million Dollars ($1,000,000) Personal and Advertising Injury, One Hundred Thousand Dollars ($100,000) Damage to Rented Premises, Ten Thousand Dollars ($10,000) Premises Medical Payments; (ii) Property Coverage equal to replacement value of property owned along with extra expense coverage to cover period of time to replace office premises; (iii) Professional Liability: One Million Dollars ($1,000,000) aggregate and per occurrence; (iv) Automobile Liability for owned, non-owned and hired autos (as applicable) – One Million Dollars ($1,000,000) per accident; and (v) Workers Compensation sufficient to meet statutory required benefits of the state in which your employees are domiciled; all from carrier(s) reasonably acceptable to NuVasive. On an ongoing basis, Representative shall provide NuVasive with one or more certificates of insurance showing that Representative maintains insurance in accordance with this Section 6.16. Such certificates shall confirm that NuVasive has been named as an additional insured on Representative's insurance policies by endorsement to such policies and shall provide that there shall be no cancellation or reduction in coverage without thirty (30) days' prior written notice to NuVasive.

7.   **ADDITIONAL OBLIGATIONS OF NUVASIVE**

7.1   Training by NuVasive. NuVasive shall provide sales and compliance training to Representative's personnel at periodic intervals, with the frequency and content of the training to be determined by NuVasive. When possible, such training shall be given at Representative's facilities, but it may be necessary to provide combined training at a geographically central location near but not in the Territory. Travel and expenses associated with attendance by Representative and Representative's personnel shall be borne by Representative. Representative shall sign all certifications confirming its training as may be requested by NuVasive.

7.2   Promotional Materials. NuVasive shall provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures, instructional material, advertising literature, product samples, and other Product data ("Promotional Materials"). NuVasive may charge Representative for such materials. Representative shall not add, delete, or modify any language in the Promotions Materials in any manner, except for adding Representative contact information. Under no circumstances shall Representative use any other promotional material or literature regarding the Products without the prior written consent of NuVasive.

7.3   Telephone Marketing and Technical Support. NuVasive shall provide a reasonable level of technical support in English to personnel of Representative who have been trained by NuVasive during its normal business hours to answer Representative's questions related to the Products. NuVasive will also provide assistance to Representative regarding sales administration, hiring, and implementation of sales plans.

-8-

## 8. INDEMNITY

Subject to all of the Conditions set forth in this Section 8, NuVasive shall defend, indemnify and hold harmless Representative and its employees and agents, from and against any and all causes of action, claims, suits, proceedings, damages and judgments by third parties (collectively, "Claims"), to the extent that such Claims are based primarily on an alleged manufacturing or design defect in a Product sold by Representative. In the event that any Claim is asserted against Representative, Representative shall provide written notice to NuVasive within (10) days after learning of such Claim. NuVasive will have the right to select counsel, and conduct and control at its expense the defense against and settlement of such Claim in its own name, or if necessary in Representative's name and NuVasive's defense counsel may act on Representative's behalf regardless of whether such Claim has also been asserted against NuVasive. Representative will cooperate with and make available to NuVasive such assistance and information as may be reasonably requested by NuVasive, and Representative will have the right to participate in the defense, including representation by independent counsel, at Representative's expense, provided that under such circumstances Representative will have the right to compromise and settle the Claim only with the prior written consent of NuVasive. If, in connection with any Claim it is determined by NuVasive that Representative acted beyond its authority, or failed to comply with any of its material obligations under this Agreement, NuVasive shall be immediately relieved of its obligations to Representative under this Section 8.

## 9. TRADEMARKS

9.1 Use. NuVasive hereby grants to Representative the non-exclusive, non-transferable, limited right and license for the Term to indicate to the public that it is an authorized representative of the Products and to advertise (within the Territory) such Products under the trademarks, service marks, logos, and trade names that NuVasive may adopt from time to time ("Trademarks"). Representative shall not alter or remove any Trademark applied to the Products. Except as set forth in this Section 9, nothing contained in this Agreement shall grant to Representative any right, title or interest in the Trademarks. At no time during or after the Term shall Representative challenge or assist others to challenge NuVasive's ownership of its Trademarks or attempt or assist others to attempt to register any trademarks, marks or trade names confusingly similar to those of NuVasive. Should NuVasive notify Representative that the use of any Trademarks violates the then in effect Trademark guidelines ("Trademark Guidelines") established by NuVasive, Representative shall bring such use into conformance with the Trademark Guidelines and shall provide to NuVasive a specimen of such conforming use. Notwithstanding the foregoing, NuVasive, at its discretion, may terminate this trademark license when it determines that Representative is using the Trademarks in a manner that violates NuVasive's then in effect Trademark Guidelines. Promptly following termination or expiration of this Agreement for any reason, Representative shall take all actions necessary to transfer and assign to NuVasive all rights, title and interest in and to the Trademarks and goodwill related thereto which Representative may have acquired as a result of this Agreement and shall promptly discontinue all uses of the Trademarks. Representative shall cooperate with NuVasive, at NuVasive's expense, to register the Trademarks in any jurisdiction, including executing appropriate documents and otherwise assisting NuVasive.

9.2 Approval of Representations. All representations of the Trademarks that Representative intends to use (including without limitation in any catalogue or other marketing collateral) shall first be submitted to NuVasive for written approval (which shall not be unreasonably withheld) of design, color, and other details. Representative may not mark the Products or Product packaging materials with its own trademarks, service marks, trade names, or logos or those of any third party ("Other Marks") without the prior written consent of NuVasive. If any of NuVasive's Trademarks are to be

-9-

used in conjunction with Other Marks on or in relation to the Products, then the Trademarks shall be presented equally legibly, equally prominently, and of greater size than the other but nevertheless separated from the Other Marks so that the Trademarks and the Other Marks each appears to be a mark in its own right, distinct from one another.

10. **CONFIDENTIALITY**

10.1 Confidential Information. "Confidential Information" means the proprietary or confidential information of NuVasive which is disclosed to Representative, whether before or after the Effective Date, and (a) if disclosed in writing, is marked as confidential at the time of disclosure, or (b) if disclosed orally or in other intangible form, is identified and treated as confidential at time of disclosure and identified in writing and marked confidential within thirty (30) days after disclosure and relates to products, plans, designs, costs, prices, finances, marketing plans, business opportunities, personnel, research, development, know-how, trade secrets, inventions, blueprints, techniques, processes, algorithms, software programs, schematics, designs, contracts, customer lists, procedures, formulae, patent applications and other information relating to NuVasive's business, services, processes or technology. Confidential Information shall not include information that Representative proves: (i) was known by Representative or was publicly available prior to disclosure by NuVasive to Representative; (ii) became publicly available after disclosure by NuVasive to Representative through no act of Representative; (iii) is hereafter rightfully furnished to Representative by a third party without confidentiality restriction; or (iv) is disclosed with the prior written consent of NuVasive or as expressly authorized under this Agreement.

10.2 Non-Disclosure. Parties shall not, except as otherwise expressly provided herein, use, disclose, disseminate or otherwise allow access to the Confidential Information of the other Party to anyone other than to employees that have a need to know such Confidential Information to implement this Agreement and who are bound by written confidentiality obligations with provisions no less stringent than those contained in this Section 10. Each Party shall prevent unauthorized disclosure or use of the Confidential Information of the other Party. Parties shall execute all documents and otherwise shall take all necessary steps to ensure that each be able to enforce rights hereunder pertaining to Confidential Information. Parties shall be responsible for any breach of this Section 10.2 by employees, contractors or agents.

10.3 Ownership. Representative acknowledges and agrees that NuVasive (or its licensors) owns all rights, title and interests, including intellectual property rights, in and to NuVasive's Confidential Information.

10.4 Notification. If Representative learns or believes that any person who has had access to the Confidential Information of NuVasive has violated or intends to violate this Agreement, Representative shall immediately notify NuVasive and shall cooperate with NuVasive in seeking injunctive or other equitable relief against any such person.

10.5 Exceptions. Representative may disclose the Confidential Information of NuVasive, only if such disclosure is required by law, provided that Representative promptly notifies NuVasive to allow intervention by NuVasive (prior to the disclosure), cooperates with NuVasive to contest or minimize the disclosure (including application for a protective order) at NuVasive's expense and limits such disclosure to the party entitled to receive the Confidential Information and to the scope of the legal requirement. Notwithstanding the foregoing, any Confidential Information disclosed pursuant to this Section 10.5 shall otherwise continue to be treated as Confidential Information hereunder. Notwithstanding anything to the contrary, Representative must obtain the consent of NuVasive prior to disclosure of this Agreement to any third party.

-10-

10.6 Confidentiality of Agreement. Representative shall not disclose any term of this Agreement or announce the existence of this Agreement without the prior written consent of NuVasive.

10.7 Reproduction of Confidential Information. Confidential Information shall not be reproduced except as required to implement this Agreement. Any reproduction or derivative of any Confidential Information of NuVasive by Representative shall remain the property of NuVasive and shall contain all confidential or proprietary notices or legends which appear on the original.

10.8 Equitable Remedies. Any unauthorized disclosure or use of Confidential Information by Parties shall be a material breach of this Agreement, and Parties shall be entitled to all remedies available under law or in equity, including without limitation injunctive relief without the need to post a bond therefor.

## 11.   TERM AND TERMINATION

11.1 Term. This Agreement shall take effect on the Effective Date and continue in force for a term beginning on the Effective Date and ending on December 31, 2013 ("Term"), unless sooner terminated under the provisions of this Section 11. Representative understands and agrees that following termination for any reason, Representative will be responsible for returning any outstanding inventory items and will be held responsible for missing items.

11.2 Termination for Cause. (i) If either party defaults in the performance of any provision of this Agreement, then the non-defaulting party may give written notice to the defaulting party that if the default is not cured within thirty (30) days the Agreement (except for breaches of Section 2.5, 6.1, 9, 10 or 12.3, in which case such termination shall be immediate upon notice) will be terminated. Such thirty (30) day notice period shall not be required if the breach by its nature cannot by its nature be cured within thirty (30) days.

11.3 Termination At Will. NuVasive shall have the right to terminate this Agreement at will if Representative is deemed to be in "Poor Standing" per Section 6.1. NuVasive shall also have (i) the right to terminate this Agreement at will if Representative breaches a term of this Agreement at any time on or prior to 90 days from the date of this Agreement, and (ii) the termination right described in Sections 6.15 and 11.6.

11.4 Termination for Insolvency. This Agreement may be terminated by either Party without notice (i) due to insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of the other Party, (ii) upon either Party making an assignment for the benefit of creditors, or (iii) upon either Party's dissolution or ceasing to do business.

11.5 Effect of Termination.

(a)   Accrued Obligations. Termination shall not relieve either party of obligations incurred prior to the effective date of such termination.

(b)   Return of Materials. All trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, samples, literature, sales aids of every kind and NuVasive Confidential Information shall remain the property of NuVasive. Within ten (10) days after the termination of this Agreement, Representative shall prepare all such items in its possession for shipment, as NuVasive may direct, at NuVasive's reasonable expense. Representative shall not make, use, dispose of or retain any copies or

-11-

derivatives of any NuVasive Confidential Information in any form. Effective upon the termination of this Agreement, Representative shall cease to use all Trademarks. Representative shall comply with all requests from Nuvasive regarding the return of inventory, Products, samples, etc.

(c)     Additional Commissions. In addition to any commissions already earned by Representative but not yet paid by NuVasive under the terms of Section 3 above, NuVasive shall pay commissions to Representative on all orders from the Territory that were accepted by NuVasive within thirty (30) days after the date of termination of this Agreement and for which NuVasive receives payment within sixty (60) days after the date of termination of this Agreement.

(d)     If NuVasive should terminate this Agreement due to a material breach by Representative of any of their obligations under Section 2.4, 6.13, 6.15, 9 or 10 of this Agreement, then in addition to any other legal or equitable remedies available to NuVasive, NuVasive shall have the right in its sole discretion and for no additional consideration to Representative: to direct Representative to immediately assign to NuVasive all Compliance Agreements or similar agreements described in Section 6.13 above; and to solicit, contract with, or hire any sales representatives of Representative.

11.6 Change of Control. In the event that NuVasive undergoes a merger, acquisition, consolidation, a sale of all or substantially all of NuVasive's assets, or a majority in voting power of NuVasive's then-outstanding voting securities are acquired by a third party (each a "Change of Control"), NuVasive and the successor in interest or acquiring party (the "Acquiring Party") shall have the right to terminate this Agreement at any point from thirty (30) days before the occurrence such event and up to twelve (12) months after such event (the "Termination Right").

In connection with a Change of Control, Representative shall be entitled to a payment of up to the Stated Percentage (the "Change of Control Payment"). The Change of Control Payment, to the extent paid, shall be paid as follows: one half of the Change of Control Payment shall be paid promptly following the closing of the Change of Control (the "First Payment"), and the remaining portion of the Change of Control Payment shall be paid promptly following the termination of this Agreement pursuant to exercise by NuVasive or the Acquiring Party of the Termination Right (the "Second Payment").

Notwithstanding the foregoing, the Change of Control Payment shall only be required if Representative: (i) is currently engaged as a Representative; (ii) is not in Poor Standing; and (iii) is not in breach of a material provision of this Agreement (including, but not limited to, Section 6.13); provided, however, if NuVasive is not required to make the Change of Control Payment solely due to subsection (ii) of this paragraph, Representative shall be entitled to half of the First Payment and half of the Second Payment (in accordance with the terms set forth in this Section 11.6).

For purposes hereof, the "Stated Percentage" shall equal five percent (5%) of (a) all annualized sales generated by Representative pursuant to this Agreement (and in the Territory) minus (b) $10,600,000 which represents Product orders procured from customers within the Territory for the fiscal year ended December 31, 2012.

11.7 Additional Provisions Regarding Change of Control. In the event the Second Payment is made, all Compliance Agreements (or similar agreements then in effect) shall be immediately assigned to NuVasive or the Acquiring Party (at NuVasive's discretion) and all other reasonable steps (not to include significant cash payments by Representative) shall be taken by Representative to ensure that

-12-

the services of all Representative Affiliates are continued uninterrupted on behalf of the Acquiring Party or Nuvasive (as appropriate). Further, NuVasive may at any time Representative is in Poor Standing, upon payment of the Stated Percentage, elect to terminate this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps (not to include significant cash payments by Representative) be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of Nuvasive).

11.8 <u>Survival</u>. The provisions of Section 5, Section 6.13, Section 8, Section 9 (except for the grant of rights and licenses by NuVasive), and Sections 10-12 shall survive the expiration or termination of this Agreement for any reason. All other rights and obligations of the parties shall cease upon termination of this Agreement.

## 12. MISCELLANEOUS

### 12.1 Governing Law and Jurisdiction.

(a) Other than with respect to Section 6.13 hereof, this Agreement is entered into in and shall be governed, construed and enforced in all respects solely and exclusively under the laws of the State of California, USA without giving effect to any law which would result in the application of a different body of law. Any and all suits hereunder shall be brought and resolved solely and exclusively in, and the parties hereby irrevocably consent to the exclusive jurisdiction and proper venue of, the state and federal courts located in the County of San Diego, State of California, USA, and waive any objections thereto based on any ground including improper venue or Forum Non-Conveniens. The parties agree that any process directed to any of them in any such litigation may be served outside the State of California, USA, with the same force and effect as if the service had been made within the State of California, USA, and that service of process may be effected in accordance with Section 12.2 hereof. Any decision rendered by such court shall be binding, final and conclusive upon the parties, and a judgment thereon may be entered in, and enforced by, any court having jurisdiction over the party against which au award is entered or the location of such party's assets.

(b) The prevailing party in any action or suit shall be entitled to recover all costs it incurred in connection therewith, including, without limitation, reasonable attorneys' fees.

(c) Notwithstanding anything to the contrary herein, each party shall be entitled to seek injunctive or other equitable relief, wherever such party deems appropriate in any jurisdiction, in order to preserve or enforce such party's rights for any breach or threatened breach of the other party of Articles 6, 9, 10 and 12.5. Each party agrees that: such Sections are necessary and reasonable to protect the other party and its business, any violation of these provisions could cause irreparable injury to the other party for which money damages would be inadequate, and as a result, the other party will be entitled to seek and obtain injunctive relief against the breach or threatened breach of the provisions of such Sections without the necessity of posting bond or proving actual damages. The parties agree that the remedies set forth in this Section 12.1(c) are in addition to and in no way preclude any other remedies or actions that may be available at law or under this Agreement.

12.2 <u>Notices</u>. Any notice required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested, addressed to the other party at

-13-

the address shown below or such other address for which such party gives notice hereunder. Such notice shall be deemed to have been given three (3) days after deposit in the mail.

To NuVasive:         NuVasive, Inc.
                     7475 Lusk Boulevard
                     San Diego, California 92121
                     Attention: Legal Department

To Representative: Absolute Medical LLC
                     213 Villa Di Este Terrace #105
                     Lake Mary, Florida 32746
                     Attention: Greg Soufleris

12.3 Assignment. Representative may assign or transfer this Agreement or any of its rights and obligations under this Agreement only upon the prior written consent of NuVasive, which shall not be unreasonably denied.

12.4 Property Rights. Representative agree that NuVasive owns all right, title, and interest in the product lines that include the Products and in all of NuVasive's patents, trademarks, trade names, inventions, copyrights, know-how, and trade secrets relating to the design, manufacture, operation or service of the Products. The use by Representative of any of these property rights is authorized only for the purposes herein set forth, and upon termination or expiration of this Agreement such authorization shall cease.

12.5 Indemnification.

(a)     Representative shall indemnify, defend and hold harmless NuVasive and its directors, officers, employees and agents from any loss, cost, liability or expense, including attorneys' fees, that NuVasive incurs or becomes liable for arising out of any breach by Representative of any of its representations, warranties and covenants contained herein and any acts or omissions of Representative or its employees and agents relating to the performance of this Agreement.

(b)     NuVasive shall indemnify, defend and hold harmless Representative and its directors, officers, employees and agents from any loss, cost, liability or expense, including attorneys' fees, that Representative incurs or becomes liable for arising out of any breach by NuVasive of any of its representations, warranties and covenants contained herein and any acts or omissions of NuVasive or its employees and agents relating to the performance of this Agreement.

12.6 Severability. If any provision(s) of this Agreement shall be held invalid, illegal or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall be valid and enforceable and the parties shall negotiate in good faith a substitute, valid and enforceable provision which most nearly effects the parties' intent in entering into this Agreement.

12.7 Modification: Waiver. This Agreement may not be altered, amended or modified in any way except in a writing signed by both parties. The failure of a party to enforce any provision of the Agreement shall not be construed to be a waiver of the right of such party to thereafter enforce that provision or any other provision or right.

-14-

12.8 Entire Agreement. This Agreement and the exhibits hereto represent and constitute the sole, final and entire agreement between the parties, and supersedes and merges all prior negotiations, agreements and understandings, oral or written, with respect to the matters covered by this Agreement, including (without limitation) the prior Exclusive Sales Representative Agreement executed by the Parties.

12.9 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. The parties agree that a facsimile may be executed as an original.

12.10    Advice of Counsel. Each of the parties to this Agreement represent that they have had the opportunity to seek the advice of counsel with respect to the negotiation and execution of this Agreement. Representative further represents that it has executed this Agreement of its own free will and is not relying on counsel for NuVasive with respect to any portion of this Agreement.

12.11    No Implied Licenses. Except as explicitly set forth herein, Representative is not granted any explicit or implied licenses in this Agreement.

12.12    Representations and Warranties.

(a)    Corporate Power. Representative is duly organized and validly existing under the laws of its state of incorporation (as set forth on the first page of this Agreement) and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof.

(b)    Due Authorization. Representative is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder. The person executing this Agreement on Representative's behalf has been duly authorized to do so by all requisite corporate action.

(c)    Binding Agreement. This Agreement is a legal and valid obligation binding upon the Parties and enforceable in accordance with its terms. The execution, delivery and performance of this Agreement by the Parties does not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, nor violate any material law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

12.13    Compliance. Representative agrees to maintain all records required to substantiate compliance with all such laws, regulations, policies, procedures and guidelines and terms of this Agreement for the term of the Agreement plus an additional six years.  Representative shall not in any way disparage NuVasive, its products, or its agents or employees, including, without limitation, taking any action or making any statement the intent or reasonably foreseeable effect of which is to impugn or injure the reputation or goodwill of NuVasive or any of its agents or employees.

-15-

This AGREEMENT is entered into and binding upon the Parties as of the Effective Date:

**NUVASIVE, INC.**

**ABSOLUTE MEDICAL LLC**

By: _____
Matt Link, Executive Vice President, US Sales

By: _____
Greg Soufleris

-16-

## EXHIBIT A
### PRODUCTS

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

### Products: All NuVasive Products

## EXHIBIT B
### TERRITORY

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

### Territory:

The following counties in the State of Florida:

| | | |
|---|---|---|
| Flagler | Brevard | Martin |
| Volusia | Osceola | St. Lucie |
| Lake (with the exception of Clermont ambulatory Surgical Center) | Orange | |
| Seminole | Highlands | |
| Palm Beach:  with the exception of the following hospital:  Lake Worth Surgical Center | Indian River | |

The following hospitals in Broward County, Florida:
Advanced Orthopedics
North Broward Medical Center

The following hospital in Miami-Dade County, Florida:
The Gable Surgical Center

The following hospital in Polk County, Florida:
Heart of Florida Regional Medical Center, Davenport, FL

-18-

### EXHIBIT C
### COMMISSIONS

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

Commissions for Exclusive Representatives (stretch amounts paid quarterly):

|  | 2013 |
|---|---|
| Flat commission on all sales up to $10,600,000 (2012 sales in the Territory) | 15% |
| Flat commission on all sales between $10,600,001 and the aggregate Quota Commitment | 18% |
| Additional commission on all incremental sales in excess of Quota Commitment should Distributor achieve aggregate quarterly Quota Commitment but not quarterly Quota Commitment in each product category. | 19% |
| Additional commission on all incremental sales in excess of Quota Commitment should Distributor achieve aggregate quarterly Quota Commitment AND quarterly Quota Commitment in each product category. | 20% |

In addition, upon the achievement in $10,600,000 of Net Sales in the Territory, Representative shall be paid an additional $18,000.

(Above commissions exclude fees/loaner charges, which shall be paid at 20%).

NuVasive reserves the right to introduce new products with different commission structures.

## EXHIBIT D
## ADDITIONAL COMPENSATION

Within fifteen days of the completion of the milestones set forth below within the timeframe set forth below, such completion to be determined in the reasonable discretion of NuVasive, NuVasive shall pay to Distributor the following amounts.

Within seven (7) days of the Effective Date:

1. $50,000 upon the successful establishment of Distributors legal entity and the execution the Compliance Agreements for Distributor's employees/contractors.

2. $10,000 upon completion of compensation plans for the Distributor sales team.

Within thirty (30) days of the Effective Date:

3. $25,000 for the completion, in collaboration NuVasive's Sales Director, Southeast, of an updated business plan.

4. $35,000 for the completion of comprehensive recruiting, hiring and expansion plan.

Within sixty (60) days of the Effective Date:

5. $50,000 for the establishment of internal infrastructure to support case scheduling, asset management, etc., specifically to include:
   a. IT Infrastructure (iPad implementation, Email System etc.)
   b. Adoption of NuVasive Mobile Charge Sheet and Salesforce.com

6. $50,000 for the successful collaboration and development of a case management and asset management program and associated metrics.

Within ninety (90) days of the Effective Date:

7. $25,000 for the completion of a new distributor training program, such training program to include training on:
   c. Compliance
   d. Sales Administration
   e. Legal
   f. Sales Training
   g. Leadership Development
   h. Hiring and Recruiting

Within one hundred and twenty (120) days of the Effective Date:

8. $55,000 upon the execution of hiring and recruiting plan as set forth in Number 4 above.

-20-

## EXHIBIT B
### 2013 QUOTA COMMITMENT

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control. ·

EXHIBIT F

TERMS AND CONDITIONS OF SALE

[see attached]

## TERMS AND CONDITIONS OF SALE

These terms and conditions govern the sale of all products ("Products") by NuVasive®, Inc. ("Seller") to the party issuing an order for Products hereunder ("Buyer") and apply notwithstanding any conflicting, contrary or additional terms and conditions in any purchase order or other document or communication. These terms and conditions constitute the sole, final and entire agreement between Seller and Buyer and supersede all other agreements between them regarding the subject matter hereof. These terms and conditions may only be waived or modified in a written agreement signed by an authorized representative of Seller. Neither Seller's acknowledgement of a purchase order nor Seller's failure to object to conflicting, contrary or additional terms and conditions in a purchase order shall be deemed an acceptance of such terms and conditions or a waiver of the provisions hereof.

1. Orders and Acceptance. Orders shall be initiated by Buyer issuing a purchase order to Seller. Orders shall identify the Products, unit quantities, descriptions, applicable prices and requested delivery dates. All orders are subject to acceptance by Seller. Accepted orders may not be cancelled except upon Seller's written approval, which may, at Seller's discretion, be subject to Buyer's payment of Seller's reasonable cancellation charges. ORDERS SHALL BE BINDING ONLY UPON BUYER, AND SHALL CEASE TO BE BINDING ONLY IF AND WHEN EXPRESSLY REJECTED BY SELLER. ONLY ACCEPTED ORDERS SHALL BE BINDING UPON BOTH SELLER AND BUYER. All prices for Products, including for the use of Loaned Products (defined below), shall be in accordance with Seller's list pricing, unless modified in a written agreement signed by an authorized representative of Seller.

2. Terms and Method of Payment. Payments shall be due upon receipt of invoice and shall be made solely in U.S. dollars in immediately available funds. If payment is not received by Seller within thirty (30) calendar days following the date of invoice, the unpaid balance will accrue interest from the date due until the date paid at a rate of one and one half percent (1.5%) per month, or the maximum rate allowed under applicable law, whichever is less. If in the judgment of Seller the financial condition of Buyer, at any time, does not justify continuance of production or shipment on the terms of payment specified, Seller may require full or partial payment of any completed delivery prior to delivery of any subsequent orders.

3. Title and Delivery.
(A) Products shall be delivered FCA (Incoterms 2000) point of shipment. Title and risk of loss or damage in the Products shall pass to Buyer upon Seller's tender of the Products to a carrier for shipment. If loss or damage occurs during shipment, Buyer shall not be relieved of its obligation to pay costs of insurance, transportation, import duties, taxes or any other expenses incurred for licenses or clearances required at port of entry and destination. A security interest in the Products shall be retained by Seller until receipt of payment in full from Buyer. Seller shall use commercially reasonable efforts to meet Buyer's requested delivery schedule.
(B) Seller agrees to provide Buyer with loaned instruments and products ("Loaned Products") for use by buyer with the Products. Seller is and shall be at all times the sole owner of the Loaned Products. Buyer has no right to sell, transfer, assign, pledge or otherwise encumber the Loaned Products without prior written approval by Seller. Buyer shall bear all risks of loss or damage to the Loaned Products (and all associated costs or expenses) from any cause from the date of delivery to Buyer until returned to Seller, unless such loss or damage results from the negligence of Seller.

4. Warranty and Remedies.
(A) Seller warrants that: (1) each Product or Loaned Product shall conform to its published specifications upon shipment to Buyer; and (2) for a period of one (1) year from the date of delivery, the software included in any Product will materially conform to Seller's then-current documentation for such software and the media containing such software (but not the software itself) is free from physical defects (the "Limited Warranty").
(B) EXCEPT FOR THE EXPRESS LIMITED WARRANTY IN SECTION 4(A), TO THE MAXIMUM EXTENT ALLOWABLE UNDER APPLICABLE LAW, SELLER DISCLAIMS ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, STATUTORY OR OTHERWISE (INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE) IN CONNECTION WITH ANY PRODUCT OR LOANED PRODUCT. Seller assumes no liability for faulty or improper application or use of any Product or Loaned Product or improper use of any Product or Loaned Product in combination with any other products.
(C) With respect to Products or Loaned Products which do not conform to their published specifications, Seller will repair or, at its option, replace any non-conforming Products or Loaned Products and return the repaired or replacement Products or Loaned Products to Buyer without charge. All Products returned under warranty must be accompanied by a written explanation of the non-conformance. SUCH REPAIR OR REPLACEMENT IS BUYER'S ONLY REMEDY AND SELLER'S ONLY LIABILITY AND OBLIGATION FOR BREACH OF WARRANTY HEREUNDER.
(D) NOTWITHSTANDING ANYTHING ELSE HEREIN, SELLER WILL NOT BE LIABLE HEREUNDER OR OTHERWISE IN CONNECTION WITH ANY PRODUCT OR LOANED PRODUCTS, UNDER ANY LEGAL OR EQUITABLE THEORY, WHETHER IN CONTRACT, TORT OR OTHERWISE (INCLUDING NEGLIGENCE OR STRICT LIABILITY): (I) FOR ANY AMOUNT EXCEEDING THE AMOUNT PAID BY BUYER TO SELLER FOR THE ORDER GIVING RISE TO SUCH LIABILITY; (II) FOR ANY PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR (III) ANY LOSS OF DATA, LOST PROFITS, LOST OPPORTUNITY OR LOST REVENUE, WHETHER CHARACTERIZED AS DIRECT DAMAGES OR OTHERWISE.

5. Taxes. Seller's prices are exclusive of all taxes. Responsibility for all customs duties, charges, sales tax, value-added tax, and any other taxes imposed by any taxing authority on the sale or use of any of the Products or Loaned Products (excluding any taxes solely on Seller's income) shall be borne solely by Buyer. If Buyer is tax-exempt, Buyer shall, prior to purchase, furnish Seller with any documents necessary to demonstrate its tax-exempt status. Providing such documentation, however, does not relieve Buyer of its obligations to pay taxes in this Section 5, if applicable.

6. Compliance with Law. Buyer represents, warrants and covenants that, at all times, Buyer's use, distribution, sale, marketing, advertising, import and export of all Products and Loaned Products will comply with all applicable laws, rules, regulations and industry standards of the United States and of any other applicable jurisdiction, anti-kickback laws, physician referral laws, including the U.S. Foreign Corrupt Practices Act and all applicable export laws, restrictions, and regulations of the United States or any applicable foreign government, agency or authority. Buyer will not export or re-export, or authorize the export or re-export of any Product or Loaned Product, technology or information it obtains or learns from Seller (or any direct product thereof) in violation of any such laws, restrictions or regulations. Buyer shall obtain and bear all expenses relating to any necessary licenses and/or exemptions with respect to the export from the USA of the Products or Loaned Products, or the import of the Products or Loaned Products to any location in compliance with all applicable laws and regulations.

7. Intellectual Property Ownership. Buyer acknowledges that the Products and Loaned Products incorporate technology that are subject to Seller's intellectual Property Rights, and that such technology is not sold to Buyer and is only licensed to Buyer for use solely as incorporated and/or embedded into the Product or Loaned Product. Other than the foregoing license, Seller or its licensors shall retain all Intellectual Property Rights and interests in and to or underlying the Products or Loaned Products and nothing herein shall be construed to grant Buyer a license of any kind to any Intellectual Property Rights of Seller. To the maximum extent allowable under applicable law, Buyer agrees that it shall not, directly or indirectly through any third party, reverse engineer, decompile, duplicate or translate any Product or Loaned Product or seek to reveal the trade secret or know how underlying any Product or Loaned Product. "Intellectual Property" or "Intellectual Property Rights" as used herein collectively means any and all patents, copyrights, trademarks, trade secrets, mask works, moral rights, know-how or any other proprietary right, and any applications for the foregoing, under the laws of the United States, any other jurisdiction, the European Union, or any other bi-lateral or multi-lateral treaty regime.

-23-

8. Return/Upgrade Policy. EXCEPT WITH RESPECT TO BIOLOGIC PRODUCTS, Buyer shall be able to return any unused Products for full credit within sixty (60) days of delivery; provided, however, that Buyer will be charged a 30% restocking fee for all unused Products returned after ten (10) days of delivery; provided further, that all returns include a Returns Material Authorization (RMA) number, which can be obtained from NuVasive customer service. Buyer will not be able to return any Products after sixty (60) days of delivery. Any instrumentation Product purchased by Buyer from Seller may be upgraded for a newer model developed by Seller (if such model was not available at the time of purchase) within three (3) years of the delivery date or the original instrumentation Product in accordance with the following: (a) for the first year after the delivery date, Buyer shall receive 100% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgraded instrumentation; (b) for the second year after the delivery date, Buyer shall receive 50% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgrade instrumentation; and (c) for the third year after the delivery date, Buyer shall receive 25% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgraded instrumentation.

9. Software Maintenance/Updates. For a period of one (1) year from the date of delivery of a Product containing software, Seller will provide Buyer with software updates and support services. Support services consist of the following: (a) technical support by telephone twenty-four (24) hours a day, year-round, at Seller's support line at 1-877-348-6511 from the United States and at 1-858-909-1800 internationally; and (b) if Buyer reports a software problem to Seller, and Seller confirms that the problem exists in Seller's Product, Seller will use its best efforts to promptly correct or supply a work-around for the error if it substantially degrades the performance of the Product, and to correct other significant errors in future software releases.

10. Discounts and Rebates. Buyer shall disclose any discounts or other reductions in price received under this Agreement as required under Section 1128B(b)(3)(A) of the Social Security Act [42 U.S.C. 1320a-7b(b)(3)(A)] to any state or federal program which provides cost or charge-based reimbursement to Buyer for the Products purchased under this Agreement.

11. Miscellaneous. Failure by Seller to insist upon performance of any term or condition set forth herein shall not be construed as a waiver of such terms and conditions and shall not affect the right of Seller thereafter to enforce each and every term and condition. These terms and conditions and all disputes arising out of or related to these terms and conditions shall be solely and exclusively construed and governed in accordance with the laws of the State of California, USA, without application of any law that would result in the application of a different body of law. The UN Convention on Contracts for the International Sale of Goods is hereby expressly excluded and shall not apply to these terms and conditions. Any and all suits hereunder shall be brought and resolved solely and exclusively in, and the parties hereby irrevocably consent to the exclusive jurisdiction and proper venue of, the state and federal courts located in the County of San Diego, State of California, USA, and waive any objections thereto based on any ground including improper venue or Forum Non-Conveniens. These terms and conditions shall be binding upon and inure to the benefit of the parties, and their successors, and permitted assigns. If one or more provisions in these terms and conditions are ruled entirely or partly invalid or unenforceable by any court or governmental authority of competent jurisdiction, then the remaining portions hereof shall remain valid and the parties shall reform the provision(s) to the minimum extent necessary to render them valid and enforceable in conformity with the parties' intent as manifested herein. Any rights to accrued payments and Sections 2, 4(g), 4(b), 5, 6, 7, and 11 shall survive the expiration of these terms and conditions.

EXHIBIT G.

MDMA Code of Conduct on Interactions with Healthcare Providers

## 2013 INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT, made this 13th day of February, 2013, by and between ABSOLUTE MEDICAL LLC, a Florida corporation (hereinafter referred to as "Agent"), whose address is 213 Villa Di Este Terrace #105, Lake Mary, FL 32746 and, **Steve Madsen Pro.** (hereinafter referred to as "Independent Contractor"), whose address is **112 S Hampton Dr., Jupiter, FL 33458.**

### WITNESSETH:

WHEREAS, Agent is in the business of selling surgical and non-surgical spinal products and implants related to spinal surgery, including, but not limited to spinal implants, access instruments, such as retractors, graphing material, biological products, and other products, which are more fully described on Schedule B (the "Products") in the territory set forth in Schedule A attached hereto, hereinafter referred to as "Agent's Territory" by one or more manufacturers who supply the Products to Agent ("Manufacturer");

WHEREAS, Agent desires to engage Independent Contractor to provide the services described in Schedule B (the "Services") and Independent Contractor desires to accept such engagement, all on the terms and conditions set forth herein;

WHEREAS, Independent Contractor seeks to be engaged by Agent as an independent contractor to provide the Services described in Schedule B in the designated territory (set forth in Schedule C)(the "Territory") and earn a commission as set forth in Schedule D for such services; and

WHEREAS, as a material inducement for Agent to enter into this Agreement is Independent Contractor's agreement to be bound by all of the terms and conditions contained herein in particular the provisions of Section 12 below.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto agree as follows:

1.    Relationship of Parties.

(a)    The parties to this Agreement intend that the relationship between them be that of corporation and independent contractor.  Independent Contractor is an independent contractor of the Agent.  The parties do not intend to create a partnership, joint venture or employer/employee relationship.

(b)    Agent shall not have the right to require Independent Contractor to do anything that would jeopardize the relationship of independent contractor between

1

Initial

EXHIBIT
3

Agent and Independent Contractor. Likewise, Independent Contractor shall not conduct his/her business in any way which will give rise to an employer/employee relationship between the parties.

(c) Independent Contractor shall perform the duties described in Schedule B at a location of the Independent Contractor's choosing. Independent Contractor shall be responsible for all costs associated with maintaining that location.

(d) The Agent shall not require that Independent Contractor work specified hours or days and the Independent Contractor shall set his own schedule. Independent Contractor shall have no fixed hours, no established routines or routes, nor be required to cover the Territory within a specified time frame. Independent Contractor has discretion regarding when and how to perform his or her duties and responsibilities described in Schedule B.

(e) None of the benefits provided by the Agent to its employees are available to the Independent Contractor, including vacation pay, sick pay, insurance, or retirement benefits.

(f) Agent shall not withhold any local, state, or federal income tax, social security, or other withholdings required of employees from commissions paid to Independent Contractor. Independent Contractor shall indemnify and hold Agent harmless against any of the costs specified in this paragraph.

(g) Independent Contractor is responsible for hiring, paying, and supervising any staff that he or she may hire. Independent Contractor shall ensure that all of his/her employees, agents and independent contractors rendering services hereunder meet the obligations specified herein. The Independent Contractor, his/her employees and agents shall, at all times, exercise complete discretion and independent professional judgment in the performance of the services provided hereunder. Independent Contractor shall indemnify and hold Agent harmless against any costs or expenses that are incurred by Agent as a result of any actions of Independent Contractor's employees, agents and independent contractors.

(h) Independent Contractor agrees to be solely and entirely responsible for his/her acts and for the acts of his/her employees and agents, and for paying any taxes and insurances required by law. Independent Contractor shall indemnify and hold Agent harmless against same.

(i) Independent Contractor may work for other entities while engaged as Agent's independent contractor so long as that work does not interfere with Independent Contractor's performance of the duties described in Schedule B and does not conflict with Section 12 below.

2. Independent Contractor. Agent hereby engages Independent Contractor as an independent contractor to provide the Services in the territory described in Schedule C

2

Initial_____

attached hereto and made a part hereof (the "Territory"). The products that are included in the product groups sold by the independent contractors employed by Agent are listed on Schedule B and are sold by the independent contractors and field support representatives exclusive of any other products whatsoever. Independent Contractor hereby accepts such engagement, all subject to the conditions, limitations and provisions set forth in this Agreement. Agent reserves the right to review and modify from time to time the Territory and the duties of engagement, and limit, expand or otherwise change the Territory and the duties of engagement.

3.    Term of Agreement. This Agreement shall commence on the Effective Date and shall continue for one (1) year from the Effective Date. Unless either party provides written notice of not less than thirty (30) days from expiration of the Term that it wishes to terminate this Agreement, then this Agreement shall automatically renew for a period of one (1) year. The term shall thereafter automatically renew for successive one (1) year periods unless thirty (30) days notice is provided. This Agreement may also be earlier terminated by either party in accordance with Section 9 hereof.

4.    Covenants of Independent Contractor. Independent Contractor covenants to Agent that at all times during the term of this Agreement:

    (a)    Independent Contractor shall use his/her best efforts to work with the Independent Contractor's and field support representatives to advertise, promote and sell the Products and to develop, maintain and regularly increase a substantial volume of sales within the Territory to existing and new customers in order to achieve maximum market penetration.

    (b)    Independent Contractor shall distribute only literature, brochures and other promotional materials (collectively, the "Promotional Materials") which have been provided to Independent Contractor by Agent or by Manufacturer and shall distribute Promotional Materials only to Independent Contractors of the Agent, field support representatives, existing customers and potential customers of the Products.

    (c)    Except as set forth in Promotional Materials or on Products provided to Independent Contractor, he/she shall not use Manufacturer(s)' name, trademarks, service marks or logos under any circumstances, unless Independent Contractor obtains prior written approval from Agent. Nothing contained in this Agreement is intended to give Independent Contractor any license to use any of the foregoing.

    (d)    Independent Contractor shall store all of the Products delivered to him/her at the location set forth on the first page of this Agreement or at such other locations within Independent Contractor's Territory approved by Agent in writing in advance. Independent Contractor shall use his/her best efforts to safeguard all Products in his/her possession or control and to protect such Products from damage and theft, as well as maintain an inventory of Products in Independent Contractor's possession.

3

Initial_____

(e)     Independent Contractor shall not: (i) knowingly sell or deliver, directly or indirectly, any Products for use or resale outside Independent Contractor's Territory; (ii) solicit orders for Products from customers outside Independent Contractor's Territory through any means; or (iii) establish an office outside Independent Contractor's Territory for sale of the Products.

(f)     Independent Contractor shall not make representations to customers or potential customers or third parties that would be detrimental to either Agent or Manufacturer.

(g)     Independent Contractor shall not alter, in any way, the original packages of any Products or repackage any Products or ship any Products in damaged packages which could affect the sterility or fitness for use of the Product. Should Independent Contractor come into possession of any Products which need to be repackaged, he/she shall return same to Manufacturer with notice to Agent.

(h)     Upon advance notice and during normal business hours Independent Contractor shall permit Agent to visit and inspect Independent Contractor's premises and inspect the Products in his/her possession or control.

(i)     Independent Contractor shall participate, assist and cooperate with Agent in the collection of customer accounts receivable as may be requested by Agent from time to time.

(j)     Independent Contractor shall not encumber, rent, sell, create a security interest in or otherwise transfer or dispose of any Products in Independent Contractor's possession or control.

(k)     Independent Contractor shall execute, alone or with Agent, any UCC financing statement or other documents requested by Agent to protect the ownership interests of Manufacturer in the Products against the interests of third persons.

(l)     Independent Contractor shall not make any false or misleading representations or statements to any person with respect to Agent, Manufacturer or the Products. Furthermore, Independent Contractor shall not make any express or implied warranties to any customers or prospective customers with respect to the Products which are in any way inconsistent with the Promotional Materials. Furthermore, Independent Contractor shall not make any express or implied warranties to customers or potential customers or any other party regarding the Products which are not included in Manufacturer's then current printed materials without Agent's prior written consent in each instance.

(m)     Independent Contractor shall not enter into any agreement for or on behalf of Agent or Manufacturer, create any obligation on behalf of Agent or Manufacturer, or otherwise attempt to bind or obligate Agent or Manufacturer in any manner.

4

Initial_____

(n) Independent Contractor shall comply with all of the terms and conditions of engagement, and all of Agent's instructions and requirements which may be stated by Agent, orally or in writing, from time to time.

5. Covenants of Agent. Agent covenants to Independent Contractor that at all times during the term of this Agreement:

(a) In the event of limited product availability, Agent shall distribute Products to Agent's independent contractors according to Agent's sole discretion.

(b) Agent shall make reasonable efforts to fill each order of Independent Contractor for Products that Agent approves, but shall not be liable in any respect for a failure to ship or for a delay in shipment of Products.

6. Business Plan. From time to time while Independent Contractor is serving as an independent contractor for Agent pursuant hereto, Agent may require that Independent Contractor submit to Agent a "Business Plan" covering a period of time between six (6) months to one (1) year. The Business Plan shall include a sales forecast by product groups, a list of target accounts, a description of Independent Contractor's proposed marketing and sales strategy and other relevant data as may be requested by Agent. Based on such Business Plan and Independent Contractor's prior performance, Independent Contractor and Agent shall establish a sales goal for Independent Contractor for the period covered by the Business Plan. It is entirely within Independent Contractor's discretion how to reach his or her sales goal.

7. Orders, Commissions, Benefits, Delivery and Expenses.

(a) Independent Contractor hereby acknowledges that title to any Products delivered to Independent Contractor pursuant to this Agreement shall remain in Manufacturer until sold to a customer in the ordinary course of business. Notwithstanding the foregoing, Independent Contractor shall be liable for all lost or damaged inventory.

(b) Provided Independent Contractor is not in breach of any obligations under this Agreement, Agent shall pay to Independent Contractor the commissions described in Schedule D attached hereto which are subject to modification upon thirty days notice to Independent Contractor.

(c) Independent Contractor shall not be entitled to receive any other compensation or consideration from Agent for the performance of its duties hereunder.

(d) Agent, upon approval from Manufacturer, shall establish prices for Products to be sold in Agent's Territory.

(e) Independent Contractor shall obtain the prior written approval of Agent with respect to the credit rating of a new customer prior to the shipment of any Products

·5

Initial _____

to such customer.  Upon receipt of verbal instructions from Agent, which shall be confirmed in writing, Independent Contractor shall cease delivery of any Products to a customer which has failed to make payments to Manufacturer in accordance with Manufacturer's billing requirements at such time.

(f)    Independent Contractor shall bear all costs and expenses of conducting his/her business relating to the sale of the Products in Independent Contractor's Territory, including but not limited to, travel, sales expenses and entertainment.

8.    Changes to Products, Parts and Policies.   Unless otherwise provided by applicable law:

(a)    Manufacturer may at any time modify or discontinue selling any Product and Independent Contractor shall have no claim against Agent or Manufacturer for failure to furnish Products of the type previously sold,

(b)    Manufacturer may at any time change warranty or service policies without incurring any liability to Independent Contractor.

9.    Termination of Agreement.

(a)    This Agreement may be terminated by either party at any time, with or without cause, by providing not less than fifteen (15) days written notice to the other party. This Agreement may otherwise be terminated by either party if the other party:

(i)    commits a breach of any provision of this Agreement, or a breach of any provision of any other agreement or written obligation heretofore or hereafter in effect between Agent and Independent Contractor (collectively, the "Other Agreements"), which is not cured within five (5) days after receipt of written notice thereof by the other party;

(ii)    makes a material false representation, report or claim in connection with the performance of their obligations under this Agreement or any Other Agreement;

(iii)    ceases to carry on business in the ordinary course;

(iv)    violates any provision of Section 12 of this Agreement;

(v)    becomes insolvent, liquidates, is adjudicated a bankrupt, files a bankruptcy petition, makes an assignment for the benefit of creditors, invokes the provisions of any law for the relief of debtors, or files or has filed against them any similar proceeding; or

(vi)    commits any act or omission by Independent Contractor or any employee, independent contractor or other agent of Independent Contractor that might be construed as a violation of the federal Stark law, federal false claims act, federal anti-kickback statute, federal Health

6

Initial_____

insurance and Portability Act provisions, federal civil money penalties statute, laws, rules and regulations pertaining to Medicare or Medicaid, similar state laws or of criminal acts of a violent nature or relating to the practice of medicine.

A termination based upon subsections (ii)-(vi) above shall be effective immediately.

(b)    Upon termination of this Agreement for any reason, with or without cause, Independent Contractor shall immediately deliver to Agent all price lists, customer lists, catalogues, literature and any other dated and printed materials relating to the sale of the Products in Independent Contractor's possession, custody or control, on the effective date of the termination, including but not limited to, Promotional Materials.

(c)    Upon termination of this Agreement for any reason, with or without cause, Independent Contractor shall, within ten (10) days after the Termination Date, deliver as directed by Agent all Products then in his/her possession or control and a list of all then currently scheduled surgeries.    In addition, Independent Contractor shall promptly supply Agent with a current list of the locations of any Products not in Independent Contractor's possession or control.    Agent shall have the right to deduct from any compensation due to Independent Contractor: (i) the replacement cost of any Products previously delivered to Independent Contractor which have not been either sold to a customer or delivered to Agent in accordance herewith; (ii) the replacement cost of any Products returned to Agent which are deemed unacceptable by reason of their damaged condition; and (iii) the amount of any repackaging and refinishing charges.    If the amount owed by Independent Contractor to Agent exceeds the commissions owed by Agent to Independent Contractor, then Independent Contractor shall be liable for the deficiency.    Such amount shall be due to Agent within ten (10) days after the termination of this Agreement.    Failure to remit said amount shall entitle Agent to default interest on the outstanding amounts at the maximum allowable rate.

(d)    The termination of this Agreement shall not relieve a party from any obligations or liability to the other party incurred prior to termination nor shall a termination of this Agreement by a party be in lieu of any other remedies which may be available to such party under this Agreement, at law or in equity.

(e)    For calculation of compensation due as of the date of termination, Independent Contractor shall be entitled to compensation only for any Products surgically implanted prior to the effective date of termination.   Independent Contractor shall not receive any compensation for Products surgically implanted after termination. Any draws payable to Independent Contractor shall cease upon termination, if applicable.

10.    Returns.    Product returns during the term of this Agreement, other than in accordance with Section 8 hereof, must be approved by Manufacturer in advance in accordance with Manufacturer's then current "Return Goods Policy".

7

Initial____

11.     Force Majeure. Agent shall not be liable to Independent Contractor on account of any failure or delay in performing its obligations under this Agreement, including without limitation, any failure or delay in delivering the Products to Independent Contractor or his/her customers, where such failure or delay results, directly or indirectly, wholly or partially, from any cause beyond its control, including by way of illustration but not by way of limitation, any acts of God, acts of governments, curtailment of utility services, floods, fires, shortages of material, war, insurrection, strikes or other labor difficulties, production difficulties in Manufacturer's factories or those of its suppliers, or delays or failure of transportation facilities.

12.     Confidentiality; Noncompetition; Competitive Products.

        (a)     (i)     During the term of this Agreement, Independent Contractor shall not manufacture, sell, market, attend surgeries using, or deliver any product, or participate in any manner in such activities, whether personally or through a fictitious name, corporation, partnership or other legal entity if such product is in competition with any product manufactured, sold, marketed or distributed for sale by Manufacturer; nor shall Independent Contractor manufacture, sell, market, or deliver any non-competitive products that are used in spinal surgery. For purposes of this Section 12, a product is "competitive" if it is technologically feasible to use in place of or as a substitute for another, irrespective of the nature or extent of activity of such products in the existing market.

        (ii)     During the term of this Agreement and for a period of one (1) year following the effective date of termination under Section 9 or Section 3 of this Agreement for any reason whatsoever (the "Termination Date"), Independent Contractor shall not directly or indirectly, as an individual, proprietor, partner, venturer, stockholder, director, officer, consultant, employee, independent contractor, agent or in any other capacity:

                (1) Engage or participate, directly or indirectly, in the sale, manufacture, or marketing of any spinal surgical devices offered by Agent or any of Agent's Manufacturer(s) (except for sales made on behalf of Agent pursuant to this Agreement during its term;

                (2) (a) work for, provide services to, engage in or assist others to engage in or have interest in any business which competes with the Agent and/or Manufacturer(s); (b) otherwise engage in any activities of the type in which he/she is engaged on behalf of Agent including, without limitation, the representation of any manufacturer, seller, or marketer of medical device products that are the same as or that are competitive with any Manufacturers' products or; (c) enter into any compensation arrangement, sale of his/her business, distribution of assets, or any other transaction relating to the manufacture, distribution, promotion or sale of products which directly or indirectly compete with any Manufacturers' product. The territorial scope of this restriction shall be limited to the geographical county(ies) covered by Independent Contractor and in which Independent Contractor solicited customers, covered cases, or

8

Initial_____

sold any product on behalf of Agent at any time during the twelve (12) month period preceding the end of his/her engagement with Agent.

(3) solicit, serve, divert, sell to, or accept business from or attend surgeries of or assist any person in so soliciting, serving, selling to, diverting or accepting business from or attending surgeries of any "Protected Customer" of the Ageny or in any way attempt to influence or persuade such customers to alter or terminate their business relationship with Agent or to refrain from purchasing any products offered by Agent. The term "Protected Customer" refers to any physician, hospital or medical facility that purchased or utilized in surgery any Product or any other product sold or distributed by Agent and/or a Manufacturer and/or their employees, representatives and independent contractors during the twelve month period preceding termination of his/her engagement with Agent. ; or

(1) Solicit the employment of, hire, retain or engage, or cause any person or entity with which Independent Contractor is affiliated to solicit the employment of, hire, retain or engage, any employee, independent contractor or other agent of Agent or Manufacturer who had a relationship with Agent or Manufacturer at any time during the term of this Agreement. This restriction shall also apply to employees, independent contractors and other agents of Independent Contractor who have or had a relationship with Independent Contractor any time during the term of this Agreement which Agent or Manufacturer employs or retains during the term of this Agreement and within one month of its termination.

(b) (i) During the term hereof and after the termination of this Agreement for any reason whatsoever, Independent Contractor shall not at any time directly or indirectly disclose to any individual, corporation, partnership or other entity any "confidential information" (as hereinafter defined) or trade secrets of or relating to Agent or Manufacturer.

(ii) For purposes of this Agreement, "confidential information" means information disclosed or known to Independent Contractor or as a consequence of or through the performance of his/her obligations under this Agreement (including information conceived, originated, discovered or developed by Independent Contractor), not generally known in the industry, about Agent's or Manufacturer's business, processes, apparatus, products, research, research programs, customers, pricing, financial data and business plans, and shall include the list of Agent's customers and their contact information (address and telephone numbers).

(c) During the term of Independent Contractor's service to the Agent, Independent Contractor shall not, directly or indirectly on such person's own behalf or as an employee, independent contractor, agent, partner, owner, officer, director of any person or entity or any other capacity, employ, retain or contract with any person or entity who directly or indirectly: (i) sells, offers for sale, promotes, distributes, represents, receives or solicits orders for or attends surgeries utilizing any Competitive Products; or (ii) accepts compensation of any kind from any person or entity providing or

9

Initial_____

engaging in the sale, promotion, distribution or representation of any Competitive Products. Furthermore, Independent Contractor shall not directly or indirectly represent any Competitive Products without the Agent's written consent.

(d)     Independent Contractor recognizes and acknowledges that the limitations set forth in this Section 12 are properly required for the adequate protection and benefit of the business of Agent, and that Agent will be irreparably harmed by the breach of this Section 12. In addition to any other available remedies, Agent shall have the right to have the provisions of this Section 12 enforced by temporary or permanent injunction in a court of competent jurisdiction.

(e)     Independent Contractor agrees that in the event that any of the provisions of this Section 12 are found by a court of competent jurisdiction to exceed the time and geographic limitations enforceable under applicable law, such provisions shall be automatically reformed to establish the maximum time or geographic limitations permitted by law, or, if not capable of such reformation deemed null and void. Moreover, the parties agree that the durational restrictions contained in these covenants shall be tolled during any period of violation.

(f)     In the event that Independent Contractor desires to be released from the restrictions contained in Sections A(ii) (1) – (3), he/she may pay Agent the sum of three times the sum Agent has received as a result of Independent Contractor's sale of Products during the twelve month period immediately preceding termination of the Agreement.

The terms and conditions of this Section 12 shall survive the expiration or termination of this Agreement.

13.     Indemnification.  Each of Agent and Independent Contractor (the "Indemnitor") shall indemnify, defend and hold the other harmless from and against any liability, loss, costs, expenses (including without limitation attorney's fees and costs) or damages howsoever caused by reason of any injury (whether to body, property, or personal or business character or reputation) sustained by any person or to property, by reason of any breach of this Agreement, neglect, default, or omission by the indemnitor or its agents, employees or other representatives.

14.     Damages.  Agent shall not be liable for any incidental, consequential, special or punitive damages for a failure to fill an order, delay in shipment or delivery, or any other act or omission.

15.     Entire Agreement.  This Agreement constitutes the entire Agreement between the parties relating to the matters covered by this Agreement and supersedes all prior agreements, whether written or oral.  No modifications or waiver of any part of this Agreement shall be binding upon either party unless in writing executed by both parties.

10

Initial_____

16.     Severability.   If any term or provision of this Agreement shall be determined invalid or unenforceable to any extent or in any application, then the remainder of this Agreement and of such term or provision except to such extent or in such application, shall not be affected thereby, and each and every term and provision of this Agreement shall be enforced to the fullest extent and in the broadest application permitted by law. Further pertaining to the restrictions contained in Section 12 hereof, while said restrictions are considered by the parties hereto to be reasonable in all circumstances, it is recognized that restrictions of the nature set forth herein may fail for reasons unforeseen and accordingly it is hereby agreed and declared that if any of such restrictions shall be deemed or adjudged to be void or voidable as going beyond what is reasonable in all the circumstances, for the protection of the Agent's business, then such restrictions shall not thereby be terminated, but shall be deemed amended to the extent required to render such restrictions valid and enforceable.

17.     Notice.   Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by pre-paid certified mail, return receipt requested or by Federal Express or other similar overnight delivery service providing proof of delivery, to the other party at the address set forth on the first page of this Agreement. All notices shall be effective upon mailing as set forth above.

18.     Governing Law, Jurisdiction.   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. Any action or proceeding shall be brought in the courts of Broward County, Florida.

19.     Headings.   The headings in the Sections of this Agreement are inserted for convenience only and shall not constitute a part hereof.

20.     Customer Goodwill.   I agree that a portion of the consideration to be provided by Agent under this agreement is in exchange for any goodwill I may currently have with physicians, hospitals and other medical providers and their staff and hereby transfer that goodwill to Agent for its future benefit.

21.     Binding Nature.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, representatives and permitted assigns. Independent Contractor shall not assign this Agreement or any portion thereof without the express written permission of Agent.

22.     Construction.   The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

23.     Further Assurances.   Each of the parties hereto shall execute any and all further or additional instruments or documents as the other party may reasonably request in order to give effect to the agreements contained herein.

11

Initial_____

24. **Prevailing Party Attorneys' Fees.** The prevailing party in any action or proceeding brought by either party relating to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the other, including costs and fees on appeal.

25. **Individual Obligor** Agent recognizes that Independent Contractor may do business via a corporation or other business entity. Agent, however, is, in part, contracting for the specific services of the individual executing this Agreement. Accordingly, to the extent that the Independent Contractor is identified as a business entity in the opening paragraph of this Agreement, by executing this Agreement, the individual signatory confirms that he is also individually bound by all of its terms and conditions.

IN WITNESS WHEREOF the parties hereto have set their hands the day and year first above written.

ABSOLUTE MEDICAL LLC                    INDEPENDENT CONTRACTOR

By: _____            _____

GREG SOUFLERIS, Principal Agent        Print Name: _____
                                       Individually and on behalf of Independent
                                       Contractor

12

Initial_____

## SCHEDULE A

## Agent's Territory

Volusia

Orange

Seminole

Lake

Osceola

Brevard

Indian River

St. Lucie

Okeechobee

Highland

Martin

Palm Beach

North Broward

13

Initial_____

## SCHEDULE B

### [Services and Products]

### INDEPENDENT CONTRACTOR'S SERVICES:

### SALES REPRESENTATIVE:

The FSR is responsible for providing coverage for all surgeries in an assigned geography. Coverage includes but is not limited to coordinating scheduling, ordering and delivering inventory, in-servicing hospital staff and surgeons on products, intra-operative product technical support, delivering accurate charge sheets and cleaning and pick-up of inventory. An FSR is expected to represent the Agent in a professional manner and to be regarded as an asset by the surgical and nursing staff.

The SR is responsible for the duties described above for an FSR, and, in addition, the SR will vigorously pursue the sale of products in a defined geography. Sales duties will include but are not limited to sales forecasting, geography landscaping, prospecting, product presentation and business requesting. The SR will track purchase orders and invoices for the Agent as well as

### PRODUCTS:

Spinal surgical products including but not limited to spinal implants, biologics, bone cement, allograft, neurophysiological monitoring equipment, disposables, hemostasis products, surgical instruments i.e. retractors, hand instruments etc.

14

Initial_____

## SCHEDULE D

### [Commissions]
### 2013 Compensation Plan

- $5,500 per month

16

24.    Prevailing Party Attorneys' Fees.    The prevailing party in any action or proceeding brought by either party relating to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the other, including costs and fees on appeal.

25.    Individual Obligor.  Agent recognizes that Independent Contractor may do business via a corporation or other business entity. Agent, however, is, in part, contracting for the specific services of the individual executing this Agreement. Accordingly, to the extent that the Independent Contractor is identified as a business entity in the opening paragraph of this Agreement, by executing this Agreement, the individual signatory confirms that he is also individually bound by all of its terms and conditions.

IN WITNESS WHEREOF the parties hereto have set their hands the day and year first above written.

ABSOLUTE MEDICAL LLC                    INDEPENDENT CONTRACTOR

By: _____             _____

GREG SOUFLERIS, Principal Agent         Print Name: _DAVE__HANLEY_
                                        Individually and on behalf of independent
                                        Contractor

12

Initial D H

24. Prevailing Party Attorneys' Fees. The prevailing party in any action or proceeding brought by either party relating to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the other, including costs and fees on appeal.

25. Individual Obligor. Agent recognizes that Independent Contractor may do business via a corporation or other business entity. Agent, however, is, in part, contracting for the specific services of the individual executing this Agreement. Accordingly, to the extent that the Independent Contractor is identified as a business entity in the opening paragraph of this Agreement, by executing this Agreement, the individual signatory confirms that he is also individually bound by all of its terms and conditions.

IN WITNESS WHEREOF the parties hereto have set their hands the day and year first above written.

ABSOLUTE MEDICAL LLC

By:

GREG SOUFLERIS, Principal Agent

INDEPENDENT CONTRACTOR

Print Name: RYAN MILLER
Individually and on behalf of Independent Contractor

· 12

Initial_____

NO. 0092    J   'J   01

JOLM:

**From:** Greg Soufleris <gsoufleris@absolute-med.com>
**Date:** November 27, 2017 at 7:52:59 PM EST
**To:** Paul McClintock <PMcClintock@nuvasive.com>, Mark Singer <msinger@nuvasive.com>
**Subject: Thank You**

Sales Leadership,

I'd like to officially inform you of my resignation with our partnership. It's been a wonderful ~12 years and I couldn't be more proud of what we've built, however, my time has come to move on. I'd like to personally thank each of you for the time spent with me and wish you the best in future endeavors. I'll ensure there will be a smooth transition and will be available for anything as we close this out professionally.

I will also have my attorney Chris Mills (561) 701-3523 Christopher.Mills@arlaw.com)
contact Kirk Tyree to ensure we're all on the same page as we move forward.

Sincerely,

Greg Soufleris
Principal | Absolute Medical
C: (954)868-4492

Sent from my iPhone

1



EXHIBIT

4

**From:** Bryan Busch [mailto:Bryan.Busch@arlaw.com]
**Sent:** Tuesday, December 5, 2017 11:29 AM
**To:** Chris Cardwell
**Subject:** Re: NuVasive/Absolute

Chris, thx for the response. The 2 reps that have not resigned are Thad Bragulla and Brennan Burkhart. The 3 reps that have resigned are Dave Hawley, Ryan Miller and Brandon Gottstein.

Bryan E. Busch
Adams and Reese, LLP

On Dec 4, 2017, at 10:30 PM, Chris Cardwell <ccardwell@gsrm.com> wrote:

> Brian – I appreciate your client's willingness to cooperate in the short term. Why don't we try to schedule a face to face to try to reach an agreement on expectations/obligations going forward in the next few weeks. My client wants to be reasonable, but it needs some assurances that your client's "resignation" is not just an excuse to shirk his contractual obligations and go provide services for one of my client's competitors.
>
> While we try to work out issues between our clients, will you please identify the reps still affiliated with Absolute/NuVasive and provide me with the non-compete agreements of the reps who moved on.
>
> Also, I'll take a stab at a draft agreement for your client to allow NuVasive to contact, hire, and direct its representatives and get it to you asap.
>
> Thanks,
>
> Chris
>
> **From:** Bryan Busch [mailto:Bryan.Busch@arlaw.com]
> **Sent:** Monday, December 4, 2017 4:34 PM
> **To:** Chris Cardwell
> **Subject:** RE: NuVasive/Absolute
>
> My client has no problem releasing and/or consenting to your client's use of the sales representatives. My client reached out to Mr. Singer on Friday about a transition and the need for assistance covering cases but has not received any material response. Please let us know how to assist and minimize any alleged business interruption for NuVasive. Thx.

1

**EXHIBIT**

**5**



**Bryan Busch**
Partner
ADAMS AND REESE LLP

3424 Peachtree Road NE, Suite 450 | Atlanta, GA 30326
main 470.427.3700 | direct 470.427.3702 |
efax 470.427.3676 | fax 404.500.5975

bryan.busch@arlaw.com

website bio vCard map  

**From:** Chris Cardwell [mailto:ccardwell@qsrm.com]
**Sent:** Friday, December 01, 2017 7:39 PM
**To:** Bryan Busch
**Subject:** NuVasive/Absolute

Bryan,

Following up on today's conversation, it's my understanding that your client is unable to cover cases going forward, and has requested that NuVasive provide assistance and case coverage. NuVasive will accept responsibility for covering cases of which it has reasonable advanced knowledge, and will directly compensate the sales representatives who cover the cases. In that regard, NuVasive requests that your client consent to its release of its sales representatives to NuVasive for case coverage purposes.

Due to the urgent nature of this issue, please let me know if you client objects to this proposal by 2:00 tomorrow. I'm available via email or cell at 615-424-3699.

Chris Cardwell
CONFIDENTIALITY NOTICE: This email may contain privileged, confidential and/or other legally-protected information and is meant only for the use of the specific intended addressee(s). Your receipt is not intended to waive any applicable privilege. If you have received this email in error, you may not use, copy or retransmit it. Please delete it and all attachments immediately and notify the sender via separate email or by calling our offices at 615-244-4994.

2

-----Original Message-----
From: Dave Hawley [mailto:dhawley@absolute-med.com]
Sent: Tuesday, December 12, 2017 6:08 AM
To: Elizabeth Lukianov
Subject: Instruments

Liz.

Need to get started on a few instruments to be made for Sawin.

Arsenal:
-Need a multidirectional counter-torque - or just the opposite direction it is currently. x2 -Longer
Straight thoracic gearshift probe x3 -Navigation instruments ---Drill guide/Drill for
thoracolumbar cases. Depth guide from 30-60mm. Drill bit diameter 3.5.

Solanas
-Navigation instruments:
Made similar to the Arsenal NI instruments.
---Drill guide/Drill. Depth guide from 10-40mm Drill diameter 2.5mm ---Threaded screw driver

I'm going to send you a couple things today. What address would you like them shipped to?


Sent from my iPhone

1

