

### EXCLUSIVE SALES REPRESENTATIVE AGREEMENT

This EXCLUSIVE SALES REPRESENTATIVE AGREEMENT (the "Agreement") is entered into effective as of January 1, 2014 ("Effective Date") by and between NuVasive, Inc., a Delaware corporation with principal offices at 7475 Lusk Boulevard, San Diego, California 92121 ("NuVasive"), and Absolute Medical LLC, a Florida limited liability company with a principal place of business at 213 Villa Di Este Terrace #105, Lake Mary, Florida 32746 ("Representative") (each a "Party" and collectively "the Parties").

### 1. DEFINITIONS

1.1     "Products" means those products listed in **Exhibit A** attached hereto. Products subject to this Agreement may be changed, discontinued or added by NuVasive, at its sole discretion, so long as such change, discontinuation and/or addition similarly affects, or would otherwise put Representative in line with, the product offering for other similarly situated sales representatives of NuVasive. Such change, discontinuation and/or addition shall be effective thirty (30) days after delivery by NuVasive to Representative of a new **Exhibit A**.

1.2     "Territory" means the geographic areas and/or specific institutions listed on **Exhibit B** hereto.

1.3     "Stated Percentage" shall equal ten percent (10%) of all Incremental Sales (as defined in Exhibit H); provided, however that the Stated Percentage shall equal seven percent (7%) of all Incremental Sales if Representative is in Poor Standing at any time during the most recently completed calendar year.

### 2. APPOINTMENT AND AUTHORITY OF REPRESENTATIVE

2.1     Exclusive Sales Representative. Subject to the terms and conditions herein, NuVasive hereby appoints Representative as NuVasive's exclusive sales representative for Products in the Territory, and Representative hereby accepts such appointment. Representative's sole authority shall be to solicit orders for Products in the Territory in accordance with the terms of this Agreement.

(a)     The Territory may be increased or decreased by agreement of the Parties in writing. NuVasive may, in its sole discretion, decrease the Territory if (i) the Territory is not sufficiently covered by sufficient representation in accordance with the sales action plan agreed to by the Parties and delivered pursuant with Section 6.4, (ii) Representative is in violation of Section 6.12, 6.13, 6.14 or 6.15 of this Agreement, (iii) Representative is in Poor Standing, or (iv) NuVasive pays Representative an amount equal to the then-current Stated Percentage with respect to the sales generated in the prior calendar year in the portion of the Territory that is being decreased from Representative. Upon exercise of NuVasive's rights in Section 2(a)(i)-(iii), all Compliance Agreements (or similar agreements then in effect) designated by NuVasive (the "Designated Agreements") for Representative Affiliates within the decreased Territory shall be automatically and immediately assigned to NuVasive and all other reasonable steps shall be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of NuVasive. NuVasive shall pay to Representative the following amounts for the Designated Agreements: $10,000 for each Spine Associate (or equivalent), $15,000 for each Spine Specialist (or equivalent), and $25,000 for each Sales Manager (or equivalent), with NuVasive making the determination as to which category applies.

(b)     Further, any time Representative is in Poor Standing, upon payment of the Stated Percentage for the entire Territory, NuVasive may elect to terminate this Agreement and have all Compliance Agreements assigned to it (and require that all other reasonable steps be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of NuVasive).

CONFIDENTIAL

2.2     Territorial Limitation. Representative shall not, directly or indirectly, (i) advertise or promote any Products outside the Territory; (ii) solicit or procure any orders for Products from outside the Territory; or (iii) otherwise act as NuVasive's representative with respect to the Products outside the Territory, without the prior written consent of NuVasive. Representative may only submit and procure orders from customers located and taking delivery of Products within the Territory. Representative shall maintain sufficient representation in all spine hospitals and clinics in the Territory and shall promptly replace any sales representatives that leave Representative's organization while the Agreement is in force. Any accounts or portions of the Territory without sufficient representation may at NuVasive's discretion be moved to a non-exclusive status (notwithstanding Section 2.1) or removed from the Territory under Section 2.1(a).

2.3     Independent Contractors. The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either Party the power to direct and control the day-to-day activities of the other Party, (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Representative to create or assume any obligation on behalf of NuVasive for any purpose whatsoever. All financial and other obligations associated with each Party's business and its performance of obligations under this Agreement are the sole responsibility of the respective Party. Each Party shall be solely responsible for, and shall indemnify and hold the other Party free and harmless from, any and all claims, actions, proceedings, damages, liability, costs and expense (including reasonable attorneys' fees) arising out of the acts of its employees or its agents. For the avoidance of doubt, with respect to its sales representatives, Representative shall be solely responsible for hiring, promoting, discharging, scheduling appointments, establishing pay scales and/or other remuneration, remunerating, reimbursing for work-related expenses, implementing discipline and any other action directly related to the employment of such sales representatives.

2.4     Conflicts of Interest. Representative represents and warrants to NuVasive that it does not (nor does any entity or person affiliated with it) currently represent or promote any lines or products that are competitive with any NuVasive Product, and that it shall not (nor shall any entity or person affiliated with it) during the Term, directly or indirectly, represent, promote, sell or otherwise commercialize within the Territory (i) any lines or products that are competitive with any Product covered by this Agreement or (ii) any non-NuVasive products for use in spine surgery. Further, during the Term, Representative shall not, directly or indirectly, represent, promote, sell or otherwise commercialize any products (other than the Products) without the prior written consent of NuVasive. Representative has identified on Exhibit G all products and/or services for which Representative or its affiliates, directly or indirectly, acts as a sales representative, agent, employee, etc. Representative agrees that it is a material term of this Agreement that Exhibit G be complete and accurate at all times, agrees to provide updates as needed to Exhibit G, agrees to appropriately inquire of all its affiliates and representatives to confirm the accuracy of such information, and agrees that failure to accurately and timely disclose all required information on Exhibit G will place Representative in Poor Standing hereunder for a period of at least 1 year from the date on which Exhibit G is properly updated.     In addition, Representative represents that its performance of all the terms of this Agreement and as an agent of NuVasive does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by it in confidence or in trust prior to its engagement by NuVasive, and Representative agrees not to disclose to NuVasive any confidential or proprietary information or material belonging to any previous employers or other entities with whom Representative has been involved. Representative represents and warrants that it has not entered into (and is not bound by) any agreement, either written or oral, that is in conflict herewith or in conflict with the engagement contemplated hereby. Representative further represents and warrants that it will not, directly or indirectly, engage in the development of products or intellectual property that are for use in (or applicable to) spine surgery, and that Representative has disclosed to NuVasive all relevant details regarding any such development activity that occurred in the past.

CONFIDENTIAL

2.5     Additional Obligations. Representative agrees and warrants that it will cooperate fully with NuVasive personnel in all respects with regard to performing the obligations of this Agreement, including participating in requested teleconferences, meetings, and travel, and providing sales target and sales forecasting information to NuVasive upon reasonable request.

3.  COMMISSION

3.1     Sole Compensation. Representative's sole compensation under the terms of this Agreement shall be a commission ("Commission") based on Net Sales (as defined in Section 3.2 below) of Products resulting from Representative's procurement of orders therefore pursuant to this Agreement, in accordance with the schedule set forth in Exhibit C hereto.

3.2     Basis of Commission. The Commission shall apply to all Product orders (i) procured by Representative from customers within the Territory in accordance with this Agreement; (ii) that have been accepted by NuVasive; and (iii) for which shipment of Products and recognition of revenue by NuVasive has occurred. Commissions shall be computed based on "Net Sales" which shall, for purposes of this Agreement, be defined as the dollar amount actually received by NuVasive from a customer for the sales of the Product(s), less charges for shipping, handling, freight, taxes, C.O.D. charges, insurance, tariffs and duties, cash and trade discounts, rebates, charge back payments to managed healthcare organizations, GPO administrative fees, amounts allowed or credited for returns, uncollected or uncollectable amounts, services, taxes imposed upon the sale of the Products and the like. The Territory may be subdivided into regions if set forth as such on Exhibit B, Exhibit C or Exhibit D (as updated from time to time by NuVasive). Separate Quota Commitments may be designated for each such region.

3.3     Time and Manner of Payment. The Commission pursuant to Section 3 on a given order shall be due and payable thirty (30) days after the end of the calendar month in which NuVasive invoices and ships that order.

3.4     Commission Charge Back. NuVasive shall have the absolute right to set such cash discounts, to make such allowances and adjustments, to accept such returns from its customers, and to write off as bad debts such overdue customer accounts as it deems advisable in its discretion. In each such case, NuVasive shall charge back to Representative's account any Commission previously paid or credited to it with respect to such cash discounts, allowances, adjustments, returns or bad debts. Representative also agrees to accept charges for: (i) pricing arrangements (or side deals) not approved by NuVasive or noncompliance with NuVasive's policy against "house accounts" maintained by Representative; (ii) lost, damaged or missing inventory; (iii) failure to comply with NuVasive's communicated policies, e.g., inventory management policy and pricing policy as updated from time to time; and (iv) courier charges for the delivery of Products when NuVasive standard method of shipping was available.

3.5     Monthly Statements. NuVasive shall submit to Representative monthly statements of the Commissions due and payable to Representative under the terms of this Agreement, with reference to the specific invoices on which the Commissions are being paid.

3.6     Potential Bonus Payments. NuVasive may, from time to time and in its sole discretion, pay bonuses as separately outlined by Sales Administration for the achievement of peak sales performance and as part of special product roll-outs and initiatives.

-3-

Error! Unknown document property name.

CONFIDENTIAL

## 4.  SALE OF THE PRODUCTS

4.1      Prices and Terms of Sale. NuVasive shall provide Representative with copies of its current price lists, its delivery schedules, and its standard terms and conditions of sale, as established from time to time. NuVasive's current terms and conditions of sale are attached hereto as **Exhibit E**, which may be amended from time to time in the sole discretion of NuVasive (the "Terms and Conditions"). Representative shall quote to customers only those authorized prices, delivery schedules, and terms and conditions, and shall have no authority to quote or offer any discount to such prices or change any such terms and conditions, without the prior written consent of NuVasive. NuVasive may change the prices, delivery schedules, and terms and conditions, at any time and from time to time, such changes to be effective thirty (30) days after delivery by NuVasive to Representative of written notice of any such changes. Each order for a Product shall be governed by the prices, delivery schedules, and terms and conditions in effect at the time the order is accepted by NuVasive, and all quotations by Representative shall contain a statement to that effect.

4.2      Orders; Acceptance. All orders for the Products shall be in writing, and the originals shall be submitted to NuVasive. NuVasive shall promptly furnish to Representative informational copies of all commissionable orders sent by customers in the Territory. All orders obtained by Representative shall be subject to acceptance by NuVasive at its sole discretion. Representative shall have no authority to make any acceptance or delivery commitments to customers. NuVasive agrees that its normal business practice is to accept all bona fide orders for Products, subject to availability and NuVasive's credit and ordering policies.

4.3      Collection. It is expressly understood by Representative that full responsibility for all collection rests with NuVasive, provided, at NuVasive's request, Representative will assist NuVasive in the collection of any accounts receivable of NuVasive.

## 5.  WARRANTY

5.1      Customer Warranty. Any warranty for the Products shall run directly from NuVasive to the customer, and pursuant to the warranty the customer shall return any allegedly defective Products to NuVasive. Representative shall have no authority to accept any returned Products.

5.2      Warranty Terms. All warranty claims shall be governed by the Terms and Conditions.

## 6.  ADDITIONAL OBLIGATIONS OF REPRESENTATIVE

6.1      Quota Commitment. Representative shall solicit orders that are submitted to NuVasive in accordance with this Agreement for the quantity of Products set forth in **Exhibit D** attached hereto ("Quota Commitment"). The Quota Commitment shall be determined, based on dialogue with Representative, by NuVasive in its sole discretion and delivered to Representative within thirty (30) days of the end of each calendar year, or as may be delivered to Representative by NuVasive from time to time (it being understood that NuVasive intends to deliver a Quota Commitment at intervals more frequently than annually only with respect to newly introduced products). If Representative (i) fails to secure orders for ninety-five percent (95%) of its aggregate Quota Commitment in any two consecutive calendar quarters, or (ii) fails to secure orders for ninety-five percent (95%) of its aggregate Quota Commitment for any given calendar year, then Representative shall be deemed in "Poor Standing" and NuVasive may, at its discretion and without prejudice to any other rights NuVasive may have under this Agreement, terminate Representative's exclusivity granted in Section 2.1 herein and appoint one or more additional representatives for sale of Products in the Territory, reduce the Territory per Section 1.2, and/or terminate the Agreement at will per Section 11.3. If Representative is deemed to be in Poor Standing, Representative will remain in Poor Standing and NuVasive will maintain all rights granted to it as a result until such time as Representative regains good standing by achieving its Quota Commitment for a full calendar quarter. Orders fulfilling the Quota Commitment shall be based on bona fide orders submitted to

-4-

**Error! Unknown document property name.**

CONFIDENTIAL

NuVasive that would, upon acceptance by NuVasive, qualify for the payment of a Commission to Representative. The Territory may be subdivided into regions if set forth as such on **Exhibit B, Exhibit C** or **Exhibit D** (as updated from time to time by NuVasive). Separate Quota Commitments may be designated for each such region.

6.2     Representative Infrastructure and Promotion of the Products.  NuVasive and Representative acknowledge and agree that development of proper infrastructure on the part of Representative is vital for the success of the business. NuVasive will work with Representative to develop and refine expectations for business investments to be made by Representative for the purpose of expanding its infrastructure (e.g., overseeing operations, operational activities, adding personnel with specialized skills, investing in new markets, computer systems and software, inventory tracking and management, NuVasive compatible mobile phone & tablet, NuVasive customer relationship management system subscription, etc.) (the "Infrastructure Investments"). The Infrastructure Investments required by NuVasive will be reasonable in scope and expense and will be supported with resources from NuVasive. As the Infrastructure Investments are defined and communicated to Representative from time to time, Representative agrees to comply with the Infrastructure Investments and agrees that failure to do so shall entitle NuVasive to appropriately redefine the Territory, terminate Representative's exclusivity, and/or charge Representative for fines and/or costs. Representative acknowledges and agrees to maintain sufficient personnel to effectively and consistently promote the sale of the Products as contemplated by the Agreement, with a focus on selling a complete mix of the various Products. Representative shall also provide sufficient promotional support to its sales representatives in order to promote the Products in their assigned territories. Representative agrees not to sell all or any part of the Promotional Materials of Section 7.2 to any third party without the prior written consent of NuVasive. Representative shall use the Promotional Materials of Section 7.2 solely to demonstrate and promote the Products to bona fide customers considering ordering such Products in strict accordance with all the terms of this Agreement and solely to the extent necessary to fulfill the purposes of this Agreement.

6.3     Territorial Responsibility.  Representative shall assign its entire Territory to individual sales representatives, shall set individual quotas for each representative, and shall communicate all such information to NuVasive on an ongoing basis.

6.4     Sales Action Plans.  Representative shall provide to NuVasive, within thirty (30) days following the end of each calendar year, an annual sales objectives plan detailing Representative's sales goals and execution strategies for the coming year. In addition, Representative shall deliver to NuVasive, by the fifth (5th) day of each calendar month, a monthly action plan detailing Representative's sales history, revised sales plans and strategies. The format of such reporting will be determined by NuVasive.

6.5     Audit.  Upon reasonable request by NuVasive, Representative agrees to furnish a full and detailed statement of NuVasive's business and in Territory but only to the extent it relates to this Agreement, including without limitation to matters related to Sections 6.10 and 6.13 herein. NuVasive shall have the right during normal business hours and upon thirty (30) days prior written notice to audit Representative's and Representative Affiliate's records relative to NuVasive's business (including basic financial information of Representative) and verify any Representative or Representative Affiliate statement sent to NuVasive.

6.6     Demonstration and Staff Training.  NuVasive agrees to provide Representative and its personnel with adequate training regarding the use and operation of the Products, and to also provide its staff and personnel with regular training regarding any updates to the Products. Representative agrees to attend (and have its applicable employees and contractors attend within 90 days of date of hire by Representative) training as requested by NuVasive. Representative agrees (i) that all of its applicable employees and contractors will attend NuVasive's sales training course within six (6) months of execution of this Agreement and (ii) to implement a sales training plan agreed upon by Representative and NuVasive's sales management that takes full use of training courses and provides regular and thorough training to entire sales team. Representative also agrees to

-5-

**Error! Unknown document property name.**

CONFIDENTIAL

meet NuVasive's requirements for attendance and participation in NuVasive's Marquis Visit Program, which shall include an annual quota for MVPs to be scheduled by Representative. MVP training costs will be cost shared between NuVasive and Representative, as updated by Surgeon Education policy from time to time.

6.7     Product Complaints.     Representative represents and warrants that Representative shall: (i) promptly investigate and monitor all customer and/or regulatory complaints and/or correspondence concerning the use of the Products in the Territory; (ii) immediately notify NuVasive of all such complaints and/or correspondence; (iii) assign to NuVasive all rights (including intellectual property rights), title and interests in and to any customer feedback with regard to the Products, and (iv) take any and all such actions to ensure such assignment is effected, upon reasonable request of NuVasive.

6.8     Representations; Marketing.     NuVasive shall provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures, instructional material, advertising literature, product samples, and other Product data ("Promotional Materials"). Representative represents and warrants it shall not make any false or misleading representations to customers or others regarding NuVasive or the Products, or about NuVasive competitors or competitor products. Representative represents and warrants that it shall not make any representations, warranties or guarantees with respect to the specifications, features or capabilities of the Products that are not consistent with, or otherwise expand upon the claims in, the Promotional Materials or other documentation supplied by NuVasive. Representative represents and warrants that it shall use only the Promotional Materials supplied by NuVasive in its promotion of the Products. Representative represents and warrants that in no event shall Representative make any guarantee or warranty concerning the Products that is inconsistent with, or otherwise expands upon, NuVasive's standard limited warranty or on behalf of any vendor or supplier of NuVasive. Representative represents and warrants that it shall promote and market the Products in accordance with the training provided by NuVasive.

6.9     Notice of Changes.     Representative shall promptly advise NuVasive of (i) any changes in Representative' status, organization, personnel, and similar matters, (ii) any changes in the key personnel, organization, and status of any major customers of NuVasive in the Territory, and (iii) any political, financial, legislative, industrial or other events in the Territory that could affect the mutual business interests of Representative and NuVasive, whether harmful or beneficial.

6.10     Compliance with Laws and Policies.     Representative represents and warrants that it will comply with all applicable federal, state, local, municipal, regulatory and/or governmental agency laws, statutes, regulations, edicts, guidance, directives, and ordinances, including, without limitation, (a) the Social Security Act; (b) HIPAA, (c) all federal and state health care anti-fraud, anti-kickback and abuse laws such as 42 U.S.C. § 1320a-7b(b); (d) the Federal Food, Drug, and Cosmetic Act and its implementing regulations; (e) all rules, regulations, and guidance of the FDA; and (f) all rules and regulations of the Center for Medicare and Medicaid Services (CMS). Without limiting the generality of the foregoing, except to the extent allowed by applicable law, Representative will make no offer, payment or other inducement, whether directly or indirectly, to induce the referral of business, the purchase, lease or order of any item or service, or the recommending of the purchase, lease or order of any item or service.     Representative will comply, and will ensure its personnel carrying out activities under this Agreement comply, with all operating and compliance policies of NuVasive, including (without limitation)  the MDMA Code of Conduct on Interactions with Healthcare Providers, NuVasive's Code of Ethical Business Conduct, NuVasive's Global Business Ethics Program, including the Healthcare Compliance Policy Guide, Insider Trading Policy and Inventory Management Policy (relating to wide variety of inventory management issues, including without limitation inventory investment, accountability for inventory management (such as cost-sharing) and consignment inventory), as such policies may be created and updated from time to time, and including any applicable training requirements with respect to such policies. Additionally, on not less than an annual basis, Representative shall certify to compliance with the Healthcare Compliance Policy Guide by submitting a Certification of Compliance (in such form as attached hereto as

Error! Unknown document property name.

CONFIDENTIAL

Exhibit F) to NuVasive that Representative is in compliance with this Section 6.10 and any other compliance terms in this Agreement in a form acceptable to NuVasive. Representative shall provide on a timely basis, to be determined by NuVasive, all information of Representative and/or its personnel and Representative Affiliate to comply with the Physician Payments Sunshine Act and/or any similar state law.

6.11    Sales Representatives. NuVasive may elect to interview candidates for sales representative positions and to approve or disapprove such candidates based upon the hiring profile; provided, however, that such approval or disapproval does not affect Representative's authority to making hiring or other employment decisions. NuVasive shall have the right to approve how such sales representatives are trained and deployed. Representative shall compensate its sales representatives in its discretion.

6.12    Regulatory Compliance. Representative will not alter or modify the Product(s) in any way prior to delivery to customers. Representative shall at all times conduct its activities on behalf of NuVasive in accordance with the labeling limitations on the Products, the terms of this Agreement, NuVasive's written policies and procedures, and in compliance with applicable state and federal laws in effect from time to time, including the FDA's quality system regulations (QSR), Adverse Event Reporting System (AERS) and/or current good manufacturing practice (cGMP) regulations and shall undertake all required compliance actions, including establishing and implementing all required control and reporting procedures. Representative shall provide NuVasive with such information and data as may be requested by Company pursuant to this Agreement.

6.13    Agreement Regarding Competitive Products; Non-Solicitation.   During the Term and for a period of twelve (12) months following the expiration or termination hereof, neither Representative nor any of Representatives' partners, employees, sub-contractors, sales personnel (whether employees of Representative or independent contractors), affiliates or agents who have provided services pursuant to this Agreement or have received information from Representative related to the Products (nor any entity in which Representative has an ownership interest) (each a "Representative Affiliate") shall i) develop, represent, promote or otherwise try to sell within the Territory any lines or products that, in the Company's reasonable judgment, compete with the Products covered by this Agreement, (ii) solicit (directly or indirectly) any current or former customers of NuVasive within the Territory to purchase any products or lines that are, in the Company's reasonable judgment, competitive with the Products covered by this Agreement, or (iii) solicit or offer work to, directly or indirectly, any of NuVasive's employees, agents or representatives. Representative represents and warrants that (A) each Representative Affiliate engaged by it as of the date of execution hereof shall execute an agreement in form and substance sufficient to contractually obligate such person or entity to comply with the restrictions contained in this Section 6.13(a "Compliance Agreement"), (B) each person or entity who becomes a Representative Affiliate in the future shall execute a Compliance Agreement prior to performing any services for the benefit of NuVasive or receiving any information regarding the Products, (C) each Compliance Agreement will name NuVasive as an intended third party beneficiary with full right to directly enforce provisions necessary to comply with this Section 6.13, and (D) it will vigorously enforce the restrictions contained in this Section 6.13 and each Compliance Agreement at its own cost (and in the event Representative fails to adequately enforce such restrictions, NuVasive may do so at Representative's cost). Representative shall provide NuVasive a copy of each Compliance Agreement with respect to each Representative Affiliate immediately upon such person or entity becoming a Representative Affiliate. Each Compliance Agreement shall require all sales representatives to comply with the terms of Sections 6.10 and 6.12 hereof, and each such Compliance Agreement shall be provided to NuVasive. The eighteen (18) month period during which the restrictions of this Section are applicable shall toll for any period of time in which Representative is not in compliance herewith.

NuVasive and Representative acknowledge and agree that the foregoing non-competition covenants are reasonable and necessary to protect the legitimate interests of NuVasive, including without limitation, the protection of Confidential Information. Representative further acknowledges and agrees that such covenants are an essential part of, and consideration for, NuVasive's promises contained in this Agreement.

-7-

Error! Unknown document property name.

CONFIDENTIAL

If any provision of this Agreement is held to be unenforceable, such provision will be distinct and severable from the other provisions of this Agreement, and such unenforceability will not affect the validity and enforceability of the remaining provisions. If a court holds that the duration, scope, geographic range, or any other restriction stated in any provision of this Agreement is unreasonable under circumstances then existing, the parties agree that the maximum duration, scope, geographic range, or other restriction that the court deems reasonable under such circumstances will be substituted and that the court will have the power to revise any of those restrictions to cover the maximum period, scope, geographic range, and/or other restriction permitted by law. It is the intent of the parties that the court, in establishing any such substitute restriction, recognize that the parties' desire is that the stated restrictions upon which the parties have agreed be honored to the maximum lawful extent.

6.14     Debarment. Representative represents and warrants that neither it nor any of its personnel carrying out activities under this Agreement have been nor are debarred, suspended, excluded or are otherwise ineligible under Section 306 of the Federal Food, Drug and Cosmetic Act (as amended by the Generic Drug Enforcement Act of 1992), 21 U.S.C. § 336, or are listed on any applicable federal exclusion list including the then-current: (a) HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); (b) General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov); and (c) FDA Debarment List (available through the internet at http://www.fda.gov/ora/compliance_ref/debar/).

6.15     Interaction with Health Care Professionals. Representative represents and warrants that neither it nor any of its personnel carrying out activities under this Agreement currently have any form of compensation arrangement with any Health Care Professional other than an agreement to purchase product. Representative agrees that neither it nor any of its personnel shall   enter into, any arrangement (e.g., grants, donations, sponsorships, reimbursement of expenses, etc.) or agreement, oral or written, with a Health Care Professional, other than for the purchase of product without the express prior written consent of NuVasive's Compliance Officer or his/her designee. A breach of this provision shall be cause for NuVasive to terminate this Agreement at will.

6.16     Insurance. During the Term, Representative shall maintain in full force and effect the following insurance coverage of not less than the following amounts: (i) General Liability including Products/Completed Operations Liability - Two Million Dollars ($2,000,000) aggregate, One Million Dollars ($1,000,000) Bodily Injury/Property Damage per occurrence, One Million Dollars ($1,000,000) Personal and Advertising Injury, One Hundred Thousand Dollars ($100,000) Damage to Rented Premises, Ten Thousand Dollars ($10,000) Premises Medical Payments; (ii) Property Coverage equal to replacement value of property owned along with extra expense coverage to cover period of time to replace office premises; (iii) Professional Liability: One Million Dollars ($1,000,000) aggregate and per occurrence; (iv) Automobile Liability for owned, non-owned and hired autos (as applicable) – One Million Dollars ($1,000,000) per accident; and (v) Workers Compensation sufficient to meet statutory required benefits of the state in which your employees are domiciled; all from carrier(s) reasonably acceptable to NuVasive. On an ongoing basis, Representative shall provide NuVasive with one or more certificates of insurance showing that Representative maintains insurance in accordance with this Section 6.16. Such certificates shall confirm that NuVasive has been named as an additional insured on Representative's insurance policies by endorsement to such policies and shall provide that there shall be no cancellation or reduction in coverage without thirty (30) days' prior written notice to NuVasive.

6.17     Compliance. Representative agrees to maintain all records required to substantiate compliance with all such laws, regulations, policies, procedures and guidelines and terms of this Agreement for the term of the Agreement plus an additional six years after its expiration or termination.

6.18     Non-Disparagement. Representative shall not in any way disparage NuVasive, its products, or its agents or employees, including, without limitation, taking any action or making any statement the intent or

-8-

Error! Unknown document property name.

CONFIDENTIAL

reasonably foreseeable effect of which is to impugn or injure the reputation or goodwill of NuVasive or any of its agents or employees.

6.19    Representations and Warranties.

(a)    Corporate Power. Representative is duly organized and validly existing under the laws of its state of incorporation (as set forth on the first page of this Agreement) and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof.

(b)    Due Authorization. Representative is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder. The person executing this Agreement on Representative's behalf has been duly authorized to do so by all requisite corporate action.

(c)    Binding Agreement. This Agreement is a legal and valid obligation binding upon the Parties and enforceable in accordance with its terms. The execution, delivery and performance of this Agreement by the Parties does not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, nor violate any material law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

## 7.  ADDITIONAL OBLIGATIONS OF NUVASIVE

7.1    Training by NuVasive. NuVasive shall provide sales and compliance training to Representative's personnel at periodic intervals, with the frequency and content of the training to be determined by NuVasive. When possible, such training shall be given at Representative's facilities, but it may be necessary to provide combined training at a geographically central location near but not in the Territory. Travel and expenses associated with attendance by Representative and Representative's personnel shall be borne by Representative. Representative shall sign all certifications confirming its training as may be requested by NuVasive.

7.2    Promotional Materials. NuVasive may charge Representative for such materials. Representative shall not add, delete, or modify any language in the Promotions Materials in any manner, except for adding Representative contact information. Under no circumstances shall Representative use any other promotional material or literature regarding the Products without the prior written consent of NuVasive.

7.3    Telephone Marketing and Technical Support. NuVasive shall provide a reasonable level of technical support in English to personnel of Representative who have been trained by NuVasive during its normal business hours to answer Representative's questions related to the Products. NuVasive will also provide assistance to Representative regarding sales administration, hiring, and implementation of sales plans.

## 8.  INDEMNITY

Subject to all of the Conditions set forth in this Section 8, NuVasive shall defend, indemnify and hold harmless Representative and its employees and agents, from and against any and all causes of action, claims, suits, proceedings, damages and judgments by third parties (collectively, "Claims"), to the extent that such Claims are based primarily on an alleged manufacturing or design defect in a Product sold by Representative. In the event that any Claim is asserted against Representative, Representative shall provide written notice to NuVasive within (10) days after learning of such Claim. NuVasive will have the right to select counsel, and conduct and control at its expense the defense against and settlement of such Claim in its own name, or if necessary in Representative's name and NuVasive's defense counsel may act on Representative's behalf regardless of whether such Claim has also been asserted against NuVasive. Representative will cooperate with and make available to NuVasive such assistance and information as may be reasonably requested by NuVasive,

-9-

CONFIDENTIAL

and Representative will have the right to participate in the defense, including representation by independent counsel, at Representative's expense, provided that under such circumstances Representative will have the right to compromise and settle the Claim only with the prior written consent of NuVasive. If, in connection with any Claim it is determined by NuVasive that Representative acted beyond its authority, or failed to comply with any of its material obligations under this Agreement, NuVasive shall be immediately relieved of its obligations to Representative under this Section 8.

## 9.  TRADEMARKS

9.1    Use.  NuVasive hereby grants to Representative the non-exclusive, non-transferable, limited right and license for the Term to indicate to the public that it is an authorized representative of the Products and to advertise (within the Territory) such Products under the trademarks, service marks, logos, and trade names that NuVasive may adopt from time to time ("Trademarks"). Representative shall not alter or remove any Trademark applied to the Products. Except as set forth in this Section 9, nothing contained in this Agreement shall grant to Representative any right, title or interest in the Trademarks. At no time during or after the Term shall Representative challenge or assist others to challenge NuVasive's ownership of its Trademarks or attempt or assist others to attempt to register any trademarks, marks or trade names confusingly similar to those of NuVasive. Should NuVasive notify Representative that the use of any Trademarks violates the then in effect Trademark guidelines ("Trademark Guidelines") established by NuVasive, Representative shall bring such use into conformance with the Trademark Guidelines and shall provide to NuVasive a specimen of such conforming use. Notwithstanding the foregoing, NuVasive, at its discretion, may terminate this trademark license when it determines that Representative is using the Trademarks in a manner that violates NuVasive's then in effect Trademark Guidelines.  Promptly following termination or expiration of this Agreement for any reason, Representative shall take all actions necessary to transfer and assign to NuVasive all rights, title and interest in and to the Trademarks and goodwill related thereto which Representative may have acquired as a result of this Agreement and shall promptly discontinue all uses of the Trademarks. Representative shall cooperate with NuVasive, at NuVasive's expense, to register the Trademarks in any jurisdiction, including executing appropriate documents and otherwise assisting NuVasive.

9.2    Approval of Representations.  All representations of the Trademarks that Representative intends to use (including without limitation in any catalogue or other marketing collateral) shall first be submitted to NuVasive for written approval (which shall not be unreasonably withheld) of design, color, and other details. Representative may not mark the Products or Product packaging materials with its own trademarks, service marks, trade names, or logos or those of any third party ("Other Marks") without the prior written consent of NuVasive. If any of NuVasive's Trademarks are to be used in conjunction with Other Marks on or in relation to the Products, then the Trademarks shall be presented equally legibly, equally prominently, and of greater size than the other but nevertheless separated from the Other Marks so that the Trademarks and the Other Marks each appears to be a mark in its own right, distinct from one another.

## 10.  CONFIDENTIALITY

10.1    Confidential Information.  "Confidential Information" means the proprietary or confidential information of NuVasive which is disclosed to Representative, whether before or after the Effective Date, and (a) if disclosed in writing, is either marked as confidential or is known, understood or reasonably expected to be confidential at the time of disclosure, or (b) if disclosed orally or in other intangible form, is either identified and treated as confidential at time of disclosure, or is known, understood or reasonably expected to be confidential at the time of disclosure, or is, without limiting the foregoing, identified in writing and marked confidential within thirty (30) days after disclosure and relates to products, plans, designs, costs, prices, finances, marketing plans, business opportunities, personnel, research, development, know-how, trade secrets, inventions, blueprints, techniques, processes, algorithms, software programs, schematics, designs, contracts, customer lists, procedures, formulae, patent applications and other information relating to NuVasive's business, services, processes or

-10-

Error! Unknown document property name.

CONFIDENTIAL

technology. Confidential Information shall also include the terms of this Agreement. Confidential Information shall not include information that Representative proves: (i) was known by Representative or was publicly available prior to disclosure by NuVasive to Representative; (ii) became publicly available after disclosure by NuVasive to Representative through no act of Representative; (iii) is hereafter rightfully furnished to Representative by a third party without confidentiality restriction; or (iv) is disclosed with the prior written consent of NuVasive or as expressly authorized under this Agreement.

10.2     Non-Disclosure. Parties shall not, except as otherwise expressly provided herein, use, disclose, disseminate or otherwise allow access to the Confidential Information of the other Party to anyone other than to employees that have a need to know such Confidential Information to implement this Agreement and who are bound by written confidentiality obligations with provisions no less stringent than those contained in this Section 10. Each Party shall prevent unauthorized disclosure or use of the Confidential Information of the other Party. Parties shall execute all documents and otherwise shall take all necessary steps to ensure that each be able to enforce rights hereunder pertaining to Confidential Information. Parties shall be responsible for any breach of this Section 10.2 by employees, contractors or agents.

10.3     Ownership. Representative acknowledges and agrees that NuVasive (or its licensors) owns all rights, title and interests, including intellectual property rights, in and to NuVasive's Confidential Information.

10.4     Notification. If Representative learns or believes that any person who has had access to the Confidential Information of NuVasive has violated or intends to violate this Agreement, Representative shall immediately notify NuVasive and shall cooperate with NuVasive in seeking injunctive or other equitable relief against any such person.

10.5     Exceptions. Representative may disclose the Confidential Information of NuVasive, only if such disclosure is required by law, provided that Representative promptly notifies NuVasive to allow intervention by NuVasive (prior to the disclosure), cooperates with NuVasive to contest or minimize the disclosure (including application for a protective order) at NuVasive's expense and limits such disclosure to the party entitled to receive the Confidential Information and to the scope of the legal requirement. Notwithstanding the foregoing, any Confidential Information disclosed pursuant to this Section 10.5 shall otherwise continue to be treated as Confidential Information hereunder. Notwithstanding anything to the contrary, Representative must obtain the consent of NuVasive prior to disclosure of this Agreement to any third party.

10.6     Reproduction of Confidential Information. Confidential Information shall not be reproduced except as required to implement this Agreement. Any reproduction or derivative of any Confidential Information of NuVasive by Representative shall remain the property of NuVasive and shall contain all confidential or proprietary notices or legends which appear on the original.

10.7     Equitable Remedies. Any unauthorized disclosure or use of Confidential Information by Parties shall be a material breach of this Agreement, and Parties shall be entitled to all remedies available under law or in equity, including without limitation injunctive relief without the need to post a bond therefor.

11. TERM AND TERMINATION

11.1     Term. This Agreement shall take effect on the Effective Date and continue in force for a term beginning on the Effective Date and ending on December 31, 2016 ("Term"), unless sooner terminated under the provisions of this Section 11. NuVasive shall have the option to renew the Agreement for successive one year terms following termination. Representative understands and agrees that following termination for any reason, Representative will be responsible for returning any outstanding inventory items and will be held responsible for missing items.

-11-

Error! Unknown document property name.

CONFIDENTIAL

11.2      Termination for Cause.  (i) If either party defaults in the performance of any provision of this Agreement, then the non-defaulting party may give written notice to the defaulting party that if the default is not cured within thirty (30) days the Agreement (except for breaches of Sections 2.2, 2.4, 6.13, 6.15, 9, 10 or 12.3, in which case such termination shall be immediate upon notice) will be terminated.  Such thirty (30) day notice period shall not be required if the breach by its nature cannot by its nature be cured within thirty (30) days.

11.3      Termination At Will.  NuVasive shall have the right to terminate this Agreement at will if Representative is deemed to be in "Poor Standing" per Section 6.1.  NuVasive shall also have (i) the right to terminate this Agreement at will if Representative breaches a material term of this Agreement at any time, and (ii) the termination right described in Sections 6.15 and 11.6(a).

11.4      Termination for Insolvency.  This Agreement may be terminated by either Party without notice (i) due to insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of the other Party, (ii) upon either Party making an assignment for the benefit of creditors, or (iii) upon either Party's dissolution or ceasing to do business.

11.5      Effect of Termination.

(a)      Accrued Obligations.  Termination shall not relieve either party of obligations incurred prior to the effective date of such termination.

(b)      Return of Materials.  All trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, samples, literature, sales aids of every kind and NuVasive Confidential Information shall remain the property of NuVasive.  Within ten (10) days after the termination of this Agreement, Representative shall prepare all such items in its possession for shipment, as NuVasive may direct, at NuVasive's reasonable expense.  Representative shall not make, use, dispose of or retain any copies or derivatives of any NuVasive Confidential Information in any form.  Effective upon the termination of this Agreement, Representative shall cease to use all Trademarks.  Representative shall comply with all requests from NuVasive regarding the return of inventory, Products, samples, etc.

(c)      Additional Commissions.  In addition to any commissions already earned by Representative but not yet paid by NuVasive under the terms of Section 3 above, NuVasive shall pay commissions to Representative on all orders from the Territory that were accepted by NuVasive within thirty (30) days after the date of termination of this Agreement and for which NuVasive receives payment within sixty (60) days after the date of termination of this Agreement.

(d)      If NuVasive should terminate this Agreement due to a material breach by Representative of any of their obligations under Sections 2.2, 2.4, 6.13, 6.15, 9, 10 or 12.3 of this Agreement, then in addition to any other legal or equitable remedies available to NuVasive, NuVasive shall have the right in its sole discretion and for no additional consideration to Representative: to direct Representative to immediately assign to NuVasive all Compliance Agreements or similar agreements described in Section 6.13 above; and to solicit, contract with, or hire any sales representatives of Representative.

11.6      Change of Control.

(a)      In the event that NuVasive undergoes a merger, acquisition, consolidation, a sale of all or substantially all of NuVasive's assets, or a majority in voting power of NuVasive's then-outstanding voting securities are acquired by a third party (each a "Change of Control"), NuVasive and/or the successor in interest or acquiring party (the "Acquiring Party") shall have the right to terminate this Agreement at any time up to twelve (12) months after such event (the "Termination Right").

-12-

Error! Unknown document property name.

CONFIDENTIAL

(b)     Representative shall be entitled to a payment of the Stated Percentage promptly following the closing of the Change of Control and the termination of this Agreement pursuant to exercise by NuVasive or the Acquiring Party of the Termination Right (the "Change of Control Payment").

(c)     Notwithstanding Section 11.6(b), the Change of Control Payment shall only be required if Representative: (i) has been engaged as a Representative and actively selling the Products for at least one (1) year prior to the Change of Control and (ii) is not in breach of a material provision of this Agreement (including, but not limited to, Section 6.13).

11.7     Additional Provisions Regarding Change of Control.  In the event the Change of Control Payment is made, all Compliance Agreements (or similar agreements then in effect) shall be immediately assigned to NuVasive or the Acquiring Party (at NuVasive's discretion) and all other reasonable steps (not to include significant cash payments by Representative) shall be taken by Representative to ensure that the services of all Representative Affiliates are continued uninterrupted on behalf of the Acquiring Party or NuVasive (as appropriate).

11.8     Survival.  The provisions of Section 5, Section 6.13, Section 8, Section 9 (except for the grant of rights and licenses by NuVasive), and Sections 10-12 shall survive the expiration or termination of this Agreement for any reason.  All other rights and obligations of the parties shall cease upon termination of this Agreement.

## 12. MISCELLANEOUS

12.1     Governing Law and Jurisdiction.

(a)     This Agreement is entered into in and shall be governed, construed and enforced in all respects solely and exclusively under the laws of the state in which Representative resides while performing services under this Agreement without giving effect to any law which would result in the application of a different body of law.  Any decision rendered by such court shall be binding, final and conclusive upon the parties, and a judgment thereon may be entered in, and enforced by, any court having jurisdiction over the party against which an award is entered or the location of such party's assets.  Each party shall be entitled to seek injunctive or other equitable relief, wherever such party deems appropriate in any jurisdiction, in order to preserve or enforce such party's rights for any breach or threatened breach of the other party of Articles 6, 9, 10 and 12.5.  Each party agrees that: such Sections are necessary and reasonable to protect the other party and its business, any violation of these provisions could cause irreparable injury to the other party for which money damages would be inadequate, and as a result, the other party will be entitled to seek and obtain injunctive relief against the breach or threatened breach of the provisions of such Sections without the necessity of posting bond or proving actual damages.

(b)     In the event of any dispute or claim relating to or arising out of the terms of this Agreement or its interpretation, each of the parties agree that all such disputes shall be fully and finally resolved by binding arbitration conducted before a single neutral arbitrator from AAA in County of San Diego, State of California, USA, pursuant to the then current employment arbitration rules (rules can be accessed at www.adr.com).  The arbitrator shall permit adequate discovery.  In addition, the arbitrator is empowered to award all remedies otherwise available in a court of competent jurisdiction.  Any judgment rendered by the arbitrator may be entered by any court of competent jurisdiction.  The arbitrator shall issue an award in writing and state the essential findings and conclusions on which the award is based.  By executing this Agreement, the parties are both waiving the right to a jury trial with respect to any such disputes.  In all other jurisdictions the parties shall split the costs of the arbitrator, forum and filings fees equally.  Each party shall bear its own respective attorneys' fees and all other costs, unless otherwise provided by law and awarded by the arbitrator.  This arbitration section does not include claims that, by law, may not be subject to mandatory arbitration.  In addition, this arbitration

-13-

**Error! Unknown document property name.**

CONFIDENTIAL

section does not prevent either party from seeking temporary injunctive relief, as permitted by applicable state law, through either AAA or an appropriate court of competent jurisdiction.

    12.2    Notices. Any notice required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested, addressed to the other party at the address shown below or such other address for which such party gives notice hereunder. Such notice shall be deemed to have been given three (3) days after deposit in the mail.

To NuVasive:      NuVasive, Inc.
                  7475 Lusk Boulevard
                  San Diego, California 92121
                  Attention: Legal Department

To Representative: Absolute Medical LLC
                   213 Villa Di Este Terrace #105
                   Lake Mary, Florida 32746
                   Attention: Greg Soufleris

    12.3    Assignment. Representative may assign or transfer this Agreement or any of its rights and obligations under this Agreement only upon the prior written consent of NuVasive, which shall not be unreasonably denied.

    12.4    Property Rights. Representative agree that NuVasive owns all right, title, and interest in the product lines that include the Products and in all of NuVasive's patents, trademarks, trade names, inventions, copyrights, know-how, and trade secrets relating to the design, manufacture, operation or service of the Products. The use by Representative of any of these property rights is authorized only for the purposes herein set forth, and upon termination or expiration of this Agreement such authorization shall cease.

    12.5    Indemnification.

        (a)    Representative shall indemnify, defend and hold harmless NuVasive and its directors, officers, employees and agents from any loss, cost, liability or expense, including attorneys' fees, that NuVasive incurs or becomes liable for arising out of any breach by Representative of any of its representations, warranties and covenants contained herein and any acts or omissions of Representative or its employees and agents relating to the performance of this Agreement.

        (b)    NuVasive shall indemnify, defend and hold harmless Representative and its directors, officers, employees and agents from any loss, cost, liability or expense, including attorneys' fees, that Representative incurs or becomes liable for arising out of any breach by NuVasive of any of its representations, warranties and covenants contained herein and any acts or omissions of NuVasive or its employees and agents relating to the performance of this Agreement.

    12.6    Severability. If any provision(s) of this Agreement shall be held invalid, illegal or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall be valid and enforceable and the parties shall negotiate in good faith a substitute, valid and enforceable provision which most nearly effects the parties' intent in entering into this Agreement.

    12.7    Modification; Waiver. This Agreement may not be altered, amended or modified in any way except in a writing signed by both parties. The failure of a party to enforce any provision of the Agreement shall not be construed to be a waiver of the right of such party to thereafter enforce that provision or any other provision or right.

-14-

Error! Unknown document property name.

CONFIDENTIAL

12.8     Entire Agreement.  This Agreement and the exhibits hereto represent and constitute the sole, final and entire agreement between the parties, and supersedes and merges all prior negotiations, agreements and understandings, oral or written, with respect to the matters covered by this Agreement, including (without limitation) the prior Exclusive Sales Representative Agreement executed by the Parties.

12.9     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.  The parties agree that a facsimile may be executed as an original.

12.10     Advice of Counsel.  Each of the parties to this Agreement represent that they have had the opportunity to seek the advice of counsel with respect to the negotiation and execution of this Agreement. Representative further represents that it has executed this Agreement of its own free will and is not relying on counsel for NuVasive with respect to any portion of this Agreement.

12.11     Headings.  The headings used in this agreement are for convenience of reference only and shall not affect the construction of or be taken into consideration in interpreting this agreement.

12.12     No Implied Licenses.  Except as explicitly set forth herein, Representative is not granted any explicit or implied licenses in this Agreement.

Error! Unknown document property name.



This AGREEMENT is entered into and binding upon the Parties as of the Effective Date:

NUVASIVE, INC.

ABSOLUTE MEDICAL LLC

By: _____
    Matt Link, Executive Vice President, US Sales

By: _____
    Greg Soufleris, Authorized Officer

*[Signature Page to Exclusive Sales Representative Agreement]*



EXHIBIT A
PRODUCTS

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

Products: **All NuVasive Products**



EXHIBIT B
TERRITORY

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

Territory:

The following counties in the State of Florida:

Flagler
Volusia
Lake (with the exception of Clermont ambulatory Surgical Center)
Seminole
Palm Beach (with the exception of the following hospital: Lake Worth Surgical Center)
Brevard
Osceola
Orange
Highlands
Indian River
Martin
St. Lucie

The following hospitals in Broward County, Florida: Advanced Orthopedics

The following hospital in Miami-Dade County, Florida: The Gable Surgical Center

The following hospital in Polk County, Florida: Heart of Florida Regional Medical Center, Davenport, FL



EXHIBIT C
COMMISSIONS

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement).  Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement.  Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

New
Commission
Rates

| | | | |
|---|---|---|---|
| **Monthly Commission Rate** | | | |
| O+/Allograft | ░░░░ | ░░░░ | ░░░░ |
| All other Products | ░░░░ | ░░░░ | ░░░░ |
| | | | |
| **QTR Mix Rate (from $1 in Mix Buckets Over QTA Only)** | | | |
| Mix - 5/5 | ░░░ | ░░░ | ░░░ |
| Mix - 4/5 | ░░░ | ░░░ | ░░░ |
| Mix - 3/5 | ░░░ | ░░░ | ░░░ |
| Mix - 2/5 | ░░░ | ░░░ | ░░░ |
| Mix - 1/5 | ░░░ | ░░░ | ░░░ |
| | | | |
| **Quarterly Bonus paid on Dollars in Excess of Quota** | ░░░ | ░░░ | ░░░ |

NuVasive reserves the right to introduce new products with different commission structures.

Commissions to be paid are determined by applying the appropriate commission rate to Net Sales as described in Section 3.2.  The appropriate commission rate to be applied is determined by "Total Sales" which is defined as the dollar amount actually received by NuVasive from a customer for the sales of the Product(s), less discounts, rebates, and amounts allowed or credited for returns.



EXHIBIT D

2014 QUOTA COMMITMENT

This Exhibit is incorporated by reference into and made a part of the Exclusive Sales Representative Agreement (the "Agreement") between the Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

2014 Quotas will be determined in accordance with Section 6.1



EXHIBIT E

TERMS AND CONDITIONS OF SALE

[see attached]



### TERMS AND CONDITIONS OF SALE

These terms and conditions govern the sale of all products ("Products") by NuVasive®, Inc. ("Seller") to the party issuing an order for Products hereunder ("Buyer") and apply notwithstanding any conflicting, contrary or additional terms and conditions in any purchase order or other document or communication. These terms and conditions constitute the sole, final and entire agreement between Seller and Buyer and supersede all other agreements between them regarding the subject matter hereof. These terms and conditions may only be waived or modified in a written agreement signed by an authorized representative of Seller. Neither Seller's acknowledgement of a purchase order nor Seller's failure to object to conflicting, contrary or additional terms and conditions in a purchase order shall be deemed an acceptance of such terms and conditions or a waiver of the provisions hereof.

1. <u>Orders and Acceptance.</u> Orders shall be initiated by Buyer issuing a purchase order to Seller. Orders shall identify the Products, unit quantities, descriptions, applicable prices and requested delivery dates. All orders are subject to acceptance by Seller. Accepted orders may not be cancelled except upon Seller's written approval, which may, at Seller's discretion, be subject to Buyer's payment of Seller's reasonable cancellation charges. ORDERS SHALL BE BINDING ONLY UPON BUYER, AND SHALL CEASE TO BE BINDING ONLY IF AND WHEN EXPRESSLY REJECTED BY SELLER. ONLY ACCEPTED ORDERS SHALL BE BINDING UPON BOTH SELLER AND BUYER. All prices for Products, including for the use of Loaned Products (defined below), shall be in accordance with Seller's list pricing, unless modified in a written agreement signed by an authorized representative of Seller.

2. <u>Terms and Method of Payment.</u> Payments shall be due upon receipt of invoice and shall be made solely in U.S. dollars in immediately available funds. If payment is not received by Seller within thirty (30) calendar days following the date of invoice, the unpaid balance will accrue interest from the date due until the date paid at a rate of one and one half percent (1.5%) per month, or the maximum rate allowed under applicable law, whichever is less. If in the judgment of Seller the financial condition of Buyer, at any time, does not justify continuance of production or shipment on the terms of payment specified, Seller may require full or partial payment of any completed delivery prior to delivery of any subsequent orders.

3. <u>Title and Delivery.</u>
(A) Products shall be delivered FCA (Incoterms 2000) point of shipment. Title and risk of loss or damage to the Products shall pass to Buyer upon Seller's tender of the Products to a carrier for shipment. If loss or damage occurs during shipment, Buyer shall not be relieved of its obligation to pay costs of insurance, transportation, import duties, taxes or any other expenses incurred for licenses or clearances required at port of entry and destination. A security interest in the Products shall be retained by Seller until receipt of payment in full from Buyer. Seller shall use commercially reasonable efforts to meet Buyer's requested delivery schedule.
(B) Seller agrees to provide Buyer with loaned instruments and products ('Loaned Products') for use by Buyer with the Products. Seller is and shall be at all times the sole owner of the Loaned Products. Buyer has no right to sell, transfer, assign, pledge or otherwise encumber the Loaned Products without prior written approval by Seller. Buyer shall bear all risks of loss or damage to the Loaned Products (and all associated costs or expenses) from any cause from the date of delivery to Buyer until returned to Seller, unless such loss or damage results from the negligence of Seller.

4. <u>Warranty and Remedies.</u>
(A) Seller warrants that: (1) each Product or Loaned Product shall conform to its published specifications upon shipment to Buyer; and (2) for a period of one (1) year from the date of delivery, the software included in any Product will materially conform to Seller's then-current documentation for such software and the media containing such software (but not the software itself) is free from physical defects (the 'Limited Warranty').
(B) EXCEPT FOR THE EXPRESS LIMITED WARRANTY IN SECTION 4(A), TO THE MAXIMUM EXTENT ALLOWABLE UNDER APPLICABLE LAW, SELLER DISCLAIMS ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, STATUTORY OR OTHERWISE (INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE) IN CONNECTION WITH ANY PRODUCT OR LOANED PRODUCT. Seller assumes no liability for faulty or improper application or use of any Product or Loaned Product or improper use of any Product or Loaned Product in combination with any other products.
(C) With respect to Products or Loaned Products which do not conform to their published specifications, Seller will repair or, at its option, replace any non-conforming Products or Loaned Products and return the repaired or replacement Products or Loaned Products to Buyer without charge. All Products returned under warranty must be accompanied by a written explanation of the non-conformance. SUCH REPAIR OR REPLACEMENT IS BUYER'S ONLY REMEDY AND SELLER'S ONLY LIABILITY AND OBLIGATION FOR BREACH OF WARRANTY HEREUNDER.
(D) NOTWITHSTANDING ANYTHING ELSE HEREIN, SELLER WILL NOT BE LIABLE HEREUNDER OR OTHERWISE IN CONNECTION WITH ANY PRODUCT OR LOANED PRODUCTS, UNDER ANY LEGAL OR EQUITABLE THEORY, WHETHER IN CONTRACT, TORT OR OTHERWISE (INCLUDING NEGLIGENCE OR STRICT LIABILITY): (i) FOR ANY AMOUNT EXCEEDING THE AMOUNT PAID BY BUYER TO SELLER FOR THE ORDER GIVING RISE TO SUCH LIABILITY; (ii) FOR ANY PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR (iii) ANY LOSS OF DATA, LOST PROFITS, LOST OPPORTUNITY OR LOST REVENUE, WHETHER CHARACTERIZED AS DIRECT DAMAGES OR OTHERWISE.

5. <u>Taxes.</u> Seller's prices are exclusive of all taxes. Responsibility for all customs duties, charges, sales tax, value-added tax, and any other taxes imposed by any taxing authority on the sale or use of any of the Products or Loaned Products (excluding any taxes solely on Seller's income) shall be borne solely by Buyer. If Buyer is tax-exempt, Buyer shall, prior to purchase, furnish Seller with any documents necessary to demonstrate its tax-exempt status. Providing such documentation, however, does not relieve Buyer of its obligations to pay taxes in this Section 5, if applicable.

6. <u>Compliance with Law.</u> Buyer represents, warrants and covenants that, at all times, Buyer's use, distribution, sale, marketing, advertising, import and export of all Products and Loaned Products will comply with all applicable laws, rules, regulations and industry standards of the United States and of any other applicable jurisdiction, anti-kickback laws, physician referral laws, including the U.S. Foreign Corrupt Practices Act and all applicable export laws, restrictions, and regulations of the United States or any applicable foreign government, agency or authority. Buyer will not export or re-export, or authorize the export or re-export of any Product or Loaned Product, technology or information it obtains or learns from Seller (or any direct product thereof) in violation of any such laws, restrictions or regulations. Buyer shall obtain and bear all expenses relating to any necessary licenses and/or exemptions with respect to the export from the USA of the Products or Loaned Products, or the import of the Products or Loaned Products to any location in compliance with all applicable laws and regulations.

7. <u>Intellectual Property Ownership.</u> Buyer acknowledges that the Products and Loaned Products incorporate technology that are subject to Seller's Intellectual Property Rights, and that such technology is not sold to Buyer and is only licensed to Buyer for use solely as incorporated and/or embedded into the Product or Loaned Product. Other than the foregoing license, Seller or its licensors shall retain all Intellectual Property Rights and interests in and to or underlying the Products or Loaned Products and nothing herein shall be construed to grant Buyer a license of any kind to any Intellectual Property Rights of Seller. To the maximum extent allowable under applicable law, Buyer agrees that it shall not, directly or indirectly through any third party, reverse engineer, decompile, duplicate or translate any Product or Loaned Product or seek to reveal the trade secret or know how underlying any Product or Loaned Product. 'Intellectual Property' or 'Intellectual Property Rights' as used herein collectively means any and all patents, copyrights, trademarks, trade secrets, mask works, moral rights, know-how or any other proprietary right, and any applications for the foregoing, under the laws of the United States, any other jurisdiction, the European Union, or any other bi-lateral or multi-lateral treaty regime.

E-2

CONFIDENTIAL

8. Return/Upgrade Policy. EXCEPT WITH RESPECT TO BIOLOGIC PRODUCTS, Buyer shall be able to return any unused Products for full credit within sixty (60) days of delivery; provided, however, that Buyer will be charged a 30% restocking fee for all unused Products returned after ten (10) days of delivery; provided further, that all returns include a Returns Material Authorization (RMA) number, which can be obtained from NuVasive customer service.  Buyer will not be able to return any Products after sixty (60) days of delivery.  Any Instrumentation Product purchased by Buyer from Seller may be upgraded for a newer model developed by Seller (if such model was not available at the time of purchase) within three (3) years of the delivery date or the original Instrumentation Product in accordance with the following: (a) for the first year after the delivery date, Buyer shall receive 100% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgraded Instrumentation; (b) for the second year after the delivery date, Buyer shall receive 50% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgrade Instrumentation; and (c) for the third year after the delivery date, Buyer shall receive 25% credit of the original purchase price to be applied toward the purchase, at Seller's list price, of the upgraded Instrumentation.

9. Software Maintenance/Updates.  For a period of one (1) year from the date of delivery of a Product containing software, Seller will provide Buyer with software updates and support services. Support services consist of the following: (a) technical support by telephone twenty-four (24) hours a day, year-round, at Seller's support line at 1-877-348-5511 from the United States and at 1-858-909-1800 internationally; and (b) if Buyer reports a software problem to Seller, and Seller confirms that the problem exists in Seller's Product, Seller will use its best efforts to promptly correct or supply a work-around for the error if it substantially degrades the performance of the Product, and to correct other significant errors in future software releases.

10.  Discounts and Rebates.  Buyer shall disclose any discounts or other reductions in price received under this Agreement as required under Section 1128B(b)(3)(A) of the Social Security Act [42 U.S.C. 1320a-7b(b)(3)(A)] to any state or federal program which provides cost or charge-based reimbursement to Buyer for the Products purchased under this Agreement.

11.  Miscellaneous.  Failure by Seller to insist upon performance of any term or condition set forth herein shall not be construed as a waiver of such terms and conditions and shall not affect the right of Seller thereafter to enforce each and every term and condition. These terms and conditions and all disputes arising out of or related to these terms and conditions shall be solely and exclusively construed and governed in accordance with the laws of the State of California, USA, without application of any law that would result in the application of a different body of law.  The UN Convention on Contracts for the International Sale of Goods is hereby expressly excluded and shall not apply to these terms and conditions. Any and all suits hereunder shall be brought and resolved solely and exclusively in, and the parties hereby irrevocably consent to the exclusive jurisdiction and proper venue of, the state and federal courts located in the County of San Diego, State of California, USA, and waive any objections thereto based on any ground including improper venue or Forum Non-Conveniens. These terms and conditions shall be binding upon and inure to the benefit of the parties, and their successors, and permitted assigns.  If one or more provisions in these terms and conditions are ruled entirely or partly invalid or unenforceable by any court or governmental authority of competent jurisdiction, then the remaining portions hereof shall remain valid and the parties shall reform the provision(s) to the minimum extent necessary to render them valid and enforceable in conformity with the parties' intent as manifested herein. Any rights to accrued payments and Sections 2, 4(B), 4(D), 5, 6, 7, and 11 shall survive the expiration of these terms and conditions.

Error! Unknown document property name.



## EXHIBIT F

## CERTIFICATION

### REPRESENTATION REGARDING REVENUE RECOGNITION POLICY, CUSTOMER AGREEMENTS, AND THE NUVASIVE HEALTHCARE COMPLIANCE POLICY GUIDE OF NUVASIVE, INC.

#### AS OF _____

The undersigned certifies to Alexis V. Lukianov, Chairman & Chief Executive Officer of NuVasive, Inc., and Michael Lambert, Executive Vice President & Chief Financial Officer of NuVasive, Inc., as follows:

- I understand that my relationship with NuVasive, Inc. ("NuVasive") obligates me to comply with NuVasive's Standard Terms and Conditions of Sale, as well as to inform management of any known deviation from the Standard Terms and Conditions of Sale.

- I have read and understand that the Standard Terms and Conditions of Sale include the following:
  - o  Payments shall be due within 30 days upon receipt of invoice.
  - o  Title passes to the customer upon shipment of the product from NuVasive facilities.
  - o  Product return/upgrade rights are limited to the following circumstances:
    - ▪  Any product, with the exception of biologics, may be returned for full credit if returned within 60 days. These returns are subject to a 30% restocking fee.
    - ▪  Biologic products have no return privileges.
    - ▪  Return rights are not valid after 60 days.
    - ▪  Instrumentation is upgradeable to a newer model if such model was not available at the time of original purchase, per the following timeframes:
      - •  Within first year of delivery date, 100% credit towards list price of the upgrade instrumentation.
      - •  Within second year of delivery date, 50% credit towards list price of the upgrade instrumentation.
      - •  Within third year of deliver date, 25% credit towards list price of the upgrade instrumentation.
  - o  For product containing software, software maintenance/updates will be available for one year from delivery date.
  - o  All discounts and or rebates have been communicated to the Sales Administration Department.

- I further certify the following (indicate by checkmark only the following that apply):

  - o  ____To the best of my knowledge, 1) all arrangements with customers ("Customer Agreements") comply with the Standard Terms and Conditions of Sale as outlined above, 2) any deviations from the Standard Terms and Conditions of Sale have been communicated to management and reflected in Customer Agreements, and 3) I am not a party to, nor am I aware of, any arrangements regarding the sale of NuVasive products other than in the normal course of business and pursuant to NuVasive's normal avenues for product sale. Examples of such arrangements would include: (1) side businesses that act as additional distributors or brokers for product sales, (2) businesses that include owners or operators that are healthcare providers or shareowners (or distributor personnel) of NuVasive, and (3) arrangements for the purchase and further resale of NuVasive products, etc.

    - ▪  ____I HAVE NOT made (nor am I aware of) any side agreements, written or verbal, that deviate from agreed payment terms of the Standard Terms and Conditions of Sale, Customer Agreements or Revenue Recognition Policy, which would allow for (1) extension of payment terms beyond 90 days, (2) change in risk or title passage based on modified shipping terms, (3) an obligation of NuVasive to bill and hold any product except as it relates to the Osteocel product line, (4) terms implying that multiple deliverables must occur before title changes, or (5) stock rotation rights or the right to return to NuVasive product or capital assets previously recorded as a sale to a customer.

< OR >

CONFIDENTIAL

- ____I HAVE made side agreement(s), written or verbal, that deviate(s) from the Standard Terms and Conditions of Sale and allow for one or more of the issues noted above (if this statement is checked, please attach a summary of the non-standard terms and/or a copy of the agreement, as applicable).

o  ____I HAVE read and understand the NuVasive Healthcare Compliance Policy Guide ("Guide"). I understand that my relationship with NuVasive obligates me to comply with the Guide in its entirety, as well as to inform NuVasive's Compliance Officer, or his designee, of any know instances of non-compliance with the Guide.

o  ____I HAVE complied with, will continue to comply with, and will continue to ensure that all personnel reporting to me comply with, all compliance policies of NuVasive, including the MDMA Code of Conduct on Interactions with Healthcare Providers, NuVasive's Code of Ethical Business Conduct, the Guide, as such policies may be created and updated from time to time, and including any applicable training requirements with respect to such policies.

o  ____I HAVE NOT made and will make no offer, payment or other inducement, whether directly or indirectly, to induce the referral of business, the purchase, lease or order of any item or service, or the recommending of the purchase, lease or order of any item or service.

Printed Name and Title: _____          Signed: _____

Date: _____

Please email to certifications@nuvasive.com or fax to 858-736-0469

F-2

Error! Unknown document property name.



EXHIBIT G

OTHER PRODUCTS/SERVICES



## EXHIBIT H

## DEFINITION OF INCREMENTAL SALES

"Incremental Sales" shall mean all sales generated by Representative pursuant to this Agreement (and in the Territory) during the most recently-completed calendar year, less $10,658,914.