1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION

 3
      - - - - - - - - - - - - - - - X
 4    NUVASIVE, INC.,                :
                                     :
 5            Plaintiff,             :  Case No.:
                                     :  6:17-cv-2206-Orl-41GJK
 6                                   :
      vs.                            :
 7                                   :  Orlando, Florida
                                     :  June 28, 2018
 8    ABSOLUTE MEDICAL, LLC,         :  1:36 p.m.
      GREG SOUFLERIS, DAVE HAWLEY,   :
 9    RYAN MILLER, and ABSOLUTE      :
      MEDICAL SYSTEMS, LLC.          :  REDACTED TRANSCRIPT
10                                   :
              Defendants.            :
11                                   :
      - - - - - - - - - - - - - - - X
12
             TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
13             BEFORE THE HONORABLE CARLOS E. MENDOZA
                   UNITED STATES DISTRICT JUDGE
14

15    APPEARANCES:

16
       Counsel for Plaintiff:        Christopher W. Cardwell
17                                    Diana N. Evans
                                      M. Thomas McFarland
18
       Counsel for Defendants:       Bryan E. Busch
19                                    Chantal Pillay

20
      Proceedings recorded by mechanical stenography.
21    Transcript produced by computer-aided transcription.

22
      Court Reporter:   Suzanne L. Trimble, CCR, CRR, RPR
23                      Federal Official Court Reporter
                        401 West Central Boulevard, Suite 4600
24                      Orlando, Florida 32801
                        e-mail: trimblecourtreporter@gmail.com
25
```

2

T A B L E   O F   C O N T E N T S

PROCEEDINGS                                                    PAGE

                          June 28, 2018
TESTIMONY

 **GREG SOUFLERIS**, called by Defense
        Direct Examination By Mr. Busch..................
        Cross-Examination By Mr. Cardwell...............
        Redirect Examination By Mr. Busch...............
 **DAVID HAWLEY**, called by Defense
        Direct Examination By Mr. Busch..................
        Cross-Examination By Mr. Cardwell...............
 **RYAN MILLER**, called by Defense
        Direct Examination By Mr. Busch..................
        Cross-Examination By Mr. Cardwell...............
 **GREG SOUFLERIS**, called by Plaintiff
        Direct Examination By Mr. Cardwell..............
        Cross-Examination By Mr. Busch..................


OTHER

      Colloquy..........................................3
      Colloquy........................................110

E X H I B I T S

     NO.                          MARKED/ADMITTED   PAGE

 Defendant's Exhibit No. 1             admitted........
 Defendant's Exhibit No. 2             admitted........
 Defendant's Exhibit No. 3             admitted........
 Defendant's Exhibit No. 4             admitted........
 Defendant's Exhibit No. 5             admitted.......
 Defendant's Exhibit                   admitted........
 Nos. 7 through 25
 Defendant's Exhibit No. 26            admitted........

 Plaintiff's Exhibit                   admitted........
 Nos. 21 through 26

3

1            P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  This is the case of Nuvasive

3   Inc. v. Absolute Medical, LLC, Greg Soufleris, Dave Hawley,

4   Absolute Medical Systems LLC, and Ryan Miller, Case

5   No. 6:17-cv-2206.

6            Will counsel please state their appearances for the

7   record?

8            MR. CARDWELL:  Chris Cardwell, Diana Evans, and

9   Thomas McFarland for NuVasive.

10           MS. EVANS:  Good afternoon.

11           MR. MCFARLAND:  Good afternoon.

12           THE COURT:  No one else is going to introduce

13   themselves?  These are the corporate reps?

14           MR. CARDWELL:  I'm sorry, Your Honor.  Brian Johnson

15   and Mark Singer.

16           THE COURT:  All right.  Thank you.

17           Defendants.

18           MR. BUSCH:  Good afternoon, Your Honor.  Bryan Busch

19   and Chantal Pillay, counsel for the defendants in this case.

20   Seated behind me, Your Honor, is Mr. Greg Soufleris, Mr. Ryan

21   Miller, and Mr. Dave Hawley.

22           THE COURT:  All right.  We're ready to get started.

23   There have been two binders submitted for the Court's

24   consideration, one from each side.

25           From the plaintiff's perspective, are you asking

4

1  that these items be considered in determining what the final

2  decision of the Court is going to be?

3          MR. CARDWELL:  We are, Your Honor.  The vast

4  majority of those are admitted through various declarations

5  that are before Your Honor.

6          THE COURT:  I understand.  And same for the

7  information provided by the defense?

8          MR. BUSCH:  Yes, Your Honor.  We provided you with a

9  binder of exhibits we intend to introduce today.

10          THE COURT:  All right.  I certainly will consider

11  them.  So let's move forward.  Just one curious observation I

12  have.  This came up when we rescheduled last time.  Part of

13  the defense's position was this assertion that plaintiff did

14  not have clean hands to enforce the non-compete because they

15  breached the agreement.  I can't help but notice that in your

16  filings prior to the hearing you made no mention of that.  Why

17  is that?

18          MR. BUSCH:  Your Honor, we have withdrawn that

19  assertion.

20          THE COURT:  So the only thing I am determining then

21  is the enforceability of the non-compete then.  That's the

22  only remaining issue?

23          MR. BUSCH:  Yes, Your Honor.

24          THE COURT:  All right.  Well, I appreciate your

25  candor on that.  That simplifies things considerably.

5

1        Is plaintiff ready to proceed?

2        MR. CARDWELL:  We are, Your Honor.

3        THE COURT:  All right.  What is your plan?  I've

4   been informed defense is calling two witnesses.  What are you

5   doing?

6        MR. CARDWELL:  I was not aware they were calling

7   witnesses.  Your Honor, we're going to rely solely on the

8   exhibits that have been put on.

9        THE COURT:  Those are the exhibits with argument?

10        MR. CARDWELL:  Yes, Your Honor.

11        THE COURT:  Well, you might want to hold off on your

12   argument until they call their witnesses.  I mean, it's up to

13   you.  It would be an easy call for me.  You want to make your

14   argument, then have them present?

15        MR. CARDWELL:  Your Honor, I would like to hear the

16   witnesses.

17        THE COURT:  All right.  I would too.

18        Are you ready to call your first witness?

19        MR. BUSCH:  I am, Your Honor.  Would the Court like

20   an opening statement?

21        THE COURT:  I'm acutely familiar with these issues.

22   I'll hear summation, if you would like.

23        MR. BUSCH:  Sure.

24        THE COURT:  Go on ahead and call your first witness.

25        MR. BUSCH:  Your Honor, at this time we called Greg

6

1   Soufleris to the stand.

2           THE COURTROOM DEPUTY:  Please come forward and be

3   sworn.  Raise your right hand.

4                           **GREG SOUFLERIS**,

5    called by Defense, was duly sworn by the courtroom deputy,

6   and in answers to questions propounded, testified as follows:

7           THE COURTROOM DEPUTY:  Have a seat there, please.

8           THE COURT:  All right.  Good afternoon,

9   Mr. Soufleris.  Once seated, please arrange the chair so that

10  you are comfortable with the chair's proximity to the

11  microphone and then state your full name into the microphone.

12  Please spell your last name.

13          THE WITNESS:  Thank you, Your Honor.  May I please

14  have a cup for the --

15          THE COURT:  Sure.  You can stay there.  We'll bring

16  it to you.  Go on ahead and state your name, spelling your

17  last.

18          THE WITNESS:  Gregory Tabeling Soufleris.

19          THE COURT:  And spell your last name.

20          THE WITNESS:  S-o-u-f-l-e-r-i-s.

21          THE COURT:  All right.  Thank you.  All right.  Your

22  witness.

23          MR. BUSCH:  Thank you, Your Honor.  May I approach

24  the lectern?

25          THE COURT:  Sure.

7

1    MR. BUSCH:  Your Honor, we have an exhibit binder

2    that's the same as Your Honor's that I would like to place

3    over at the witness stand, if that's okay.

4    THE COURT:  Sure.

5    <u>DIRECT EXAMINATION</u>

6    BY MR. BUSCH:

7    Q    Mr. Soufleris, could you please tell the Court where you

8    currently reside?

9    A    I reside in Orlando with my wife and three children.

10   Q    And, Mr. Soufleris, did you have any university or

11   graduate degree experience?

12   A    I attended James Madison University in Harrisonburg,

13   Virginia, with an English degree.

14   Q    Tell the Court about your work career after graduating

15   from James Madison University?

16   A    I was employed by a company called Integrity Medical in

17   2006.

18   Q    And what did Integrity Medical do?

19   A    Sold spinal implants.

20   Q    For whom?

21   A    For NuVasive spine.

22   Q    What type of products did NuVasive make?

23   A    Spine fusion devices.

24   Q    Mr. Soufleris, what did you do with Integrity Medical?

25   A    I began as a field support representative and eventually

1    became a sales representative.

2    Q    And where was your sales territory, sir?

3    A    The greater Orlando area.

4    Q    Did you receive any training from NuVasive during your

5    work for Integrity Medical?

6    A    A brief introductory two-week training.

7    Q    During that two-week training did you receive any

8    confidential information or anything you would deem as a trade

9    secret?

10   A    No.  It was basic anatomy and general product review.

11   Q    Did NuVasive pay for you to attend that training?

12   A    They did not.

13   Q    Did you receive any training directly from Integrity

14   Medical?

15   A    Yes.  Lots of trainings, monthly journal meetings,

16   monthly product reviews, competitive reviews, as well as

17   hands-on demos.

18   Q    During your work as a sales representative for Integrity

19   Medical, were you able to build your own network of customers,

20   sir?

21   A    Yes, sir.

22   Q    What type of customers were you able to build?

23   A    Orthopedic spine surgeons, neurosurgeons, nurses,

24   hospital administrators.

25   Q    Did you maintain your own database of customer

1   information?

2   A    I did.

3   Q    How was that information contained?

4   A    Majority in my head; however, in my cell phone was cell

5   phone numbers and e-mail addresses.

6   Q    During your time with Integrity Medical did NuVasive

7   provide you with customer leads or contacts?

8   A    Never.

9   Q    What happened to Integrity Medical?

10  A    Its distributorship was purchased by NuVasive in 2013.

11  Q    Were you out of a job, Mr. Soufleris?

12  A    I was.

13  Q    What did you do next?

14  A    Began negotiations with NuVasive for employment.

15  Q    And what type of employment?

16  A    As a distributor, independent contractor.

17  Q    Who did you speak with at NuVasive about that

18  opportunity?

19  A    Matt Link executive vice president of sales.

20  Q    During your discussion with Mr. Link was there any

21  discussions about you becoming an employee of NuVasive?

22  A    No, there was not.  I was still to be a distributor and

23  to establish an entity to do so.

24  Q    Did you have any discussions with anyone at NuVasive

25  regarding whether the independent contractor arrangement would

1    be with you individually or through a corporate entity?

2    A    I did with Matt Link.

3    Q    And what were you told?

4    A    To form a corporate entity and that would be the contract

5    with NuVasive.

6    Q    Did you take NuVasive's advice and form a company called

7    Absolute Medical, LLC?

8    A    Yes, sir.

9    Q    And when was that company formed?

10   A    Mid February 2013.

11   Q    Did you use an attorney to help with the formation

12   process?

13   A    I did not.

14   Q    Who were the members of that LLC?

15   A    I was.

16   Q    Who was the manager of the LLC?

17   A    Only me.

18   Q    Where was Absolute Medical LLC's principle place of

19   business?

20   A    213 Villa Di Este Drive -- I apologize -- Terrace, Lake

21   Mary, Florida, 32827.

22   Q    Did you register Absolute Medical with the Florida

23   Secretary of State?

24   A    I did.

25   Q    Did you file initial articles of organization with the

1   Secretary of State?

2   A    I did.

3   Q    Did you file annual returns with the Florida Secretary of

4   State?

5   A    I did.

6   Q    Mr. Soufleris, if you could turn to Exhibit 1 in the

7   notebook binder there in front of you, sir.

8          THE COURT:  Before you move on, you said 213 Vila

9   something drive.  Could you spell that something for me.

10         THE WITNESS:  V-i-l-a space d-e space E-s-t-e

11  Terrace.

12         THE COURT:  All right.  Thank you.  Feel free to

13  continue.

14  BY MR. BUSCH:

15  Q    Yes.  Could you turn to Exhibit 1 in your notebook there,

16  Mr. Soufleris?

17  A    Yes.

18  Q    And are those Secretary of State filings that you filed

19  on behalf of Absolute Medical?

20  A    They are.  They are.

21  Q    And those appear to be true and correct copies of those

22  filings?

23  A    Yes, sir.

24         MR. BUSCH:  Your Honor, I would move Exhibit 1 into

25  evidence.

12

1    THE COURT:  All right.  Has he reviewed those

2  documents before today?

3    MR. BUSCH:  Who?

4    THE COURT:  Your witness.

5    MR. BUSCH:  Yes, sir, he has.

6    THE COURT:  So we don't have him verify every page.

7  If he's reviewed it before today, you can just move them in.

8    MR. BUSCH:  Okay.

9    THE COURT:  All right.  So Exhibit 1 from the

10  defense is being moved into evidence.  Are there going to be

11  any objections to any of these exhibits?

12    MR. CARDWELL:  Your Honor, the only ones I have

13  legitimate objection to were the ones we asked for in

14  discovery that were objected to and not produced.

15    THE COURT:  Which ones are those?

16    MR. CARDWELL:  I'm trying to figure that out right

17  now.

18    THE COURT:  Why don't you figure that out, and we'll

19  get to that.  Go on ahead.

20  BY MR. BUSCH:

21  Q    Did you have an operating agreement prepared for Absolute

22  Medical?

23  A    Yes.

24  Q    If you could turn to Exhibit 2 in the binder there in

25  front of you, is that the Absolute Medical, LLC, operating

1    agreement?

2    A     Correct.

3            MR. BUSCH:  Your Honor, I move Exhibit 2 into

4    evidence.

5            THE COURT:  Any objection?

6            MR. CARDWELL:  No objection, Your Honor.

7            THE COURT:  All right.  Two is moved in.

8            (Defendant's Exhibit No. 2 was admitted into

9    evidence.)

10   BY MR. BUSCH:

11   Q     Did you obtain a federal tax ID number for Absolute

12   Medical?

13   A     Yes, sir.

14   Q     Could you turn to Exhibit 3 in your notebook?  Is that a

15   copy of the EIN number for Absolute Medical?

16   A     It is.

17           MR. BUSCH:  Your Honor, I move that into evidence.

18           THE COURT:  Any objection?

19           MR. CARDWELL:  No objection, Your Honor.

20           THE COURT:  Three is moved into evidence.

21           (Defendant's Exhibit No. 3 was admitted into

22   evidence.)

23   BY MR. BUSCH:

24   Q     Did you open a bank account in the name of Absolute

25   Medical?

14

1    A    Yes.

2    Q    And which bank did you use?

3    A    Bank of America.

4    Q    If you could turn to Exhibit 5 in the notebook in front

5    of you, sir.  Is that a true and correct copy of the bank

6    information for Absolute Medical?

7    A    Yes.

8              MR. BUSCH:  Your Honor, I move Exhibit 5 into

9    evidence.

10             THE COURT:  Any objection?

11             MR. CARDWELL:  Your Honor, we've asked for these

12   materials in discovery, and they were objected to, but we will

13   not object to this one.

14             THE COURT:  All right.  Five is admitted.  So we

15   have, 1, 2, 3 and 5.  Correct?

16             MR. BUSCH:  Yes, sir.

17             (Defendant's Exhibit Nos. 1 and 5 were admitted

18   into evidence.)

19             THE COURT:  All right.  Keep going.

20   BY MR. BUSCH:

21   Q    Did Absolute Medical file tax returns each year it was in

22   existence?

23   A    Yes, sir.

24   Q    If you could turn to Exhibit 4 in your notebook in front

25   of you.

1  A     Yes.

2  Q     And are those redacted tax returns filed by Absolute

3  Medical?

4  A     Yes, they are.

5          MR. BUSCH:  Your Honor, I would move Exhibit 4 into

6  evidence.

7          THE COURT:  Any objection?

8          MR. CARDWELL:  Yes, Your Honor.  We object to that.

9  Those were requested and not produced in discovery.

10         THE COURT:  All right.  So the remedy here is to

11  either exclude them from admitting it or give you more time

12  and reset this hearing.  What would you like?

13         MR. CARDWELL:  We'll allow them to be moved, Your

14  Honor.

15         (Defendant's Exhibit No. 4 was admitted into

16  evidence.)

17         THE COURT:  It's tough when your opening bid is the

18  most severe sanction the Court could -- I understand.  We can

19  take that up later.  If you decide to file a motion for some

20  sort of other sanction based on their lack of compliance to

21  discovery, then we can take that up later.

22         MR. CARDWELL:  I understand, Your Honor.

23         THE COURT:  I suspect you want to keep this thing

24  moving along.

25         MR. CARDWELL:  Your Honor, then we have no

1    objections to admission of any of these exhibits, if that will

2    move things along.

3             THE COURT:  I'll let you go through them so you can

4    identify them.  But without objection from the plaintiff,

5    what's previously marked as Defense Exhibits 7 through 25 are

6    admitted without objection.  But feel free to go through them.

7    You don't need to move anymore in evidence.  They're all

8    admitted.

9             (Defendant's Exhibit Nos. 7 through 25 were

10   admitted into evidence.)

11            MR. BUSCH:  Thank you, Your Honor.

12   BY MR. BUSCH:

13   Q    Mr. Soufleris, did you obtain general liability insurance

14   for Absolute Medical?

15   A    Yes, I did.

16   Q    And could you look at Exhibit 6 in your binder.  And is

17   that the general liability insurance policy?

18   A    Yes, it is.

19   Q    Did you obtain credit cards in the name of Absolute

20   Medical?

21   A    Yes, I did.

22   Q    Which types?

23   A    Bank of America small business Visa and an American

24   Express small business platinum.

25   Q    Did you use those cards for business expenses for

1   Absolute Medical?

2   A     Yes, I did.

3   Q     Did you use those cards for personal expenses?

4   A     I did not.

5   Q     Mr. Soufleris, was Absolute Medical formed or used for

6   any fraudulent, improper, or illegal purpose?

7   A     It was not.

8   Q     Did you use funds of Absolute Medical to pay any of you

9   or your family's personal debts or obligations?

10  A     I did not.

11  Q     Did you comingle your personal funds with the funds of

12  Absolute Medical?

13  A     I did not.

14  Q     Were Absolute Medical funds used to pay third parties for

15  you or our family's sole benefit?

16  A     They were not.

17  Q     Did you or your family convert company property of

18  Absolute Medical for your own personal benefit?

19  A     No, sir.

20  Q     Did Absolute Medical maintain its own separate accounting

21  and books and records?

22  A     Yes, it did.

23  Q     In 2013 did Absolute Medical enter into a distributorship

24  agreement with NuVasive?

25  A     Yes, it did.

1  Q    If you could turn to Exhibit 7 in your binder in front of

2  you, sir.  Is that the 2013 agreement between Absolute Medical

3  and NuVasive?

4  A    Yes, it is.

5  Q    And what is the date of that sales agreement,

6  Mr. Soufleris?

7  A    February 14, 2013.

8  Q    Was NuVasive aware that Absolute Medical was formed one

9  day prior to signing the distributorship agreement?

10  A    Yes, they were.

11  Q    How were they aware of that?

12  A    It was discussed with Matt Link.

13  Q    Was Absolute Medical formed for the sole purpose of

14  contracting with NuVasive for this distributorship agreement?

15  A    Yes, it was.

16  Q    And was NuVasive aware of the purpose of Absolute

17  Medical's formation?

18  A    Yes, they were.

19  Q    How were they aware?

20  A    Discussed with Matt Link.  This was a exclusive

21  representation.

22  Q    Was NuVasive aware of the ownership structure of Absolute

23  Medical?

24  A    Yes, they were.

25  Q    How were they aware?

19

1    A    This was discussed with Matt Link as well.

2    Q    How long was the term of the 2013 sales agreement?

3    A    Just under one year.

4    Q    And what was Absolute Medical obligated to do under the

5    2013 sales agreement?

6    A    Exclusively sell NuVasive's products.

7    Q    Where?  What areas?

8    A    Within the established geography, which was essentially

9    Central Florida down to West Palm Beach area.

10   Q    And was that exclusive territory listed in Exhibit B to

11   the agreement in front of you, sir?

12   A    Yes, it is.

13   Q    Under the 2013 sales agreement was Absolute Medical an

14   employee or an independent contractor?

15   A    Independent contractor.

16   Q    If you can turn to Section 2.3 of the agreement there in

17   front of you.

18   A    Yes.

19   Q    Does that explain Absolute Medical being an independent

20   contractor?

21   A    Yes, it does.

22   Q    Did Absolute Medical receive a salary or any guaranteed

23   income?

24   A    No.  Straight commissions and milestone payments.

25   Q    And is the commission schedule set forth on Exhibit C to

1   the agreement there in front of you?

2   A    Yes, it is.

3   Q    Did NuVasive pay for any training for Absolute Medical or

4   any of its sales representatives?

5   A    No, they did not.

6   Q    I'll have you look at Section 10 of the exhibit there in

7   front of you, Exhibit 7.

8   A    Section 10 of the notebook?

9   Q    No.  Section 10 of the Exhibit 7 there in front of you.

10  A    Yes.

11  Q    That section deals with confidential information.  Could

12  you tell the Court what your understanding of that section

13  was?

14  A    NuVasive is to inform Absolute Medical or its contractors

15  of any confidential information in writing.

16  Q    And did NuVasive provide any sort of written

17  confidentiality papers to Absolute Medical?

18  A    Not to my knowledge.

19  Q    Did NuVasive ever provide Absolute Medical with

20  information about its products that was not available in the

21  public domain?

22  A    No.  The information available to the products is Google

23  searchs, is found on YouTube videos, the U.S. patent attorney,

24  and general marketing literature that's passed out.

25  Q    Did Nuvasive ever provide Absolute Medical with any sales

1   leads, names of interested physicians, or access to any

2   medical facilities?

3   A    Absolutely not.

4   Q    Did NuVasive ever provide Absolute Medical access to any

5   databases containing information about clients, physicians, or

6   medical facilities?

7   A    Not to my knowledge.

8   Q    Did Absolute Medical assemble its own sales team to

9   assist in selling NuVasive products?

10  A    Yes, it did.

11  Q    How many initial sales representatives were hired by

12  Absolute Medical?

13  A    Seven.

14  Q    Were the sales representatives independent contractors or

15  employees of Absolute Medical?

16  A    Independent contractors.

17  Q    Was NuVasive involved in hiring or compensating the

18  Absolute Medical independent sales reps?

19  A    No, they were not.

20  Q    Did Absolute Medical prepare its own independent

21  contractor agreements for its sales representatives?

22  A    Yes, it did.

23  Q    Let me have you turn to Exhibit 8 of the binder there in

24  front of you.

25  A    Yes.

1    Q     And is that a 2013 standard form agreement between

2    Absolute Medical and its sales representatives?

3    A     Yes, it is.

4    Q     What was the initial term of this agreement?

5    A     One year.

6    Q     Were Absolute Medical sales reps paid on commission?

7    A     Yes, they were.

8    Q     Was NuVasive involved in negotiating or drafting these

9    agreements in any way?

10   A     No, they were not.

11   Q     Is NuVasive listed anywhere as a third-party beneficiary

12   in this 2013 agreement?

13   A     No, they are not.

14   Q     Did NuVasive ever object to the form of the 2013

15   agreement?

16   A     No, they did not.

17   Q     Section 1.13 in Exhibit 7 -- Mr. Soufleris, if you can

18   turn back to Exhibit 7.

19   A     I apologize.  You said one --

20   Q     Exhibit 7, Section 1.13 -- 6.13.

21   A     Yes.

22   Q     That provision discusses, about halfway down, a

23   compliance agreement, which is a defined term.  Do you see

24   that?

25   A     I do.

23

1  Q     What was your understanding of the compliance agreement

2  that was referred to in this section?

3  A     NuVasive was to give Absolute Medical independent

4  contractors a form for non-compete.

5  Q     Did NuVasive ever provide Absolute Medical with a

6  compliance agreement for the sales representatives to sign?

7  A     No, they did not.

8  Q     Did NuVasive ever discuss, mention, or ever talk about a

9  compliance agreement with Absolute Medical?

10  A     Not to my knowledge.

11  Q     Did NuVasive ever ask Absolute Medical to provide copies

12  of a compliance agreement?

13  A     Not to my knowledge.

14  Q     Mr. Soufleris, did you ever provide copies of Absolute

15  Medical's sales agreement, like the form shown in Exhibit 8,

16  to NuVasive?

17  A     One time in 2013.

18  Q     I'll have you turn to Exhibit No. 9, if you could, sir.

19  Are those the signature pages of the 2013 form agreement for

20  Mr. Dave Hawley and Mr. Ryan Miller?

21  A     Yes, they are.

22  Q     And are those documents that you sent to NuVasive at

23  NuVasive's request?

24  A     Yes, I did.

25  Q     And did you maintain copies of those documents within

1    your own office?

2    A    No, I did not.

3    Q    Did NuVasive ever request that Greg Soufleris

4    individually ever sign any direct contract with NuVasive?

5    A    No, they did not.

6    Q    Did NuVasive ever ask to see any contracts between Greg

7    Soufleris individually and Absolute Medical?

8    A    No, they did not.

9    Q    Were there ever any contractors between Greg Soufleris

10   individually and Absolute Medical?

11   A    No, there were not.

12   Q    Tell the Court what your day-to-day duties were as

13   manager of Absolute Medical.

14   A    Overall managing of the company, as well as managing the

15   sales representatives contracted to the company.

16   Q    Did you individually, Mr. Soufleris, make any direct

17   sales of NuVasive products?

18   A    No, I did not.

19   Q    In 2014 did Absolute Medical ask -- I'm sorry.

20        In 2014 did NuVasive ask Absolute Medical to sign a

21   new distributorship agreement?

22   A    Yes, they did.

23   Q    And could you turn to Exhibit 10 in the binder there in

24   front of you?  Is that a copy of the 2014 sales agreement with

25   NuVasive?

1    A    Yes, sir.

2    Q    And what was the term of that agreement?

3    A    For three years.

4    Q    And is Absolute Medical in this agreement also identified

5    as an independent contractor?

6    A    Yes, it is.

7    Q    Did the territory in the 2014 agreement stay the same as

8    the original 2013 agreement?

9    A    Very similar.

10   Q    Was the commission structure the same?

11   A    Very similar.

12   Q    At this time, in January of 2014, did NuVasive ask for

13   any direct contracts with Greg Soufleris?

14   A    No, they did not.

15   Q    Did NuVasive ask for any copies of any compliance

16   agreements with Absolute Medical's sales representatives?

17   A    No, they did not.

18   Q    Did NuVasive ask Absolute Medical to provide copies of

19   any contracts with its sales representatives?

20   A    Not to my knowledge.

21   Q    Did Absolute Medical obtain signed contracts with sales

22   representatives in 2015?

23   A    Yes, they did.

24   Q    If you could turn to Exhibit 11 there in the binder in

25   front of you, sir.  Is that a copy of the 2015 independent

26

1  contractor agreements between Absolute Medical and its sales

2  representatives?

3  A    Yes, it is.

4          MR. CARDWELL:  Object to the extent that it says

5  it's from a company known as Absolute Medical Inc., Your

6  Honor.

7          THE COURT:  All right.  Give me a little more detail

8  on this objection.  You can make it a speaking objection.

9          MR. CARDWELL:  I apologize for that, Your Honor.  He

10 just testified that this was an agreement between Absolute

11 Medical, LLC, and its sales representatives, when on the face

12 of the document it says that it's an agreement between the

13 sales rep and a company known as Absolute Medical Inc.

14         THE COURT:  Would you like to respond to the

15 objection?

16         MR. BUSCH:  Your Honor, I think the witness can

17 clear that up.

18         THE COURT:  All right.  Let's hear it.

19         THE WITNESS:  I originally went through an attorney

20 that gave me a blanket contract, and I filled it out myself,

21 and it's a clerical error that continued on for the life of

22 the contract.  It's truly a mistake on my behalf.

23         THE COURT:  All right.  I'll certainly consider that

24 as to the weight.  It's been admitted already, but I

25 appreciate you making -- bring that go to the Court's

27

1    attention.  Feel free to continue with your direct.

2    BY MR. BUSCH:

3    Q    Were the 2015 agreements one-year terms?

4    A    Yes, they were.

5    Q    In January of 2017 did Absolute Medical enter into

6    another exclusive sales representative agreement with

7    NuVasive?

8    A    Yes, they did.

9    Q    And if you can turn to Exhibit 12 in the binder there in

10   front of you.  What was the term -- what was the length of the

11   2017 sales representative agreement?

12   A    Five years.

13   Q    And is Absolute Medical, again, identified in this

14   document as a independent contractor?

15   A    Yes, they are.

16   Q    And did the territory stay the same?

17   A    Very similar.

18   Q    Was the commission structure the same?

19   A    Very similar.

20   Q    At this point in time in 2017, did NuVasive ask for any

21   direct contracts with Greg Soufleris individually?

22   A    No, they did not.

23   Q    Did NuVasive ask for copies of any sort of compliance

24   agreements?

25   A    No, they did not.

1  Q    Did NuVasive ask Absolute Medical to provide copies of
2  any contracts with its sales representatives?
3  A    No, they did not.
4  Q    Going back to the 2017 -- let me ask you this question.
5  Did Absolute Medical present a 2017 sales agreement to its
6  sales representatives?
7  A    Yes, it did.
8  Q    And did all of Absolute Medical's sales representatives
9  sign the 2017 agreement?
10  A    All except for four.
11  Q    And who were the four that refused to sign?
12  A    Casey Camero, Matt Camero, David Hawley, Ryan Miller.
13  Q    And why did they refuse to sign?
14  A    They didn't agree to the restrictive covenants.
15  Q    And did you keep paying commissions to those individuals
16  in 2017?
17  A    Yes, I did.
18  Q    Did Absolute Medical present Mr. Dave Hawley and Mr. Ryan
19  Miller with draft independent contractor agreements for
20  execution in 2017?
21  A    Yes.
22  Q    If you can turn to Exhibit 13 of the binder there in
23  front of you, sir.  Are those the graft agreements that
24  Absolute Medical presented to Mr. Hawley and Mr. Miller?
25  A    Yes.

1  Q    Did either Mr. Hawley or Mr. Miller sign those documents?

2  A    They did not.

3  Q    In the summer of 2017, Mr. Soufleris, did NuVasive have

4  any conversations with you about reducing Absolute Medical's

5  territory?

6  A    Yes, they did.

7  Q    And could you please tell the Court what happened?

8  A    In the summer of 2017, NuVasive executives reached out to

9  two of Absolute Medical's independent contractors to --

10  without my knowledge -- establish an exclusive distributorship

11  with them, within the existing Absolute Medical territory.

12  Q    Did NuVasive present Absolute Medical with a territory

13  transition agreement?

14  A    Yes, they did.

15  Q    Is Exhibit 14 a copy of that territory transition

16  agreement?

17  A    Yes, it is.

18  Q    And was Absolute Medical's territory reduced as a result

19  of this agreement?

20  A    Yes, by over 50 percent.

21  Q    Which territories, if you could tell the Court, were

22  lost?

23  A    Brevard, Indian River, St. Lucie, Martin, West Palm, and

24  Broward Counties.

25  Q    And did Absolute Medical lose key sales representatives

1  as a result of the territory agreement?

2  A    Yes, they did.

3  Q    How many representatives were lost?

4  A    Four.

5  Q    And at this time in the summer of 2017, how many sales

6  representatives did Absolute Medical have remaining?

7  A    Five.

8  Q    What percentage of Absolute Medical business was lost as

9  a result of this arrangement?

10  A    Over 50 percent.

11  Q    How much money did Absolute Medical receive from NuVasive

12  as a result of this transaction?

13  A    Roughly $630,000.

14  Q    How much money did Absolute Medical spend in marketing,

15  infrastructure, and startup costs in setting up business in

16  the lost territory?

17  A    Several hundred thousand dollars.

18  Q    What did Absolute Medical do with the money received from

19  NuVasive under the territory transition agreement?

20  A    Over half was spent on Q1 and Q2 taxes.  The remaining

21  commissions were paid out and the existing were -- the

22  existing funds were reimbursed back to the capital that was

23  spent in startup costs.

24  Q    After this key territory was lost, where did the majority

25  of Absolute Medical business come from?

1    A    Dr. Paul Sawin.

2    Q    Tell the Court who he is?

3    A    He's a neurosurgeon in Orlando with Orlando Neurosurgery.

4    Q    What percentage of Absolute Medical's remaining business

5    came from Dr. Sawin?

6    A    Roughly 80 percent.

7    Q    What happened to Dr. Sawin's relationship with NuVasive?

8    A    In late October 2017 he notified me that he no longer had

9    a desire to carry on a relationship with NuVasive.

10   Q    Did this decision with Dr. Sawin have an impact on any of

11   your sales representatives?

12   A    Yes, it did.

13   Q    Which ones?

14   A    Dave Hawley, Brandon Gottstein.

15   Q    And what was the response to Mr. Hawley and Mr. Gottstein

16   to the loss of Dr. Sawin as a customer?

17   A    Dave Hawley notified me in mid to late November that he

18   was no longer interested in working for Absolute Medical and

19   was going to seek other career opportunities for himself.

20   Q    And did you also get a similar message from Mr. Miller?

21   A    I did.

22   Q    And did Mr. Miller and Mr. Hawley resign their employment

23   with Absolute Medical?

24   A    Yes, they did, later on that month.

25   Q    If you can turn to Exhibit 15 in the binder there in

1    front of you, sir.  Tell the Court what those documents are.

2    A    They're three resignation notices to Absolute Medical

3    from Dave Hawley, Ryan Miller, and Brandon Gottstein.

4    Q    After these three resignations, how many sales

5    representatives were left at Absolute Medical?

6    A    Two.

7    Q    Who were those individuals?

8    A    Thad Bragulla and Brennan Burkhart.

9    Q    At the end of November 2017, did you make a decision on

10   the future of Absolute Medical, LLC?

11   A    Yes, I did.

12   Q    And what decision did you reach?

13   A    After the majority of the geography was lost, the

14   majority of the sales representatives were no longer there,

15   and the number one key customer had decided to part ways, I

16   was forced into closing the doors because business was not

17   sustainable.

18   Q    Did you inform NuVasive of this decision?

19   A    I did in an e-mail to my sales leadership.

20   Q    And is Exhibit 16 of the binder there in front of you the

21   resignation you e-mailed to NuVasive?

22   A    Correct.

23   Q    And did Absolute Medical offer to assist in a transition?

24   A    Yes, it did.

25   Q    What did Absolute Medical offer to do?

1  A    I sent an e-mail to my boss Mark Singer and notified him

2  that Absolute Medical would release individuals to NuVasive

3  that were still there, that would cover any surgical

4  procedures that needed to be covered, as well as any inventory

5  that needed support with managing.

6  Q    Did Absolute Medical present NuVasive with a final

7  invoice for commissions through the end of November?

8  A    Yes, it did.

9  Q    What was the amount of that invoice?

10  A    Roughly 124,000.

11  Q    Has NuVasive paid that amount to Absolute Medical?

12  A    No, they have not.

13  Q    Regarding Absolute Medical, what steps did you take to

14  wind that company down?

15  A    I released the remaining contractors to NuVasive.  The

16  credit card balances were paid and shut down.  The bank

17  account was shut down.  Office supplies were boxed up.  Office

18  furniture was left behind for the next tenant.  And every

19  filing for the company's dissolution was properly filed.

20  Q    Did Absolute Medical have to borrow money to pay off its

21  creditors?

22  A    Yes, it did.

23  Q    And if you can turn to Exhibit 17, is that the

24  dissolution form with the Florida Secretary of State for

25  Absolute Medical?

1  A    Yes, it is.

2  Q    After your decision to shut down Absolute Medical, LLC,

3  did you begin discussions about new employment for yourself,

4  sir?

5  A    Yes, I did.

6  Q    And who did you begin those discussions with?

7  A    Alphatec Spine.

8  Q    Is there an individual at Alphatec Spine you spoke to?

9  A    Terry Rich.

10  Q    Did you individually ever have any contractual

11  relationship with NuVasive prohibiting you from working with a

12  competitor?

13  A    No, I did not.

14  Q    What type of business is Alphatec in?

15  A    Spinal implant company.

16  Q    And what type of arrangement did you negotiate with

17  Alphatec?

18  A    An independent contractor agreement.

19  Q    And under that contractor agreement, what were you

20  required to do?

21  A    Set up sales forces throughout my geography.

22  Q    And what was your geography?

23  A    All of Florida with the exception of the prior geography

24  with Absolute Medical and NuVasive and half of Georgia.

25  Q    And how were you paid?

1   A    On a monthly draw.

2   Q    Were you personally, directly involved in making sales on

3  behalf of Absolute Medical Systems?

4   A    No, I was not.

5   Q    Have you personally sold products that compete with

6  NuVasive products when in the old territory worked by Absolute

7  Medical?

8   A    No.

9   Q    And did you form a new entity, Mr. Soufleris, to contract

10  with Alphatec Spine?

11   A    Yes, I did.

12   Q    What was the name of that new entity?

13   A    Absolute Medical Systems.

14   Q    And did you use an attorney to help with the formation

15  process?

16   A    No.

17   Q    Who were the members of this LLC?

18   A    Myself.

19   Q    Who was the manager of the LLC?

20   A    I was.

21   Q    Where is Absolute Medical Systems' principle place of

22  business?

23   A    8901 Lee Vista Boulevard, Orlando.

24        MR. BUSCH:  Your Honor, if it's okay with the Court,

25  I would like to shorten Absolute Medical Systems to AMS.

1     THE COURT:  That's fine.

2   BY MR. BUSCH:

3   Q    Did you register AMS with the Florida Secretary of State?

4   A    Yes.

5   Q    Did you file the articles of organization with the

6   Florida Secretary of State?

7   A    Yes.

8   Q    If you can turn to Exhibit 18 in the binder there in

9   front of you.  Are those your filing documents for AMS with

10  the Florida Secretary of State?

11  A    Yes, they are.

12  Q    Did you have an AMS operating agreement prepared?

13  A    Yes, I did.

14  Q    Could you turn to Exhibit 19?  Is that a copy of the AMS

15  operating agreement?

16  A    Yes, it is.

17  Q    Did you obtain an EIN number for AMS?

18  A    Yes, I did.

19  Q    And is that shown on Exhibit 20?

20  A    It is.

21  Q    And will AMS file federal tax returns with the Internal

22  Revenue Service?

23  A    Yes, it will.

24  Q    Did you open up a bank account in the name of AMS?

25  A    Yes, I did.

1    Q    Where was that?

2    A    Bank of America.

3    Q    If you could look at Exhibit 21, is that a copy of AMS's

4    bank account information with Bank of America?

5    A    Yes, it is.

6    Q    Did you obtain a credit card in the name of AMS?

7    A    Yes, I did.

8    Q    Which one?

9    A    American Express.

10   Q    Do you use the AMS Am Ex card for business expenses for

11   AMS?

12   A    Yes, I do.

13   Q    Do you use the AMS Am Ex card for personal expenses?

14   A    No, I do not.

15   Q    Did AMS assume any of the obligations of Absolute

16   Medical?

17   A    No, they did not.

18   Q    Did it assume any leases?

19   A    No, it did not.

20   Q    Assume any credit card debt?

21   A    No, it did not.

22   Q    Assume any contractor payments?

23   A    No, it did not.

24   Q    Assume any utility bills?

25   A    No, it did not.

1    Q    Did AMS receive any assets from Absolute Medical?

2    A    No, it did not.

3    Q    Didn't receive any cash?

4    A    No, it did not.

5    Q    No furniture?

6    A    No, it did not.

7    Q    No equipment?

8    A    No, sir.

9    Q    No office supplies?

10   A    No, it did not.

11   Q    Does AMS employ any of the sales representatives that

12   previously worked for Absolute Medical?

13   A    No, it does not.

14   Q    Mr. Dave Hawley, co-defendant in this case, does he work

15   for AMS?

16   A    No, he does not.

17   Q    Has Mr. Hawley ever worked for AMS?

18   A    No, he does not.

19   Q    Co-defendant Ryan Miller, does he work for AMS?

20   A    No, he does not.

21   Q    Has he ever worked for AMS?

22   A    He has not.

23   Q    Is it your testimony, Mr. Soufleris, that AMS does no

24   work for Alphatec in the territory previously worked by

25   Absolute Medical?

1    A    That is correct.

2    Q    Are there any employees or contractors that used to work

3    or AMS -- or that used to work for Absolute Medical that now

4    work for AMS?

5    A    There is an office assistant.

6    Q    Is that the only one?

7    A    Yes, sir.

8    Q    Is AMS involved in selling Alphatec products to any of

9    the physicians that previously purchased products from

10   Absolute Medical?

11   A    No.

12   Q    Does AMS utilize any of the customer lists, contracts, or

13   databases used by Absolute Medical?

14   A    No, it does not.

15   Q    Why is that?

16   A    It's not in the same geography.  The territories are

17   completely different.

18   Q    Is AMS located in the same physical location as Absolute

19   Medical?

20   A    No, it is not.

21   Q    How far apart are the offices?

22   A    35 miles.

23   Q    Does AMS utilize the same bank account as Absolute

24   Medical?

25   A    No, it does not.

1    Q     The same credit cards?

2    A     No, it does not.

3    Q     Use the same logo?

4    A     No, it does not.

5    Q     The same e-mail address?

6    A     No, it does not.

7    Q     Does AMS utilize the same furniture as Absolute Medical?

8    A     No, it does not.

9    Q     The same computers?

10   A     No, it does not.

11   Q     Were any receivables transferred from Absolute Medical to

12   AMS?

13   A     No, they were not.

14   Q     Does AMS utilize the same account as Absolute Medical for

15   electric and water service?

16   A     No, they do not.

17   Q     Have any funds been transferred between AMS and Absolute

18   Medical?

19   A     No, they have not.

20          MR. BUSCH:  Those are my questions, Judge.

21          THE COURT:  Cross-examination.  And one correction,

22   there were 26 exhibits, I indicated 1 through 25.

23   Ms. Darleen, 1 through 26 are admitted.

24          (Defendant's Exhibit No. 26 was admitted into

25   evidence.)

1          THE COURT:  All right.  Feel free to proceed.

2          MR. CARDWELL:  Thank you, Your Honor.  I apologize

3   if this is a little disorganized.  We weren't expecting live

4   testimony.

5                        CROSS-EXAMINATION

6   BY MR. CARDWELL:

7   Q    Mr. Soufleris, was Central Florida Regional Hospital a

8   facility that was within Absolute Medical, LLC, sales

9   territory?

10  A    Yes, it was.

11  Q    And who was the Absolute Medical, LLC, sales rep assigned

12  to that account?

13  A    Ryan Miller.

14         MR. CARDWELL:  Your Honor, I'm going to refer to

15  Exhibit 22 in our premarked package.

16         THE COURT:  All right.  Go on ahead.

17         MR. CARDWELL:  I apologize.  Your Honor, this one

18  was not premarked because we just recently obtained it.  And,

19  Your Honor, I only have one more copy.  Permission to approach

20  the witness, hand him a copy and --

21         THE COURT:  Sure.

22  BY MR. CARDWELL:

23  Q    Sir, Exhibit 22, can you identify that document, please?

24  A    It looks to be a surgery request form.

25  Q    Is that commonly known as a charge sheet?

42

1    A    Yes, it is.

2    Q    Is that for Alphatec products, sir?

3    A    Looks to be, yes.

4    Q    And what is the date of that, sir?

5    A    1/29/18.

6    Q    Is that after you formed Absolute Medical Systems?

7    A    Yes, it is.

8    Q    And does it say that Absolute Medical Systems is the

9    distributor of this account?

10   A    It does.

11   Q    And does it say that Ryan Miller is the Absolute Medical

12   Systems sales rep assigned to this account?

13   A    Yes, it does.

14   Q    Thank you.  But you've had nothing to do with this

15   account?

16   A    Correct.

17   Q    Who wrote "Absolute Medical Systems"?

18   A    It looks like Ryan Miller wrote it.

19   Q    Any idea why he would claim to be affiliated with

20   Absolute Medical Systems?

21   A    I do not.

22   Q    Okay.  Talk about training.  You talked about, I think

23   you said, NuVasive never provided you with any training.  Is

24   that correct?

25   A    Can you clarify?

43

1    Q    Did NuVasive ever give you any training on how to sell

2    its medical devices?

3    A    Greg Soufleris?

4    Q    Yes.

5    A    I attended a basic introductory training in 2006 for two

6    weeks.

7    Q    Did you ever go to national sales meeting?

8    A    Absolutely.

9    Q    And there's training at national sales meeting?

10   A    National sales meeting, it's a celebration for the sales

11   representatives to receive awards.

12   Q    I apologize.

13   A    There's a ball held.  There are certain games and

14   activities for the culture and the comradery for each sales

15   representative.

16              THE COURT:  Is there training there?

17              THE WITNESS:  There are breakout sessions.

18              THE COURT:  Is that a yes or no?

19              THE WITNESS:  Yes.

20              THE COURT:  Okay.  Let's go.

21   BY MR. CARDWELL:

22   Q    Did you ever attend mid year meeting?

23   A    Yes.

24   Q    Also training at that meeting?

25   A    There is training there.

44

1  Q    And you attended those trainings?

2  A    I attended the event.

3  Q    Did you go to the training?

4  A    Some.

5  Q    Okay.  Any regional meetings where there was training?

6  A    Not sales training.

7  Q    What type of training?

8  A    We would review numbers.

9  Q    What about product training?  How did you learn about the

10 ins and outs of Nuvasive products that were introduced to the

11 marketplace?

12 A    The majority of my training was from Integrity Medical

13 from 2006 to '13.  Generally, when you're new to the

14 organization your employers provide these for you.  So that's

15 where the competitive knowledge came in.  That's where the

16 general anatomy came in.

17 Q    I'm not talking about general.  I'm talking about

18 specific training about NuVasive products that were introduced

19 to market.  Perhaps we can do it this way:

20          You've been a distributor since 2013?

21 A    Correct.

22 Q    How many new products has NuVasive introduced into market

23 in that time?

24 A    I don't know.

25 Q    Dozens?

1    A    Potentially not that high but --

2    Q    Certainly more than five?

3    A    Correct.

4    Q    And NuVasive separates itself from its competitors by its

5    innovative products, correct?

6    A    Most of the spine companies say that they have innovative

7    products, and that's how they pride themselves.

8    Q    Does any other spine company have a system such as

9    Reline?

10   A    Yes.

11   Q    Who?

12   A    There are multiple other thoracolumbar spinal fixation

13   systems.  I would say over 100.

14   Q    Let me do it this way.  Absolute Medical sales reps, did

15   they attend national sales meetings?

16   A    A few of them at times.

17   Q    And there would be training there?

18   A    There would be.

19   Q    And how about mid year sales meetings?

20   A    Some would have gone over the years.

21   Q    How many surgeons within your sales territory did -- let

22   me go back.

23          I'm talking about Absolute Medical, LLC, now.  How

24   many surgeons within that territory did you or one of the

25   sales reps who worked for you travel to San Diego for

46

1  training?

2  A    I would not have those numbers.

3  Q    Give me a guess.

4  A    From 2013 through 2017?

5  Q    Yes.

6  A    Myself or sales representatives?

7  Q    Yes.

8  A    Collectively?

9  Q    Yes.

10  A    Maybe 12.

11  Q    So 12.  And what happens then is you accompany the

12  surgeon out to San Diego for training, and they receive

13  training on NuVasive's products, correct?

14  A    They do.  Correct.

15  Q    And that helps you to sell the products to the surgeons,

16  correct?

17  A    It's more of a cultural effect, bringing a rep out and

18  showing the experience, than it is a specific product.  These

19  physicians are trained over years of residencies and

20  fellowships.  So to learn a new product, that doesn't happen

21  very often.

22  Q    It certainly helps with the relationship when they come

23  out to San Diego, does it not?

24  A    It could.

25  Q    Did you ever undergo best seller training?

47

1    A    I did.

2    Q    And that was something NuVasive provided?

3    A    It's a generic sales training that dozens of

4    organizations go through.

5    Q    Did NuVasive provide it to you?

6    A    They provided it to us.  I apologize.  At my expense, I

7    sent myself out there.

8    Q    To the NuVasive best seller sales training?

9    A    Correct.

10   Q    And that was also provided to your sales representatives,

11   correct?

12   A    It could have been.

13   Q    How about leadership training in January before national

14   sales meeting?  Did you ever attend that?

15   A    I did.

16   Q    When did you attend that?

17   A    In 2017.

18   Q    And that was something NuVasive provided?

19   A    They did.

20   Q    Your agreement with NuVasive -- Absolute Medical LLC's

21   agreement with NuVasive, that was an exclusive arrangement,

22   correct?

23   A    Correct.

24   Q    That means there was no other NuVasive sales

25   representatives in your territory, correct?

1   A    Yes.

2   Q    So you were the face of NuVasive to those surgeons?

3   A    My sales reps were the face of NuVasive to the surgeons.

4   Q    You're underestimating yourself.  Dr. Sawin, your largest

5   customer, how many times do you play golf with him?

6   A    A couple times a week -- I apologize -- couple times a

7   month.

8   Q    How often do you go to dinner with him?

9        MR. BUSCH:  Your Honor, objection, relevance.  I

10  mean, I don't know what possible relevance there could be

11  to --

12       THE COURT:  All right.  Relevance, any tendency to

13  make a fact in dispute more or less likely.  Why is his

14  relationship with this physician relevant?

15       MR. CARDWELL:  It was the largest customer of

16  Absolute Medical, LLC,.  It remains the largest customer of

17  Absolute Medical Systems LLC, and he said that he has nothing

18  to do with selling, when I believe, Your Honor, that attending

19  dinners and playing golf is part of the sales strategy.

20       THE COURT:  I understand.  Overruled.  You may

21  continue.  You've made your point by the way.  We don't need

22  many more of these questions.  I understand what you're

23  getting at.  Go on ahead though.

24       MR. CARDWELL:  I'll move on then, Your Honor.

25  BY MR. CARDWELL:

1    Q    Just one question.  You continue to play golf and have

2    dinner with Dr. Sawin on a regular basis, don't you?

3    A    What's regular?

4    Q    How often do you play golf with Dr. Sawin?

5    A    As I said, about twice a month.

6    Q    And how often do you have dinner with Dr. Sawin?

7    A    Potentially once or twice a month.

8    Q    And I believe you agreed with me that Absolute Medical,

9    LLC, sales reps were the face of NuVasive to the surgeons,

10   correct?

11   A    Correct.

12   Q    And that continues today, Absolute Medical Systems or

13   AMS's sales reps are the face of that company to surgeons,

14   correct?

15   A    Incorrect.

16   Q    They're not?

17   A    Correct.  They are not.  They are not Absolute Medical

18   Systems' sales representatives.  They are Alphatec sales

19   representatives.

20   Q    I'm just talking about -- Absolute Medical Systems has

21   sales reps these days, correct?

22   A    Correct.

23   Q    We saw on that charge sheet that Mr. Ryan Miller was one

24   of the sales reps, correct?

25   A    I already notified that that was incorrect.

1      MR. BUSCH:  Objection.

2      THE COURT:  All right.  There's an objection.  State

3  the basis for your objection.

4      MR. BUSCH:  Objection, argumentative.  Your Honor,

5  the witness has already testified that Mr. Miller did not work

6  for AMS and was not contracted with AMS to do anything, and

7  counsel is just being argumentative with respect to the

8  question --

9      MR. CARDWELL:  I'll move on, Your Honor.

10      THE COURT:  All right.  Objection is sustained.

11  Let's move on.

12  BY MR. CARDWELL:

13  Q    There was a lot of talk on direct examination about

14  whether NuVasive asked you for different things.  Do you

15  recall that testimony, sir?

16  A    About NuVasive asking me for different things?

17  Q    Asking you for compliance agreements and just asking you

18  to provide different things, do you recall that?

19  A    Certain documents, correct.

20  Q    Okay.  Did NuVasive have the right to expect you to live

21  up to your contractual obligations?

22      MR. BUSCH:  Objection.  Asking for the intent of

23  what NuVasive thought with respect to the agreement.

24      THE COURT:  I think it's a little more nuanced than

25  that.  The objection is overruled.  He can answer that.

1      THE WITNESS:  Can you restate it?

2  BY MR. CARDWELL:

3  Q    Sure.  When you entered this agreement with NuVasive, did

4  you intend to comply with all of the contractual terms?

5  A    Yes.

6  Q    And was it fair, in your opinion, for NuVasive to assume

7  that you would comply with those terms?

8  A    Yes.

9  Q    Why didn't you?

10  A    Which term?

11  Q    Okay.  Let's talk about that.  You had an obligation to

12  provide NuVasive with non-compete agreements for your various

13  sales reps, correct?

14  A    Correct.

15  Q    And you had an agreement, you had an obligation not to

16  allow them to sell NuVasive's products unless they in fact

17  were subject to a non-compete agreement, correct?

18  A    Correct.

19  Q    And if they violated their non-compete, you had an

20  obligation to either seek to enforce the non-compete or to

21  compensate NuVasive for doing so, correct?

22  A    I'm not sure.

23  Q    Let's talk about the first two.  Why did you allow them

24  to work without non-compete agreements?

25  A    Mark Singer was aware that multiple people had not signed

1    non-compete agreements.  We were in a position, as a company,

2    was continuing to lose volume, lose revenue, lose culture to

3    maintain stability of the sales force.

4    Q    When did you make Mr. Singer aware of this?

5    A    Mr. Singer made me aware of this in February.

6    Q    So Mr. Singer told you that Absolute Medical, LLC, sales

7    reps would not sign non-compete agreements?

8    A    Mr. Singer told me in February that representatives had

9    told him that they had not signed their noncompetes and that

10   they are not liable to be forced for a non-compete.

11   Q    Now, when you answered discovery in this case, you took

12   the position that Mr. Hawley and Mr. Miller had never signed

13   non-compete agreements, correct?

14   A    For when?

15   Q    In this case, that's the position you took in your

16   discovery responses?

17   A    I apologize.  I'm not familiar with court.  This is my

18   first time here.  Would you mind just explaining what you

19   mean?

20   Q    I'll do it this way.  You agree that Mr. Miller and

21   Mr. Hawley signed non-compete agreements with Absolute

22   Medical, LLC, in 2013?

23   A    Yes.

24   Q    And you also agree that they signed non-compete

25   agreements with Absolute Medical Inc., which was the same as

1  Absolute Medical, LLC, in 2016, correct?

2  A    I'm trying to think back.  I know we have 2014.  We have

3  2015.  I'm not sure.

4       MR. CARDWELL:  Your Honor, last night at about 6:00

5  we were given some documents and --

6       THE COURT:  Who were you given the documents by?

7       MR. CARDWELL:  Opposing counsel.

8       THE COURT:  All right.  Which opposing counsel?

9  There are several of them over there.

10      MR. CARDWELL:  I don't know who sent the e-mail.  I

11  believe it was someone from the Atlanta office.

12      THE COURT:  All right.  Representing which -- there

13  are two different.  All right.  Fine.  Keep going.  What's the

14  point?

15      MR. CARDWELL:  The point is that we received signed

16  copies of 2016 independent contractor agreements for both

17  Mr. Hawley and Mr. Miller.  And if I can approach him.

18      THE COURT:  You may approach.

19      MR. CARDWELL:  Thank you.

20  BY MR. CARDWELL:

21  Q    Is this the January 1, 2016, independent contractor

22  agreement for Mr. Miller?

23  A    It is.

24  Q    And he signed that agreement?

25  A    He did.

54

1    Q    And is this the 2016 agreement for Mr. Hawley?

2    A    It is.

3    Q    And he signed that agreement?

4    A    He did.

5    Q    And why would they not sign the 2017 agreements?

6    A    I'm not sure.

7    Q    Well, you testified on direct it was because they

8    disagreed with the restrictive covenants.

9    A    That's what they told me.

10   Q    So did the restrictive covenants somehow change?

11   A    That's a question for them.

12             MR. CARDWELL:  Well, a few other documents we got

13   last night, Your Honor, were the 2017 draft agreements.  If I

14   way approach.

15             THE COURT:  You may.

16             MR. BUSCH:  I believe both of those exhibits are in

17   our notebook, if you want to refer to that so we're all on the

18   same page.

19             THE COURT:  Look, this is difficult for my court

20   reporter to pick up the side conversations.  If you want to

21   talk to each other as attorneys, I don't have a problem with

22   that.  If you want it on the record, then you need to address

23   the Court, not each other.

24   BY MR. CARDWELL:

25   Q    Did I just hand you the 2017 agreement for Mr. Miller?

1   A    Yes, it looks to be.

2   Q    And is this the 2017 agreement for Mr. Hawley?

3   A    Yes, it looks to be.

4   Q    Sir, if you would, please compare the restrictive

5   covenants in the 2016 and 2017 agreements and let me know if

6   they are the same.

7   A    Where is that listed?

8   Q    Paragraph 5, Section 5, sir.

9   A    Yes.  They look to be the same.

10  Q    They're identical.  And am I correct, sir, that all you

11  had to do to renew these -- to renew the 2016 agreement, to

12  alleviate the need to get a signature on the 2017 agreement,

13  was to let the representative salesperson know that you were

14  choosing to renew it?  Is that correct?

15  A    I'm not sure.

16         MR. BUSCH:  Your Honor, I object to that question to

17  the extent it calls for a legal conclusion about whether a

18  contract is renewed or legally enforceable in successive

19  years.

20         MR. CARDWELL:  I'll withdraw it.

21         THE COURT:  All right.  It's withdrawn.

22  BY MR. CARDWELL:

23  Q    Would you please refer to Section 3.1?

24  A    Of this?

25  Q    Yes.  Of the 2016 agreement, sir.

56

1   A    Okay.

2   Q    Do you see where it says *Section 3.1 Term*?

3   A    I do.

4   Q    Would you please read that into the record, sir?

5   A    *This agreement shall be effective beginning on and as of*

6   *the effective date and shall continue in effect through*

7   *December 31, 2015.  The term, unless sooner terminated under*

8   *the provisions of Section 7 hereof, upon 30 days written*

9   *notice to salesperson prior to the expiration of the current*

10  *term, distributor shall have the option to renew the agreement*

11  *for the successive one year terms with each such renewal*

12  *constituting an additional year in the term.*

13  Q    Okay.  Two follow-up questions to that, sir.  Number one,

14  it said the term expired December 31, 2015.  That's a typo,

15  correct?  It should have said 2016?

16  A    It seems to be.

17  Q    And you had the right to just give them notice that you

18  were renewing it.  Why didn't you do that?

19  A    I don't know how to answer that question.

20  Q    Well, you agree it says that you had the option to renew

21  the agreement for successive one year terms, correct?

22  A    I'm not sure.

23  Q    Is that what it says?

24  A    That I have the --

25  Q    Does it say, *The distributor shall have the option to*

1  *renew the agreement for successive one year terms with each*

2  *such renewal constituting an additional year in the term*?

3  A    Yes.

4  Q    And in fact, not just the restrictive covenant, but the

5  entirety of the 2016 agreement is identical to the 2017

6  agreement, correct?

7  A    I'm not sure.

8  Q    Would you please review it?

9  A    The entirety of the contract?

10 Q    Tell me if you see any differences, other than the date.

11 Perhaps your counsel will stipulate.

12         MR. BUSCH:  I don't know the answer.

13         THE COURT:  How about if I look at them?

14         MR. CARDWELL:  That's fine.

15         THE COURT:  Unless he's going to hold them up to the

16 light, I think that's a daunting task on cross-examination.

17         MR. CARDWELL:  Your Honor, if I can move --

18         THE WITNESS:  Your Honor, may I say something?

19         THE COURT:  No.  Actually, I'll give you a chance at

20 redirect -- give your attorney a chance at redirect.  You're

21 just here to answer counsel's questions.  Go on ahead.

22         THE WITNESS:  I apologize.

23         MR. CARDWELL:  Your Honor, I would like to move the

24 2016 Hawley agreement into evidence as Exhibit 27 or as

25 Plaintiff's 27.

1   THE COURT:  Hold on.  Why don't we do this:  Tell

2   Ms. Darleen you want to move them.  Bring them up to her and

3   she'll tell you what number they are.

4   THE COURTROOM DEPUTY:  I'm sorry.  Judge, I don't

5   have their exhibit list.  They only had one.  I just need

6   that.

7   THE COURT:  Go back to the podium.  Leave them there

8   and tell us what you want to do.  We're not picking up

9   anything not on a microphone.  How many documents are there?

10   MR. CARDWELL:  There's four documents.  There's the

11   2016 Absolute Medical, LLC, contract with Mr. Hawley.

12   THE COURT:  All right.  That will be 27.  Correct,

13   Ms. Darleen?

14   THE DEPUTY CLERK:  No, Judge, that will be 21.

15   MR. CARDWELL:  Actually, 27 is correct because we

16   have other --

17   THE COURT:  They have 26 exhibits in at this point.

18   THE COURTROOM DEPUTY:  I'm sorry, Judge.  I didn't

19   know that.

20   THE COURT:  That's okay.  Next time you want to do

21   this ahead of time.  All right.  Defendant has admitted 1

22   through 26.  Currently there are only 20 exhibits admitted by

23   the plaintiff.  So this would be Plaintiff's 21.

24   MR. CARDWELL:  Your Honor, I believe we moved the --

25   THE COURTROOM DEPUTY:  And 22, yes.

1          THE COURT:  All right.  Okay.

2          MR. CARDWELL:  Okay.  So that's 21, is that correct?

3          THE COURT:  Ms. Darleen, tell us what these are.

4   The next one is going to be what?

5          THE COURTROOM DEPUTY:  23.

6          THE COURT:  Document No. 2, what is it?

7          MR. CARDWELL:  It is the 2016 contract between

8   Absolute Medical, LLC, and Mr. Ryan Miller.

9          THE COURT:  And that will be what number?

10          THE COURTROOM DEPUTY:  24.

11          THE COURT:  All right.  Next document.

12          MR. CARDWELL:  The 2017 contract between Absolute

13   Medical and Mr. Hawley.

14          THE COURTROOM DEPUTY:  25.

15          MR. CARDWELL:  The 2017 agreement between Mr. Miller

16   and Absolute Medical.

17          THE COURTROOM DEPUTY:  26.

18          THE COURT:  Any objection to my considering these

19   during my deliberations?

20          MR. BUSCH:  No, Your Honor.  No objection.

21          THE COURT:  They're admitted.

22          (Plaintiff's Exhibit Nos. 21 through 26 were

23   admitted into evidence.)

24          THE COURTROOM DEPUTY:  Thank you, Judge.

25          THE COURT:  Thank you.

60

1     All right.  Feel free to continue.

2  BY MR. CARDWELL:

3  Q    Where was Absolute Medical LLC's office?

4  A    213 Villa Di Este Terrace, Lake Mary, Florida.

5  Q    And that was a home that you resided in?

6  A    That was the office.  That was not a home that I resided

7  in.

8  Q    What about the Devin Place address that appears with the

9  secretary of state?

10  A    Devin Place was my home address.

11  Q    And that's what you listed as Absolute Medical LLC's

12  address with the state, correct?

13  A    So I would receive notifications to the home.

14  Q    Excuse me?

15  A    So that I would receive notifications to my home.

16  Q    And where is Absolute Medical Systems LLC located, sir?

17  A    Lee Vista Road in Orlando.

18  Q    And that's a condominium that you own?

19  A    It's an apartment.

20  Q    Okay.  But you own it?

21  A    I do not own it.

22  Q    It's owned by a trust, correct?

23  A    It's owned by a trust.

24  Q    And you are part of that trust?

25  A    I personally am not part of that trust.

61

1    Q     Who is the trust?

2          MR. BUSCH:  Your Honor, objection to relevance of

3    who owns a building that Absolute Medical Systems is in.  It's

4    some sort of a trust.  I'm not sure what possible relevance

5    that could have to a non-compete case.

6          THE COURT:  Response?

7          MR. CARDWELL:  This goes to the alter ego theory.

8    The offices are always in his home or buildings that he

9    controls.

10         THE COURT:  All right.  The objection is overruled.

11   He can answer the question.

12         THE WITNESS:  My office has not been in my home.

13   BY MR. CARDWELL:

14   Q     Okay.  The Lee Vista, who is a part of the trust?

15   Absolute Medical Systems --

16   A     No.

17   Q     -- it's owned by a trust?

18   A     It is not owned by a trust.

19   Q     Who owns it?

20   A     Who owns what?

21   Q     What is Absolute Medical Systems address?

22   A     8901 Lee Vista Drive.

23   Q     And a trust owns that property, correct?

24   A     Correct.

25   Q     And who are members of that trust?

1    MR. BUSCH:  Objection to the term "members of the

2  trust."  There is no such thing.

3  BY MR. CARDWELL:

4  Q    What is your relationship to the trust?

5    THE COURT:  That objection is sustained.  Ask the

6  question more precisely.  Go on ahead.

7  BY MR. CARDWELL:

8  Q    What is your relationship to the trust?

9    THE COURT:  Why don't you ask him who the trustees

10  are?

11  BY MR. CARDWELL:

12  Q    Who are the trustees?

13  A    The Absolute Group.

14  Q    What's the Absolute Group?

15  A    It's a real estate company.

16  Q    Do you own that real estate company?

17  A    Am I a member of it?

18  Q    Yes.

19  A    Yes.

20    THE COURT:  All right.  Just for future reference,

21  he's making his point by your absolute unwillingness to just

22  answer the questions.  This almost turned into a comedy

23  routine.  He eventually got there by asking the Court to

24  intervene.  Just answer the questions.

25    THE WITNESS:  I apologize, Your Honor.

1      THE COURT:  All right.  Let's go.

2  BY MR. CARDWELL:

3  Q    Who are the other members of that trust -- I'm sorry.

4  Who are the other trustees?

5  A    I am not sure.

6  Q    Who are the beneficiaries of that trust?

7  A    I don't have it in front of me.  It's a land trust.

8  Q    What other companies list that address as their home

9  address with the Florida Secretary of State?

10 A    Can you be more clear?

11 Q    Sure.  Absolute Ortho Inc., what is that company?

12 A    That's a medical device company.

13 Q    And that's a medical device company that is contracted to

14 sell osseous products, correct?

15 A    That is correct.

16 Q    And osseous products also compete with NuVasive products,

17 correct?

18 A    That is not correct.

19 Q    Are osseous products used in spine surgery?

20 A    Yes, they are.

21 Q    Are NuVasive products used in spine surgery?

22 A    Yes, they are.

23 Q    Are osseous products implants that are used in spine

24 surgery?

25 A    Yes, they are.

1   Q    Just like NuVasive products?

2   A    Similar.

3   Q    And you are the sole shareholder of Absolute Ortho Inc.,

4   correct?

5   A    Correct.

6   Q    And it is also headquartered at the Lee Vista Boulevard

7   address, correct?

8   A    Yes.

9   Q    Blackfin Funds, what is that?

10  A    It's a holding company.

11  Q    Who owns that company?

12  A    I do.

13  Q    And is it headquartered at the Lee Vista Boulevard

14  address?

15  A    The mailing address is listed there.

16  Q    When is the last time you went to the Lee Boulevard --

17  vista address?

18  A    Yesterday.

19  Q    Any other companies that are headquartered there?

20  A    There could be.

21  Q    Companies that you own?

22  A    There could be.

23          THE COURT:  All right.  We do not have an unlimited

24  amount of time.  I'm going to ask you to keep moving through

25  this.

65

1        MR. CARDWELL:  I'm go to start moving quickly.

2        THE COURT:  About to start moving quickly.  All

3   right.

4        MR. CARDWELL:  I'm going to try to move quickly,

5   Your Honor.

6        THE COURT:  Why don't we start moving towards a wrap

7   up here?

8        MR. CARDWELL:  Yes, Your Honor.

9        THE COURT:  This is not a deposition.

10        MR. CARDWELL:  Your Honor, if you would refer to our

11   exhibits, the defendant's exhibits, and I'm at Exhibit 9 now,

12   Your Honor.

13        THE COURTROOM DEPUTY:  He's the plaintiff, Judge.

14        THE COURT:  I've got them.

15        MR. CARDWELL:  And, Your Honor, if I may approach

16   the witness.

17        THE COURT:  You may.

18   BY MR. CARDWELL:

19   Q    I just handed you what's premarked Exhibit 9, sir.  Have

20   you seen this document before?

21   A    I have.

22   Q    What's the date on that?

23   A    December 12, 2017.

24   Q    And is that an e-mail from Mr. Hawley?

25   A    It is.

1  Q    And that is an e-mail from Mr. Hawley to Alphatec,

2  correct?

3  A    It says to Elizabeth Lukianov.

4  Q    She works with Alphatec, correct?

5  A    She does.

6  Q    And it's dated December of 2017?

7  A    December 12, 2017, correct.

8  Q    Which is after Mr. Hawley resigned from Absolute Medical,

9  correct?

10  A    Correct.

11  Q    What e-mail address does he use?

12  A    It's listed here dhawley@absolute-med.com.

13  Q    That absolute-med.com, that's the e-mail address that all

14  of the Absolute sales reps used, correct?

15  A    Absolute Medical, correct.

16  Q    In fact Mr. Hawley continues to use an Absolute Medical

17  e-mail address, does he not?

18  A    I do not know.

19  Q    You don't know what e-mail address he uses?

20  A    I do not know.

21  Q    Do you know that Mr. Miller continues to use an Absolute

22  Medical e-mail address?

23  A    I do not know.

24       MR. CARDWELL:  Your Honor, if I may have one minute

25  with my client.

1          THE COURT:  You may.

2   BY MR. CARDWELL:

3   Q    Your new role as an Alphatec distributor, how are you

4   compensated?

5   A    With a monthly draw.

6   Q    So you're an independent contractor, but you're not being

7   paid commissions?

8   A    I am being paid commissions as well.

9   Q    So a monthly draw plus commissions, correct?

10  A    Correct.

11  Q    And how much is your monthly draw?

12          MR. BUSCH:  Objection, Your Honor, relevance.  I'm

13  not sure what his personal financial deal -- the amount of the

14  money of the personal financial deal has anything to do with a

15  non-compete here.

16          MR. CARDWELL:  May I, Your Honor?

17          THE COURT:  Sure.

18          MR. CARDWELL:  Today we received the contracts that

19  showed that Absolute Medical Systems' territory does not

20  include the former Absolute Medical territory, and the former

21  Absolute Medical territory is being handled by Hawley and

22  Miller.

23          I think if he's being paid an extraordinary amount

24  of money and not being reliant on commissions, it would show

25  that he's in fact being paid for helping to move Dr. Sawin's

1    business.

2            THE COURT:  You don't know the answer to that

3    question?

4            MR. CARDWELL:  I don't know the answer, but I

5    suspect that it's a handsome amount.

6            THE COURT:  I'm uncomfortable with requiring him to

7    answer that question.

8            MR. CARDWELL:  We have requested it in discovery.

9            THE COURT:  And what was the response?

10           MR. CARDWELL:  They objected.

11           THE COURT:  All right.  Keep going.  I'll make a

12   ruling on that towards the end of your cross-examination.

13           MR. CARDWELL:  I'll wrap up.

14   BY MR. CARDWELL:

15   Q    You don't know if Mr. Hawley and Mr. Miller continue to

16   use the Absolute Medical e-mail addresses, correct?

17   A    Absolute-med has been shut down.

18   Q    Are they now using absolute-medical.org as the e-mail

19   address?

20   A    I offered -- when you open up -- yeah, potentially.  I

21   don't know.

22   Q    What e-mail address are you now using?

23   A    Absolute-medical.org.

24   Q    And are they also using absolute-medical.org?

25   A    I do not know that.

1  Q     Have you made it available to them?

2  A     Early on, yes, part of the transition period.

3  Q     You're good friends with Mr. Miller and Mr. Hawley,

4  aren't you?

5  A     We are friends.

6  Q     Their phone numbers haven't changed, have they?

7  A     They have not.

8  Q     Your phone number hasn't changed?

9  A     It has not.

10  Q     And we know from that charge sheet that they continue to

11  call on and service Dr. Sawin, correct?

12  A     That charge sheet is incorrect.

13  Q     Do you know who their customers are?

14  A     I do not.

15        MR. CARDWELL:  Your Honor, that's all for cross.

16        THE COURT:  Redirect.

17        MR. BUSCH:  Two very quick topics, Your Honor, and

18  then we'll be done.

19                REDIRECT EXAMINATION

20   BY MR. BUSCH:

21  Q    Mr. Soufleris, opposing counsel was asking you and made a

22  representation to the Court about Dr. Sawin being a customer

23  of Absolute Medical Systems.  Can you tell the Court whether

24  or not Absolute Medical Systems sells any product to

25  Dr. Sawin?

1   A    They do not sell any product to Dr. Sawin.

2   Q    There was also some discussion about some training that

3   you may have attended on your own dime.  During any of the

4   training sessions that you had where NuVasive was there, were

5   you provided with any confidential information about

6   NuVasive's product that was not in the public domain?

7   A    Not to my recollection.

8   Q    Were you provided with any NuVasive trade secrets that

9   were not in the public domain?

10  A    Not to my recollection.

11          MR. BUSCH:  Nothing further, Your Honor.

12          THE COURT:  All right.  Thank you.  Mr. Soufleris,

13  feel free to be seated at counsel table.

14          Will you be calling any additional witnesses?

15          MR. BUSCH:  Two more, Your Honor.

16          THE COURT:  All right.  Call your next witness,

17  please.

18          MR. BUSCH:  Your Honor, before I do that, I have a

19  serious issue I have to bring before the Court.  Opposing

20  counsel has introduced what appears to be a photograph of some

21  sort of a charge sheet -- I think is what they called it.  The

22  problem with this document, Your Honor, is it violates HIPAA

23  directly.  It also violates the privacy rights of the patient

24  that is listed on this piece of paper.  So at a minimum, we

25  would either, A, like the Court to disregard this exhibit,

1  but, B, if the Court wants to consider it, we would ask that

2  it at least be put under seal.

3          THE COURT:  Let me see it, Ms. Darleen.  All right.

4  Whose HIPAA rights are being violated here?

5          MR. BUSCH:  The patient's, Your Honor.

6          THE COURT:  Where is the patient's name on here?

7          MR. BUSCH:  ███████████, Your Honor.

8          THE COURT:  Okay.  That's what you're asking to be

9  redacted or placed under seal?

10          MR. BUSCH:  I would like the whole document placed

11  under seal, Your Honor, or simply thrown out by this Court.

12          THE COURT:  All right.  What's the plaintiff's

13  response to that?

14          MR. CARDWELL:  I see no identify -- maybe I'm

15  missing it.  I don't see identifying information.

16          THE COURT:  On the left side of the paper there's

17  what appears to be a darker gray stamp with some sort of bar

18  code on it and above the bar code's name is where counsel is

19  alleging that's the patient's name.

20          MR. CARDWELL:  I don't know that to be true, Your

21  Honor, but I see no problem with just redacting that, if

22  that's an issue.

23          THE COURT:  All right.  So why is sealing the entire

24  document rather than just redacting the patient's name not the

25  appropriate course of action here?

72

1        MR. BUSCH:  Well, Your Honor, I think that given the

2   medical information that's on there about the patient being

3   treated, what procedures, what instrumentation was used, the

4   date, the facility, I just out of abundance of caution would

5   ask that it should be placed under seal.

6        THE COURT:  All right.  Anything further from the

7   plaintiff?

8        MR. CARDWELL:  No, Your Honor.  I think redacting

9   is --

10       THE COURT:  Where did you get this document?

11       MR. CARDWELL:  I don't know where it came from, Your

12  Honor.

13       THE COURT:  You're kidding me.  You have no idea

14  where this document --

15       MR. CARDWELL:  I mean, it came from the hospital.

16       THE COURT:  Who provided it to you?

17       MR. CARDWELL:  Thad Bragulla.

18       THE COURT:  All right.  And who is that?

19       MR. CARDWELL:  He is a former Absolute Medical, LLC,

20  sales rep.

21       THE COURT:  All right.  Well, that person can answer

22  for any HIPAA issues.  I appreciate defense counsel worried

23  about the rights of a party he doesn't represent.  That's

24  immaterial.  This person provided it to you can answer for

25  what he's done.  But in terms of the application here, I think

1    the defense's request is reasonable.  I'm going to consider

2    it, but it will be placed under seal on ore tenus motion of

3    the defendant, but I will consider it.

4           Are you ready to call your next witness?

5           MR. BUSCH:  We are, Your Honor.

6           THE COURT:  All right.  Call your next witness,

7    please.

8           MR. BUSCH:  Your Honor, at this time the defense

9    would like to call Mr. Dave Hawley to the stand.

10          THE COURTROOM DEPUTY:  Please come forward and be

11   sworn.  Raise your right hand.

12                       **DAVID HAWLEY**,

13    called by Defense, was duly sworn by the courtroom deputy,

14   and in answers to questions propounded, testified as follows:

15          THE COURTROOM DEPUTY:  Have a seat there, please.

16          THE COURT:  Good afternoon, Mr. Hawley.  Once

17   seated, please make yourself comfortable with the chair's

18   proximity to the microphone and state your full name into that

19   microphone.  Please spell your last name.

20          THE WITNESS:  Thank you, Your Honor.  David Ryan

21   Hawley, H-a-w-l-e-y.

22          THE COURT:  All right.  Your witness.

23                  <u>DIRECT EXAMINATION</u>

24    BY MR. BUSCH:

25   Q    Mr. Hawley, can you please tell the Court where you

1  currently reside?

2  A    In Orlando with my wife and soon to be first-born child.

3  Q    Did you attend university or college?

4  A    Florida Gulf Coast University.

5  Q    Did you graduate from that university?

6  A    Yes, sir.

7  Q    What was your degree in?

8  A    Finance with a minor in economics.

9  Q    When did you start working with a company called Absolute

10 Medical?

11 A    In 2013.

12 Q    And what did Absolute Medical do?

13 A    Absolute Medical was a distributor for NuVasive products.

14 Q    What type of products did NuVasive make?

15 A    Spinal implants.

16 Q    What did you do for Absolute Medical?

17 A    I began as a sales associate and turned into a sales

18 representative.

19 Q    Where was your sales territory, sir?

20 A    Orange County.

21 Q    There's been some discussion earlier today about

22 training.  Do you recall receiving any training from NuVasive?

23 A    Yes.  I also had the brief two-week training in the

24 beginning of my work with Integrity Medical, while I was with

25 them.

1    Q    And during the course of your training with NuVasive, did

2    NuVasive ever provide you with any information about its

3    products that were not in the public domain?

4    A    No, sir.

5    Q    Did NuVasive ever provide you with any trade secret

6    information about its products that were not in the public

7    domain?

8    A    No, sir.

9    Q    Did NuVasive ever pay for you to attend any training

10   classes?

11   A    No.  They did not.

12   Q    Did you receive any training directly from Absolute

13   Medical?

14   A    Yes.  Quite a bit.  We would do monthly get-togethers,

15   reviewing product, procedures, reviewing marketing material.

16   Yeah, we did a lot.

17   Q    During your work as a sales representative for Absolute

18   Medical, were you able to build your own network of customers?

19   A    Yes, sir.

20   Q    Tell the Court generally about those customers.

21   A    They are orthopedic spine surgeons and neurosurgeons.

22   Q    And did you maintain your own personal database of

23   customer information?

24   A    I did.

25   Q    How was that maintained?

1  A    Spreadsheets, diagrams, I had my phone with contacts.

2  Q    During your time at Absolute Medical, did NuVasive ever

3  provide you with any customer leads, physician names, or

4  contacts?

5  A    Never.

6  Q    Did NuVasive ever assist you in gaining access to any

7  medical facilities?

8  A    Never.

9  Q    Did NuVasive ever provide you with any access to any

10  databases containing information about clients, physicians, or

11  medical facilities?

12  A    Never.

13  Q    How did you yourself, Mr. Hawley, educate yourself about

14  NuVasive products?

15  A    Through YouTube videos, the online website, marketing

16  materials.  I learned a lot on the job, in surgeries, working

17  under, you know, the management of Absolute Medical.

18  Q    When you came to work for Absolute Medical, were you an

19  employee or an independent contractor?

20  A    Independent contractor.

21  Q    Were you paid a salary or by commission?

22  A    Commission.

23  Q    And did you have a territory?

24  A    Yes.

25  Q    And what was that territory?

1    A    Orange County.

2    Q    Did you pay for your own business expenses?

3    A    Yes, sir.

4    Q    Did you receive a 1099 tax form from Absolute Medical?

5    A    Yes, sir.

6    Q    Did you pay taxes on the commissions you received from

7    Absolute Medical?

8    A    Yes, sir.

9    Q    Did you maintain your own business credit card?

10   A    I did.

11   Q    Did you maintain your own business bank account?

12   A    Yes.

13   Q    Did you have your own separate office?

14   A    I did, home office.

15   Q    When you started with Absolute Medical in 2013, did you

16   have any written agreement?

17   A    In 2013 I did have a written agreement, yes.

18   Q    All right.  If you can turn to Exhibit 8 in the binder

19   there in front of you, sir.

20   A    Okay.

21   Q    Do you recognize that as the form 2013 agreement between

22   Absolute Medical and its sales representatives?

23   A    Yes.

24   Q    And if you can turn over to Exhibit No. 9.  Do you

25   recognize your signature on that signature page?

1    A    Yes, sir, I do.

2    Q    Do you believe you were agreeing to the 2013 agreement

3    that's shown as Exhibit 8?

4    A    That's correct.

5    Q    And did you, again, sign independent contractor

6    agreements with Absolute Medical in 2014, 2015, and 2016?

7    A    Yes, sir.

8    Q    In 2017 did Absolute Medical present you, once again,

9    with another one-year independent contractor agreement?

10   A    They did.

11   Q    Is that agreement found at Exhibit 13 in the book there

12   in front of you?

13   A    Yes, sir.

14   Q    Did you sign this or any other 2017 agreement with

15   Absolute Medical?

16   A    No, sir, I did not.

17   Q    Please tell the Court why.

18   A    There was an amendment in this agreement that I found,

19   and I did not agree that NuVasive had the right to sue me

20   because I did not work for NuVasive.  I worked for Absolute

21   Medical.

22   Q    Did you work for Absolute Medical in 2017 without a

23   written contract?

24   A    Yes, sir.

25   Q    And you still received commissions?

1    A    I did.

2    Q    As we sit here today, is there any written agreement in

3    Effect between you and Absolute Medical?

4    A    No, sir.

5    Q    During the entire time you worked for Absolute Medical,

6    Mr. Hawley, selling NuVasive products, were you ever presented

7    with a contract directly between you and NuVasive?

8    A    Never.

9    Q    Did you ever sign any written agreements with Nuvasive?

10   A    No, sir.

11   Q    During your time at Absolute Medical, did you have the

12   opportunity to sell NuVasive products to Dr. Sawin?

13   A    I did.

14   Q    Who is he and where does he work?

15   A    He is a neurosurgeon for Orlando Neurosurgery in Orlando

16   Florida.

17   Q    When did you begin selling products to Dr. Sawin?

18   A    Approximately 2014.

19   Q    What percentage of your sales involved purchases from

20   Dr. Sawin?

21   A    Roughly 80 percent.

22   Q    And at some point in 2017, did you become concerned about

23   Dr. Sawin buying future NuVasive products?

24   A    Yes, sir.  He approached me in, I believe it was, mid

25   October and said that he would no longer like to utilize

1  NuVasive instrumentation.

2  Q    In response to that news, what did you do, Mr. Hawley?

3  A    I started to seek out new employment, as this was a major

4  client of mine, and that would be difficult to sustain my

5  business without selling to him.

6  Q    And did you find another job, sir?

7  A    Yes, sir.

8  Q    And who did you find a job with?

9  A    With Alphatec Spine.

10  Q    When did you inform Mr. Soufleris of your decision?

11  A    I had a conversation with him in mid November, that I let

12  him know the conversation that I had with Dr. Sawin, that he

13  no longer wanted to utilize NuVasive products, and that I was

14  going to be seeking out employment.

15  Q    And did you send an e-mail out to Mr. Soufleris resigning

16  from Absolute Medical?

17  A    Yes.

18  Q    And is that e-mail Exhibit 15 in the binder in front of

19  you?

20  A    Yes, it is.

21  Q    And for a period of time, Mr. Hawley, after your

22  resignation, did you continue transferring or processing the

23  remaining NuVasive files that you were working on?

24  A    Could you restate the question?

25  Q    Yeah.  For a period of time after you resigned, was there

1  a transition period where you went from your old job to your

2  new job?

3  A    Yes, sir.

4  Q    And did you attempt to assist NuVasive through that

5  transition period?

6  A    Yes, sir.

7  Q    Are you an independent contractor for Alphatec Spine?

8  A    I am an independent contractor.

9  Q    And what does Alphatec Spine do?

10  A    They provide and manufacture spinal instrumentation and

11  hardware.

12  Q    And is that similar to the type of product sold by

13  NuVasive?

14  A    It is.

15  Q    What do you do for Alphatec Spine?

16  A    I am a sales representative.

17  Q    And do you have a territory?

18  A    I do.

19  Q    What is that territory?

20  A    Orange, Osceola, Volusia, and Seminole Counties.

21  Q    Are you able to sell to some of the same doctors you

22  worked with when you were previously employed by Absolute

23  Medical?

24  A    Yes, sir.

25  Q    And how are you paid?

1    A     A monthly draw.

2    Q     Could you turn to Exhibit 23 of the notebook there in

3    front of you?

4    A     Okay.

5    Q     Is that a formal independent contractor agreement between

6    yourself and Alphatec Spine?

7    A     Yes, sir, it is.

8    Q     And you'll notice at the top it's got an entity listed

9    there, Hawley Med.  Do you see that?

10   A     Yes.

11   Q     Is that your entity?

12   A     Yes, it is.

13   Q     Are you familiar with a company called Absolute Medical

14   Systems operated by Greg Soufleris.

15   A     Yes, I am.

16   Q     Do you have any involvement with AMS?

17   A     None.

18   Q     Have you ever worked for AMS as a sales rep, independent

19   contractor, or employee?

20   A     Never.

21   Q     Have you ever sold any products or ever been compensated

22   in any way by AMS?

23   A     No, sir.

24   Q     Mr. Hawley, does Absolute Medical still owe you any

25   commissions?

1   A    They do.

2   Q    And what do they owe you commissions for?

3   A    They owe me commissions for -- it may have been partially

4   sales in October, but also in November to the tune of

5   approximately $40,000.

6   Q    And do you know when or if that money will ever be paid?

7   A    It's my understanding that Absolute Medical is seeking

8   those damages so that I may be paid these commissions.

9   Q    Since you left Absolute Medical in November of 2017, have

10   you had any further involvement with NuVasive?

11   A    No, sir, outside of -- excuse me -- outside of helping

12   them in that transition period.

13   Q    Okay.  You've been accused by NuVasive in this lawsuit of

14   shipping NuVasive custom instruments to Alphatec Spine so

15   those instruments could be replicated for one of your clients.

16   Are you aware of that?

17   A    I am aware.  That never occurred.

18   Q    I'm asking you to look at an e-mail shown as Exhibit 24

19   in the binder in front of you.

20   A    Okay.

21   Q    Could you tell the Court about that e-mail?

22   A    This is an e-mail that I sent to Elizabeth Lukianov to

23   have some Alphatec instruments modified to better fit the

24   hands of Dr. Sawin.

25   Q    And did this e-mail have anything to do with NuVasive

1  instruments?

2  A    No, sir.

3  Q    Have you ever sent any NuVasive products or instruments

4  to Alphatec?

5  A    No, sir.

6  Q    And would there be any business necessity to provide

7  Alphatec with NuVasive tools?

8  A    Not that I can think of.  NuVasive custom instruments are

9  designed to fit the NuVasive products.  Custom Alphatec tools

10  are designed to fit Alphatec products.

11  Q    Thank you, Mr. Hawley.

12  A    Thank you.

13          THE COURT:  Cross-examination.

14          MR. CARDWELL:  Thank you, Your Honor.

15                      CROSS-EXAMINATION

16   BY MR. CARDWELL:

17  Q    Good afternoon, Mr. Hawley.

18  A    Good afternoon.

19  Q    So you acknowledge signing the 2016 non-compete

20  agreement -- or agreement that contained a non-compete in it,

21  correct?

22  A    Yes, sir.

23  Q    And that had a one year non-compete, correct?

24  A    I believe so, yes.

25  Q    And the term of that agreement was from 1/1 of '16 to

Case 6:17-cv-02206-CEM-GJK  Document 95  Filed 07/30/18  Page 85 of 128 PageID 1824

1   12/31 of '16, correct?

2   A    I would have to look at it.

3   Q    Let's take a look at Exhibit 24 that you were just

4   looking at.

5   A    Okay.

6   Q    Do you have that in front of you?

7   A    Yes.

8   Q    Dhawley@absolute-med.com, do you see that?

9   A    Yes, sir.

10  Q    That's the e-mail you used when you were employed by

11  Absolute Medical, LLC, correct?

12  A    Yes, sir.

13  Q    And when did you stop using that e-mail address, sir?

14  A    I don't know a specific date.

15  Q    It would have been April or May of 2018, wouldn't it?

16  A    I don't know.

17  Q    Do you deny that?

18  A    I would have to look to see when I stopped using it.  I

19  don't know.

20  Q    What e-mail do you now use?

21  A    I have DaveRyanHawley@gmail.com.

22  Q    What else?

23  A    As well as dhawley@absolute-medical.org

24  Q    Okay.  Let's talk to the absolute-medical.org.  Did

25  Mr. Soufleris make that e-mail address available to you?

1  A    He did.  This was a professional courtesy that he gave me

2  during this transition period, before I could set up, you

3  know, my own domain e-mail.

4  Q    And did he make that same professional courtesy to

5  Mr. Miller?

6  A    I don't know.  That would be a question for him.

7  Q    In fact, to this day, you use the absolute-medical.org

8  e-mail address for your business communications, correct?

9  A    I have used it, yes.

10 Q    That's the only one you use now, is it not?

11 A    I've used DaveRyanHawley@gmail.com also.

12 Q    Your phone number has not changed since you've

13 transitioned from Absolute Medical, LLC, has it?

14 A    No, sir.

15 Q    And you say that -- you acknowledge signing the 2013

16 agreement with Absolute Medical, LLC, correct?

17 A    Yes, sir.

18 Q    And that contains non-compete obligations in it, correct?

19 A    I believe so.

20 Q    And that is the only agreement you have ever signed with

21 Absolute Medical, LLC, correct?

22 A    No.  I have signed agreements through 2016 with Absolute

23 Medical.

24      MR. CARDWELL:  Your Honor, may I approach the bench

25 to get those two exhibits back to show him?

1            THE COURT:  You may.

2            MR. CARDWELL:  Thank you.  If I may approach the

3  witness, Your Honor?

4            THE COURT:  You may.

5  BY MR. CARDWELL:

6  Q   Exhibit 26, Mr. Hawley, is a 2016 agreement, and that's

7  the one you signed, correct?

8  A   This is 2016?

9  Q   Yes.

10  A   Yes, I signed 2016.

11  Q   And you refused to sign 2017, correct?

12  A   Yes, sir.

13  Q   Am I correct that they are the exact same documents?

14  A   I would have to look through them, but they may be.

15  Q   Can you point to any clause in the 2017 agreement that

16  was not present in the 2016 agreement?

17  A   I don't know that for certain.

18  Q   Do you suspect that there is a difference?

19  A   I don't know for sure.

20  Q   And the non-compete provisions in the '16 and '17

21  agreements are both just for one year, correct?

22  A   Could you repeat that again?

23  Q   Sure.  The restrictive covenants, the non-competes,

24  they're only for one year after your employment terminates,

25  correct?

1  A    Generally speaking, yes, I do recall that on the 2017

2  agreement, yes.

3  Q    And your duties, the duties that you perform for Absolute

4  Medical, LLC, did not change from 2016 to 2017, did they?

5  A    I'm not sure I understand the question.

6  Q    What did you do for Absolute Medical in 2016?

7  A    I was a sales representatives.

8  Q    What did you do in 2017?

9  A    Sales representatives.

10  Q    Did your territory stay the same?

11  A    Yes, sir.

12  Q    Commission stay the same?

13  A    Probably not.  I mean, roughly, yes.

14  Q    Quota probably changed?

15  A    Probably.

16  Q    Everything else about your job stayed the same?

17  A    Yes.

18  Q    Other than you signed the '16 agreement and you refused

19  to sign the '17 one, correct?

20  A    That's correct.

21  Q    Do you recall answering interrogatories in this case,

22  sir?

23  A    Answering what?  I'm sorry.

24  Q    Interrogatories.

25  A    Could you explain that?  I'm sorry.  I'm not familiar

1    with the legal term.

2          MR. CARDWELL:  Sure.  Your Honor, if we can refer to

3    Plaintiff's Exhibit 6 and if I could approach the witness?

4          THE COURT:  You may.

5    BY MR. CARDWELL:

6    Q    Sir, do you recall answering the questions that were

7    there on Exhibit 6?

8    A    Where are the questions?  I'm sorry.  I'm not trying to

9    be difficult here.

10   Q    Sir, on the next to the last page of Exhibit 6, is that

11   your signature?

12   A    That is my signature.

13   Q    And what does it say?  Read that verification out loud,

14   please.

15   A    *I, David Hawley, hereby affirm that I have read the*

16   *forgoing answer to interrogatories that they are true and*

17   *correct to the best of my information, knowledge, and belief*,"

18   and then dates it.

19   Q    Do you recall reviewing answers to questions and then

20   verifying them?

21   A    Yes.

22   Q    I'm going to refer you first to interrogatory two.  Does

23   that interrogatory ask you to identify all phone numbers and

24   e-mail addresses you've utilized to conduct business?

25   A    Yes.

1  Q     Did you identify the dhawley e-mail address you just

2  referenced?

3  A     At absolute-med.com, I see it here.

4  Q     I'm talking about the Gmail account.

5  A     No, I did not.

6  Q     You didn't answer that?

7  A     That is not there, no.

8  Q     Why?

9  A     I don't know at that time if I was utilizing that e-mail.

10  Q     On what date did you answer those discovery responses?

11  A     Where might I find that?  May 21st, 2018.

12  Q     So is it fair to say you had not used the Gmail account

13  to conduct business for Alphatec by May 20th of 2018?

14  A     That may have been missed, yeah.

15  Q     Please take a look at number ten.  Does that

16  interrogatory ask you to identify all non-compete agreements

17  that you had signed?

18  A     It does.

19  Q     What was your answer to that interrogatory, sir?

20  A     *Defendant objects to the question.  It is overly broad,*

21  *unduly burdensome, vague, and ambiguous as plaintiff is*

22  *requesting every contract that defendant has signed.*

23  *Defendant further objects to this request and as grounds*

24  *asserts that plaintiff seeks to discover documents that are*

25  *irrelevant and outside the scope of this action and that have*

1    *the needs of this case.  Specifically, plaintiff has not*

2    *limited this discovery request in time or scope nor has*

3    *plaintiff limited this request to information pertaining to*

4    *NuVasive or Absolute Medical, LLC, and thus this request is*

5    *overly broad, unduly burdensome, and irrelevant.*

6    *Notwithstanding said objections, the defendant did not sign a*

7    *non-compete agreement with plaintiff or with Absolute Medical,*

8    *LLC.*

9    Q    That's not true, is it?

10   A    I did not sign an agreement in 2017 for a non-compete.

11   Q    That's not what you said in your answer, though, is it?

12   A    That could have been more specific, yes.

13   Q    Dr. Sawin was your largest customer at Absolute Medical,

14   LLC?

15   A    Yes, sir.

16   Q    You continue to service him?

17   A    Yes, sir.

18   Q    And you began servicing him immediately -- I mean, within

19   days of resigning from Absolute Medical, LLC, correct?

20   A    Yes, sir.

21   Q    Now, with Dr. Sawin, you kept going to the same

22   hospitals.  I mean, he didn't change hospitals, correct?

23   A    No, sir.

24   Q    So you knew NuVasive pricing at those hospitals, didn't

25   you?

1   A    Sure, yeah.

2   Q    And pricing is something that medical companies keep

3   pretty close to the vest, right?

4   A    At this account we have a capitated pricing program that

5   Adventist has -- that Adventist has given to us, and we have

6   to, as all vendors in the hospital, have to meet that

7   agreement.  So everyone has the same price, if that's what

8   you're getting at.

9   Q    But specialized products aren't a part of that capitated

10  pricing, are they?

11  A    I'm not sure what you mean.

12  Q    That there are many products that don't fall within the

13  capitated pricing, correct?

14  A    Like what?

15  Q    Like specialized products, things like LessRay or certain

16  XLIF procedures?

17  A    There was a -- if we're talking specifics, there is

18  lateral pricing, lateral cage pricing, that is across the

19  board.  I never sold LessRay to the hospital.

20  Q    Where else does -- tell me all of the hospitals that

21  Dr. Sawin operates.

22  A    Ninety-nine percent at Florida Hospital and a case here

23  and there at Orlando Regional Medical Center.

24  Q    Do you know the pricing at Orlando Regional Medical

25  Center also?

1    A    Um, we had done cases there.

2    Q    And --

3    A    It was probably similar to Florida Hospital, I would

4    guess.

5    Q    Also, over time you've learned Dr. Sawin's surgical

6    preferences, correct?

7    A    Sure.  Spent a lot of time with him.

8    Q    Can you just share those surgical preferences with your

9    competitors?

10    A    Could you restate the question?

11    Q    Sure.  Do you go around and share the preferences that

12    you've learned from Dr. Sawin's operating room?  Do you share

13    that with your competitors?

14    A    I have not.

15    Q    Why?  To be a good rep, to really provide a benefit to

16    the surgeon, you've got to know what that surgeon's next move

17    is, correct?

18    A    That might be what -- I'm not sure what you're asking.

19    Q    You know how Dr. Sawin performs different operations,

20    correct?

21    A    I have seen several operations that he's been a part of.

22    Q    And you're able to accurately predict what tool he's

23    going to use next, the way that he's going to conduct a

24    surgery, correct?

25    A    I have not been trained medically, and I don't -- I'm not

1    sure what you're asking.

2    Q    Do you agree that NuVasive has carved out products at

3    Adventists that they get more than the capitated pricing?

4    A    They may.

5    Q    You know that, don't you?  You've worked there for years.

6    A    I have worked there for years, yes.

7    Q    And you don't know the answer to that question?

8    A    No.  I'm not certain.

9              MR. CARDWELL:  That's all, Your Honor.

10             THE COURT:  Redirect?

11             MR. BUSCH:  Nothing further, Your Honor.

12             THE COURT:  Thank you, sir.  Feel free to be seated

13   at counsel table.

14             I would invite you to call your final witness.

15             MR. BUSCH:  Yes, Your Honor.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Just leave everything up there.  We'll

18   clean up after you.

19             THE WITNESS:  Thank you, sir.

20             MR. BUSCH:  At this time the defense would like to

21   call Mr. Ryan Miller to the stand.

22             THE COURTROOM DEPUTY:  Please courtroom forward and

23   be sworn.

24

25   ////

**RYAN MILLER,**

1

2  called by Defense, was duly sworn by the courtroom deputy,

3  and in answers to questions propounded, testified as follows:

4        THE COURTROOM DEPUTY:  Have a seat there, please.

5        THE COURT:  All right.  Sir, good afternoon.  Once

6  seated, please state your full name into that microphone, and

7  please spell your last name.

8        THE WITNESS:  Ryan Allen Miller.  Miller is spelled

9  M-i-l-l-e-r.

10        THE COURT:  Your witness.

11                DIRECT EXAMINATION

12  BY MR. BUSCH:

13  Q    Where do you currently reside, Mr. Miller?

14  A    In Orlando, Florida, with my wife.

15  Q    Did you attend university or college?

16  A    Yes, sir, I did.

17  Q    Where did you go?

18  A    University of Central Florida.

19  Q    What was your degree in?

20  A    Hospitality management.

21  Q    What year did you begin working for Absolute Medical?

22  A    2013.

23  Q    What did Absolute Medical do?

24  A    They were distributors of spinal implants from NuVasive.

25  Q    What was your position at Absolute Medical?

1    A    I was a sales representative.

2    Q    Did you have a territory?

3    A    I did.

4    Q    What territory was that?

5    A    Primarily Seminole County.

6    Q    During your work as a sales representative, Mr. Miller,

7    for Absolute Medical, were you able to build your own network

8    of customers?

9    A    Yes, sir, I was.

10   Q    Tell the Court generally about that network?

11   A    Orthopedic, neuro, spine surgeons, doctors, obviously

12   nurses, scrub techs, anybody that I would see or run into in

13   the hospital on a fairly regular basis.

14   Q    Did you maintain your own database of customer

15   information?

16   A    I did.

17   Q    How was that information maintained?

18   A    Primarily all in my cell phone, e-mails, phone contacts,

19   et cetera.

20   Q    During your time at Absolute Medical, did NuVasive ever

21   provide you with any customer leads, physician names, or

22   contacts?

23   A    No, they didn't.

24   Q    Did NuVasive assist you in gaining access to any medical

25   facilities?

1   A     Never.

2   Q     Did NuVasive ever provide you with access to any

3   databases containing information about clients, physicians, or

4   medical facilities?

5   A     They did not.

6   Q     During your time at Absolute Medical, did NuVasive ever

7   provide you with confidential information about its product

8   that was not in the public domain?

9   A     Not to my knowledge.

10  Q     How did you learn of NuVasive's products?

11  A     Through marketing material, any websites that were

12  online, videos on YouTube, things of that nature.

13  Q     When you came to work for Absolute Medical, were you an

14  employee or an independent contractor?

15  A     Independent contractor.

16  Q     Were you paid a salary or paid by commission?

17  A     Paid by commission.

18  Q     Did you pay for our own business expenses?

19  A     Yes, sir, I did.

20  Q     Did you receive a 1099 tax form from Absolute Medical?

21  A     Yes.

22  Q     Did you pay taxes on those commissions?

23  A     I did.

24  Q     Did you maintain our own business credit card?

25  A     Yes.

1    Q    Your own bank account?

2    A    Yes.

3    Q    Did you have your own separate home office?

4    A    I do.

5    Q    When you started with Absolute Medical in 2013, did you

6    have any written agreement?

7    A    I'm sorry.  Repeat the question.

8    Q    In 2013, when you started with Absolute Medical, did you

9    have any written agreement?

10    A    I did.

11    Q    And is that agreement -- the form of that agreement found

12    on what's been marked as Exhibit 8?

13    A    Exhibit 8?

14    Q    Exhibit 8, yes, sir.

15    A    Yes.  This is the 2013 independent contract.

16    Q    And you believe you signed that one, Mr. Miller?

17    A    Yes.

18    Q    How long was the term of that original agreement?

19    A    I believe it was for one year.

20    Q    And did you also sign independent contractor agreements

21    in '14, '15, and '16, to the best of your knowledge?

22    A    Yes, sir, I did.

23    Q    And did Absolute Medical present you with an independent

24    contractor agreement in 2017?

25    A    They did.

1  Q    And if you could look at Exhibit 13 there in front of

2  you.

3  A    Okay.  Yes, here, 2017 independent contract.

4  Q    And was that an agreement that was presented to you by

5  Absolute Medical?

6  A    Yes, it was.

7  Q    And did you sign that agreement, sir?

8  A    I did not.

9  Q    And tell the Court why.

10  A    After being in this industry for almost eight years,

11  speaking with other competitors, recently being married, I

12  realized that it was in my best interest to protect -- you

13  know, protect myself and if I at any point in time needed to

14  make a change in my job for my well-being, that I could do so.

15  Q    Did you work for Absolute Medical 2017 without a written

16  contract?

17  A    Yes, sir, I did.

18  Q    As we sit here today, sir, is there any written agreement

19  in effect between you and Absolute Medical?

20  A    There is not.

21  Q    During the entire time you worked for Absolute Medical

22  selling NuVasive products, were you ever presented with a

23  contract directly between you and NuVasive?

24  A    I was not.

25  Q    Did you ever sign any agreements with NuVasive?

1    A    I didn't.

2    Q    In 2017, sir, did you begin looking for a new job?

3    A    I did.

4    Q    And can you tell the Court why?

5    A    Yeah.  I had been with NuVasive for, like I said, about

6    seven and a half years, and towards the end of that time, the

7    culture completely changed.  A lot of people that I had built

8    relationships with had left.  Innovation had basically tanked.

9    Also conversations with Mr. Hawley about Dr. Sawin leaving.

10   Just things kind of came to a head and weren't sitting very

11   well with me.  So I thought I would seek other opportunities.

12   Q    And did you take a job with a company called Alphatec

13   Spine?

14   A    Yes, sir, I did.

15   Q    When did you inform Mr. Soufleris of your decision?

16   A    I believe it was about midway through November, I

17   informed him I would be leaving at the end of the month.

18   Q    Did you send him a resignation e-mail?

19   A    I did.

20   Q    When did you start working with Alphatec?

21   A    I believe it was the beginning of December.

22   Q    Are you a independent contractor or direct employee of

23   Alphatec?

24   A    Independent contractor.

25   Q    And if you can turn to Exhibit No. 25, is that a copy of

1    your agreement with Alphatec?

2    A    Yes, it is.

3    Q    And it's with a company called Miller Time, I believe.

4    Is that your company?

5    A    It is.

6    Q    What do you do for Alphatec?

7    A    I'm a sales representatives.

8    Q    Do you have a territory?

9    A    I do.

10   Q    What is that territory?

11   A    Primarily Seminole, Seminole County.  Volusia I believe

12   is included, but primarily Seminole.

13   Q    Are you able to sell to some of the same doctors you

14   worked with when you were previously employed by Absolute

15   Medical?

16   A    Yes, I am.

17   Q    And how are you paid?

18   A    A salary.

19   Q    Are you familiar with a company called Absolute Medical

20   Systems?

21   A    Yes, I am.

22   Q    Do you have any involvement with Absolute Medical

23   Systems?

24   A    No, I do not.

25   Q    Have you ever worked for AMS as a sales rep, independent

1   contractor, or employee?

2   A    I haven't.

3   Q    Have you ever sold any products or been compensated in

4   any way by AMS?

5   A    No, I have not.

6   Q    Does Absolute Medical still owe you a commission?

7   A    They do.

8   Q    How much?

9   A    Approximately $12,000.

10  Q    Since you left Absolute Medical in November of 2017, have

11  you been involved in selling any NuVasive products?

12  A    No.

13  Q    Have you been involved in using any NuVasive tools or

14  instruments?

15  A    No.

16  Q    Opposing counsel has introduced, I think it's called, a

17  charge sheet --

18  A    Yes.

19  Q    -- that's got your name on it.  I want to take an

20  opportunity --

21          MR. BUSCH:  If I could approach the witness, Your

22  Honor?

23          THE COURT:  You may approach.

24  BY MR. BUSCH:

25  Q    Take a minute to look at that, Mr. Miller, and tell the

1    Court what that document is.

2    A    Sure.  This would be a charge sheet that is filled out

3    after surgery which enables the company to bill the hospital.

4    Q    And is that your handwriting on that charge sheet?

5    A    It is my handwriting.

6    Q    And you'll see there's a reference to -- there's a

7    reference to your name is on there.  Is that your name?

8    A    That is my name.

9    Q    And then there's a reference to Absolute Medical Systems.

10   Do you see that?

11   A    Yes, I do.

12   Q    Do you work for Absolute Medical Systems?

13   A    I do not.

14   Q    Why is that name included on that sheet?

15   A    Just a typo, similar to typos I've made in the past and

16   had to correct.  Example, originally worked for Integrity

17   Medical for three years and then switched, you know, to

18   Absolute.  There were probably a handful of charge sheets I

19   continued to write Integrity Medical on, just out of habit,

20   just a typo.

21           MR. BUSCH:  Thank you, sir.

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Cross-examination.

24           MR. CARDWELL:  Thank you, Your Honor.

25   ////

<u>CROSS-EXAMINATION</u>

<u>BY MR. CARDWELL</u>:

1

2

3    Q    So you worked for Integrity Medical for how long?

4    A    It was 2010 until about 2013-ish.

5    Q    So from time to time you would write Integrity, just out

6    of habit?

7    A    Yes, correct.

8    Q    How long did you work for Absolute Medical Systems?

9    A    Never.

10   Q    So why would you write Absolute Medical Systems out of

11   habit?

12   A    Because I was using an e-mail, a different e-mail.

13   Q    What's the different e-mail you were using?

14   A    The absolute-medical.org.

15   Q    Absolute-medical.org, is that Absolute Medical, LLC, or

16   Absolute Medical Systems' e-mail address?

17   A    I'm kind of confused.  Can you rephrase the question?

18   Q    What e-mail address did you use for Absolute Medical,

19   LLC?

20   A    That was the absolutemed- -- yeah, absolutemed-.com.

21   Q    Absolute-med.com?

22   A    Yes, correct.

23   Q    What do you use now?

24   A    I use two different e-mails.  I use

25   RyanAMiller23@gmail.com.  I also use the

1    rmiller@absolute-medical.org.

2    Q    So I'm confused why you would accidently write systems

3    down on the sheet.

4    A    Because I had heard the name before.

5    Q    How many times -- let me back up.

6               Absolute Medical Systems has refused to produce

7    charge sheets.  How many times do you think you wrote Absolute

8    Medical Systems on a charge sheet?

9    A    I would imagine this was maybe the only one, after I

10   realized it was a typo.

11   Q    When did you realize it was a typo?

12   A    Probably shortly after the hospital contacted me and

13   said, Hey, we're not really sure what this is, and I said, Oh,

14   okay.

15   Q    So who contacted you from the hospital?

16   A    I'm not sure.  Probably would have been some

17   administration.

18   Q    What was it that confused them?

19   A    The name.

20   Q    So it's your testimony under oath that someone from the

21   hospital contacted you because they were confused about

22   Absolute Medical Systems being on here?

23   A    No.  I would say that they were just confused because I

24   typically wrote something different.

25   Q    What would you typically write?

1    A    I would typically write Absolute Medical.

2    Q    And that's something that they would contact you about?

3    A    They would contact me with anything.  If there was a new

4    product on the charge sheet or they had concerns about a date

5    being incorrect, anything that just they weren't sure about,

6    they would contact me and ask.

7    Q    National sales meeting, how many times did you attend it?

8    A    Four or five, I believe.

9    Q    With Mr. Hawley and Mr. Soufleris?

10   A    I'm not sure if they were there every single time but

11   sometimes.

12   Q    But sometimes they were there?

13   A    Sometimes.

14   Q    And they were also there at mid year meetings?

15   A    I believe we attended a couple of mid year meetings.

16   Q    And some regional meetings?

17   A    I believe they discontinued those, but I might have been

18   to one or two, sure.

19   Q    And at the national sales meeting, at mid year meeting,

20   and at the regional meetings, there's training that goes on,

21   correct?

22   A    They hold trainings that, yeah, we are flown to behalf

23   of.

24   Q    And you heard Mr. Soufleris say that the sales rep are

25   the face of NuVasive to NuVasive's customers, didn't you?

1    A    I believe so.

2    Q    You agree with that?

3    A    Sure.  I guess that's his opinion.

4    Q    It's your opinion, too, isn't it?

5    A    Not necessarily.

6    Q    When you were with Absolute Medical, who else was in your

7    territory selling to your surgeons?

8    A    As far as competition -- or I don't know what you mean.

9    Could you rephrase the question?

10   Q    On behalf of NuVasive, when you were with NuVasive, who

11   else was selling to your surgeons?

12   A    As NuVasive representatives?

13   Q    Yeah.

14   A    The co-workers, the 1099s of Absolute Medical.

15   Q    Sure, just those guys --

16   A    Yeah.

17   Q    -- they're the face of the company to the surgeons?

18   A    Sure.

19   Q    And the contract you signed with Alphatec, that's got a

20   non-compete agreement in it, does it not?

21   A    The contract that I signed with Alphatec, does it have a

22   non-compete?

23   Q    Yes.

24   A    Yes, sir, it does.

25              MR. CARDWELL:  That's all, Your Honor.

1          THE COURT:  Redirect?

2          MR. BUSCH:  Nothing further, Your Honor.

3          THE COURT:  Thank you, sir.  Feel free to be seated

4 at counsel table.  Will the plaintiff be presenting any

5 rebuttal evidence?

6          MR. CARDWELL:  Just two questions with one document,

7 Your Honor.

8          THE COURT:  Are you calling a witness?

9          MR. CARDWELL:  Yes.  If I could recall

10 Mr. Soufleris, I have two questions about one document they

11 provided today.

12          THE COURT:  Mr. Soufleris, if you would be kind

13 enough to be seated in the witness chair, you remain under

14 oath.  Feel free to conduct your examination.

15          MR. CARDWELL:  Thank you, Your Honor.  I'm going to

16 be referring to Exhibit 21 in defendant's binder.

17                    **GREG SOUFLERIS,**

18       called as a witness, having been previously duly

19       sworn, was examined and testified as follows:

20                DIRECT EXAMINATION

21  BY MR. CARDWELL:

22 Q   Mr. Soufleris, if you would flip to that page.

23 A   Yes, sir.

24 Q   What is Exhibit 21?

25 A   It's Absolute Medical Systems LLC checking account

1    information.

2    Q    And that's tied to an Absolute Medical LLC's business

3    debit card, is it not?

4    A    They are listed as both being owned.  They're not tied to

5    one another.

6    Q    Same address?

7    A    Yes.

8    Q    Same name on card?

9    A    Yes.

10   Q    And it says, if I look at business debit card, accounts

11   linked for access 7087, and that's the same as the account

12   number for Absolute Medical Systems LLC, correct?

13   A    I'm not sure.

14   Q    Do you see --

15   A    I see what you're saying.  The same day Absolute Medical

16   Systems is shutdown -- I apologize -- Absolute Medical is

17   shutdown.

18           MR. CARDWELL:  That's all, Your Honor.

19           THE COURT:  Cross.

20                        CROSS-EXAMINATION

21    BY MR. BUSCH:

22   Q    Mr. Soufleris, did you have separate bank accounts for

23   Absolute Medical Systems and Absolute Medical?

24   A    Absolutely.

25   Q    Separate bank number accounts?

1   A     Absolutely.

2         MR. BUSCH:  Thank you.

3         THE COURT:  All right.  Any redirect examination?

4         MR. CARDWELL:  No, Your Honor.

5         THE COURT:  Mr. Soufleris, thank you.  Feel free to

6   be seated at counsel table.

7         Will the plaintiff be calling any additional

8   witnesses on rebuttal?

9         MR. CARDWELL:  No, Your Honor.

10        THE COURT:  All right.  I'll hear argument from

11  plaintiff.  How much time do you need for your argument?

12        MR. CARDWELL:  Your Honor, I can condense it.  I

13  anticipated -- we did not know there was going to be live

14  testimony.  I know Your Honor has read our briefs.

15        THE COURT:  Right.  How much time do you need?

16        MR. CARDWELL:  Ten minutes.

17        THE COURT:  How about from the defense standpoint?

18        MR. BUSCH:  15 minutes.

19        THE COURT:  All right.  You have 15 each.  I'll give

20  you a two-minute warning.  Go on ahead.

21        MR. CARDWELL:  Your Honor, this is really, when you

22  break it down, a pretty --

23        THE COURT:  Let's talk in plain words.  What do you

24  think happened here?

25        MR. CARDWELL:  I think a doctor left, and I think

1    these guys didn't want to go get new business.  That's what I

2    think happened.  They took the easy way out, and they followed

3    Dr. Sawin, rather than live up to their contractual

4    obligations.  You know, these guys are supposed to be sales

5    people, Your Honor.  They're not farmers.  They're hunters.

6    And maybe Dr. Sawin left independent of them.  Maybe he left

7    because of that them.  But I'll take them at their word for

8    what they testified today, that he left, they were scared they

9    were going to lose their golden goose.

10          Well, that's not what it means to be a salesperson,

11   Your Honor.  You don't -- you don't leave when times get tough

12   and violate non-competes and do what they did.  I think that

13   happened.

14          THE COURT:  How would you respond to the assertion

15   that they didn't, because they didn't sign the 2017, they

16   didn't violate a non-compete?

17          MR. CARDWELL:  I think a couple of things about

18   that.  Number one, throughout -- until yesterday evening at

19   6:00, their consistent sworn position was that they did not

20   have any non-competes.  They had never signed them.  We found

21   the 2013, and then all of a sudden the other ones have

22   appeared.  They signed the '16 one, no question about that.

23   How do we know they didn't sign '17?

24          But I can get past that, Your Honor.  I believe that

25   the '16 is still in effect.  They continued -- I understand

1   Florida law, which is what governs these and not Delaware law.

2   I understand it requires a signature, Your Honor, but that

3   signature was on the 2016 document.  We heard testimony today

4   that they continued to do business in accord with the 2016

5   document.  And we don't have a statute of frauds problem here

6   because we're within a year.  So respectfully I'm going to --

7   I believe, Your Honor, that the 2016, by continuing to work --

8   and I believe that what they did was they ratified the terms

9   of the 2016 non-compete agreement, and, Your Honor, there is a

10  case we found last night --

11          THE COURT:  Is it your position -- and I know the

12  witnesses were unable to answer this.  I'll review the

13  documents for myself -- that 2016 and 2017 non-competes are

14  exactly the same?

15          MR. CARDWELL:  We have not found a word different.

16          THE COURT:  How would you respond to the assertion

17  from opposing counsel, which I'm sure he's going to make, that

18  there was a clause in there indicating that there was an

19  option to -- I haven't seen the contract yet, but from what I

20  gathered from it, that it could renew and that it simply

21  didn't, and if it didn't, then it expired?

22          MR. CARDWELL:  The clause in the non-compete said it

23  could renew at Mr. Soufleris' option.  All he had to do was

24  say renewed.

25          THE COURT:  How do you respond to the fact that he

1    didn't?  He didn't do that.

2          MR. CARDWELL:  Well, I think you have to look at

3    what they've done, Your Honor.  A, we don't know he didn't do

4    that, and, B, it's convenient that they've all wound up with

5    the same new employer.

6          THE COURT:  But you said we don't know that he did

7    that.  That's not the way I'm looking at it.  We don't know

8    that he did.

9          MR. CARDWELL:  Right.

10          THE COURT:  I mean, you have to have some sort of

11    evidence.  I mean, I know that you're suspicious that he did.

12    Your suspicions are not evidence.  He either did or didn't.

13    Right now, I can't just presume that he did absent evidence to

14    the contrary.  So the evidence has to be that he did or

15    didn't.  There is no evidence, so I can't conclude that he

16    didn't.

17          MR. CARDWELL:  I believe, Your Honor, the evidence

18    is that they continued doing business in the exact same vein,

19    the exact same way, with the exact same contract.  And all he

20    had to do to comply with his obligation -- because, remember,

21    he had an obligation to NuVasive to ensure that these

22    compliance agreements were in place.  So to comply with his

23    contractual obligation, all he had to do was say renew.  We

24    took him at his word, and he testified, yes, I intend to

25    comply with my contractual obligations.  So I think we can

1   assume he did do that because he was contractually obligated

2   to.

3         Beyond that, sir, the *Gay v. Prime Management Group*

4   case, which is 912 So .2D 711, is a case we believe stands for

5   the proposition that the 2016 agreements were renewed when

6   those gentlemen continued working for Absolute Medical under

7   the same terms and conditions.  And I have a copy for Your

8   Honor, if you would like one.

9         THE COURT:  If you would be so kind.  Please bring

10  it to Ms. Darleen.

11        MR. CARDWELL:  Your Honor, let's get back to the

12  nuts and bolts of what this is.  Three sales people from a

13  long time distributor all of a sudden go to work for that

14  distributor's competitor.  They say that they're not working

15  together, but they use the same -- they use the same phone

16  numbers.  They use the same e-mail addresses.  They write down

17  at least one time the name of the new company on a charge

18  sheet.  And this occurred, Your Honor, at least two months

19  after the transition.

20        The three documents, which we saw for the first time

21  today, from Alphatec conveniently say that Mr. Soufleris'

22  sales territory is everything other than what it was for

23  NuVasive, but that he's being paid cash, you know, he's being

24  paid -- he's not relying on commissions, while the other two

25  continue to operate in the former Absolute Medical sales

1    territory and are paid commissions.  At least the gentleman

2    who is servicing Dr. Sawin is continued to be paid

3    commissions.

4           They simply picked up shop and moved to a different

5    competitor.  There's no difference here.  Even the bank

6    account records that they produced today for the first time

7    show a connection between Absolute Medical Systems and

8    Absolute Medical.

9           I know Your Honor has been through all of the

10   documents that we submitted, and there's several.  I'm not

11   going to try to go through them all in my 15 minutes.

12          But you asked me what I thought happened.  And

13   that's it.  I think these guys, just -- I think they got

14   paid -- they got offered a deal from Alphatec to try to move

15   the business.  And one thing that's been missing from this,

16   Your Honor -- and perhaps this will help.  I can give you some

17   color.

18          Alphatec Spine recently hired NuVasive's former

19   president and chief operating officer.  Following that hire

20   there was a mass raid on NuVasive's sales force and customers.

21   We don't just have this case going.  There's a case in North

22   Carolina where the same thing has happened.  Distributors have

23   just quit.  They've ignored their non-compete obligations, and

24   they're going after the exact same customers.

25          THE COURT:  What happened first, this case or North

1   Carolina?

2           MR. CARDWELL:  This one happened before North

3   Carolina, Your Honor.  Our PI hearing in that one is July 5th.

4   Is that right, July 5th?  Yeah.  So we have a PI there.

5           THE COURT:  Are you attempting for a TRO in that

6   case or just go for the --

7           MR. CARDWELL:  In that case we filed -- we did not

8   try to get a TRO.  I've never had a court grant a TRO in a

9   non-compete, Your Honor.  We filed the preliminary injunction

10  motion contemporaneously with the Complaint.  We did not do

11  that in this case because we were still trying to figure out

12  what was going on and gather our evidence.

13          But as we've done it, everything we see -- and

14  you'll see it in the declarations.  Mr. Soufleris is still

15  playing golf and having dinner with Dr. Sawin.  These guys are

16  calling on the exact same doctors.  I mean, you're right.  If

17  there are no non-competes.  If you rule that there are

18  absolutely no non-competes, then, you know, we've got some

19  problems.  But absolute -- at a minimum, Absolute Medical has

20  a non-compete, and it has a contractual obligation to enforce

21  its non-competes.

22          And these guys, they might -- they might be working

23  on their own now or have it set up like this, but in reality

24  this is the same ball of wax, Your Honor.

25          Does Your Honor have any other questions?

1    THE COURT:  I don't.

2    MR. CARDWELL:  Your Honor, I appreciate the time.  I

3    know you've taken a look at all of our documents.  I do

4    appreciate the time.  Thank you.

5    THE COURT:  All right.  Question, come on up, for

6    you before we get started.  Tell me why this theory is wrong

7    because I don't -- not to be critical of your opposing

8    counsel, but I'm not sure he's hit the nail on the head or

9    maybe he's trying to be civil and not describe what he really

10   thinks happened.

11         One could reasonably surmise that the three

12   defendants in this case decided that the doctor was the

13   biggest client, essentially the only client that mattered in

14   their particular world.  So Mr. Soufleris has them sign the

15   non-compete in 2016.  For 2017 he allows it to expire.  I'm

16   sure that's what your argument is.  There's no non-compete in

17   2017.  There could have been, had Mr. Soufleris complied, but

18   he didn't.  So why wouldn't he comply and force them to submit

19   to the 2017 or just automatically renew the 2016?  One might

20   argue it was because he was letting them go.  He was letting

21   them go because before they left they knew what they were

22   going to do.  They were going to lure the doctor away, and he

23   was going to stay there with an empty bag to clean the mess up

24   and then shrug his shoulders when asked, What are those two

25   doing taking all of the business?

1          They know all of the pricing.  They know all of the

2     doctors.  You don't have to sell me on the fact that a

3     personal face-to-face relationship between a sales rep and a

4     doctor matters.  It matters more than anything.  They know all

5     of the prices of the company they're leaving.  They know all

6     of the prices of the company they're entering into business

7     with.  They know all of the doctors.

8          They don't have a non-compete.  So if the break

9     between Mr. Soufleris and the two departing salesmen can be

10    complete, if you can't connect them, then you have nothing.

11         But then you have all of those variables that are

12    troublesome for the Court.  You know, the interrogatories, I

13    understand how that works, but they weren't answered

14    truthfully.  He under oath testifies that he has some sort of

15    Gmail account, implying that, oh, no, no, I've had that Gmail

16    account.  He's had that Gmail account a little over a month.

17         So all signs point to some shenanigans being afoot

18    here.  So convince me that that's not the case.  Your calling

19    them as witnesses, they had memories like I haven't seen

20    before on direct examination, and on cross they can't remember

21    what they swore to in the interrogatories.  So tell me why I'm

22    wrong on that.

23         MR. BUSCH:  You're wrong for two reasons, Your

24    Honor.  The first one is that we certainly presented evidence

25    in this case of why Mr. Soufleris was unable to enforce that

non-compete.  He was unable to enforce it because he lost his
territory.  He was losing sales agents.  And if he had gone to
those two, Mr. Hawley and Mr. Miller, and said, you sign this
or else they leave, they'll leave.

THE COURT:  He didn't have to make them sign it.  He
could have caused the contract to renew, and the fact that
they continued working for that company would have been a
pretty good legal basis to stand on, right?

MR. BUSCH:  Your Honor, he could have, but he
didn't.  For legitimate business reasons he chose not to do
it.

THE COURT:  Occam's razor, right, Occam's razor, you
know what this is, right?

MR. BUSCH:  Yes.

THE COURT:  The simplest explanation for the
circumstances is oftentimes the right one.  So there are the
two theories.  The one that I just posited -- it's not my
theory.  I'm just saying someone can argue that.

MR. BUSCH:  Right.

THE COURT:  He didn't want them subject to a
non-compete because he knew they were leaving, and they were
going to take the doctor, who they're all friends and would
leave with them.

What's your theory of what happened?

MR. BUSCH:  The theory, Your Honor, and this is the

1    most important thing for the Court to hear, a theory which is

2    being profited by opposing counsel here is not evidence.  They

3    have the burden to meet every single element of evidence in

4    this case, and, Judge, this is not a simple one-issue case.

5    There are four legal issues that the Court has to decide

6    before ruling on this, four.  And his burden is to come up

7    here and present evidence that meets every single one of them.

8          Instead, he stood up here and proposed some nice

9    conspiracy theories, which may or may not sound good to the

10   Court.  It doesn't matter.  A theory is not evidence,

11   especially in this case when the burden rests solely upon them

12   by clear and convincing evidence, when you have independent

13   contractors, to meet every single element.

14         And I think what we need to focus on -- instead of

15   showing, you know, what may have happened, what might have

16   happened, let's focus on what evidence is before the Court

17   today because that's all that matters.  That's all that

18   matters to the Court is what was presented today, what has

19   been presented in the pleadings to meet the burden that

20   plaintiff has to show here.

21         And, again, Judge you've got four issues, and

22   they're not easy.  The first one is the original non-compete

23   with NuVasive and Absolute Medical.  You have to decide under

24   Delaware law whether or not that original non-compete is

25   validly enforceable under the law, and I will submit to you,

1    Your Honor, it is not.  And that ends this case right there.

2         It is not because the term ends of the non-compete

3    in January of 2023.  That is what the plain language of the

4    non-compete says.  It applies for the entire term of the

5    agreement plus one year.  That's January 2023.  Under Delaware

6    law, that length of time is not reasonable.

7         Number two, there's no territory restriction in the

8    non-compete.  Now, there's a territory restriction in the

9    non-solicitation clause later on down.  If Your Honor looks at

10   the non-compete, there's no territorial restriction -- done.

11   Case over.  They can't win without a territorial restriction.

12        Your Honor, third, the scope of this non-compete is

13   unlimited.  Why is it unlimited?  Because it doesn't apply,

14   doesn't specify any products at all, and it's in NuVasive's

15   sole judgment whether or not something competes or doesn't

16   compete, applies to all future products, past products,

17   present products, all of them.  Also fails that prong, Judge.

18        And the most important prong, Your Honor, is the

19   business interest.  They have to show that they have a

20   legitimate business interest that outweighs my clients'

21   interest, their freedom to work, outweighs the doctor's

22   freedom to choose products and the patient's freedom to have

23   products installed in their body.  They did not present any

24   evidence to the Court that shows that they have a protectable

25   interest here.

1          All of the testimony was that this information about

2     their product is in the public domain.  The training that was

3     testified to is just generic training.  It is not anything

4     that is specialized for NuVasive that would allow them to pass

5     their burden on the business interest piece.

6          And so for the first prong that the Court has to

7     decide, whether the non-compete is enforceable, they failed

8     against Absolute Medical.  It absolutely fails.  There's no

9     evidence before the Court for them to meet their burden in

10    this case.

11         The second issue that the Court has to decide is

12    whether or not, if the non-compete applies against Absolute

13    Medical, are you going to extend the non-compete to Absolute

14    Medical Systems, which is a new company that had been formed.

15         Here, Your Honor has to apply Florida law.  And the

16    Court has to look specifically at whether or not the

17    continuation theory or successor liability theory is

18    applicable in this case.  Traditional corporate law in Florida

19    does not impose liability on a predecessor corporation.  It is

20    an extraordinary remedy.

21         The Court must conduct an extensive factual analysis

22    to determine that.  In our brief, Your Honor, we cite to all

23    of the factors that the Court can consider.  Are you in the

24    same location?  Do you have the same bank account?  Same

25    credit cards?  Same employees?  Are you commingling funds?

1  Are you taking assets from one place and putting them in

2  another?  None of the factors that the Court considers here

3  under Florida law are here in this case.  And, therefore,

4  Judge, you cannot extend the non-compete.  Even if you find it

5  reasonable and apply it to Absolute Medical, you can't apply

6  it to Absolute Medical Systems under the theory that plaintiff

7  is traveling under.

8        Third, Your Honor, defendants are asking this Court

9  to enforce the non-compete against Absolute Medical and then

10  enforce it individually against Mr. Soufleris.  Now, Your

11  Honor, NuVasive set up this structure.  NuVasive, publicly

12  traded billion dollar company, decided we don't want to have

13  employees here in Orlando.  We don't want to have direct

14  contracts with individuals.  We don't even want to have direct

15  contracts with the people that they claim are the face of

16  NuVasive.  You heard opposing counsel get up here and say

17  that.  You guys are the face of NuVasive, yet NuVasive chose

18  itself not to have a single written contract with the people

19  that are its face.  That was their decision, Judge.  They set

20  up this structure.  They put the structure in place to have an

21  independent contractor as an LLC, not contract with him

22  individually, and then have that independent contractor have

23  another set of independent contractors.

24        Why in the world would NuVasive, if it's so

25  important to them, set up a structure like this?  I'll tell

124

1   you why, Your Honor, there's two reasons they do that.  Number

2   one, tax liability.  They don't want to pay payroll.  It saves

3   them a ton of money to treat my clients as independent

4   contractors.  Number two, normal liability, you don't have the

5   same liability for a contractor as you do an employee.  They

6   can disclaim everything they want.  They can disclaim the

7   product if there's any sort of product defects.  They get all

8   of those benefits for having an independent contractor

9   scenario set up.  And yet they want to come into this court,

10  Judge, despite this was their setup and try to apply some sort

11  of an employee standard to my clients.  And they failed,

12  Judge.

13          They cannot pierce the veil to Mr. Soufleris

14  individually.  Florida law is clear.  And we cite to the *Sykes*

15  case in your brief, a 1984 case.  The fact that one individual

16  is the owner or principal of a corporate entity does not lead

17  inevitably to the conclusion that the corporate entity is a

18  fraud or that it is necessarily the alter ego.  If this were

19  the rule, it would completely destroy the corporate entity as

20  a method of doing business, and it would ignore the historical

21  justification for the corporate enterprise system.

22          That is exactly what's going on here, Your Honor.

23  They're trying to pierce the veil to Mr. Soufleris

24  individually.  They have not contracted with him.  He has

25  followed all of the corporate formalities, as he testified to

1    in his direct examination.  There has been no showing that

2    Absolute Medical was formed for an improper purpose, which is

3    also required under the statute.  There's no evidence before

4    the Court to support a piercing of the veil theory to

5    Mr. Soufleris individually.

6            Finally, Your Honor, the fourth issue you have to

7    decide is whether or not to extend the non-compete agreement

8    to Mr. Miller and Mr. Hawley.  The Absolute Medical

9    non-compete agreement, am I going to extend that to Mr. Miller

10   and Mr. Hawley?  You cannot, Judge.  You cannot for the very

11   simple reason that Florida has codified for us what happens in

12   this scenario.  Florida statute 524.335.  You can --

13           THE COURT:  Two minutes.

14           MR. BUSCH:  You cannot enforce a non-compete without

15   a written agreement.  It is absolutely impossible in the state

16   of Florida.  You can't do it.  There is no non-compete

17   agreement that Mr. Hawley and Mr. Miller have that NuVasive

18   has presented, zero.

19           And the second thing you can't do is you can't be a

20   third-party beneficiary to a client -- to an agreement and try

21   to enforce it, unless it is specifically set forth in the

22   agreement.  Now, NuVasive was never identified in the 2013

23   agreement that was signed as a third-party beneficiary.  It

24   can't enforce that one.  It's expired.  And they're not

25   listed.  They were listed as a third-party beneficiary in the

1  2017 agreement that Mr. Soufleris gave them, but they never

2  signed it, and that is a fundamental flaw in this case.

3          Your Honor, it is an extraordinary remedy that

4  plaintiff is seeking to have a non-compete imposed on people

5  that it chose intentionally not to contract with.  NuVasive

6  made the decision not to contract with Mr. Soufleris

7  individually, not to contract with Mr. Hawley, not to contract

8  with Mr. Miller.  That was their choice.  They are stuck with

9  the consequences of that choice, and they cannot enforce any

10 non-compete against those individuals.

11         Thank you, Judge.

12         THE COURT:  All right.  Thank you.  You have four

13 minutes left.  And it's a tight four.  So I'm going to hold

14 you to it.

15         MR. CARDWELL:  I will do it in three, Your Honor.

16         THE COURT:  All right.

17         MR. CARDWELL:  The term of the non-compete, Your

18 Honor, is one year.  This whole thing about making it six

19 years, that's because they unlawfully terminated the contract.

20 There was a five-year contract that they just quit.  And they

21 didn't quit that contract pursuant to any contractual term.

22 They just quit to go work for a competitor.  So that's their

23 own doing.  And, Your Honor, certainly you have the right to

24 make it whatever term you want.  But written into the contract

25 it is one year.

127

1           The territory, we've never sought to enforce this

2    territory anything past what their sales territory is.  Under

3    Delaware law, Delaware law follows what's called the modern

4    rule, and it actually imposes an obligation on Delaware courts

5    to modify non-competes to make them reasonable.  We cite the

6    case in our prehearing brief, Your Honor, and there's also --

7    in the exclusive sales agreement between NuVasive and Absolute

8    Medical, LLC, there is a provision which specifically states

9    that if the Court strikes an invalid provision, the rest

10   remains, which would be the non-solicit or the Court can

11   modify to make it legal, and that's just to comply with

12   Delaware law.

13           Mr. Soufleris formed Absolute Medical Systems either

14   the day or within a few days of terminating his relationship

15   with NuVasive.  Your Honor, forming a new LLC to circumvent

16   your contractual rights is wrong.  And that's one of the

17   badges of fraud the courts look to when piercing the corporate

18   veil.  It's one of the chief ones.  He forms the company.  He

19   adopts the same name, the same e-mail address, the same phone

20   numbers.  He continues to run it out of the homes he wants.

21   All of the things that were in the declarations and the

22   Secretary of State documents that we provided to the Court.

23   That's what happened.  He formed it, and they started doing

24   this business solely to avoid their contractual obligations.

25           Your Honor, on behalf of NuVasive, I respectfully

128

1    request that you enter the requested preliminary injunction

2    and enjoin these three gentlemen from competing with NuVasive.

3    Thank you.

4              THE COURT:  All right.  Thank you for your

5    arguments.  Court's in recess.

6         (WHEREUPON, this matter was concluded at 4:03 p.m.)

7

8                         *   *   *

9

10                   <u>CERTIFICATE OF REPORTER</u>

11

12   I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-entitled matter.

13

14   _/s/ Suzanne L. Trimble_____ ___        7/1/18
     Suzanne L. Trimble, CCR, CRR, RPR          Date
15   Official Court Reporter.

16

17   I certify that the foregoing is a true and correct copy of
     the transcript originally filed with the clerk of court on
     7/1/18, and incorporating redactions of personal identifiers
18   as ordered by Judge Mendoza 7/30/18 (Docket 94).

19   Redacted characters appear as a black box in the transcript.

20

21   _/s/ Suzanne L. Trimble_____ ___        7/30/18
     Suzanne L. Trimble, CCR, CRR, RPR          Date
22   Official Court Reporter.

23

24

25