1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - - - - - - - - - - - - - - - - - -X
NUVASIVE, INC.,                          :
                                         :
        Plaintiff,                       :  Case No.:
                                         :  6:17-cv-2206-Orl-41GJK
vs.                                      :
                                         :
ABSOLUTE MEDICAL, LLC,                   :  Orlando, Florida
GREG SOUFLERIS,                          :  November 19, 2019
DAVE HAWLEY,                             :  2:00 p.m.
ABSOLUTE MEDICAL SYSTEMS, LLC,           :
and RYAN MILLER,                         :
                                         :
        Defendants.                      :
                                         :
- - - - - - - - - - - - - - - - - - -X

TRANSCRIPT OF
MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE
BEFORE THE HONORABLE CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE


APPEARANCES:

 Counsel for Plaintiff:        Diana N. Evans
                               Marshall Thomas McFarland
                               Christopher W. Cardwell

 Counsel for Defendants:       Bryan E. Busch
                               Chris Mills


Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.


Court Reporter:   Suzanne L. Trimble, CCR, CRR, RPR
                  Federal Official Court Reporter
                  401 West Central Boulevard, Suite 4600
                  Orlando, Florida 32801
                  e-mail: trimblecourtreporter@gmail.com

2

# T A B L E   O F   C O N T E N T S

PROCEEDINGS                                                    PAGE

November 19, 2019

TESTIMONY

**THOMAS McFARLAND**, called by Plaintiff
   Direct Examination By Mr. Cardwell............... 5
   Cross-Examination By Mr. Busch.................. 9
   Redirect Examination By Mr. Cardwell............ 11
**RYAN MILLER**, called by Plaintiff
   Direct Examination By Mr. Cardwell............... 14
   Cross-Examination By Mr. Busch.................. 28
   Redirect Examination By Mr. Cardwell............ 34
   Recross-Examination By Mr. Busch................ 37
**DAVID HAWLEY**, called by Plaintiff
   Direct Examination By Mr. Cardwell............... 38
   Cross-Examination By Mr. Busch.................. 45
   Redirect Examination By Mr. Cardwell............ 50
**GREGORY SOUFLERIS**, called by Plaintiff
   Direct Examination By Mr. Cardwell............... 54
   Cross-Examination By Mr. Busch.................. 67
   Redirect Examination By Mr. Cardwell............ 74


OTHER

 Plaintiff's Closing Argument By Mr. Cardwell........ 76
 Defense Closing Argument By Mr. Busch............... 84

# E X H I B I T S

| NO. | MARKED/ADMITTED | PAGE |
|---|---|---|
| Plaintiff's Exhibits | | |
| Nos. 1, 3, 5 through 13 and 15 | admitted........ | 80 |
| No. 2 and 4 | admitted........ | 67 |
| Nos. 14 and 29 | admitted........ | 45 |
| No. 30 | admitted........ | 27 |

3

P R O C E E D I N G S

1

2      THE COURTROOM DEPUTY:  This is the case of

3  NuVasive Inc. v. Absolute Medical LLC, Greg Soufleris,

4  Dave Hawley, Absolute Medical Systems LLC, and Ryan Miller,

5  Case No. 6:17-cv-2206.

6      Will counsel please state their appearances for the

7  record?

8      MR. CARDWELL:  Chris Cardwell, Thomas McFarland, and

9  Diana Evans for the plaintiff.

10      THE COURT:  Good afternoon.

11      MR. CARDWELL:  Good afternoon, Your Honor.

12      MR. BUSCH:  Your Honor, Bryan Busch and Chris Mills

13  for the defendants, who are here with me, Mr. Greg Soufleris,

14  Mr. Ryan Miller, and Mr. Dave Hawley.

15      THE COURT:  All right.  Good afternoon.

16      There have been some serious allegations made by the

17  plaintiff in this case.  I wanted to offer you an opportunity

18  to elaborate on those allegations.  And certainly the defense

19  will have an opportunity to respond in kind.

20      So what is your intention today?  Are you just going

21  to argue, or are you planning on presenting any evidence?

22      MR. CARDWELL:  If it please the Court, we were going

23  to present evidence.

24      THE COURT:  Evidence in terms of what?

25      MR. CARDWELL:  I intend to have Mr. McFarland talk

4

1   about searches he did on Relativity so we can talk about the

2   nature of the documents that the defendants produced.  And

3   then I intend to call them individually to talk about their

4   individual productions.

5           THE COURT:  All right.  Assuming you call all three

6   of the defendants, their counsel is going to be able to

7   question them.

8           I don't want to break this up where they're going to

9   call someone and rest.  I'm going to give you some latitude to

10  question whoever the plaintiff calls here.

11          Would you like to be heard before we get started?  I

12  don't need to hear an opening statement.  I know where we're

13  at.  I just want you to present whatever you're going to

14  present, and then I'll hear summation from each of you.

15          Would the defense like to be heard in terms of the

16  logistics of this hearing before we get started?

17          MR. BUSCH:  No, Your Honor.  That seems fair.

18          THE COURT:  All right.  Go on ahead and call your

19  first witness.

20          MR. CARDWELL:  Your Honor, we call Thomas McFarland.

21          THE COURTROOM DEPUTY:  Please come forward and be

22  sworn.

23                    **THOMAS McFARLAND**,

24  called by Plaintiff, was duly sworn by the courtroom deputy,

25  and in answers to questions propounded, testified as follows:

1          THE COURTROOM DEPUTY:  Have a seat there, please.

2          THE COURT:  All right.  Once seated, please make

3    yourself comfortable with the chair's proximity to the

4    microphone.  Then please state your full name into that

5    microphone, spelling your last name.

6          THE WITNESS:  My name is Marshall Thomas McFarland,

7    M-c-F-a-r-l-a-n-d.

8          THE COURT:  Your witness.

9          MR. CARDWELL:  Thank you, Your Honor.

10                      <u>DIRECT EXAMINATION</u>

11   <u>BY MR. CARDWELL</u>:

12   Q    Mr. McFarland, I think everybody knows this, but you're

13   an associate of Gullett, Sanford, Robinson & Martin?

14   A    That's correct.

15   Q    And you're working on this case?

16   A    That's correct.

17   Q    Are you aware that in the response to our motion that was

18   filed, the defendants claimed to have produced 180,000

19   some-odd documents?

20   A    That's correct.  I believe it was 139,000 e-mails and

21   roughly 65,000 text messages.

22   Q    Okay.  So what I want to do is, I want to talk about what

23   those documents were.  How many unique documents have they

24   produced thus far?

25   A    Our firm utilizes a platform called Relativity 9 for the

1    management and review of electronic discovery in this case.

2    Within the database for this case, the documents that the

3    defendants have produced are 185,519 unique documents within

4    that database.

5    Q    What is a unique document?

6    A    A unique document would be each individual document

7    that's produced.  For example, an e-mail that contains three

8    attachments would register in the database as four unique

9    documents, the e-mail plus the three attachments.  So that

10   185,000 number represents all of those documents.

11   Q    Were the vast majority of these documents produced after

12   the stay was lifted?

13   A    Yes.  That's correct.

14   Q    If one places a pre January 1, 2017, date limitations on

15   the 182,000 unique documents -- let me rephrase that.

16          How many of the 182,000 documents that the

17   defendants produced predate January 1 of 2017?

18   A    The Relativity 9 platform allows us to place limitations

19   for things like date on the documents.  If we place a

20   limitation for pre January 1 of 2017, 76,557 unique documents

21   populate.  So at least that many documents predate January 1

22   of 2017.

23          And the reason that I say "at least" is because

24   there were two stages of production in this case.  We were

25   before the Court on a production that consisted of .pdf's and

1    then production of native files.  The native files are the

2    only ones that contain the metadata that allows the system to

3    code it.  The vast majority of the unique documents that were

4    produced contain the metadata, but ones that don't have that

5    metadata won't be encapsulated in the date limitation.

6    Q    Getting to documents of a more relevant timeframe, how

7    many documents, unique documents, did the defendants produce

8    that were created between July 1, 2017, and December 10, 2017?

9    A    You asked me to place that limitation on the documents.

10   And if I place that limitation on the database, 20,072 unique

11   documents populate of the 182,000 some-odd documents.

12   Q    Of those 20,072 documents between July 1 of '17 and

13   December 10 of '17, how many contain the word "Sawin" or

14   "Dr. Sawin"?

15   A    Just placing the limitation as Sawin reveals nine

16   documents total.

17   Q    Would you describe those nine documents for the Court,

18   please?

19   A    Of those nine documents, one is an e-mail from

20   Defendant Hawley regarding a trip that he and others took,

21   including Dr. Sawin.  I'm not sure where.  I believe it's

22   somewhere in the Caribbean.  The title of the trip is

23   Casablanca.  I'm not real sure.  That's not relevant to the

24   case.

25            Two of those nine documents are LinkedIn updates

1  which reference a Zachary Sawin, which I understand to be

2  Dr. Sawin's son.  It's unrelated to the case.

3         Four of the nine documents are communications

4  between Defendant Soufleris and an individual at a country

5  club regarding a golf tournament he played in around August of

6  2017 with Dr. Sawin.

7         And then two of the nine documents are an identical

8  calendar -- electronic calendar reservation for a dinner in

9  the Orlando area on or about December 8 of 2017 attended by

10  Defendants Soufleris and Hawley, Dr. Sawin, and individuals

11  from Alphatec.

12  Q    Of the 20,072 documents in that timeframe, how many

13  contain the term "Alphatec" or "ATEC"?

14  A    196.

15  Q    How many contain the term "NuVasive"?

16  A    575.

17  Q    To put that in comparison, how many contain the term

18  "DICK's Sporting Goods"?

19  A    1,076.

20  Q    How about "Amazon"?

21  A    Amazon, 751.

22  Q    "Travelocity"?

23  A    339.

24  Q    "Golf"?

25  A    2,882.

1   Q    "Uber"?

2   A    382.

3   Q    "Brooks Brothers"?

4   A    352.

5   Q    And "Best Buy"?

6   A    352 as well.

7   Q    Were any of the documents produced from the e-mail server

8   that was utilized by Absolute Medical Systems -- I'm sorry --

9   Absolute Medical?

10  A    Are you -- the e-mail server that ends in the address

11  @absolute-med.com, e-mails from that server were not produced.

12         MR. CARDWELL:  That's all I have, Your Honor.  Thank

13  you.

14         THE COURT:  Cross-examination?

15         MR. BUSCH:  Briefly, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. BUSCH:

18  Q    Mr. McFarland, it's an honor to cross-examine you.

19         The absolute-med.com domain that you just

20  referenced, did you on behalf of NuVasive attempt to search

21  any NuVasive records to determine how many e-mails NuVasive

22  had with the absolute-med.com domain?

23  A    Me personally?

24  Q    Anyone.

25  A    I have not run any searches on NuVasive's system, no.

1    Q    Do you know if anyone ran searches on NuVasive systems

2    for the absolute-med.com e-mail address?

3    A    I'm not aware.  I'm not aware of that.

4    Q    Mr. McFarland, as counsel for NuVasive in this case, how

5    many requests did NuVasive make to third parties other than

6    the defendants for e-mails with the absolute-med.com e-mail

7    address?

8    A    I don't know exactly off the top of my head.  But I

9    can identify certain parties that we did subpoena, if that

10   helps.

11   Q    I'm just wondering how many -- how many people or how

12   many places other than my clients did NuVasive look for the

13   absolute-med.com e-mails?

14   A    Sure.  I served a subpoena on behalf of NuVasive on

15   Alphatec Spine Incorporated, on Patrick Miles individually, on

16   Craig Hunsaker individually.  I also served subpoenas upon

17   non-parties Osseus Fusion Systems, Orthofix Inc., K2M Inc.,

18   NovaBone LLC.  I believe we served some subpoenas on Bank of

19   America, but I don't believe those requested communications.

20   I may be missing one or two.  I don't recall.  But I think

21   that's -- I think that's them.

22   Q    Do you know whether or not --

23   A    Oh, sorry.  Sorry.  Sorry.  Central Florida Regional

24   Hospital was one of them.

25   Q    Do you know whether or not my clients corresponded via

1    e-mail to NuVasive or any of its employees through the

2    absolute-med.com e-mail address?

3    A    The absolute-med.com e-mail address?

4    Q    Yes.

5    A    That's my understanding, yes.

6    Q    You didn't get any of these e-mails directly from

7    NuVasive?

8    A    I can't say with certainty what -- I have not seen any

9    e-mails from NuVasive.  I personally have not seen any e-mails

10   from NuVasive that were from those e-mail addresses that

11   you've identified.  No, I have not.

12           MR. BUSCH:  Nothing further, Your Honor.

13           THE COURT:  Redirect examination?

14                    REDIRECT EXAMINATION

15   BY MR. CARDWELL:

16   Q    Since he brought it up, the absolute-med.com e-mails that

17   we obtained from Osseus, what did they show?

18   A    From Osseus Fusion Systems?

19   Q    Yes.

20   A    I saw some correspondence from Mr. Soufleris to

21   individuals at Osseus where he is essentially directing or

22   organizing the sale of Osseus' products in the central Florida

23   area through an individual named Allie Hesser.

24   Q    Do they also show that -- the documents that we obtained

25   from that subpoena, do they show that Dave Hawley was working

1  on behalf of Mr. Soufleris in that area?

2  A    Mr. Hawley does appear in those communications, yes.  And

3  it does appear as if he's representing Osseus Fusion Systems'

4  products as well.

5  Q    NovaBone.  What did our subpoena that you served on

6  NovaBone reveal?

7  A    The documents received from NovaBone reveal that

8  Mr. Miller was representing and selling the NovaBone biologic

9  product within the central Florida area within -- I mean, the

10  same surgeons he represented on behalf of Absolute

11  Medical LLC.

12  Q    And that's Mr. Soufleris's company he was working on

13  behalf of?

14  A    There are two companies identified in those documents.

15  One is an entity known as Spinal Solutions Group that's owned

16  by Defendant Soufleris.  Several of the documents also list

17  Mr. Miller as an Absolute Medical Systems LLC

18  representative -- sales representative.

19  Q    Did we attempt to obtain communications between Alphatec

20  and the various defendants?

21  A    Yes.  As I mentioned earlier, we subpoenaed Alphatec

22  Spine Inc. requesting those communications.  We also

23  subpoenaed Mr. Miles and Mr. Hunsaker individually.  Those

24  subpoenas were resisted by those three parties.  They listed a

25  place of compliance in southern California where the

1    individuals are domiciled.

2          NuVasive attempted to file motions to compel to

3    enforce those subpoenas which were denied for, among other

4    reasons, the reason that NuVasive should seek those

5    communications from the defendants in this lawsuit.

6          MR. CARDWELL:  Thank you.

7          THE COURT:  All right.  Sir, feel free to be seated

8    at counsel table.

9          I would invite you to call your next witness.

10         MR. CARDWELL:  Your Honor, I call Ryan Miller.

11         THE COURTROOM DEPUTY:  Please come forward and be

12   sworn.  Please raise your right hand.

13                        **RYAN MILLER**,

14   called by Plaintiff, was duly sworn by the courtroom deputy,

15   and in answers to questions propounded, testified as follows:

16         THE COURTROOM DEPUTY:  Have a seat there, please.

17         THE COURT:  All right.  Good afternoon, sir.  Please

18   make yourself comfortable.  Then state your full name into

19   that microphone, spelling your last name.

20         THE WITNESS:  Yes.  Ryan Allan (phonetic spelling)

21   Miller.  Miller is M-i-l-l-e-r.

22         THE COURT:  Your witness.

23         MR. CARDWELL:  Thank you, Your Honor.

24

25   ////

1                         DIRECT EXAMINATION

2    BY MR. CARDWELL:

3    Q    Mr. Miller, you recently submitted a declaration in this

4    case.  I believe it was last Friday; is that correct?

5    A    Yes, sir.

6    Q    Before you submitted this declaration, did you review the

7    document production you made in this case?

8    A    I'm not sure I understand the question.

9    Q    Sure.  You've produced documents in this case, correct?

10   A    Yeah.  Quite a few, I believe.  Yes, sir.

11   Q    And you did not review those documents before signing

12   your declaration, did you?

13   A    Not immediately before.  I would imagine at some point

14   I've seen or looked over a majority of them.  I'm not sure if

15   that makes sense.

16   Q    When is the last time you recall looking at the text

17   messages you produced in this matter?

18   A    In the entire case?

19   Q    Yes.

20   A    I'm not sure.  At some point when maybe you presented

21   them to me or --

22   Q    So you looked at the ones I showed you in deposition?

23   A    Yes, obviously those.

24   Q    The reason I ask this, in your deposition, you say that

25   none of your text messages that predate November 19, 2017,

1  exist.  Is that what you testified to?

2  A    I'm sorry.  Could you repeat that again?

3  Q    Sure.  Paragraphs 10 and 11 of your declaration --

4  A    Yes.

5  Q    -- I'll read those to you.

6          10:  "On November 19, 2017, I entered into a new

7  cellular contract with AT&T and upgraded my existing cell

8  phone to an iPhone 7.  Several days later, my new iPhone 7

9  arrived and I returned my existing cell phone back to AT&T for

10  a credit."

11          Paragraph 11:  "Without any malice, intent, or

12  knowledge, none of the old text messages from my previous

13  phone transferred to this new device and were apparently not

14  retrievable from the cloud that was part of" -- it says --

15  "his contract with AT&T."

16  A    Okay.  I understand.

17  Q    Do you believe that to be true?

18  A    I do.

19  Q    Do you believe that you produced no text messages that

20  predate sometime after November 19 of 2017?

21  A    I believe anything that was taken off my phone after my

22  new phone was received was presented to you.

23  Q    That's not my question.  What your declaration says is

24  that everything that predated this November 19, 2017, date was

25  lost.

1    A    I believe so.

2    Q    What's the basis of that belief, sir?

3    A    The basis of that belief is that you relayed the

4    information that nothing was pulled off my phone before that

5    date when we gave our phones over to you.

6              MR. CARDWELL:  Your Honor, may I?

7              THE COURT:  You may.

8    BY MR. CARDWELL:

9    Q    You frequently exchange text messages with Mr. Soufleris

10   and Dr. Matthew Burry, correct?

11   A    I do.

12   Q    Dr. Matthew Burry is one of the surgeons who operates at

13   Central Florida Regional who you support on behalf of Absolute

14   Medical, and then Alphatec, and now on behalf of Absolute

15   Medical Systems, correct?

16   A    Yes, sir.

17   Q    Can you read that on your screen, sir?

18   A    Yes, I can see it.

19   Q    And do you see above where it says Matthew Burry and

20   there is a 2/9/2017 date stamp, it says "read"?

21   A    Yes.  2017, I see it.

22   Q    And then you respond to him with a thumbs up and a square

23   also on 2/9/2017, correct?

24   A    I see that.

25   Q    And then there's a gap.  And that gap is Mr. -- or

1    Dr. Burry sending you a text message on August 13, 2018,

2    correct?

3    A    Yes, sir.

4    Q    You certainly didn't go over a year without texting one

5    of your best clients, did you?

6    A    No, I don't believe so.

7    Q    And it appears that your declaration testimony about all

8    of the pre November 2017 text messages being deleted is not

9    correct; is that right?

10   A    I believe that to be accurate, yes.

11   Q    Do you still believe your declaration statement is

12   accurate?

13   A    I believe that I am not an electronic expert.  My wife

14   and I decided after we were married to join the same cell

15   phone plan in November of 2017, at which point we upgraded our

16   phones.  We had older phones.  And I got a new phone sometime

17   shortly after and I traded in my old phone in for the upgrade.

18   Q    The Bates stamp on that document is RAM0005215.  We will

19   now look at RAM005312.

20            Elizabeth Lukianov is someone who you formerly text

21   messaged with on a regular basis when you were with NuVasive

22   and now do so on behalf of Alphatec, correct?

23   A    Yes.

24   Q    What I mean by that is, you both were with NuVasive and

25   now you're both at Alphatec, right?

1    A    Correct.

2    Q    I'll show you text messages with Ms. Lukianov.  It looks

3    like on 3/31/2017 at the end of a text string, you were

4    saying, "Cool.  Thanks."  Is that correct?

5    A    It appears that, yes, I said that.

6    Q    And there are no more messages between you and

7    Ms. Lukianov until 12/11/2017; is that right?

8    A    That appears to be the situation, yes, sir.

9    Q    And in that text message, she's saying, "Have everything

10   you need for Wednesday."

11          And what she means by that is, you're about to go

12   into one of your Absolute Medical accounts, probably Central

13   Florida Regional, and try to sell them on Alphatec's products,

14   correct?

15   A    I'm not -- I'm not sure.  I don't know what that's

16   referring to, to be honest.

17   Q    Well, look at your response.  It says --

18   A    Sure.

19   Q    -- "Everything except hospital approval.  It's an HCA

20   account."

21   A    Yes.  I see that.

22   Q    Is Florida Regional an HCA hospital?

23   A    Correct.  It looks like we were discussing product

24   approval.

25   Q    And that was ten days after you left NuVasive?

1   A    Yes.  Looks that way.

2   Q    The next document is RAM0005334.  Brandon Gottstein is a

3   gentlemen you frequently exchanged text messages with,

4   correct?

5   A    Occasionally, yes.

6   Q    And he is a gentleman who formerly worked with you at

7   Absolute Medical and then left the same day as you to join

8   Alphatec, correct?

9   A    I was unaware he left the same day, but he's now

10  currently with Alphatec, I believe.  Yes.

11  Q    And you both now work for Absolute Medical Systems; is

12  that right?

13  A    I'm not sure of his current situation, but I know that I

14  do.  You would have to ask him.

15  Q    Does he come to the Absolute Medical Systems Christmas

16  party?

17  A    I believe he was there, yes.

18  Q    So with Mr. Gottstein -- and that -- you recognize that

19  as Mr. Gottstein, correct?

20  A    It says his name.

21  Q    Okay.  And it looks like he sends you a text message that

22  you read on June 8 of 2017, correct?

23  A    It appears to be, yes.

24  Q    And then on 12/11/17, he sends you another text message

25  that says, "Case still on for Wednesday," correct?

1   A    I see that.

2   Q    And that was dated 12/11/17, right?

3   A    Yes, it is.

4   Q    And that was the same date as Ms. Lukianov's text message

5   to you also talking about a case on Wednesday?

6   A    Yes.

7   Q    Can you understand -- can you explain the gap between

8   June 8 of '17 and December 11 of 2017 on you and

9   Mr. Gottstein's communications?

10  A    I think with any communication that I had with anybody

11  from my original phone -- I'll kind of reiterate what I said a

12  few moments ago, that the phone I had initially was traded in.

13  My wife and I, after being married, entered into a new

14  agreement -- a new cellular phone agreement in November of

15  2017.  We were eligible for an upgrade.  So shortly after we

16  entered into our new cell phone agreement, I received a new

17  phone and traded in my old phone for the new one.  So --

18  Q    Right.  But in your declaration, you said because of that

19  trade-in, you lost all pre November 19, 2017, e-mails.

20  A    Anything that would have been on that phone, I would

21  assume, since the phone is gone, would be gone I guess.

22  Again, I'm not a highly, you know, trained electronic

23  tech-savvy type of person.  Any phone I've ever had, I've used

24  it just the way I've used every phone prior and after.  So --

25  Q    How much time did you spend drafting that declaration?

1   A    How much time did I spend drafting it?

2   Q    Yes.

3   A    I'm not a -- not really a whole lot.  Why?

4   Q    This is RAM0053884, and this is another string of

5   messages between you and Dr. Burry.  And these are just

6   between you and Dr. Burry.  Mr. Soufleris is not a part of

7   this thread.

8           Do you see where on 5/5/2017 --

9   A    I do.

10   Q    -- you ask Dr. Burry if he's helping Dr. Allende on

11   Monday?

12   A    I see that.

13   Q    And then there's no more text messages until December 11,

14   2017, when you message Dr. Burry, correct?

15   A    I see that.

16   Q    Now, a lot happened in your life between May of '17 and

17   December 11 of '17, correct?

18   A    I'm not sure what you mean.

19   Q    Well, your employer, Absolute Medical, broke its

20   long-term contract with NuVasive, correct?

21   A    Yes.

22   Q    And on December 1st, you, Mr. Hawley, and Mr. Soufleris

23   all went to work for Alphatec, correct?

24   A    I believe my initial start date was December 1st.  I'm

25   not sure that theirs was the exact same day.

1  Q    And within days of your start date, you and Mr. Soufleris

2  took Dr. Burry out to PF Chang's, correct?

3  A    Yes.  We had dinner.

4  Q    And when you guys were -- there's no question that

5  between May of '17 and December of '17, you exchanged text

6  messages with Dr. Burry, correct?

7  A    I mean, yeah.  Of course I exchanged text messages with

8  Dr. Burry.

9  Q    RAM005461.  Your co-defendant Dave Hawley is an another

10 gentleman you frequently text messaged with, correct?

11 A    Yes.

12 Q    And here you recognize this as a text thread between you

13 and Mr. Hawley?

14 A    It appears to be, yes.

15 Q    And it looks like on June 6 of 2017, he has sent you a

16 text message, correct?

17 A    The one that says the -- not MAS console?

18 Q    Yes.

19 A    Okay.  I see that.

20 Q    And then on December 11, 2017, again, the same day with

21 the others, he sends you another text message, correct?

22 A    I see it.

23 Q    Except this one is talking about doing business on behalf

24 of Alphatec, correct?

25 A    I'm -- I'm not sure.  There's a procedure listed there, a

1    spine procedure.  I'm not sure which company we were

2    discussing.

3    Q    You, Mr. Hawley, and Mr. Soufleris, all had dinner with

4    Jon Allen some time in November of 2017 to talk about making

5    the move to Alphatec, correct?

6    A    I know that I met with Jon Allen.

7    Q    There was a dinner when the three of you were there,

8    right?

9    A    At some point, I believe.

10   Q    Okay.  So we don't have the text messages about that

11   because they're not on your phone, right?

12   A    Again, I know you keep alluding to the phone, but I think

13   we've discussed the transition from my old phone to my newest

14   phone.

15   Q    When you left for -- when you left NuVasive and joined

16   Alphatec on December 1st, I understand that there is a dispute

17   about whether or not you guys signed the 2017 contracts with

18   Mr. Soufleris.  I understand that.  But you knew you had

19   signed the 2016 contract, correct?

20   A    Yes.

21   Q    And you knew that 2016 contract had non-compete

22   obligations, correct?

23   A    I believe so.

24   Q    And you knew that those non-compete obligations had not

25   expired when you went to work for Alphatec?

1         MR. BUSCH:  Objection, Your Honor.  That misstates

2    what the plain language of the 2016 document has.  It has a

3    different --

4         THE COURT:  No, no, no.  You're objecting.  He can

5    ask and he can agree or disagree.

6         MR. BUSCH:  Well, I understand, Your Honor --

7         THE COURT:  No, no.  You listen to me.  You can't

8    give a speaking objection that indirectly instructs him how to

9    answer the question.  He can disagree with the premise.  What

10   he asks is not evidence.  What he answers is evidence.

11        MR. BUSCH:  The question is misleading.  It's also

12   misleading to suggest that Mr. Miller signed this document

13   individually, which has been a strategy with NuVasive from the

14   beginning, including in the depositions, to say, you signed a

15   document, when, in fact, it was his corporate entity that did

16   that.

17        THE COURT:  All right.  You just did exactly what I

18   told you I didn't want you to do.  You just told him how to

19   answer the question.  Don't do that again.  If you feel that

20   strongly about it, you can come up sidebar.  If you coach him

21   again, there's going to be problems.  No need to come sidebar.

22   The cat's out of the bag.  He can disagree with the premise

23   and answer the question.

24        MR. BUSCH:  No, no.  The cat's in the --  the cat's

25   never out of the bag, Judge.  I mean, we have a systemic

1  problem with the way that NuVasive is asking its questions,

2  which includes depositions and now in front of Your Honor.  I

3  want to make sure that the Court understands that we have an

4  agreement from 2016 that has a different date and that had a

5  different party who was the signature on that -- on that

6  contract.  That is extremely important.

7          THE COURT:  Again, no more speaking objections.  I

8  understand.  He can answer the question.

9          MR. CARDWELL:  Thank you.

10 BY MR. CARDWELL:

11 Q    You knew that there was a reasonable chance that NuVasive

12 was going to sue you, didn't you?

13 A    I knew there was a possibility.  I figured it was small.

14 Q    Well, that's why you asked for Alphatec to indemnify you,

15 correct?

16 A    Can you elaborate?

17 Q    Sure.  Alphatec is paying all of your legal fees?

18 A    I believe that they are.

19          MR. BUSCH:  Objection, Your Honor.  I'm not sure

20 what this has to do with the ESI and the spoliation.  So I

21 would object.

22          THE COURT:  So is your objection as to relevance?

23          MR. BUSCH:  Yes, Your Honor.

24          THE COURT:  The objection is as to relevance.  Would

25 you like to respond to the objection?

1    MR. CARDWELL:  Sure.  I think the fact that they

2    sought and received indemnification shows that they believed

3    that it was likely they would be sued.

4    THE COURT:  Right.  And he didn't object to that

5    question.  He objected to the question after that, so,

6    "Question:  Sure.  Alphatec is paying all of your legal fees?"

7    That was the objection.

8    Why is that a relevant question?

9    MR. CARDWELL:  Because it shows that he is, in fact,

10   being indemnified.  And he sought indemnification.  He

11   received indemnification.  And it's showing that he thought

12   there would be a --

13   THE COURT:  All right.  We're getting a little thin

14   there.  I mean, you're trying to establish that some

15   shenanigans were afoot many, many years ago.  So I'm going to

16   sustain the objection and instruct you to move on.

17   MR. CARDWELL:  Okay.

18   BY MR. CARDWELL:

19   Q    To be clear, you thought there was a chance you would be

20   sued?

21   A    May -- possibly.

22   MR. CARDWELL:  Thank you.  That's all I have.

23   THE COURT:  Cross-examination?

24   MR. BUSCH:  Yes, Your Honor.

25   MR. CARDWELL:  Oh.  Your Honor, I apologize.  May I

1   move those text messages?  They are defendant's --

2          THE COURT:  All right.  Just for the general

3   proposition of moving what he used on his direct into

4   evidence, is there any defense objection as to those being

5   admitted?

6          MR. BUSCH:  There is, Your Honor, because we would

7   like the full copy of the text messages, because there's

8   additional threads between my client and the different people.

9   And so he's introducing it for the purpose of trying to show

10  that it was cut off when, in fact, there are other threads.

11  So I would like the entirety of the spreadsheet introduced.

12         THE COURT:  All right.  Have all those been -- are

13  they part of the record at this point in terms of what's been

14  filed on CM/ECF?

15         MR. CARDWELL:  They are not, Your Honor.  Large

16  portions of them are, but there are thousands of pages.

17         THE COURT:  All right.  Just for the limited

18  purposes of the direct, I'm going to admit over objection what

19  you used.  But I will allow him to complete the record.  And

20  certainly if the defense wants to introduce the rest of it for

21  context, it's coming in as well.

22         MR. CARDWELL:  No objection to that, Your Honor.

23  And that's Exhibit 30.

24      (Plaintiff's Exhibit No. 30 was admitted into evidence.)

25         THE COURT:  All right.  You're going to need to

1   present that to Ms. Darleen.

2          And I certainly would invite you to conduct your

3   cross.

4          MR. BUSCH:  Thank you.

5                      CROSS-EXAMINATION

6   BY MR. BUSCH:

7   Q    Mr. Miller, when do you recall becoming a defendant in

8   this case?

9   A    I want to say sometime early 2018.

10  Q    Okay.  And could it have been the summer of 2018 at the

11  time that the injunction hearing was?

12  A    Yes, sir.

13  Q    And so in November of 2017, did you have any awareness

14  that you were going to be a defendant in a lawsuit brought by

15  NuVasive?

16  A    No.

17  Q    And tell the Court about your cell phone that you

18  utilized prior to November of 2017.

19  A    Yeah.  So I had a -- I believe it was an iPhone 6 that I

20  had had for -- I am not sure -- a year, maybe two.  My wife

21  and I had recently got married.  I've been an iPhone user

22  forever.  We decided that, obviously being married now, that

23  we should enter into a cell phone agreement together, which we

24  did.  Again, we decided that I think in November of -- you

25  know, late November of 2017.  We were also eligible for

1  upgrades.

2  Q    Tell the Court about the new phone that you got in

3  November of 2017.  What type of phone was that?

4  A    So I believe it was an iPhone X or iPhone 10.  I'm not

5  sure what it's technically called.  But it was a much newer

6  phone than the one I currently had at the time.

7  Q    Okay.  And how did you go about converting the

8  information from the old iPhone to the new iPhone in November

9  or December of 2017?

10  A    I didn't necessarily take any steps to have anything

11  transferred, I guess based on what the people at the store

12  told me that through Wi-Fi or, you know, something similar

13  that because I'm an Apple user that my new phone should upload

14  all my old photos, messages, et cetera, stuff like that.

15  Q    When you got your new phone in December of 2017, were you

16  aware that -- did you believe that all of the text messages

17  from before had transferred over to the new phone?

18  A    I would believe that the majority of the information

19  would have transferred.  I mean, as you know, we have a ton of

20  messages, a ton of threads.  I mean, I wouldn't go look to see

21  if every single thread was there.  Some are outdated.  Some

22  are old, people I'm not friends with anymore.  I mean, I just

23  assumed that, you know, the contacts that were important,

24  mother, co-workers and stuff, were still there, which they

25  appeared to be.

1    Q    At this time when you transferred from one phone to the

2    other in 2017, did you, Mr. Miller, go in and delete or

3    destroy any text message threads on your new phone?

4    A    I didn't.

5    Q    And you used that new phone beginning in December of 2017

6    for both personal and business use?

7    A    Yes, I did.

8    Q    I want to fast forward you to 2018.  After you became a

9    party to this case, were you aware that in July of 2018, you

10   were served with some discovery requests from NuVasive that

11   included requests for text messages?

12   A    Yes.

13   Q    Is that the first time that you became aware that

14   NuVasive was interested in gathering text message information

15   from your phone?

16   A    I believe so.

17   Q    And what did you do to comply with that request?  What

18   did you do with your phone?

19   A    So initially -- you know, I'm, again, not a very

20   tech-savvy person.  I just, you know, was Googling how to help

21   provide old documentation, but didn't come up with a whole

22   lot.  I think at some point shortly thereafter, we were told

23   to hand over our phones to a specialist, a professional that

24   extracts information when it's needed.  So I did that.

25   Q    Did you, in fact, take the cell phone to a company called

1   D4 Discovery in Orlando, Florida?

2   A    I did.

3   Q    And do you have any idea what D4 did with the phone?

4   A    I wasn't onsite.  It took I think a couple hours.  I left

5   while they did it.  But I guess my understanding is they

6   extracted all of the requests that were made by NuVasive.

7   Q    Have you had a chance to review every line item in the

8   spreadsheet that shows every single text message that you sent

9   in 2017, 2018, and 2019?

10  A    No.  I mean, that would nearly be impossible.

11  Q    When you communicate with your physician clients, for

12  instance Dr. Burry, do you always communicate one on one with

13  them, or are there other people on the threads?

14  A    There's multiple threads, myself, me, and two others, me

15  and somebody else.  It's -- yeah.  It just depends.  But

16  multiple threads.

17  Q    And in addition to -- do you have any idea how many text

18  messages that the D4 Discovery folks were able to get off your

19  phone?

20  A    Just text messages alone, I'm sure thousands.  I'm not

21  sure of the actual number.

22  Q    If I told you that they were able to pull 43,169 text

23  messages off your phone, would that surprise you?

24  A    That's pretty impressive.

25  Q    Did you -- as well as text messages, Mr. Miller, did you

1    also produce e-mails in this case?

2    A    I did.

3    Q    And tell the Court what your personal e-mail address that

4    you had control over was.  What was that e-mail address?

5    A    The RyanAMiller23@Gmail.com address.

6    Q    Did you provide the password to that e-mail address also

7    to the folks at D4?

8    A    I believe so, yeah.

9    Q    Do you know what D4 did with that password?

10   A    I would imagine searched through and extracted everything

11   they felt relevant.

12   Q    If I told you that you produced 25,787 e-mails from that

13   e-mail address, would that surprise you?

14   A    Yeah.  That's pretty impressive.

15   Q    Mr. Miller, since becoming a party to this lawsuit in

16   June of 2018, have you intentionally destroyed or deleted any

17   text messages?

18   A    I haven't.

19   Q    Have you intentionally destroyed or deleted any e-mails?

20   A    No.

21   Q    Have you intentionally destroyed or deleted any paper

22   copies of documents?

23   A    I haven't.

24   Q    The absolute-med.com domain that Absolute Medical

25   Systems -- or Absolute Medical utilized up until 2017, are you

1   familiar with that domain?

2   A    Yeah.  I get a little caught up remembering which one is

3   which due to their similarities, but that was the, I think,

4   initial e-mail that was used or --

5   Q    It was, absolute-med.com was the initial domain.  Does

6   that refresh your recollection?

7   A    Okay.

8   Q    And, Mr. Miller, did you have -- were you in charge at

9   all of that domain between Absolute Medical and Google?

10  A    I wasn't.

11  Q    Did you have any control over that domain?

12  A    I didn't.

13  Q    We're going to get into this as part of the remedy.  So

14  I'm just going to ask you briefly.  Are you familiar with a

15  2017 compliance agreement that Absolute Medical provided to

16  your entity, Millertime Medical Inc.?

17  A    Repeat the question.

18  Q    The 2017 agreement --

19  A    Yes.

20  Q    -- that Absolute Medical provided to your corporate

21  entity, Millertime Medical, are you familiar with that

22  document?

23  A    Man, I kind of -- sorry -- get caught up on the Absolute

24  Medical thing.  One more time, the question.

25  Q    2017, Mr. Miller.

1    A    Yes.  Yes.

2    Q    Absolute Medical.  Did Absolute Medical present you with

3    a proposed compliance agreement or independent contractor

4    agreement for Millertime Medical Inc.?

5    A    I'm sorry.  I'm just nervous.  I don't understand the

6    question really.

7    Q    Okay.  In 2016, did Millertime Medical sign an

8    independent contractor agreement with Absolute Medical?

9    A    It did.

10   Q    Okay.  In 2017, did Absolute Medical present Millertime

11   Medical with an independent contractor agreement?

12   A    It presented it, yes.

13   Q    Okay.  And did you, as president of Millertime Medical,

14   execute or sign that 2017 independent contractor agreement?

15   A    I didn't.

16   Q    Did you ever destroy any signature pages to that

17   agreement?

18   A    I did not.

19            MR. BUSCH:  Those are my questions, Your Honor.

20            THE COURT:  Okay.  Thank you.

21            Redirect examination?

22            MR. CARDWELL:  Thank you, Your Honor.

23                         REDIRECT EXAMINATION

24   BY MR. CARDWELL:

25   Q    Of the 43,169 e-mails that you claim you produced -- I'm

1    sorry -- text messages you claim you produced, how many were

2    between January 1, 2017, and December 1, 2017?

3    A    I'm not sure.

4    Q    The answer is zero, correct?

5    A    I'm not sure.  I haven't looked at them.

6    Q    You talked about producing your phone to a forensic

7    examiner; is that right?

8    A    Yes, sir.

9    Q    And you acknowledge you were served with discovery in, I

10   you said, July of '18?

11   A    I believe so.

12   Q    It wasn't until March of 2019 when you presented your

13   phone to that forensics examiner, was it?

14   A    I don't remember the date, but it was sometime after the

15   initial subpoena or request.

16   Q    It was in 2019, wasn't it?

17   A    Yes.  It was earlier -- earlier this year.

18   Q    Okay.  Talk about e-mails.  I agree with you.  It's tough

19   to keep the Absolute Med and the Absolute Medical System apart

20   because they're so similar.  But you acknowledge that you did

21   not produce any e-mails from your Absolute Medical account,

22   correct?

23   A    I mean, it wasn't my account.  I used it for a certain

24   amount of time, but --

25   Q    You could have preserved them, couldn't you?

1  A    I'm not sure.  Again, that account wasn't under my

2  control.  It's not like I paid for it or --

3  Q    Mr. Soufleris told you via e-mail that he was shutting it

4  down and moving to the Absolute Medical Systems e-mail

5  account, correct?

6  A    Most -- most likely.

7  Q    And you took no steps to preserve that evidence?

8  A    I didn't think about it.

9  Q    That's because your boss, Mr. Soufleris, never told you

10  to preserve evidence, correct?

11  A    I don't -- I'm not sure.

12  Q    No one in this case told you to preserve evidence,

13  correct?

14  A    I'm not sure.  I mean --

15  Q    That 2017 agreement came to you on your Absolute Medical

16  Systems e-mail account, correct?

17  A    I'm not positive.  If you say so, I believe you.

18  Q    And because that's been deleted, we don't have those

19  e-mails either, do we?

20  A    If you don't have them, then I guess you don't.

21          MR. CARDWELL:  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you, sir.  Feel free

23  to be seated at counsel table.

24          I will give you some leeway if you want to ask any

25  more questions on recross so we don't have to recall him as a

1    defense witness if you would like to.

2              MR. BUSCH:  Yeah.  I just have one question --

3              THE COURT:  Sure.

4              MR. BUSCH:  -- just real quick on redirect.

5                         RECROSS-EXAMINATION

6    BY MR. BUSCH:

7    Q    Opposing counsel was talking to you about preserving

8    e-mail evidence in December of 2017.  Mr. Miller, were you a

9    party to this lawsuit in December of 2017?

10   A    I wasn't.

11             MR. BUSCH:  Thank you.

12             THE COURT:  All right.  Thank you.  Feel free to be

13   seated at counsel table.

14             I would invite the plaintiff to call their next

15   witness.

16             MR. CARDWELL:  Your Honor, we call Mr. Dave Hawley.

17             THE COURTROOM DEPUTY:  Please come forward and be

18   sworn.  Please raise your right hand.

19                         **DAVID HAWLEY**,

20   called by Plaintiff, was duly sworn by the courtroom deputy,

21   and in answers to questions propounded, testified as follows:

22             THE COURTROOM DEPUTY:  Have a seat there, please.

23             THE COURT:  All right.  Good afternoon, Mr. Hawley.

24   Make yourself comfortable with the proximity to the

25   microphone.  Then please state your full name into that

1    microphone, spelling your last name.

2          THE WITNESS:  David Ryan Hawley, H-a-w-l-e-y.

3          THE COURT:  Okay.  Your witness.

4          MR. CARDWELL:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6    BY MR. CARDWELL:

7    Q    Good afternoon, Mr. Hawley.

8    A    Hello.

9    Q    You also provided a declaration Friday evening in this

10   case, correct?

11   A    Yes, sir.

12   Q    And your declaration says that you -- you acknowledge

13   producing no text messages that predate February of 2018,

14   correct?

15   A    Correct.

16   Q    And the reason you give for that is because there is a

17   one-year delete button -- or delete option for text messages

18   on your iPhone; is that right?

19   A    That's right.

20   Q    When did you set that one-year delete option?

21   A    Several years ago.  I had an iPhone 7 -- or it could have

22   been when I had the 4 or 5.  I had an issue with just data and

23   photos, you know, taking over my phone.  Basic functions, you

24   know, weren't working.  And so I enabled it then and have done

25   so since I've, you know, gotten new phones.

1    Q    Now, after you were served with this lawsuit, you took no

2    steps to change that one-year delete function, did you?

3    A    I didn't think twice about it.

4    Q    And no one instructed you to make sure that you preserved

5    text messages, correct?

6    A    I'm not -- I'm not sure.

7    Q    If someone would have told you to check your device to

8    make sure that text messages weren't being deleted, you would

9    have done that, wouldn't you?

10   A    Sure.  Yeah.

11   Q    And I believe we first served discovery on you on

12   April 12 of 2018.  Does that sound correct?

13   A    Sure.

14   Q    So if on April 12 of 2018, if you would have gone back

15   and collected documents at that time, we would have had text

16   messages going back to April 12 of 2017, correct?

17   A    Sure.  But also, you know, as this function was set, you

18   know, my impression is that everything gets uploaded on the

19   cloud.  Text messages, photos, everything should be backed up

20   on the cloud.  So that should be retrievable.

21   Q    Where does that understanding come from?

22   A    It's just an assumption, I guess.

23   Q    So going back to that, had you begun to collect documents

24   when you were initially served with discovery requests,

25   there's no question we would have text messages dating back to

1   April 12 of 2017, correct?

2   A    Whatever you have is what was produced.  I'm not sure

3   what you have.

4   Q    Well, you didn't take your phone to be imaged until March

5   of 2019, correct?

6   A    That was when it was requested.

7             MR. BUSCH:  Your Honor, may we approach?

8             THE COURT:  Sure.

9        (At the bench.)

10             MR. BUSCH:  I don't want to interrupt, but I do

11   think it's important to understand that there was a stay that

12   was issued in this case.  And then we had a hearing in front

13   of the magistrate judge and that's when all of the ESI and

14   everything was determined how and when and why it was going to

15   be produced.  I don't want to say that in front of the

16   witness.

17             THE COURT:  And I appreciate you telling me that.

18   Is there anything you would like to add to that?

19             MR. CARDWELL:  I think the record will show when the

20   stay was.

21             THE COURT:  That's okay.  I appreciate that.  Go on

22   ahead.

23        (In open court.)

24   BY MR. CARDWELL:

25   Q    Prior to giving your phone to be imaged in March of 2019,

1   you made no independent effort to make sure that you were

2   preserving text messages, correct?

3   A    Outside of just assuming that everything is on the cloud.

4   Q    Didn't download any, correct?

5   A    No, I don't believe so.

6   Q    Didn't provide any to your lawyer?

7   A    I'm not sure.  I don't think so.

8   Q    Would you look at Exhibit 14?  It should be in front of

9   you, sir.

10           MR. CARDWELL:  Your Honor, may I?

11           THE COURT:  You may approach.

12   BY MR. CARDWELL:

13   Q    I'm going to hand you what was premarked as Exhibit 14.

14   A    Mm-hm.

15   Q    What is the date of that e-mail?

16   A    7/12/2018.

17   Q    So July 12, 2018?

18   A    Uh-huh.

19   Q    And what does it say?  Would you read that into the

20   record, please?

21   A    "Greg, I appreciate you extending the courtesy to allow

22   me to continue to use the domain for Absolute Medical during

23   my transition.  Absolute Medical may now remove

24   DHawley@Absolute-medical.org from its user list.  Thanks

25   again."

DAVID HAWLEY - Direct Examination by Mr. Cardwell                    42

1   Q    So before you told Mr. Soufleris it was okay to delete

2   your account, what steps did you take?

3            MR. BUSCH:  Objection.  Misleading, Your Honor.

4            THE COURT:  All right.  He's arguing that the

5   question is misleading.  What is your response to that?

6            MR. CARDWELL:  I haven't finished the question yet.

7            THE COURT:  All right.  Let's hear the question in

8   full and I'll hear the objection again.  We'll decide where

9   we're going.  Go on ahead.

10  BY MR. CARDWELL:

11  Q    Prior to the date that you told Mr. Soufleris it was okay

12  to terminate your Absolute Medical Systems e-mail account,

13  what steps did you take to preserve the e-mails in that

14  account?

15  A    I didn't.  I didn't, you know --

16  Q    Again, because you've never been given instructions to

17  preserve documents, correct?

18  A    I don't know if I have or not during this -- during this

19  time.

20            MR. CARDWELL:  Your Honor, if I may?

21            THE COURT:  You may.

22  BY MR. CARDWELL:

23  Q    Sir, I've just handed you what was premarked as

24  Exhibit 29.  Is that correct?

25  A    Yes.

DAVID HAWLEY - Direct Examination by Mr. Cardwell          43

1  Q    And this is a December 18, 2018, e-mail at the top from

2  Ms. Edelson to you, correct?

3  A    Correct.

4  Q    And Ms. Edelson is the manager of Absolute Medical

5  Systems?

6  A    I'm not sure her exact title.  Administrative assistant

7  maybe.

8  Q    Okay.  And she was with Absolute Medical prior to that,

9  correct?

10  A    Yes.

11  Q    And what this is, if you go to the first of this e-mail

12  chain, December of '17, Ms. Edelson is e-mailing you your 2018

13  independent contractor agreement for Absolute Medical Systems,

14  correct?

15  A    Appears to be.

16  Q    And this agreement is substantially similar to the

17  agreement you signed on behalf of Absolute Medical in the

18  years 2014 through 2016, correct?

19          MR. BUSCH:  Objection.  Misleading.

20          THE COURT:  All right.  The objection is misleading.

21          "Appears to be."

22          "And this agreement substantially similar to the

23  agreement you signed on behalf of Absolute Medical in the

24  years 2014 through 2016."

25          He's objecting to that question being misleading.

1    What's your response?

2            MR. CARDWELL:  It's almost verbatim.  They've

3    changed the name of the company.  It's even the same document

4    number.

5            THE COURT:  All right.  I'm going to let him answer

6    the question.  The objection is overruled.

7            THE WITNESS:  You know, without going line by line

8    through the contracts, you know, together --

9    BY MR. CARDWELL:

10   Q    Let me ask it this way.  The agreements you signed on

11   behalf of Absolute Medical, they were transmitted to you in a

12   similar fashion, via e-mail from Ms. Edelson, correct?

13   A    It's possible.

14   Q    Okay.  And you signed all of those agreements other than

15   in 2017, correct?

16   A    Yes, sir.

17   Q    And that one was also transmitted to you via e-mail,

18   correct?

19   A    It's possible.

20   Q    And this one, the 2018 agreement, is being transmitted to

21   you via e-mail, correct?

22   A    Yes.

23   Q    And you signed the 2018 agreement, right?

24   A    Yes, sir.

25   Q    And you signed the 2016 agreement?

DAVID HAWLEY - Cross-Examination by Mr. Busch                45

1    A    That's correct.

2    Q    You signed the 2015 agreement?

3    A    Yes, sir.

4    Q    '14 agreement?

5    A    Right.

6              MR. CARDWELL:  Your Honor, I would like to move into

7    evidence Exhibit 14, which was the e-mail we talked about

8    earlier, and the Exhibit 29, which is the 2018 agreement and

9    accompanying e-mail exchange.

10             THE COURT:  All right.  For the limited purposes of

11   this hearing, of course, are there any objections from the

12   defense?

13             MR. BUSCH:  No, Your Honor.

14             THE COURT:  All right.  They'll be admitted and

15   marked as such.

16             MR. CARDWELL:  Thank you.

17        (Plaintiff's Exhibit Nos. 14 and 29 were admitted into

18        evidence.)

19             THE COURT:  Anything further?

20             MR. CARDWELL:  That's all, Your Honor.

21             THE COURT:  Cross-examination?

22                        CROSS-EXAMINATION

23   BY MR. BUSCH:

24   Q    Good afternoon, Mr. Hawley.  Can you tell the Court if

25   you utilize a cell phone number ending in 8629 for business

1    and personal use?

2    A    I do.

3    Q    And who is your provider?

4    A    Sprint.

5    Q    How long have you had that phone number?

6    A    As long as I can remember.

7    Q    And tell the Court what happened in -- well, let me back

8    up for just a minute.

9         In 2016, what type of electronic device, cell phone

10   were you using?

11   A    I think '16 was iPhone 7 plus.

12   Q    Tell the Court what happened in July of 2017 with your

13   cell phone.

14   A    I believe I replaced it with a new phone.  There was a

15   new phone in '17 and a new phone in '19, I believe.

16   Q    The phone that you got in July of 2017, which type of

17   phone was that?

18   A    So that might have been the 7 plus then.  And the one

19   before that was probably the 5.

20   Q    Why was it that you decided to get a new cell phone in

21   July of 2017?

22   A    I was running out of storage on my phone and so I

23   upgraded, got a new phone.

24   Q    And you mentioned the auto delete function.  Did you have

25   any discussions with anyone at Sprint regarding the auto

1    delete function in July of 2017?

2    A    Not that I can recall.

3    Q    And you activated that auto delete function in July of

4    2017?

5    A    Likely shortly after I got the new phone, just as I did

6    with the prior.

7    Q    Tell the Court why you activated that one-year auto

8    delete function.

9    A    To free up storage, you know, to have basic function of

10   my phone.  I take a lot of pictures.

11   Q    Was that part of a routine practice and maintenance that

12   you started doing your phone at that point?

13   A    Yes, sir.

14   Q    And when you became a defendant in this action in roughly

15   December of 2017, at the time that that lawsuit was filed, did

16   you recall that you had activated that one-year auto delete

17   function on your iPhone 7 in July of 2017?

18   A    I didn't think twice about it.

19   Q    And in compliance with the discovery requests that were

20   served upon you, Mr. Hawley, did you take your cell phone

21   somewhere in February of 2019?

22   A    Yes, sir.  Just as Ryan Miller spoke about, we took it to

23   D4 Discovery to have a forensic analysis obtained from the

24   phone to pull information.

25   Q    And would it be accurate to say there was 22,519 text

1   messages pulled off that phone?

2   A    Okay.

3   Q    And in addition to the content that was on your cell

4   phone, did you produce any e-mails that were requested of you

5   in this case?

6   A    Yes, sir.

7   Q    And do you utilize and have you utilized an e-mail

8   address DHawley@Hmedical.org?

9   A    Yes, sir.

10  Q    And did you provide the password to that e-mail to the D4

11  third-party custodian?

12  A    I believe I did, yep.

13  Q    And would you agree 6,208 e-mails were produced from that

14  e-mail address?

15  A    Okay.

16  Q    Do you also utilize an e-mail address

17  DaveRyanHawley@gmail.com?

18  A    Yes, sir.

19  Q    And did you provide that password to the third-party

20  custodian?

21  A    Yes.

22  Q    Would you agree that 30,597 e-mails were produced from

23  that e-mail account?

24  A    That sounds about right.

25  Q    Mr. Hawley, did you ever delete or destroy any e-mails

DAVID HAWLEY - Cross-Examination by Mr. Busch                    49

1   associated with the DaveRyanHawley@Gmail.com account?

2   A    No, sir.

3   Q    Did you ever delete or destroy any e-mails associated

4   with DHawley@Hmedical.org?

5   A    No, sir.

6   Q    And did you ever intentionally delete or destroy any text

7   messages that were on your cell phone other than the one-year

8   auto delete function that you had activated?

9   A    No, sir.

10  Q    Mr. Hawley, did you maintain any sort of control or

11  authority over the absolute-med.com domain utilized by

12  Absolute Medical?

13  A    No.

14  Q    Did you maintain any control or authority over the

15  absolute-medical.org domain utilized by Absolute Medical

16  Systems?

17  A    No.

18  Q    Mr. Hawley, were you aware that Absolute Medical in the

19  first part of 2017 provided you with a proposed independent

20  contractor agreement for your corporate entity, Hawley Med?

21  A    Yes, sir.

22  Q    You remember that?

23  A    Yes.

24  Q    Did you on behalf of Hawley Med ever execute that 2017

25  agreement?

1    A    No.

2    Q    Did you ever destroy copies of your executed signature

3    page?

4    A    No, sir.

5              MR. BUSCH:  Nothing further, Your Honor.

6              THE COURT:  Thank you.

7              Redirect examination?

8                       REDIRECT EXAMINATION

9    BY MR. CARDWELL:

10   Q    You just testified that no one at Sprint assisted you in

11   setting that one-year auto delete function.  That's something

12   you did on your own, correct?

13   A    Correct.

14   Q    I don't have an extra copy of your declaration, but if I

15   may, sir --

16             MR. CARDWELL:  May I, Your Honor?

17             THE COURT:  Sure.

18   BY MR. CARDWELL:

19   Q    If I could get you to read paragraph 11 of your

20   declaration into the record.

21   A    "Based on suggestions of Sprint customer service

22   representative in July '17, I purchased a new iPhone with

23   additional storage space, beginning using the iCloud option

24   for storage of data, and enabled the auto delete function for

25   text messages older than one year."

DAVID HAWLEY - Redirect Examination by Mr. Cardwell          51

1      THE COURT:  You may retrieve.

2      MR. CARDWELL:  Thank you.

3  BY MR. CARDWELL:

4  Q    So it wasn't the suggestion of a Sprint customer service

5  person that you --

6  A    The suggestion was to purchase a new iPhone to have more

7  storage on the phone.

8  Q    If you had more storage, why would you need to put the

9  auto delete function into effect?

10 A    This was just additional storage space.

11 Q    Of the 22,500 texts you just mentioned, how many were in

12 the relevant time, you know, when you guys were considering

13 leaving NuVasive and joining Alphatec?

14 A    I have no idea.

15 Q    There were none between July 1 of '17 and December 1 of

16 '17, were there?

17 A    If the texts that were pulled were before, you know, one

18 year, I would assume that they're not there.

19 Q    And the e-mail address you use for your work at Absolute

20 Medical, you continued to use that in your work for Alphatec

21 until early 2018, correct?

22 A    I don't remember the dates, but --

23 Q    You used it until Mr. Soufleris told you he would be

24 turning it off, correct?

25 A    I believe -- I believe so.

1  Q    Okay.  And that was sometime after you switched from

2  NuVasive to Alphatec?

3  A    You know, again, I don't remember the dates.  It's been a

4  couple years.

5  Q    In any event, those e-mails are gone, right?

6  A    Well, what you guys have obtained, you know, we fully

7  cooperated, giving -- giving our phones, you know, to the D4

8  Discovery.  And I don't know what you guys have, you know, in

9  full and what you don't.

10 Q    And when you informed Mr. Soufleris it was okay to shut

11 down your Absolute Medical Systems e-mail account, nothing

12 prevented you from saving those e-mails at that time, correct?

13 A    It was -- it wasn't even a thought to do so.

14 Q    But one thing that was going on prior to that July date

15 is that you were representing Orthofix's Trinity biologic

16 product in surgeries that Dr. Sawin was performing, correct?

17 A    Dr. Sawin utilizes this Trinity ELITE.

18 Q    And it was Mr. Soufleris and Absolute Medical Systems and

19 not you that had the contract with Osseus to use those Trinity

20 products?

21 A    I did not have a contract with Greg, Absolute Medical

22 Systems, or the companies.

23 Q    And I think you testified in your deposition that during

24 that period that you and -- you were supposedly separated from

25 Mr. Soufleris and Absolute Medical Systems, he made other

1  competitive companies available to you such as K2M, Orthofix,

2  and others; is that right?

3  A    He introduced me to some individuals with those

4  companies, yep.

5  Q    And now we don't have the e-mails between you and

6  Mr. Soufleris about those companies, do we?

7  A    I don't know.

8          MR. CARDWELL:  Thank you.

9          THE COURT:  All right.  Mr. Busch, would you like to

10  ask any additional questions?

11          MR. BUSCH:  Nothing further, Your Honor.

12          THE COURT:  All right.  Thank you, sir.  Feel free

13  to be seated at counsel table.

14          Will the plaintiff be calling any additional

15  witnesses?  Any additional witnesses?

16          MR. CARDWELL:  Yes, one more.  I would call

17  Greg Soufleris.

18          THE COURT:  All right.  Mr. Soufleris, come on

19  forward.

20          THE COURTROOM DEPUTY:  Please come forward and be

21  sworn.  Raise your right hand.

22                  **GREGORY SOUFLERIS**,

23  called by Plaintiff, was duly sworn by the courtroom deputy,

24  and in answers to questions propounded, testified as follows:

25          THE COURT:  Good afternoon, Mr. Soufleris.  Please

1    make yourself comfortable.  State your full name and please

2    spell your last name.

3              THE WITNESS:  Thank you, Your Honor.

4    Gregory Tabeling Soufleris, S-o-u-f-l-e-r-i-s.

5              THE COURT:  All right.  Your witness.

6              MR. CARDWELL:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MR. CARDWELL:

9    Q    Mr. Soufleris, you also provided a declaration in this

10   case, correct?

11   A    Yes.

12   Q    Paragraph 4 of that declaration reads, "I formed AMS in

13   December 2017 and signed a distributorship agreement with

14   Alphatec Inc. for the sale of spinal implant products in

15   Florida except for the Orlando area and Georgia."

16             Is that correct?

17   A    That's correct.

18   Q    Now, in addition to that, you signed distributorship

19   agreements with other spine and/or biologic companies.

20   A    I personally did not sign additional agreements.

21   Q    Your companies did?

22   A    Can you --

23   Q    Sure.  Absolute Medical Systems signed an agreement with

24   Orthofix to market its biologic product, Trinity?

25   A    Correct.

1   Q    Another one of your companies, Spine Solutions, entered

2   into a distributorship agreement with I believe NovaBone?

3   A    Correct.

4   Q    And you signed both of those agreements?

5   A    I believe so.

6   Q    And those -- you were active in the Orlando area for

7   those competitive companies, right?

8   A    What's active?

9   Q    You had sales in the Orlando area?

10  A    Correct.

11  Q    And those sales were through Mr. Hawley and Mr. Miller?

12  A    Mr. Hawley and Mr. Miller did not receive any

13  commissions.

14  Q    I understand you didn't pay them commissions, but they're

15  the ones who utilized the products in the operating room?

16  A    The surgeons utilized the products in the operating room.

17  Q    They were the ones who were supporting the surgeries; is

18  that correct?

19  A    Correct.

20  Q    Okay.  Nobody else was?

21  A    I'm not sure.  Likely nurses.

22  Q    But you are now paying them commissions on those sales?

23  A    Paying who?

24  Q    You are now paying Mr. Miller and/or Mr. Hawley sales on

25  the biologic products that you were not paying them

1   commissions on during the first year of AMS's existence?

2   A    Mr. Hawley receives commission.  Mr. Miller does not.

3   Q    That's because he's on a guaranteed salary?

4   A    That's a contract agreement that we have in place.

5   Q    So the only thing that changed when they came into the

6   Absolute Medical Systems fold is they began receiving

7   commissions on those products -- or at least Mr. Hawley did?

8   A    Which products?

9   Q    Orthofix.

10  A    Mr. Hawley receives commission on Orthofix currently.

11  Q    And this says that the distributorship with Alphatec was

12  for Florida except for Orlando.  You say that, correct?

13  A    Correct.

14  Q    But two days after -- well, let's go back.

15       The day after Dr. Sawin first used Alphatec

16  products, on December 5, 2017, you and Mr. Hawley took him to

17  drinks, right?

18  A    I'm not sure.  Could have happened.

19  Q    Two days later, Alphatec executives fly across the

20  country from San Diego, stay at your country club, and you go

21  have dinner at Kres Chophouse with Mr. Hawley, the CEO, the

22  general counsel, and Dr. Sawin, correct?

23  A    That's correct.

24       MR. BUSCH:  Your Honor, relevance -- object to

25  relevance based on the fact that we're here for the

1    spoliation.

2          MR. CARDWELL:  Your Honor, to talk about what these

3    deleted messages would show.

4          THE COURT:  Well, I mean, this doesn't mean what

5    they'll show.  So what are you trying to do with this?  They

6    went to dinner at Kres in downtown Orlando with the physician

7    after he started using the product.  Why is that relevant

8    going down this --

9          MR. CARDWELL:  I think I'm about to tie that up,

10   Your Honor.

11         THE COURT:  All right.  I'm going to give you some

12   leeway, but you need to tie it together or I'm going to

13   sustain the objection afterwards and not consider what comes

14   out of here.  So go on ahead.

15         MR. CARDWELL:  Sure.

16   BY MR. CARDWELL:

17   Q    And there were communications with Dr. Sawin prior to

18   this dinner to set it up; isn't that right?

19   A    From whom?

20   Q    From you.

21   A    No.

22   Q    There were communications between you and Alphatec about

23   this dinner prior to it happening?

24   A    Were there communications to set up a dinner?

25   Q    Yes.

1   A    Likely.

2   Q    E-mails?

3   A    I have -- I have no idea.

4   Q    But there were likely e-mails between you and Alphatec

5   about this dinner?

6   A    I have no idea.  It could have been over the phone, text

7   message, e-mail.  I have no idea.

8          MR. CARDWELL:  I think I've made my point.

9          THE COURT:  Okay.  Keep going.

10  BY MR. CARDWELL:

11  Q    Your phone is set to a 30-day delete option for text

12  messages, correct?

13  A    Correct.

14  Q    And you're the one that set it to 30 days?

15  A    I -- I set it for 30 days?

16  Q    Yes.

17  A    It was -- it was likely myself or Verizon, one of the

18  two, or AT&T, the prior server.

19  Q    And it is still set to 30-day delete as of today?

20  A    I don't believe as of today.

21  Q    It was set to 30-day delete as of your August 2019

22  deposition?

23  A    Correct.  As soon as the deposition was over, I got a new

24  phone.

25  Q    Why did you take no efforts to preserve your text

GREGORY SOUFLERIS - Direct Examination by Mr. Cardwell          59

1   messages?

2   A    I thought they were preserved.

3   Q    Well, you just said that there was a 30-day delete

4   function.

5   A    There is.

6   Q    Why did you think they were preserved?

7   A    Mr. Hawley mentioned it also.  I have no idea that there

8   aren't records like bank records that go back seven years or

9   iCloud storage that you can redo apps.  I have no idea.

10  Q    And as the owner of Absolute Medical and Absolute Medical

11  Systems, did you ever issue any type of litigation hold in

12  this case?

13  A    I don't know what that means.

14  Q    Okay.  Did you ever instruct yourself and others to

15  preserve relevant documents?

16  A    I'm not sure.

17  Q    Did any of your lawyers instruct you to preserve relevant

18  documents?

19  A    I know when we had to bring -- you know, when we had to

20  send our phones in, when we had to give our e-mail addresses

21  and give all the passwords and get all the data, they said, do

22  not touch anything.  So -- I don't know the timeframe of that.

23  Q    You certainly recall receiving a letter from me

24  September 10 of 2019 instructing you to preserve evidence,

25  correct?

1    A     Could have.

2    Q     I'm sorry.  I misspoke on the date.

3          MR. CARDWELL:  If I may, Your Honor?

4          THE COURT:  You may approach.

5  BY MR. CARDWELL:

6    Q     This has been premarked as Exhibit 2.  What is the date

7  of that letter, sir?

8    A     November 28, 2017, to Mr. Mills.

9    Q     Okay.  Mr. Mills is your lawyer, correct?

10   A     Correct.

11   Q     And the next to the last sentence on the second page,

12  does that instruct you to preserve relevant evidence?

13   A     "Absolute Medicals and current salesperson will continue

14  to cover all surgical cases" --

15   Q     On the last page, the second page.

16   A     Where you want me to read out loud?

17   Q     Yes, please.

18   A     You said the last sentence or the second to last?

19   Q     I believe it's the second to last.

20   A     "NuVasive will take such action as is necessary in order

21  to protect its legal interests."

22          That's the second to last.

23          MR. CARDWELL:  Excuse me.

24          THE COURT:  I've got an idea.  Why don't you read it

25  into the record?

1          MR. CARDWELL:  That's fine.

2    BY MR. CARDWELL:

3    Q    The next to the last paragraph says, "Absolute Medical is

4    now on notice of potential litigation and is required to take

5    all necessary steps to preserve and not destroy, conceal, or

6    alter any and all communications and documents relevant to

7    this matter, including by way of example and without

8    limitations e-mails, text messages, voice mails, records,

9    files, and other data, wherever located and regardless of the

10   format or media.  Be forewarned that purposeful destruction of

11   such evidence could result in penalties, including legal

12   sanctions."

13          Is that right?

14   A    If that's what it says, yes.

15   Q    What steps did you take?

16   A    I didn't do anything.

17   Q    Paragraph 8 of your declaration, "Absolute Medical

18   received notice from Google in February 2018 that the domain

19   was going to be closed, but the notice did not mention

20   permanent loss of e-mails affiliated with the domain."

21          What did you do to check and see if e-mails would be

22   preserved before you shut down the Absolute Medical e-mail

23   server?

24   A    I didn't shut it down.  I just didn't renew it.

25   Q    Why not?

1    A    Absolute Medical was in the process of being dissolved

2    and it was on an auto payment with the credit card that was

3    Absolute Medical's credit card.  The account wasn't open any

4    longer.

5    Q    Okay.  You didn't think there would be relevant evidence

6    in the e-mails?

7    A    I'm sure that that's -- I didn't -- you asked if I --

8    Q    You acknowledge there was relevant evidence in those

9    e-mails?

10   A    I don't believe so.

11   Q    Why not just continue to make the payments?

12   A    The company was being dissolved.

13   Q    Why not make them personally?

14   A    I personally -- I was told to keep everything separate.

15   Q    Isn't it true that Alphatec is indemnifying Absolute

16   Medical in this lawsuit?

17            MR. BUSCH:  Objection, relevance.

18            MR. CARDWELL:  They could have paid to keep -- it

19   shows they could have paid to keep the server alive and we

20   would have those documents.

21            THE COURT:  All right.  You've established -- any

22   tendency to make a fact in dispute more or less likely for the

23   purpose of this hearing.  The objection is overruled.  You can

24   ask that question.  You can ask your question.

25            You can answer it.

1        THE WITNESS:  Say it again.

2    BY MR. CARDWELL:

3    Q    Sure.  Absolute Medical is -- sorry.

4        Alphatec is indemnifying Absolute Medical?

5    A    I don't know if they're indemnifying Absolute Medical.

6    Q    They're indemnifying Absolute Medical Systems and you,

7    correct?

8    A    I believe so.

9    Q    And as the sole member of Absolute Medical, have you

10   received any legal bills?

11   A    I'm not sure.

12   Q    Did you ever consider asking Alphatec to pick up the tab

13   on the e-mails so they wouldn't be lost?

14   A    I did not consider that.  I did not know they would be

15   lost.

16   Q    Paragraphs 13 and 14, you talk about shutting down

17   Mr. Hawley and Mr. Miller's Absolute Medical Systems accounts.

18   And it sounds -- it looks like you did that June or July of

19   2018; is that correct?

20   A    I deactivated their accounts.

21   Q    Before you deactivated their accounts, did you take any

22   steps to see if those e-mails would be retained or if they

23   would be lost?

24   A    I believe I sent an e-mail to them that said these

25   accounts will be deactivated.

GREGORY SOUFLERIS - Direct Examination by Mr. Cardwell      64

1  Q    My question is, before you deactivated those accounts,

2  did you check with Google or with anyone else to see if the

3  e-mails on those accounts would be lost?

4  A    Again, the same as Absolute Medical domain, I had no idea

5  that these were not discoverable.

6  Q    Paragraph 26 of your declaration says, "Upon receiving

7  NuVasive's written discovery requests, I provided copies of

8  all text messages housed on my iPhone 6 at that time."

9            Does that sound right to you?

10 A    Sounds correct.

11 Q    You did not take your phone to be imaged like Mr. Miller

12 or Mr. Hawley, did you?

13 A    That's correct.

14 Q    And you received NuVasive's written discovery requests on

15 August 6 of 2018, correct?

16 A    I'm not sure of the date.  If you say so.

17 Q    Okay.  Thank you.  But you didn't start producing text

18 messages until March of 2019, correct?

19 A    You said August of '17 and I didn't produce until March

20 of --

21 Q    I'm sorry.  August of '18 was when you received the

22 requests.

23 A    Okay.

24 Q    And you began producing texts in March of '19.

25 A    Honestly, I'm not sure when I produced.  I'm given a

 1  timeline and there was a ton of information.  I don't know

 2  what days I produced what and how.  I produced everything I

 3  had before the deadline that I was supposed to.

 4  Q    You haven't produced any documents from your WhatsApp,

 5  have you?

 6  A    Documents from my WhatsApp?

 7  Q    WhatsApp.

 8  A    There aren't any documents from WhatsApp.

 9  Q    You don't utilize WhatsApp for business communications?

10  A    My business communications are largely through e-mail,

11  text message, cell phone.

12  Q    They might largely be through that, but you also

13  communicate through WhatsApp for business, don't you?

14  A    Through business, no.

15  Q    Just prior to --

16  A    Can I strike that?  A consultant in one of the businesses

17  communicates through WhatsApp because he's an international

18  traveler, Dan Elmalem.

19  Q    And other members or other contractors of Absolute

20  Medical Systems utilize WhatsApp, don't they?

21  A    I don't believe so.  You would have to check with them.

22  Q    Well, you use it to communicate with them, don't you?

23  A    Not off the top of my head.

24  Q    Okay.  You submitted a business plan to Alphatec in

25  October of 2017, correct?

1   A    Sounds right.

2   Q    And one thing that was in that business plan is you

3   wanted Alphatec -- and I'll say this in quotes -- "indemnify

4   us from any lawsuits," right?

5   A    Okay.

6   Q    You wanted Alphatec to indemnify you from a lawsuit?

7   A    If that's what the presentation said.

8   Q    Okay.  You thought it was likely that NuVasive would sue

9   you after you tried to breach the contract, right?

10  A    I did not know I breached the contract.

11  Q    After you received my letter that was marked as

12  Exhibit 2, you thought there was a good chance NuVasive would

13  sue you, didn't you?

14  A    When -- when -- when was the presentation sent and when

15  did I receive your letter?

16  Q    The presentation was sent October -- well, you went up

17  there and presented it on October 12 of 2017.

18  A    Correct.  So I would not know that I would be sued until

19  I received your letter a month and a half later.

20  Q    Then why did you ask Alphatec for indemnification?

21  A    I assumed NuVasive is litigious.

22            MR. CARDWELL:  One second, Your Honor.

23            Your Honor, Exhibit 4, if I may, these are just the

24  requests for production of documents that we sent to

25  Mr. Soufleris, just to establish for the record the actual

1    date of service, if I may.

2              THE COURT:  You may.  You may approach.

3    BY MR. CARDWELL:

4    Q    Do you agree these were served on you on August 6, 2018?

5    A    Correct.

6              MR. CARDWELL:  And, Your Honor, if I could move

7    Exhibit 4, which was the letter we were talking about earlier.

8              THE COURT:  Any objection?

9              MR. BUSCH:  No objection.

10             MR. CARDWELL:  Exhibits 2 and 4.

11             THE COURT:  2 and 4 that you used, for the limited

12   purposes of this hearing, I'll consider them.  They're

13   admitted and marked as such.  Go on ahead and continue.

14       (Plaintiff's Exhibit No. 2 and 4 were admitted into

15       evidence.)

16             MR. CARDWELL:  That's all, Your Honor.

17             THE COURT:  Any cross-examination on this witness?

18             MR. BUSCH:  Yes, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. BUSCH:

21   Q    Mr. Soufleris, briefly on the absolute-med.com domain,

22   could you please tell the judge who owned that domain?

23   A    Google.

24   Q    And who contracted with Google for that domain?

25   A    I don't believe there was a contract.

1   Q     Was the domain utilized by Absolute Medical?

2   A     Correct.

3   Q     And when did you begin using that domain?

4   A     February of 2013.

5   Q     And tell the judge again how the payment was made on the

6   absolute-med.com domain.

7   A     It was a yearly payment.

8   Q     And how was that paid?

9   A     Through my -- through Absolute Medical's bank of -- I

10  apologize.   Through Absolute Medical's American Express

11  business card.

12  Q     When did Absolute Medical begin the dissolution process?

13  A     I believe December of 2017.

14  Q     And as part of that dissolution process, did Absolute

15  Medical begin -- or stop paying vendors or stop renewing

16  vendor contracts in the regular course of its business?

17  A     Yes.

18  Q     And was one of those contracts that Absolute Medical

19  decided not to renew was for the domain with Google?

20  A     Again, not a contract, but the auto renewal was

21  essentially stopped.

22  Q     And at the time that the auto renewal was stopped,

23  Mr. Soufleris, did you or anyone else at Absolute Medical have

24  any knowledge of Google's archive policy with respect to

25  closed domains?

1  A    No.

2  Q    Did you or anyone else at Absolute Medical have any

3  knowledge that the e-mails from that domain would not be able

4  to be retrieved at a later date?

5  A    No.

6  Q    Did you, Mr. Soufleris, or anyone on behalf of Absolute

7  Medical intentionally destroy or delete any e-mails from the

8  absolute-med.com domain?

9  A    No.

10  Q    Tell the Court when it was, Mr. Soufleris, that you first

11  learned of Google's archive domain policy and how -- the

12  circumstances surrounding that.

13  A    I believe when we were requested from NuVasive to produce

14  the documents is when we contacted Google.

15  Q    And who contacted Google?

16  A    Daneri Edelson.

17  Q    Did she do that on your instruction?

18  A    Correct.

19  Q    And what was your understanding at that time of Google's

20  archive policy?

21  A    Prior to her contacting?

22  Q    No.  After -- after her contact.

23  A    She said that there's no way to reactivate the domain and

24  that we have no access to any prior e-mails.

25  Q    Switching gears to the domain that's

1    absolute-medical.org, which entity utilizes that domain?

2    A    Absolute Medical Systems.

3    Q    And when did you start that domain?

4    A    I believe December of 2017.

5    Q    And how many employees or representatives currently

6    utilize e-mails at that domain?

7    A    Close to 30.

8    Q    And did you provide the password to that domain to the D4

9    third-party folks in Orlando, Florida?

10   A    Yes.

11   Q    And do you know if D4 -- do you know subsequently if any

12   e-mails were produced from that domain?

13   A    I believe so.

14   Q    And tell the judge who made the decision to deactivate

15   the e-mail addresses for Dave Hawley and Ryan Miller at the

16   absolute-medical.org domain.

17   A    I did.

18   Q    And tell the judge why you made that decision.

19   A    Based on our hearing, we didn't know anything was wrong

20   with independent contractors using an e-mail.  And once we got

21   here, we realized that was wrong and wanted to deactivate it.

22   Q    At the time that AMS deactivated Mr. Hawley and

23   Mr. Miller's e-mail address, did AMS -- was AMS aware that

24   these e-mails would be permanently lost under Google's archive

25   policy?

1   A    Absolutely not.

2   Q    At any time did you or anyone else on behalf of Absolute

3   Medical Systems intentionally destroy or discard any evidence?

4   A    No.

5   Q    Mr. Soufleris, in November of 2017 -- I'm sorry.

6         Could you tell the judge at the beginning of 2017

7   which cell phone you used and who your provider was?

8   A    The beginning of 2017, I believe it was AT&T and an

9   iPhone 5.

10  Q    And in March of 2017, did you change iPhones and

11  providers?

12  A    I did.

13  Q    What was your iPhone beginning in March of 2017?

14  A    I believe iPhone 6.

15  Q    And who was your provider?

16  A    Verizon.

17  Q    And at that time in March of 2017, Mr. Soufleris, did you

18  activate a 30-day auto delete function on your new cell phone

19  for text messages?

20  A    I'm not sure of the time, but when I got the 6, Verizon

21  versus AT&T versus us moving.  So when I got the 6 is when the

22  auto delete has been activated.

23  Q    And did you, Mr. Soufleris, understand that the text

24  messages that would be subject to that auto delete -- the

25  content of those text messages would be lost?  Did you have

1    that understanding?

2    A    Absolutely not.

3    Q    Mr. Soufleris, in December of 2017 when you were served

4    with this lawsuit, did you recall that you had the 30-day auto

5    delete function enabled on your iPhone 6?

6    A    I don't recall.  I don't know one way or the other.

7    Q    And you agree with Mr. Cardwell that you were served

8    individually with a document production request in August of

9    2018; is that correct?

10   A    I believe so.

11   Q    And then at some point, you printed off and produced all

12   of the text messages that you had on your iPhone 6?

13   A    Correct.  I contacted Verizon and they sent all of the

14   text messages, all of the phone calls.  And then I screenshot

15   all the information and sent it to your office.

16   Q    And did you attempt to find text messages that predated

17   your 30-day auto delete through Verizon?

18   A    Correct.  I contacted Verizon, and I gave the iCloud

19   number to the D4 people as well as my password.

20   Q    Mr. Soufleris, do Dave Hawley and/or Ryan Miller have any

21   authority or control over the absolute-med.com domain?

22   A    No.

23   Q    And do Dave Hawley or Ryan Miller have any authority or

24   control over the absolute-medical.org domain name?

25   A    No.

1  Q    In 2017, Mr. Soufleris, as a representative of Absolute

2  Medical, do you recall sending a 2017 independent contractor

3  agreement to Dave Hawley's entity, Hawley Med?

4  A    Yes.

5  Q    Do you recall sending a similar 2017 agreement to

6  Ryan Miller's entity, Millertime Medical?

7  A    Yes.

8  Q    Do you recall whether or not Hawley Med ever signed the

9  2017 agreement?

10 A    I recall he did not.

11 Q    And did he tell you that?

12 A    Yes, he did.

13 Q    And did he tell you why?

14 A    Yes, he did.

15 Q    Tell the Court what Mr. Hawley told you.

16 A    He doesn't believe in the non-compete provisions.

17 Q    Did Mr. Miller, on behalf of Millertime Medical, ever

18 sign the 2017 contractor agreement?

19 A    He did not.

20 Q    And did he also inform you that he was not going to sign

21 it?

22 A    That's correct.

23 Q    Mr. Soufleris, on behalf of any of your corporate

24 entities or on behalf of yourself individually, have you

25 intentionally destroyed or discarded any electronic evidence

1    in this case?

2    A    No, I have not.

3    Q    Have you intentionally destroyed or discarded any paper

4    evidence in this case?

5    A    No, I have not.

6            MR. BUSCH:  Thank you.

7            THE COURT:  Redirect?  Keep it short.  You're

8    already over time.  If you want any opportunity to tie this

9    together on a closing argument, I would do this very quickly.

10           MR. CARDWELL:  Yes, Your Honor.  I understand.

11                    REDIRECT EXAMINATION

12   BY MR. CARDWELL:

13   Q    Google contract, how much did it cost a year?

14   A    I don't recall.

15   Q    Less than a hundred bucks, right?

16   A    I don't believe that's accurate.

17   Q    Six dollars per account?

18   A    I'm not sure of the contract.

19   Q    When you got the preservation e-mail or preservation

20   letter from my office, you were represented by counsel at that

21   time, correct?

22   A    Yes.

23   Q    When you got the discovery request, you were represented

24   by counsel, correct?

25   A    Yes.

1  Q    And you don't have to pay for this counsel.  It's free.
2  Alphatec is paying for it?
3  A    Correct.
4  Q    And you didn't ask counsel what your obligations were;
5  you didn't seek instruction on how to properly preserve
6  documents, did you?
7          MR. BUSCH:  Objection, to the extent he's asking for
8  attorney-client privileged communications, Your Honor.
9          THE COURT:  Response?
10          MR. CARDWELL:  I think in the sense of -- I think
11  there is no privilege when you're talking about litigation
12  holds and preservation of documents.
13          THE COURT:  Well, I mean, I don't have any real
14  briefing on that right now.  So in abundance of caution, I'm
15  going to sustain that.  If you're going to go down that road,
16  you need to come armed with some case law or something in
17  support of your position.  So keep on going.
18  BY MR. CARDWELL:
19  Q    The former Absolute Medical sales representatives, after
20  they switched over to Absolute Medical Systems, they continued
21  to use the Absolute Medical e-mail address until you replaced
22  it with a new one, correct?
23  A    Restate that.
24  Q    Sure.  Absolute Medical Systems began working for
25  Alphatec on December 1, 2017, right?

1   A     Early December, correct.

2   Q     And it was sometime after that that Absolute Medical

3   Systems obtained its own Google e-mail account?

4   A     I'm not sure of the date.

5              MR. CARDWELL:  That's all, Your Honor.  Thank you.

6              THE COURT:  All right.  One more shot from the

7   defense here.

8              MR. BUSCH:  Nothing -- nothing further of this

9   witness, Your Honor.  The defense will just reserve all of

10  their time for arguments.

11             THE COURT:  All right.  Feel free to be seated.

12             We are out of time.  So how much time are you

13  requesting for closing argument?

14             MR. CARDWELL:  Less than five minutes.

15             THE COURT:  I'll give you ten each side and I'll

16  time it.  And before you get started, I guess my question to

17  you is, you've presented quite a bit of circumstantial

18  evidence in support -- you believe in support of your

19  contention that -- I'll just put it shenanigans were afoot

20  here.  So how do you tie that together?  I mean, you have

21  three witnesses that testified that it was inadvertent or

22  there was no intent behind it.  So how do we tie that

23  together?

24             MR. CARDWELL:  So you can prove spoliation through

25  circumstantial evidence, Your Honor.  And let's think about

1    what else the three witnesses have talked about.

2           When the case started, no one had ever signed a

3    non-compete agreement.  They universally swore to that in

4    their interrogatory responses.  In fact, at the preliminary

5    injunction hearing, Your Honor said that those responses were

6    just false.

7           Then when we find the --

8           THE COURT:  You quoted me.  I'm not sure that --

9    well --

10          MR. CARDWELL:  It's pretty close to that,

11   Your Honor.

12          THE COURT:  But it wasn't that.  You're quoting me.

13   Quote me or don't quote me.  Go on ahead.

14          MR. CARDWELL:  We finally find the 2013 agreement,

15   you know, just before the hearing, and then all of a sudden we

16   get the '14, the '15, the '16.  And the universal story

17   becomes, well, we didn't sign the '17.  Okay.  Well, let's see

18   the e-mails that go back and forth.  We know that the '16 and

19   the '18 agreements were communicated with the sales reps via

20   e-mail.  They've acknowledged the '17 ones were.

21          So it's convenient that all of the communications

22   between the time Mr. Soufleris claims he began considering

23   leaving NuVasive after the territory transition agreement,

24   which we're saying that's in July of '17, and the time he

25   joined Alphatec, December 1, '17, all of those communications

1    are gone, Your Honor.  All of them.  And apparently there was

2    no litigation hold that went out.  There was no instruction

3    from counsel about how to preserve documents or which

4    documents to preserve.

5          There's -- you know, where there's smoke, there's

6    fire, Your Honor.  And that's the purpose of circumstantial

7    evidence.  And there's an acknowledgement that all of these

8    materials are gone.  And beyond that, you're talking about

9    text messages.

10          Mr. Soufleris took affirmative steps to shut down

11   the entire Absolute Medical e-mail account and then the two

12   most relevant Absolute Medical Systems's portions of that

13   account.  Apparently he deleted those again without consulting

14   counsel, without understanding the ramifications of his

15   actions, just let it fly and deleted those entire accounts.

16          Respectfully, Your Honor, I believe that that's more

17   than circumstantial evidence.  I believe that that's direct

18   evidence of destruction of documents.

19          THE COURT:  Okay.  Thank you for your argument.  I

20   appreciate that.

21          Mr. Busch, would you like to be heard?

22          MR. CARDWELL:  I apologize.  I did have an argument.

23   Was that my closing?

24          THE COURT:  That was your closing.  But you have

25   more time if you want to keep going.

79

1          MR. CARDWELL:  Oh, yeah.  I'm sorry.  I thought I

2     was answering your question, Your Honor.

3          THE COURT:  No, no, no.  Let's go.  That was two

4     minutes and 18 seconds into it.  I'll stop it while you gather

5     your thoughts.

6          MR. CARDWELL:  And one housekeeping matter,

7     Your Honor.  If we could, the first 15 exhibits on our

8     premarked list were attached to our opening brief.  I would

9     like to move those that were not introduced into evidence in

10    this hearing into evidence.

11         THE COURT:  Well, I don't really know what those are

12    at this point.

13         So does defense want to be heard on that?

14         MR. BUSCH:  Yeah.  I object to the blanket

15    introduction of all these documents.  I mean, I haven't had a

16    chance to even go through them.  So --

17         MR. CARDWELL:  They're with the brief.

18         THE COURT:  What you've submitted contemporaneous to

19    your presentation has been admitted.  I think in all fairness

20    if he hasn't seen what you're admitting prior to today and had

21    a chance to be heard on the objections, you can attempt -- you

22    want an opportunity to move them in in a written document and

23    give your opposing counsel an opportunity to respond in kind?

24         MR. CARDWELL:  They are in a written document.

25    They're in our initial motion.

80

1          THE COURT:  Okay.  I understand.  But you want to

2     move those all in, correct?

3          MR. CARDWELL:  Yes, Your Honor.

4          THE COURT:  All right.  They've been moved into

5     evidence.  I'm going to issue an endorsed order giving you

6     some time to respond in writing in terms of objections, if the

7     defense would like to object.  So they've been moved in and

8     I'll make a decision accordingly.

9          Are you ready to start your argument?

10     (Plaintiff's Exhibit Nos. 1, 3, 5 through 13 and 15 were

11        admitted into evidence.)

12          MR. CARDWELL:  Yeah.  I am, Your Honor.

13          THE COURT:  Feel free to proceed.

14          MR. CARDWELL:  Your Honor, as I've said, we began

15     this case with the defendants claiming under oath that Hawley,

16     Miller, and other Absolute Medical sales reps never signed

17     noncompetition agreements.  We served discovery requests and

18     subpoenas in March of '18 and no material -- no material

19     response, no e-mails, no texts, no contracts are produced.

20          We find those 2013 agreements on the eve of the day

21     that the preliminary injunction was first set for hearing,

22     produce them.  Silence from the defendants until the eve of

23     the -- when we actually have that hearing and they produce the

24     other agreements and change their claim from we've never

25     signed agreements to we never signed the 2017 agreements.

1          We did have the PI hearing.  Your Honor denied our

2    injunction, but you found -- in denying it, you found that

3    their consistent testimony is that the 2017 agreements were

4    never signed and that Mr. Soufleris did not renew the 2016

5    agreements, basically said that we had insufficient

6    information to overcome their testimony.

7          All the while, we're trying to get that information.

8    We're serving discovery.  We're serving subpoenas.  We're

9    doing what you've got to do to get evidence in these types of

10   cases.  And we're rebuffed at every step we take.  It's not

11   until Judge Kelly orders defendants to reply and to respond to

12   all of our discovery responses that we finally start getting

13   documents.

14         When we got those documents in March of 2009 [sic],

15   it's a massive, massive document dump.  You heard

16   Mr. McFarland's testimony.  There are more documents that

17   dealt with Brooks Brothers than there was with Alphatec or

18   Dr. Sawin combined.

19         And then as we parse through this 182,000 unique

20   documents, we start to learn that, okay, what's missing?

21   Well, there's no e-mails from the Absolute Medical e-mail

22   server.  There's very few from the Absolute Medical Systems

23   e-mail server.  And there's no text messages between the time

24   that they claim they're leaving NuVasive -- or consider

25   leaving NuVasive and the time they actually leave.  There's

1    just a complete dearth of evidence there.

2            And what we find out is that Mr. Soufleris took it

3    on himself to delete these accounts.  He didn't ask for

4    advice, didn't do any research.  He just haphazardly went and

5    completely deleted e-mail accounts.

6            Your Honor, more of that is required by litigants.

7    If it's not, all folks would have to do is go -- when they're

8    sued is delete their e-mail servers and say, huh, I didn't

9    know that would cost my opponent relevant evidence.

10           He came to court with no good reason for why he did

11   that other than he wanted to avoid continuing to pay the fee.

12   Your Honor, that deprived NuVasive of evidence relevant to

13   Mr. Hawley's and Mr. Miller's promotion of non-Alphatec

14   competitive products to surgeons.

15           You know, at the preliminary injunction hearing,

16   they all testified that they're not working together, that

17   there is no connection between Hawley, Miller, and Soufleris.

18   Well, it turns out that there is.  It turns out the documents

19   that we got from NovaBone and Osseus and K2 and others show

20   that Mr. Hawley and Mr. Miller continue to represent

21   competitive products in Orlando on behalf of Mr. Soufleris.

22   And what they say is, no, that's okay because Mr. Soufleris

23   isn't paying them commissions.  It's okay for them to do this

24   so long as he's not paying them commissions.

25           Well, the truth of the matter is they came to the PI

1    hearing, they lied and said they had no affiliation.  And it

2    turns out they do have an affiliation.  And not only do they

3    have an affiliation with that, but Mr. Soufleris is going and

4    helping them and Alphatec with his surgeon customers.

5              December 1, Mr. Soufleris's contract with Alphatec

6    becomes effective.  It says, you are not to perform any

7    activities on our behalf in Orlando.  December 7,

8    Mr. Soufleris is having dinner with his Belltown surgeon,

9    Dr. Sawin, with Alphatec's CEO, general counsel, and

10   Mr. Hawley.  What type of prohibition was that that Alphatec

11   put on them?  It's a complete sham.

12             So what are we missing?  We don't have

13   Mr. Soufleris's communications with Hawley and Miller or any

14   of Alphatec Medical's customers such as Dr. Sawin from at

15   least July 1, 2017, through really March of 2018.  This would

16   include Soufleris, Hawley, and Miller talking about moving to

17   Alphatec.  We learned in Mr. Soufleris's deposition that he

18   hoped Hawley and Miller would join him at Alphatec.  But

19   there's no communications about it.  Even though they all

20   showed up at a dinner with Jon Allen, who was an Alphatec

21   representative, just before they came on board, no e-mails, no

22   text messages about it because they've been deleted.

23             These messages would also include talk about

24   Dr. Sawin moving his business to Alphatec.  All we know from

25   the text messages is that Mr. Hawley covered one of

84

1    Dr. Sawin's surgeries on December 1 -- I believe it is

2    December 1 of '17.

3         THE COURT:  90 seconds.

4         MR. CARDWELL:  And then he goes and he covers it on

5    behalf of Alphatec four days later and the business is gone.

6         We lost those communications.  We lost Hawley and

7    Miller's e-mails and texts with their customers about moving

8    to Alphatec.  Your Honor saw the difference in the dates

9    between Mr. Miller talking to Dr. Burry and then talking to

10   him nine months later.  And that's completely inconsistent

11   with his deposition testimony.

12        Finally, Your Honor, we lost Hawley's and Miller's

13   e-mails with Alphatec about what products are needed to

14   satisfy their customers' needs.  The first e-mail we have

15   between Hawley and Miller and Alphatec is a signed contract

16   dated December 1.  Four days later, the business is gone.

17        Your Honor, they've spoliated documents.  They

18   should have preserved it.  They knew what was going to happen

19   and those documents are gone.

20        THE COURT:  Thank you.

21        Mr. Busch, would you like to make argument?

22        MR. BUSCH:  Thank you, Your Honor.  I appreciate the

23   opportunity to address the Court here.  I want to apologize

24   for my conduct a little bit earlier today.

25        THE COURT:  And I appreciate that.  You're a

1  passionate guy.  Don't spend your time apologizing.

2  MR. BUSCH:  I am emotional about this case and about

3  my clients.  And I am emotional about this motion because what

4  NuVasive is trying to do with the remedies that they have

5  requested here is fundamentally alter and change the entire

6  landscape of the evidence in this case because they have no

7  contracts that prohibit any of my three clients there from

8  doing what they did.  They don't exist.

9  There is no independent contract that prohibits

10  Mr. Soufleris individually, Mr. Miller individually, or

11  Mr. Hawley individually from competing and selling products in

12  the Orlando area.  And so what they've done under the guise of

13  the spoliation motion is try to alter that fact, change that

14  fact in front of the Court and, frankly, throw around these

15  broad terms like the clients are lying and they lied to the

16  Court.  And, yes, Your Honor, I am going to get emotional

17  about that when someone makes those accusations against my

18  client, especially when they're not true.

19  THE COURT:  So I guess the implication is -- and I

20  don't want to make this thing go longer than it has to, but

21  the implication is that whatever was deleted during the

22  defined time period would have contained the contract or

23  signed contract.

24  And I guess I should have asked you this before you

25  sat down.  E-mail goes from point A to point B.  If the e-mail

86

1   isn't with point B, why isn't it with point A?  Why doesn't

2   NuVasive look in their sent box and see that they fired this

3   off?  I'll give you a chance to respond to that.

4           But, Mr. Busch, I would invite you to --

5           MR. BUSCH:  Sure.

6           THE COURT:  It seems to me like if you sent it, you

7   should have it in your sent box.

8           Go on ahead, though.

9           MR. BUSCH:  So, Your Honor, we have to look to the

10  law in this case.  What is the legal standard?  Because we

11  haven't discussed that at all.

12          Rule 37 is what governs the Court in its analysis in

13  this case and it governs ESI, ESI that's lost and can't be

14  restored or replaced through additional discovery.  And the

15  Court has the discretion to go through and look at what was

16  lost, what was done, what wasn't done.

17          The cases, Your Honor, that have interpreted this

18  here in Florida -- and we'll cite to the *Wooden* case, the

19  in -- *Living Colors* case.  And those cases have said

20  repeatedly that you must, as the movant in this case, show

21  that the alleged evidence existed at one time.  And that's the

22  *Wooden* case.  You also must show that the evidence couldn't be

23  found elsewhere.  And you also must show, in the in -- *Living*

24  *Color* case, an intent to destroy versus a negligent failure to

25  preserve.

1           And the committee notes to Rule 37 are clear on

2    this.  And the committee said, look, when you're dealing with

3    ESI, multiple electronic devices, perfection in storing ESI is

4    often impossible.  You look to routine good faith operation.

5           So when the Court looks at the standards that have

6    been laid out and what the burden is on NuVasive in this case,

7    it's clear that they don't come anywhere close to meeting that

8    standard.

9           First, with respect to the absolute-med.com

10   domain -- and it's important to understand that the remedy

11   that NuVasive is asking for, Judge, is for a jury instruction

12   that the 2017 agreements were signed and existed and destroyed

13   by our clients.  That's what they've asked for in their brief.

14   Because the information in the absolute-med.com domain is

15   gone, they want this Court to create a contract out of thin

16   air where all of the witnesses have said they don't exist, we

17   didn't sign them, there was never an agreement.  And NuVasive

18   has failed miserably to show that this evidence existed at one

19   time, which is what the *Wooden* court has told us they have to

20   do.  They must show that the evidence existed and that we

21   destroyed it.

22           The evidence is actually the complete opposite from

23   that.  There is no evidence that the domain was intentionally

24   destroyed.  Yes, Mr. Soufleris made a decision when he was

25   closing down Absolute Medical not to renew that domain.  That

1    was a business decision that was made in the ordinary course

2    of business.  He did not have knowledge that those archived

3    e-mails would be lost.  And frankly, Your Honor, if you're

4    going to blame anybody for that, you can blame me because I

5    had a conversation with him about that and I told him it was

6    okay.  I had no idea that Google's policy was to destroy

7    archived e-mails.  So if there's anybody that's responsible

8    for those e-mails not being here, it's me.  And I'll take full

9    responsibility for that because I did not understand that that

10   was Google's policy.

11           But in any event, the remedy that NuVasive is asking

12   for, for this Court to instruct the jury that these 2017

13   agreements exist, fails all of the requirements under Rule 37.

14           The second remedy that NuVasive is asking for this

15   Court is for -- and it's a little bit odd, but they're asking

16   the Court for a jury instruction that there was a collective

17   scheme to transition business away from -- or away from

18   NuVasive towards Alphatec.  And, again, there is -- that is

19   just a general statement.  It is not a -- it is not evidence

20   of a particular document or something that was destroyed.

21   They're asking for this very odd general -- general

22   instruction from the Court.

23           Again, I don't think there's any evidence that

24   there's been a collective scheme of anything.  My clients, all

25   three of them, are individually allowed to do whatever they

1    want to do.  And that's going to be coming up in front of the

2    Court in our summary judgment motions very shortly.

3            So there's been no existence proven, as the *Wooden*

4    case requires us to show, that there was a collective scheme.

5    And, again, that's just an odd remedy request.

6            So we would submit that defendant -- or that

7    NuVasive's motion should be denied in its entirety.  The two

8    specific remedies that they ask for are not warranted in this

9    case, and there's been no evidence of intentional misconduct

10   on the part of my clients.

11           And with respect to -- I forgot to mention with

12   respect to the text messages, we cited several cases in our

13   brief.  An auto delete function may be negligent, but it's not

14   intent.  And that's what they're required to show in order to

15   get the remedy they're seeking.

16           Thank you, Judge.

17           THE COURT:  Thank you for your argument.

18           Just if you could briefly address that.

19           MR. CARDWELL:  The first issue, Your Honor, was why

20   doesn't NuVasive have these e-mails?  And because NuVasive was

21   not the sender or the receiver.

22           THE COURT:  I appreciate that.  I just -- the light

23   came on after I asked the question.

24           MR. CARDWELL:  Okay.  That's fine, Your Honor.

25           I wanted to point out October 28 --

1      THE COURT:  You've got to be quick.  You didn't

2   reserve rebuttal time.  I've got to be fair here.

3      MR. CARDWELL:  All I'm doing -- I have no rebuttal.

4   That was all I was going to rebut because you told me.  And I

5   just wanted to bring a case to Your Honor's attention that was

6   published October 28, 2019.

7      THE COURT:  Please read the style and the cite into

8   the record.  And then I would invite you to bring the hard

9   copy up.

10      MR. CARDWELL:  *Nationwide Life Insurance Company v.*

11   *Betzer.*  It's from here from in the Middle District.

12      THE COURT:  Where the in Middle District?

13      MR. CARDWELL:  Ocala Division.

14      THE COURT:  Okay.

15      MR. CARDWELL:  2019 U.S. District LEXUS 194165.  If

16   Your Honor uses Westlaw, it's 2019 Westlaw 5700288.

17      THE COURT:  If you would be kind enough to bring the

18   hard copy forward, we'll take it from you if you'll let me

19   have it.  I just wanted to make sure opposing counsel had it.

20   So go on ahead and bring that case over.  Certainly we'll

21   consider it in making any decision.

22      MR. CARDWELL:  Thank you, Your Honor.

23      THE COURT:  All right.  You can bring it up.

24      All right.  I would invite you to continue moving

25   forward with the litigation, and we will get to this as

1    quickly as we can.

2            Is there anything further from the plaintiff before

3    we end the session?

4            MR. CARDWELL:  No, Your Honor.

5            THE COURT:  Mr. Busch, anything further from the

6    defense?

7            MR. BUSCH:  Nothing, Your Honor.  I would just

8    state, though, that the discovery is over and all the summary

9    judgment motions have been filed.

10           THE COURT:  Ms. Darleen is wanting us to confirm the

11   ones that were -- not the whole list, but only the ones that

12   were admitted.  So you can state them into the microphone.

13   We'll review the record to make sure it's accurate.  But go on

14   ahead.

15           MS. EVANS:  Yes, Your Honor.  Exhibits 2, 4, 14, 29,

16   and 30 were the ones that were admitted.  And then 1 through

17   15, excluding 2 and 4, are the ones that you're going to give

18   defendants a chance to address.

19           THE COURT:  Correct.  They've been moved into

20   evidence and I'm going to give defense a chance.  And I'll

21   issue an endorsed order setting the timing up on that.

22           Thank you.  Have a good afternoon.

23           MR. CARDWELL:  Thank you.

24           MR. BUSCH:  Thank you, Your Honor.

25       (WHEREUPON, this matter was concluded at 3:58 p.m.)

92

\*   \*   \*

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


 _/s/ Suzanne L. Trimble_____          11/21/19
Suzanne L. Trimble, CCR, CRR, RPR          Date
Official Court Reporter