# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| NUVASIVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 6:17-cv-2206-Orl-41GJK |
| | ) | |
| ABSOLUTE MEDICAL, LLC, ABSOLUTE | ) | |
| MEDICAL SYSTEMS, LLC, GREG | ) | INJUNCTIVE RELIEF SOUGHT |
| SOUFLERIS, DAVE HAWLEY, and RYAN | ) | |
| MILLER, | ) | |
| | ) | |
| Defendants, | ) | |
| ———————————————————— | ) | |

## NUVASIVE, INC.'S CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ABSOLUTE MEDICAL, LLC, ABSOLUTE MEDICAL SYSTEMS, LLC, DAVE HAWLEY, AND RYAN MILLER AND SUPPORTING MEMORANDUM OF LAW

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ i

INDEX OF EXHIBITS ................................................................ iii

TABLE OF AUTHORITIES ........................................................ v

I. INTRODUCTION ................................................................ 1

II. STATEMENT OF MATERIAL FACTS........................................ 1

    A.  The Sales Agreement Between NuVasive and Absolute Medical.................................1

    B.  Hawley and Miller Signed Compliance Agreements Precluding Them From Competing With NuVasive Until – At The Earliest – January 1, 2018 ...........................................2

    C.  Soufleris Prepares To Join Alphatec, Causes Absolute Medical To Cease Performance Under The Sales Agreement, And Soufleris Forms Its Successor-In-Interest – Absolute Medical Systems – To Compete In The Territory ........................................................4

        i.  On behalf of Absolute Medical, Soufleris surreptitiously pitched a business plan to Alphatec to convert NuVasive's business in the Territory ......................................4

        ii.  After receiving an offer to join Alphatec, Soufleris attempts to "resign" from his relationship with NuVasive but the Sales Agreement does not terminate ........................................................................................7

        iii.  The Absolute Medical sales representatives who joined Soufleris at Alphatec resign from Absolute Medical on November 30, 2017 ....................................8

        iv.  Soufleris forms Absolute Medical Systems solely to compete in the Territory ........................................................................................8

        v.  Absolute Medical Systems immediately began utilizing Absolute Medical's sales representatives and office manager........................................................9

        vi.  Absolute Medical Systems provided the sales representatives with business cards and email addresses, instructed them to provide it with their Charge Sheets and to utilize its surgical database, and assisted them with administrative tasks .............11

        vii.  Absolute Medical and Absolute Medical Systems comingled funds/accounts........................................................................................13

    D.  Hawley And Miller Began Competing With NuVasive Prior to January 1, 2018, And Have Not Stopped Doing So........................................................................14

    E.  Recently-produced Documents Indicate Hawley And Miller Also Executed 2017 Compliance Agreements ........................................................................16

815937.3/020171439

**III. STANDARD FOR GRANTING SUMMARY JUDGMENT** ..................................... 19

**IV. LAW AND ARGUMENT** ...................................................................................20

  A. It Is Undisputed That Hawley And Miller Violated The Restrictive Covenants In Their 2016 Compliance Agreements ...................................................................................20

    i. The Restrictive Covenants comply with Florida law and are enforceable ............20
      a. The 2016 Compliance Agreements are writings signed by Hawley and Miller ....................................................................................................20
      b. The Restrictive Covenants are justified by multiple legitimate business interests ....................................................................................................21
      c. The 2016 Compliance Agreements' Restrictive Covenants are reasonably necessary to protect NuVasive's legitimate business interests .......................23
      d. The 2016 Compliance Agreements' temporal restrictions are appropriate ............................................................................................24

    ii. Hawley and Miller violated the Restrictive Covenants .........................................24
    iii. Hawley and Miller impermissibly benefited from their breaches of the Restrictive Covenants, which harmed NuVasive ...................................................................25
    iv. The Court should toll the temporal terms of the Restrictive Covenants...............25

  B. Absolute Medical Systems Is Responsible For Its And Absolute Medical's Breaches Of The Sales Agreement ...................................................................................26

    i. Absolute Medical violated several sections of the Sales Agreement ...................26
      a. Absolute Medical stopped performing under the Sales Agreement ...............27
      b. Absolute Medical violated Section 5.04(c) of the Sales Agreement ..............27
      c. Absolute Medical violated Section 5.09 of the Sales Agreement....................28
    ii. Absolute Medical Systems is a mere continuation of Absolute Medical .............29
      a. The two companies commingled funds, accounts, and other assets...............31
      b. The two companies are in the same industry, have the same office location, and have common ownership..................................................................32
      c. The two companies have common personnel and customers .........................32
      d. The two companies use the same telephone numbers and email addresses ....32

  C. NuVasive Is Entitled To A Permanent Injunction Against Absolute Medical And Absolute Medical Systems...................................................................................33

    i. NuVasive established actual success on the merits ............................................33
    ii. NuVasive continues to suffer irreparable harm ...................................................34
    iii. The harm incurred by NuVasive outweighs any harm to the Defendants ............34
    iv. Issuing the requested injunction is in the public interest ......................................35

**V. CONCLUSION**..................................................................................................35

## INDEX OF EXHIBITS

**Exhibit 1: Deposition of Absolute Medical, LLC** ........................................................... *passim*

**Exhibit 2: Deposition of Absolute Medical Systems, LLC** ...................................... *passim*

**Exhibit 3: Deposition of Gregory Soufleris** ............................................... *passim*

**Exhibit 4: Absolute Medical, LLC's Responses to Requests for Production** ...................3

**Exhibit 5: Absolute Medical, LLC's Responses to Interrogatories** ...............................3

**Exhibit 6: Dave Hawley's Responses to Interrogatories** .......................................3

**Exhibit 7: Dave Hawley's Responses to Requests for Production** .................................3

**Exhibit 8: June 27, 2018, Email from Emmanuel** ...............................................3

**Exhibit 9: Dave Hawley's 2016 Compliance Agreement** ..................................3, 4, 21, 24

**Exhibit 10: Ryan Miller's 2016 Compliance Agreement** ..................................3, 4, 21, 24

**Exhibit 11: Absolute Medical, LLC's Amended Responses to Interrogatories** ...............3

**Exhibit 12: February 23, 2017, Email from Gottstein to Edelson** ....................................3

**Exhibit 13: Email Thread between Soufleris and Besharatpour** ................................4, 31

**Exhibit 14: Email Thread between Soufleris and Hunsaker** ...........................................7

**Exhibit 15: Deposition of Daneri Edelson** ..................................................9, 12, 13, 16

**Exhibit 16: Email Thread between Miller and Grinyuk** ............................................10

**Exhibit 17: Deposition of Dave Hawley** ......................................................... *passim*

**Exhibit 18: Declaration of M. Thomas McFarland** ............................................11

**Exhibit 19: Deposition of Ryan Miller** ......................................................... *passim*

**Exhibit 20: Charge Sheets** ...............................................................15

**Exhibit 21: January 23, 2017, Email Thread between Soufleris and Hawley** ................17

**Exhibit 22: February 9, 2017, Email from Edelson to Hawley** ...................................17, 18

**Exhibit 23: February 9, 2017, Email from Hawley to Edelson** .........................................17

815937.3/020171439

**Exhibit 24: February 17, 2017, Email Thread between Hawley and Edelson**..................**17**

**Exhibit 25: October 16, 2017, Email Thread between Soufleris and Edelson**...........**18, 19**

**Exhibit 26: October 16, 2017, Email from Edelson** .........................................................**18**

**Exhibit 27: January 23, 2017, Email Thread between Soufleris and Miller** ...................**18**

**Exhibit 28: February 9, 2017, Email from Edelson to Miller** .........................................**18**

**Exhibit 29: February 17, 2017, Email from Edelson to Miller** .......................................**19**

**Exhibit 30: August 8, 2017, Email from Miller to Soufleris**...........................................**19**

**Exhibit 31: Declaration of Peter Marzano**....................................................................**22**

**Exhibit 32: Deposition of Absolute Ortho, LLC** ..........................................................**31**

**Exhibit 33: Deposition of Mark Singer** .........................................................................**34**

## <u>TABLE OF AUTHORITIES</u>

<u>Cases:</u>

*ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348 (11th Cir. 2017) ..........................34

*ADT LLC v. Sec. Networks, LLC*, Case No. 12-81120-CIV-DIMITROULEAS, 2019 U.S. Dist. LEXIS 15677 (S.D. Fla. Jan. 30, 2019) ..................................................................................34

*Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145 (Fla. 4th DCA 1994)..............................30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................19

*AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299 (S.D. Fla. 2004)......................................35

*Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047 (Fla. 1982) ..........................................................30

*Capelouto v. Orkin Exterminating Co.*, 183 So. 2d 532 (Fla. 1966) ................................25, 26

*Electrostim Med. Servs. v. Dawn Lindsey & Zynex Med., Inc.*, No. 8:11-cv-2467-T-33TBM, 2012 WL 1405707 (M.D. Fla. Mar. 13, 2012) ........................................................................24

*Etkin & Co. v. SBD, Ltd. Liab. Co.*, No. 11-21321-CIV-LENARD/GOODMAN, 2015 U.S. Dist. LEXIS 180657 (S.D. Fla. Sep. 1, 2015)...........................................................................30

*Gargiulo v. G.M Sales, Inc.*, 131 F.3d 995 (11th Cir. 1997) ....................................................19

*Interim Healthcare v. Spherion Corp.*, 884 A.2d 513 (Del. Sup. Ct. 2005) ...........................26

*Intermex Wire Transfer v. V.*, 2014 Fla. Cir. LEXIS 29206 (Fla. Cir. October 1, 2014) ........25

*Interstate Commerce Comm'n v. Rio Grande Growers Coop.*, 564 F.2d 848 (9th Cir. 1977)34

*KH Outdoor, LLC v. Trussville*, 458 F.3d 1261 (11th Cir. 2006)............................................33

*Kverne v. Rollins Protective Servs. Co.*, 515 So. 2d 1320 (Fla. 3d DCA 1987)...............25, 26

*Lab. Corp. v. Prof'l Recovery Network*, 813 So. 2d 266 (Fla. 5th DCA 2002)......................30

*Laroche v. Denny's Inc.*, 62 F. Supp. 2d 1366 (S.D. Fla. 1999).............................................19

*Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.*, 939 So. 2d 268 (Fla. 4th DCA 2006) ...............................................................................................................24

*MEDai Inc. v. Quantros, Inc.*, No. 6:12-cv-840-Orl-37GJK, 2012 U.S. Dist. LEXIS 115504 (M.D. Fla. Aug. 16, 2012) .......................................................................................................35

815937.3/020171439

*Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209 (S.D. Fla. 2005) ..........................24

*New York v. Operation Rescue Nat'l*, 80 F.3d 64 (2d Cir. 1996) .............................................34

*Oman Int'l Fin. Ltd. v. Hoiyong Gems Corp.*, 616 F. Supp. 351, 361 (D.R.I. 1985) .............30

*Osbourne Assocs. v. Cangemi*, No. 3:17-cv-1135-J-34MCR, 2017 WL 5443146 (M.D. Fla. Nov. 14, 2017) ..........................................................................................................................24

*Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223 (11th Cir. 2009)...................................24

*TTT Foods Holding Co. Ltd. Liab. Co. v. Namm*, No. 16-cv-81798, 2017 U.S. Dist. LEXIS 77402 (S.D. Fla. May 19, 2017) ..........................................................................................30

## Rules and Statutes:

Federal Rule of Civil Procedure 56 ......................................................................................19

Florida Statutes § 542.335 ...............................................................................20, 21, 23, 24

# I.     INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56 and this Court's June 10, 2020, Order[1] (Doc. 252), NuVasive, Inc. submits this motion for partial summary judgment as to Defendants Absolute Medical, LLC, Absolute Medical Systems, LLC, Dave Hawley, and Ryan Miller.[2] The undisputed facts in this matter establish that Absolute Medical Systems is a mere continuation of Absolute Medical who violated, and should be permanently enjoined from further violating, the January 1, 2017, Exclusive Sales Agreement with NuVasive ("Sales Agreement") including, without limitation, its restrictive covenants.  It is also undisputed that, despite initially denying their existence under oath, Hawley and Miller violated the reasonable restrictive covenants they owed to NuVasive – harming it and unjustly benefiting them – and the expiration of those restrictive covenants should be tolled.

NuVasive respectfully requests that this Court grant this motion, enter a permanent injunction against Absolute Medical and Absolute Medical Systems, and set this matter for a hearing to determine the damages NuVasive is entitled to recover from Hawley and Miller.

# II.     STATEMENT OF MATERIAL FACTS

## A.  The Sales Agreement Between NuVasive and Absolute Medical.

The Sales Agreement (governed by Delaware law) required Absolute Medical to, among other things:

- exclusively distribute NuVasive's products for five years (the "Term") in a defined geographic territory which included Flagler, Volusia, Lake, Seminole, Palm Beach, Brevard, Osceola, Orange, Highlands, Indian River, Martin, and St. Lucie Counties;

---

[1] The Order denied NuVasive's Motions for Partial Summary Judgment (Docs. 195, 196) as moot and directed the parties to refile a single motion on or before July 27, 2020. (Doc. 252).

[2] Defendant Greg Soufleris was the sole member of Absolute Medical and the sole member of Absolute Medical Systems at its formation. (Dep. Absol. Med., attached as **Exhibit 1**, 6:14–25; Dep. Absol Med. Sys., attached as **Exhibit 2**, 7:6–9, 10:8–9).

Advanced Orthopedics, Beth Israel Surgical Center, and North Broward General Hospital in Broward County; the Gable Surgical Center in Miami-Dade County; and the Heart of Florida Regional Medical Center in Polk County (the "Territory")[3];

- promptly advise NuVasive of any material changes in its personnel, the status of any major NuVasive customers in the Territory, or any other major events in the Territory that could affect its and NuVasive's mutual business interests;

- not compete with NuVasive during the Term and one year after the Term expires;

- require its Representative Affiliates (as defined by Sales Agreement)[4] to execute "Compliance Agreements" that contain reasonable non-solicitation and non-competition provisions and name NuVasive as a third-party beneficiary; and

- vigorously enforce the Compliance Agreements or pay for NuVasive to do so.

(**Exhibit 3**, 22:6–23:8, Ex. 3 at §§ 1.01, 1.02, 5.04, 5.09, 6.02, 12.01, Ex. 4 at ¶ 13).  The Sales Agreement's Term cannot be terminated by Absolute Medical unless NuVasive materially breaches it or becomes insolvent.  (**Id.** at Ex. 3 at Art. IX).

## B. Hawley And Miller Signed Compliance Agreements Precluding Them From Competing With NuVasive Until – At The Earliest – January 1, 2018.

During this litigation's infancy, Defendants represented under oath that Soufleris, Hawley, Miller, and Gottstein never signed non-compete agreements, of any kind, with Absolute Medical and that they were not subject to any restrictive covenants.  (Absol. Med. Resp. Req. Produc., attached as **Exhibit 4**, ¶ 1; Absol. Med. Resp. Interr., attached as **Exhibit**

---

[3] Pursuant to Section 12.08 of the Sales Agreement – and in exchange for a payment of $677,195 – NuVasive and Absolute Medical amended the Territory via a Territory Transition Agreement ("TTA"), transferring a portion thereof to another NuVasive sales agent. (Dep. G. Soufleris, attached as **Exhibit 3a** and **3b**, 91:23–25; 92:1–7; 98:10–13, Ex. 4 at ¶¶ 3–4, 8, Annex I, Annex II).  It did not alter the Term, release Absolute Medical's obligation to be an exclusive distributor for NuVasive, or change its non-competition obligations. (**Id.**)

[4] "Representative Affiliates" are Absolute Medical's "partners, employees, sub-contractors, sales personnel (whether employees of Representative or independent contractors) affiliates or agents who have provided services pursuant to this [Sales] Agreement or have received information from [Absolute Medical] related to [NuVasive's] Products." (**Exhibit 3**, Ex. 3 at Ex. A). Soufleris, Hawley, Miller, and Brandon Gottstein, were all "Representative Affiliates," but nevertheless, Soufleris claims he neither required them to sign Compliance Agreements in 2017 nor signed one himself.  (**Exhibit 1**, 41:20-43:13, 72:11–19, 80:12–21, 213:18–214:20; **Exhibit 3**, 23:9–25:9, 24:10–26:2, 35:19–36:9, 36:23–37:9).

**5**, ¶ 1; Hawley Resp. Interr., attached as **Exhibit 6**, ¶ 10, Hawley Resp. Req. Produc., attached as **Exhibit 7**, ¶¶ 1–2, 10).  NuVasive disproved these false representations when it discovered Compliance Agreements entered into by Hawley and Miller in 2013.  (Decl. K. Tyree, Doc. 60-7, ¶¶ 4–5, Exs. B–D).  They then amended their discovery responses on June 27, 2018—one day before the Court conducted a hearing on NuVasive's request for a preliminary injunction—and produced Compliance Agreements for Hawley and Miller for the years 2013 through 2016.  (Email from Emmanuel, attached as **Exhibit 8**; Hawley's and Miller's 2016 Compliance Agreements attached as **Exhibit 9** and **Exhibit 10**).[5]  The 2016 Compliance Agreements bind Hawley and Miller individually, as well as their single-member limited liability companies.  (**Exhibit 9**, § 4.1; **Exhibit 10**, § 4.1).

The 2016 Compliance Agreements became effective January 1, 2016, and expired December 31, 2016.  (**Exhibit 9**, § 3.1; **Exhibit 10**, § 3.1; Order Doc. 150, p. 10).  To protect the confidential information and the goodwill that Absolute Medical and NuVasive developed with their customers, the 2016 Compliance Agreements contain "Non-Circumvention," "Non-Competition," and "Non-Solicitation" covenants (collectively, "Restrictive Covenants"), which expired on December 31, 2017.  (**Exhibit 9**, §§ 5.4–5.6; **Exhibit 10**, §§ 5.4–5.6).[6]

---

[5] Hawley produced his Compliance Agreements and Absolute Medical produced Miller's, who was not yet named as a Defendant. Additionally, Absolute Medical amended its sworn interrogatory response by stating, "no employees and/or independent contractors since January 1, 2017, were subject to a non-compete agreement with Absolute Medical." (Absol. Med. Amend. Resp. Interr., attached as **Exhibit 11**, ¶ 1). Again, these sworn representations are demonstrably false because Absolute Medical unquestionably entered into 2017 Compliance Agreements with sales representatives Thad Bragulla, Brennan Burkhart, Christopher Shultz, and Gottstein – the last of which joined Soufleris at Alphatec Spine, Inc. (Decl. T. Bragulla, Doc. 19-3, ¶ 3; 2d Decl. T. Bragulla, Doc. 60-10, ¶ 5, Ex. A; **Exhibit 3**, 8:16–14:17, 34:16–21, 35:12–18, 37:10–13; Feb. 23, 2017, Email Containing Gottstein 2017 Compliance Agreement Signature Page, attached as **Exhibit 12**, ("Attached you will find my signed contract.")). It is curious that Defendants only amended their discovery responses *after* NuVasive conclusively demonstrated that their responses were false.

[6] The 2016 Compliance Agreements also: (i) expressly define "Competitive Products"; (ii) contain Hawley's and Miller's acknowledgements that the Restrictive Covenants are reasonable and necessary; (iii) entitle NuVasive to

**C.** **Soufleris Prepares To Join Alphatec, Causes Absolute Medical To Cease Performance Under The Sales Agreement, And Soufleris Forms Its Successor-In-Interest – Absolute Medical Systems – To Compete In The Territory.**

In August 2017, Soufleris purchased an office and office furniture for Absolute Medical, which Absolute Medical Systems now utilizes.  Indeed, on August 16, 2017, he transferred $10,000 from Absolute Medical's account to another company he owns and controls, The Absolute Group, Inc. (**Exhibit 3**, 123:14–124:18).  Two weeks later, he used those funds for the down payment on property located at 8901 Lee Vista Boulevard.[7]  (Email exchange, attached as **Exhibit 13**; **Exhibit 3**, 165:5–9, 123:14–124:18).

On October 3, 2017, Absolute Medical ordered (and paid $1,282.55 for) IKEA furniture for the "new office."  (**Exhibit 3**, 165:10–12, Ex. 43; **Exhibit 1**, 212:11–213:17).  This furniture was scheduled for delivery on November 9, 2017, and after delivery was delayed, Soufleris confirmed the furniture was for the new office.  (**Exhibit 3**, Ex. 43).  Prior to this delivery, Absolute Medical Systems (like Absolute Medical) accepted deliveries and conducted business at 10525 Cromwell Grove Terrace in Orlando.  (**Id.** at 166:14–167:2; **Exhibit 1**, 157:1–158:2, 173:20–174:1; Tr. Hr'g Prelim. Inj., Doc. 79, Defs.' Ex. 21).

**i.** **On behalf of Absolute Medical, Soufleris surreptitiously pitched a business plan to Alphatec to convert NuVasive's business in the Territory.**

Soufleris began consulting with his, Absolute Medical's, and Absolute Medical Systems' attorney, Chris Mills, about separating Absolute Medical from NuVasive while

---

[7] injunctive relief, "specific performance, and an equitable accounting of, and constructive trust for, all profits or other benefits arising out of or related to any such violation"; (iv) permit prevailing party attorneys' fees; and (v) name NuVasive as a third-party beneficiary. (**Exhibit 9**, §§ 5.5, 5.8, 8.9, 8.11; **Exhibit 10**, §§ 5.5, 5.8, 8.9, 8.11).
[7] The property is held by TAG Investment Land Trust, of which Absolute Group is the sole beneficiary, and Soufleris utilized it to conduct the business of all of his medical device companies, including Absolute Medical Systems. It was not unusual for Absolute Medical to pay for properties purchased by Absolute Group and held by Tag Investments Land Trust or to pay for Soufleris' automobiles and taxes.  (**Exhibit 1**, 174:12–191:8).

negotiating the TTA.  (**Exhibit 3**, 43:4–44:10). Though over four years (plus a one-year non-compete period) remained on the Sales Agreement, Soufleris pitched his plan to NuVasive's direct competitor, Alphatec, in October 2017.[8]  (**Id.** at 9:3–6). For his pitch, Absolute Medical paid for Soufleris to travel to Alphatec's California headquarters on October 12, 2017, to meet with Alphatec's leadership.  (**Exhibit 3**, 50:16–51:10, 62:12–18; 75:20–25; 76:1–13, Ex. 10; **Exhibit 1**, 121:8–122:24, 220:16–222:11, Ex. 15, Ex. 16).   Soufleris' scheme to convert NuVasive's business to Alphatec included "comprehensive non-compete avoidance" and:

- called for Soufleris, via Absolute Medical, to serve as Alphatec's "Chief of Staff" in a sales territory which encompassed the Territory, and report directly to its Chief Executive Officer, Pat Miles;

- promised that Absolute Medical would deliver $20 million in revenue in 2018 through "aggressive sales on-boarding to immediately gain revenue" and "comprehensive non-compete avoidance," and $30-40 million in revenue in 2019;

- stated that Absolute Medical would achieve these goals, at least in part, "by utilizing current resources;" and

- required Alphatec to indemnify Absolute Medical and its personnel.

(**Exhibit 3**, 52:15–25, 56:13–15, 62:6–18, Ex. 10; **Exhibit 1**, 123:10–148:19, Ex. 15).

Approximately three weeks after visiting Alphatec's headquarters, Soufleris played in a member-guest golf tournament with Absolute Medical's largest customer, Dr. Paul Sawin, but does not recall whether he told Dr. Sawin he was considering a move to Alphatec.  (**Exhibit 3**, 67:8–19, 76:23–77:1).  Then, on November 12-13, 2017, Soufleris returned to Alphatec for additional meetings.  (**Id.** at 71:9–72:13, Ex. 13).

---

[8] Soufleris purchased Alphatec stock prior to pitching his services to them.  (**Exhibit 3**, 42:2–15, Ex. 9).

815937.3/020171439

After leaving Alphatec's headquarters on November 13, 2017, Soufleris exchanged emails (which show his attorney's involvement in the negotiations) with various Alphatec executives, including its President and General Counsel. (**Id.** at 73:4–76:2, Ex. 14, Ex. 15, Ex. 16). These emails articulate Alphatec's recognition that Absolute Medical's sales territory cannot include the Territory and discuss a term sheet for Soufleris' relationship with Alphatec. (**Id.** at 76:14–79:11, Ex. 16). The final term sheet contained Alphatec's offer for Soufleris to serve as its Florida distributor (minus the Territory, Tampa, and Jacksonville) and:

- pay Soufleris a minimum of $500,000.00 per year;

- pay Soufleris a bonus if his sales representatives (*i.e.*, Hawley and Miller) cover their guaranteed salaries;[9]

- provide Soufleris with millions of dollars of stock options and incentives.

(**Id.** at 77:4–21, 79:8–11, Ex. 16, Ex. 17; **Exhibit 1**, 236:13–237:4). Soufleris' November 14, 2017, response to the term sheet states his desires to represent all of Florida, Georgia, and Alabama, and "to make sure [his] ability to transition immediate business is valued;" and voices his understanding that joining Alphatec would forfeit any right to have NuVasive buy out his distributorship. (**Exhibit 3**, 77:4–21, 79:8–11, Ex. 16, Ex. 17). It also contains Soufleris' statement to Alphatec's General Counsel that "there is more 'juice to squeeze' from the revenue [he will] bring over in year one in Central FL that can't be overlooked." (**Id.** at

---

[9] Soufleris testified that he does not understand what Alphatec meant by "rep override." But Alphatec's General Counsel's November 16, 2017, email to Soufleris provides:

> **"Override":** Once rep guarantee/salary is covered, "override" is delta between ongoing rep commission and 40%
> - So, if rep is making 20% on all sales, then remaining 20% is "override";
> - Or, if rep is flat salary (i.e. nothing beyond base pay), full 40% is "override" after salary covered.

(**Exhibit 3**, 78:10-16, Ex. 17 at DRH008540). This override is only applicable to the first year of the arrangement as the sales representatives will be part of Soufleris' organization after that year. (**Id.** at Ex. 17 at DRH008541).

81:12–82:14, Ex. 17).  Of course, the promised Central Florida revenue included sales to Dr. Sawin, whom Soufleris hoped would follow him to Alphatec.  (**Id.** at 82:7–14).

### ii. After receiving an offer to join Alphatec, Soufleris attempts to "resign" from his relationship with NuVasive but the Sales Agreement does not terminate.

Alphatec sent Soufleris a proposed Dedicated Sales Representative Agreement on November 27, 2017 (the "Alphatec Agreement").  (Email, attached as **Exhibit 14**).  A few hours later, though NuVasive was neither in default nor insolvent, Soufleris sent it an email stating he is "resigning" from "our partnership" and would no longer honor the Sales Agreement.  (**Exhibit 3**, 23:2–8, 82:23–83:15, Ex. 18; **Exhibit 1**, 108:14–109:7).  The next day, Soufleris informed Hawley and Miller, whom he wanted to join Alphatec, about his decision to leave NuVasive for Alphatec.[10]  (**Exhibit 3**, 9:7–10:17).  He then shared this decision with Gottstein, whom he also wanted to join him at Alphatec.  (**Id.** at 11:8–12:4). While Soufleris claims he did not recruit these three, he admits telling Alphatec executives that "they would be good guys to recruit and have on the team," that he "fought like hell" to have them on his team, and that he did not recommend bringing on any other Absolute Medical sales professionals.  (**Id.** at 11:19–12:4, 13:25–14:15; **Exhibit 2**, 23:4–11).

In a November 28, 2017, letter, NuVasive's counsel informed Soufleris that Absolute Medical could not "resign" from the Sales Agreement and that attempting to do so was a material breach of it.  (**Exhibit 1**, 237:11–238:12, Ex. 43).  Then, NuVasive's December 13, 2017, letter to Absolute Medical's counsel terminated its right to be the exclusive sales distributor in the Territory (but did not terminate the Sales Agreement) and demanded that it

---

[10] NuVasive believes the parties communicated regarding their collective move to Alphatec prior to this date, but Defendants spoliated those communications. (Doc. 203).

come into compliance with the Sales Agreement.  (**Id.** at Ex. 43 at ¶¶ 2, 4).  To date, neither party has terminated the Sales Agreement.

### iii. The Absolute Medical sales representatives who joined Soufleris at Alphatec resign from Absolute Medical on November 30, 2017.

Shortly after Absolute Medical "resigned" from the Sales Agreement, on November 30, 2017, Hawley, Miller, and Gottstein emailed Soufleris their immediate resignations from Absolute Medical.[11] (**Exhibit 1**, 170:1–24, Ex. 19).  Days later, after taking no steps to enforce their restrictive covenants, Soufleris used Absolute Medical's funds (recorded as "office expenses") to send flowers to Hawley's, Miller's, and Gottstein's wives and inserted notes thanking them and expressing excitement about the "journey" on which they were embarking. (**Exhibit 1**, 71:23-76:8, 206:9–208:17; **Exhibit 3**, 163:19–165:4, 241:1–3, Ex. 42).

### iv. Soufleris forms Absolute Medical Systems solely to compete in the Territory.

The Alphatec Agreement became effective on December 1, 2017. (**Exhibit 3**, Ex. 32). Later than day, Daneri Edelson, Absolute Medical's (and Absolute Medical Systems') office manager, emailed Absolute Medical Systems' EIN to Soufleris, which he forwarded to Absolute Medical's and Absolute Medical Systems' accountant, stating "[P]lease see my new entity – which will be replacing absolute medical.  I had to dissolve it due to me leaving companies."[12]  (**Exhibit 3**, 97:22–99:9, Ex. 19, Ex. 32; **Exhibit 1**, 154:17–25; 155:1–15, Ex. 18).  Soufleris then began dissolving Absolute Medical in mid-December 2017.  (**Exhibit 1**, 26:11-14, 196:20-22).

---

[11] Hawley's and Gottstein's emails state that they are terminating their contracts (**Exhibit 1**, Ex. 19), which is curious as they claim to not be subject to contracts with Absolute Medical.

[12] Interestingly, Soufleris testified, on behalf of Absolute Medical Systems, that he did not know why it was necessary to form a new company to sell spinal implants when he already owned a company that did just that. (**Exhibit 2**, 10:14–21).

**v.   Absolute Medical Systems immediately began utilizing Absolute Medical's sales representatives and office manager.**

Absolute Medical's personnel joined Absolute Medical Systems and Soufleris' other medical device companies before the dissolution began.  Edelson acknowledges her roles with the two companies are "substantially similar" and that "nothing's changed" between the services she performed for each entity. (**Exhibit 2**, 37:17–38:4, 38:16–19; Dep. D. Edelson, attached as **Exhibit 15**, 12:3–25, 13:24–14:8). Likewise, Gottstein began selling Alphatec products for Absolute Medical Systems in early 2018, and Absolute Medical representative Angel Mangual became Absolute Medical Systems' pediatric specialist sometime before March 8, 2018.  (**Exhibit 3**, 222:19–223:9; **Exhibit 2**, 18:24–19:21, 22:9–23, 25:21–25).

Further, despite Alphatec's purported prohibition against them doing so, Hawley and Miller covertly began working for Absolute Medical Systems and Soufleris' other medical device companies in the Territory during this time, including by selling non-Alphatec spine products which compete with NuVasive's.  (**Exhibit 3**, 227:18–230:5, Ex. 32 at Ex. A; **Exhibit 2**, 19:6–23:22, 26:22–33:17).   For example, in January of 2018, Hawley (through Absolute Medical Systems' contract with Orthofix) began selling Trinity, a competitive biologic product, to Drs. Sawin and Rosen in surgeries where they implanted Alphatec's (or other competitive) products and sending his Charge Sheets to Edelson.  (**Exhibit 3**, 181:21–22, 182:1–18, 183:5–11, Ex. 55 at Attach. C, Ex. 56, Ex. 57; **Exhibit 2**, 30:14–34:3).   Similarly, Miller sold Trinity to one of his surgeon customers, and began selling a biologic product known as NovaBone (which is contracted through another Soufleris company, Spinal Solutions) to his surgeon customers at Central Florida Regional Hospital ("CFRH") in Orlando in early 2018. (**Exhibit 3**, 104:24–105:18, 107:22–110:19; **Exhibit 1**, 43:24–44:2).

The sham Chinese wall between Hawley, Miller, and Absolute Medical Systems was exposed when Miller acknowledged his affiliation with Absolute Medical/Absolute Medical Systems on the first three Charge Sheets he submitted to Alphatec, causing Alphatec to instruct him to "update your distributorship to Miller Time on this REQ and going forward." (**Exhibit 3**, 132:6–133:19, Ex. 31; Email exchange, attached as **Exhibit 16**, p. 3). It was futher exposed when Soufleris celebrated Dr. Sawin's first use of Alphatec's products on December 5, 2017, by using company funds to take Dr. Sawin and Hawley (who supported the surgeries) out for drinks to discuss, among others, how the surgeries went. (**Exhibit 3**, 145:3–146:6, 228:14–17). Two days later, Alphatec joined the celebration at a dinner at Kres Chophouse attended by Dr. Sawin, Hawley, Soufleris, and Alphatec's CEO (Miles), and General Counsel (Craig Hunsaker).[13] (**Id.** at 113:7–14; 140:4–144:20, 167:12–168:11, 228:18–21).

The morning after the Kres Chophouse dinner, Soufleris introduced Miles to Dr. Ilgenfritz, a pediatric surgeon and former Absolute Medical customer whom Soufleris described as a "huge target." (**Id.** at 168:13–169:15, 223:8–9, 234:5–236:1, Ex. 81). Dr. Ilgenfritz became an Alphatec customer after this meeting and, even though it did not receive commissions on Alphatec's sales to Dr. Ilgenfritz during the first year of its existence, Absolute Medical Systems assigned its pediatric sales specialist, Mangual, to support his surgeries. (**Id.** at 169:20–170:16, 222:19–224:14, Ex. 45, Ex. 76).

---

[13] Eliminating any doubt that this meal was a business dinner, publicly available records indicate that Alphatec picked up the tab, reporting Dr. Sawin's portion of the meal as a payment of $312.52 to him for "Food and Beverage". Open Payments Data, CENTERS FOR MEDICARE & MEDICAID SERVICES, https://openpaymentsdata.cms.gov/physician/138647/general-payments (last visited October 13, 2019).

The following month, Dr. Sawin and Soufleris (but not Hawley)[14] visited Alphatec's headquarters for a Visiting Surgeon Program on January 21-22, 2018, and stayed in the same hotel. (**Id.** at 201:4–204:23, Ex. 70, Ex. 71).  Then, in late March of 2018, Soufleris, Alphatec executive Mark Ojeda, and Hawley took a golf trip (which Absolute Medical Systems recorded as a business expense) to Mexico with Dr. Sawin. (**Id.** at 86:5–88:8, 238:20–239:12; Decl. M. McFarland, attached as **Exhibit 18**, ¶¶ 3-6).  Finally, during a 2018 spine conference in New Orleans, Soufleris dined with Dr. Sawin and various Alphatec executives at Emeril's Delmonico.  (**Exhibit 3**, 229:17–20, 237:18–238:7).

Soufleris, through Absolute Medical Systems, also helped Miller with his surgeon customers.  For example, on December 5, 2017, he used Absolute Medical Systems' funds to take Miller and Dr. Burry to a business dinner at P.F. Chang's.  (**Exhibit 3**, 137:6–11; **Exhibit 1**, 205:3–206:4; **Exhibit 2**, 65:19–66:4, 73:3–20; Dep. R. Miller, attached as **Exhibit 19**, 143:22–144:10).

    vi. **Absolute Medical Systems provided the sales representatives with business cards and email addresses, instructed them to provide it with their Charge Sheets and to utilize its surgical database, and assisted them with administrative tasks.**

Hawley, Miller, Soufleris, Gottstein, and Edelson utilized their Absolute Medical email addresses (which end in @absolute-med.com) until at least December 28, 2017, when Soufleris gave them Absolute Medical Systems' email addresses (which end in @absolute-medical.org), instructed them to notify their contacts about the new email addresses, and stated that he would shut the old email addresses "off after the first of the year." (**Exhibit 3**, 162:16–163:15, Ex.

---

[14] Hawley testified that he does not recall being at this event (Dep. D. Hawley, attached as **Exhibit 17**, 134:3–21) and no documents in the record indicate that he was present.

41).  Although the Absolute Medical/Absolute Medical Systems email address changed from @absolute-med.com to @absolute-medical.org, Soufleris' signature block continued to state "Principal | Absolute Medical" and recite his (954) 868-4492 telephone number – the same one he used while operating Absolute Medical – through at least March 22, 2018.  (**Id.** at 191:7–25; 192:1–25; 193:1–2, 225:9–13).  At about that time, Absolute Medical Systems (at its cost) provided company business cards to Hawley, Miller, and others. (**Id.** at 113:20–25, 115:7–17).

On January 9, 2018, Edelson instructed Hawley, Miller, and Gottstein (via their Absolute Medical Systems email addresses) to provide her with copies of their Charge Sheets (which Alphatec refers to as Surgery Requisition Forms) after they send them to Alphatec because "we're keeping an internal log of our cases." (**Id.** at 122:3–23, 131:23–25, Ex. 26). She again emailed Hawley and Miller at their Absolute Medical Systems email addresses on March 12, 2018, and requested their input on software that Absolute Medical Systems was testing "in order to streamline [their] processes."[15]  (**Id.** at 124:21–25, 127:13–24, Ex. 28) Then, on March 21, 2018, Edelson emailed Alphatec about Absolute Medical Systems "setting up a software program for the reps." (**Exhibit 15**, 50:7–51:2, Ex. 19).  The next day, she conducted a training system on this program, known as Surg.io, for the "reps," including Hawley and Miller.  (**Exhibit 3**, 130:11–22; **Exhibit 15**, 50:7–51:2, 67:5:24).  As of April 20, 2018, Hawley, Miller, and Gottstein were using Surg.io.  (**Exhibit 2**, 78:8–79:5; **Exhibit 15**, 65:12–66:21).

---

[15] The username for the software was gsoufleris@absolute-med.org and the password contains the word "absolute."  (**Exhibit 15**, 65:12–66:21).

Like Absolute Medical, Absolute Medical Systems bore the expense of Edelson's services, such as assisting with credentialing and pricing issues, and made her available to Hawley and Miller at no charge. (**Exhibit 3**, 101:13–19, 102:9–12, 107:22–25, Ex. 21; **Exhibit 1**, 169:12-23; **Exhibit 15**, 12:3–25). She assisted Hawley with pricing at Florida Hospital-Adventist as early as December 20, 2017, and Miller in obtaining pricing from Alphatec for his accounts on March 21, 2018. (**Exhibit 3**, 111:6–112:6, 161:5–162:2, Ex. 22).

Similarly, on April 24, 2018, Miller exchanged emails with Edelson (from their respective Absolute Medical Systems email accounts) about the status of Hawley and another representative obtaining credentials to work at CFRH. (**Id.** at 117:2–119:1). On June 6, 2018, Edelson, in her role as the Executive Administrator of "Absolute Medical" (which she referred to as an exclusive distributor of Alphatec's products), provided a copy of Hawley's job duties to CFRH so that he could do just that. (**Id.** at 120:4–15, Ex. 25).

**vii. Absolute Medical and Absolute Medical Systems comingled funds/accounts.**

Finally, Absolute Medical and Absolute Medical Systems comingled funds and accounts. For example, on December 12, 2017, Soufleris opened a Bank of America checking account for Absolute Medical Systems which he immediately linked to Absolute Medical's checking account ending in 7087. (Tr. Hr'g Prelim. Inj., Doc. 79, Defs.' Ex. 21). Then, on December 15, 2017, Bank of America sent new debit cards for this Absolute Medical checking account to Soufleris' home at 10525 Cromwell Grove Terrace, even though the company was dissolving. (**Exhibit 3**, Ex. 44). Similarly, after receiving a replacement card in February of 2018, Soufleris utilized Absolute Medical's Platinum American Express ending in 51003 until at least December of 2018. (**Exhibit 1**, 228:13–229:24, Ex. 38, Ex. 39).

13

Most notably, in a December 28, 2017, email, Soufleris instructed his accountant to pay Absolute Medical's year-end taxes out of Absolute Medical Systems' account because Absolute Medical had no funds.  (**Exhibit 3**, 99:12–101:1).  As a result, Absolute Medical Systems paid approximately $30,000.00 of Absolute Medical's tax debt.  (**Exhibit 2**, 9:6–25)

D. **Hawley And Miller Began Competing With NuVasive Prior To January 1, 2018, And Have Not Stopped Doing So.**

Hawley and Miller testified that they intended to honor the obligations imposed on them by the 2016 Compliance Agreements.  (**Exhibit 17**, 37:3–38:1, 139:2–9; **Exhibit 19**, 46:22–47:7; 55:12–24).  Nevertheless, they resigned from Absolute Medical (without notice) on November 30, 2017, signed contracts with Alphatec, and immediately began converting their NuVasive customers to it and other competitive companies, despite being contractually precluded from doing so, and continue to do so.  (**Exhibit 17**, 9:13–21, 15:7–11; 36:1–8, 54:18–56:8, 65:7–66:23, 73:2–74:9, 87:11–22, 139:25–141:18, 142:15–17, Ex. 5, Ex. 6; **Exhibit 19**, 10:12–11:15, 43:2–4, 50:1–24, 52:20–53:2, 85:7–17, 87:11–89:1, 94:1–96:21, 236:3–13, Ex. 4, Ex. 5).[16]  Their impact on Alphatec's (and NuVasive's) business was dramatic, as they both won Alphatec sales competitions for most sales to new Alphatec customers.  (**Exhibit 3**, 17:15–18:24).  Indeed, Absolute Medical Systems reported that Hawley's and Miller's former NuVasive surgeon-customers were "new surgeon users" in its

---

[16] In addition to Alphatec, Hawley and Miller sold competitive products designed, manufactured, and distributed by NovaBone, Ulrich Spine, Spine Wave, Orthofix, Osseous, Pan Medical, Life Spine, and K2M.  (**Exhibit 3**, 102:13–107:19; **Exhibit 17**, 54:9–15, 85:21–86:7, 98:2–11, 98:17–99:12, 101:1–107:6; **Exhibit 19**, 160:16–191:15).  They did so through contacts between those companies and companies owned and controlled by Soufleris (including Absolute Medical Systems for Orthofix), though they claim to have received no compensation for their efforts until January 1, 2019. (**Exhibit 3**, 109:4–110:5, 129:11–130:8; **Exhibit 17**, 86:2–7, 99:16–100:4, 107:7–109:2, 112:20–24, 114:3–115:18, 121:17–123:1, 147:22–148:18; **Exhibit 19**, 177:22–178:13, 191:5–15; **Exhibit 2**, 61:4–13).

2018 Q1 Quarterly Business Review that it presented to Alphatec.  (**Id.** at 212:7-12, 213:14-20, Ex. 75 at p. 3).

Dr. Sawin utilized NuVasive's products almost exclusively for several years prior to December 5, 2017.  (**Exhibit 17**, 9:11–21; **Exhibit 1**, 62:14–18, 63:23–64:1).  Following the conversion of Dr. Sawin's business, Hawley consistently worked, without any interruption, on Alphatec's behalf.  (**Exhibit 17**, 55:2–8).   In total, Hawley sold at least $106,807.50 of Alphatec's products to Dr. Sawin and Dr. Rosen (another of his former NuVasive customers) in December 2017 alone, which consisted of the following surgeries:

| Surgeon | Surgery Date | Value |
|---------|--------------|-------|
| Sawin | December 5, 2017 | $12,900 |
| Sawin | December 5, 2017 | $8,228 |
| Sawin | December 5, 2017 | $7,134 |
| Sawin | December 6, 2017 | $5,656 |
| Sawin | December 12, 2017 | $4,518 |
| Sawin | December 12, 2017 | $5,656 |
| Sawin | December 12, 2017 | $8,000 |
| Sawin | December 13, 2017 | $4,518 |
| Sawin | December 13, 2017 | $14,217.50 |
| Rosen | December 18, 2017 | $2,700 |
| Sawin | December 19, 2017 | $8,228 |
| Sawin | December 19, 2017 | $4,262 |
| Sawin | December 20, 2017 | Unknown Amount |
| Sawin | December 20, 2017 | $10,250 |
| Sawin | December 22, 2017 | $2,940 |
| Sawin | December 22, 2017 | $7,600 |

 (**Id.** at 54:18–55:23; Charge Sheets, attached as collective **Exhibit 20**).  He then sold $405,414 and $16,650 of Alphatec's competitive products to Drs. Sawin and Rosen, respectively, in the first quarter of 2018.  (**Exhibit 3**, 214:15–17, Ex. 75 at p. 3).  Absolute Medical Systems now

values Dr. Sawin's business at between $1.9 and $2 million per year and Dr. Rosen's business at $400,000 per year.  (**Exhibit 2**, 81:9–17, 82:3–4).[17]

Although Miller did not make any December 2017 sales of Alphatec's products because of issues getting those products approved at his accounts, he used that month to obtain pricing approval at those accounts and promote Alphatec's products to his surgeon-customers, ultimately leading to Drs. Burry, Rodas, and Allende moving the bulk of their business from NuVasive to Alphatec.[18]  (**Exhibit 19**, 20:7–22, 88:18–89:1, 91:4–93:21, 96:4–20, 103:21–104:16, 142:17–143:8, 199:2–200:24, 218:14–220:22, 221:18–223:10).   After working on Alphatec's behalf to get pricing approved at his accounts in December 2017, Miller then sold $24,155, $22,665, and $11,370 of Alphatec's competitive products to Drs. Burry, Rodas, and Allende, respectively, in the first quarter of 2018.  (**Exhibit 3**, Ex. 75 at p. 3).  Absolute Medical Systems now values the total business of these three surgeons between $550,000 and $650,000 annually.  (**Exhibit 2**, 82:5–10).[19]

**E.**  <u>**Recently-produced Documents Indicate Hawley And Miller Also Executed 2017 Compliance Agreements.**</u>

Although this Motion seeks no relief relative to Hawley's and Miller's 2017 Compliance Agreements, recently-produced documents further contradict their sworn

---

[17] Absolute Medical Systems values the business of Dr. Gandhi (another one of Hawley's former NuVasive customers) at $200,000 per year.  (**Exhibit 2**, 82:1–2; **Exhibit 17**, 20:20–22, 40:5:10 (Hawley testifying that Dr. Gandhi is within his Alphatec sales territory and that he previously solicited his business for NuVasive by traveling with him to NuVasive's headquarters in San Diego for training)).

[18] Soufleris helped Miller solicit Dr. Burry by hosting a business dinner.  (**Exhibit 15**, 65:19–66:14). And when asked if his customers moved their business from NuVasive because he is a good sales person, Miller responded "I hope so" and admitted that they would use whichever products he requested.  (**Exhibit 19**, 92:16–93:3).

[19] NuVasive notes this transcript excerpt incorrectly identifies Drs. Allende and Rodas as "Hyundai" and "Rose."

testimony that they never entered into any such agreements.[20]  However, Hawley and Soufleris negotiated the terms of Hawley's 2017 Compliance Agreement with Absolute Medical in January 2017.  Specifically, Soufleris set forth a: (i) flat commission rate of 7 percent; (ii) bonus commission rate of 0.375 percent between 100 and 105 percent to quota ("PTQ"); and (iii) quota of $8,227,570 for 2017.  (Jan. 23, 2017, Hawley Email Thread, attached as **Exhibit 21**, pp. 1-2).  Hawley responds that this proposal reflects a "fair quota and comp[ensation] – appreciate that.  Everything looks great to me, and is well in line with what I had in mind. . . Thanks again for putting this all together, you've got my commitment to take this territory to the next level."  (**Id.** at p. 1).  Soufleris then forwards Hawley's consent to Edelson since it "is the last of orlando [sic] SR comp that [she] needed for contracts[.]"  (**Id.**)  Several days after this exchange, Edelson emails Hawley his 2017 Compliance Agreement—containing the exact flat commission rate (7 percent); quarterly bonus (0.375 percent at 100–105 PTQ); and 2017 quota ($8,228,554) to which Hawley previously agreed—for execution.[21]  (Feb. 9, 2017, Email from Edelson, attached as **Exhibit 22**, pp. 1, 18).  Hawley responds, "Thanks, I'll get this over shortly[,]" and Edelson reminded him of the need to return his executed signature page several days later.   (Feb. 9, 2017, Email from Hawley, attached as **Exhibit 23**; Feb. 17, 2017, Email Thread, attached as **Exhibit 24**).  Critically, however Hawley never indicted any semblance of

---

[20] Defendants produced these documents pursuant to various orders issued by this Court following NuVasive's motion for sanctions for spoliation of evidence. (Doc. 203). Defendants' recent production does not remedy their spoliation as they were only able to recover emails from one of the accounts they spoliated: gsoufleris@absolute-med.com.  (Not. Compliance, Doc. 221, ¶ 5). There is also no indication that the emails they were able to recover from this singular account represents a complete production of the emails existing therein at the time Soufleris deactivated the account despite having an obligation to preserve relevant evidence.

[21] Soufleris testified that each of its sales representatives received the same form Compliance Agreement with their different commission structures and territories being addressed in exhibits to those form Compliance Agreements, and Hawley conceded the parties operated pursuant to the 2017 Compliance Agreement's structure but does not remember how they agreed to it. (**Exhibit 1**, 55:24–56:25; **Exhibit 17**, 48:24–49:25).

objection to the 2017 Compliance Agreement, and, in fact, expressed only his intent to return the signed agreement "shortly."[22]  (**Exhibit 23**).

On October 16, 2017, the parties confirmed that they entered into, and were operating pursuant to, Hawley's 2017 Compliance Agreement when Soufleris instructed Edelson to pay Hawley at his 2017 Compliance Agreement quarterly bonus rate even though he was just shy of hitting 100 PTQ.  (Oct. 16, 2017, Email Thread, attached as **Exhibit 25**, p. 1).  Edelson confirms by asking, "[s]o you want me to bonus him at the .375% *as per his contract*:

> On Oct 16, 2017, at 10:11 AM, Daneri Edelson <drodriguez@absolute-med.com> wrote:
>
> Will do G. Yeah he was really close … he was at 98%ptq for Q3. So you want me to bonus him at the .375% as per his contract. (see below)
>
> 7% Flat
>
> **Quarterly Bonus**
> .375% at 100%ptq - 105% ptq ( only if Absolute Medical hits)

(**Id.**)[23]  Soufleris responds affirmatively, and pays Hawley's Q3 bonus per the terms of the 2017 Compliance Agreement.  (**Id.**; Oct. 16, 2017, Email, attached as **Exhibit 26**).

Finally, Hawley himself confirms the existence of his 2017 Compliance Agreement when he purportedly resigned from Absolute Medical via a November 30, 2017, email with subject line: "Termination of Contract" stating, "Effective immediately, I hereby terminate my contract with Absolute Medical."  (**Exhibit 1**, Ex. 19).

---

[22] It is also important to note that Edelson directs Hawley to return the executed signature page to her, as opposed to Soufleris. (Feb. 9, 2017, Email from Edelson, **Exhibit 23**). As such, it would lie only within Edelson's Absolute-Med account, which Defendants were unable to salvage. (Dec. L. Mirmelli, Doc. 221-1, ¶ 7).

[23] In fact, Edelson copies the exact language from the 2017 Compliance Agreement months earlier as indicated by the identical extra space prior to the word "only." (*Compare* **Exhibit 22**, p. 18, *with* **Exhibit 25**, p. 1).

Next, Soufleris detailed Miller's 2017 Compliance Agreement in a January 23, 2017, email setting forth a: (i) flat commission rate of 8 percent; (ii) bonus commission rate of .5 percent at 100 PTQ; (iii) bonus of commission rate of 1 percent at 105 PTQ; and (iv) quota of $1,271,684 for 2017.  (Jan. 23, 2017, Email Thread, attached as **Exhibit 27**).  Just as she did with Hawley, Edelson emailed Miller his 2017 Compliance Agreement—containing these exact terms—for execution on February 9, 2017.  (Feb. 9, 2017, Email, attached as **Exhibit 28**).[24]  Edelson's also directed Miller to return the executed signature page to her, and reminded him to do so on February 17, 2017, without objection from him.  (**Id.**; Feb. 17, 2017, Email From Edelson, attached as **Exhibit 29**).  Finally, just as with Hawley, there is no evidence documenting any objection by Miller to his 2017 Compliance Agreement.

Months later, the parties acknowledged Miller's 2017 Compliance Agreement when Absolute Medical paid him his 1 percent bonus commission for hitting 105 PTQ for Q3. (**Exhibit 25**, pp. 1-2).  Miller also acknowledged its existence in writing in August 2017 when NuVasive requested it from him as part of an internal audit.  (Aug. 8, 2017, Email from Miller, attached as **Exhibit 30**).

## III.   STANDARD FOR GRANTING SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 directs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a).  Once a party makes a properly supported motion for summary judgment, the other party must come forward with specific

---

[24] Miller conceded the parties operated pursuant to this Compliance Agreement's structure in 2017. (**Exhibit 19**, 58:11–60:8). This also confirms that Miller's supplemental production of emails from his devices, (Dec. A. Bergeron, Doc. 220-1, ¶¶ 8-9), is incomplete as this email was <u>not</u> within Defendants' supplemental production.

factual evidence that presents more than mere allegations.  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).  In other words, summary judgment may be granted if the non-moving party's evidence is "merely colorable" or "is not significantly probative."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  A nonmoving party cannot defeat a motion for summary judgment based upon a nonmoving party's "suspicion, perception, opinion, and belief."  *Laroche v. Denny's Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999).

## IV.    LAW AND ARGUMENT

### A.  It Is Undisputed That Hawley and Miller Violated The Restrictive Covenants In Their 2016 Compliance Agreements.

It is undisputed that Hawley and Miller violated the restrictive covenants in their 2016 Compliance Agreements.  As detailed above, NuVasive does not believe Defendants' claims that Hawley and Miller failed to sign the 2017 Compliance Agreements, but even if, assuming *arguendo*, they did not, there is no dispute that the 2016 Compliance Agreements are enforceable and that they failed to comply with Sections 5.4 through 5.6 by selling competitive products (without interruption) from December 2017 to the present.  Indeed, they testified that they acted as though they were not subject to any restrictive covenants as soon as they left NuVasive and joined Alphatec on December 1, 2017.  (*E.g.*, **Exhibit 19**, 42:16–23).

### i.  The Restrictive Covenants comply with Florida law and are enforceable.

First, the applicable restrictive covenants in the 2016 Compliance Agreements comply with Section 542.335, Florida Statutes, and are enforceable.  These Agreements are writings signed by Hawley and Miller, the restrictive covenants are justified by several legitimate business interests as defined by Section 542.335(1)(b), the restraints are reasonably necessary to protect those business interests, and the temporal restrictions are appropriate.

20

*a.   The 2016 Compliance Agreements are writings signed by Hawley and Miller.*

The 2016 Compliance Agreements comply with Section 542.335(1)(a)'s requirement

that they be in writing and signed by the person against whom enforcement is sought.  Indeed,

Hawley and Miller acknowledge signing the 2016 Compliance Agreements which binds both

their single-member limited liability companies and themselves to non-solicitation and non-

competition restrictions.  (**Exhibit 17**, 37:3–12; **Exhibit 19**, 45:14–18, 46:21–47:7).

*b.   The Restrictive Covenants are justified by multiple legitimate business interests.*

The Restrictive Covenants comply with Section 542.335(b)'s requirement that there is

a legitimate business interest which supports their existence.  Specifically included in Section

542.335(b)'s non-exclusive list of legitimate business interests are trade secrets, valuable

confidential business or professional information that does not qualify as trade secrets,

substantial relationships with specific or existing customers, and extraordinary or specialized

training.  Here, the record contains more than sufficient proof about the trade secrets and other

confidential information NuVasive entrusted to Hawley and Miller, as well as the specialized

training it provided to them.  Further, even Hawley and Miller cannot dispute that their

substantial relationships with their existing customers justifies reasonable restrictions.[25]

Sections 5.1 and 5.3 of the 2016 Compliance Agreements contain Hawley's and

Miller's promises to maintain the secrecy of NuVasive's confidential information, and

included in Section 5.2's non-exhaustive list of confidential information is trade secrets,

---

[25] In fact, when asked why Drs. Burry, Rodas, and Allende would use Alphatec's products at his suggestion, Miller testified, "I mean, I had spent the majority of my life, almost a decade, with those guys."  (**Exhibit 19**, 92:23–24).  The "almost a decade" Miller refers to is his NuVasive career since he had no previous experience in the spinal marketplace, conceding he developed these relationships on NuVasive's behalf and utilized them to convert their business to Alphatec.  (**Id.** at 34:19–35:18, 38:6–13).

contacts, proposals, pricing information, strategies, inventions, business and marketing plans, and materials that NuVasive furnishes to them. (**Exhibit 9**, §§ 5.1–5.3; **Exhibit 10**, §§ 5.1–5.3). Hawley and Miller both testified that they take no issue with any of their 2016 Compliance Agreements' provisions. (**Exhibit 17**, 37:20–22; **Exhibit 19**, 47:6–7). And their actions demonstrate that they actually possessed this confidential information. Hawley testified that he worked on pipeline products—which he conceded were confidential—with NuVasive, while Miller utilized his knowledge of NuVasive's pricing at CFRH to create a chart he presented to a hospital administrator demonstrating savings the hospital would purportedly realize by allowing surgeons to utilize Alphatec's products rather than NuVasive's. (**Exhibit 17**, 13:4–11, 36:9–20; **Exhibit 19**, 198:24–199:14, Ex. 43).

Similarly, Hawley and Miller received specialized training from NuVasive. Both acknowledge receiving training at the outset of their NuVasive engagements and continuing training at sales meetings. (**Exhibit 17**, 39:3–13; **Exhibit 19**, 49:1–50:8; Tr. Hr'g Prelim. Inj., Doc. 79, 106:7–23; **Exhibit 1**, 14:19–15:21). Most notably, Hawley and Miller are XLIF Certified.[26] (**Exhibit 1**, 16:3–24). The value of the XLIF Certification NuVasive provided to Hawley and Miller cannot be overstated as it provides them with a competitive edge in the marketplace related to lateral approach surgery along with a deep understanding of the complex anatomy, integrated technologies, and procedural sophistication associated with this type

---

[26] NuVasive's eXtreme Lateral Interbody Fusion ("XLIF") Certification program is an innovative, market-leading training program that was implemented in 2010 that NuVasive makes available to its sales associates and spine specialists who complete "spine school." (Decl. P. Marzano, attached as **Exhibit 31**, ¶¶ 3–5). In order to receive XLIF Certification, the sales associate or representative must travel to San Diego, California (or formerly Paramus, New Jersey), and successfully complete a rigorous operating room examination consisting of several hundred points encompassing all aspects of the XLIF procedure. (**Id.** at ¶ 6). The exam requires the individual to correctly identify and explain all technical aspects and indicators involved in the XLIF procedure. (**Id.**)

surgery.  (**Exhibit 31**, ¶ 7).  As a result of receiving XLIF Certification, Hawley and Miller possess superior knowledge and clinical skills relative to lateral approach surgery than those of NuVasive's competitors, which do not provide their sales force with a training program focused on lateral approach surgery that is as comprehensive and specialized as the XLIF Certification.  (**Id.** at ¶¶ 7-8).  Alphatec is now reaping the benefits of their superior knowledge and clinical skills NuVasive expended significant time and expense developing.  (**Id.** at ¶ 9).

Finally, and perhaps most importantly, the relationships that Hawley and Miller have with their surgeon customers and the goodwill they generated with those surgeon customers justify the Restrictive Covenants.  Indeed, they place such a high value on their relationships with their surgeon-customers that they agreed to sell non-Alphatec products to them without being compensated just to keep competitive sales representatives out of their surgeon customers' operating rooms.  (**Exhibit 17**, 147:22–148:10; **Exhibit 19**, 117:19–118:5).  Miller even testified that keeping competitors like NuVasive out of the operating rooms is "priceless." (**Exhibit 19**, 117:19–118:5).  These relationships paid off as, for example, Dr. Sawin went from being a nearly exclusive user of NuVasive's products to a surgeon who utilized a number of competitive companies' products with the common denominator being that Hawley represented those products.  (**Exhibit 17**, 9:11–21).  Similarly, Miller acknowledged that his skill as a sales person caused Drs. Allende, Burry, and Rosen to stop utilizing NuVasive's products and begin utilizing those products he promoted.  (**Exhibit 19**, 92:16–93:3).

   c.  *The 2016 Compliance Agreements' Restrictive Covenants are reasonably necessary to protect NuVasive's legitimate business interests.*

Next, neither Hawley nor Miller can dispute that the Restrictive Covenants – which can be blue-penciled per Section 5.7 – are not reasonably tailored to the legitimate business

interests they protect as required by Section 542.335(c).  The Non-Circumvention clause limits them only from interfering with Absolute Medical's relationships with its vendors, suppliers (including NuVasive), employees, and Customers; the Non-Competition provision precludes them only from selling products that compete with the NuVasive products they sold to their surgeon-customers in the territories Absolute Medical assigned to them and the other hospitals in which they worked on Absolute Medical's behalf during the preceding year; and the Non-Solicitation provision is limited to Absolute Medical's Customers or prospective Customers.[27] (**Exhibit 9**, §§ 5.4–5.6; **Exhibit 10**, §§ 5.4–5.6).  Respectfully, these restrictions are well in-line with those upheld by Florida's courts.  *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009); *Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.*, 939 So. 2d 268, 273 (Fla. 4th DCA 2006); *Electrostim Med. Servs. v. Dawn Lindsey & Zynex Med., Inc.*, No. 8:11-cv-2467-T-33TBM, 2012 WL 1405707, at *12 (M.D. Fla. Mar. 13, 2012); *Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1217 (S.D. Fla. 2005).

     *d.   The 2016 Compliance Agreements' temporal restrictions are appropriate.*

     Finally, the one-year temporal restrictions found in the Restrictive Covenants comport with Florida law.  It is an entire year shorter than what is presumably unreasonable under Section 542.335(d)(1), and Florida courts routinely uphold one-year restrictive covenants for salespersons.  *See, e.g.*, *Osbourne Assocs. v. Cangemi*, No. 3:17-cv-1135-J-34MCR, 2017 WL 5443146 (M.D. Fla. Nov. 14, 2017).

---

[27] In November 2017, Absolute Medical's only significant customers were Drs. Sawin, Burry, Rodas, Allende, and Rosen. (**Exhibit 3**, 91:13–92:19). As there are approximately thirty spine surgeons (whom Absolute Medical chose not to focus on) in Orlando, this restriction is not overly oppressive.  (**Id.** at 93:18–24).

### ii. Hawley and Miller violated the Restrictive Covenants.

There is also no dispute that Hawley and Miller violated and continue to violate the Restrictive Covenants.  They admit—in their discovery responses and deposition testimony—that they began working for Alphatec and other competitive companies in their NuVasive sales territories in early December 2017, before the Restrictive Covenants expired, and that they have continued doing so ever since.  (**Exhibit 17**, 9:13–21, 36:1–8, 54:18–56:8, 139:25–141:18, 142:15–17, Ex. 6; **Exhibit 19**, 43:2–4, 85:7–17, 87:11–89:1, 94:1–96:21, 236:3–13).

### iii. Hawley and Miller impermissibly benefited from their breaches of the Restrictive Covenants, which harmed NuVasive.

Finally, there is no dispute that Hawley's and Miller's breaches of the Restrictive Covenants harmed NuVasive.  Miller bragged that he converted the business of Drs. Allende, Burry, and Rosen because he is a good salesperson, and Hawley acknowledged how Dr. Sawin went from exclusively using NuVasive's products for several years to only using one product on rare occasions less than a week after he resigned from Absolute Medical.  (**Exhibit 17**, 92:16–93:3; **Exhibit 19**, 9:11–21).  Further, there is no dispute that Hawley and Miller impermissibly benefited from their violations of their 2016 Compliance Agreements as Alphatec paid them to violate their obligations during the first twelve months of their Alphatec engagements.  (**Exhibit 17**, 144:14–21; **Exhibit 19**, Ex. 6 at Ex. C).

### iv. The Court should toll the temporal terms of the Restrictive Covenants.

Since Hawley and Miller violated the reasonable Restrictive Covenants, the Court should extend their expiration to ensure that NuVasive receives the agreed-upon twelve complete months of non-competition.  In other words, the Court should enjoin them from competing with NuVasive in their NuVasive sales territories for one month.

Under Florida law, when a party does not comply with the terms of an enforceable restrictive covenant a court may extend the duration of a restrictive covenant beyond the time specified in an agreement to ensure that the contracting party receives the entire benefit of the restrictive covenant. *Capelouto v. Orkin Exterminating Co.*, 183 So. 2d 532, 534–35 (Fla. 1966); *Kverne v. Rollins Protective Servs. Co.*, 515 So. 2d 1320, 1321–22 (Fla. 3d DCA 1987); *Intermex Wire Transfer v. V.*, 2014 Fla. Cir. LEXIS 29206, at *14 (Fla. Cir. October 1, 2014) (extending the term of the restrictive covenant for 5 months because defendants participated in prohibited activities during the course of the litigation).

Here, there is no dispute that Hawley and Miller began working for Alphatec in December 2017 (prior to the expiration of the Restrictive Covenants) and continued doing so since that time. (**Exhibit 17**, 9:13–21, 36:1–8, 54:18–56:8, 139:25–141:18, 142:15–17, Ex. 6; **Exhibit 19**, 43:2–4, 85:7–17, 87:11–89:1, 94:1–96:21, 236:3–13). As such, the Restrictive Covenants should be extended as in *Kverne* because to hold otherwise would "ignore" their improper actions undertaken throughout this litigation. 515 So. 2d at 1322 (quoting *Capelouto*, 183 So. 2d at 534-35). Accordingly, the Court should extend the expiration of the Restrictive Covenants, enjoin them from competing with NuVasive in their former NuVasive sales territories for one month, award NuVasive appropriate damages, and disgorge any profits earned during those periods.

**B.** **Absolute Medical Systems Is Responsible For Its And Absolute Medical's Breaches Of The Sales Agreement.**

Next, the undisputed facts establish that the Sales Agreement imposes valid restrictions on the parties which Absolute Medical breached, causing damage to NuVasive. *Interim Healthcare v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Sup. Ct. 2005). They also establish

26

that Absolute Medical Systems is Absolute Medical's successor in interest and, therefore is liable for those (and its own) breaches of the Sales Agreement.

**i.  Absolute Medical violated several sections of the Sales Agreement.**

Absolute Medical breached the Sales Agreement when it failed to ensure that Hawley, Miller, and others were subject to Compliance Agreements in 2017; failed to inform NuVasive that Soufleris began searching for ways to separate from it in June of 2017; began scheming with Alphatec to move NuVasive's business to it in October of 2017; attempted to "resign" from NuVasive on November 27, 2017; and failed to vigorously enforce Hawley's and Miller's 2016 Compliance Agreements or pay for NuVasive to do so.  These violations, individually and collectively, converted nearly all of NuVasive's business in the Territory.

*a.  Absolute Medical stopped performing under the Sales Agreement.*

The most notable breach occurred on November 27, 2017, when Absolute Medical, without notice, stopped complying with its terms.  This stripped NuVasive of the resources necessary to service the Territory and, when combined with Absolute Medical's other breaches, rendered NuVasive unable to salvage relationships with the surgeon customers it entrusted to Absolute Medical.  (Decl. M. Singer, Doc. 19-1, ¶¶ 5-7).

Sections 9.02 through 9.04 of the Sales Agreement provide that Absolute Medical may terminate the Sales Agreement only if NuVasive materially breaches (and does not cure) the Sales Agreement or becomes insolvent; neither of which occurred before Absolute Medical sent its November 27, 2017, "resignation" email.  There is no contention that NuVasive was ever insolvent, and Soufleris admits NuVasive did not materially breach the Sales Agreement

and that he cannot identify any provision in the Sales Agreement which allows Absolute Medical to terminate the Sales Agreement in the manner he did. (**Exhibit 1**, 108:24–109:7).

      *b.   Absolute Medical violated Section 5.04(c) of the Sales Agreement.*

Absolute Medical's compliance with Section 5.04(c)'s notice provision would have mitigated the damages caused by its sudden cessation of activities on NuVasive's behalf as it would have provided NuVasive with, at least, 75 days to secure its relationships with its surgeon customers and begin the process of replacing Absolute Medical with sales professionals dedicated to NuVasive. Section 5.04(c) obligates Absolute Medical to "promptly advise NuVasive of . . . any political, financial, legislative, industrial or other events in the Territory that could affect the mutual business interests of [Absolute Medical] and NuVasive, whether harmful or beneficial." Absolute Medical failed to comply with this obligation as it did not inform NuVasive:

- that Soufleris began planning to separate from NuVasive in June of 2017;

- that Soufleris began scheming with Alphatec in October of 2017 to convert NuVasive's business (as well as Hawley, Miller, and Gottstein) to Alphatec; or

- that NuVasive's business within the Territory was in jeopardy.

(**Exhibit 3**, 43:21–44:10; **Exhibit 1**, 112:3–23). Further, Absolute Medical failed to even give NuVasive notice that it would immediately stop performing its contractual obligations and Defendants cannot dispute that these events (could have and in fact) harmed NuVasive's and Absolute Medical's mutual business interests.

      *c.   Absolute Medical violated Section 5.09 of the Sales Agreement.*

Absolute Medical's violation of Section 5.09 of the Sales Agreement also impaired NuVasive's ability to protect its business as it allowed Soufleris, Hawley, and Miller to take

off their NuVasive hats and immediately service the surgeon customers NuVasive entrusted to them on behalf of Alphatec and other NuVasive competitors.  These violations include failing to ensure that Soufleris, Hawley, and Miller were subject to Compliance Agreements in 2017 and failing to enforce what was left of the restrictive covenants in the 2016 Compliance Agreements after they began competing with NuVasive.

Section 5.09: (i) requires Absolute Medical's Representative Affiliates to execute Compliance Agreements; and (ii) requires it to vigorously enforce the Compliance Agreements or pay NuVasive to do so.  Contrary to these obligations, Absolute Medical failed to require Hawley, Miller, and Soufleris to execute[28] Compliance Agreements in 2017 and failed to enforce what remained of the restrictive covenants in Hawley's, Miller's, and Gottstein's 2016 Compliance Agreements after they submitted their resignations.  (**Exhibit 1**, 71:23–74:21, 81:9–87:17).  Like its other violations of the Sales Agreement, this devastated NuVasive's ability to protect the business it entrusted to Absolute Medical, allowed it to move that business to Alphatec and other competitive companies overnight, and prohibited NuVasive from making sales calls in the area.  (Decl. M. Singer, Doc. 19-1, ¶¶ 5-7).

**ii.  Absolute Medical Systems is a mere continuation of Absolute Medical.**

Unconcerned about these contractual violations, the Defendants collectively and incorrectly believe they can escape liability because Soufleris dissolved Absolute Medical and formed Absolute Medical Systems.  This is not so. NuVasive can enforce the Sales Agreement and obtain injunctive relief against Absolute Medical Systems because it is a mere continuation of Absolute Medical; which, without limitation, operates in a building and utilizes furniture

---

[28] Absolute Medical could have simply renewed the 2016 Compliance Agreements but chose not to do so.

purchased by Absolute Medical, utilizes Absolute Medical's sales representatives to sell competitive products in the Territory, utilizes Absolute Medical's office manager and allows her to perform services for the sales representatives who pretended they were not affiliated with it, and services the same surgeon customers it serviced for NuVasive.  Further, the two companies comingled funds, and accounts.

Under Florida law, a successor entity is liable for the obligations of its predecessor if "(1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 153-54 (Fla. 4th DCA 1994) (citing *Bernard v. Kee Mfg. Co*., 409 So. 2d 1047, 1049 (Fla. 1982)); *Etkin & Co. v. SBD, Ltd. Liab. Co*., No. 11-21321-CIV-LENARD/GOODMAN, 2015 U.S. Dist. LEXIS 180657, at *20-21 (S.D. Fla. Sep. 1, 2015).   A mere continuation is found when the successor has the same ownership, management, staff, assets, location, and clients as its predecessor. *See, Munim*, 648 So. 2d 145. In other words, courts impose liability if the successor entity is "merely a continuation or reincarnation of the predecessor under a different name."  *Id*. at 154; *TTT Foods Holding Co. Ltd. Liab. Co. v. Namm*, No. 16-cv-81798, 2017 U.S. Dist. LEXIS 77402, at *12 (S.D. Fla. May 19, 2017) (holding the successor entity of an LLC, which became insolvent, was a mere continuation of the predecessor entity, because the LLC and the predecessor entity shared the same office location, customers, manufacturers, freight companies, products, and member-manager).  The main inquiry is "whether there has been a change in form, but not in substance." *Lab. Corp. v. Prof'l Recovery Network*, 813 So. 2d 266, 270 (Fla. 5th DCA 2002); *Oman Int'l*

*Fin. Ltd. v. Hoiyong Gems Corp.*, 616 F. Supp. 351, 361 (D.R.I. 1985) (the "question is whether each entity has run its own race, or whether there has been a relay-style passing of the baton from one to the other."). Indeed, liability must attach when the successor entity "is merely a 'new hat' for the seller, with the same or similar management and ownership." *Munim*, 648 So. 2d at 154.

Here, in addition to comingling funds, the two companies, without limitation, share an office location, furniture, customers, products, and ownership, and there is no indication that Soufleris formed Absolute Medical Systems for any reason other than to avoid Absolute Medical's contractual obligations. Therefore, Absolute Medical Systems is liable for Absolute Medical's breaches of the Sales Agreement under the continuation theory of successor liability.

> a.  *The two companies commingled funds, accounts, and other assets.*

Soufleris acquired the Lee Vista Boulevard property in September of 2017. At a minimum, Absolute Medical provided funds for its down payment and for it to be furnished. (**Exhibit 13**; **Exhibit 3**, 123:14–124:18, 165:5-9). Now, Absolute Medical Systems and Soufleris' other companies conduct business out of the Lee Vista Boulevard property (Dep. Absol. Ortho, attached as **Exhibit 32**, 18:8–19:7, 51:12–20), and utilize the furniture Absolute Medical purchased (which, along with the Cadillac that is now licensed in Soufleris' name, constitutes all of Absolute Medical's assets other than amounts owed to it by Soufleris' other companies at the time it dissolved). (**Exhibit 3**, 165:10–166:10, Ex. 43; **Exhibit 1**, 156:1–8, 180:13–182:23, 212:11–213:17).

The two companies also use the same American Express account. (**Exhibit 1**, 228:13-229:24, Ex. 38, Ex. 39). Similarly, prior to Absolute Medical Systems getting a checking

account on December 12, 2017, Absolute Medical paid for Soufleris to (i) fly to California in October of 2017 to pitch his business plan to Alphatec; (ii) take Dr. Burry and Miller to dinner in early 2017; and (iii) send flowers to the sales representatives wives after they joined Alphatec. (**Exhibit 3**, 163:19–165:4, 241:1–3, Ex. 42; **Exhibit 1**, 71:23–76:8, 121:8–122:24, 206:9-208:17, 220:16-222:11, Ex. 16). Then after opening that account, he linked it to Absolute Medical's account. (Tr. Hr'g Prelim. Inj., Doc. 79, Defs.' Ex. 21).

>   b.  *The two companies are in the same industry, have the same office location, and have common ownership.*

Absolute Medical's sole member, Soufleris, was also Absolute Medical System's sole member until July of 2019. (**Exhibit 1**, 6:14–25; **Exhibit 2**, 7:6–9, 10:8–9).[29] He formed Absolute Medical in 2013 to make "medical sales" on behalf of NuVasive (**Exhibit 1**, 20:8–13, 21:12–14), and then formed Absolute Medical Systems, which operates out of a property purchased (at least in part) with Absolute Medical's funds and decorated with furniture Absolute Medical purchased, to promote products that directly compete with NuVasive's products. (**Exhibit 2**, 10:14–21; 11:19–12:2, 16:3–6).

>   c.  *The two companies have common personnel and customers.*

The two companies also share personnel and customers. Hawley, Miller, and Gottstein each began selling products that compete with NuVasive's products on behalf of Absolute Medical Systems immediately after Soufleris formed it. Similarly, every Absolute Medical Systems sale in the Territory between December 1, 2017, and December 1, 2018, was to an Absolute Medical surgeon customer. (**Exhibit 3**, 212:7–217:1, Ex. 75).

---

[29] Soufleris served/serves as the President of both entities, was the sole decision maker for Absolute Medical, and the decision to form Absolute Medical Systems was his. (**Exhibit 1**, 6:14–19, 19:9–14; **Exhibit 2**, 10:22–11:21).

> *d.   The two companies use the same telephone numbers and email addresses.*

Finally, both entities utilize the same telephone numbers.  Soufleris, Edelson, Hawley, Miller, and Gottstein maintained the same numbers when their affiliation with NuVasive ended.  Similarly, they continued utilizing Absolute Medical's email address well after it ceased doing business.  Then, at Soufleris' instruction, began utilizing Absolute Medical Systems' substantially similar email addresses.  Lastly, regardless of which email address he utilized, Soufleris' email signature continued to refer to his business as "Absolute Medical" until at least late March of 2018. (**Exhibit 3**, 191:7–25; 192:1–25; 193:1–2, 225:9–13).

## C.  NuVasive Is Entitled To A Permanent Injunction Against Absolute Medical And Absolute Medical Systems.

At a minimum, the Court should enforce the Sales Agreement's one-year non-compete provision against Absolute Medical Systems.  Though Defendants devastated NuVasive's business in the Orlando area by ignoring their contractual obligations, doing so would give NuVasive a chance to reconnect with its former surgeon customers and regain some of their business, without having to compete against Soufleris, Hawley, and Miller.

A district court may grant a permanent injunction if the movant shows: (1) actual success on the merits; (2) irreparable harm will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs the damage the proposed injunction may cause the opponent; and (4) the injunction would not be adverse to public interest. *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).  Here, the undisputed facts establish that a permanent injunction should issue which prohibits the two companies from competing within the Territory for a year, as Soufleris formed Absolute Medical Systems, which is the mere continuation of Absolute Medical, solely to avoid its contractual obligations.

### i.  NuVasive established actual success on the merits.

First, NuVasive will succeed on the merits of its claim that Absolute Medical violated the Sales Agreement because the Sales Agreement is a valid contract and Soufleris caused Absolute Medical to violate it.  (**Exhibit 3**, 23:2–8, 82:23–83:15, Ex. 18; **Exhibit 1**, 109:3–7; **Exhibit 2**, 10:14–21; 11:19–12:2, 16:3–6).   As Absolute Medical Systems is a mere continuation of Absolute Medical, the Court should enjoin it from benefiting from those violations. *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1354-55 (11th Cir. 2017) (citing *Interstate Commerce Comm'n v. Rio Grande Growers Coop.*, 564 F.2d 848, 849 (9th Cir. 1977) (binding nonparty to injunction where it was a successor to a party to the injunction and the incorporator of the successor had knowledge of the injunction); *New York v. Operation Rescue Nat'l*, 80 F.3d 64, 70-71 (2d Cir. 1996) (binding nonparty to injunction where nonparty was successor of a party to, and had notice of, the injunction)).[30]

### ii.  NuVasive continues to suffer irreparable harm.

Further, NuVasive will suffer further irreparable harm if Absolute Medical Systems continues selling competitive products in the Territory.  As of September 10, 2019, NuVasive remained shorthanded in the Orlando area.  (Dep. M. Singer, attached as **Exhibit 33**, 55:11–16).  An injunction will allow a new NuVasive sales representative to establish himself or herself in this territory and will level the playing field by giving NuVasive a chance to reconnect with its former surgeon customers and regain their business.

---

[30] In *ADT LLC*, the Eleventh Circuit held that a successor in interest entity to an enjoined party could not be enjoined because it did not have notice of the injunction. Following a remand, the Southern District of Florida made an evidentiary determination that the successor in interest did, in fact, have notice of the injunction and was, therefore, bound by the permanent injunction. *See ADT LLC v. Sec. Networks, LLC*, Case No. 12-81120-CIV-DIMITROULEAS, 2019 U.S. Dist. LEXIS 15677, at **4-5 (S.D. Fla. Jan. 30, 2019).

### iii. The harm incurred by NuVasive outweighs any harm to the Defendants.

Third, NuVasive's continuing loss of sales in the Territory outweighs any damage that Absolute Medical or Absolute Medical Systems will suffer if the Court issues the requested injunction, which will only require them to do what the Sales Agreement and the Alphatec Sales Agreement obligates them to do, albeit without satisfying the Sales Agreement's full Term. (**Exhibit 3**, 134:5–135:138:16, Ex. 32 at Ex. A). Further, the injunction will only keep them from working within the Territory for one year.

### iv. Issuing the requested injunction is in the public interest.

Lastly, the public has an interest in seeing valid contracts enforced. *MEDai Inc. v. Quantros, Inc.*, No. 6:12-cv-840-Orl-37GJK, 2012 U.S. Dist. LEXIS 115504, at *27 (M.D. Fla. Aug. 16, 2012); *AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004). Not enforcing the Sales Agreement against Absolute Medical "actually disserves the public interest in protecting fair competition, particularly with regard to a restrictive covenant." *MEDai Inc.,* 2012 U.S. Dist. LEXIS 115504. at *26. Prohibiting Absolute Medical Systems from violating its predecessor's obligations is consistent with the public's interest in enforcing contracts and promoting fair competition.

### V.    CONCLUSION

For the reasons set forth above, the Court should enter summary judgment against Absolute Medical and Absolute Medical Systems on Counts I and III and against Hawley and Miller for their violations of their 2016 Compliance Agreements, and set a hearing to determine the damages those violations caused to NuVasive.

815937.3/020171439

Dated: July 27, 2020

Respectfully submitted,

**/s/ *Christopher W. Cardwell***
R. Craig Mayfield (Fla. Bar No. 0429643)
Cmayfield@bradley.com
Diana N. Evans (Fla. Bar No. 98945)
Dnevans@bradley.com
Bradley Arant Boult Cummings LLP
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Tel: (813) 559-5500
Fax: (813) 229-5946

Christopher W. Cardwell, Esq. (*pro hac vice*)
ccardwell@gsrm.com
Mary Taylor Gallagher, Esq. (*pro hac vice*)
mtgallagher@gsrm.com
M. Thomas McFarland, Esq. (*pro hac vice*)
tmcfarland@gsrm.com
GULLETT, SANFORD, ROBINSON &
MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, TN 37201
Tel: (615) 244-4994
Fax: (615) 256-6339

*Attorneys for Plaintiff NuVasive, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.  The party or parties served are as follows:

Busch, Slipakoff, Mills & Slomka, LLC

Bryan E. Busch
Email: bb@bsms.law
Laura H. Mirmelli
Email: lm@bsms.law
Riverwood 100,
3350 Riverwood Pkwy., Suite 2100
Atlanta, GA  30339
Phone: (404) 800-4062
Fax:   (404) 800-4062

Christopher Y. Mills
Email: cm@bsms.law
319 Clematis Street, Suite 109
West Palm Beach, FL 33401
Phone: (561) 701-5386

*Attorneys for Defendants*

*/s/ Christopher W. Cardwell*_____