UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**NUVASIVE, INC.,**

  **Plaintiff,**

**v.**                                                    **Case No. 6:17-cv-2206-Orl-41GJK**

**ABSOLUTE MEDICAL, LLC,
GREG SOUFLERIS, DAVE
HAWLEY, ABSOLUTE
MEDICAL SYSTEMS, LLC, and
RYAN MILLER,**

  **Defendants.**

_____/

### ORDER

THIS CAUSE is before the Court on cross motions for summary judgment. Plaintiff Nuvasive, Inc. filed a Partial Motion for Summary Judgment ("Plaintiff's MSJ," Doc. 260), to which Defendants Dave Hawley, Ryan Miller, and Absolute Medical Systems, LLC ("AMS") (collectively, "Movant Defendants"[1]) filed a Response (Doc. 266), and Plaintiff filed a Reply (Doc. 268). Movant Defendants also filed a Motion for Partial Summary Judgment ("Movant Defendants' MSJ," Doc. 257), to which Plaintiff filed a Response (Doc. 265), and Movant Defendants filed a Reply (Doc. 267). Also before the Court is Plaintiff's Motion for the

_____

[1] Defendants Absolute Medical, LLC and Greg Soufleris are not included in the Movant Defendants.

Imposition of Sanctions for Spoliation of Evidence ("Spoliation Motion," Doc. 203), to which Defendants filed a Response in Opposition (Doc. 211). For the reasons stated herein, Plaintiff's Spoliation Motion will be granted in part and denied in part, Plaintiff's MSJ will be granted in part and denied in part, and Movant Defendants' MSJ will be granted in part and denied in part.

## I.   BACKGROUND

Plaintiff manufactures medical products and equipment and describes itself as "an innovative medical company that focuses on products and processes that treat spinal disease." (Second Am. Compl., Doc. 188, at 3). Plaintiff's relationship with Defendant Absolute Medical, LLC ("AM") began in 2013 when Plaintiff and AM executed an Exclusive Sales Representative Agreement (Doc. 60-7, at 3–27), appointing AM as Plaintiff's "exclusive sales representative" for certain of Plaintiff's products in a specified geographic area. (*Id.* at 3). In 2017, Plaintiff and AM continued their relationship when they executed another Exclusive Sales Representative Agreement ("2017 Sales Agreement," Doc. 260-3, at 131–59), wherein Plaintiff "appoints" AM as Plaintiff's "exclusive" and "sole" sales representative for a specified territory covering portions of Central and South Florida, effective January 1, 2017, for a term of five years.[2] (*Id.* at 132; *see id.* at

---

[2] Plaintiff and AM later entered into a Territory Transition Agreement (Doc. 260-3, at 160–71) that reduced the sales territory covered by AM. (Doc. 260-3 at 17; Doc. 260-3 at 160). With the exception of express releases provided for in the Territory Transition Agreement, which are

131, 150, 151). Defendant Greg Soufleris was the president and sole member of AM. (AM Dep., Doc. 260-1, at 4, 8, 10). Hawley and Miller, each through their own company, were sales representatives for AM. (Soufleris Dep., Doc. 260-3, at 91–92; Hawley's 2016 Independent Contractor Agreement, Doc. 260-10, at 20 (showing Hawley's signature, printed name, and title of "Sales Representative"); Miller's 2016 Independent Contractor Agreement, Doc. 260-11, at 20 (showing Miller's signature, printed name, and title of "Sale Representative")).

The primary dispute in this case lies in certain provisions of the 2017 Sales Agreement. That agreement, *inter alia*, includes non-competition and non-solicitation terms prohibiting AM and its sales representatives, for the five-year term of the agreement and twelve months following, from:

> (i) represent[ing], promot[ing], sell[ing], solicit[ing], or otherwise commercializ[ing] (directly or indirectly) any products or services that are, in [Plaintiff]'s reasonable judgment, competitive with any of [Plaintiff]'s products or services . . . ;
>
> (ii) solicit[ing], encourag[ing], or induc[ing], or caus[ing] to be solicited, encouraged or induced (directly or indirectly) any [specified persons within the specified territory], to terminate or adversely modify any business relationship with [Plaintiff], or not to proceed with, or enter into, any business relationship with [Plaintiff], []or otherwise interfere[ing] with any business relationship between [Plaintiff], and any [specified persons within the specified territory]; or

---

inapplicable to this case, the Territory Transition Agreement provided that "the terms of the [2017] Sales Agreement [would] remain in full force and effect." (Doc. 260-3 at 161–62).

> > (iii) solicit[ing] or offer[ing] to work (directly or indirectly) or hir[ing] any of [Plaintiff's] employees, agents or representatives.

(Doc. 260-3 at 137). To effectuate these restrictive covenants, the agreement also includes a provision requiring AM to have each of its sales representatives "execute[] an agreement . . . to contractually obligate [them] to comply with the" restrictive covenants, including naming Plaintiff "as an intended third party beneficiary with full right to directly enforce provisions" of such agreements. (*Id.* at 137–38).

As AM sales representatives, Hawley and Miller each executed Independent Contractor Agreements ("ICAs") with AM beginning in 2013.[3] (*See generally* Hawley's 2013 ICA, Doc. 265-8; Miller's 2013 ICA, Doc. 265-9). The 2013 ICAs— which were effective for a term of one year and automatically renewed for successive one-year periods unless terminated with notice—contain non-competition and non-solicitation provisions. (Doc. 265-8 at 4, 9–11; Doc. 265-9 at 4, 9–11). The restrictive covenants, which were in effect for the term of the 2013 ICAs and for a one-year period following termination of the 2013 ICAs, prohibited Hawley and Miller from directly or indirectly participating in any activities that competed with the sale of Plaintiff's products. (Doc. 265-8 at 9–11; Doc. 265-9 at 9–11). Hawley

---

[3] The 2013 ICAs name "Steve Madsen Pro." as the "Independent Contractor" on the first page of the agreement, (Doc. 265-8 at 2; Doc. 265-9 at 2); however, the 2013 ICAs are executed by Hawley and Miller "Individually and on behalf of Independent Contractor," (Doc. 265-8 at 17; Doc. 265-9 at 17), so it is clear that these agreements bind Hawley and Miller individually.

and Miller executed similar ICAs for the years 2014, 2015, and 2016, but those ICAs named Hawley Med, LLC and Miller Time Medical, Inc. as the "Salesperson" and were signed by Hawley and Miller with the title "Sales Representative." (Hawley's 2014 ICA, Doc. 265-10, at 2–19;[4] Hawley's 2015 ICA, Doc. 265-10, at 20–38; Hawley's 2016 ICA, Doc. 260-10, at 2–20; Miller's 2014 ICA, Doc. 265-11, at 2–20; Miller's 2015 ICA, Doc. 265-11, at 21–39; Miller's 2016 ICA, Doc. 260-11, at 2–20).

Whether or not Hawley and Miller, or their corporate entities, executed ICAs for 2017 has been the subject of intense debate during this case. (*See generally, e.g.*, Doc. 203; Nov. 21, 2019 Hr'g Tr., Doc. 215; Jan. 3, 2020 Order, Doc. 219; July 1, 2020 Hr'g Tr., Doc. 253). The latest ICAs in the record are the 2016 ICAs. (*See generally* Doc. Nos. 260-10, 260-11). The 2016 ICAs contain restrictive covenants similar to the previous ICAs. (Doc. 260-10 at 2, 9; Doc. 260-11 at 2, 9). The non-competition provision prohibits "directly or indirectly . . . sell[ing] Competitive Products or own[ing], manag[ing], operat[ing] or control[ing] or participat[ing] in . . . any business that is in competition with the business of [AM]." (Doc. 260-10 at 9; Doc. 260-11 at 10). The non-solicitation provision prohibits "directly or indirectly . . . canvas[ing], solicit[ing], or accept[ing] any business . . . from any Customer or

---

[4] The copy of Hawley's 2014 ICA filed on the record is unsigned. However, this contract is not relevant to the instant Motions before the Court.

prospective Customer of [AM] or any person who or which is an affiliate of any Customer or prospective Customer of [AM]." (Doc. 260-10 at 9; Doc. 260-11 at 10). These provisions are enforceable during the term of the 2016 ICAs—January 1, 2016 through December 31, 2016[5]—"and for a twelve (12) month period following the [t]erm." (Doc. 260-10 at 9; Doc. 260-11 at 9). Therefore, the restrictive covenants would have been effective through December 31, 2017—twelve months following the end of the term. The 2016 ICAs also name Plaintiff as "an express third party beneficiary" with "the right, power and authority to enforce," *inter alia*, the non-competition and non-solicitation provisions. (Doc. 260-10 at 15; Doc. 260-11 at 15).

In October 2017, Soufleris began communicating with Alphatec, Inc. ("Alphatec"), (Doc. 260-3 at 5), a direct competitor of Plaintiff,[6] (Bragulla Dep., Doc. 198-4, at 37–38). In October and November 2017, Soufleris twice flew to Alphatec's headquarters in California. (Doc. 260-1 at 38–39, 100–02 (stating that AM paid for Soufleris's October flight); Doc. 260-3 at 31 (stating that Alphatec paid for Soufleris's November flight); Nov. Flight Confirmation, Doc. 260-4, at 13–16). During the October visit, Soufleris presented to Alphatec a five-year business plan—

---

[5] Although the 2016 ICAs state "December 31, 2015," as the end of the term, (Doc. 260-10 at 5; Doc. 260-11 at 5), Soufleris testified that the date was a typo and that the correct year of expiration was 2016. (Prelim. Inj. Hr'g Tr., Doc. 95, at 56).

[6] Limited direct evidence was presented by the parties regarding whether Alphatec is a direct competitor of Plaintiff. (*See, e.g.*, Doc. 198-4 at 37–38). However, in the context of the entire record, it is undisputed by the parties that Alphatec is a direct competitor of Plaintiff.

for the time period from 2018 through 2023—proposing a business relationship between Alphatec and AM. (Doc. 260-1 at 38–44, 109–17).

On November 27, 2017, Alphatec sent an email to Soufleris with the subject line "DELIVERY: Draft Contract." (Nov. 27, 2017 Alphatec Email, Doc. 260-15, at 2). Attached to the email was an unsigned draft of a Dedicated Sales Representative Agreement showing an effective date of December 1, 2017, and a term continuing until December 31, 2022. (*Id.* at 4). Later the same day, Soufleris sent an email to Plaintiff "officially inform[ing Plaintiff] of [his] resignation with our partnership." (Nov. 27, 2017 AM Email, Doc. 260-4, at 32; Doc. 260-3 at 82–83). The next day, Plaintiff responded by letter, informing Soufleris and AM that "[AM] has no right or ability to unilaterally terminate or 'resign' under the [2017] Sales Agreement and such purported termination or resignation is itself a material breach under the [2017] Sales Agreement." (Nov. 28, 2017 Nuvasive Letter, Doc. 260-1, at 141).

Three days later, on November 30, 2017, Hawley, Miller, and AM's "field support representative, Mr. Gottstein," all submitted their "official resignations" to AM. (Doc. 260-1 at 72; Miller Resignation Email, Doc. 260-1, at 122; Hawley Resignation Email, Doc. 260-1, at 123; Gottstein Resignation Email, Doc. 260-1, at 124).

On December 1, 2017, Soufleris "dissolve[d]" AM and created a "new entity," AMS, to "replac[e]" AM. (AMS EIN Email, Doc. 260-1, at 121; Doc. 260-1 at 66–

67). This dissolution of AM included Soufleris instructing Hawley, Miller, and other AM employees to notify their contacts of a change in email work address. (Doc. 260-3 at 91–92; Dec. 28, 2017 Email, Doc. 260-4, at 114). On the same day, the communications between Soufleris and Alphatec, (*see, e.g.*, Alphatec Emails, Doc. 260-4, at 17–31), culminated in a contract between Alphatec and AMS effective December 1, 2017. (Doc. 260-3 at 36; Alphatec Dedicated Sales Representative Agreement ("Alphatec Sales Agreement"), Doc. 260-4, at 50–57). The Alphatec Sales Agreement provides that—for a term beginning on December 1, 2017, and ending on December 31, 2022, with provisions for automatic renewal—AMS is "authorized . . . and obligated to" sell Alphatec's products and that AMS "is permitted to use employees and contractors to perform its duties" under the agreement. (Doc. 260-4 at 50). Within a week, Hawley and Miller began "representing Alphatec's products." (Doc. 260-1 at 22; *see also* Doc. 260-3 at 88–89, 96–97, 121; Miller Dep., Doc. 260-20, at 38–39).

On December 13, 2017, Plaintiff sent a follow-up letter to AM, with a copy to Soufleris, "terminat[ing] [AM]'s right to be the exclusive distributor of [Plaintiff's] products." (Dec. 13, 2017 Nuvasive Letter, Doc. 265-6, at 2). However, the letter also makes clear that Plaintiff was "simply terminat[ing AM's] right to be the exclusive sales representative within [the designated] territory" and that this termination [did] not affect [AM's] obligation to sell [Plaintiff]'s products within

[the] sales territory in accordance with the [2017 Sales Agreement]'s terms and conditions." (*Id.*).

This lawsuit followed. Plaintiff asserts nine counts in the Second Amended Complaint, which is the operative complaint. (*See generally* Doc. 188). Counts I and II are breach of contract claims against AM under Delaware common law;[7] Count III is a breach of contract claim against AMS under Delaware common law; Count IV is a breach of contract claim against Hawley and Miller;[8] Count V is a conversion claim against Hawley and AMS;[9] Count VI is a Florida Revised Limited Liability Company Act claim against Soufleris; Count VII pertains to piercing the corporate veil as to Soufleris for the actions of AM and AMS; Count VIII is a Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et. seq.*, claim against all Defendants; and Count IX is a tortious interference claim against Soufleris.[10, 11] (*Id.* at 14–23). Plaintiff moves for summary judgment as to Counts I, III, and IV.[12]

---

[7] Count I requests injunctive relief related to the 2017 Sales Agreement, and Count II requests enforcement of an arbitration clause in the 2017 Sales Agreement. (*See* Doc. 188 at 14–16).

[8] The Second Amended Complaint does not specify what state's law this claim is brought under. (*See* Doc. 188 at 18–20).

[9] The Second Amended Complaint does not specify what state's law this claim is brought under. (*See* Doc. 188 at 20).

[10] The Second Amended Complaint does not specify what state's law this claim is brought under. (*See* Doc. 188 at 23).

[11] Previously, pursuant to a "Dispute Resolution" clause in the 2017 Sales Agreement, (Doc. 260-3 at 145–46), the Court ordered Plaintiff and AM to "proceed to arbitration on Count II" and stayed "Counts III, to the extent that Plaintiff seeks monetary relief, VI, VII, VIII, and IX . . . pending arbitration." (May 31, 2019 Order, Doc. 178, at 5).

[12] Plaintiff only references by number Counts I and III in its request for entry of summary judgment. (*See* Doc. 260 at 42). However, Plaintiff also requests summary judgment "against

(*See generally* Doc. 260). The Movant Defendants move for summary judgment as to Counts IV and V.[13] (*See generally* Doc. 257).

## II.   SPOLIATION MOTION

### A.   **Legal Standard**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009). The Eleventh Circuit has previously applied a multi-factor test to determine whether sanctions are appropriate when a party has spoliated evidence. *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018) (citing the federal common law standard). "When a party alleges that spoliation of evidence has occurred, a court should ask whether sanctions— including adverse inferences and the exclusion of evidence—are warranted, based on (1) whether the party seeking sanctions was prejudiced and whether any prejudice was curable, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and ([4]) the potential for abuse if sanctions are not imposed." *Tien v. Red Coats, Inc.*, 753 F. App'x 768, 770 (11th Cir. 2018).

---

Hawley and Miller for their violations of their 2016 Compliance Agreements," which is clearly a reference to the allegations set forth in Count IV. (*See id.*; Doc. 188 at 18–20).

[13] While the Movant Defendants do not specify by number which counts they request summary judgment on, "Hawley and Miller request summary judgment in their favor on [Plaintiff]'s breach of contract claims[, and] . . . Hawley and AMS request summary judgment in their favor on [Plaintiff]'s conversion claim." (Doc. 257 at 20).

In December 2015, the Federal Rules of Civil Procedure were amended to specifically address the spoliation of electronically stored information ("ESI"). *ML Healthcare*, 881 F.3d at 1307 (citing Fed. R. Civ. P. 37(e)). Federal Rule of Civil Procedure 37(e) now states:

> If [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>>
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e); *see Williford v. Carnival Corp.*, No. 17-21992-CIV-COOKE/GOODMAN, 2019 U.S. Dist. LEXIS 88808, at *13–17 (S.D. Fla. May 28, 2019) (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).

The Eleventh Circuit has not yet addressed whether the common law multi-factor test is still applicable given the amendment to Rule 37(e). *ML Healthcare*, 881

F.3d at 1308; *Tien*, 753 F. App'x at 770. However, district courts in the circuit have held that "[a]s a practical matter, . . . Rule 37(e) 'now governs a district court's power to sanction a party for spoliation of electronically stored information.'" *Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 U.S. Dist. LEXIS 204933, at *26 (S.D. Fla. Dec. 4, 2018) (emphasis omitted) (quoting *Wooden v. Barringer*, No. 3:16-CV-446-MCR-GRJ, 2017 U.S. Dist. LEXIS 183170, 2017 WL 5140518, at *3 (N.D. Fla. Nov. 6, 2017)); *see also id.* ("Rule 37(e) 'forecloses reliance on inherent authority to impose sanctions for spoliation.' (quoting *Wooden*, 2017 U.S. Dist. LEXIS 183170, at *4 (emphasis omitted)); *Williford*, 2019 U.S. Dist. LEXIS 88808, at *13–17. Therefore, the Court will apply the Rule 37(e) factors and not the common law test.

### B.    Analysis

AM and Soufleris have been on notice to preserve evidence relevant to this litigation since at least November 2017. (Doc. 260-1 at 141–42). And all Defendants have been on notice to preserve evidence since at least the filing of the original Complaint in this case in December 2017. (Compl., Doc. 1, at 1). Inexplicably, despite being on notice of the requirement to preserve evidence relevant to this litigation, Defendants—and their counsel—completely failed to do so.

"Throughout [AM]'s existence," the company used email addresses for all of its employees under the email domain "absolute-med.com." (AM Dep., Doc. 203-1,

at 18; Soufleris Decl., Doc. 211-1, at 3). On December 15, 2017, Soufleris emailed himself a "to do" list containing "shut down/start new" as an item. (Doc. 203-1 at 17). Two days later, Soufleris purchased a new email domain for AMS, "absolute-medical.org." (Soufleris Dep., Doc. 203-9, at 4–5). Then, on December 28, 2017, Soufleris emailed Hawley, Miller, and others, advising them to "[m]ake sure you've notified your contacts of your change of email [because] I'll be winding this down this week and shutting off after the first of the year," (Dec. 28, 2017 Email, Doc. 203-9, at 11), indicating to AM's employees that AM's email addresses would no longer be functional and that they should inform their contacts about their new AMS email addresses, (Doc. 203-9 at 6–7). Sometime shortly thereafter, Soufleris shut down the AM email domain, including all email accounts associated with it.[14] (Doc. 215 at 61). On February 1, 2018, well into this litigation, Soufleris received an email from Google, the holder of AM's email domain, stating that the "@absolute-med.com" domain would be suspended for all users on March 2, 2018 (*Id.* at 8). Soufleris contends that the email from Google "did not mention permanent loss of emails affiliated with the domain," (Doc. 211-1 at 4), but he did not take any steps to check with Google to see if that belief was correct or to otherwise preserve the

---

[14] Soufleris testified that "[he] didn't shut it down" and that "[he] just didn't renew it." (Doc. 215 at 61). The Court finds no difference between the two—both actions involved the conscious decision by Soufleris to no longer maintain the email domain and all of the email evidence contained therein.

emails within the domain, (Doc. 215 at 61, 64). Nor did Hawley or Miller take any steps to preserve the emails from their AM email accounts after being notified that those accounts were being deactivated. (*Id.* at 35–36, 42; Miller Dep., Doc. 203-10, at 29 (stating the Miller "never even thought" about preserving relevant email evidence); Hawley Dep., Doc. 203-11, at 3, 16) (stating that Hawley took no steps to preserve relevant email evidence because no one instructed him to do so)). On November 19, 2019, the Court held a hearing on the Spoliation Motion, (Min. Entry, Doc. 214), during which Defendants' counsel, Mr. Bryan E. Busch, stated that he was "to blame" for the loss of the email evidence because he—despite not knowing whether the emails would be preserved—instructed Soufleris that it was okay to close the email domain. (Doc. 215 at 88). Mr. Busch's direction to Soufleris is particularly concerning to the Court given that a member of the Bar is expected to have significantly more legal sophistication than a litigant.[15] *Classic Soft Trim, Inc. v. Albert*, No. 6:18-cv-1237-Orl-78GJK, 2021 U.S. Dist. LEXIS 37008, at *16–17 (M.D. Fla. Feb. 10, 2021) (discussing a litigant's sophistication in determining whether evidence spoliation was intentional). All of the emails within the closed email domain have been irretrievably deleted. (*See* Doc. 219 at 1–2 (discussing attempts to recover the deleted emails); Defs.' Notice of Compliance, Doc. 220, at

---

[15] The Court notes that Mr. Busch has been an attorney and member of the Georgia Bar for over twenty years. *Georgia Bar Directory*, Mr. Bryan Edward Busch, https://www.gabar.org/MemberSearchDetail.cfm?ID=MDA2MDU1.

1–2 (discussing same); Defs.' Notice of Compliance, Doc. 221, at 1–2 (discussing same)).

Sometime shortly after the June 28, 2018 Preliminary Injunction hearing in this case, (*see* Min. Entry, Doc. 81), Soufleris also deactivated Hawley's and Miller's new AMS email addresses. (Doc. 203-7 at 1–2; Doc. 203-13 at 3–4). As with the AM email addresses, no steps were taken by Defendants or their counsel to preserve these emails, (Doc. 215 at 35–36, 42; Doc. 203-10 at 29; Doc. 203-11 at 3, 16), and the emails for these accounts are also irretrievably lost. (Doc. 203-7 at 1). What is particularly troublesome about the timing of this action is that it occurred *after* the Court expressly warned Defendants about their previous untruthful statements in this litigation. (Prelim. Inj. Hr'g Tr., Doc. 79, at 118 (discussing Defendants' untruthful answers to discovery requests and complete memory failures on cross-examination despite having perfect recall on direct examination)).

Text messages from Soufleris, Hawley, and Miller's cell phones have also been irretrievably deleted. (*See generally* Doc. 215). Soufleris maintains that this deletion resulted from him activating an automatic deletion function on his cell phone that caused text messages to be deleted after thirty days. (Doc. 203-1 at 9–11; Doc. 211-1 at 6). Hawley and Miller similarly failed to preserve text messages, contending that the text messages were lost either when their phones were replaced or when they deleted them to save data space on their phones. (Doc. 209-10 at 25–

26, 31; Doc. 209-11 at 4; Doc. 211-2 at 4–5; Doc. 211-3 at 4–5; Doc. 215 at 15, 39,

47). However, notably, not *all* text messages were deleted from Defendants' cell

phones. Rather, there is a gap in text messages that occurred between approximately

June 2017 and December 2017. (*See, e.g.*, Doc. 215 at 15–23). And Defendants

admit that there certainly would have been text communications during this time

period. (*See id.*). Unquestionably, based on the timeline of events leading to this

litigation, the actions and communications by Defendants during the timeframe of

the missing text messages are crucial to the issues in this case because AM was

dissolved and AMS was formed in December 2017.

Defendants and their counsel all state that the wholesale destruction of

evidence in this case was not intentional. (Doc. 211-1 at 4, 5; Doc. 215 at 32, 49, 69,

71, 73–74, 87–89). However, given Defendants' previous penchant for duplicity on

the record in this litigation, the Court finds these assertions to lack credibility. *In re*

*Delta/AirTran Baggage Fee Antitrust Litig.*, No. 1:09-md-2089-TCB, 2015 U.S.

Dist. LEXIS 101474, at *46–47 n.13 (N.D. Ga. Aug. 3, 2015) (noting that "on a

motion for sanctions, unlike one for summary judgment, credibility determinations

are not reserved for the jury [and that] . . . [w]itness credibility is critical to the

resolution of a motion for spoliation sanctions, particularly where the alleged

spoliator's intent is at issue" (citation and quotations omitted)).

Numerous facts on the record support this conclusion. Soufleris's explanation for not maintaining the AM email domain—despite AM being involved in active litigation—is implausible. Soufleris contends that he shut down the AM email domain because AM "did not have the necessary funds to continue this service with Google." (Doc. 211-1 at 3). However, around the time the email domain was shut down, AMS was freely paying significant debts for AM, (*see, e.g.,* Doc. 260-2 at 5–6), and Defendants have not produced any evidence to suggest that maintaining the email domain was more than a nominal cost, (Doc. 215 at 74). Nor did Defendants ever contact Plaintiff or the Court to advise that AM could not afford to pay the nominal cost to preserve vast amounts of relevant evidence in this case. Indeed, as early as Summer 2018, Soufleris knew that the emails from the deleted email domain could not be recovered. (Doc. 203-1 at 19–21). And yet, around that same time, Soufleris deactivated Hawley and Miller's AMS email accounts. (Doc. 203-7 at 1–2; Doc. 203-13 at 3–4). This leads the Court to conclude that Defendants could no longer claim ignorance that emails would be irretrievably deleted if accounts were deactivated and that Defendants deactivated the additional AMS email accounts anyway. Finally, Defendants waited until March 2019 to disclose the loss of these emails to Plaintiff, (Doc. 203-7 at 1)—many months after being told by Google that the emails could not be recovered and only after the Court's January 30, 2019 Order (Doc. 145) on Plaintiff's Motions to Compel (Doc. Nos. 117, 118), requiring

Defendants to properly respond to discovery requests. (Doc. 145 at 18–19). Similarly, the selected timeframe of deleted text messages makes Defendants' various arguments about the deletions being unintentional completely implausible. A new phone or auto-delete function would delete all text messages prior to a certain date, not just messages within a timeframe crucial to the issues in this litigation. This evidence makes clear that Defendants destroyed this evidence with an intent to deprive Plaintiff from using the evidence in this case. *See* Fed. R. Civ. P. 37(e)(2).

The facts regarding Defendants' spoliation of vast amounts of evidence in this case are clear. Defendants were on notice to preserve evidence relevant to this case. Defendants and their counsel not only failed to take reasonable steps to preserve that evidence, as required by Rule 37(e)—but *intentionally destroyed* vast amounts of evidence. And most of the spoliated evidence cannot be restored or replaced. Thus, the only remaining questions are if and how Plaintiff was prejudiced by this spoliation and what remedy is appropriate.

As to prejudice,[16] Plaintiff argues that Defendants' spoliation of the AM email domain, AMS email addresses, and text messages deprives Plaintiff of essentially

---

[16] "Subdivision (e)(2) of Rule 37 does not include a requirement that the court find prejudice to the party deprived of the information because the required intent finding also supports an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *Easterwood v. Carnival Corp.*, No. 19-cv-22932-BLOOM/Louis, 2020 U.S. Dist. LEXIS 215534, at *10–12 n.2 (S.D. Fla. Nov. 18, 2020) (quoting *Hoover v. NCL (Bah.) Ltd.*, No. 19-22906-CIV-COOKE/GOODMAN, 2020 U.S. Dist. LEXIS 139513, at *23 (S.D. Fla. Aug. 5, 2020) (internal quotations omitted)); *O'Berry v. Turner*, No. 7:15-CV-00064-HL, 2016 U.S. Dist. LEXIS 55714, at *12 (M.D. Ga. Apr. 27, 2016). The Court nonetheless briefly addresses the

all communications by AM and many of the communications by the other Defendants, "leaving Defendants' self-serving testimony as the only evidence related to this time period." (Doc. 203 at 18). As evidenced by Defendants' demonstrably false statements on the record, Plaintiff is certainly well-positioned to argue that it should be allowed to dispute Defendants' self-serving statements with other evidence. But Plaintiff is unable to do this because so much evidence has been destroyed by Defendants. Plaintiff has been severely prejudiced because it is left unable to disprove Defendants' self-serving declaratory and testimonial evidence.

Having found that Defendants intentionally destroyed relevant evidence in this case, that they did so with the intent to deprive Plaintiff of the ability to use that evidence in this litigation, and that Plaintiff is severely prejudiced by that destruction, the Court has three options under Rule 37(e). The Court may "presume that the lost information was unfavorable to the party; . . . instruct the jury that it may or must presume the information was unfavorable to the party; or . . . dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2)(A)–(C). Importantly, "courts acknowledge that it can often never be proved what was contained in destroyed evidence. Typically, only the spoliator knows how much prejudice has been caused by the destruction." *Classic Soft Trim*, 2021 U.S. Dist. LEXIS 37008,

---

issue of prejudice because of the severe prejudice to Plaintiff in light of Defendants' history of untruthfulness in this litigation.

at *15 (quoting *Nationwide Life Ins. Co. v. Betzer*, No. 5:18-cv-39-Oc-30PRL, 2019 U.S. Dist. LEXIS 194165, at *31 (M.D. Fla. Oct. 28, 2019)). Undoubtedly, that is true here. Only Defendants know for sure when, how, and why the transition from AM to AMS occurred. And only Defendants know for certain whether Hawley and Miller signed ICAs in 2017. But Defendants destroyed nearly all of the evidence that would potentially resolve these issues. Therefore, in the exercise of its discretion,[17] the Court will "presume that the lost information was unfavorable to [Defendants]" and, if this case proceeds to a jury trial, will "instruct the jury that it . . . *must* presume the information was unfavorable to [Defendants]." Fed. R. Civ. P. 37(e)(2)(A)–(B) (emphasis added).

Additionally, the Court expresses grave concerns about the statement by Mr. Busch during the Spoliation Hearing that he was "to blame" for the destruction of the email evidence. (Doc. 215 at 88). "[A]s members of the bar, and officers of the court, our primary responsibility is not to the client, but to the legal system. Our judicial machinery is dependent upon the full support of all members of the bench and bar. Advocacy does not include 'game playing.'" *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1522–23 (11th Cir. 1986). And advocacy certainly does not include instructing a litigant that it is acceptable to destroy evidence.

---

[17] The Court considers this sanction to be an exercise of restraint because Rule 37(e) also permits the Court to "enter default judgment" for Defendants' egregious actions. Fed. R. Civ. P. 37(e)(2)(C).

"Conduct such as that engaged in here must not, can not and will not be tolerated." *Id.* at 1523. Accordingly, Mr. Busch will be directed to show cause why he should not be personally sanctioned for his involvement in the spoliation of evidence discussed above.[18]

### III.   MOTIONS FOR SUMMARY JUDGMENT

#### A.   Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Ness v. Aetna Life Ins. Co.*, 257 F. Supp. 3d 1280, 1287 (M.D. Fla. 2017) (citing *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).

---

[18] The Court notes that it has not foreclosed the option of also *sua sponte* imposing a monetary sanction against Defendants for the spoliation. However, a request for monetary sanctions was not included in Plaintiff's Spoliation Motion.

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary

judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen*, 121 F.3d at 646).

### B.   Analysis

#### 1.   *Movant Defendants' Untimely Response to Plaintiff's MSJ*

As a preliminary matter, Plaintiff argues that the Movant Defendants' Response to Plaintiff's MSJ was untimely and should therefore be stricken. (Doc. 268 at 1 n.1). To understand the gravity of the Movant Defendants' untimely Response, some background is necessary. After a hearing, (Min. Entry, Doc. 251), for the reasons discussed on the record, (July 1, 2020 Hr'g Tr., Doc. 253, at 3–4), the Court denied as moot motions for summary judgment previously filed by the parties and directed each party to file a new motion for summary judgment on or before July 27, 2020, (June 10, 2020 Endorsed Order, Doc. 252). All parties timely filed their motions for summary judgment—the Movant Defendants on July 20, 2020, (Doc. 257 at 20), and Plaintiff on July 27, 2020, (Doc. 260 at 43). On July 28, 2020, Plaintiff filed a Motion for Clarification (Doc. 261), requesting clarification as to the response deadline for the motions for summary judgment because the Amended Case Management and Scheduling Order set the original summary

judgment response deadline at thirty days, while Local Rule 3.01(b)[19] required a response within fourteen days. (*Id.* at 1). The Court granted Plaintiff's Motion for Clarification, permitting Plaintiff to respond to Movant Defendants' MSJ on or before August 19, 2020, but expressly noting that "Defendants' response deadline of fourteen days remains unchanged."[20] (July 28, 2020 Order, Doc. 262, at 2). This set the Movant Defendants' response deadline at August 10, 2020. Despite this express instruction from the Court, the Movant Defendants filed their Response on August 19, 2020—nine days late. The Movant Defendants offer no explanation for the untimeliness of their Response and have not moved the Court to accept the Response as timely in spite of Plaintiff's request to strike the Response. Accordingly, the Court will grant Plaintiff's request and strike the Movant Defendants' Response as untimely. *McDuffie v. Broward Cnty.*, 654 F. App'x 408, 412 (11th Cir. 2016) (holding that "the district court did not abuse its discretion in striking [Plaintiff]'s response as untimely [because Plaintiff] d[id] not dispute that her response to the . . . summary-judgment motion was eleven days late and filed without leave of the court" and noting that "[t]he record also shows that [Plaintiff]'s counsel never requested an

---

[19] The Court issued new Local Rules effective February 1, 2021, but the previous version of the Local Rules was in effect at the time of these filings.

[20] The Court also highlighted Defendants' counsel's apparent avoidance of Plaintiff's counsel's attempted conferral, as required by Local Rule 3.01(g), and "remind[ed] counsel for Defendants of his duty to act with professionalism and to respond promptly to inquiries and communications from opposing counsel." (Doc. 262 at 2).

extension of time before filing the late response . . . [and] did not assert that her late filing should be excused due to excusable neglect").

    2.    *Counts I and III*

Counts I and III[21] allege breach of contract claims for breach of the 2017 Sales Agreement, against AM and AMS, respectively.

    a.    <u>Count I—Breach of Contract Claim against AM</u>

Under Delaware law,[22] a breach of contract claim consists of the following elements: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) (citation omitted). Plaintiff argues that AM breached the 2017 Sales Agreement in several ways, most notably by refusing to perform under the agreement and by failing to have Soufleris, Hawley, and Miller execute ICAs for 2017.

The term of the 2017 Sales Agreement was "5 years" beginning on January 1, 2017. (Doc. 260-3 at 131, 141). Thus, the agreement was in force on November 27, 2017, when Soufleris attempted to "resign," on behalf of AM, from the agreement. (*See* Doc. 260-4 at 32; Doc. 260-3 at 82–83). This action is a blatant breach of the

---

[21] As noted above, the Court previously stayed Count III "to the extent that Plaintiff seeks monetary relief." (Doc. 178 at 5). However, the Court did not stay Count III insofar as Plaintiff seeks injunctive relief.

[22] The 2017 Sales Agreement states that the "[a]greement shall be governed by and construed in accordance with the laws of the State of Delaware." (Doc. 260-3 at 145).

agreement because AM was unequivocally telling Plaintiff that it would no longer be performing its obligations under the agreement, (*see* Doc. 260-1 at 35–36), and AM claimed no permissible reason for doing so, (Doc. 260-3 at 141–42 (stating express provisions for termination); Doc. 260-1 at 35–36 (stating that AM was not aware of any action by Plaintiff or provision of the agreement that allowed for such termination by AM)[23]). *Tenneco Auto., Inc. v. El Paso Corp.*, No. 18810-NC, 2007 Del. Ch. LEXIS 4, at *29 (Jan. 8, 2007) ("A refusal to perform contractual obligations constitutes . . . breach of the agreement." (citing *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000))).

The 2017 Sales Agreement also required AM to have each of its sales representatives "execute[] an agreement . . . to contractually obligate [them] to comply with the" restrictive covenants in the agreement, including naming Plaintiff "as an intended third party beneficiary with full right to directly enforce provisions" of such agreements. (Doc. 260-3 at 137–38). AM readily admits that it failed to

---

[23] Soufleris states in his February 2018 declaration that "[Plaintiff] breached the terms of the [2017] Sales Agreement by reducing part of [AM]'s exclusive territory and directly hiring key sales representatives away from [AM] to promote [Plaintiff]'s products within the new annexed territory." (Soufleris Decl., Doc. 38-1, at 2). However, as with many other statements in this case made by Defendants, it is clear that Soufleris's original statement was untrue based on his own deposition testimony and the express language of the Territory Transition Agreement. (*See* Doc. 260-1 at 35–36; Doc. 260-3 at 161–62 (expressly providing that "the terms of the [2017] Sales Agreement [would] remain in full force and effect")). Soufleris later testified in his deposition as corporate representative of AM that he did not believe that Plaintiff had materially breached its agreement with AM in any way. (Doc. 260-1 at 36).

comply with this provision as to Hawley, Miller, and other AM sales representatives for 2017. (Doc. 260-1 at 27–34). This failure is a clear breach of the terms of the 2017 Sales Agreement.[24]

As a result of these breaches, Plaintiff was left "incredibly shorthanded" in the geographic areas assigned to AM by the 2017 Sales Agreement. (Singer Decl., Doc. 19-1 at 2). To cover its surgeon clients in these areas, Plaintiff had to "require[] experienced sales representatives in other territories to travel to [AM]'s territory to support [Plaintiff]'s customers." (*Id.*). And eventually, Plaintiff lost at least some of its surgeon clients because of AM's breaches of its contractual obligations under the 2017 Sales Agreement. (Doc. 260-18 at 4; Doc. 260-20 at 28–29). Plaintiff has clearly demonstrated that it is entitled to summary judgment as to liability on its breach of contract claim against AM for AM's breaches of the 2017 Sales Agreement.

> b.   Count III
>
> (1)   Successor Liability of AMS

Next, Plaintiff argues that AMS should be held responsible for AM's breach of the 2017 Sales Agreement because "[AMS] is a mere continuation of [AM]."

---

[24] Because AM clearly breached the 2017 Sales Agreement by refusing to perform and failing to require its sales representatives to execute ICAs, the Court need not address the remaining provisions that Plaintiff argues AM breached.

(Doc. 260 at 36). Under Florida law,[25] "a predecessor corporation's liability may be imposed on its successor corporation if: (1) the successor assumes the obligations of the predecessor; (2) the transaction is a de facto merger; (3) the successor is a mere continuation of the predecessor; or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor." *Centimark Corp. v. A to Z Coatings & Sons, Inc.*, 288 F. App'x 610, 614 (11th Cir. 2008) (citing *Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049 (Fla. 1983)). Plaintiff's argument focuses on the third theory of successor liability—mere continuation.[26] "The concept of continuation of business arises where the successor corporation is merely a continuation or reincarnation of the predecessor corporation under a different name." *Id.* (citing *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 154 (Fla. 4th DCA 1994)). "Mere continuation 'occurs when one corporation is absorbed by another, i.e., there is a continuity of the [first] corporation evidenced by such things as the same management, personnel, assets, location and stockholders.'" *Id.* (alteration in original) (quoting *Amjad Munim*, 648

---

[25] While the 2017 Sales Agreement itself and the obligations thereunder are considered in accordance with Delaware law, the issue of successor liability is not expressly covered by the agreement, and AM and AMS are both Florida companies, (Doc. 188 at 3, 4; Doc. 194 at 3); therefore, the issue of whether AMS is a successor entity to AM is considered under Florida law. *Centimark Corp. v. A to Z Coatings & Sons, Inc.*, 288 F. App'x 610, 614 (11th Cir. 2008) (applying Florida law to a successor corporation analysis when the former company was incorporated in Georgia and the successor company was incorporated in Florida).

[26] Plaintiff briefly argues that "there is no indication that Soufleris formed [AMS] for any reason other than to avoid [AM]'s contractual obligations." (Doc. 260 at 38). However, the substance of Plaintiff's entire argument focuses on the mere continuation theory, and Plaintiff does not otherwise argue the fraud theory of successor liability.

So. 2d at 154). Ultimately, the "question is whether each entity has run its own race, or whether[] there has been a relay-style passing of the baton from one to the other." *Id.* (alteration in original) (quoting *Amjad Munim*, 648 So. 2d at 154).

Plaintiff argues that AMS is a mere continuation of AM because: the two companies commingled funds, accounts, and other assets; the two companies are in the same industry, have the same office location, and have common ownership; the two companies have common personnel and customers; and the two companies use the same telephone numbers and email addresses. (Doc. 260 at 38–40). There is no doubt that both AM and AMS are exactly the same type of business. (AMS Dep., Doc. 260-2, at 6 (explaining the business purpose of AMS and that AM served exactly the same purpose)); *Parrot, Inc. v. Nicestuff Distrib. Int'l, Inc.*, No. 06-61231-CIV, 2009 U.S. Dist. LEXIS 141142, at *72–74 (S.D. Fla. June 14, 2009). As to ownership and management, Soufleris was the President and sole member of AM, (Doc. 260-1 at 4), and was also the President and sole member of AMS from the time of its formation in December 2017 until July 2018,[27] (Doc. 260-2 at 4–7). *Centimark*, 288 F. App'x at 616 ("[M]ere continuation is shown by such things as the same management . . . ." (quoting *Amjad Munim*, 648 So. 2d at 154) (internal quotations omitted)); *Regions Bank v. Kaplan*, 805 F. App'x 1004, 1007 (11th Cir.

---

[27] In July 2018, AMS added a new member. (Doc. 260-2 at 4). Given that this change occurred long after AMS's formation and well into this litigation, the Court does not find this change to be relevant to the successor liability analysis.

2020) ("Mere continuation occurs when the '[new] corporation is merely a "new hat" for the seller, with the same or similar entity or ownership.'" (quoting *Amjad Munim*, 648 So. 2d at 154)). And the decision to dissolve AM and form AMS was made by Soufleris alone. (Doc. 260-2 at 7). AM and AMS also shared several, though not all, of the same personnel, including several sales representatives and the same office manager, all of whom performed the same functions with each company. (Doc. 260-2 at 11–15, 26–27; Edelson Dep., Doc. 260-16, at 5–6); *Centimark*, 288 F. App'x at 616 (citing *Amjad Munim*, 648 So. 2d at 154)). And, most if not all of AMS's surgeon clients were former clients of AM. (Doc. 260-3 at 110–15). *Regions Bank*, 805 F. App'x at 1008 (noting that having the same clients is an indicator of a continuation between the former and successive company (citing *Serchay v. NTS Ft. Lauderdale Off. Joint Venture*, 707 So. 2d 958, 960 (Fla. 4th DCA 1998))).

As to monetary assets, the record reflects that AMS freely utilized the monetary assets of AM after AMS's formation, including most notably linking the two companies' checking accounts, (AMS Checking Account Summary, Doc. 86-21, at 1), AMS paying tax debt for AM, (Doc. 260-2 at 5), and AM purchasing office furniture to be used by AMS, (Doc. 260-3 at 71–72, 94–95; Furniture Order Confirmation, Doc. 260-4 at 118–23; Absolute Ortho Dep., Doc. 260-33, at 5–7).[28]

---

[28] There is also some evidence on the record that AM's funds may have been used to purchase the property at which AMS's office is located. (Doc. 260-1 at 73–80). However, due to the number of businesses involved and the successive transfer of funds that has not been tracked

AM and AMS also share property assets, including the aforementioned office furniture and a vehicle purchased by AM that is still in Soulferis's possession after AM's dissolution. (Doc. 260-1 at 80–83). *Centimark*, 288 F. App'x at 616 (discussing continuity of assets as a factor demonstrating successor liability); *Amjad Munim*, 648 So. 2d at 154 (discussing same).

Finally, as to the telephone numbers and email addresses, there is evidence on the record that Soufleris and some of the sales representatives for AMS continued to use the same phone numbers and email addresses as they had used with AM for at least a few months following the dissolution of AM. (Doc. 260-3 at 103–05, 119). However, it is clear that AM terminated its email accounts around February 2018 and that AMS employees were issued new email addresses. (*Id.* at 31, 91–92; Doc. 260-4 at 114; Doc. 215 at 61–62). *Mason v. E. Speer & Assocs.*, 846 So. 2d 529, 532 (Fla. 4th DCA 2003) (discussing successor liability when the second company used the same telephone number and stationery but had no transfer of personnel or assets); *but see Lab. Corp. v. Prof'l Recovery Network*, 813 So. 2d 266, 270 (Fla. 5th DCA

---

on the record, the Court cannot conclude that AM's funds were certainly used to purchase AMS's office location. (*See id.*); *but see Regions Bank*, 805 F. App'x at 1008 (noting that "the presence of a middleman is . . . not relevant to continuation liability"). Similarly, there is some record evidence that AM and AMS may use the same credit card account. (Doc. 260-1 at 103–04). However, there is a disputed issue of material fact about the credit card use because Soufleris, on behalf of AM, testified that he did not know why AM's credit card was still being used after its dissolution; thus, it is unclear whether the purchases were made by AM or AMS. (*Id.*).

2002) (discussing that simply using "new letterhead" does not demonstrate that a successor company is not a mere continuation of the former company).

Taken collectively, this undisputed evidence makes clear that Soufleris dissolved AM and then formed AMS as a mere continuation of AM. *Centimark*, 288 F. App'x at 615 (affirming successor liability when the "wealth of evidence establishes that [the former company] and [the successor company] had great overlap in their officers, directors, personnel, assets, and stockholders"); *Lab. Corp.*, 813 So. 2d at 270 ("While having common attributes does not automatically impose liability on a successor corporation, merely repainting the sign on the door and using new letterhead certainly gives the appearance that the new corporation is simply a continuation of the predecessor corporation."). Therefore, Plaintiff is entitled to summary judgment as to the issue of successor liability of AMS. *See Stitzel*, 361 F. App'x at 22 (noting that summary judgment is appropriate when the evidence "is so one-sided that one party must prevail as a matter of law" (quoting *Anderson*, 477 U.S. at 251–52)).

(2)    Injunctive Relief against AMS

Plaintiff next argues that "the Court should enforce the [2017] Sales Agreement's one-year non-compete provision against [AMS]" by issuing a permanent injunction against AMS. After prevailing on the merits of a claim, to be entitled to a permanent injunction a plaintiff must demonstrate "(1) that [the

plaintiff] . . . suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Broad. Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1261 (11th Cir. 2014) (all but first alteration in original) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *see also Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 n.16 (11th Cir. 2015). Plaintiff has not argued why remedies available at law, such as monetary damages, would be inadequate to compensate for its injury. Therefore, Plaintiff's MSJ as to permanent injunctive relief will be denied.

### 3.    Count IV

Count IV of the Second Amended Complaint asserts breach of contract claims against Hawley and Miller for violation of their 2013 ICAs. (Doc. 188 at 18–20). However, Plaintiff's argument for summary judgment on this count is that Hawley and Miller violated the restrictive covenants in their 2016 ICAs, not their 2013 ICAs. And Hawley and Miller move for summary judgment on this Count as to the 2013 ICAs, the 2016 ICAs, and the 2017 ICAs. A brief discussion of the events that led to this procedural posture is necessary to understand why each side moves for summary judgment on this Count on the basis of ICAs from different years.

During discovery in this case, when Plaintiff asked AM to identify its employees and independent contractors and whether those individuals were subject to a non-competition agreement, AM responded that "several individuals objected to signing non-compete agreements and other non-compete agreements were never finalized by the parties." (AM's Resp. to Pl.'s First Set of Interrogs., Doc. 260-6, at 6–7). And in response to Plaintiff's request for "all of [AM's] contracts or other agreements with," among others, Hawley and Miller, AM stated that it "ha[d] no documents responsive to this request." (AM's Resp. to Pl.'s First Set of Reqs. for Produc. of Docs., Doc. 260-5, at 6). Hawley provided similar responses to discovery requests, stating that he "did not sign a non-compete agreement with Plaintiff or with [AM]," (Hawley's Resps. to Pl.'s First Set of Interrogs., Doc. 260-7, at 9), and that he "is not subject to a noncompete agreement with [AM] or [Plaintiff]," (Hawley's Resps. to Pl.'s First Set of Req. for Produc. of Docs., Doc. 260-8, at 6). After Plaintiff discovered that the 2013 ICAs did in fact exist, (Tyree Decl., Doc. 60-7, at 1–2, 28–44), AM and Hawley amended their discovery responses, (Emmanuel Email, Doc. 260-9, at 1), and produced the 2013, 2014, 2015, and 2016 ICAs, (*see* AM's Am. Resps. to Pl.'s First Set of Reqs. for Produc. of Docs., Doc. 123-7, at 5–6; Hawley Am. Resps. to Pl.'s First Set of Interrogs., Doc. 122-7, at 8). As discovery progressed, Defendants' failure to produce documents worsened, resulting in Plaintiff's Spoliation Motion, as discussed above.

Following these discovery issues, Plaintiff moved the Court for leave to file a Third Amended Complaint. (*See generally* Pl.'s Mot. for Leave to File Third Am. Compl., Doc. 238). In the Court's Order denying Plaintiff's request for leave to amend, the Court found that amendment of the complaint to reference additional years of the ICAs was unnecessary because "[c]ertainly, Defendants will be in no position to claim surprise or undue prejudice. They know the issue[s] . . . in the case and on this subject they know as much, if not more, than [Plaintiff]." (May 4, 2020 Order, Doc. 243, at 4). The Court's previous ruling is consistent with the purpose of a complaint, which is "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Count IV, as pleaded in the Second Amended Complaint, adequately put Hawley and Miller on notice that Plaintiff was alleging a breach of the restrictive covenants in the ICAs. Therefore, it is appropriate for the Court to consider summary judgment on this Count based on any of the ICAs.

a.      2013 ICAs

Hawley and Miller move for summary judgment as to the 2013 ICAs, arguing that Plaintiff lacks standing to enforce these agreements because it is not a party to the agreements. Plaintiff argues that it is an intended third-party beneficiary of the 2013 ICAS and therefore is entitled to enforce the provisions therein. Under Florida

law,[29] "[a] party has a cause of action as a third-party beneficiary to a contract if the contracting parties express an intent primarily and directly to benefit that third party." *Munnings v. FedEx Ground Package Sys.*, No. 6:07-cv-282-Orl-19KRS, 2008 U.S. Dist. LEXIS 31069, at *11 (M.D. Fla. Apr. 11, 2008) (quoting *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 169 F.3d 677, 680 (11th Cir. 1999)); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005) ("Under Florida law, a third party is an intended beneficiary of a contract between two other parties only if a direct and primary object of the contracting parties was to confer a benefit on the third party."). "If the contracting parties had no such purpose in mind, any benefit from the contract reaped by the third party is merely 'incidental,' and the third party has no legally enforceable right in the subject matter of the contract." *Bochese*, 405 F.3d at 982 (collecting cases).

The 2013 ICAs do not contain an express third-party beneficiary provision like the one in the 2016 ICAs. (*See generally* Doc. Nos. 265-8, 265-9; *compare* Doc. 260-10 at 15; Doc. 260-11 at 15). Ordinarily, the fact that a contract does not contain an express third-party beneficiary clause does not end the inquiry. *FDIC v. Pearl*, No. 8:12-cv-1813-T-30TBM, 2013 U.S. Dist. LEXIS 50347, at *7 (M.D. Fla. Apr.

---

[29] "The question of whether, for standing purposes, a non-party to a contract has a legally enforceable right therein is a matter of state law." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005) (citing *Miree v. DeKalb Cnty.*, 433 U.S. 25, 29–33 (1977)). The 2013 ICAs state that they are "governed by and construed in accordance with the laws of the State of Florida." (Doc. 265-8 at 12; Doc. 265-9 at 12).

8, 2013) ("Florida law looks to the 'nature or terms of a contract' to find the parties' clear or manifest intent that it 'be for the benefit of a third party.'" (quoting *Jenne v. Church & Tower, Inc.*, 814 So. 2d 522, 524 (Fla. 4th DCA 2002))). However, as applicable specifically to restrictive covenants, a Florida statute provides that "[t]he court shall not refuse enforcement of a restrictive covenant on the ground that the person seeking enforcement is a third-party beneficiary of such contract . . . , provided . . . the restrictive covenant expressly identified the person as a third-party beneficiary of the contract and expressly stated that the restrictive covenant was intended for the benefit of such person." Fla. Stat. § 542.335(1)(f). Florida appellate courts have interpreted this to mean that a third party cannot enforce restrictive covenants without such an express provision.[30] *Cellco P'ship v. Kimbler*, 68 So. 3d 914, 917–18 (Fla. 2d DCA 2011); *Tusa v. Roffe*, 791 So. 2d 512, 514 (Fla. 4th DCA 2001). The restrictive covenants in the 2013 ICAs do not expressly state that they are for the benefit of Plaintiff, as required by the statute. (Doc. 265-8 at 11 (stating that the restrictive covenants are for the "protection and benefit" of AM but not mentioning Plaintiff by name or identity); Doc. 265-9 at 11 (stating same)).

---

[30] Absent clear direction from the Florida Supreme Court on an issue, this Court is "bound to follow" decisions of the state's intermediate appellate courts unless there is some persuasive indication that the Florida Supreme Court would decide the issue differently. *Nunez v. Geico Gen. Ins. Co.*, 685 F.3d 1205, 1210 (11th Cir. 2012) (quoting *McMahon v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002)).

Therefore, the restrictive covenants in the 2013 ICAs cannot be enforced by Plaintiff, and the Court will grant summary judgment to Hawley and Miller on this issue.[31]

> ### b.   2016 ICAs

Plaintiff moves for summary judgment on Count IV for breach of contract as to both Hawley and Miller, requesting that "the Court . . . extend the expiration of the [r]estrictive [c]ovenants [in the 2016 ICAs], enjoin [Hawley and Miller] from competing with [Plaintiff] in [Hawley and Miller's] former . . . sales territories for one month, award [Plaintiff] appropriate damages, and disgorge any profits earned during those periods." (Doc. 260 at 33).

> ### (1)   Enforceability of the Restrictive Covenants

Under Florida law,[32] because the contracts at issue contain restrictive covenants, Plaintiff must first demonstrate that those restrictive covenants are

---

[31] Alternatively, Hawley and Miller argue that they are entitled to summary judgment as to the 2013 ICAs because these agreements were terminated when Hawley and Miller signed the 2014 and subsequent ICAs. Specifically, the 2014 ICAs contain a provision that "[t]his Agreement supersedes all prior and contemporaneous representations, promises, agreements and understandings *between the parties*." (Doc. 265-10 at 12; Doc. 265-11 at 12 (emphasis added)). The Court mentions this argument only for its irony because it contradicts Hawley and Miller's own argument regarding the subsequent ICAs, as addressed below, that they are not bound by the 2014 through 2016 ICAs because they were executed on behalf of their corporate entities and are not binding on Hawley and Miller individually. The 2013 ICAs are signed by Hawley and Miller "Individually and on behalf of Independent Contractor" and expressly state that "the individual signatory confirms that he is also individually bound by all of [the 2013 ICAs'] terms and conditions." (Doc. 265-8 at 13, 17; Doc. 265-9 at 13, 17). Thus, in order for the 2014 or subsequent ICAs to function to terminate the 2013 ICAs, Hawley and Miller would have to be parties to the subsequent agreements in their individual capacity. Yet Hawley and Miller vigorously argue that only their corporate entities are bound by the subsequent agreements.

[32] The 2016 ICAs state that Florida law governs the agreements. (Doc. 260-10 at 13; Doc. 260-11 at 13).

enforceable. Section 542.335, Florida Statutes, "dictates whether the Court may enforce a restrictive covenant." *Pirtek USA, LLC v. Wilcox*, No. 6:06-cv-566-Orl-31KRS, 2006 WL 1722346, at *2 (M.D. Fla. June 21, 2006). Under section 542.335(1)(a), Florida Statutes, "[a] court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought." Additionally, "[t]he person seeking enforcement of [the] restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009) (quoting Fla. Stat. § 542.335(1)(b)). The statute contains a non-exhaustive list of "legitimate business interests," which include "[t]rade secrets," "[v]aluable confidential business or professional information," "[s]ubstantial relationships with specific prospective or existing customers," and "[c]ustomer, patient, or client goodwill." Fla. Stat. § 542.335(1)(b). Finally, "to be enforceable, restrictive covenants must be reasonable with regard to time, area and line of business." *Proudfoot*, 576 F.3d at 1231 (citing Fla. Stat. § 542.335(1)); *see also* Fla. Stat. § 542.335(1)(c) (requiring a plaintiff to "plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction").

Once the party seeking to enforce the restrictive covenant demonstrates "that the contractually specified restraint is 'reasonably necessary to protect the legitimate

business interest[s] . . . justifying the restriction,' the burden of proof shifts to [the party challenging enforcement of the covenant] to show that the 'contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest[s].'" *Proudfoot*, 576 F.3d at 1231 (all but third alteration in original) (quoting Fla. Stat. § 542.335(1)(c)). Furthermore, if the court finds that the challenging party has met its burden, "the court is required to 'modify the [contractually specified] restraint and grant only the relief reasonably necessary to protect such interest or interests.'" *Id.* (quoting Fla. Stat. § 542.335(1)(c)). Finally, "[i]n determining the enforceability of a restrictive covenant, a court . . . [s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." Fla. Stat. § 542.335(1)(g)(1).

The Court first addresses whether the 2016 ICAs are in writing and signed by the parties against whom enforcement is sought. Fla. Stat. § 542.335(1)(a). The "Salesperson[s]" in the introductory paragraph of the ICAs are named as "Hawley Med, LLC," (Doc. 260-10 at 2 (emphasis omitted)), and "Miller Time Medical, Inc.," (Doc. 260-11 at 2 (emphasis omitted)). The introductory paragraph also includes a blank line for the "principal owner," also referred to as the "Principal." (Doc. 260-10 at 2; Doc. 260-11 at 2). At the end of the ICAs, Hawley and Miller signed with the title "Sales Representative." (Doc. 260-10 at 20; Doc. 260-11 at 20).

Finally, the 2016 ICAs contain the following provision concerning individual liability:

> If Salesperson is not an individual but is an entity such as a corporation or limited-liability company, Salesperson shall cause its principal in the introductory paragraph of this Agreement to provide all services on behalf of Salesperson; and all duties, responsibilities and obligations of Salesperson shall apply with equal force to such person designated the same as if such person were, in fact, the Salesperson and the Salesperson and such principal shall be jointly and severally liable therefor. Whenever the term "**Salesperson**" is used in this Agreement, it shall mean both the Salesperson and the Principal collectively, jointly and severally.

(Doc. 260-10 at 5–6; Doc. 260-11 at 5–6 (emphasis in original)).

Based on the corporate entities being named and the line for the Principal being blank, Hawley and Miller argue that "as individuals . . . they are not parties to the [ICAs]." (Doc. 257 at 13). More specifically, Hawley and Miller argue that "[w]hile [they] signed the 2016 ICAs, they did so as the authorized representatives of each corporate entity and did not intend or agree to be individually bound." (*Id.* at 14). However, the only record evidence that Hawley and Miller cite for this proposition regarding their intent is the 2016 ICAs themselves, (*id.* (citing copies of the 2016 ICAs)), which do not speak to Hawley and Miller's intent regarding whether they signed individually or on behalf of their corporate entities. Hawley and Miller have not met their summary judgment because the ICAs on their face do not conclusively show whether the agreements bind only Hawley and Miller's

companies or also each of them individually, and Hawley and Miller cite no other evidence.

Plaintiff argues the contrary—that Hawley and Miller are bound individually by the 2016 ICAs.[33] First, Plaintiff cites to pleadings in this and other litigation. However, Plaintiff has not cited to any legal authority explaining why those pleadings can be considered for the truth of the matters asserted therein. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (holding that "[i]t is recognized that a court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings" but "not for the truth of the matters asserted in the other litigation" (internal quotation marks omitted)). And even if Hawley's and Miller's allegations in their pleading in the instant case may be considered, the statements therein do not conclusively establish that Hawley and Miller are bound individually by the 2016 ICAs. Next, Plaintiff relies on its interpretation of the provisions in the 2016 ICAs themselves, but as discussed above, the face of those agreements is ambiguous as to whether Hawley and Miller were signing individually or on behalf of their corporate entities.

---

[33] Alternatively, in a footnote, Plaintiff argues that if Hawley and Miller are not bound individually by the 2016 ICAs, then they are still bound individually by the 2013 ICAs, which named them individually. (Doc. 265 at 18 n.3). However, Plaintiff has not moved for summary judgment on the basis of the 2013 ICAs.

Alternatively, Plaintiff argues that, as a matter of law, the Court should construe the 2016 ICAs and determine whether Hawley and Miller are bound individually. While "[o]rdinarily the interpretation of a written contract is a matter of law to be determined by the court," *DEC Elec., Inc. v. Raphael Constr. Corp.*, 558 So. 2d 427, 428 (Fla. 1990), "[w]here the wording of an agreement is ambiguous, its interpretation involves question[s] of fact, precluding summary disposition," *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1235 (M.D. Fla. 2012) (quoting *Smith v. Shelton*, 970 So. 2d 450, 451 (Fla. 4th DCA 2007)). *See also id.* (citing *Hoffman v. Terry*, 397 So. 2d 1184, 1184 (Fla. 3d DCA 1981); *Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432, 433–34 (Fla. 1980)). Here, the 2016 ICAs are ambiguous as to whether Hawley and Miller were signing on their individual behalf or as representatives of their corporate entities. The evidence currently in the record does not resolve this issue. Thus, given the issue of disputed material fact, Plaintiff's request for summary judgment on this Count will be denied.[34]

---

[34] Plaintiff also argues that the Court must find that the 2016 ICAs impose individual liability on Hawley and Miller because of the Court's Order on Plaintiff's Motion for Preliminary Injunction (Doc. 150). However, the Court's previous Order did not expressly address this issue, (*see id.*), and, even if it did, the legal standard and evidence available at the two stages of the case vary significantly. *Turner v. Allstate Ins. Co.*, No. 2:13-cv-685-ECM (WO), 2020 U.S. Dist. LEXIS 180499, at *45–46 (M.D. Ala. Sept. 30, 2020) ("The Court notes that the determinations a court makes on a motion for preliminary injunction are not evidence to be used to preclude a different ruling on summary judgment. The standards for ruling on a motion for preliminary injunction differ from those on a motion for summary judgment." (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 396 (1981))).

While neither side has satisfied its burden to be entitled to full summary judgment on this Count, on consideration of a motion for summary judgment "[i]f the court does not grant all the relief requested . . . it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). The purpose of this rule is to allow a court to "salvage some of the judicial effort involved in the denial of a motion for summary judgment and to streamline the litigation process by narrowing the triable issues." *United States v. Khan*, No. 3:17-cv-965-J-PDB, 2019 U.S. Dist. LEXIS 27270, at *43 (M.D. Fla. Feb. 21, 2019) (citation omitted) (discussing the purposes of Rule 56(g)). Whether to enter an order pursuant to Rule 56(g) is discretionary. *Id.* The Court will take this opportunity under Rule 56(g) to salvage some of the judicial effort involved in ruling on the parties' Motions and therefore will consider the remaining factors as to the enforceability of the restrictive covenants and the alleged breaches thereof committed by Hawley and Miller.

Next, Plaintiff must demonstrate that the restrictive covenants in the 2016 ICAs protect "one or more legitimate business interests." Fla. Stat. § 542.335(1)(b). Plaintiff argues that the restrictive covenants were intended to protect several of the legitimate business interests specifically enumerated in the statute, including trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective

or existing customers, and extraordinary or specialized training. The ICAs specifically define the information to be protected, including but not limited to trade secrets, contracts, and customer lists. (Doc. 260-10 at 7–8; Doc. 260-11 at 7–8). Plaintiff argues that, among others things, Hawley and Miller possessed confidential information, specialized training, and "relationships . . . with . . . surgeon customers," (Doc. 260 at 30), all of which Plaintiff contends qualify under the statute as legitimate business interests.

As to specialized training, both Hawley and Miller received eXtreme Lateral Interbody Fusion ("XLIF") training from Plaintiff. (Doc. 260-1 at 7). "To be protected, training must go beyond that typically offered in any given industry." *Props. of the Vills. v. Kranz*, No. 5:19-cv-647-Oc-30PRL, 2020 U.S. Dist. LEXIS 186795, at *24 (M.D. Fla. Aug. 14, 2020) (citing *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1342 (S.D. Fla. 2016)). Plaintiff's XLIF training, which is described as "innovative" and "market-leading," provides sales representatives "superior knowledge and clinical skills" and "a competitive edge in the marketplace." (Marzano Decl. Doc. 260-32 at 1–2). This rises above the level of ordinary industry training and qualifies as a protectable legitimate business interest.

Additionally, Plaintiff argues that Hawley and Miller developed important relationships with Plaintiff's surgeon customers, which is a protectable interest under the statute. "As with many sales positions, regardless of the industry, forming

relationships with prospective and existing customers is invaluable and often vital for success." *Allied Universal Corp. v. Given*, 223 So. 3d 1040, 1043 (Fla. 3d DCA 2017) (quoting *Reliance Wholesale, Inc. v. Godfrey*, 51 So. 3d 561, 565 (Fla. 3d DCA 2010)). Hawley's and Miller's relationships with their customers—developed through their work with AM and on behalf of Plaintiff—are clear throughout the record. (*See, e.g.*, Hawley Dep., Doc. 260-18, at 27, 36, 40, 42 (documenting Hawley's business relationships); Doc. 260-20 at 28, 35–36 (documenting Miller's business relationships)). Miller even went so far as to state that keeping "the competition" away from his surgeon customers was "priceless." (Doc. 260-20 at 35–36). These "priceless" relationships are just the type of legitimate business interests that the statute is designed to protect. *See Vital Pharms., Inc. v. Alfieri*, No. 20-cv-61307-SINGHAL, 2020 U.S. Dist. LEXIS 211992, at *20–21 (S.D. Fla. Oct. 7, 2020) ("Florida case law reveals that a substantial relationship . . . exist[s] where there is active, on-going business being conducted; exclusivity; a customer who cannot be easily identified by other competitors in the industry; and an expectation of continued business." (quoting *IDMWORKS*, 192 F. Supp. 3d at 1340–41)).

Under section 542.335(1)(b), Florida Statutes, a plaintiff "[i]s only required to establish *one* legitimate business interest to justify the non-compete covenant." *Proudfoot*, 576 F.3d at 1233 (emphasis added). Here, Plaintiff has sufficiently demonstrated that the restrictive covenants in the 2016 ICAs protect one or more of

Plaintiff's legitimate business interests, so the Court will grant summary judgment to Plaintiff as to this issue.[35]

Finally, "[a] person seeking enforcement of a restrictive covenant also shall plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." Fla. Stat. § 542.335(1)(c). "Restrictive covenants must be 'reasonable in time, area, and line of business' in order to be enforceable." *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, No. 8:11-cv-1883-30AEP, 2011 U.S. Dist. LEXIS 127336, at *19 (M.D. Fla. Sept. 26, 2011) (quoting Fla. Stat. § 542.335(1)). "A court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." Fla. Stat. § 542.335(a)(h). For a former salesperson, "a court shall presume reasonable in time any restraint 6 months or less in duration and shall presume unreasonable in time any restraint more than 2 years in duration." *Int'l Hair*, 2011 U.S. Dist. LEXIS 127336, at *19 (quoting Fla. Stat. § 542.335(1)(d)(1)).

The restrictive covenants in the 2016 ICA are not overly broad in scope, restricting Hawley and Miller only from selling products that directly compete with

---

[35] Because Plaintiff has clearly demonstrated more than one protectable legitimate business interest, the Court does not address the remainder of the claimed protectable interests, such as Hawley's work on "confidential" "pipeline products," (Doc. 260-18 at 5), and Miller's knowledge of Plaintiff's product pricing, (Doc. 260-20 at 72–74).

Plaintiff's products in the specified territory or from soliciting Plaintiff's current or prospective customers or affiliates. (Doc. 260-10 at 9; Doc. 260-11 at 10). And the restrictive covenants do not entirely prohibit Hawley and Miller from working in their industry of choice. *Proudfoot*, 576 F.3d at 1235 n.12; *Envtl. Servs. v. Carter*, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009) ("This is not an instance where the covenant is being used as a tool simply to eliminate all competition."). The restrictions are also tailored to the territory area in which Hawley and Miller worked for Plaintiff, which for Hawley is limited to only Orange County, Florida, (Doc. 260-10 at 3, 17), and for Miller is limited to six counties in Central Florida, (Doc. 260-11 at 3, 17).[36] This geographic restriction is reasonable. *Xerographics, Inc. v. Thomas*, 537 So. 2d 140, 143 (Fla. 2d DCA 1988) (finding a geographic restriction of five counties in Florida to be reasonable on its face). And a temporal restriction for a salesperson lasting one year, such as the one here, is regularly found to be reasonable by Florida courts. *Pitney Bowes, Inc. v. Acevedo*, No. 08-21808-CIV-JORDAN, 2008 U.S. Dist. LEXIS 61194, at *9 (S.D. Fla. July 28, 2008) ("A one-year restriction preventing a former sales executive from competing with his former employer within fifty miles from where he worked and from soliciting clients he serviced (or oversaw) in his last

---

[36] The non-competition provision also applies to "any other locale in which [the] Salesperson conducted business activities on behalf of [AM]." (Doc. 260-10 at 9; Doc. 260-11 at 9). However, there is no evidence on the summary judgment record that Hawley's or Miller's activities for AM or Plaintiff extended beyond their designated territories.

year of employment is likely to be found reasonable."); *Xerographics*, 537 So. 2d at 143 ("The one-year restriction was not overly burdensome."); *AutoNation, Inc. v. Peters*, No. 16-60010-CIV-COHN/SELTZER, 2016 U.S. Dist. LEXIS 57373, at *13–14 (S.D. Fla. Apr. 29, 2016) ("A one-year period is long enough to reasonably protect [the employer]'s interests, but short enough not to unduly burden [the employee]'s ability to work in his chosen profession wherever he wishes."). The Court is satisfied that the restrictive covenants here are appropriate in scope, geographic area, and duration and reasonably necessary to protect Plaintiff's legitimate business interests.

Next, the burden of proof shifts to Defendants to show that the restrictive covenants are not "overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest[s]." *Proudfoot*, 576 F.3d at 1231 (alteration in original) (quoting Fla. Stat. § 542.335(1)(c)). Hawley and Miller have not made any arguments regarding the scope of the restrictive covenants in Movant Defendants' MSJ, and as noted above, the Court will strike Defendants' Response to Plaintiff's MSJ. Therefore, Hawley and Miller have not met their burden as to this issue. *See Gailes v. Marengo Cnty. Sheriff's Dep't*, 916 F. Supp. 2d 1238, 1244 n.12 (S.D. Ala. 2013) ("A [party] that fails to address a claim challenged by [the movant] does so at its peril, both because the Court may not detect defects in the [movant]'s position . . . and because . . . the Court will not on its own raise arguments to counter

the [movant]'s case."). Therefore, the Court will grant summary judgment to Plaintiff as to the issue of demonstrating that the restrictive covenants are reasonably necessary to justify protection of one or more legitimate business interests.

### (2)    Breach of the Restrictive Covenants

Under Florida law,[37] to prevail on a breach of contract claim, Plaintiff must establish the following elements: (1) a valid contract, (2) a material breach, (3) causation, and (4) damages. *Handi-Van, Inc. v. Broward Cnty.*, 116 So. 3d 530, 541 (Fla. 4th DCA 2013); *Abbott Labs., Inc. v. Gen. Elec. Cap.*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000). As discussed above, the 2016 ICAs are valid and enforceable contracts, except that there is currently an issue of disputed material fact as to whether the ICAs can be enforced against Hawley and Miller individually or only against their corporate entities. For the purposes of judicial efficiency, in accordance with Federal Rule of Civil Procedure 56(g) the Court will consider the remaining elements of the breach of contract claim.

The restrictive covenants in the 2016 ICAs are enforceable during the term of the ICAs—January 1, 2016 through December 31, 2016—"and for a twelve (12) month period following the [t]erm." (Doc. 260-10 at 9; Doc. 260-11 at 9). Therefore, the restrictions are enforceable until December 31, 2017. Both Hawley and Miller

---

[37] The 2016 ICAs state that Florida law governs the agreements. (Doc. 260-10 at 13; Doc. 260-11 at 13).

readily admit that they were working for Alphatec in December 2017, selling Alphatec products to the same surgeons in the same territory as when employed by Plaintiff and thus directly competing with Plaintiff's products. (Doc. 260-18 at 4, 8, 15–17, 46–49; Doc. 260-20 at 11, 23–26, 28–29, 31–32). This is a clear violation of the restrictive covenants in the 2016 ICAs. (*See* Doc. 260-10 at 9; Doc. 260-11 at 9). And these violations caused damage to Plaintiff because Hawley and Miller converted at least some of Plaintiff's surgeon clients over to using Alphatec products. (Doc. 260-18 at 4; Doc. 260-20 at 28–29). Thus, if the restrictive covenants are enforceable upon Hawley and Miller individually—which, as discussed above, the Court cannot yet determine—it is clear that Hawley and Miller breached those restrictions and caused damage to Plaintiff.

(3)    Remedies for Breach

Next, Plaintiff argues that the Court should toll the restrictive covenants and enjoin Hawley and Miller from competing against Plaintiff for one month—the period of time for which Hawley and Miller were allegedly in breach prior to expiration of the restrictions at the end of December 2017. Additionally, Plaintiff argues that the Court should award to Plaintiff "appropriate damages" and "disgorge any profits" earned by Hawley and Miller. (Doc. 260 at 33). Because there currently exists a disputed issue of material fact regarding whether the restrictive covenants can be enforced against Hawley and Miller individually, the Court does not find it

appropriate to yet determine what, if any, remedy for the alleged breach is appropriate. Thus, Plaintiff's request for summary judgment on this issue will be denied.

<u>c.</u>   <u>2017 ICAs</u>

Finally, as to Count IV, Hawley and Miller move for summary judgment as to the 2017 ICAs, arguing that "there is no evidence that the 2017 ICAs . . . were ever executed by Hawley and Miller."[38] (Doc. 257 at 16). As noted previously, whether or not Hawley and Miller, or their corporate entities, executed ICAs for 2017 has been the subject of intense debate during this case. Hawley and Miller argue that they never executed the 2017 ICAs, and Plaintiff argues that they were executed but destroyed by Defendants' spoliation of evidence. As discussed above, the Court finds it appropriate to presume that the spoliated evidence was unfavorable to Defendants. However, the Court cannot determine from the current record whether this presumption should rise to the level of a finding that Hawley and Miller did in fact execute 2017 ICAs. Because there is an issue of disputed material fact about the existence of the executed agreements, Hawley and Miller have failed to meet their burden, and the Court will deny summary judgment as to the 2017 ICAs.

---

[38] Alternatively, Hawley and Miller argue that Plaintiff may not recover under the 2017 ICAs because those ICAs were not attached to the Complaint, and Hawley and Miller did not sign them as individuals. Both of these arguments are disposed of in the same manner as the conclusions for the 2016 ICAs, as discussed above.

### 4.    Count V

Count V alleges a Florida common law claim of conversion against Hawley and AMS. "Under Florida law, '[a] conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion.'" *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1258 (11th Cir. 2015) (alteration in original) (quoting *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So. 2d 858, 860 (Fla. 1948)); *see also Joseph v. Chanin*, 940 So. 2d 483, 486 (Fla. 4th DCA 2006).

Both Plaintiff and Alphatec produce custom surgical equipment for use by surgeons. (Bragulla Dep., Doc. 198-4, at 38, 50–51, 58–60). The sales representatives for each of these companies go to hospitals and assist with preparation of this equipment for upcoming surgeries and remain in the hospital during the surgeries if the surgeon has questions about the equipment. (*Id.* at 34–35, 43–44, 47–48). The claim for conversion against Hawley and AMS relates to this surgical equipment. The sequence of events pertaining to this claim began on December 12, 2017, just after Hawley started working for AMS and Alphatec. (Doc. 265 at 24). On that date, Hawley sent an email to Elizabeth Lukianov, who Plaintiff

argues was Hawley's co-worker at Alphatec[39] and a former employee of AM representing Plaintiff's products. (Dec. 12, 2017 Email, Doc. 188-6, at 1; Doc. 265 at 24). As Plaintiff argues, Hawley "inadvertently" sent this email to Lukianov's former email address instead of to her new email address with Alphatec. (Doc. 265 at 24). The email asks Lukianov to "get started on a few instruments to be made for [Dr. Paul] Sawin," describes technical specifications for the instruments, states that "I'm going to send you a couple things today[,]" and then asks Lukianov, "[w]hat address would you like them shipped to?" (Doc. 188-6 at 1). Dr. Sawin was a surgeon who used products and equipment from both Plaintiff and Alphatec at the time the email was sent. (Doc. 198-4 at 34–36).

The following January, Thad Bragulla, who was a former AM sales representative selling Plaintiff's products and then later a direct employee of Plaintiff, was directed by Plaintiff "to go in and pull" all of Plaintiff's surgical equipment from Central Florida Regional Hospital. (*Id.* at 57; *id.* at 13, 17, 24–25, 28, 57–58). Then, in May 2018, Bragulla observed some of Plaintiff's surgical equipment—anterior cervical spacer trials and cage trials—prepared for surgery for Dr. Sawin. (Doc. 198-4 at 47–51). Bragulla—the only person working for Plaintiff

---

[39] It is not clear from the record whether Lukianov was formerly an employee of AM working with Plaintiff's products or a direct employee of Plaintiff and then later an employee of AMS working with Alphatec's products or a direct employee of Alphatec. However, the distinction is inconsequential to the instant claim.

at the hospital during this timeframe—did not prepare this equipment for surgery and thus did not know how it got into the hospital; he had previously removed all of Plaintiff's equipment and was the only person actively bringing Plaintiff's equipment into the hospital. (*Id.* at 49–50, 61–62). Therefore, Bragulla concluded that Hawley,[40] who was no longer working for Plaintiff, must have been the person who set up this equipment. (*Id.* at 49–56). However, Bragulla did not personally observe Hawley preparing this equipment, (*id.* at 49), and Hawley adamantly denies ever "possess[ing], us[ing], cop[ying], prepar[ing] for surgery or convert[ing] any [of Plaintiff's] instruments or equipment," (Hawley Decl., Doc. 198-1, at 8).

Based on this set of facts, Plaintiff alleges that Hawley or another sales representative working on behalf of AMS converted Plaintiff's custom surgical equipment. Hawley and AMS move for summary judgment on this claim because Plaintiff has produced "no evidence to support its theory." (Doc. 257 at 20). In support, Hawley and AMS cite Hawley's declaration, selected portions of Bragulla's deposition, and Plaintiff's corporate representative deposition, all of which state that these declarants have no direct evidence that Hawley or another AMS sales representative possessed and prepared Plaintiff's surgical equipment observed by Bragulla at the hospital. However, Hawley and AMS ignore the extensive deposition

---

[40] Or another sales representative working at the direction of Hawley. (Doc. 198-4 at 56, 60).

testimony by Bragulla explaining that in light of the fact that Bragulla had previously removed all of Plaintiff's surgical equipment from the hospital and was the only person bringing in such equipment it was highly likely that Plaintiff's surgical equipment was wrongly possessed by Hawley or another AMS representative. Hawley and AMS have not met their burden on summary judgment because the conflicting statements by Bragulla and Hawley present a disputed issue of material fact. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248. Therefore, Movant Defendants' MSJ as to Count V will be denied.[41]

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for the Imposition of Sanctions for Spoliation of Evidence (Doc. 203) is **GRANTED in part** and **DENIED in part.** The Spoliation Motion is **GRANTED** insofar as:

   a. The Court will presume that the spoliated evidence was unfavorable to Defendants.

---

[41] Hawley and AMS's argument on this claim is only that Plaintiff has presented no evidence in support of its claim. Neither party addresses the element of a conversion claim that requires the deprivation to be "permanently or for an indefinite time." *Palm Beach Golf Ctr.-Boca*, 781 F.3d at 1258. Indeed, it appears from Bragulla's deposition testimony that Plaintiff was able to recover its surgical equipment. (Doc. 198-4 at 54).

      b. If this case proceeds to a jury trial, the Court will instruct the jury that it *must* presume the spoliated evidence was unfavorable to Defendants.

      c. Plaintiff's Spoliation Motion is otherwise **DENIED.**

2. **On or before May 18, 2021,** counsel for Defendants, Mr. Bryan E. Busch, shall **SHOW CAUSE** as to why he should not be sanctioned for spoliation of evidence in this case.

3. Nuvasive, Inc.'s Consolidated Motion for Partial Summary Judgment Against Absolute Medical, LLC, Absolute Medical Systems, LLC, Dave Hawley, and Ryan Miller (Doc. 260) is **GRANTED in part** and **DENIED in part.** Plaintiff's MSJ is **GRANTED** as to the following undisputed material facts and issues of law:

      a. AM breached the 2017 Sales Agreement.

      b. AMS is a mere continuation of AM and therefore is liable as a successor company to AM.

      c. The restrictive covenants in the 2016 ICAs protect one or more of Plaintiff's legitimate business interests.

      d. The restrictive covenants in the 2016 ICAs are reasonably necessary to protect Plaintiff's legitimate business interests.

e.  If the restrictive covenants in the 2016 ICAs can be enforced upon Hawley and Miller individually, both Hawley and Miller breached those covenants, which resulted in damage to Plaintiff.

f.  Plaintiff's MSJ is otherwise **DENIED.**

4.  Defendants Dave Hawley, Ryan Miller, and Absolute Medical Systems, LLC's Response to Nuvasive, Inc.'s Motion for Partial Summary Judgment (Doc. 266) is **STRICKEN.**

5.  Defendants Dave Hawley, Ryan Miller, and Absolute Medical Systems, LLC's Motion for Partial Summary Judgment (Doc. 257) is **GRANTED in part** and **DENIED in part.**

a.  To the extent that Plaintiff seeks to base Count IV on the 2013 ICAs, summary judgment is **GRANTED** to Hawley and Miller.

b.  Movant Defendants' MSJ is otherwise **DENIED.**

**DONE** and **ORDERED** in Orlando, Florida on May 4, 2021.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record