UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


**NUVASIVE, INC.,**

           **Plaintiff,**

**v.**                                      **Case No.  6:17-cv-2206-CEM-GJK**
                                                        **UNDER SEAL**

**ABSOLUTE MEDICAL, LLC,**
**GREG SOUFLERIS, DAVE**
**HAWLEY, ABSOLUTE**
**MEDICAL SYSTEMS, LLC,**
**RYAN MILLER, and BRYAN E**
**BUSCH,**

           **Defendants.**

_____/

## ORDER

THIS CAUSE is before the Court on the Court's May 4, 2021 Order

("Summary Judgment Order," Doc. 290);[1] Absolute Medical, LLC's ("AM") and

Absolute Medical Systems, LLC's ("AMS") Motion to Confirm Arbitration Award

("Motion to Confirm," Doc. 333);[2] Plaintiff's Motion to Vacate Arbitration Award

("Motion to Vacate," Doc. 353) and Plaintiff's Sealed Motion to Vacate Arbitration

---

[1] The Summary Judgment Order also ordered Defendants' counsel, Mr. Bryan E. Busch, to show cause as to why sanctions should not be entered against him. (Doc. 290 at 57). Mr. Busch filed a Response (Doc. 293).

[2] Plaintiff filed a Response in Opposition (Doc. 354) and a Sealed Response in Opposition (Doc. 356), and Defendants filed a Reply (Doc. 362).

Award ("Sealed Motion to Vacate," Doc. 355);[3] and Defendants' Motion to Strike Declaration of Clayton ("Motion to Strike," Doc. 368). For the reasons stated herein, the Motion to Confirm will be denied, the Motion to Vacate and Sealed Motion to Vacate will be granted, and the Motion to Strike will be denied as moot.

## I. BACKGROUND

After four long years of litigation, it is somewhat ironic that the underlying facts leading up to the claims in this case are nearly irrelevant at this point. Nonetheless, the Court will briefly summarize the actions that led to the current situation. This case arises primarily from a contractual dispute between Plaintiff, a manufacturer of medical products and equipment, (Second Am. Compl., Doc. 188, at 3), and AM, which entered into an Exclusive Sales Representative Agreement (Doc. 60-7 at 3–27) with Plaintiff beginning in 2013. In 2017, Plaintiff and AM continued their relationship when they executed another Exclusive Sales Representative Agreement ("2017 Sales Agreement," Doc. 260-3, at 131–59). Defendant Greg Soufleris was the president and sole member of AM. (AM Dep., Doc. 260-1, at 4, 8, 10). Defendants Dave Hawley and Ryan Miller, each through their own company, were sales representatives for AM. (Soufleris Dep., Doc. 260-3, at 91–92; Hawley's 2016 Independent Contractor Agreement, Doc. 260-10, at 20; Miller's 2016 Independent Contractor Agreement, Doc. 260-11, at 20). Near the end

---

[3] Defendants filed a Response (Doc. 360), and Plaintiff filed a Reply (Doc. 365).

of 2017, Soufleris "dissolve[d]" AM and created a "new entity," AMS, to "replac[e]" AM. (AMS EIN Email, Doc. 260-1, at 121; Doc. 260-1 at 66–67). Shortly after Soufleris formed the new company, Hawley and Miller began working for AMS. (Hawley Dep., Doc. 260-18, at 4, 8, 15–17, 46–49; Miller Dep., Doc. 260-20, at 11, 23–26, 28–29, 31–32).

Following termination of the parties' business relationship and formation of AMS, Plaintiff filed this lawsuit, which asserted nine counts in the Second Amended Complaint. (*See generally* Doc. 188). Counts I and II are breach of contract claims against AM; Count III is a breach of contract claim against AMS; Count IV is a breach of contract claim against Hawley and Miller; Count V is a conversion claim against Hawley and AMS; Count VI is a Florida Revised Limited Liability Company Act claim against Soufleris; Count VII pertains to piercing the corporate veil as to Soufleris for the actions of AM and AMS; Count VIII is a Florida Deceptive and Unfair Trade Practices Act claim against all Defendants; and Count IX is a tortious interference claim against Soufleris. (*Id.* at 14–23).

In 2019, pursuant to a "Dispute Resolution" clause in the 2017 Sales Agreement, (Doc. 260-3 at 145–46), the Court ordered Plaintiff and AM to "proceed to arbitration on Count II" and stayed "Counts III, to the extent that Plaintiff seeks monetary relief, VI, VII, VIII, and IX . . . pending arbitration." (May 31, 2019 Order, Doc. 178, at 5). While arbitration was proceeding, Plaintiff moved for summary

judgment as to Counts I, III, and IV. (*See generally* Pl.'s Mot. for Summ. J., Doc. 260). Hawley, Miller, and AMS moved for summary judgment as to Counts IV and V. (*See generally* Hawley, Miller, and AMS's Mot. for Summ. J., Doc. 257). The Court granted partial summary judgment to each side on certain undisputed material facts and issues of law. (Doc. 290 at 57–58). Once arbitration concluded, (*see generally* Final Award, Doc. 283-2), the stayed counts were unstayed, and Defendants filed a second round of summary judgment motions, (*see generally* Defs.' Mot. for Partial Summ. J., Doc. 308; AMS's Mot. for Summ. J., Doc. 312). The Court denied both of the subsequent motions for summary judgment. (Nov. 12, 2021 Order, Doc. 334, at 30).

At this point, the Court fully expected that this case would then proceed to the long-awaited trial, which was scheduled to begin on November 29, 2021. (Notice of Hearing, Doc. 286). Then the instant motions were filed, one requesting that the Court confirm the arbitration award and one requesting that the Court vacate the arbitration award. (*See generally* Doc. Nos. 333, 353). Given the timing of the quickly approaching trial, the Court was forced to once again continue the trial to consider the issues raised in the motions concerning the arbitration award. (Nov. 17, 2021 Endorsed Order, Doc. 350).

## II. MOTION TO VACATE AND MOTION TO CONFIRM

### A. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*., governs arbitration awards arising from contracts involving transactions in interstate commerce. *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005). When parties to an arbitration agreement "have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, . . . then at any time within one year after the award is made any party to the arbitration may apply to the court . . . for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10, 11]." 9 U.S.C. § 9. A court "may make an order vacating the award upon the application of any party to the arbitration" when, *inter alia*, "the award was procured by corruption, fraud, or undue means." *Id.* § 10(a)(1). "Notice of a motion to vacate . . . an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." *Id.* § 12.

### B. Analysis

The FAA provision for confirmation of an arbitration award applies only if the award has not been vacated, modified, or corrected. 9 U.S.C. § 9. Therefore, the Court will first consider Plaintiff's Motion to Vacate.

### 1. Jurisdiction

"A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." *Fitzgerald v. Seaboard Sys. R.R.*, 760 F.2d 1249, 1251 (11th Cir. 1985) (per curiam). The FAA "does not confer subject matter jurisdiction over petitions to vacate arbitration awards, nor does it create independent federal question jurisdiction." *Peebles v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 431 F.3d 1320, 1325 (11th Cir. 2005) (citing *Baltin v. Alaron Trading Corp.*, 128 F.3d 1466, 1469 (11th Cir. 1997), *cert. denied*, 525 U.S. 841 (1998)). Therefore, the Court first ensures that it has jurisdiction to consider the Motion to Vacate.

The FAA provides that a motion to vacate may be filed in "the United States court in and for the district wherein the award was made." 9 U.S.C. § 10(a). Here, the arbitration award was made in San Diego, California, (Doc. 283-2 at 2), which is located in the U.S. District Court for the Southern District of California, 28 U.S.C. § 84(d). However, "when a federal district court grants a motion to compel arbitration it retains jurisdiction to confirm or vacate the resulting arbitration award under 9 U.S.C. §§ 9–10." *PTA-Fla, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1305 (11th Cir. 2016) (quoting *TranSouth Fin. Corp. v. Bell*, 149 F.3d 1292, 1297 (11th Cir. 1998); citing *Marine Transit Corp. v. Dreyfus*, 284 U.S. 263, 275–76 (1932) ("[W]here the court has authority under the [FAA] . . . to make an order for

arbitration, the court also has authority to confirm the award or to set it aside.")). This Court had subject matter jurisdiction over the case at the time it granted the Motion to Compel Arbitration, (Doc. 178 at 4–5), so it retains jurisdiction to rule on the Motion to Vacate. *PTA-Fla*, 844 F.3d at 1305.

### 2. Equitable Tolling

As noted above, the FAA requires that a motion to vacate an arbitration award "be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. It is undisputed that Plaintiff did not file its Motion to Vacate within the prescribed three-month statutory timeframe. (*See* Doc. 283-2 at 15 (noting that the Final Award is dated March 4, 2021); Doc. 353 at 20 (noting that the Motion to Vacate was filed on November 22, 2021)). Nonetheless, Plaintiff argues that the Court should equitably toll the three-month statutory period for filing a motion to vacate because of Defendants' fraud during the arbitration hearing and attempts to conceal that fraud following the arbitration award. Defendants, on the other hand, argue that the doctrine of equitable tolling has not been adopted by the Eleventh Circuit as applied to the FAA and therefore cannot be applied here.

Equitable tolling "suspends a limitations period 'until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Cocke v. Merrill Lynch & Co.*, 817 F.2d

1559, 1561 (11th Cir. 1987) (quoting *Reeb v. Econ. Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir. 1975)).[4] Only a single Eleventh Circuit case has considered the issue of whether district courts can apply equitable tolling to the three-month statutory deadline for vacation of an arbitration award. In *Cullen v. Paine, Webber, Jackson & Curtis, Inc.*, 863 F.2d 851 (11th Cir. 1989), the Eleventh Circuit held that it was "unpersuaded" by the appellant's contention that equitable tolling applied to the FAA because the appellant failed to cite any applicable case law and "alleged insufficient facts to demonstrate" that he proceeded with due diligence. *Id.* at 854. Essentially, the Eleventh Circuit declined to decide the issue because the appellant had not met its burden and the specific facts presented were not compelling. However, the Eleventh Circuit did not rule out the possibility of applying equitable tolling to the FAA, noting that "an exception might be proper in some circumstances." *Id.* Other circuit courts have similarly held that an exception might potentially exist but that the facts before the courts did not warrant application of such an exception.[5] *Fradella v. Petricca*, 183 F.3d 17, 21 (1st Cir. 1999) ("We need not consider whether the deadline prescribed in FAA § 12 is subject to such equitable tolling, since [the appellant] has not generated a trialworthy issue as to his

---

[4] Cases decided by the Fifth Circuit prior to October 1, 1981 are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[5] District courts in the Eleventh Circuit have also held similarly. *Mitra v. Glob. Fin. Corp.*, No. 08-80914-CIV, 2009 U.S. Dist. LEXIS 53954, at *9 (S.D. Fla. June 23, 2009); *Belz v. Morgan Stanley Smith Barney, LLC*, No. 3:13-cv-636-J-34MCR, 2014 U.S. Dist. LEXIS 28906, at *25 (M.D. Fla. Mar. 5, 2014).

entitlement to invoke tolling."); *Choice Hotels Int'l, Inc. v. Shiv Hosp'y, LLC*, 491 F.3d 171, 177–78 (4th Cir. 2007) (assuming *arguendo* that due diligence and tolling were exceptions to the three-month statutory time period but concluding that the facts did not warrant application of the exceptions); *Taylor v. Nelson*, 788 F.2d 220, 225 (4th Cir. 1986) ("We do not consider, however, whether due diligence or tolling rules are proper exceptions to the limitations period prescribed by the [FAA], for we conclude that [the appellee] did not, in any event, act with due diligence, and was not prevented . . . from making a timely motion to vacate in the district court."); *Piccolo v. Dain, Kalman & Quail, Inc.*, 641 F.2d 598, 601 (8th Cir. 1981) ("Although the existence of a 'due diligence' exception may be questioned, the [appellees]' efforts to comply with section 12 would not qualify for this exception in any event."); *Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155, 1158 (10th Cir. 2007) (holding that equitable tolling did not apply because the appellant still had one month before the three-month deadline when he learned of the evidence and failed to file within that time).

It appears that the only circuit court to definitively determine this issue is the Ninth Circuit in *Move, Inc. v. Citigroup Global Markets*, 840 F.3d 1152 (9th Cir. 2016). The Ninth Circuit held that equitable tolling could be applied to the FAA, citing legal authority from the U.S. Supreme Court and reasoning that "[i]t is hornbook law that limitations periods are customarily subject to equitable tolling . . .

unless tolling would be inconsistent with the text of the relevant statute." *Id.* at 1156 (quoting *Young v. United States*, 535 U.S. 43, 49 (2002)). The Ninth Circuit then went on to conduct a thorough examination of whether the text, structure, or purpose of the FAA was inconsistent with equitable tolling, concluding that it was not. *Id.* at 1156–58. Absent Eleventh Circuit legal authority on the issue, this Court agrees with, and incorporates by reference, the well-reasoned opinion of the Ninth Circuit in *Move* and finds "that the FAA is subject to the established doctrine of equitable tolling." *Id.* at 1158.

"Equitable tolling is an extraordinary remedy which is typically applied sparingly." *Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008) (quoting *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000)). Equitable tolling is only "appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp.*, 522 F.3d 1190, 1197 (11th Cir. 2008) (emphasis omitted) (quoting *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999) (per curiam)); *see also Outler v. United States*, 485 F.3d 1273, 1280 (11th Cir. 2007) (holding that the elements of equitable tolling are: "(1) extraordinary circumstances and (2) due diligence" (citing *Diaz v. Sec'y for Dep't of Corr.*, 362 F.3d 698, 702 (11th Cir. 2004))).

Plaintiff argues that extraordinary circumstances beyond its control existed here and that it acted with due diligence. A discussion of the sequence of events leading up to Plaintiff's Motion to Vacate is necessary to determine whether extraordinary circumstances existed here and whether Plaintiff acted with due diligence. The Final Award was issued on March 4, 2021. (Doc. 283-2 at 15). The parties filed a Joint Notice (Doc. 283) on March 15, 2021, notifying the Court that the arbitration had concluded and requesting a status conference to discuss how to proceed with the stayed claims in this litigation in light of the Final Award. (*Id.* at 1–2). The Court held a status conference on March 25, 2021, (Min. Entry, Doc. 285, at 1–2), and directed the parties to file an Amended Case Management Report for the claims that were previously stayed, (Mar. 25, 2021 Endorsed Order, Doc. 287). The parties filed an Amended Case Management Report (Doc. 289) on April 21, 2021, and the Court issued the Second Amended Case Management and Scheduling Order (Doc. 291) on May 5, 2021, which reopened discovery in this case for a limited period of time through June 30, 2021, (*id.* at 1). During this time, Plaintiff propounded Requests for Production on Soufleris and AMS. (*See generally* Soufleris's Resp. to Second Reqs. for Prod., Doc. 302-1; AMS's Resp. to Third Reqs. for Prod., Doc. 302-2). When Plaintiff believed that Soufleris's and AMS's responses to the discovery requests were insufficient, Plaintiff filed a Motion to Compel Better Responses (Doc. 302), which was granted in part by the Court on

August 20, 2021, and required Soufleris and AMS to produce the requested documents no later than August 26, 2021, (Aug. 20, 2021 Order, Doc. 319, at 7). Instead of producing the documents, Soufleris and AMS filed a Motion for Reconsideration (Doc. 324), seeking relief from the Court's Order, which the Court denied, (Aug. 27, 2021 Order, Doc. 325, at 3–4). Soufleris and AMS failed to produce the compelled documents until November 4, 2021, (Cardwell Decl., Doc. 353-1, at 1), seventy days after the Court's deadline to do so, (*see* Doc. 319 at 7). Just six days after this production of documents, AM and AMS filed their Motion to Confirm, which noted to the Court that Defendants' counsel expected Plaintiff to raise the issue of misconduct during the arbitration "based upon text messages recently produced by Defendants." (Doc. 333 at 7). Plaintiff then filed a Motion for Leave to File Motion to Vacate (Doc. 338) on November 15, 2021, which the Court granted on November 17, 2021, (Nov. 17, 2021 Endorsed Order, Doc. 348), after a hearing, (Min. Entry, Doc. 345, at 1). Plaintiff filed its Motion to Vacate on November 22, 2021. (Doc. 353 at 20).

This sequence of events demonstrates that Plaintiff was diligently pursuing its rights at every step following issuance of the Final Award by the arbitration panel, even in the face of Soufleris and AMS actively subverting discovery requests and a Court Order by failing to timely produce the requested communications. Based on the timing of Soufleris and AMS finally producing the requested communications,

and AM and AMS's Motion to Confirm just six days after production, it is also clear that Defendants were intentionally attempting to run out the clock on Plaintiff's time to file a motion to vacate by failing to produce the documents that could show misconduct during the arbitration. These are extraordinary circumstances, and Plaintiff acted with due diligence; thus, application of equitable tolling is appropriate here, and Plaintiff's Motion to Vacate is timely based on that tolling.[6]

### 3. *Motion to Vacate Analysis*

As discussed above, a court may issue an order vacating an arbitration award when, *inter alia*, "the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). The Eleventh Circuit employs "a three part test to determine whether an arbitration award should be vacated for fraud"—(1) "the movant must establish the fraud by clear and convincing evidence," (2) "the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration," and (3) "the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration." *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988). Plaintiff argues that all three

---

[6] Ultimately, if the Eleventh Circuit determines that equitable tolling may not be applied to the FAA, this Court notes that the remainder of the claims in this case would be resolved in the same manner based on the Court's inherent sanctioning authority. Thus, only Count II, the count previously compelled to arbitration, turns on the issue of equitable tolling.

elements of this test are satisfied based on fraudulent conduct by Soufleris and Hawley during the arbitration.

The relevant events that occurred during the arbitration are as follows. Hawley testified via video conference in the arbitration proceeding on December 16, 2020, beginning at 3:22 PM Pacific Standard Time, which is 6:22 PM Eastern Standard Time.[7] (Arbitration Tr., Doc. 353-3, at 2, 4). At the commencement of his testimony, at 6:23 PM, Hawley swore under oath "that the evidence you're about to give will be the truth, the whole truth, and nothing but the truth," and "that there is no one else in the room with you who is not identified and that no unauthorized person can communicate with you while you are giving your testimony." (*Id.* at 4–5). However, just six minutes prior to taking this oath, Soufleris sent an iMessage[8] to Hawley stating "[k]eep phone on," to which Hawley responded at 6:18 PM, "Ok." (Hawley iMessages, Doc. 355-1, at 2). Soufleris then continued to send Hawley messages— telling Hawley how to testify—until 8:12 PM, (*id.*), which time spanned the duration of Hawley's testimony, (Doc. 353-3 at 5–41).

Hawley has filed a Declaration (Doc. 360-3), wherein he states that he "was not aware that Mr. Soufleris was texting [him] during the course of [his] testimony and did not review or utilize the text messages from Mr. Soufleris prior to answering

---

[7] For clarity, hereinafter, the Court will reference only Eastern Standard Time.
[8] An iMessage is a form of text message used by Apple electronic devices.

questions during the Arbitration." (*Id.* at 4). A review of the messages in conjunction with Hawley's testimony, however, entirely discredits Hawley's claims of ignorance and innocence. First, all of Hawley's testimony directly aligns in time and subject-matter with the messages being sent by Soufleris, and Hawley's testimony is always consistent with Soufleris's messages. (*Compare* Doc. 353-3 at 5–41 (showing Hawley's deposition testimony occurring between and 6:24 PM and 8:15 PM) *with* Doc. 355-1 at 2 (showing Soufleris's messages to Hawley between 6:24 PM and 8:12 PM)). Moreover, there are three specific instances during Hawley's testimony that establishes by clear and convincing evidence that his testimony was indeed being guided by Soufleris's messages.

At 6:25 PM, Hawley was asked, "[i]n fact, you signed numerous noncompetes with Absolute Medical, correct?" (Doc. 353-3 at 6). Hawley responded, "[o]ver the years, yes" but then corrected his answer to say "[o]n behalf of Hawley Med." (*Id.*). At this same time, at 6:24 PM by the timestamp of the messages, Soufleris had messaged Hawley, saying "[i]t was your corporate entity." (Doc. 355-1 at 2). This exchange shows that Hawley corrected his answer to clarify that he signed on behalf of his corporate entity—Hawley Medical—after being prompted to do so by Soufleris's message.

Between 6:28 PM and 6:29 PM, Hawley was directed to the language in a specific email he sent to "Nuvasive's leadership" and asked what it meant. (Doc.

353-3 at 9). At 6:28 PM, Soufleris sent Hawley a message stating that it was "[t]ypical *political* stuff to get you on his *good side*." (Doc. 355-1 at 2 (emphasis added)). Hawley then responded to the question about the email at 6:30 PM, stating that it was "one of those kind of *political* emails where I'm, you know, trying to get on the *good side* of the CEO of the company that I'm working for." (Doc. 353-3 at 10 (emphasis added)). Hawley's use of the exact terms "political" and "good side" surely indicate that his testimony was guided by Soufleris's message.

Finally, between 8:07 PM and 8:13 PM, Hawley was being questioned about a certain device that Hawley mailed to his new employer, Alphatec, as an example of what Alphatec needed to create to make its products function better. (*Id.* at 34–40). This line of questioning related to Plaintiff's allegations that Defendants improperly took Plaintiff's devices and gave them to Alphatec to copy. At 8:10 PM, Soufleris messaged Hawley, stating "Atec driver and Stryker," (Doc. 355-1 at 2), which were the two Alphatec products being discussed, (*see* Doc. 353-3 at 35–37). At 8:11 PM, Soufleris emphasized his previous "Atec driver and Stryker" message, and at 8:12 PM, Soufleris again messaged "Stryker." (Doc. 355-1 at 2). During this time, Hawley was specifically questioned about an email between himself and an Alphatec employee, where the employee thanked Hawley for sending Alphatec an "alternative driver." (Doc. 353-3 at 36). At first, at 8:10 PM—the exact time Soufleris was sending the first message and therefore before Hawley would have

had a chance to read it—Hawley testified that he could not remember what he mailed. (*Id.*). But then, at 8:12 PM—after Hawley would have had the opportunity to read at least the first message—he changed his testimony and stated that he had shipped the "ATEC driver," (*id.* at 39), which is consistent with Soufleris's message. However, counsel then questioned Hawley, asking "[w]hy would you need to ship an Alphatec product to Alphatec as an example of what they need to create?" (*Id.* at 39–40). Hawley, apparently noting the error of following Soufleris's directed responses, stated that "[y]eah, I guess that doesn't make sense." (*Id.* at 40).

All three of these examples, combined with the complete alignment of all of Hawley's testimony with Soufleris's messages, establishes by clear and convincing evidence that Hawley was reading Soufleris's messages in real-time while Hawley was testifying and conforming his testimony to Soufleris's messages. Given this compelling evidence, the Court finds that Hawley's declaration that he was not reviewing the messages is simply not credible. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, No. 1:09-md-2089-TCB, 2015 U.S. Dist. LEXIS 101474, at *46–47 n.13 (N.D. Ga. Aug. 3, 2015) (noting that "on a motion for sanctions, . . . credibility determinations are not reserved for the jury").

Turning back to the three-part Eleventh Circuit test for vacating an arbitration award, as to the first element—that the movant must establish the fraud by clear and convincing evidence—Plaintiff has done so. Hawley took an oath that no

unauthorized person could communicate with him during his testimony. Hawley violated that oath when Soufleris sent him messages telling Hawley how to answer questions, and Hawley conformed his answers to align with Soufleris's directions. Lying under oath is just the type of fraud envisioned by the provision of the FAA allowing for vacation of an arbitration award. *Bonar*, 835 F.2d 1378, 1383–84 (directing a district court to vacate an arbitration award due to perjury).

As to the second element—that the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration—certainly Plaintiff could not have discovered prior to arbitration that Soufleris was planning to improperly direct Hawley's testimony. Plaintiff contends that it also could not have discovered the fraud while it was ongoing because Hawley's testimony was occurring via video feed. (Doc. 353-1 at 3 (noting that "Soufleris was physically present in Atlanta, Georgia at the offices of his counsel, Bryan E. Busch" during his testimony, which occurred just prior to Hawley's testimony, and that "Hawley was physically present in the Orlando, Florida, metropolitan area")). The Court agrees. Plaintiff could not have possibly discovered that this was occurring because no one was in the room with Hawley at the time of his video testimony. This is especially true in light of Hawley's oath that he would not communicate with any unauthorized person during his testimony, which Plaintiff took to be true.

Finally, Plaintiff must demonstrate that the fraud materially related to an issue in the arbitration. "This last element does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred." *Bonar*, 835 F.2d at 1383. Some of the key issues in the arbitration were whether Defendants—including Hawley—executed non-competition agreements as were required by AM's 2017 Sales Agreement, whether Defendants violated those agreements, and if so, whether AM took any action to enforce the non-competition agreements. (Doc. 283-2 at 7 (discussing AM's "fail[ure] to secure annual non-compete agreements from at least two members of its salesforce (Hawley and Miller) for calendar year 2017, as it was contractually required to do"); Arbitration Partial Summ. J. Order, Doc. 283-1, at 6 (discussing the requirement that AM "vigorously enforce" the non-competition agreements and Plaintiff's claim relating to AM's failure to do so)). Hawley's testimony related directly to these issues. (*See generally* Doc. 353-3). Accordingly, the fact that Hawley's testimony, which was central to the issues before the arbitration panel, was procured by fraud establishes that the fraud materially related to an issue in the arbitration.

As a result of the fraud committed by Soufleris and Hawley—which has been proven by clear and convincing evidence, could not have been discovered by Plaintiff prior to or during the arbitration, and was materially related to an issue in the arbitration—this Court finds it necessary to vacate the Final Award issued by the

arbitration panel.[9] Given this conclusion, the Court is left to determine how to proceed with the count compelled to arbitration and the remainder of this litigation. The FAA provides that "[i]f an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators." 9 U.S.C. § 10(b). Defendants argue that the appropriate remedy is a new arbitration. (Doc. 360 at 18). Plaintiff simply requests "any such further and general relief as [the Court] deems just and appropriate." (Doc. 355 at 19).

The statutory language places complete discretion about how to proceed in this Court's hands. However, requiring Plaintiff to participate in a new arbitration proceeding would not be appropriate when the failure of the first "lengthy and costly multi-day arbitration hearing," (Defs.' Mot. for Reconsideration, Doc. 292, at 6), was due solely to Defendants' misconduct. Further, there is no evidence to demonstrate that Defendants would modify their unacceptable behavior in a new arbitration proceeding, and it would be extremely prejudicial to Plaintiff to require it to go through the time and expense of a new proceeding while simultaneously again delaying the remainder of this litigation. At this point in this years' long litigation, the Court is left to look for another remedy—one which finally resolves *all* of the misconduct that has occurred in this case and not just the fraud that

---

[9] For the same reasons, Defendants' Motion to Confirm must be denied.

occurred during the arbitration. Therefore, the Court will exercise jurisdiction over the arbitrated claims in conjunction with the ongoing litigation here to reach a final resolution. In doing so, the Court will reconsider the facts of Defendants' previous and ongoing misconduct here along with the most recent conduct by Defendants in the arbitration to craft an appropriate sanction.

## III.  SANCTIONS

### A.  Background

Some background regarding Defendants' misconduct before this Court is necessary to understand the sequence of events that have led to this juncture. Previously, after extensive consideration, the Court granted a motion by Plaintiff for Defendants' spoliation of evidence, ("Spoliation Motion," Doc. 203), citing Defendants' intentional "wholesale destruction of evidence in this case," including an entire email domain, additional email accounts, and text messages from multiple cell phone numbers belonging to Defendants, all of which contained evidence relevant to the issues in this case.[10] (Doc. 290 at 18; *id.* at 10–21, 56–57). The Court concluded that "[t]he facts regarding Defendants' spoliation of vast amounts of evidence in this case are clear. Defendants were on notice to preserve evidence relevant to this case. Defendants and their counsel not only failed to take reasonable

---

[10] The Court's Summary Judgment Order, which included consideration of the Spoliation Motion, is incorporated by reference into this Order. (*See generally* Doc. 290).

steps to preserve that evidence, . . . but *intentionally destroyed* vast amounts of evidence. And most of the spoliated evidence cannot be restored or replaced." (*Id.* at 18). In reaching that conclusion, the Court also expressed grave concerns about "Defendants' previous penchant for duplicity on the record in this litigation," Defendants' "lack [of] credibility," and Defendants' counsel's[11] role in the evidence spoliation. (*Id.* at 16, 20). As a result, pursuant to the legal authority set forth in Federal Rule of Civil Procedure 37(e), "in the exercise of its discretion, the Court" determined that the appropriate sanction would be to "'presume that the lost information was unfavorable to [Defendants]'" and, if this case proceeds to a jury trial, . . . 'instruct the jury that it . . . *must* presume the information was unfavorable to [Defendants].'" (*Id.* at 20 (footnote omitted) (quoting Fed. R. Civ. P. 37(e)(2)(A)– (B) (emphasis added))). The Court also required Defendants' counsel to show cause as to why he should not be sanctioned for his role in the spoliation. (*Id.* at 57). However, based on the conduct during the arbitration that has most recently come to light, the Court is left to reconsider its previous exercise of discretion under Rule 37(e) for the evidence spoliation combined with Defendants' conduct during and following the arbitration.

---

[11] Defendants' only counsel involved in the spoliation of evidence was Mr. Bryan E. Busch. (Doc. 290 at 14, 20–21). None of the other counsel of record in this case are implicated.

Following Defendants' fraud during the arbitration, as noted above, the Court permitted the parties to file a new Case Management Report and file a second round of dispositive motions associated with the counts that had previously been stayed pending completion of the arbitration. During this time—while Defendants were actively defying the Court's discovery Order requiring the text messages to be produced—Defendants vigorously argued in no less than four motions before the Court that the Court was bound by the Final Award in the arbitration for Count II as applied to most of the remainder of the counts pending in this litigation. (*See* Doc. 292 at 6–7; Doc. 308 at 2, 4–10; Doc. 312 at 4–7 (also arguing that Count III should be compelled to arbitration); Defs.' Mot. for Partial Reconsideration, Doc. 341 at 1–2).[12] In other words, Defendants were attempting to have this Court enforce their fraudulently obtained arbitration award and to use that award to legally bar most of the remaining claims in this case. Thus, Defendants not only committed fraud in the arbitration, but they also attempted to commit fraud in this Court.

---

[12] The Court previously considered and rejected these arguments on the merits. (Oct. 25, 2021 Order, Doc. 331, at 7–9; Nov. 12, 2021 Order, Doc. 334, at 6–11, 13–14; Nov. 16, 2021 Order, Doc. 346, at 2–3).

**B.     Legal Standard**

Both Rule 37(e), which governs sanctions for the previous spoliation of electronically stored information, and the Court's inherent sanction authority are relevant here.

*1.     Rule 37(e)*

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009). Federal Rule of Civil Procedure 37(e), which governs the spoliation of electronically stored information states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default
judgment.

Fed. R. Civ. P. 37(e); *see Williford v. Carnival Corp.*, No. 17-21992-CIV-
COOKE/GOODMAN, 2019 U.S. Dist. LEXIS 88808, at *13–17 (S.D. Fla. May 28,
2019) (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).

## 2. *Inherent Authority*

Courts have an inherent sanctioning power, not arising from rule or statute.
*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 46 (1991). "[A] federal court may resort
to its inherent power to sanction an attorney or a party for bad faith conduct." *Byrne
v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001). "This includes the power 'to
fashion an appropriate sanction for conduct which abuses the judicial process.'"
*Hernandez v. Acosta Tractors, Inc.*, 898 F.3d 1301, 1306 (11th Cir. 2018) (quoting
*Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir.
2017)). However, this power "must be exercised with restraint and discretion,"
*Chambers*, 501 U.S. at 44, and "key to unlocking a court's inherent power is a
finding of bad faith," *Purchasing Power*, 851 F.3d at 1223.[13] "And such a bad faith
finding must be made in compliance 'with the mandates of due process,' requiring

---

[13] "[A] court has inherent power . . . to sanction a party who has acted in bad faith,
vexatiously, wantonly, or for oppressive reasons." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 382
(2013).

fair notice and an opportunity to be heard." *Hernandez*, 898 F.3d at 1306 (quoting

*Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1257 (11th Cir. 2012)).

## C.    Analysis

In the many years that the Undersigned has practiced law and sat on the bench

as a state and then federal court judge, never has he witnessed conduct so persistently

contrary to the principles of our judicial process as the actions by Defendants in this

case. That misconduct must be stopped.

Previously, the Court has strenuously attempted to exercise restraint and

discretion when levying sanctions in this case. From the early stages of this case, at

the preliminary injunction hearing, the Court recognized and brought to Defendants'

attention that they were not being truthful with the Court. (Prelim. Inj. Hr'g Tr., Doc.

79, at 118 (discussing Defendants' untruthful answers to discovery requests and

complete memory failures on cross-examination despite having perfect recall on

direct examination)). Then the Court went through exhaustive efforts to recover

evidence intentionally spoliated by Defendants. (*See* Jan. 3, 2020 Order, Doc. 219

at 1–2 (discussing attempts to recover the deleted emails); Defs.' Notice of

Compliance, Doc. 220, at 1–2 (discussing same); Defs.' Notice of Compliance, Doc.

221, at 1–2 (discussing same)). Still, the Court exercised restraint under Rule 37(e),

opting for lesser sanctions while allowing Defendants to show cause for their

conduct. (Doc. 290 at 20 n.17). Ultimately, the Court's repeated attempts to curb

Defendants' conduct have been fruitless. While the Court was attempting to impose the least severe sanction necessary, Defendants meanwhile were continuing their abusive behavior, this time in the arbitration proceeding. Finally, Defendants chose to bring that fraud here to this Court by subverting a discovery Order and attempting to obtain judgment on all claims based on the result of the arbitration.

Thus, the Court now considers the ultimate sanction of default. "'Ultimate sanction' cases . . . rest upon the conviction that no lesser sanction will prevent the offending litigant from continuing to lie or distort the truth so pervasively that it 'prevent[s] the opposing party from fairly presenting his case or defense.' Use of the 'ultimate sanction' addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of courts, which otherwise 'cannot command respect if they cannot maintain a level playing field amongst participants.'" *Chemtall Inc. v. Citi-Chem, Inc.*, 992 F. Supp. 1390, 1409 (S.D. Ga. 1998). For the numerous reasons outlined in this Order—and the Court's previous Orders—default judgment against all Defendant appears to be the appropriate resolution to this case.

However, pursuant to the Court's inherent sanction authority, when the Court is considering sanctioning a party or an attorney, the Court must comply with "with the mandates of due process." *Hernandez*, 898 F.3d at 1306 (quoting *Kornhauser*, 685 F.3d at 1257). "[C]omplying with the mandates of due process means that the

[party or] attorney must, first, be afforded 'fair notice that [their] conduct may warrant sanctions and the reasons why,' and, second, 'be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify [their] actions.'" *Kornhauser*, 685 F.3d at 1257–58 (quoting *Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1575–76 (11th Cir. 1995)). Therefore, all Defendants will be required to show cause as to why this Court should not grant default Judgment to Plaintiff on all counts and award attorneys' fees and costs.

To be clear, Defendants have had ample due process and opportunity to respond to the factual allegations against them, and the Court has concluded the weighing of evidence. The factual findings in this Order should not be argued in Defendants' response. Instead, in an abundance of caution to ensure every aspect of due process is provided, the Court will hear from Defendants on the limited legal issue of whether default judgment and an award of fees and costs is the appropriate sanction.

### D.    Mr. Busch

As noted, Defendant's counsel, Mr. Busch, was previously ordered to show cause as to why sanctions should not be imposed on him for his actions relating to Defendants' spoliation of evidence. That issue remains outstanding. Unfortunately, it has now become clear that Mr. Busch's complicity may run even deeper than first anticipated. Specifically, it appears that Soufleris was in Mr. Busch's office with

him while sending Hawley messages, perpetrating the fraudulent arbitration. (Doc. 353-1 at 3). Moreover, Mr. Busch attempted to commit fraud on this Court by openly defying the Court's discovery Order and by making legal arguments that the arbitration award that he knew was obtained fraudulently had a binding effect on the claims here. Therefore, Mr. Busch will also be ordered to show cause as to why he should not be held jointly and severally liable with Defendants for an award of attorneys' fees and costs.

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Absolute Medical, LLC's and Absolute Medical Systems, LLC's Motion to Confirm Arbitration Award (Doc. 333) is **DENIED**.

2.  Plaintiff's Motion to Vacate Arbitration Award (Doc. 353) and Sealed Motion to Vacate Arbitration Award (Doc. 355) are **GRANTED**.

    a.  The Arbitration Award (Doc. 283-2) is **VACATED**.

3.  **On or before January 17, 2022**,[14] Defendants shall **SHOW CAUSE** as to:

---

[14] Absent extraordinary circumstances, this deadline shall not be extended due to the impending jury trial scheduled to begin on February 7, 2022.

a. why default judgment should not be granted to Plaintiff and against all Defendants on all counts;

b. why attorneys' fees and costs should not be awarded to Plaintiff; and

c. why Defendants and their attorney Bryan E. Busch should not be jointly and severally liable for the award of attorneys' fees and costs.

d. Defendants and Mr. Busch may file a Response of **no more than ten pages**.

e. While Plaintiff need not file a Reply, if Plaintiff wishes to file a Reply, it shall do so **on or before January 24, 2022**, and the Reply shall be **no more than five pages**. If Plaintiff chooses to not file a Reply, Plaintiff shall file a notice on the record to that effect in order to most expeditiously handle this matter.

4. Defendants' Motion to Strike Declaration of Clayton (Doc. 368) is **DENIED as moot**.

5. This Order is currently filed under seal based on the sealed status of several documents addressed herein. However, **on or before February 9, 2022**, the parties shall file a joint proposed redacted version of this

Order, which can be placed on the public docket. Failure to do so will result in the full unredacted Order being placed on the public docket.

**DONE** and **ORDERED** in Orlando, Florida on January 10, 2022.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record