# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

NUVASIVE, INC.,                         )
                                        )
      Plaintiff,                   )
                                        )
v.                                      )    Case No. 6:17-cv-2206-CEM-LHP
                                        )
ABSOLUTE MEDICAL, LLC, et al.,          )
                                        )
      Defendants.                  )

## NUVASIVE, INC.'S POST-HEARING MEMORANDUM ON DAMAGES

In an October 23, 2024, Evidentiary Hearing (the "Hearing") the Court received evidence regarding the profits NuVasive lost due to Defendants'[1] violations of the 2017 Sales Agreement between AM and NuVasive (the "Sales Agreement") and Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). Additionally, the Parties confirmed their agreement about the amount of attorneys' fees NuVasive can recover and Defendants conceded NuVasive's right to pre- and post-judgment interest on any lost profits award.

Without limitation, this Memorandum addresses the operative "substantial evidence" standard for quantifying lost profits and NuVasive's satisfaction of that standard. This includes discussion of the causal links tying

---

[1] Defendants are Absolute Medical, LLC ("AM"), Absolute Medical Systems, LLC ("AMS"), and Gregory Soufleris. (Doc. 426, H'rg Tr., ("Tr.,"), 7:13–23).

Defendants' bad acts to the amounts of NuVasive's lost profits (distinguished from the ruling that established Defendants caused NuVasive to lose profits).

## I. NUVASIVE IS ENTITLED TO ITS LOST PROFITS THAT ARE CAUSALLY CONNECTED TO DEFENDANTS' BAD ACTS.

Delaware law, which governs the Sales Agreement, requires breach of contract plaintiffs to prove an entitlement to recover damages by a preponderance of the evidence. *Abbvie Endocrine, Inc. v. Takeda Pharm. Co.*, No. 2020-0953-SG, 2023 Del. Ch. LEXIS 360, at *6 (Del. Ch. Sept. 5, 2023).[2] Then, plaintiffs must produce "substantial evidence" of the amount of their damages. *Id*. (citing *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (proof to establish the amount of damage is less than to establish the fact of damage).[3] Here, the November 22, 2023, default judgment (Doc. 395), established Defendants' liability and entitled NuVasive to recover lost profits. (Tr., 31:11–15, 34:16–35:2). At the Hearing, NuVasive introduced substantial evidence (much of it in the form of causal connections) of the lost profits that flowed from Defendants' conversion of its business at Central Florida Regional

---

[2] Lost profits are also recoverable under FDUTPA. *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-2274-VMC-TGW, 2022 U.S. Dist. LEXIS 142861, *54 (M.D. Fla. Aug. 10, 2022); *Tymar Distribution LLC v. Mitchell Grp. United States, LLC*, 558 F. Supp. 3d 1275, 1283, 1286 (S.D. Fla. 2021). Recovering lost profits requires claimants to establish liability by a preponderance of the evidence. *Flogrown v. Heritage*, No. 6:17-cv-983-Orl-18GJK, 2019 U.S. Dist. LEXIS 239038, *7 (M.D. Fla. Jan. 28, 2019).

[3] *See also, SIGA Techs., Inc. v. Pharmathene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015) (amount of damages can be an estimate); *Abbvie*, 2023 Del. Ch. LEXIS 360 at *7 (same); *Re v. Gannett Co., Inc.*, 480 A.2d 662, 668 (Del. Super. 1984), *aff'd*, 496 A.2d 553 (Del. 1985). Similarly, FDUTPA requires the amount of damages "be proven with certainty." *Fort Lauderdale Lincoln Mercury v. Corgnati*, 715 So. 2d 311, 314 (Fla. Dist. Ct. App. 1998).

Hospital ("CFRH"), where Drs. Burry, Rodas, and Allende operate, and Florida Hospital Orlando ("FHO"), where Drs. Sawin, Rosen, and Gandhi operate, through violations of the Sales Agreement and FDUTPA.

## A. **Substantial evidence causally links Defendants' bad acts to NuVasive losing $13,645,940 in profits in Central Florida.**

At the Hearing, Soufleris and former NuVasive sales executive, Mark Singer, established that Defendants developed deep relationships with surgeons in Central Florida (especially Dr. Sawin) while contractually performing as exclusive distributors and sales representatives for NuVasive, that Soufleris leveraged those relationships to negotiate contract terms with Alphatec, and that, after doing so, Defendants utilized those relationships to illegally convert NuVasive's business in that market to Alphatec (and other companies they represented) within days of informing NuVasive of their intent to no longer honor the Sales Agreement's terms.  (Tr., 26:16–32:15, 57:7–8; **Ex. 2**; **Ex. 14**; **Ex. 20**).  NuVasive's expert witness, Misty Decker, then quantified NuVasive's lost profits that flowed from Defendants' contractual breaches at $13,645,940.  As Defendants failed to provide an alternative damages model and substantial evidence supports the reasonableness of Decker's opinions, the Court should adopt her opinions and award NuVasive $13,645,940 in lost profits that, as reflected in Decker's report, are:

| | |
|---|---|
| Term Biologics | $2,713,139 |
| Term Hardware | $9,727,708 |
| Non-Compete Biologics | $254,786 |
| Non-Compete Hardware | $950,307 |
| **Total:** | **$13,645,940** |

## 1. Substantial evidence is such relevant evidence that the Court might accept to support a conclusion as to lost profits.

In 1988, the Delaware Supreme Court held "[s]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is "defined as more than a scintilla but less than a preponderance of the evidence." *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988). Following *Breeding*, Delaware courts – determining if substantial evidence supports claimed lost profits – consider that:

> [p]roof of the fact of damages in a lost profits case means proof that there would have been some profits. If the plaintiff's proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery. But once this level of causation has been established for the fact of damages, less certainty (perhaps none at all) is required in proof of the amount of damages. While proof of the fact of damages must be certain, proof of the amount can be an estimate, uncertain, or inexact.

*Agilent Techs., Inc. v. Kirkland*, 2010 Del. Ch. LEXIS 34, at *116 n.271 (Del. Ch. Feb. 18, 2010) (quoting Robert L. Dunn, Recovery of Damages for Lost Profits § 1.3 at 11 (6th ed. 2005)). Further, the "circumstances surrounding a breach also can affect the level of proof required to sustain an award of

expectation damages." *Pharmathene, Inc. v. SIGA Techs., Inc.*, No. 2627-VCP,

2014 Del. Ch. LEXIS 142, at *25 (Del. Ch. Aug. 8, 2014).   To that end,

Delaware's "wrongdoer rule" provides that:

> [d]oubts [about the extent of damages] are generally resolved
> against the party in breach. A party who has, by his breach, forced
> the injured party to seek compensation in damages should not be
> allowed to profit from his breach where it is established that a
> significant loss has occurred. A court may take into account all the
> circumstances of the breach, including willfulness, in deciding
> whether to require a lesser degree of certainty, giving greater
> discretion to the trier of the facts. Damages need not be calculable
> with mathematical accuracy and are often at best approximate.

*Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, 2001 Del. Ch. LEXIS 132,

at *64 (Del. Ch. Oct. 22, 2001) (quoting Restatement (Second) of Contracts §

352 cmt. a (1981)).   In other words, "if a defendant's wrongful conduct

contributed to uncertainty in the calculation of damages, the perils of such

uncertainty should be laid at the defendant's door." *NetApp, Inc. v. Cinelli*, No.

2020-1000-LWW, 2023 Del. Ch. LEXIS 220, at *47 n.303 (Del. Ch. Aug. 2, 2023)

(internal quotation omitted); *see also SIGA*, 132 A.3d at 1111 ("When a party

breaches a contract, that party often creates a course of events that is different

from those that would have transpired absent the breach.  The breaching party

cannot avoid responsibility for making the other party whole simply by arguing

that expectation damages based on lost profits are speculative because they

come from an uncertain world created by the wrongdoer.").

The First Circuit recently applied the substantial evidence standard in affirming the trial court's reliance on Decker's findings of "specific damages amounts based on her examination of multiple factors, including historical sales data, actual sales in the relevant period," and the defendant's projected sales. *NuVasive v. Day*, 77 F.4th 23, 30 (1st Cir. 2023) ("*Day II*").  In making this ruling, the *Day II* Court noted Decker's testimony about causal links between the defendant's bad acts and the plaintiff's losses, including a "drop in NuVasive's sales to [the subject] surgeons in Q2 of 2019 [and] the uptick in Alphatec's sales in the same period." *Id*. at 30 n.8.  Indeed, the court found that "[t]he record here contained an abundance of circumstantial evidence from which the district court supportably inferred the causal link between [defendant's] breaches and [plaintiff's] harm." *Id*. at 29 n.6.

### 2. Defendants' violations of the Sales Agreement and FDUTPA resulted in significant harm to NuVasive.

At the Hearing, this Court heard substantial evidence that NuVasive incurred a significant loss of profits due to Defendants' violations of the Sales Agreement and FDUTPA.  To wit, AM exclusively distributed NuVasive's spinal hardware and biologics in Central Florida "for years" before entering into the Sales Agreement on January 1, 2017.  (Tr., 27:14–18, 40:2–5, 51:5–13; **Ex. 10**).  Among other things, that Sales Agreement required AM to continue exclusively selling NuVasive's products for five years in Central Florida and

precluded it from competing with NuVasive in that territory for one year after the Sales Agreement's termination.  (Tr., 25:21–26:9, **Ex. 10**, §§ 1.01, 5.09).  Nevertheless, Defendants began scheming to violate the Sales Agreement shortly after it was signed.  As part of this scheme, on October 10, 2017, Soufleris emailed his brother a draft business plan (the "Business Plan") that described his desire and ability to move AM's business to NuVasive's direct competitor, Alphatec.[4]  (Tr., 26:16–27:13; **Ex. 14**).   This Business Plan articulated Soufleris' promise to generate $30-40,000,000 in revenue for Alphatec in two years, including $20,000,000 in revenue in 2018 through, for example, "[C]omprehensive non-compete avoidance."  (Tr., 28:7–16; **Ex. 14**).

Later in October, Soufleris visited Alphatec's San Diego, California, headquarters and began negotiating terms with Alphatec's General Counsel, Craig Hunsaker, to realign AM with Alphatec, which, at the time, had no sales representatives in the Central Florida area.   (Tr., 29:2–22, 52:15–53:12).  Consistent with his Business Plan, Soufleris stressed his ability to immediately generate revenue in Central Florida (where he and AM represented NuVasive) and demanded additional compensation for his ability to do so.  (Tr., 29:23–30:17, 31:20–32:8; **Ex. 2**; **Ex. 20**).

---

[4] Slide 4 of the Business Plan states Soufleris will follow Alphatec President Pat Miles "anywhere on the planet."  (Tr., 27:24–28:6; **Ex. 14**, p. 4).

After coming to terms with Alphatec in late November 2017, Soufleris caused AM (including AM's sales representatives) to stop performing its obligations under the Sales Agreement (leaving NuVasive with no sales representation in the territory), formed AMS, and (through AMS) began converting NuVasive's spinal hardware and biologics business in Central Florida to Alphatec and other companies that compete with NuVasive.  (Tr., 27:19–23, 39:24–40:1, 53:13–20).  Due to Defendants' relationships with local surgeons, the results were immediate and permanent.   (Tr., 54:3–56:25). Indeed, despite having never utilized its products, Dr. Sawin moved his business to Alphatec (and other companies represented by AMS) in early December 2017, and Drs. Rosen, Gandhi, Rodas, Burry, and Allende followed by the end of January 2018.  (Tr., 35:25–37:4, 37:20–39:14, 40:2–43:10, 57:6–58:11; **Ex. 6**; **Ex.12**; **Ex. 41**; **Ex. 43**).

### 3.  Decker reasonably quantified NuVasive's lost profits.

After Defendants agreed to her qualifications to do so, NuVasive's damages expert, Misty Decker,[5] quantified the profits NuVasive lost due to the conversion of the CFRH and FHO surgeons' business using the before and after method, which the Parties agree is a proper method for measuring lost profits.

---

[5] Decker attached her CV to her Report and discussed her qualifications at the Hearing.  (Tr., 70:22–72:19, 76:4; **Ex. 1** at Ex. A).

(Tr., 9:18–11:11, 71:20–72:19; **Ex. 1**[6]).  Courts applying the substantial evidence rule award damages where future lost profits are capable of being calculated by extrapolating from a plaintiff's sales data prior to the breach. *Agilent*, 2010 Del. Ch. LEXIS 34, at *103-16; *Beard Research*, 8 A.3d at 613 ("Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate.").  In *Agilent*, the plaintiff's expert analyzed sales data and market share, which provided substantial evidence of its lost profits.  *Agilent*, 2010 Del. Ch. LEXIS 34, at *108–16.  As here, the opposing expert "failed to present a compensatory damages calculation of his own," and, instead, did "little more than point out potential flaws" in the plaintiff's damages analysis.  *Id.* at *112. After finding the defendants did not "show that [the plaintiff's] estimated damages are unreasonable[,]" and "because the defendants failed to reconstruct a plausible" alternative, the court adopted the plaintiff's lost profits estimate.  *Id.* at *112, 115.

---

[6] The Court conditionally admitted Decker's expert report as **Exhibit 1**.  (Tr., 75:8–14, 85:12–18).  It is well-within the Court's discretion to do so in bench trials/evidentiary hearings such as the Hearing.  *See U.S. v. Philip Morris USA Inc.*, No. 99-2496 (PLF), 2021 U.S. Dist. LEXIS 181650, at *20–23 (D.D.C. Sept. 23, 2021) (admitting expert reports in an evidentiary hearing to "aid the Court in assessing the weight of expert testimony on technical and complex issues"); *Axiom Worldwide, Inc. v. Excite Med. Corp.*, 591 F. App'x 767, 777 (11th Cir. 2014) (it is "the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

As in *Agilent*, the Court should adopt Decker's opinions on NuVasive's lost profits. Utilizing the before and after method required Decker to determine the amount of NuVasive's "but-for sales," which are the sales NuVasive would have made had Defendants not violated the Sales Agreement and the FDUTPA. (Tr., 97:11–98:18). To do this, she calculated NuVasive's projected sales attributable to the relevant surgeons (which included determining the dates those surgeons performed spine surgeries within Central Florida) then subtracted sales NuVasive made to each surgeon (the "mitigating sales") during the relevant time to determine NuVasive's but-for sales. (Id.) Decker then calculated NuVasive's lost profits by subtracting its avoided spending (*e.g.* the cost of goods sold and avoided commissions) from its but-for sales. (Tr., 98:4–100:11, 102:7–103:19; **Ex. 1** at D-11, D-12). She further reduced her quantification of NuVasive's lost profits after considering information about COVID's effect on the number of spine surgeries being performed, which she obtained from her discussions with NuVasive executives and review of relevant literature. (Tr., 100:12–102:6; **Ex. 1** at D-8, D-9, D-10). Decker noted Soufleris expected to move more business than she found they did. (Tr., 96:3–16; **Ex. 14**).

As is typical for economic experts, Decker does not opine about legal causation. (Tr., 108:5–15).[7]  However, she testified about "the reasonable certainty criteria" and "causal links" she considered while analyzing the evidence the Parties rely upon. (Tr., 79:20–80:9, 108:15–109:8).  These causal links – which are financial correlations between bad acts and damages – include the "critical" relationships between the sales representatives and the surgeons, which are so important that Defendants' sales representatives admit to providing competitive products to surgeons, including Dr. Sawin, without receiving a commission to "keep competitors out of the OR."  (Tr., 108:20-112:25).  They also include Defendants' exploitation of their relationships with these surgeons to quickly convert their business to utilizing products with which they had no experience, especially Dr. Sawin, whom she noted, recorded a video recognizing Hawley's critical contribution to his work and stated in text messages that Soufleris is like a son to him.  (Tr., 109:9–113:8, 114:24–116:8; **Ex. 1** at pp. 13-17, D-6; **Ex. 46**).

Defendants make two general critiques of Decker's opinions: that she calculates lost profits through the Sales Agreement's non-compete year and that her calculation of lost profits do not equate to Alphatec's gains, neither of

---

[7] *See, e.g., Actava TV, Inc. v. Joint Stock Co. "Channel One Russ. Worldwide"*, No. 18-cv-06626 (ALC), 2023 U.S. Dist. LEXIS 43933, at *15-16 (S.D.N.Y. Mar. 15, 2023) (causation "issues are better resolved by the trier of fact and go to the weight given to [expert] opinions rather than their admissibility").

which has merit.  (Doc. 407, pp. 17–22, 24).  First, Defendants fail to cite any authority as to why Decker should not consider the non-compete year when calculating lost profits attributable to the surgeons with whom Defendants did business through December 31, 2022[8] (Drs. Rosen, Gandhi, Burry, and Rodas), which encompasses the term of the Sales Agreement and the non-compete year.  (**Ex. 10**, § 5.09(c) ("During the Term and for a period of twelve (12) months thereafter . . .")).  Second, it is NuVasive's losses and not Alphatec's gains that are relevant. (Tr., 129:21–130:3, 199:25–200:6).  Indeed, one cannot accurately compare the two because:

- the Alphatec sales data Defendants produced is incomplete;
- reliance upon the Alphatec data does not consider the other products (including implants and biologics[9]) that Defendants sold after they stopped complying with the Sales Agreement; and
- Miller's undercutting of NuVasive's pricing to his customers.

(Tr., 130:3–132:18).

Defendants' more specific critique of Decker's opinion that NuVasive incurred $1,658,016 in lost profits due to their conversion of its business at CFRH also has no merit.  (Tr., 150:1–13).  Of that amount, Defendants limit their challenge to a portion of Decker's assignment of $411,091 in lost profits

---

[8] Defendants admit causing $786,537 of the $992,646 in lost profits Decker attributes to their conversion of Drs. Burry's and Rodas' business, failing only to admit to the lost profits NuVasive incurred during the non-compete year.  (Doc. 407, pp. 3, 29; Tr., 129:11–14).

[9] The record reflects that Defendants sold nearly $1,000,000 of Trinity's biologic product through July 9, 2018, to FHO that Drs. Sawin, Rosen, and Gandhi utilized.  (Tr., 133:4–25; **Ex. 41**).

to Dr. Allende by claiming (with no evidence) that Dr. Allende stopped practicing in Central Florida prior to the end of 2019.  (Tr., 123:1–19, 126:4–6).   Contrary to this unsupported claim, Alphatec's sales records, Decker's utilization of the "Wayback Machine," and Singer's testimony support Decker's testimony that she properly calculated lost profits attributable to the decline in Dr. Allende's usage of NuVasive's products through December 31, 2019, as Dr. Allende operated in Central Florida until at least that time.  (Tr., 53:21–54:5, 123:23–125:22; **Ex. 1** at pp. 20-21).

As to the surgeons affiliated with FHO (Drs. Rosen, Gandhi, and Sawin), Defendants' sole claim about her allocation of lost profits from Drs. Rosen's and Gandhi's practice[10] is that she overstated those lost profits by failing to consider their utilization of a competitive spine company's surgical robot as reason for those losses.  In response, Decker stood by her Report's finding that the lost profits attributable to declines in Dr. Rosen's and Dr. Gandhi's usage amounted to $4,050,210 and $843,869, respectfully, as the robot was not available to those doctors until at least four months after Defendants converted Drs. Rosen's and Gandhi's business.[11]  (Tr., 126:9–22, 128:9–129:20, 149:17–25; **Ex. 1** at pp. 18-20).

---

[10]  Defendants base this claim solely on testimony that Hawley gave in the arbitration that constitutes inadmissible hearsay (setting aside its credibility) as there is no evidence he was unavailable at the Hearing.  (Tr., 126:9–22).

[11]  Even if the robot was available, Defendants' failure to honor the Sales Agreement left NuVasive with no sales representation in an area where it is a difficult and lengthy endeavor

Next, Decker attributes $7,093,845 in lost profits to Dr. Sawin. (Tr., 148:11–24; **Ex. 1** at D-11). In support of this calculation, Decker testified about causal links connecting Defendants' behavior and Dr. Sawin's decision to stop utilizing NuVasive products in favor of Alphatec's and other companies' products distributed by Defendants that cause her to disregard the claim that Defendants played no role in that decision.[12] (Tr., 109:9–110:7, 111:7–122:44, 174:23–178:18, 206:13–217:20, 219:14–220:7; **Ex. 1** at pp. 13-18; **Ex. 3**; **Ex. 5**; **Ex. 38**). For example, Dr. Sawin acknowledged Hawley was critical to his work in the operating room, that he almost exclusively utilized NuVasive's products, and never utilized Alphatec products until December 2017, when Defendants began distributing Alphatec's (and other competitive companies') products. (Tr., 112:8–19, 115:4–117:10, 174:23–178:4; **Ex. 14**). Additional causal links include communications in which Dr. Sawin, after moving his practice "lock, stock and barrel" from NuVasive, expresses dissatisfaction with Alphatec's products (stating that using them compromises patient care) and customer

---

to replace sales representation. (Tr., 56:3–17, 68:7–20, 127:5–128:22, 166:1–23, 168:8–169:12, 170:15–171:15).

[12] At the Hearing, Soufleris testified that he did not "ask" Dr. Sawin to move his business from NuVasive to Alphatec. (Tr., 45:16–18). Absent from this answer or any evidence presented at the Hearing is testimony that Defendants' sales representatives did not ask Dr. Sawin to do so or that Soufleris did not ask Dr. Sawin to utilize Alphatec's products, encourage Dr. Sawin to move his business, discuss Alphatec's (and other companies') competitive products with Dr. Sawin, or provide those competitive products to Dr. Sawin. To the contrary, **Exhibits 28** and **29** indicate that Soufleris traveled to Alphatec's headquarters with Dr. Sawin in January of 2018. (Tr., 46:6–49:6). Similarly, **Exhibits 12, 41**, and **43** show that AMS, through Hawley, provided biologic products to Dr. Sawin and others at FHO. (Tr., 35:5–39:22).

service, and Hawley requesting Alphatec mimic custom instruments NuVasive created for Dr. Sawin.[13]  (Tr., 113:2–114:20, 120:7–121:8; **Ex. 3**;[14] **Ex. 5**).

Courts analyzing expert testimony as to causal links between a breach and damages undertake fact-specific inquiries to ensure the conclusions are based on reliable data or reasonable assumptions.  In *Globus Medical, Inc. v. Jamison*, the defendants challenged Decker's lost profits calculations on seven grounds, including that the sales representatives covered different surgeon-customers after they left plaintiff's employ, customer excess inventory led to decreased sales, plaintiff's pricing caused the sales decrease, and that one customer left practice in the contract's covered area.  No. 2:22-cv-282, 2024 U.S. Dist. LEXIS 203564, at *21-23 (E.D. Va. Nov. 7, 2024).  In response, the plaintiff successfully argued Decker did not need to establish causation for her testimony to be relevant, and was required only to show the damages were linked to the wrongful act with reasonable certainty.  *Id.* at *23.  The court also

---

[13] Assisting competitor's creation of custom instruments to aid surgeon's utilization of that competitor's products is a type of causal link relied upon by the district court and affirmed in *Day II*.  77 F.4th at 28. (affirming district court's disregard of surgeon's testimony that he moved his business independent of defendant sales representative's actions due, in part, to defendant's assistance in obtaining custom instruments).

[14] **Exhibit 3** is Dr. Sawin's August 2018 correspondence to Alphatec executives that states that he "moved [his] practice lock, stock and barrel to ATEC nearly a year ago with the promise that, even though the products were marginal, a concerted effort would be made to make them usable. To date, this has been largely an unrealized promise." It also contains Dr. Sawin's description of Alphatec's products as "pedestrian," "a god-awful, miserably-designed-and-executed mess," "a joke," and "embarrassingly engineered and non-functional" among other criticisms. Though the Court may choose to not introduce this correspondence into evidence, Decker testified about it and its effect on her opinions.  (Tr., 114:7–115:6, 207:24–208:23, 211:21–212:18).

distinguished cases the defendants cited in support of their argument that Decker failed "to establish a sufficient connection between alleged wrongdoing and damages" because they "offer[ed] examples of an extreme disconnect between the facts of the case and assumptions made by experts preparing testimony." *Id.* at *24. The court found her testimony was not too speculative and her conclusions sufficiently reliable, as she quantified lost sales using data that did not contradict evidence in the record. *Id.* at *18-21.[15]

As in *Jamison*, Decker bases her opinions on reliable data that does not contradict any evidence in the record. Her report and testimony at the Hearing establish that she reasonably calculated NuVasive's lost profits using conservative projections for the relevant time, discounted for legitimate factors (*e.g.*, Dr. Sawin's retirement, Dr. Allende's relocation, the COVID pandemic), and disregarded factors with unreliable or negligible effects (*e.g.*, Alphatec's sales data, the Globus robot).[16] Further, Decker's conclusions as to lost profits are consistent with Singer's and Soufleris' testimonies and the exhibits entered

---

[15] Another example is *CardioNet, LLC v. Mednet Healthcare Techs., Inc.*, where the defendant argued for denial of lost profits because the plaintiff's expert failed to sufficiently show causal links to the wrongful acts. 146 F. Supp. 3d 671, 696 (E.D. Pa. 2015). The defendant relied on precedent with an analogous fact pattern that the *CardioNet* court distinguished as the plaintiff "provided evidentiary support for its damages calculation through the testimony of [the CEO-fact witness]" and noted the record was "not devoid of evidence to support an award of lost profits," even if not one-hundred percent of the damages claimed in the expert's model. *Id.* at 696 n. 29.

[16] *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 87 (1st Cir. 2017) (an expert is "not required to eliminate every other possible cause").

into the record at the Hearing.  Standing alone, this is enough for the Court to accept Decker's opinions.

**B. <u>Defendants failed to present evidence that diminished the causal links between their bad acts and NuVasive's lost profits.</u>**

Decker attributes NuVasive's lost profits to Defendant's conversion of its Central Florida business.  Defendants, like the *Agilent* defendants, presented no witnesses at the Hearing, choosing instead to argue that Decker overstated NuVasive's lost profits solely through cross-examinations of Soufleris and Decker and Dr. Sawin's declaration and arbitration testimony (which is subject to a pending motion *in limine* (Doc. 421)).  Defendants' presentation did not affect (much less negate) the reasonableness of Decker's calculations. Even if Decker's conclusions rest on projections, the Court should weigh those issues in Decker's testimony, rather than disregard her findings.[17]  If the Court considers Dr. Sawin's declaration and arbitration testimony, it should weigh his statements against evidence that "either directly or indirectly contradicted

---

[17] *See Dexon Comput. Inc. v. Cisco Sys.*, No. 5:22-cv-53-RWS-JBB, 2024 U.S. Dist. LEXIS 99496, at *26 (E.D. Tex. Jan. 12, 2024) (relying upon plaintiff's expert  report as the defense expert "proposed no alternative damages method, [] the Court does not find exclusion warranted"); *Autotech Techs., Ltd. P'ship v. Palmer Drives Controls & Sys.*, No. 19-cv-00718-PAB-NRN, 2023 U.S. Dist. LEXIS 30372, at *13 (D. Colo. Feb. 23, 2023) (accepting expert's conclusions over defendants' critiques because the "[d]efendants fail[ed] to suggest a more reliable price or volume estimate"); *Balthazar Mgmt. v. Beale St. Blues Co.*, No. 17-cv-81214-BLOOM/Valle, 2018 U.S. Dist. LEXIS 228664, at *9-10 (S.D. Fla. Oct. 10, 2018) (finding plaintiff's expert's "future lost profits calculation was not speculative" because the expert "did not utilize information that she believed was unreliable or incomplete" and noting that "she used some projections rather than actual statements where all the income was not reported" and "based her projections on many sources of business records and other historical information regarding" the plaintiff's business operations).

or at least called into question some of the statements in that declaration [and
arbitration testimony]." (Tr., 219:12–220:7). For example, Decker considered
Dr. Sawin's statements in a video he recorded about Hawley's services and the
August 2018 correspondence discussing the inferiority of Alphatec's products
and services compared to NuVasive's before declining to apply any additional
downward adjustment to sales to Dr. Sawin. (**Ex. 3**; **Ex. 9**; *see also* Tr., 18:20–
19:7, 226:18–227:11 (discussion regarding admitting NuVasive's **Exhibits 3**
and **9** in the event the Court admits Dr. Sawin's hearsay testimony)).

1. **Substantial evidence supports the causal links that Decker relied upon in forming her opinions.**

Substantial evidence, including the evidence discussed in Sections I.A.2
and 3, supports Decker's conclusions and her rejection of Defendants' claim
that they played no role in the relevant doctors' decisions to move their
business from NuVasive. For example, Soufleris acknowledged having no
knowledge of Drs. Sawin, Rosen, or Gandhi utilizing Alphatec products before
Defendants (and their sales representatives) separated from NuVasive in
November of 2017. (Tr., 39:24–40:14). Yet Dr. Sawin first utilized Alphatec's
products just prior to a December 17, 2017,[18] dinner attended by Soufleris, Dr.
Sawin, Miles, and Hunsaker, and Dr. Rosen first used Alphatec products the

---

[18] This comports with Decker's analysis of Dr. Sawin's declaration testimony that he informed
NuVasive representatives in October 2017 of his decision to leave NuVasive but did not
actually do so until after Defendants breached the Sales Agreement and set their scheme in
motion to convert NuVasive's Central Florida business to Alphatec in motion.

next day, December 18, 2017. (Tr., 40:15–41:10; **Ex. 6**). Likewise, Dr. Gandhi utilized Alphatec (and other companies') products distributed by AMS from January 1, 2018, through December 31, 2022, when AMS stopped distributing Alphatec's products. (Tr., 42:8–22). Further, Drs. Sawin, Rosen, and Gandhi utilized biologics and other spinal implants distributed by AMS between December 2017 and December 2022. (Tr., 42:11–43:10). Lastly, despite Dr. Sawin's claim that he intended to move his business from NuVasive, Defendants introduced no evidence to show that they attempted to keep his business or reported a danger of losing his business to NuVasive.[19]

In sum, the record provides a sufficient basis for the Court "to make a responsible estimate of" NuVasive's damages in accordance with Decker's opinions, as "[t]he law does not require certainty in the award of damages when a wrong has been proven and injury established." *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, No. 3369-VCP, 2009 Del. Ch. LEXIS 168, at *53 (Del. Ch. Sep. 30, 2009) (quoting *All Pro Maids, Inc. v. Layton*, No. 058-N, 2004 Del. Ch. LEXIS 116, at *45 (Del. Ch. Aug. 9, 2004) (awarding lost profits damages after plaintiff proved a "breach of a covenant not to compete").

---

[19] Failing to inform NuVasive of expected changes in Dr. Sawin's (or any surgeon's) use of its products violates the Sales Agreement. (**Ex. 10** at § 5.04).

4899-6578-0485, v. 9

## 2. The Wrongdoer Rule bolsters the causal links between Defendants' bad acts and NuVasive's lost profits.

The Wrongdoer Rule, which applies "where a defendant has been found liable but the wrongdoer's conduct has made the plaintiff's claimed lost profits 'speculative because they come from an uncertain world created by the wrongdoer,'" supports Decker's conclusions. *In re Tropicana Ent., LLC*, No. 08-10856, 2024 U.S. Dist. LEXIS 218180, *24-25 (D. Del. Dec. 3, 2024) (quoting *SIGA*, 132 A.3d at 1111)). The "'wrongdoer rule' does not excuse the requirement that the court have a sound basis to estimate damages." *Enhabit, Inc. v. Nautic Partners IX, L.P.*, No. 2022-0837-LWW, 2024 Del. Ch. LEXIS 371, at *72 (Del. Ch. Dec. 2, 2024). But where the defendant's liability is established, "a plaintiff's estimate of the damages it has suffered can be sufficient to carry its burden." *In re Tropicana*, 2024 U.S. Dist. LEXIS 218180, at *25 (citing *SIGA*, 132 A.3d at 1111).[20]

The situation at bar is similar to the facts in *NuVasive v. Day*, where the District Court, citing the Wrongdoer Rule, held the defendant "violated the

---

[20] Jurisdictions beyond Delaware, including the Supreme Court, have supported a rule that places the risk of damage calculations on the wrongdoer. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565, 51 S. Ct. 248, 75 L. Ed. 544 (1931) ("[W]hatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendants' own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced."); *Boyce v. Soundview Tech. Gp., Inc.*, 464 F.3d 376, 391 (2d Cir. 2006) ("[W]here the existence of damage is certain, and the only uncertainty is as to its amount . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer.").

contract at issue, specifically the non-competition and non-solicitation clauses"
and, in its damages analysis highlighted that the plaintiff showed, "through
witness testimony, exhibits and expert opinion that the Court credits, that it
suffered lost profits". . . "as a result of [defendant's] violation" of the contract.
No. 19-cv-10800, 2022 U.S. Dist. LEXIS 55091, at *26, 28 (D. Mass. Mar. 28,
2022) ("*Day I*"). Although the plaintiff's damages evidence was partially based
on sales projections, "the subsequent decrease in [plaintiff's] sales by more
than fifty percent, [and] ten-fold increase of [third-party] Alphatec's sales" for
a subject customer, led the District Court to hold that such evidence reasonably
established lost profits. *Id*. at *28–29.

On appeal, the *Day* defendant challenged the trial court's fact-finding,
but, as the appeals court put it, he "disregard[ed] the substantial
circumstantial evidence in the record" that it found supported and "identified
a pattern of improper activity seemingly aimed at switching the affiliation of
multiple surgeons" from the plaintiff to its third-party competitor, Alphatec.
*Day II*, 77 F.4th at 27, 29. In response to the defendant's criticism of the
damages award, the Court of Appeals highlighted evidence presented at the
damages hearing and concluded that, even where damages evidence "was less
abundant," under Delaware's wrongdoer rule, "[t]he amount of damages can be
an estimate." *Id*. at *29, 30, n.9.

In sum, the default judgment established Defendants' liability. (Doc.
395). As wrongdoers, Delaware law requires the Court to construe any
uncertainty in the precise calculation of damages against them.[21]

### 3. The Court should infer that Defendants' spoliation deprived NuVasive of additional evidence of causal links between their bad acts and its lost profits.

Finally, the Court's May 4, 2021, Order held that, despite being on notice
to preserve evidence, Defendants spoliated multiple email accounts, an email
domain, and text messages during a period where their acts were "crucial to
the issues in this case." (Doc. 290, pp. 12–21). This spoliation supports
Decker's lost profits opinions, especially those regarding the causal links
between Defendants' violations of the Sales Agreement and FDUTPA and the
movement of the six surgeons' business from NuVasive. Indeed, the Court
found that Soufleris shut down AM's "email domain, including all email
accounts associated with it" sometime after March 2, 2018, and that neither he
nor any AM affiliates (including Hawley and Miller) took any steps to preserve
those emails. (*Id.* at pp. 13–15). It also found they deleted most of the text
messages they exchanged between June and December 2017. (*Id.* at p. 16).

Many of the causal links Decker relied upon took place prior to December
2017, including Soufleris' negotiations with Alphatec (in which he cited his

---

[21] Public policy demands that a wrongdoer must bear the risk of estimated damages where
their actions caused uncertainty in quantification. *See, e.g.*, *eCOMMERCE Indus. v. MWA
Intelligence, Inc.*, No. 7471-VCP, 2013 Del. Ch. LEXIS 245, at *142 (Del. Ch. Sep. 30, 2013).

ability to immediately convert business) and the "lock, stock and barrel" conversion of Dr. Sawin's business. While NuVasive will never know the complete contents of the spoliated communications (*Id*. at p. 19), the Court can reasonably assume that there were multiple communications between Defendants (including their sales representatives) and their surgeon customers; otherwise, why would they have destroyed those communications? To that end, the Court properly held that Defendants "destroyed this evidence with an intent to deprive [NuVasive] from using the evidence in this case" and that their spoliation "severely prejudiced [NuVasive]." (*Id*. at pp. 18, 19).

In sum, there is no merit to critiques about gaps in the causal links Decker relies on to calculate lost profits as Defendants' destruction of their communications with the relevant surgeons caused any such gaps. To be sure, this Court voiced its understanding of Defendants' intentions in destroying relevant evidence by ruling that it would instruct the jury that it "*must* presume the [spoliated] information was unfavorable to [Defendants]." (*Id*. at p. 20) (emphasis in original). Respectfully, this instruction is as appropriate at this point in the case as it would have been at a jury trial, as courts consider spoliated evidence to be unfavorable to spoliating parties when determining damages awards, including lost profits. *Day I*, 2022 U.S. Dist. LEXIS 55091, at *32; *OmniGen Research, LLC v. Yongqiang Wang*, No. 6:16-cv-268-MC, 2017 U.S. Dist. LEXIS 189543, at *44-46 (D. Or. Nov. 16, 2017) (awarding lost

profits damages at plaintiff's quantified amount, finding it to be "a reasonable estimation given the [defendants'] extensive spoliation of evidence" and noting that defendants' "discovery abuse and spoliation of evidence related to damages prevent[ed] a precise calculation" of profits).

## II. <u>NUVASIVE IS ENTITLED TO RECOVER ATTORNEYS' FEES.</u>

At the Hearing, the Court accepted the Parties' agreement that the proper amount of any awarded attorneys' fees is $1,300,000. (Tr., 232:5–234:3). As the Court stated no further briefing on this topic is needed (Id.), NuVasive only cites the Sales Agreement's provision that obligates AM to prosecute the claims at issue in this lawsuit or pay NuVasive the attorneys' fees and expenses it incurs in doing so. (**Ex. 10**, § 5.09).

## III. <u>NUVASIVE IS ENTITLED TO PRE- AND POST-JUDGMENT INTEREST ON ANY AWARD OF LOST PROFITS.</u>

Defendants do not dispute NuVasive's entitlement to prejudgment interest or Decker's methodology for computing it, which, at the time of the Hearing, amounted to $4,415,119 under Delaware law and $3,921,408 under Florida law.[22] (Tr., 9:18–10:9, 140:12–20, 144:4–15). Additionally, Defendants concede NuVasive's entitlement to post-judgment interest. (Tr., 9:18–10:9).

---

[22] Defendants agree the Court may Exhibits D-26 through D-50 and the columns on Exhibit D-1 of Decker's Report to calculate prejudgment interest. (Tr., 141:16–142:12, 145:2–8; **Ex. 1** at D-1). Alternatively, Decker can recalculate prejudgment interest as she did in *NuVasive, Inc. v. Rival Medical, LLC*, No. 1:21-cv-11644-DJC (D. Mass. July 19, 2024) (Doc. 93).

Therefore, NuVasive is entitled to pre- and post-judgment interest on its damages. *Parexel Int'l (IRL) Ltd. v. Xynomic Pharms., Inc.*, No. N19C-07-103 PRW CCLD, 2021 Del. Super. LEXIS 519, at *39 (Super. Ct. July 21, 2021) ("A non-breaching party is entitled to pre- and post-judgment interest as a matter of right." (citing *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011)); *see also Brandin v. Gottlieb*, No. 14819, 2000 Del. Ch. LEXIS 97, *92-101 (Del. Ch. July 13, 2000).

## IV.    CONCLUSION

In October 2017, Soufleris promised to immediately convert NuVasive's business in Central Florida if given the chance.  Defendants did just that, causing NuVasive to incur significant lost profits, which Decker reasonably quantified as $13,645,940.  Now, the Court should award NuVasive those lost profits, the agreed upon amount of $1,300,000 in attorneys' fees, and pre- and post-judgment interest and costs.

Dated: January 10, 2025                Respectfully submitted,


                                       */s/Christopher W. Cardwell*
                                       R. Craig Mayfield (Fla. Bar No. 0429643)
                                       Cmayfield@bradley.com
                                       Diana N. Evans (Fla. Bar No. 98945)
                                       Dnevans@bradley.com
                                       Bradley Arant Boult Cummings LLP
                                       100 North Tampa Street, Suite 2200
                                       Tampa, Florida 33602
                                       Tel: (813) 559-5500
                                       Fax: (813) 229-5946

                                       Christopher W. Cardwell, Esq.
                                       ccardwell@gsrm.com
                                       Mary Taylor Gallagher, Esq.
                                       mtgallagher@gsrm.com
                                       M. Thomas McFarland, Esq.
                                       tmcfarland@gsrm.com
                                       GULLETT, SANFORD, ROBINSON &
                                       MARTIN, PLLC
                                       150 Third Avenue South, Suite 1700
                                       Nashville, TN 37201
                                       Tel: (615) 244-4994
                                       Fax: (615) 256-6339

                                       *Attorneys for NuVasive, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.  The party or parties served are as follows:

Busch, Mills & Slomka, LLP

Bryan E. Busch
Email: bb@buschmills.com
3000 Heritage Walk, Suite 304
Milton, GA 30004

Christopher Y. Mills
Email: cm@buschmills.com
319 Clematis Street, Suite 109
West Palm Beach, FL 33401

*Attorneys for Defendants*

Dellecker Wilson King McKenna
Ruffier & SOS, LLP

Kenneth J. McKenna
Email:  KJMeservice@dwklaw.com
719 Vassar Street
Orlando, Florida 32804

*Attorney for Greg Soufleris, Absolute*
*Medical Systems, LLC and Absolute*
*Medical, LLC*

*/s/Christopher W. Cardwell*