## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**NUVASIVE, INC.,**

      **Plaintiff,**                    **Case No.: 6:17-cv-2206-CEM-LHP**

**v.**

**ABSOLUTE MEDICAL, LLC,
GREG SOUFLERIS, DAVE
HAWLEY, ABSOLUTE MEDICAL
SYSTEMS, LLC, RYAN MILLER,
and BRYAN E. BUSCH,**

      **Defendants.**

_____/

### DEFENDANTS, ABSOLUTE MEDICAL, LLC, ABSOLUTE MEDICAL SYSTEMS, LLC, AND GREG SOUFLERIS' POST-HEARING BRIEF

Defendants, ABSOLUTE MEDICAL, LLC, ABSOLUTE MEDICAL SYSTEMS, LLC, AND GREG SOUFLERIS hereby file this Post-Evidentiary Hearing Brief in accordance with this Court's direction, and state:

### INTRODUCTION

Plaintiff's claim for loss profits is too speculative. Throughout her analysis, Plaintiff's economist, Misty Decker, repeatedly engaged in speculation and ignored inconvenient facts such as Dr. Sawin's decision to sever long-standing ties with NuVasive. This is problematic.

Where an expert opining on lost profits fails to account for external variables, their opinion is questionable at best. *Whitby v. Infinity Radio Inc.*,

951 So. 2d 890, 898 (Fla. 4th DCA 2007) ("Dr. Fratrick failed to consider numerous external variables, which by their very nature affected only the morning day part, and rendered Dr. Fratrick's conclusion that WEAT's lost profits were a direct result of Whitby's departure questionable at best."); *Zimmer, Inc. v. Stryker Corp.*, No. 3:14-CV-152 JD, 2018 WL 276324, at *5 (N.D. Ind. Jan. 3, 2018) (expert may not "conveniently disregard contrary evidence or evidence that would lead to different results.").

In this case, multiple intervening variables emerged between 2017 and 2022 (*e.g.*, physician attrition, AdventHealth's purchase of a Globus surgical robot, and an unprecedented pandemic coupled with limited hospital beds for elective surgeries). Yet, Decker failed to properly account for these variables. (*See, e.g.*, DE 426, T. 128: 5-22) (Attorney McFarland: ". . . did you make any adjustments to your calculations in light of the defendants' criticisms?" Decker: "No, I did not, because what we have to look at is but for the situation that did happen. So we know that the defendants left and were breaching their agreement prior to the [Globus/AdventHealth] contract even being signed."); (*Id.*, T. 169: 9-10).

Decker's foregoing testimony reveals that she misunderstands the effect of intervening variables on causation. Worse, she simply speculated that AdventHealth's purchase of the Globus surgical robot was directly related to Absolute's departure from NuVasive in December of 2017.

2

And, even outside of Decker's testimony, NuVasive failed to otherwise prove causation with reasonable certainty. It is implausible for NuVasive to pin all its losses on Defendants given the multiple market-disrupting and nonactionable events that occurred between 2018 and 2021. *See, e.g.*, *Ciappa Const., Inc. v. Innovative Prop. Res., LLC*, No. CIV.A. 05L-07-035, 2007 WL 914640, at \*1 (Del. Super. Ct. Mar. 2, 2007) (holding "lost profits were too speculative" where the "lost profits claim is premised on too many unknowns and too many variables."); *Moulthrop v. Hyett*, 105 Ala. 493, 497, 17 So. 32, 34 (1895) (no way of ascertaining the amount of damages where outbreak of yellow fever interfered with operation of brick-drying machine).

## LEGAL STANDARD

"To recover lost profits, the party must prove two things: "1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989); *Total Care Physicians, P.A. v. O'Hara*, No. CIV.A. 99C-11-201JRS, 2003 WL 21733023, at \*2 (Del. Super. July 10, 2003) (discussing the differing proof required for the fact and the extent of the damages, and explaining in the context of lost profits, "TCP must prove that such losses were proximately caused by the misappropriation . . . .").

Notably, proof of proximate causation is essential to establishing lost profits. *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action."); *Nycal Offshore Dev. Corp. v. United States*, 743 F.3d 837, 843 (Fed. Cir. 2014) ("The basic principles that apply to proof of causation in a lost-profits case are well settled. '").

A party seeking lost profits carries the burden to prove causation with reasonable certainty. *Nycal*, 743 F.3d at 843 ("It is the plaintiff's burden to prove causation."); *Grethaka Sols. OU v. Click Labs, Inc.*, No. 8:22-CV-1341-WFJ-SPF, 2024 WL 326622 (M.D. Fla. Jan. 29, 2024) ("the plaintiff bears the burden of proving fact of damages with reasonable certainty."); *Pharmathene, Inc. v. SIGA Techs., Inc.*, No. CIV.A. 2627-VCP, 2010 WL 4813553, at *11 (Del. Ch. Nov. 23, 2010) ("Under Delaware law, a plaintiff can only recover those damages which can be proven with reasonable certainty.").

Reasonable certainty is not comprised of speculation or conjecture. *Callahan v. Rafail*, No. CIV.A. 99C-02-024, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001) ("It is well-settled law that "a recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.").

"In cases involving covenants not to compete, a plaintiff has the burden of demonstrating the loss attributable to defendant's competition versus the loss attributable to other potential causes of declines in revenue." *Zimmer*, No. 3:14-CV-152 JD, 2018 WL 276324, at *3. *See also* Fed. R. Evid. 702 Advisory Comm. Notes (2000 amends.) (An important benchmark for gauging reliability is "[w]hether the expert has accounted for obvious alternative explanations.").

Moreover, a party seeking lost profits must establish causation regardless of the existence of a default judgment on liability. *In re ICMfg & Assocs., Inc.*, 602 B.R. 780, 785 (Bankr. M.D. Fla. 2018) ("even though Bare Board obtained a default as to liability, it was still 'obligated to prove some connexity between the damages claimed and the defendant's tortious conduct.' And it was required to prove that connexity—or causal connection—with a reasonable degree of certainty[.]"); *Zimmer*, 2018 WL 276324, at *3 ("Zimmer and Katz confuse the question of whether Defendants may have 'caused' a violation of the non-compete agreements with the question of whether Defendants' violations of the agreements, assuming they happened, "caused" Zimmer's damages; Katz can assume the first kind of causation, but not the second.").[1]

---

[1] *Zimmer* is particularly helpful to the causation analysis in this case as it involves the expert's before-and-after method of calculating damages, and the expert's refusal to account for external variables in a case involving spinal medical devices. 2018 WL 276324, at *4.

## **ARGUMENT**

## I.    **CPA Decker's Opinions on Lost Profits are Too Speculative**

Decker's selection of inputs and assumptions affected the soundness of her methodology and undermine the credibility of her opinion. *Katz*, 485 Md. at 345, 377-88. ("the choice or calculation of the inputs to a methodology can be a part of the methodology itself . . . selection of those inputs is central to the reliability of the method itself."). And, although a party may estimate the *amount* of its damages, there must be "a sufficient evidentiary basis for making a fair and reasonable estimate of damages[.]" *Vianix Delaware LLC v. Nuance Commc'ns, Inc.*, No. CIV.A. 3801-VCP, 2010 WL 3221898, at *6 (Del. Ch. Aug. 13, 2010).

Given market fluctuations and other obvious external variables, the Court should decline to afford much weight to Decker's opinion. Decker herself testified to inevitable fluctuations and uncertainties in the market. (DE 426, T. 82: 14-20) (Decker: "[T]ypically when you have one good year of sales, oftentimes your quotas will also go up to that level. And that did not happen for 2017. And then looking at our industry research, 2017, of course, there was a change in guard in Washington, in January of 2017. And that created some uncertainty in the market, but that market rebounded in 2018.").

The law does not permit Decker to assume that all lost profits were attributable to Defendants' conduct. *Fla. Virtual Sch. v. K12, Inc.*, No. 6:20-

CV-2354-GAP-EJK, 2023 WL 6294214, at *2 (M.D. Fla. Aug. 25, 2023) ("the expert cannot also assume that Plaintiff would have obtained *all* of Defendants' student registrations had Defendant not engaged in allegedly unlawful conduct.") (emphasis in original); *Whitby,* No. 618CV437ORL31LRH, 2020 WL 10456817, at *2 ("Williams did not perform any statistical analysis demonstrating why the average cost difference is an appropriate and accurate method to estimate damages arising from claims mishandling."); *Katz, Abosch, Windesheim, Gershman & Freedman, P.A. v. Parkway Neuroscience & Spine Inst., LLC*, 485 Md. 335, 377–78, 301 A.3d 42, 67 (2023) (selection of inputs into "before-and-after method" impacts the reliability of the expert's methodology.); *Zimmer*, No. 3:14-CV-152 JD, 2018 WL 276324, at *4 ("Katz attributes lost revenues and profits to Defendants' alleged wrongdoing, without ever considering the possibility that the lost revenues and profits flowed from other non-actionable events.").

"At a minimum, [a] damages expert must prove the amount of actual damages that Plaintiff suffered *because of* Defendants' alleged misconduct on a claim-by-claim basis." *Fla. Virtual Sch*, No. 6:20-CV-2354-GAP-EJK, 2023 WL 6294214, at *3. (emphasis in original). "Causation is a critical element in an economically sound calculation of actual damages." *Id.* The mere possibility of causation, however, is not enough. There must be a reliable underlying factual basis to support the expert's opinion. *Pfizer Inc. v. Advanced Monobloc*

*Corp.*, No. 97C-04-037-WTQ, 1999 WL 743927, at *5 (Del. Super. Ct. Sept. 2,
1999), *opinion corrected on denial of reconsideration,* No. 97C-04-037-WTQ,
1999 WL 1240864 (Del. Super. Ct. Sept. 24, 1999).

Where there are other variables that could have affected a business'
profits, the recovery of loss profits from a single tortfeasor becomes too
speculative. *Kenco Chem. & Mfg. Co. v. Railey*, 286 So. 2d 272, 274 (Fla. 1st
DCA 1973) ("incident thereto were other circumstances, unrelated to the
appellee, which could have affected Kenco's profits for that period, consisting
of a change by Kenco in its method of the sales or distribution of its products
and a substantial price increase thereof by Kenco.").

The reason the law requires reasonable certainty for causation is
because anticipated profits of a commercial business are generally too
speculative and dependent on the everchanging environment we live in. *Id.*
("The general rule is that anticipated profits of a commercial business are too
speculative and dependent upon changing circumstances to warrant a
judgment for their loss. An exception is that the loss of profits from the
interruption of an established business may be recovered where the plaintiff
makes it reasonably certain by competent proof as to the amount of actual
loss."). Here, NuVasive cannot deny that everchanging circumstances affect
the orthopedic market given that Decker herself testified to uncertainty in the

market in 2017 because of a change in regime in Washington. (DE 426, T. 82:17-20). The spinal surgery market is not immune to intervening variables.

Critically, NuVasive fails to acknowledge the impact of the external variables and simply contends that it is not its burden to prove. Alternatively, NuVasive insists that causation was already decided. Not so. As discussed in this brief, "plaintiffs must show both the existence of damages provable to a reasonable certainty, and that these damages flowed from defendant's violation of the contract." *LaPoint v. AmerisourceBergen Corp.*, No. CIV.A. 327-CC, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007). *See also Nycal*, 743 F.3d at 844 (rejecting argument that "the burden of proof shifts to defendant to show that an intervening cause was the reason for plaintiff's loss.").

Boiled down, NuVasive's damage model is built upon speculation, conjecture, and the avoidance of inconvenient facts—not reasonable certainty.

## A. NuVasive is Not Entitled to Any Lost Profits Related to Dr. Sawin

NuVasive failed to prove with reasonably certainty that Dr. Sawin followed the Defendants to Alphatec, rather than vice versa. *See Robins v. NuVasive, Inc.*, No. 2:20-CV-292-RMP, 2020 WL 7081588, at *10 (E.D. Wash. Dec. 3, 2020) ("based on the potential commissions associated with these surgeon-customers, it is likely that Mr. Robins and Mr. Arthun were motivated to switch employers as a result of the surgeons' choice, rather than vice versa."). As explained in *Robins*, sales representatives are motivated to follow

9

surgeons, "rather than vice versa." *Id.* When a doctor switches to a different
product, the sales representative's commissions are impacted. *Id.*

If anything, Dr. Sawin's departure from NuVasive led to the chain of
dominoes that caused the Defendants to leave NuVasive, and not vice versa.
Dr. Sawin unequivocally testified that he did not switch to Alphatec because of
Soufleris or Hawley. (DE 425-2, p. 5, T. 870). Sawin departed NuVasive
because of his long-standing concerns relating to NuVasive's change in
leadership and innovation, not because of Absolute, Soufleris, or Hawley.

Sawin first began his relationship with NuVasive in 2006 because he was
looking for companies interested in creating innovative and new spinal
products. (*Id.* at p. 3, T. 859-60). Sawin is not only a neurosurgeon. He
developed products in the spinal market. (*Id.* at p.7, T. 875: 2-19). Notably,
NuVasive was started by a gentleman named Pat Miles. (*Id.* at p. 3, T. 860).
Prior to Dr. Sawin beginning a relationship with NuVasive, Sawin worked as
a consultant for Medtronic with Pat Miles. (*Id.*). Sawin describes Miles as an
"extremely knowledgeable, dedicated, forward thinking individual who had a
singular focus of trying to make spine surgery better. (*Id.*).

Dr. Sawin's break from NuVasive occurred after Pat Miles separated
from NuVasive in 2017. (*Id.* at p.4, T. 864). The vision and priorities of the
company changed after that. (*Id.*, T. 864-65) (Sawin: "The vision of the
company completely changed. It was no longer a company that was interested

in making spine surgery better."). Sawin "began looking for another home." (*Id.*, T. 866). After Miles transitioned to Alphatec, Sawin advised NuVasive leadership of his intent to leave. (*Id.*, T. 866-70). In turn, Sawin told Soufleris and Hawley he was going to leave NuVasive and there may be an opportunity for Hawley if he wanted to go that way. (*Id.* at p. 5, T. 869).

On the issue of causation for lost profits, Dr. Sawin's arbitration testimony is particularly relevant. The Court should not overlook the arbitration testimony or Sawin's sworn declaration. *See* section III, *infra*. It is telling that NuVasive wants to exclude Sawin's testimony even though it had the opportunity and similar motive to cross-examine Dr. Sawin at the arbitration hearing. And the Court should find it odd that Decker failed to interview any of the other five involved surgeons in forming her opinion. *See, e.g., Zimmer*, No. 3:14-CV-152 JD, 2018 WL 276324, at *5 (criticizing expert's failure to "interview Drs. North and Risko in preparing his report.").[2]

Decker did, however, review Dr. Sawin's arbitration testimony and declaration. In refusing to accept Dr. Sawin's own sworn testimony about why he departed from NuVasive, Decker points to a 2018 email from Sawin to Brian Snider at Alphatec, titled "The Promise of ATEC." (DE 426, T. 113, lines 13-

---

[2] Equally problematic, Decker assumed that the six doctors would continue to purchase NuVasive products at the same levels for the five years after 2017. However, the doctors identified in this lawsuit were not contractually bound to purchase NuVasive products.

16; 114, lines 1-23) (*See also* DE 424-3, Exh. 3, email). Yet, the 2018 email does nothing to establish proximate causation. If anything, the email is consistent with Dr. Sawin switching to Alphatec to follow Pat Miles and the new senior leadership—not because Alphatec has superior products or to pursue Absolute's sales representatives. (DE 424-3, Exh. 3).

In the email, Dr. Sawin states, "[t]here is a buzz about ATEC … because of the PROMISE of something better. This is mainly due to the faith that surgeons have in the potential that comes with the senior leadership[.]" (*Id.* at p. 1). Sawin further explained to Snider, Miles, and Rich, "when you guys joined ATEC, surgeons took notice and got excited about the potential of something great happening." (*Id.*). The theme with Dr. Sawin is consistent throughout his arbitration testimony and the 2018 email: vision, innovation, leadership, and making spinal surgery better. Dr. Sawin's decision to switch to Alphatec was fueled by his confidence in Pat Miles and focus on innovation, not to pursue Absolute's sales representatives.

## B.   External Variables—Including a Surgical Robot, Physician Attrition, and an Unprecedented Pandemic—Undermine Plaintiff's Recovery of Lost Profits from Defendants

### a.   Doctors Rosen and Gandhi: AdventHealth Purchased a Globus Robot in 2017

Defendants' Response to Plaintiff's Renewed Memorandum of Damages criticized Decker for failing to quantify the impact of Drs. Rosen and Gandhi's

use of a competing Globus robotic surgical system starting in 2018. (DE 407,
pp. 15-21). Surgeries done with the Globus robot utilize Globus' hardware,
rather than NuVasive's. The shift by Rosen and Gandhi to the Globus surgical
robot is an external factor unrelated to the Defendants' breaches.

    In response to this criticism, NuVasive's counsel advised Decker that the
contract between Globus and AdventHealth for the Florida Hospital Orlando
robot was executed on December 27, 2017. At the evidentiary hearing, while
discussing her findings and conclusions related to the impact of the Globus
robot, the following exchange between Decker and NuVasive's counsel
occurred:

```
 8   Q    And what did that investigation reveal?
 9   A    So we were able to obtain the contract related to the
10   robot and found that it was dated 12 -- I want to say
11   12/27, but that should be in my report as well.
12        So on Pages 18 through Page 20, we talk about
13   Dr. Rosen and Dr. Gandhi, specifically.  But I believe that
14   contract was dated 12/27/2017, so after the defendants had
15   left NuVasive.
16        And in that contract, there was a 90-day installation
17   provision.  So it does not appear that the robot would have
18   been installed in 2017.
19   Q    And aside from the contract, did you take any -- did
20   you do any investigation related to any Globus sales to
21   Drs. Rosen and Gandhi that could have been associated with
22   the Globus robot?
```

23  A   Yes.  I requested the sales data as well related to

24  the robot for 2017, 2018, and forward.

25      Now, Globus specifically said that at some point their

1  SAP system and the way that they did their accounting, they

2  only recorded sales to the hospital.  So we can't see sales

3  by doctor for a period of time, which they did not know

4  when they switched doing that.

5      But in the data, the first sale to Dr. Rosen was

6  April of 2018.  And the first sale to Dr. Gandhi was

7  May of 2018, which would seem to correlate to that

8  90-day provision that they had to install the robot.

9  Q   Given this additional investigation and the other

10  documentary evidence that's identified with respect to

11  Dr. Rosen and Dr. Gandhi which is identified in your

12  report, did you make any adjustments to your calculations

13  in light of the defendants' criticisms?

14  A   No, I did not, because what we have to look at is but

15  for the situation that did happen.  So we know that the

16  defendants left and were breaching their agreement prior to

17  the contract even being signed.

18      So if the defendants had not left NuVasive with

19  inadequate sales representation in the market and had not

20  already disrupted that market, is there any evidence that

21  Globus would have installed that robot at that time?  And

22  there isn't any.

(DE 426, T. 127-128).

It is undisputed that Drs. Rosen and Gandhi began operating with the Globus robot in 2018. (*Id.,* T. 128: 5-8). Rather than applying the appropriate reduction in the lost profits due to these surgeons' use of the Globus robot, Decker instead concludes out of whole cloth that AdventHealth must have bought the million-dollar Globus robot mere weeks after the Defendants' breaches, *because* of the Defendants' breaches. (*Id.*, T. 128: 18-22). Her assumption on this point is nothing more than naked speculation that attempts to shift the burden of proof.

Additionally, NuVasive points to the spoliation order to sanitize its own evidentiary failures; however, NuVasive is, and was, in better position to obtain information about the Globus robot than Defendants. Again, Decker confirmed that NuVasive merged with Globus in 2023. She also testified to information regarding Globus related issues provided to her by counsel. Yet, NuVasive failed to present any testimony or evidence from AdventHealth that its decision to purchase a Globus surgical robot was somehow related to Absolute Medical's separation from NuVasive.

Decker opines that NuVasive suffered $1.65 million in lost profits attributable to Dr. Rosen for 2018 and 2019. Yet, Dr. Rosen had just over $600,000 in actual Alphatec sales over those same two years. Similarly, Decker opines NuVasive suffered over $400,000 in lost profits attributable to Dr.

Gandhi for 2018 and 2019. Yet Dr. Gandhi had just over $175,000 in actual Alphatec sales over those same two years.

Decker's (and NuVasive's) stubborn refusal to reduce the lost profits estimate to reflect Rosen and Gandhi's unrelated shift to the Globus robot results in an inaccurate and inflated estimate of lost profits. The Plaintiff does not (and cannot) cite any caselaw that requires this Court to accept an obviously inflated estimate of lost profits.

### b. Dr. Allende Moved His Practice Outside Absolute's Sales Territory

Dr. Allende's lost profit analysis should not extend beyond 2018. Allende relocated to Brevard County in 2019. Noticeably, Absolute's switch to Alphatec did not translate into Alphatec/Allende sales in 2019. While Decker reports $308,795 in Alphatec hardware sales to Allende in 2018, his Alphatec hardware sales fell sharply to $34,120 in 2019 and $0 by 2020. (DE 424-1, p. 44, Decker Report, Exh. D-6).

Decker opines that NuVasive suffered $552,056 in lost profits attributable to Dr. Allende for 2019. However, in 2019, Dr. Allende's use of both NuVasive and Alphatec products decreased dramatically. Decker does not address the reason for the decline in Dr. Allende's 2019 Alphatec sales at all. She doesn't consider that Dr. Allende's move to another part of the state could have anything to do with it. Instead, she continues to assume that the

16

Defendants are to blame and attributes $552,056 in lost NuVasive profits to Dr. Allende in 2019.

Instead of acknowledging the hard data or interviewing Dr. Allende, Decker instead relied upon an internet "Wayback Machine" that showed Dr. Allende did not appear on his new employer's website until 2020. (DE 426, T. 93). Her speculation renders her estimated 2019 lost profits attributable to Dr. Allende unreliable.

### 2. COVID-19 and Limitations on Elective Surgeries

Decker testified that she adjusted her lost profit calculations because of COVID-19. However, she did not make any COVID adjustment for 2021. In failing to make an adjustment, she relied upon speculation instead of facts. (DE 424-1, p. 47).

In a similar NuVasive case, a Massachusetts district court declined to award lost profits whatsoever for periods after March 2020 given the impact of the pandemic. *NuVasive, Inc. v. Day*, No. 19-CV-10800, 2022 WL 899244, at *11 (D. Mass. Mar. 28, 2022) ("Although NuVasive seeks lost profits for periods after March 3, 2020, the end of the Injunction Period, the Court declines to award any additional damages given the impact of the pandemic after that time on sales projections, the decrease in surgical needs and impact on sales revenue.").

17

Indisputably, the emergence of COVID-19 in 2020 curtailed elective surgeries. (DE 426, T. 100: 17-18) (Decker: "So, obviously, during the damage period, the COVID-19 affected hospitals"); (*Id.*, T. 101: 9) ("But, again, there were limited beds at the time."). However, Decker failed to acknowledge that the uncertainty associated with COVID extended well past 2020.

The reality is that the Delta-variant was surging during the summer of 2021. "At the end of summer 2021, the Delta variant ran rampant through the country, negatively affecting unvaccinated populations in particular. By fall 2021, the United States had experienced over forty million COVID-19 infections and 700,000 COVID-19-related deaths." Meredith Bradshaw, *Going, Going, Gone: Takings Clause Challenges to the CDC's Eviction Moratorium*, 56 Ga. L. Rev. 457, 463–64 (2021).

Here, as in *Day,* the Court should decline to award NuVasive any lost profits that hypothetically occurred after March 3, 2020 given the impact of the pandemic after that time on sales projections, the decrease in surgical needs and impact on sales revenue.

### 3.    Non-Compete Year

There is no factual evidentiary basis to award lost profit damages for 2022, which NuVasive deems the "non-compete year." The Second Amended Complaint alleges that Absolute Medical failed to enforce the 2017 non-compete obligations on its sales representatives. However, there is an absence

18

of credible or competent evidence that Defendants, Gottstein, Hawley and Miller, are the but-for cause of NuVasive's lost profits in 2022.

Moreover, even if NuVasive is entitled to damages for Defendants' breach of the 2017 agreement, damages do not extend to 2022. Hawley and Miller resigned from Absolute Medical in 2017. And they did not sign non-compete agreements for the 2017 agreement.

## II.    Defendants Are Not Required to Prove that Intervening Variables Impacted NuVasive's Profits.

At the evidentiary hearing, the Court raised the issue of whether Defendants are required to put on an expert or countervailing evidence. The answer to that question is no.

NuVasive bears the burden of proof on causation—including intervening variables that impact lost profits—and it failed in its burden. *Nycal*, 743 F.3d at 844 (rejecting argument that "the burden of proof shifts to defendant to show that an intervening cause was the reason for plaintiff's loss."). "Evidence of such 'intervening causes' . . . is 'an integral part of the proximate cause analysis.'" *Id.* at n.2. "[O]nce they are identified as significant factors in the analysis, there is no reason that the plaintiff should bear the burden of proof as to some of them but not as to others." *Id.* at 844.

Additionally, NuVasive may not escape its lack of proof by pointing to spoliation. As already discussed, NuVasive merged with Globus in 2023.

Information related to the sales of Globus products should be readily available to NuVasive. Additionally, NuVasive failed to show that it was prevented from obtaining information from Alphatec or the hospitals. And, most telling, NuVasive failed to depose a single doctor in this case.

## III.    The Court Should Deny NuVasive's Motion in Limine (DE 421)

### A.    Prior Testimony

The Court should consider Dr. Paul Sawin's arbitration testimony and declaration and deny NuVasive's motion in limine. The arbitration testimony is admissible under rule 804(b)(1), Federal Rules of Evidence.

"Under the rule, former testimony is admissible if the declarant is unavailable and the party against whom the testimony is offered had an "opportunity *and* similar motive" to examine the declarant." *United States v. Paling*, 580 F. App'x 144, 148 (3d Cir. 2014). Unavailable means the declarant is "absent from the hearing and the proponent of his statement (be) unable to procure his attendance . . . by process or other reasonable means." *Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1184 (3d Cir. 1978) (citing Rule 804(a)(5)).

At the evidentiary hearing, Defendants' counsel represented to the Court that he reached out to Dr. Sawin to see if he could appear at the hearing, and he was unable to procure Dr. Sawin's appearance. (T. 18: 4-14) (Attorney McKenna: "But I did make efforts once I found out about the objection. And I'm

quite simply unable to -- I was unable to get Dr. Sawin here. I can elaborate on the reasons if it's relevant, but I don't want to dive into that prematurely.").[3]

The Court should deem Defendants' attorney's representations sufficient to establish unavailability. *Lloyd*, 580 F.2d at 1184 ("We are satisfied that where Export and Lloyd's own counsel were unable to obtain his appearance in an action in which he had a formidable interest as a plaintiff, his unavailability status was sufficient to satisfy the requirement of Rule 804."); *Athridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 109 (D.D.C. 2007) ("Given the representations of Plaintiffs' counsel as an officer of the court, this Court has no reason to believe Nguyen is not an unavailable witness under Rule 804(a)(5).").

Additionally, the "opportunity and similar motive" requirement of rule 804(b)(1) is satisfied. NuVasive's counsel cross-examined Dr. Sawin at the arbitration hearing and had a similar motive to develop the testimony. The issues and inquiry in the arbitration are the same. The parties are the same. And Dr. Sawin's testimony is particularly relevant to the issue of causation related to the fact of damages.

In support of its motion in limine, NuVasive relies upon inapposite authority. *See, e.g.*, *Amobi v. Brown*, 317 F. Supp. 3d 29 (D.D.C. 2018). *Amobi*

---

[3] Dr. Sawin had knee surgery prior to the hearing.

supports Defendants' position, not NuVasive. There, the court held that "the requirements of Rule 804(b)(1) are satisfied with respect to Nguyen's prior testimony in the arbitration proceeding, because Nguyen provided relevant testimony under oath, and was cross-examined in the context of a defense of Defendant Brown's decision to remove Amobi from his position, which is essentially the same inquiry in the present case." These same factors exist here.

Moreover, NuVasive is mistaken in its contention that Dr. Sawin's arbitration testimony is irrelevant because causation was not at issue. (DE 421, ¶ 11) ("Defendants' primary purpose for introducing the Arbitration Testimony is to further contest causation, which this Court decided in NuVasive's favor."). As already explained herein, causation is an essential element of lost profit damages. NuVasive simply misunderstands the law on this point. Proof of proximate cause is essential to the recovery of loss profits. NuVasive presents a less than compelling argument in suggesting that Dr. Sawin's testimony does not broach the issue of damages.

## B. NuVasive Opened the Door to the Admission of the Prior Testimony and Declaration

NuVasive opened the door for the Court to review Sawin's declaration and arbitration testimony. *Redd v. State*, 49 So. 3d 329, 333 (Fla. 1st DCA 2010) ("the concept of 'opening the door' allows for the admission of otherwise

inadmissible evidence when it is necessary to qualify, explain, or limit evidence

previously admitted."). At the evidentiary hearing, the following exchange

occurred on direct examination by NuVasive's counsel:

> Q:   Okay. Ms. Decker, have you reviewed Dr. Sawin's
>      declaration in this case?
> A:   I have.
> Q:   And have you reviewed his arbitration
>      testimony in this case?
> A:   Yes, during the arbitration.
> Q:   In the arbitration?
> A:   Yes, I have.
> Q:   The arbitration testimony that the defendants
>      have proffered?
> A:   Yes.
> Q:   And having reviewed those documents and
>      considered them, you still include Dr. Sawin's
>      lost business as a part of NuVasive's damages;
>      is that correct?
> A:   That's correct.
> Q:   Can you explain to the Court why that is.
> A:   So, again, from our perspective -- from my
>      perspective, from a financial expert's
>      perspective and our guidance, understanding
>      that there's the plaintiff's side and the
>      defendants' side, in this particular case, looking
>      at the documentary evidence that we've already
>      gone over, there was certainly a link there. And
>      also through the financial correlation. At least,
>      you know, from what I have looked at. And,
>      again, I'm not offering an opinion on that. But
>      also, you know, there were statements that were
>      made by Dr. Sawin in his declaration and his
>      testimony that just did not line up with the
>      documentation that we've gone over.

(DE 426, T. 121-22: 9-25; 1-12). Accordingly, the arbitration transcript and

declaration are admissible under the doctrine of completeness. Fed. R. Evid.

106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part--or any other statement--that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection.").

Additionally, the declaration and testimony should be considered as impeachment of the expert. Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion--and give the reasons for it--without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination."); *Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541, 545 (5th Cir. 1978) ("otherwise hearsay evidence that reveals the underlying sources of the expert's opinion should be as permissible on cross-examination as on direct."); *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991) ("Full examination of the underpinnings of an expert's opinion is permitted because the expert, like all witnesses, puts his credibility in issue by taking the stand. Jackson's polygraph result is relevant to Rollins' credibility because Rollins must have necessarily discounted it to reach the opinion he stated in court…. Rule 703 creates a shield by which a party may enjoy the benefit of inadmissible evidence by wrapping it in an expert's opinion; Rule 705 is the cross-examiner's sword, and, within very broad limits, he may wield it as he likes.").

## IV.      NuVasive's Expert Report is Inadmissible

NuVasive's expert report is inadmissible hearsay. *Johnston v. Borders*,
No. 615CV936ORL40DCI, 2018 WL 4215027, at *1 (M.D. Fla. Sept. 4, 2018)
("Mr. Anderson's opinions will be presented via his sworn testimony, and his
report may be used to refresh his recollection or for impeachment, but the
report itself is hearsay and is not admissible.").[4]

## <u>CONCLUSION</u>

The Court has no basis to reject Dr. Sawin's declaration and arbitration
testimony regarding his decision to terminate his relationship with NuVasive.
If anything, the Defendants' breaches were caused by Dr. Sawin's decision, not
vice versa. NuVasive is not entitled to any lost profits related to Dr. Sawin.

Rather than addressing the decline in sales attributable to Drs. Rosen
and Gandhi's use of the Globus robot starting in 2018, Decker instead assumes
that the Defendants' breaches caused AdventHealth to purchase a million-
dollar surgical robot within weeks of the Defendants' breach.

Further, Decker fails to explain why Dr. Allende's 2019 sales to both
NuVasive and Alphatec were near zero. Instead, Decker just assumes that the
2019 decline in sales to Allende was the result of the Defendants' breaches.

---

[4] The undersigned counsel did agree the Court could rely on Decker's tables to
the extent they assist in the calculation of post-judgment interest awardable.

While Plaintiff offered no proof of causation as to Drs. Rodas and Burry, Defendants have identified no specific external factors related to Decker's loss calculations for these physicians for the period of 2017-2021 other than a factor that Decker fails to address with any significance, the COVID-19 pandemic that occurred during this period.

Finally, the Court should decline to award damages for the non-compete year as they were not plead in the Second Amended Complaint and are too remote from the breach to be reliably attributed to the Defendants' conduct.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of January, 2025, a true and correct copy of the foregoing document has been electronically filed by using the Clerk of Court by using CM/ECF eFiling system which will automatically electronically furnish a copy to: Christopher Cardwell, Esq., R. Craig Mayfield, Esq., Diana Evans, Esq., Mary Taylor Gallagher, Esq, M. Thomas McFarland, Esq., Bryan Busch, Esq., and Christopher Mills, Esq.

**DELLECKER WILSON KING
McKENNA RUFFIER & SOS
A Limited Liability Partnership**

BY: <u>s/ Kenneth J. McKenna</u>
     Kenneth J. McKenna, Esq.
     Florida Bar No. 0021024
     719 Vassar Street
     Orlando, Florida 32804
     407-244-3000
     <u>KJMeservice@dwklaw.com</u>
     *Co-counsel for Defendants*
     *Greg Soufleris, Absolute Medical,*
     *LLC, and Absolute Medical Systems,*
     *LLC*