# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

NUVASIVE, INC.,

        Plaintiff,

v.                                 Case No:   6:17-cv-2206-CEM-LHP

ABSOLUTE MEDICAL, LLC, GREG
SOUFLERIS, ABSOLUTE MEDICAL
SYSTEMS, LLC,

        Defendants

_____

### ORDER AND REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration following an evidentiary hearing on the following motions filed herein:

| | |
|---|---|
| **MOTION:** | **NUVASIVE, INC.'S RENEWED MEMORANDUM OF DAMAGES (Doc. No. 403)** |
| **FILED:** | **June 7, 2024** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

> **MOTION:**   NUVASIVE, INC.'S MOTION IN LIMINE TO
> EXCLUDE DEFENDANTS' EXHIBITS AT
> DAMAGES HEARING (Doc. No. 421)
>
> **FILED:**   October 22, 2024
>
> _____
>
> **THEREON** it is **ORDERED** that the motion is **GRANTED IN PART
> AND DENIED IN PART**.

## I.    BACKGROUND

The tortured history of this case spans over six years and multiple venues and has been laid out in detail by prior Orders of the Court, with which the undersigned presumes the parties' familiarity.   *See* Doc. Nos. 290, 331, 334, 371, 395, *see also* Doc. No. 383.   The undersigned therefore limits discussion to facts and history relevant to resolution of the present disputes.

On December 29, 2017, Plaintiff filed a complaint for injunctive relief and damages against Defendants Absolute Medical, LLC ("AM"), Greg Soufleris ("Soufleris"), and Dave Hawley ("Hawley").   Doc. No. 1.   The operative pleading is the second amended complaint, which asserts nine claims under Delaware and Florida law against Defendants AM, Absolute Medical Systems, LLC ("AMS"), Soufleris, Hawley, and Ryan Miller ("Miller").   Doc. No. 188.   In essence, this case involves a contractual dispute between Plaintiff, a manufacturer of medical products and equipment that treat spinal diseases, and AM, who entered into an Exclusive Sale Representative Agreement with Plaintiff from 2013-2017, and

another such agreement in 2017.   Doc. No. 395, at 2; *see also* Doc. No. 188. Soufleris was the president and sole member of AM, and towards the end of 2017, Soufleris dissolved AM and created AMS to replace AM.   Doc. No. 395, at 2. Hawley and Miller were sales representatives for AM, and they both also worked for AMS.   *Id.*, at 2-3.

During the course of litigation, the parties engaged in extensive discovery and dispositive motions practice, arbitration proceedings and motions related thereto, a bankruptcy case and related stay, and interlocutory appellate proceedings.   *See* Doc. No. 395, at 3-7.   Once all appellate issues were resolved and the bankruptcy stay was lifted, the substantive merits of this case were addressed by United States District Judge Carlos E. Mendoza in a November 22, 2023 Order. Doc. No. 395.   As detailed in that Order, Judge Mendoza found all of the Defendants to have engaged in a course of "brazen, serious misconduct," to include numerous falsehoods, misrepresentations, intentional spoliation of evidence, and falsified testimony.   *Id.*   Based on this pattern of egregious misconduct, Judge Mendoza sanctioned Defendants pursuant to Fed. R. Civ. P. 37(e) by finding Plaintiff entitled to default judgment on all claims as follows:

a. Counts I and II breach of contract against AM;

b. Count III breach of contract against AMS;

c. Count IV breach of contract against Hawley and Miller;

d. Count V conversion against Hawley and AMS;

e. Count VI statutory individual liability against Soufleris;

f. Count VII piercing the corporate veil against Soufleris, AM, and AMS;

g. Count VIII Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* against all Defendants; and

h. Count IX tortious interference with business relationships against Soufleris.

Doc. No. 395, at 27–28.

Judge Mendoza ordered Plaintiff to file a brief as to damages related to the default judgment on or before December 6, 2023.  *Id.*, at 28.[1]  Plaintiff timely filed a memorandum quantifying its damages, Doc. No. 396, however, upon referral and consideration, the undersigned noted several gaps in the legal analysis provided to support the requested damages and denied Plaintiff's memorandum without prejudice.  Doc. No. 401.  The undersigned afforded Plaintiff an opportunity to file a renewed memorandum addressing the identified issues, and thereafter

---

[1] Judge Mendoza also awarded to Plaintiff its fees and costs associated with the litigation of Defendants' spoliation of an email domain and accounts, with such fees and costs to be levied jointly and severally against Defendants and their counsel, Attorney Bryan E. Busch.  Doc. No. 395, at 23-28.  Plaintiff timely-filed an accounting of those fees and costs.  Doc. Nos. 397, 402; *see also* Doc. No. 401.  However, on August 8, 2024, Plaintiff filed a Notice of Resolution and Satisfaction of Attorneys' Fees and Costs Regarding Spoliation (Doc. No. 408), and the undersigned thereafter denied as moot Plaintiff's request for fees relating to spoliation.  Doc. No. 411.

provided Defendants an opportunity to file a response in opposition.  Doc. Nos.
401, 404.  Plaintiff and Defendants AM, AMS, and Soufleris timely filed their
memoranda with various exhibits in support.  Doc. Nos. 403, 407.[2]  The issue of
quantification was referred to the undersigned, and upon review of the parties'
filings, the undersigned scheduled an evidentiary hearing for October 23, 2024, and
directed Plaintiff to file a reply brief, which Plaintiff timely filed.  Doc. Nos. 412,
416.

In sum, Plaintiff seeks damages in the amount of $13,645,938.00 in lost profits
under Delaware and Florida law, prejudgment interest in the amount of
$4,415,119.00 under Delaware law and $3,921,408.00 under Florida law (to the
extent not duplicative), post-judgment interest as provided by law, and attorneys'
fees and costs in the amount of $1,300,000.00.  Doc. Nos. 403, 430.[3]  Plaintiff relies

---

[2] On August 12, 2024, Defendants Hawley and Miller were dismissed from the case
with prejudice pursuant to the parties' stipulation of dismissal.  Doc. Nos. 409-10.  Thus,
any reference to "Defendants" throughout the remainder of this report and
recommendation refers only to AM, AMS, and Soufleris.

[3] In its renewed memorandum, Plaintiff lists $13,727,779.00 in lost profits.  Doc.
No. 403, at 1.  However, as discussed below, Plaintiff's expert testified at the evidentiary
hearing to the lower $13,645,938.00 amount of lost profits (which includes a $2.00
deduction by the undersigned for math errors), and Plaintiff only seeks the lower
$13,645,938.00 amount in its post-hearing briefing.  *See* Doc. No. 430.  Defendants do not
address this discrepancy in their post-hearing briefing.  *See* Doc. No. 431.  In the absence
of any argument to the contrary, the undersigned therefore has only considered the
$13,645,938.00 amount.  In addition, the amount of pre-judgment interest Plaintiff
requests has increased from $4,102,653.00 to $4,415,119.00 (under Delaware law) and from
$3,483,084.00 to $3,921,408.00 (under Florida law), *see* Doc. Nos. 403, 430, however the
undersigned attributes these increases to the fact that prejudgment interest accrues daily

on the expert report and opinion of Misty L. Decker, who applied a "before-and-after" methodology and attributed the lost profits to a reduction in sales from six physicians.    *Id.*    Defendants, however, challenge Ms. Decker's calculations, arguing that they do not flow directly and proximately from any of Defendants' breaches, and instead contend that an appropriate damages calculation is $2,388,044.00.    Doc. Nos. 407, 431.    Defendants do not contest Plaintiff's entitlement to pre-and-post-judgment interest, nor Plaintiff's entitlement to and the amount of attorneys' fees and costs.    *Id.*

The evidentiary hearing took place on October 23, 2024.    Doc. Nos. 412, 423, 426.    Three witnesses testified on behalf of Plaintiff:    Gregory Soufleris, Mark Singer, and Misty L. Decker.    Doc. Nos. 423, 426.[4]    Defendants did not call any witnesses.    Numerous exhibits were admitted into evidence without objection, and five exhibits were conditionally admitted with objections, and those objections are addressed below.    *Id.*, Doc. Nos. 424-25.    At the conclusion of the hearing, the undersigned directed the parties to file post-hearing briefing, which they timely filed.    Doc. Nos. 422, 429-31.

In addition, on the afternoon of October 22, 2024, less than 24 hours prior to

---

and therefore the amount will continue to increase until the date of judgment.

[4] The transcript from the October 23, 2024 evidentiary hearing is available at Doc. No. 426, and will be cited as (Tr., [page #]).

the evidentiary hearing, Plaintiff filed a motion in limine seeking to exclude as inadmissible hearsay the February 1, 2020 Declaration of Paul Sawin, M.D., and Dr. Sawin's December 17, 2020 arbitration testimony, both of which were attached to Defendants' pre-hearing briefing and listed by Defendants as hearing exhibits. Doc. No. 421; *see also* Doc. Nos. 407, 417.   That motion was also referred to the undersigned, and Defendants were directed to respond to the motion in their post-hearing briefing.   Doc. No. 422.   The motion is limine is addressed below.

Upon review of the evidence and the parties' filings, and for the reasons set forth below, the undersigned will grant in part and deny in part Plaintiff's motion in limine (Doc. No. 421) and will respectfully recommend that the Court grant Plaintiff's renewed memorandum on damages (Doc. No. 403) and award Plaintiff damages in the total amount of $19,361,057.00.

## II.    SUMMARY OF THE EVIDENCE PRESENTED AT THE OCTOBER 23, 2024 EVIDENTIARY HEARING[5]

### A.    *Gregory Soufleris*

The first witness to testify was Gregory Soufleris, the president and sole

---

[5] As discussed with the parties, the undersigned has only considered the evidence submitted at the evidentiary hearing, after addressing any outstanding objections.   Tr., 11-16.   The undersigned has not considered any other exhibits that may have been attached to Plaintiff's renewed memorandum and reply (Doc. Nos. 403, 416) or to Defendants' response (Doc. No. 407) that were not submitted into evidence at the October 23, 2024 hearing.   The Court has, however, taken notice of the record in this case and refers to relevant pleadings and orders as appropriate.

member of AM, and the creator of AMS.    Doc. No. 395, at 2.    Soufleris was the
distributor/principal of AM and AMS, and AM was an exclusive distributor of
Plaintiff's products.    Tr., 24-25.    AM and AMS both were involved in selling spine
hardware and biologics in the Central Florida market.    Tr., 27.

In his role as principal of AM, Soufleris entered into an Exclusive Sales
Representative Agreement ("2017 Agreement") with Plaintiff, effective January 1,
2017, through which AM would sell Plaintiff's products for a five-year period
within 12 counties in Central Florida.    Tr., 25-26; Doc. No. 424-10, at 21.    The 2017
Agreement provided that during the five-year period and for an additional 12
months thereafter, AM would not (1) represent, promote, sell, solicit, or otherwise
commercialize directly or indirectly any products or services in competition with
Plaintiff, (2) solicit, encourage, or induce any current, former, or prospective
customers, hospitals, surgeons, or physicians with whom Plaintiff has a business
relationship to terminate or adversely modify any business relationship with
Plaintiff or otherwise interfere with said relationships, or (3) solicit or offer to work
or hire any of Plaintiff's employees, agents, or representatives.    Doc. No. 424-10, at
7; *see also* Tr., 26.

On October 10, 2017, Soufleris emailed his brother, Adam Soufleris, a draft
business plan for Alphatec Spine ("Alphatec"), a direct competitor of Plaintiff.    Tr.,
26-28; Doc. No. 424-12.    At some point in October 2017, Soufleris also visited

Alphatec's offices, and thereafter Soufleris entered into negotiations with Alphatec

for AM to join Alphatec and separate from Plaintiff.    Tr., 29; *see also* Doc. No. 424-

2.    As part of those negotiations, Soufleris promised to bring revenue from Central

Florida to Alphatec.    Tr., 30; *see also* Doc. No. 424-15.    And on November 30, 2017,

three of AM's sales representatives who sold Plaintiff's products, including Miller

and Hawley, each tendered emails to AM purporting to resign from AM.    Tr., 32-

34; Doc. No. 424-14.    It appears that Soufleris did not forward these emails to

Plaintiff or otherwise notify Plaintiff of these resignations prior to AM separating

from Plaintiff.    Tr., 34.

Soufleris agreed that Plaintiff's damages in this case relate to Plaintiff's sales

to two hospitals – Florida Hospital Orlando (now known as AdventHealth Orlando)

and Central Florida Regional Hospital – and six surgeons – Dr. Sawin, Dr. Rosen,

Dr. Gandhi, Dr. Burry, Dr. Rodas, and Dr. Allende.    Tr., 35; *see also* Tr., 60.    At

Florida Hospital Orlando, Drs. Sawin, Rosen, and Gandhi utilized in their spinal

surgeries one of Plaintiff's products which AM sold called Osteocel Plus.    Tr., 35-

36.    After AM separated from Plaintiff and Soufleris created AMS, and after AMS

started to work with Alphatec, these surgeons switched to a product called Trinity,

which AMS distributed.    Tr., 36-37; *see also* Doc. No. 424-11.    Although Soufleris

was unable to testify as to the amount of the Trinity product these surgeons utilized,

between February and July of 2018, AMS sold $850,000.00 of the Trinity product,

with the vast majority of the product sold to Florida Hospital Orlando and Drs.
Rosen, Sawin, and Gandhi.    Tr., 36, 38-39; Doc. Nos. 424-22; 424-23.

Prior to AM separating from Plaintiff, AM was Plaintiff's only sales force in
the Central Florida area.    Tr., 40.    While Soufleris was unaware whether these six
surgeons ever previously used Alphatec products, Soufleris did recall going to
dinner with Dr. Sawin on December 17, 2017, shortly after AM's separation from
Plaintiff, and after Dr. Sawin's first use of an Alphatec product.    Tr., 40-41.
Soufleris further testified that he played no role in Dr. Sawin's decision to transfer
his business from Plaintiff to Alphatec in the fourth quarter of 2017, and did not ask
Dr. Sawin to transfer his business.    Tr., 45.    However, Plaintiff admitted into
evidence without objection a January 21, 2018 hotel receipt from Soufleris' trip to
Carlsbad, California, where Alphatec was headquartered, an email from Alphatec
to Dr. Sawin confirming the surgeon's visit to Alphatec, Dr. Sawin's email
confirming his flights, and an itinerary showing Dr. Sawin's visit between January
21-22, 2018.    Doc. Nos. 424-16, 424-17.    While acknowledging these documents,
Soufleris would only state that it was possible he traveled to Alphatec with Dr.
Sawin, was not sure of the purpose of this particular visit, and hypothesized that
Hawley traveled with Dr. Sawin instead.    Tr., 46-49.

Soufleris also confirmed that AMS sold Alphatec products to Dr. Rosen, Dr.
Sawin, and Dr. Gandhi from January 2018 through the end of 2022, when AMS

ceased distributing Alphatec products.   Tr., 42.   With respect to the other surgeons who operated out of Central Florida Regional Hospital (Dr. Burry, Dr. Rodas, and Dr. Allende), Soufleris confirmed that AMS sold them a different biologic called NovaBone.   Tr., 43.

   B.    Mark Singer

The second witness to testify was Mark Singer ("Singer").   Singer was first employed by Plaintiff in May 2015 as a strategic accounts director for the East Coast. Tr., 58.   Singer has worked in the spine industry since 2009, and left Plaintiff's employment in January 2021.   Tr., 51-52.[6]   In 2017, Singer was Plaintiff's Vice President of Commercial Sales for the Southeast, and in that role, Singer supervised distributors and sales representatives.   Tr., 51, 59.   At that time, AM was the only "boots on the ground sales force" for Plaintiff in the Central Florida, Orlando area. Tr., 51.

Singer testified that in 2017, Alphatec was a direct competitor of Plaintiff. And at that time, it was commonplace for sales representatives to be in the operating room with the surgeon to assist with the use of spinal products.   Tr., 52-53.   For example, Florida Hospital Orlando was not set up to perform spinal surgery without a sales representative in the operating room; however, Singer could not say

_____

[6] In January 2020, Singer became the Vice President of National Strategic Accounts and Enabling Technologies.   Tr., 60.   He remained in this position until he left in January 2021.   Tr., 60.

for certain that a sales representative was present at every spinal surgery.   Tr., 52,

60.   Singer further testified that AM was Plaintiff's exclusive sales distributor in the

Central Florida area; thus, when AM separated from Plaintiff, Plaintiff was left

without any sales representatives.   Tr., 53.

Singer testified that Dr. Sawin was Plaintiff's largest customer in the Orlando

area prior to AM's separation from Plaintiff.   Tr., 54, 59.   Dr. Rosen and Dr.

Gandhi were also consistent customers.   Tr., 54.   Until AM separated from

Plaintiff, Singer was not aware of Dr. Sawin, Dr. Rosen, Dr. Gandhi, or Dr. Allende

using Alphatec products.   Tr., 57-58.   Singer agreed that it was "more than likely"

that for Dr. Sawin, Dr. Rosen, and Dr. Gandhi to start using Alphatec products in

2017 they would have required a sales representative.   Tr., 53.

Singer further testified that when AM separated from Plaintiff, overnight and

without warning Plaintiff's business went from "a robust business of hundreds of

thousands of dollars a month to pretty much zero."   Tr., 54-55.   In addition, AM's

sales quota in 2017 was $10 million for the year, and AM was on target to hit

approximately 80-90% of its quota.   Tr., 55.   However, once AM left, the value of

Plaintiff's business dropped overnight to approximately $2-$3 million.   Tr., 55.

All business at Florida Hospital Orlando was gone, and Plaintiff was only able to

regain "the odd case here and there."   Tr., 55-56.   Singer testified that between

AM's December 2017 separation from Plaintiff and Singer's separation in January

2021, Plaintiff was unable to make any inroads to recapture the business it had lost. Tr., 56.

Singer testified that Plaintiff hired new sales representatives, but these are highly trained, highly clinical positions which require a long time to learn the surgeries and to develop relationships with surgeons.   Tr., 56.   If a sales representative does not have a relationship with the surgeon, the representative won't have access to the medical offices, the hospital, or the operating rooms.   Tr., 56.   The typical sales cycle starts with bringing the surgeon to Plaintiff's facilities to test out the equipment and talk with the sales representative, then when the surgeon agrees to use the product, the sales representative will set up eight or nine trays of sterilized instruments in the operating room, and the sales representative must be able to identify each instrument and hand it to the surgeon.   Tr., 65-67. The sales representative has to understand the steps to the surgery and be able to anticipate the instruments that the surgeon will need for each step.   Tr., 67.   Thus, even when a new sales representative has the requisite technical skills, the representative will still "literally start from square one" to build a brand and establish relationships and trust with the surgeons.   Tr., 56.   This process can take months or even years.   Tr., 65.

Singer also testified that Dr. Allende moved his practice from Central Florida Regional Hospital to Melbourne, Florida, which was outside the relevant sales

territory, in approximately June 2020.   Tr., 53-54.   Until that time, he continued to

use Plaintiff's products, although the sales volume decreased.   Tr., 61.   Singer also

testified that he "wouldn't be surprised" if Florida Hospital Orlando was in

discussions in 2017 to purchase a Globus spine surgery robot, but could not recall

any details.   Tr., 62.   Singer further testified that he was "possibly" aware that Dr.

Sawin had expressed dissatisfaction to Plaintiff's management about Plaintiff's

culture and/or product development, but did not have any direct knowledge.   Tr.,

63.

     C.     *Misty L. Decker*

The third and final witness to testify was Misty L. Decker ("Decker") a

Certified Public Accountant.   Tr., 70-71.   Decker earned her bachelor's degree in

business administration with an emphasis in accounting from the University of

Central Arkansas, and a master's degree in taxation from the University of

Mississippi.   Tr., 71.   She has worked as a public auditor, as a controller for a large

nonprofit, and has worked in litigation support and forensics since 2007.   Tr., 71.

Decker has received certifications and accreditations in Business Evaluation,

Financial Forensics, and Chartered Global Management Accountant from the

American Institute of Certified Public Accountants.   Tr., 71.   She is also a Certified

Fraud Examiner with the Association of Certified Fraud Examiners and a Certified

Licensing Professional with the Licensing Executives Society.   Tr., 71.   Decker was

tendered as an expert in forensic accounting without objection.   Tr., 71-72.

Decker was retained by Plaintiff to calculate the harm Plaintiff suffered due to Defendants' breach of the 2017 Agreement as it relates to sales to Dr. Sawin, Dr. Rosen, Dr. Gandhi, Dr. Allende, Dr. Rodas, and Dr. Burry.   Tr., 72-73.   Based on the finding of default judgment, Decker assumed Defendants' liability as to all claims and calculated Plaintiff's damages through the five-year contract term, as well as for the additional 12-month non-compete period.   Tr., 73, 91, 148-50.[7]

Decker prepared several reports explaining how she reached her calculations, the most recent of which is dated October 16, 2024.   Tr., 74; Doc. No. 424-1.[8] Decker determined that Plaintiff's lost profits would be the appropriate measure of Plaintiff's damages, and described lost profits as "what the plaintiff lost given the

_____

[7] Decker initially testified that the total damages Plaintiff suffered was $13,645,804.00.   Tr., 73.   It appears that this was error, as Decker later testified in more detail about the damages, and that testimony resulted in a total lost profits calculation of $13,645,938.00.   Tr., 91-94, 148-50.   Because Defendants did not challenge this discrepancy either at the evidentiary hearing or in their filings, the undersigned has considered the slightly higher amount, given the more detailed testimony in support.

[8] Defendants objected to the admission of Decker's report as hearsay, and the undersigned conditionally admitted the report and carried the objection with the case. Tr., 74-75.   Defendants reiterate their objection in their post-hearing briefing, *see* Doc. No. 431, at 25.   Upon further consideration, the objection is sustained, and the October 16, 2024 report is excluded from evidence.   *See Johnston v. Borders*, No. 6:15-cv-936-Orl-40DCI, 2018 WL 4215027, at *1 (M.D. Fla. Sept. 4, 2018); *Jones v. Royal Caribbean Cruises, Ltd.*, No. 12–20322–CIV, 2013 WL 8695361, at *2 (S.D. Fla. Apr. 4, 2013).   However, as the parties agreed during the hearing, Decker was permitted to refer to her report and its attachments during her testimony, and to use the report and attachments as demonstrative aides.   Tr., 74-75. As such, the undersigned has considered the October 16, 2024 report only to the extent discussed at the evidentiary hearing.

bad acts of the defendant.  So but for the bad acts, what would NuVasive have gained."  Tr., 77.  There are multiple methods for calculating lost profits, but Decker utilized the "before-and-after" methodology, which looks at the sales data for each of the six surgeons and their track records of sales with Plaintiff prior to Defendants' breach of the 2017 Agreement, as well as their track records of sales after.  Tr., 77.  Decker chose the before-and-after method based on the available sales data; no other method was possible due to a lack of sales projections and a lack of sales data for other competitive products sold.  Tr., 77-78.

In applying the before-and-after methodology, Decker looked at the sales history for each doctor for three years prior to AM's separation from Plaintiff, including sales of hardware and biologics.  Tr., 80-81.  Decker obtained this information from Plaintiff's own accounting software and from conversations with Plaintiff's Vice President of Finance.  Tr., 81.  Decker evaluated this sales data for the years 2015 and 2016 and then monthly for 2017, accounted for the fact that in late 2017 some of the bad acts impacting Plaintiff's sales were already taking place, considered market industry research which showed a slight decrease in sales overall from 2016 and 2017, and took into account the uncertainty that occurred in the market related to the change in administration in the federal government in early 2017 as well as the anticipated rebound in 2018.  Tr., 81-82, 86-87, *see also* Tr., 160-61.  Based on this analysis, Decker concluded that the best available evidence

for Plaintiff's expected profits going forward was the sales data in 2017.   Tr., 81-82,
86-87.   Decker clarified that the track record of sales for these surgeons constituted
the "best evidence" in this case because she did not have sufficient sales records for
Alphatec or any other competitors, nor any sales projections for each doctor.   Tr.,
95; *see also* Tr., 156-57.[9]

Decker also broke down the sales data by hardware sales which can be
connected to each doctor, and by biologics sales, which are purchased in bulk by
hospitals and stockpiled for use by the doctors.   Tr., 87-88.   Decker found that the
amount of hardware each surgeon used correlated directly to the amount of
biologics the surgeon would utilize, so Decker was able to allocate the biologics
sales utilizing the percentage of hardware sold to each doctor.   Tr., 88, 89.   Decker
then projected the annual sales for each doctor from December 2017 through the
end of 2022 for both hardware and biologics, which correlated with the five-year
term of the 2017 Agreement and the additional 12-month non-compete period – the
"loss period."   Tr., 90, 96-97.   In making these sales projections, Decker also made
adjustments related to the COVID-19 pandemic.   Tr., 100-02.   Decker considered
industry research in the Florida market, the limited hospital beds and reduction in

---

[9] For example, Decker looked at Soufleris' October 17, 2017 draft strategic plan for
Alphatec, (Doc. No. 424-12), but found that it did not address each of the six surgeons
specifically, and that the sales projections in that plan most likely included additional
physicians.   Tr., 95-96.   Decker further noted that her lost profit calculations were much
lower than the sales projections in Soufleris' draft strategic plan.   Tr., 95-96.

elective surgeries during the pandemic, and recognized that spinal surgeries were "considered to be the least elective of elective surgeries." Tr., 100-02. Based on this analysis, Decker adjusted the sales projections downward during the COVID-19 time period, and then made a corresponding increase to account for the uptick in surgeries following the pandemic. Tr., 101.

To establish the lost profits suffered by Plaintiff, Decker subtracted from these projected sales amounts Plaintiff's actual sales to each surgeon during the "loss period" – resulting in the "but-for sales." Tr., 97-98. Decker then subtracted from the "but-for sales" the costs of goods sold that Plaintiff avoided spending during the "loss period" due to the reduction in sales (such as unpaid commissions and costs of manufacturing), to calculate the lost profits for each surgeon. Tr., 98, 102. Decker was able to calculate the costs of goods sold percentages for each surgeon with reasonable certainty based on Plaintiff's own financial data (including the actual commissions paid in 2015 and 2016), by corroborating the data with Plaintiff's SEC 10K filings, and by speaking with the Vice President of Finance. Tr., 98-100, 102-03.[10] Decker did not include any commissions data from 2017 given that it was a partial year, and end-of-year bonuses may not have been paid. Tr., 103.

_____

[10] Decker also performed a regression analysis and a variable expense analysis to ensure that the cost of goods sold was as accurate as possible. Tr., 105.

For each doctor at issue, Decker made the following lost profit calculations:[11]

- For Dr. Sawin from December 2017 through his retirement on July 18, 2021, lost profits related to hardware sales of $5,522,130.00 and lost profits related to biologics sales of $1,571,715.00, for a total of $7,093,845.00. Tr., 91. Decker acknowledged that Dr. Sawin, Dr. Rosen, and Dr. Gandhi were in the same practice, and an argument could be made that some of the surgeries could have been performed by these other doctors, but Decker did not account for that in her calculations. Tr., 91, 106, 148.

- For Dr. Rosen, lost profits related to hardware sales of $2,515,136.00 during the 2017 Agreement term, and of $645,697.00 for the additional 12-month non-compete period. Tr., 91-92. Lost profits related to biologic sales of $708,070.00 during the 2017 Agreement term and an additional $181,307.00 for the non-compete period. Tr., 92. This equates to a total of $4,050,210.00. Tr., 149.

- For Dr. Gandhi, lost profits related to hardware sales through the 2017 Agreement term of $524,946.00 and an additional $134,417.00 during the non-compete period. Tr., 92. Biologics sales lost profits of $146,893.00 during the 2017 Agreement term and $37,613.00 during the non-compete period. Tr., 92. This equates to a total of $843,869.00. Tr., 149.

- For Dr. Allende, Decker utilized the time period December 1, 2017 through December 31, 2019, noting that, based on her own independent research, Dr. Allende relocated his practice outside the relevant sales territory to Melbourne, Florida at some point in 2020. Tr., 93, 124.[12] The total lost profits attributable to Dr.

---

[11] These calculations were verified manually and reviewed by two additional team members. Tr., 148.

[12] Part of Decker's research involved using the "Wayback Machine," which codifies older versions of websites. Tr., 124. Decker used the Wayback Machine to identify when Dr. Allende was listed as a surgeon on various websites. Tr., 124-25. She also noted that there was sales data for Dr. Allende related to Alphatec products through the fourth

Allende for both hardware and biologics through December 31,
2019 equates to $665,369.00.   Tr., 150.[13]

- For Dr. Rodas, lost profits related to hardware sales through the
  2017 Agreement term of $398,258.00, and an additional
  $102,221.00 for the non-compete period.   Tr., 94.   And lost
  profits related to biologics sales of $85,339.00 for the 2017
  Agreement term and an additional $21,852.00 for the non-
  compete period.   Tr., 94.   This equates to a total of $607,670.00.
  Tr., 150.[14]

- For Dr. Burry, lost profits related to hardware sales through the
  2017 Agreement term of $248,260.00, and an additional
  $67,972.00 for the non-compete period.   Tr., 94.   And lost
  profits related to biologics sales of $54,729.00 for the 2017
  Agreement term and an additional $14,014.00 for the non-
  compete period.   Tr., 94.   This equates to a total of $384,975.00.
  150.[15]

While Decker did not make any opinions regarding causation, she did look

at all available evidence to assess whether any causal links existed for Plaintiff's lost

profits.    Tr., 109.    For example, Decker found that Dr. Sawin utilized

approximately $245,000.00 worth of Plaintiff's products in November 2017, and that

---

quarter of 2019.   Tr., 125.

[13] During her testimony, Decker did not provide a breakdown of this amount by
hardware or biologics, and as discussed above, her report was not admitted into evidence.
However, Defendants have not challenged Decker's calculations as to Dr. Allende other
than arguing the "loss period" should end in 2018 rather than 2019.   *See* Doc. No. 407, at
3, 7, 22-23, 28-29; Doc. No. 431, at 16-17, 25.

[14] Decker testified to a total of $670,671.00, but that appears to be a math error.   Tr.,
150.

[15] Decker testified to a total of $384,976.00 but that also appears to be a math error.
Tr., 150.

number dropped to $36,000.00 in December 2017 and continued to decline thereafter. Tr., 109.    Decker further found that Dr. Sawin performed his first surgery using Alphatec products on December 5, 2017, which corresponded with an increase in Alphatec sales.    Tr., 110.    The same pattern existed for the other five surgeons; beginning in December 2017 there was a decline of 93-97 percent in the usage of Plaintiff's products, with a corresponding increase in the utilization of Alphatec and other competitor products which continued through the "loss period."    Tr., 110-11.

With respect to Dr. Sawin, Decker discussed other evidence she analyzed to establish a causal link between Plaintiff's lost profits and Defendants' breaches. Such evidence included statements by Dr. Sawin that he was a nearly exclusive user of Plaintiff's products since 2016 and did not utilize any Alphatec or other competitor products Defendants began selling until December 2017 and thereafter. Tr., 112.    Decker also pointed to a video where Dr. Sawin stated that Hawley was critical to Dr. Sawin's work in the operating room, to text messages between Dr. Sawin and Soufleris where Dr. Sawin said Soufleris was like a son to him, and to emails where Dr. Sawin was complaining about the quality of Alphatec products. Tr., 112-13, 208-09; *see also* Doc. No. 424-5.    Decker noted that Dr. Sawin had also made prior representations that he had decided to stop using Plaintiff's products in October 2017 and did not decide to switch to Alphatec products until December

2017, but Decker also noted that Soufleris had made statements in the past that he hoped the business he would convert to Alphatec would include Dr. Sawin.    Tr., 115-16.    Decker also found persuasive Hawley's request on December 12, 2017 that Alphatec mimic Plaintiff's custom instruments.    Tr., 120.

Decker also reviewed Dr. Sawin's February 1, 2020 declaration and December 17, 2020 arbitration testimony, and found that they did not change her lost profits calculations because Dr. Sawin's statements in these documents "did not line up" with the other evidence Decker reviewed.    Tr., 122.    In both the declaration and arbitration testimony, Dr. Sawin stated that he stopped using Plaintiff's products for reasons completely unrelated to Defendants' breach of the 2017 Agreement, to include dissatisfaction with Plaintiff's management, direction and leadership, and that Defendants played no role in his decision to move away from Plaintiff's products.    *See* Doc. Nos. 425-1, 425-2.    Dr. Sawin further stated that he used a variety of different product lines throughout his career and never utilized a single product or manufacturer, that he notified Plaintiff in October 2017 that he intended to sever ties, and that he did not reach out to Defendants until December 2017.    *Id.* Decker found Dr. Sawin's declaration and testimony unreliable, given that it was contradicted by Plaintiff's sales data, and the other evidence discussed above.    Tr., 175-85, 187-88, 210-11, 219-20.

Decker also testified about the potential impact Florida Hospital's purchase

of a Globus surgery robot would have on the lost profits calculations for Dr. Rosen and Dr. Gandhi.    Tr., 126-29.    Decker learned that a contract was executed between Florida Hospital and Globus on or about December 27, 2017, with a 90-day installation provision, and that there appeared to be some usage of the robot starting in 2018.    Tr., 126-27.    But Decker did not factor the Globus robot into her lost profit calculations because:    (1) Defendants' bad acts occurred prior to the execution of the Globus contract, leaving Plaintiff with inadequate sales representation so that it could no longer sell its products to these surgeons; (2) Decker was unable to obtain complete and reliable sales data related to the use of the Globus robot; and (3) there was no evidence Dr. Rosen or Dr. Gandhi were actually utilizing the Globus robot prior to Defendants' breaches of the 2017 Agreement or that these surgeons ceased doing business with Plaintiff because of the Globus robot.    Tr., 127-29, 166, 168-69, 170-71, 173-74, 202-03, 217.[16]

Decker also criticized the lost profits calculations Defendants submitted in their opposition brief.    Tr., 130.    Specifically, Decker took issue with Defendants' use of incomplete and unreliable sales data from Alphatec, and Defendants' failure to consider any other third-party sales data.    Tr., 130, 132, 134-35, 193-95, 197, 200.[17]

---

[16] Decker also appeared to opine that Dr. Rosen and Dr. Gandhi may have moved to the Globus robot to supplement the loss of Plaintiff's products which these surgeons could no longer purchase, and that Defendants were selling products these surgeons could not utilize.    Tr., 166.

[17] Decker noted that she had repeatedly asked for detailed Alphatec sales

Defendants also failed to account for pricing differentials – for example, Miller was undercutting pricing and/or comparing prices between Plaintiff and Alphatec in order to make sales on behalf of AMS.   Tr., 130-31.   Decker also noted that Defendants' calculations effectively eliminated sales data from 2020 and 2021, as well as Dr. Allende's sales in 2019.   Tr., 135-37.[18]

On cross-examination, Decker agreed that if there was evidence that Dr. Sawin's decision to cease utilizing Plaintiff's products as a primary source for spinal medical equipment was made independent of Defendants, then the lost profits attributable to Dr. Sawin could be reduced.   Tr., 186-87.   Decker declined, however, to quantify any downward adjustment on that basis.   Tr., 187.   Decker further testified that she was not aware of and did not review any deposition testimony from any of the six surgeons at issue in formulating her calculations.   Tr., 163, 184, 192.   In sum, other than the adjustments for Dr. Allende's move to Melbourne, Florida, Dr. Sawin's retirement in July 2021, and the COVID-19 pandemic, Decker found no other downward adjustments to her lost profit

---

information but never received it.   Tr., 130.

[18] Decker also provided detailed testimony as to her prejudgment interest calculations, which equated to $4,415,119.00 under Delaware law and $3,921,408.00 under Florida law.   Tr., 137-40, 144.   Counsel for Defendants stated at the evidentiary hearing that Defendants had no objection to the methodology and application of Decker's prejudgment interest calculations, and no objection to the Court utilizing Decker's interest tables included in her October 16, 2024 report.   Tr., 140-41, 143, 145.

calculations were appropriate.   Tr., 205.[19]

## III.    THE MOTION IN LIMINE

Plaintiff has moved to exclude as evidence Dr. Sawin's February 1, 2020 declaration and December 17, 2020 arbitration testimony, arguing that both documents constitute inadmissible hearsay.   Doc. No. 421, at 3-8.   The undersigned conditionally admitted both exhibits at the hearing and directed Defendants to address Plaintiff's motion in limine in their post-hearing briefing. Tr., 18-20, 221-22; *see also* Doc. Nos. 425-1, 425-2.   The undersigned further noted that any ruling on the motion in limine would apply equally to two exhibits Plaintiff conditionally admitted over Defendants' objections:   a video testimonial from Dr. Sawin, and Dr. Sawin's August 30, 2018 email to an Alphatec representative.   Tr., 18-20, 225-27, 229-30; Doc. Nos. 424-3, 424-9.

Defendants have responded to the motion in limine, Doc. No. 431, at 20-24, and upon review of the motion and response, the undersigned will grant in part and deny in part Plaintiff's motion (Doc. No. 421) and permit limited use of Dr. Sawin's declaration and arbitration testimony, as well as Dr. Sawin's video testimonial and August 18, 2018 email, as described below.

---

[19] Plaintiff admitted into evidence several other exhibits, which the undersigned has reviewed and considered as necessary in this report and recommendation.  *See* Tr., 228-32, 234-37; Doc. Nos. 424-2, 424-4, 424-5, 424-6, 424-7, 424-8, 424-10, 424-11, 424-12, 424-13, 424-14, 424-15, 424-16, 424-17, 424-18, 424-19, 424-20, 424-21, 424-22, 424-23, 424-24.

The Federal Rules of Evidence define hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c); *see also United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) ("Hearsay is a statement, other than one made by a declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted." (citing Fed. R. Evid. 801(c)). Dr. Sawin did not testify at the evidentiary hearing, and Defendants do not dispute that they seek to admit Dr. Sawin's declaration and arbitration testimony for the truth of the matters asserted therein – namely that Defendants had nothing to do with Dr. Sawin's decision to stop purchasing Plaintiff's products. Thus, the declaration and arbitration testimony on their face constitute inadmissible hearsay. *See, e.g., Pump It Up Holdings, LLC v. Anderson*, No. 6:19-cv-1252-GAP-DCI, 2021 WL 4427509, at *2, n.3 (M.D. Fla. Apr. 8, 2021) (at evidentiary hearing to determine damages following entry of default judgment, court declined to admit into evidence declarations as inadmissible hearsay); *Marine Diesel Specialists, Inc. v. M/Y "20 %,"*, No. 2:1-cv-689-FtM-99MRM, 2018 WL 2926175, at *2 n.5 (M.D. Fla. May 24, 2018), *report and recommendation adopted*, 2018 WL 2857299 (M.D. Fla. June 11, 2018) ("The Court finds that the attempted submission of testimony from these witnesses by affidavit or declaration effectively deprived Plaintiff of the ability to cross-examine the witnesses at the evidentiary hearing."); *Amobi v. Brown*, 317 F.

Supp. 3d 29, 38 (D.D.C. 2018) (as a general matter, testimony at a prior arbitration

proceeding is hearsay under Fed. R. Evid. 801(c)).

Defendants raise three arguments in their response as to why Dr. Sawin's

declaration and arbitration testimony should be admitted into evidence.    Doc. No.

431, at 20-24.    None are persuasive.

A.    *Dr. Sawin's Arbitration Testimony*

Defendants first argue that Dr. Sawin's prior arbitration testimony is

admissible pursuant to Federal Rule of Evidence 804.    Doc. No. 431, at 20-22.

The hearsay exception in Rule 804 "establishes a two-step inquiry.    First, a

witness must be 'unavailable' as that term is defined in section 804(a). . . .    Second,

the testimony of the unavailable witness must fall within one of the categories of

admissible evidence enumerated in section 804(b)."    *United States v. King*, 713 F.2d

627, 630 (11th Cir. 1983).    Here, Defendants argue that Dr. Sawin was unavailable

pursuant to Rule 804(a)(5) and (b)(1), which provides a hearsay exception for prior

testimony of a witness who is absent from a hearing, where the proponent of the

testimony has not been able to procure "by process or other reasonable means" the

declarant's attendance.    Fed. R. Evid. 804(a)(5); *see also Baylor v. Jefferson Cty. Bd. of

Educ.*, 733 F.2d 1527, 1534 (11th Cir. 1984) ("Federal Rule of Evidence 804(b)(1)

allows the receipt of a transcript from another proceeding only when the witness is

unavailable within the meaning of Federal Rule of Evidence 804(a) and only when

the opposing party 'had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.'" (quoting Fed. R. Evid. 804(b)(1))).

Defendants' argument fails at the first step, as they have not established that Dr. Sawin was "unavailable." "The burden of proving that the declarant is unavailable is on the statement's proponent." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1309 (11th Cir. 2022) (citing *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1317 (11th Cir. 2013)). Defendants must show that they "exercised effort through process or reasonable means to attempt to locate the declarant and persuade him to come testify." *Id.*

At the evidentiary hearing, Defendants' counsel stated the following:

> "I did make efforts once I found out about the objection. And I'm quite simply unable to – I was unable to get Dr. Sawin here."

……..

> As it relates to Dr. Sawin, I did tell the Court this morning that I had spoken to him but I was not able to procure his appearance once I learned of the potential objection to his testimony. I was advised that Dr. Sawin has had a knee surgery within the last few weeks and did not feel physically capable. He's using a walker and did not feel physically capable of coming to court. I think I relayed that to the defense in a phone call. To the extent that would potentially go to any argument that I make on hardship, I didn't want to just bring it out on a whole cloth in our paper.

Tr., 18, 222-23.[20]

This is the extent of Defendants' argument as to Dr. Sawin's unavailability. *See* Doc. 431, at 20-21.   Defendants did not elaborate on what efforts they made to procure Dr. Sawin's live testimony beyond a conclusory statement that counsel spoke to him at some unspecified point in time, Defendants provided no additional details about Dr. Sawin's surgery, Defendants did not list Dr. Sawin as a witness nor subpoena him as a witness, *see* Doc. No. 417 and Tr., 18, and Defendants did not request that Dr. Sawin testify remotely or ask to continue the hearing to a date when he would be able to appear in-person.   This is not sufficient to establish Dr. Sawin's unavailability.   *See Carrizosa*, 47 F.4th at 1309 ("'[C]ounsel's uncorroborated statement' as to the reason for the declarant's unavailability is not sufficient on its own to satisfy the proponent's burden." (citing *United States v. Acosta*, 769 F.2d 721, 723 (11th Cir. 1985))); *see also Acosta*, 769 F.2d at 723 (finding proponent failed to carry his burden of proving witness' unavailability where "[h]e offered no evidence that he had requested the witness to testify or that she had refused to do so.   Nor was there medical testimony as to the nature or severity of the child's illness or that the child's health would be jeopardized by the mother's absence.   Moreover, there

---

[20] Although Defendants mentioned Dr. Sawin's knee surgery both at the hearing and in their brief, *see* Doc. No. 431, at 21, n.3, they make no argument that Rule 804(a)(4)'s hearsay exception, which provides in relevant part that a witness cannot testify at a hearing because of a then-existing infirmity or physical illness, applies.

was no pre-trial motion for a continuance in order to produce the witness at a later trial.").[21]

Because Defendants have not established that they were unable to procure Dr. Sawin's attendance "by process or other reasonable means," the undersigned finds that Rule 804(a)(5)'s hearsay exception does not apply.

B.    *Plaintiff Opened the Door*

Next, Defendants argue that Plaintiff opened the door for the Court to consider Dr. Sawin's declaration and arbitration testimony because Plaintiff questioned Decker about both.    Doc. No. 431, at 23-24 (quoting Tr., 121-22). Defendants therefore argue that the declaration and arbitration testimony are admissible under the doctrine of completeness.    *Id.; see also* Fed. R. Evid. 106 "(If a

---

[21] Defendants cite to several decisions – none from within this Circuit – which are each distinguishable and unpersuasive.    The witness in *United States v. Paling*, 580 F. App'x 144 (3d Cir. 2014) had died, thus unavailability was not in question.    In *Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1184 (3d Cir. 1978), numerous attempts were made to depose the plaintiff prior to trial, plaintiff notified defendant on the day of trial that he would not appear, and counsel for defendant explained to the court "that extensive efforts had been made to obtain his appearance, but they had failed, due at least in part to his seafaring occupation." In contrast, Defendants here rely on a single vague and conclusory representation.    The parties did not dispute the unavailability of two witnesses who lived out of state in *Athridge v. Aetna Cas. And Sur. Co.*, 474 F. Supp. 2d 102, 115 (D.D.C. 2007), and unlike the present case, it appears that counsel provided evidence of the reasonable efforts made to bring the witnesses to testify at trial.    Last, Defendants rely on *Amobi v. Brown*, 317 F. Supp. 3d 29 (D.D.C. 2018), however in that case, the plaintiffs provided evidence of their attempts to procure the witness's testimony – counsel served the witness with a subpoena, spoke telephonically with family members who indicated that the witness would not come to testify, and made other phone calls that went unanswered.    No such evidence exists here.

party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part--or any other statement--that in fairness ought to be considered at the same time.   The adverse party may do so over a hearsay objection.").

Defendants misstate the record.   The undersigned conditionally admitted Dr. Sawin's declaration and arbitration testimony and reserved ruling on Plaintiff's hearsay objections.   The undersigned did so in recognition of the fact that Plaintiff did not move to exclude this evidence until the eve of the hearing, and to provide Defendants with an opportunity to address the hearsay issue in their post-hearing briefing.   Tr., 18-20, 221-22; *see also* Doc. Nos. 425-1, 425-2.   The undersigned also expressly stated that the hearsay objections would be resolved at the report and recommendation stage.   Tr., 19-20.   In other words, the undersigned permitted both sides to utilize Dr. Sawin's declaration and arbitration testimony at the evidentiary hearing, with the full knowledge and understanding by all parties that such evidence may ultimately be excluded as inadmissible hearsay.   Defendants provide no legal authority suggesting that such an approach is impermissible, or that by conditionally admitting the evidence to allow the opposing party the opportunity to be heard on the matter, the objections become a *de facto* nullity.   Doc. No. 431, at 22-24.   To now say that *Plaintiff* opened the door is inaccurate and disingenuous.

C.    *Impeachment Evidence*

Defendants' final argument is that Dr. Sawin's declaration and arbitration testimony should be admitted as impeachment evidence as to Decker's expert opinions.    Doc. No. 431, at 24.    Federal Rule of Evidence 705 provides that "an expert may state an opinion--and give the reasons for it--without first testifying to the underlying facts or data.    But the expert may be required to disclose those facts or data on cross-examination."    Fed. R. Evid. 705.    "[I]t is undeniable that a party may impeach an expert witness with materials the expert relied upon in reaching his opinion, or with materials that draw his very opinion into question."    *Jones v. GDCP Warden*, 753 F.3d 1171, 1193 (11th Cir. 2014); *see also Tucker v. Evenflo Co., Inc.*, No. 6:20-cv-2-PGB-GJK, 2021 WL 8946698, at *6 (M.D. Fla. Nov. 29, 2021) ("The Court agrees that any document listed by Evenflo's expert as background material in the expert's report may be inquired into on cross-examination.    It is immaterial that the expert does not rely on the testimony in forming his or her opinions.    The point on cross-examination may very well be either why the expert did not take the testimony into consideration and how the opinion would have change if the expert had accounted for it.").    This includes using hearsay testimony for impeachment purposes.    *See Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541, 545 (5th Cir. 1978) ("[O]therwise hearsay evidence disclosing the basis of an expert witness' opinion should be admissible to impeach if strictly limited to that purpose by instructions

and if, in the discretion of the judge, the impeaching evidence has sufficient guarantee of reliability that the prophylactic effect of the hearsay rule is not necessary to ensure trustworthiness.").[22]

Decker testified that she considered Dr. Sawin's declaration and arbitration testimony but found them to be unreliable based on various inconsistencies between Dr. Sawin's statements and other evidence she considered.   Tr., 122, 175-85, 187-88, 210-11, 219-20.   As such, Decker did not make any downward adjustments in her lost profits calculations based on Dr. Sawin's declaration and arbitration testimony.   *Id.*   Because Decker admittedly considered Dr. Sawin's declaration and testimony, she is subject to cross-examination as to why she found them unreliable and whether her opinions and calculations would have changed if she had accounted for them.   *See Tucker*, 2021 WL 8946698, at *6.   Defendants did, in fact, cross-examine Decker on these points, and to the extent Dr. Sawin's declaration and arbitration testimony were discussed in that regard, they are admissible for impeachment purposes.

But "impeachment of the expert witness on the underlying materials considered proves only that the declarant lacks credibility;" it is not substantive

---

[22] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

evidence to prove an underlying truth.   *See Urooj v. Holder*, 734 F.3d 1075, 1079 (9th Cir. 2013) (citation and quotation marks omitted).   Indeed, "weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility. On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility."   *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) (citations omitted).   Here, Defendants wish to admit Dr. Sawin's declaration and arbitration testimony not just to challenge Decker's credibility but also for the truth of the underlying statements – namely that Dr. Sawin ceased purchasing Plaintiff's products for reasons unrelated to Defendants.   *See, e.g.*, Doc. No. 431, at 10-12.   In that regard, Defendants seek to impermissibly backdoor evidence under the guise of impeachment.   *See Bratt v. Genovese*, 782 F. App'x 959, 967–68 (11th Cir. 2019) ("[I]f what makes the impeaching statement relevant is really the truth of the statement, then the statement is hearsay and inadmissible. . . .   Here, though, Bratt's attempt to introduce Wagner's November 2015 sworn statement as extrinsic evidence to impeach Genovese was solely an attempt to back-door substantive evidence under the guise of impeachment.");[23] *see also Bryan*, 566 F.2d at 545-46

---

[23] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants."   *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

(while acknowledging that hearsay may be used to impeach an expert, finding admission of other expert reports that would otherwise be inadmissible as hearsay was error where the experts could have been called at trial to testify to contradict and impeach defendant's expert, and the other expert reports lacked any independent guarantee of trustworthiness).

In sum, Defendants are entitled to question Decker as to her consideration of Dr. Sawin's declaration and arbitration testimony, why she disregarded Dr. Sawin's statements therein, and whether her opinion would have changed had she not discounted Dr. Sawin. Defendants did just that. Defendants cannot, however, backdoor this evidence as impeachment to prove the truth of the statements asserted in both exhibits. Accordingly, Plaintiff's motion in limine (Doc. No. 421) will be granted in part and denied in part. Dr. Sawin's February 1, 2020 declaration and December 17, 2020 arbitration testimony will be admitted and considered for impeachment purposes only. In all other respects these exhibits are excluded as hearsay. In addition, Dr. Sawin's video testimonial and August 18, 2018 email will be admitted with respect to whether and to what extent Decker considered them in rendering her opinions, but are also otherwise excluded as hearsay.

## IV.    PLAINTIFF'S RENEWED MEMORANDUM ON DAMAGES

Plaintiff seeks damages in the amount of $13,645,938.00 in lost profits under Delaware and Florida law, prejudgment interest in the amount of $4,415,119.00

under Delaware law and $3,921,408.00 Florida law (to the extent not duplicative), post-judgment interest as provided by law, and attorneys' fees and costs in the amount of $1,300,000.00.   Doc. Nos. 403, 430.   As previously discussed, Judge Mendoza has found Plaintiff entitled to default judgment on all claims raised in the second amended complaint, and that Plaintiff is entitled to recover its damages related to each claim.   Doc. No. 395.   Thus, the only issue before the undersigned is quantifying the damages to be awarded.

With the dismissal of Hawley and Miller, the only claims for which Plaintiff is now seeking damages are the breach of contract claims under Delaware law against AM and AMS (Counts II-III), the statutory liability and piercing the corporate veil claims under Florida law against Soufleris (Counts VI-VII), the FDUTPA claim against all Defendants (Count VIII), and the tortious interference with business relationships claim under Florida law against Soufleris (Count IX). Doc. No. 403, at 1-3.   Some of the claims do not seek damages, and others overlap as to the damages sought.   The undersigned addresses each category of damages below, identifying the cause of action that relates to those damages.

A.    *Lost Profits*

Plaintiff seeks to recover $13,645,938.00 in lost profits jointly and severally against AM, AMS, and Soufleris for the Defendants' breach of the 2017 Agreement. Doc. No. 430, at 3-4; *see also* Doc. No. 188, ¶¶ 76-97 (Counts II and III).     Delaware

law applies to the breach of contract claims.   *See* Doc. No. 424-10, at 15 (stating that

the 2017 Agreement is governed by and construed in accordance with the laws of

Delaware).   Plaintiff seeks this same amount of lost profits as damages against all

three Defendants, jointly and severally, under FDUTPA and under the Florida

tortious interference with business relationships claim against Soufleris.   Doc. No.

403, at 2-3, Doc. No. 430, at 2; *see also* Doc. No. 188, ¶¶ 121-31.[24]

"[U]nder Delaware law, the standard remedy for breach of contract is based

on the reasonable expectations of the parties that existed before or at the time of the

breach."   *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132–33 (Del. 2015),

*as corrected* (Dec. 28, 2015).   "Where a defendant's liability for breach of contract

has been established, the plaintiff is entitled to compensation to put it in the same

financial position as it would have been had the breach not occurred."   *NuVasive,*

*Inc. v. Day*, No. 19-CV-10800, 2022 WL 899244, at *10 (D. Mass. Mar. 28, 2022), *aff'd*,

77 F.4th 23 (1st Cir. 2023) (citing *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 & n.6

(Del. 2001) (stating that "the standard remedy for breach of contract is based upon

---

[24] Counts VI and VII of Plaintiff's second amended complaint do not independently request damages, but rather seek to hold Soufleris personally liable for any damages assessed against AM and/or AMS pursuant to the Florida Revised Limited Liability Company Act, Fla. Stat. §§ 605.0101, *et seq.*, and a piercing the corporate veil theory.   Doc. No. 188, ¶¶ 109-20.   Judge Mendoza already found Plaintiff entitled to default judgment on these claims, and all Defendants concede that they are jointly and severally liable as to all damages awarded, therefore the undersigned does not address these claims any further. *See* Doc. No. 395, at 28; Doc. No. 407, at 2; *see also* Tr., at 9-10.

the reasonable expectations of the parties ex ante" and that "[t]his principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract"))). "That is, . . . [o]ne measure of expectation damages is a party's lost profits." *Id.* (citing *PharmAthene, Inc. v. SIGA Techs., Inc.*, No. CV 2627-VCP, 2014 WL 3974167, at *7 (Del. Ch. Aug. 8, 2014)); *see also AbbVie Endocrine Inc. v. Takeda Pharm. Co. Ltd.*, No. 2020-0953-SG, 2023 WL 5704055, at *3 (Del. Ch. Sept. 5, 2023) ("Lost profits are an accepted means of quantifying expectation damages in a breach of contract action. However, 'no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.'" (citing *Siga Techs.*, 132 A.3d at 1108, 1131)).

In addition, a "business may recover past lost profits under FDUTPA." *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-2274-VMC-TGW, 2022 WL 3272538, at *17 (M.D. Fla. Aug. 10, 2022); *see also Wilco Trading LLC v. Shabat*, No. 8:20-cv-579-TPB-JSS, 2021 WL 1146634, at *9 (M.D. Fla. Mar. 8, 2021), *report and recommendation adopted*, 2021 WL 1140097 (M.D. Fla. Mar. 25, 2021) ("T]he lost profits claimed by Plaintiff consist of past lost profits and not lost profits anticipated in the future, *e.g.* after a trial or entry of a final judgment."). Lost profits are also recoverable in Florida under a tortious interference with business relationships claim. *See Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275,

1285 (S.D. Fla. 2021) ("Lost profits are certainly compensatory damages.   And in claims with no underlying transaction, such as business torts, lost profits are often directly caused by a defendant's wrongful act and recoverable simply as compensatory damages." (citations omitted)); *Blueskygreenland Env't Sols., LLC v. 21st Century Planet Fund, LLC*, No. 12-81234-CIV, 2014 WL 3667874, at *2 (S.D. Fla. July 22, 2014) (holding that "lost profits constitute a correct measure of damages" in a tortious interference claim); *see also Ins. Field Servs., Inc. v. White & White Inspection & Audit Serv., Inc.*, 384 So. 2d 303, 308 (Fla. Dist. Ct. App. 1980) ("Here, there is no question but that the tortious interference of appellants was the direct cause of appellee's lost profits[.]").

Defendants concede that lost profits is "the appropriate remedy both under Delaware law for the claims based in contract, [and] under Florida law for Plaintiff's alternative theories."   Doc. No. 407, at 2.   The parties also all agree that the amount of lost profits Plaintiff seeks is the same under both the Delaware and Florida causes of action, and Plaintiff does not seek duplicative damages.   *See* Doc. No. 403, at 2, Doc. No. 407, at 2.   Because the parties focus their pre-and-post hearing briefing primarily on Delaware law, because Judge Mendoza has already found liability and entitlement to damages under Delaware law, and because, as discussed below, Delaware law provides broader damages (with respect to prejudgment interest and attorneys' fees), the undersigned focuses on Delaware law going forward.

"Delaware law has established that '[i]t is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of contract, must demonstrate with *reasonable certainty* that [the] defendant's breach caused the loss.'"  *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 596–97 (D. Del. 2004) (emphasis in original) (quoting *Tanner v. Exxon Corp.*, No. 79C–JA–5, 1981 WL 191389, at *1 (Del. Super. Ct. July 23, 1981)).  "A plaintiff must prove its damages by a preponderance of the evidence."  *eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *19 (Del. Ch. Sept. 30, 2013) (footnote omitted).  However, "[w]hile a plaintiff must prove the fact of damages by a preponderance of the evidence, the proof required to establish the *amount* of damage is not as great as that required to establish the fact of damage.  Indeed, showings of future lost profits need only meet the more relaxed substantial evidence standard, requiring such relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  *AbbVie*, 2023 WL 5704055, at *3 (quotations marks and footnotes omitted).  Moreover, "[t]he breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer.  Rather, when a contract is breached, expectation damages can be established as long as the plaintiff can prove the fact of damages with reasonable certainty.  The *amount* of damages can be an

estimate." *Siga Techs.*, 132 A.3d at 1111 (footnote omitted).[25] *See also All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *11 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005) ("The law does not require certainty in the award of damages when a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages.").[26]

Plaintiff, through its expert Decker, utilized the before-and-after methodology to calculate its lost profits and Defendants concede that this methodology is appropriate and has been accepted in both Delaware and Florida courts. Doc. No. 407, at 2; Tr., 9-10. *See also AbbVie*, 2023 WL 5704055, at *6

---

[25] Defendants cite to *Zayo Grp., LLC v. Latisys Holdings, LLC*, No. CV 12874-VCS, 2018 WL 6177174, at *15 (Del. Ch. Nov. 26, 2018), for the proposition that Plaintiff must establish that its claimed damages were directly and proximately caused by Defendants' breach. Doc. No. 407, at 26. The undersigned agrees. However, the undersigned does not adopt the remainder of the analysis in *Zayo*, as the court found no breach of contract, and the damages were not calculated using the same methodology adopted by Decker.

[26] Similar standards of proof apply in FDUTPA claims. *See Twin Rivers Eng'g Corp. v. Fieldpiece Instruments, Inc.*, No. 612-cv-1794-Orl-40TBS, 2014 WL 3908189, at *13 (M.D. Fla. Aug. 11, 2014), *amended*, 2014 WL 12628592 (M.D. Fla. Nov. 3, 2014) (applying preponderance of the evidence standard to damages proof under FDUTPA (citations omitted)); *TEC Serv, LLC v. Crabb*, No. 11-62040-CIV, 2013 WL 12177335, at *8 (S.D. Fla. June 11, 2013) ("Plaintiffs have not shown that they suffered any damages [under FDUTPA] by a preponderance of the evidence."); *see also Moon v. Med. Tech. Assocs., Inc.*, No. 8:13-cv-02782-EAK, 2015 WL 1227499, at *2 (M.D. Fla. Mar. 17, 2015) ("[W]hile damages may not be determined by mere speculation or guess, it will be enough if the evidence show(s) the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." (citation omitted)).

(adopting before-and-after damages method); *Devon Med., Inc. v. Ryvmed Med., Inc.*, 60 So. 3d 1125, 1128 (Fla. Dist. Ct. App. 2011) (noting that lost profits are typically proven by either the before and after theory or the yardstick test).  In addition, Judge Mendoza previously found the before-and-after methodology to be "one of 'two generally recognized methods of proving lost profits,'" and found the methodology to be appropriate in this case.  Doc. No. 334, at 27-28 (quoting *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1538 (11th Cir. 1985)).

Applying this precedent here, the undersigned finds that Plaintiff has shown, by a reasonable degree of certainty through witness testimony, exhibits, and expert testimony, that Plaintiff suffered lost profits as to all six surgeons as a result of Defendants' breach of the 2017 Agreement.  In addition to Judge Mendoza previously finding liability, the undersigned is persuaded by the exhibits and testimony of both Soufleris and Singer, which showed that Defendants' actions from late 2017 forward resulted in a loss of sales to Plaintiff.  In particular, while Soufleris claimed lack of memory, the submitted exhibits demonstrate his close relationship with Dr. Sawin, his efforts to woo Dr. Sawin over to Alphatec including dinners and a trip to Alphatec headquarters, his negotiations with Alphatec while still bound by the 2017 Agreement, and his representations to Alphatec that he would bring over Dr. Sawin as a customer.  Doc. Nos. 424-15, 424-16, 424-17; *see*

*also* Tr., 115–16. [27]    Soufleris and Singer testified that all six surgeons were customers of Plaintiff and that they became Alphatec customers after Defendants' breach of the 2017 Agreement.    Tr., 35-37, 40-43, 57-58.    Singer also confirmed Plaintiff's overnight loss of sales from these surgeons and cogently explained how the loss of AM's sales force prevented Plaintiff from competing in the Central Florida market for an extended period of time given the nature of the relationships between surgeons and sales representatives in the spinal surgery industry.    Tr., 55-56, 65-67.    None of this testimony was contradicted or challenged, nor was any evidence presented demonstrating that any of the surgeons utilized Alphatec products prior to Defendants' breach of the 2017 Agreement.

The undersigned also finds Decker's expert testimony to be credible and reliable.    Decker analyzed sales data for the six surgeons at issue before and after Defendants' breach, deducted Plaintiff's actual sales and costs of goods sold, and accounted for various intervening factors.    Tr., 77, 79-82, 86-87, 97-98, 100-02, 160-61.    Her calculations are supported by substantial evidence, the majority of which

---

[27] Given this wealth of circumstantial evidence, the undersigned finds Soufleris' assertion that he did not directly ask Dr. Sawin to transfer his business to Alphatec less than credible.    The undersigned further notes – while not dispositive – the extensive record of Defendants' misconduct in this case, to include misrepresentations and falsehoods during the discovery and arbitration process, as well as spoliation of an entire email domain and deletion of text messages between June and December 2017.    Doc. No. 395, at 7-14.    *Cf. Day*, 2022 WL 899244, at *5 (applying adverse inference to defendants' spoliation of text messages and finding it reasonable to infer that the texts related to defendants' solicitation of one of plaintiff's customers to switch to a competitor).

Defendants do not contest, and she explained why she did not discount for other intervening factors.   Tr., 126-29, 130-31, 168-74, 175-88, 202-03, 210-11, 219-20.   The testimony of Singer and Soufleris only supports Decker's findings, and other than the impeachment evidence discussed above, Defendants have submitted nothing to contradict any of Plaintiff's evidentiary submissions.   *See, e.g.*, *NuVasive v. Day*, 77 F.4th 23, 30 (1st Cir. 2023) (affirming award of damages for breach of contract under Delaware law based on lost profits where plaintiff's expert – the same expert here – used the before-and-after methodology, relied upon sales projections, subtracted mitigating sales, costs of goods sold and commissions, and "converted the court's [prior] cause-and-effect finding into specific damages amounts based on her examination of multiple factors, including historical sales data, actual sales in the relevant period," and defendant's own sales projections); *see also All Pro Maids, Inc.*, 2004 WL 1878784, at *11 (finding defendant proximately caused plaintiff's lost profits when they breached restrictive covenant agreement; the evidence showed that plaintiff's clients dealt with defendant more than anyone else at plaintiff's business, and it was reasonable to infer that defendant contributed to competitor's success in obtaining plaintiff's former clients).

Defendants' opposition to Decker's lost profits calculations is relatively limited.   Defendants do not challenge Decker's utilization of the before-and-after methodology, nor do they contend that a different standard other than the

reasonable certainty or "substantial evidence" standard applies.   They do not challenge Decker's reliance on the track record of sales for the six surgeons for the 2015-2017 time period, nor her use of sales projections.   They do not challenge Decker's "but for sales" and "costs of goods sold" calculations.   And other than the length of the "loss period," they do not challenge Decker's lost profits calculations with respect to Dr. Rodas and Dr. Burry.   *See* Doc. Nos. 407, 431.   Defendants also have not submitted any expert testimony to challenge Decker's calculations. Rather, Defendants' objections fall into the following four categories.

### 1.   General Objections

In their post-hearing briefing, Defendants first argue that Decker's testimony and calculations should not be give much weight "[g]iven market fluctuations and other obvious external factors."   Doc. No. 431, at 6.   But Decker did take market fluctuations into consideration.   With respect to the track record for sales to the six surgeons, she considered market industry research as well as the uncertainty in the market related to the change in administration in the federal government in early 2017 and the anticipated rebound in 2018.   Tr., 81-82, 86-87, *see also* Tr., 160-61. With respect to sales projections going forward, Decker considered Plaintiff's continued sales, Dr. Sawin's retirement, Dr. Allende's relocation, and the COVID-19 pandemic.   Tr., 97-106, 110-11, 205.   The evidence thus does not support

Defendants' objection in this regard.[28]

Defendants more specifically criticize Decker for not sufficiently adjusting her lost profits calculations to account for the COVID-19 pandemic, arguing that Decker only adjusted her calculations for 2020 but not for 2021, and that any lost profits after March 3, 2020 should not be awarded.   Doc. No. 431, at 17-18. However, at the evidentiary hearing, Decker testified that she accounted for the COVID-19 pandemic in her calculations; she considered the reduction in surgeries and limited availability of hospital beds, factored in that spinal surgeries were "the least elective of elective surgeries," and then factored in a corresponding increase in surgeries coming out of the pandemic, noting that by the end of the contract term

---

[28] Defendants' citation to *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890 (Fla. Dist. Ct. App. 2007), is unpersuasive as the expert in that case failed to take into account numerous verified intervening external factors, to include the death of a radio co-host, reports showing a loss of audience share, testimony that over 70 factors affect radio station revenues, and changes in hosts at competitor radio shows.   Doc. No. 431, at 1-2.   In contrast, Defendants either take issue with Decker's failure to account for speculative factors, or challenge the weight Decker gave to the factors she did consider.

Defendants' reliance on *Zimmer, Inc. v. Stryker Corp.*, No. 3:14-CV-152 JD, 2018 WL 276324, at *1 (N.D. Ind. Jan. 3, 2018) is similarly misplaced.   Doc. No. 431, at 2.   To begin, *Zimmer* relies on Indiana law, which is inapplicable in this case.   In addition, the expert in *Zimmer* failed to even review evidence that could suggest potential other explanations for the lost profits, whereas Decker considered all available evidence and provided credible explanations for her decision to discount these explanations.

Defendant also cites to *Ciappa Const., Inc. v. Innovative Prop. Res., LLC*, No. CIV.A. 05L-07-035, 2007 WL 914640, at *1 (Del. Super. Ct. Mar. 2, 2007), but again that case is distinguishable, as the lost profits calculation failed to account for a multitude of identifiable factors, whereas Decker considered all identified factors – Defendants simply disagree with Decker's conclusions.

including the non-compete year, the number of surgeries had leveled out.    Tr., 100-

01.    Decker did not specify during the hearing whether she limited her adjustments

to any specific calendar year, Defendants did not cross-examine her on this point,

and Defendants submit no evidence suggesting that Decker failed to sufficiently

account for the pandemic. [29]    As such, the undersigned finds this objection

unpersuasive.

Defendants next argue that Plaintiff's lost profits should not include the

additional 12-month non-compete period (*i.e.*, 2022) because Plaintiff did not

specifically allege entitlement to damages for the non-compete year.    Doc. No. 407,

---

[29] Defendants cite to Decker's October 16, 2024 report as proof that Decker failed to make any adjustments for the pandemic in 2021 or 2022.    Doc. No. 431, at 17.    However, Defendants successfully objected to the admission of Decker's report on the basis that it is inadmissible hearsay, the undersigned has excluded the report with the exception of Decker's prejudgment interest calculations, and Defendants provide no argument as to why the undersigned should now make an exception and consider other portions of an excluded exhibit.  *See also id.*, at 25.    And even if the undersigned were to consider the report for impeachment purposes only, it is clear upon review that Decker based her calculations on extensive research, after reviewing dozens of sources, none of which Defendants take issue with.  Doc. No. 424-1, at 47-52.    Thus, the undersigned also finds that Decker's adjustments for the COVID-19 pandemic were based on substantial evidence.

Defendants also cite to *Day*, 2022 WL 899244, at *11, in support of its request that lost profits after March 3, 2020 should not be awarded.  Doc. No. 431, at 17-18.    The undersigned does not find *Day* persuasive on this point, as the district court did not provide any analysis or identify whether any expert accounted for the pandemic in their lost profit analysis, and the relevant injunction period in that case ended on March 3, 2020. In contrast, there is uncontroverted testimony from Decker in this case that she adjusted her calculations for COVID-19 after extensive research, and the relevant time period in this case extends through the end of 2022.

at 24-25; Doc. No. 431, at 18-19.   Defendants point to a portion of an allegation in the second amended complaint contained in Plaintiff's breach of contract/injunctive relief claim (Count I), where Plaintiff states that it "bargained for a five-year relationship" with AM.   Doc. No. 407, at 24 (quoting Doc. No. 188, ¶ 73).

Not only do Defendants fail to cite any legal authority for this argument, but they also misread Plaintiff's second amended complaint.   In the "Prayer for Relief" section, Plaintiff requested monetary damages from Defendants for their "violations of their contractual obligations," and requested an injunction requiring Defendants not to compete with Plaintiff within its sales territory.   Doc. No. 188, at 24.   There is no language limiting this requested relief to only a five-year term, and the 2017 Agreement clearly contains an additional 12-month non-competition and non-solicitation period.   *Id.*; Doc. No. 424-10, at 7.   In addition, Judge Mendoza foreclosed this issue in his November 22, 2023 order when he found Plaintiff entitled to default judgment as to all claims in their entirety, without limitation. Doc. No. 395.   *See also Base Optics Inc. v. Liu*, No. CV 9803-VCG, 2015 WL 3491495, at *16 n.122 (Del. Ch. May 29, 2015) (noting that "in the context of a breach of a non-compete agreement, lost profits from business within the scope of the parties' non-compete are direct, not consequential damages" (citing *eCommerce Indus., Inc*, 2013 WL 5621678, at *47)); *All Pro Maids*, 2004 WL 1878784, at *11-12 (awarding lost

profits under Delaware law in breach of contract action to include lost profits

during a one-year restrictive covenant non-compete period).[30]

2.    *Dr. Sawin Objections*

Defendants next argue that Decker's calculations as to Dr. Sawin are incorrect

and not supported by substantial evidence because she failed to consider Dr.

Sawin's declaration and arbitration testimony.   Doc. No. 407, at  26-28; Doc. No.

431, at 9-12.   Defendants contend that this evidence shows that Dr. Sawin ended

his relationship with Plaintiff first, and that Defendants followed Dr. Sawin to

Alphatec, not the other way around.   Doc. No. 407, at 26-27; Doc. No. 431, at 9-10.[31]

Thus, if Decker had properly considered that evidence, Decker would have found

---

[30] Defendants make two additional perfunctory arguments on this point:   (1) that
there is no credible or competent evidence that Defendants are the but-for cause of
Plaintiff's lost profits in 2022; and (2) Plaintiff's damages cannot extend to 2022 because
Hawley and Miller resigned from AM in 2017 and did not sign non-compete agreements
for the 2017 Agreement.   Doc. No. 431, at 19.   On the first argument, the undersigned has
extensively detailed the evidence and testimony submitted by Plaintiff to support its lost
profits calculations, and the undersigned finds Decker's calculations for the entire "loss
period" to be both credible and supported by substantial evidence.   On the second
argument, Defendants do not explain why the 2017 resignations of Hawley and Miller –
who have been dismissed from this case and admittedly worked for AMS – would impact
an award of lost profits against AM, AMS, and Soufleris for the 2022 non-compete year,
particularly in light of Judge Mendoza's November 22, 2023 Order finding liability on all
claims.

[31] Defendants cite to *Robins v. NuVasive, Inc.*, No. 2:20-CV-292-RMP, 2020 WL
7081588, at *10 (E.D. Wash. Dec. 3, 2020), however that case addressed a motion for
preliminary injunction and whether that plaintiff established the likelihood of success on
the merits of its breach of contract claims, it was not addressing expert testimony at the
damages phase where liability and causation had already been established.

that Dr. Sawin ceased using Plaintiff's products for the most part in late 2017 for reasons that had nothing to do with Defendants' breach of the 2017 Agreement, and therefore lost profits attributable to Dr. Sawin should be at zero.  *Id.*

Again, Defendants seek to have the undersigned consider Dr. Sawin's declaration and arbitration testimony for the truth of the matters asserted, but the undersigned has already found that impermissible.  Rather, the undersigned has considered these exhibits solely for impeachment purposes.  And on that point, the undersigned finds Defendants' argument unpersuasive.

This is not a situation where Decker failed to consider Dr. Sawin's declaration and arbitration testimony wholesale.  Rather, Decker considered both, and found the statements contained therein to be contradicted by other evidence, to include sales data, evidence of Soufleris' and Hawley's close relationships with Dr. Sawin, Soufleris' representations to Alphatec about Dr. Sawin's business, the timing of when Dr. Sawin began using Alphatec products, an October 2017 conference, and other statements by Dr. Sawin concerning the quality of Alphatec products.  Tr., 110, 112-16.  Given this contradictory evidence, Decker determined Dr. Sawin's declaration and arbitration testimony were unreliable such that they did not warrant any reductions in Decker's calculations.  *See* Tr., 110, 112-16, 120-22.

Defendants extensively cross-examined Decker on Dr. Sawin's declaration and arbitration testimony, and her reasonings were credible and supported.  Tr.,

155, 174-88.    Other than identifying one incorrect page from Dr. Sawin's arbitration testimony transcript, Tr., 179-80, Decker's testimony remained consistent and supported by other evidence, and Defendants have not persuasively demonstrated otherwise.    *See also NuVasive*, 77 F.4th at 27-30 (affirming district court's rejection of testimony from surgeon that defendant had nothing to do with surgeon's "decision to switch from nearly exclusive use of NuVasive products to primary use of Alphatec products" and instead crediting expert report based on the "substantial circumstantial evidence in the record").[32]

The undersigned therefore does not agree with Defendants' assertions that Plaintiff should not be awarded any lost profits with respect to Dr. Sawin.

### 3.    *Dr. Rosen and Dr. Gandhi Objections*

Defendants raise one objection with respect to Decker's lost profit calculations for Dr. Rosen and Dr. Gandhi – that Decker failed to reduce her calculations to account for these surgeons' use of the Globus robot starting in 2017. Doc. No. 407, at 15-21; Doc. No. 431, at 12-16.    According to Defendants, Dr. Rosen's and Dr. Gandhi's Alphatec sales did not increase proportionally during the "loss period," thus the surgeons' increasing use of the Globus robot must be the real

---

[32]  To that end, the undersigned is also not persuaded by Defendants' argument that Decker did not interview Dr. Sawin or any of the other surgeons.    Doc. No. 431, at 11. Defendants did not cross-examine Decker on this point, did not present any evidence or witness testimony of their own, and merely cite to a passing reference in a decision applying Indiana law.    *See Zimmer*, 2018 WL 276324, at *5.

"but-for" cause for Plaintiff's decreased sales, but Decker "made no effort" to determine what portion of the estimated lost profits were actually lost to the Globus robot.   Doc. No. 407, at 18.

Decker testified at the evidentiary hearing that the contract to purchase the Globus robot was executed in late December 2017 – after Defendants' breach of the 2017 Agreement.   Tr., 127.   Decker further testified that the contract contained a 90-day installation period, so the Globus robot could not have been utilized until 2018.   Tr., 127.   Decker was only able to obtain limited sales data regarding the use of the robot, and found that the first sale to Dr. Rosen related to the Globus robot was in April 2018, and the first sale to Dr. Gandhi was in May 2018 – in other words they were not using Globus products prior to Defendants' breach of the 2017 Agreement.   Tr., 128, 169.

Decker did not account for any Globus robot sales because Defendants' breach occurred prior to the installation of the robot, Defendants' breach left Plaintiff without any sales representatives in the area to compete against any competitors including the Globus robot, and there was no evidence suggesting that Dr. Rosen or Dr. Gandhi would have turned to the Globus robot absent Defendants' breaches.   Tr., 128.   Decker further testified there was evidence the Alphatec sales portfolio was not complete at the time the Globus robot contract was negotiated and executed, and by the time the contract was in place Plaintiff had no ability to sell its

products and Defendants were selling Alphatec products that were not necessarily as good as Plaintiff's.    As such, Decker determined that even if Dr. Rosen and Dr. Gandhi thereafter switched to the Globus robot, that would still be considered lost profits to Plaintiff, because Defendants took away Plaintiff's ability to compete with the robot.    Tr., 166-71.    *See Tanner*, 1981 WL 191389, at *1 ("Reasonable certainty is not equivalent to absolute certainty; rather, the requirement that plaintiff show defendant's breach to be the cause of his injury with reasonable certainty merely means that the fact of damages must be taken out of the area of speculation." (quotation marks and citation omitted)).

Defendants take issue with Decker's analysis, arguing that Decker could have and should have obtained Globus sales data, but instead based her analysis on speculation.    Doc. No. 407, at 16.    Decker attempted to obtain that data, but was unsuccessful.    Tr., 170-71.    And the undersigned disagrees with Defendants that Decker engaged in improper speculation.    Rather, she based her calculations on the available and reliable sales data as well as the timeline related to Defendants' breach of the 2017 Agreement and the use of the Globus robot.

Defendants point to a reduction in Alphatec sales in 2018 and 2019 for Dr. Rosen and Dr. Gandhi, but have presented no evidence to support their sales numbers, and have not refuted Decker's testimony that the Alphatec sales data was

incomplete and unreliable.    Doc. No. 431, at 15-16.[33]    The undersigned declines to
reduce the lost profits attributable to Dr. Rosen and Dr. Gandhi based purely on
speculation.    *See Nuvasive*, 77 F.4th at 30, n.9 ("The breaching party cannot avoid
responsibility for making the other party whole simply by arguing that expectation
damages based on lost profits are speculative because they come from an uncertain
world created by the wrongdoer. Accordingly, when a party has breached a
contract, the fact of expectation damages must be proven with reasonable certainty,
but the amount of damages can be an estimate." (citation, quotation marks, and
emphasis omitted)); *AbbVie*, 2023 WL 5704055, at *8-9 (declining to reject expert
opinion that estimated a reasonable market growth rate where testimony from
opposing party's oncologist concerning "leading-edge" advances in medical
technology failed to explain when these advances would occur and how fast they
would occur); *see also Balthazar Mgmt. v. Beale St. Blues Co., Inc.*, No. 17-CV-81214,
2018 WL 8221701, at *3 (S.D. Fla. Oct. 10, 2018) (declining to strike plaintiff's expert
witness who based lost profits analysis on the information plaintiff provided her;
expert did not utilize unreliable or incomplete information and based her
projections on other business records and historical information on the business'

---

[33] In their pre-hearing opposition, Defendants quote from an expert report of CPA
Paul Dopp.    Doc. No. 407, at 15-21.    However, Defendants did not call any expert to
testify at the evidentiary hearing nor seek to admit any expert reports, therefore the
undersigned has not considered Defendants' discussion of this report.

operations; thus the expert's future lost profits calculation was not speculative).

### 4.    *Dr. Allende Objections*

Decker calculated Dr. Allende's lost profits from December 1, 2017 through December 31, 2019 as $665,369.00, noting that at some point in 2020 Dr. Allende moved to Melbourne, Florida, which is in Brevard County and outside the relevant sales territory.   Tr., 93, 149-50.   Defendants' final objection is based on their contention that Dr. Allende actually relocated his business to Brevard County in 2019 – not 2020.   Doc. No. 407, at 23; Doc. No. 431, at 16-17.   As such, Defendants argue that the lost profits attributable to Dr. Allende should not extend beyond 2018.  *Id.*

The undersigned does not find this objection persuasive for two reasons. First, Decker testified that she had evidence in the form of sales data and independent research using, among other things, the "Wayback Machine" to determine that Dr. Allende did not relocate his business until sometime in 2020. Tr., 93, 124-25.[34]   This testimony is further supported by Singer, who testified that Dr. Allende relocated to Melbourne, Florida in approximately June 2020.   Tr., 53-54.   Second, Defendants have provided nothing beyond their own speculation that

---

[34] Defendants appear to challenge Decker's use of the "Wayback Machine" in somewhat conclusory fashion but provide no legal authority as to why Decker should not have utilized this tool.   Doc. No. 431, at 17.

Dr. Allende's relocation occurred in 2019.[35]   And while the burden of proof clearly

rests with Plaintiff, Defendants cannot overcome Plaintiff's submissions by merely

postulating as to when Dr. Allende moved his practice, without any evidence in

support.   The undersigned therefore finds Defendants' objection unpersuasive,

and that substantial evidence exists to support Decker's lost profits with respect to

Dr. Allende.   *See Day*, 2022 WL 899244, at *11 ("[W]hen a contract is breached,

expectation damages can be established as long as the plaintiff can prove the fact of

damages with reasonable certainty," which can be "through witness testimony,

exhibits and expert opinion that the Court credits.").

     5.    *Total Award*

     In sum, Plaintiff has presented substantial evidence in the form of exhibits,

witness testimony, and expert testimony to support both a finding that Defendants'

actions were the proximate cause of Plaintiff's damages, as well as the calculation

of those damages.   While the burden of proof ultimately rests with Plaintiff,

Defendants have submitted nothing other than supposition and an unsuccessful

attempt to impeach Decker's calculations as to Dr. Sawin.   But as the established

wrongdoers in this action, Defendants cannot merely rest on their contentions that

---

[35] Defendants also appear to point to a decrease in Alphatec sales to Dr. Allende between 2018 and 2020 as proof that he relocated in 2019, *see* Doc. No. 431, at 16-17, but have provided no evidence to support these sales, and as noted above, Decker was never provided complete Alphatec sales data.   *See also* Tr., 198-99.

Decker's lost profits analysis is speculative, particularly when the uncertainty was caused by Defendants' removal of Plaintiff's entire sales force.   *See Siga Techs.*, 132 A.3d at 1111; *see also Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992) (explaining that if a defendant's wrongful conduct contributed to uncertainty in the calculation of damages, "the perils of such uncertainty should be 'laid at the defendant's door'" (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 2d 597, 608 (S.D.N.Y. 1977))); *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, No. CIVA3369-VCP, 2009 WL 3161643, at *16 (Del. Ch. Sept. 30, 2009), *aff'd*, 7 A.3d 486 (Del. 2010) ("[T]he law does not require certainty in the award of damages when a wrong has been proven and injury established.   Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages.   Concord has established that it was injured by Defendants' wrongful conduct; thus, it is entitled to any damages it reasonably can prove." (citing *All Pro Maids*, 2004 WL 1878784, at *11)).

Accordingly, the undersigned will recommend that the Court find Plaintiff to have established, by a preponderance of the evidence, that it has suffered lost profits in the amount of $13,645,938.00.   The undersigned will further recommend that the Court award to Plaintiff, and against Defendants jointly and severally, these lost profits as damages under the Delaware breach of contract claims (Counts II and III).   *See All Pro Maids, Inc.*, 2004 WL 1878784, at *11 (finding defendant proximately

caused plaintiff's lost profits when they breached restrictive covenant agreement; the evidence showed that plaintiff's clients dealt with defendant more than anyone else at plaintiff's business, and it was reasonable to infer that defendant contributed to competitor's success in obtaining plaintiff's former clients).[36]

B.    *Pre-Judgment and Post-Judgment Interest*

Plaintiff also seeks an award of $4,415,119.00 in pre-judgment interest under Delaware law as to the breach of contract claims, and $3,921,408.00 under Florida law as to the FDUTPA and tortious interference claims.   Doc. No. 430, at 24.   "In a diversity case we follow the state law governing the award of [prejudgment] interest[.]"   *SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1320 (11th Cir. 2007) (alteration in original) (citing *Royster Co. v. Union Carbide Corp.*, 737 F.2d 941, 948 (11th Cir. 1984)); *see also Torpy v. Unum Life Ins. Co. of Am.*, No. 6:16-cv-410-Orl-22DCI, 2017 WL 5239451, at *5 (M.D. Fla. Oct. 18, 2017), *aff'd*, 741 F. App'x 673 (11th Cir. 2018) ("[I]t is well-settled that prejudgment interest is substantive for *Erie* purposes." (citation omitted)).

"Delaware law awards pre-judgment interest as a matter of right.   In contract actions, pre-judgment interest is computed from the date of the breach." *Balooshi v. GVP Glob. Corp.*, No. CV N19C-10-215 CEB, 2022 WL 576819, at *14 (Del.

---

[36] The undersigned again notes – and Defendants do not contest – that Plaintiff would be entitled to this same amount of damages under the FDUTPA and tortious interference claims.

Super. Ct. Feb. 25, 2022), *aff'd*, 285 A.3d 839 (Del. 2022) (citing *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) and *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992)).    Pre-judgment interest is also recoverable in a FDUTPA claim.    *See Alhassid v. Bank of America, N.A.*, 688 F. App'x 753, 761 (11th Cir. 2017) (affirming award of pre-judgment interest in FDUTPA claim and noting that "an award of prejudgment interest is non-discretionary once the amount of loss is ascertained.").    And pre-judgment interest is recoverable in Florida for a tortious interference claim.    *See KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 F. App'x 591, 595 (11th Cir. 2006) (affirming award of prejudgment interest in tortious interference claim because "Under Florida law, a prevailing party is entitled to prejudgment interest." (citations omitted)).

Defendants agree that Plaintiff is entitled to prejudgment interest at the applicable legal rates.    Doc. No. 407, at 2; Tr., 9-10.    Decker calculated prejudgment interest under both Delaware and Florida law for the entire amount of lost profits requested.    Tr., 138-42.    At the evidentiary hearing, counsel for Defendants represented that Defendants had no objection to Decker's methodology, application, and calculation of prejudgment interest, and had no objection to the Court relying upon Decker's calculations as set forth in her October 16, 2024 report. Tr., 140-42.    In particular, counsel agreed that Decker's calculations contained in Exhibits D-26 through D-50 to her report (Doc. No. 424-1, at 72-96) were admissible

and could be utilized by the Court.    Tr., 140-42.

Plaintiff cannot receive double recovery for its prejudgment interest, and Decker testified that the amount of prejudgment interest awardable under Delaware law ($4,415,119.00) is higher than that awarded under Florida law ($3,921.408.00).    Tr., 138-42.    Upon review, the undersigned finds Decker's calculations to be credible, awardable under appliable law, and supported to a degree of reasonable certainty.    Given the lack of objection, and because any award under Florida law would be subsumed by an award of prejudgment interest under Delaware law, the undersigned will recommend that the Court award prejudgment interest in the amount of $4,415,119.00 for the period December 1, 2017 through October 23, 2024 for the breach of contract claims under Delaware law, with additional interest accruing daily in the amount of $2,524.00 through the entry of judgment.    *See* Doc. No. 424-1, at 96 (Exhibit D-50).

Plaintiff also requests post-judgment interest, and Defendants again raise no objection.    Doc. No. 403, at 21; Doc. No. 430, at 24-25; Doc. No. 407, at 2; Tr., 9-10. "Unlike pre-judgment interest, post-judgment interest is governed by federal law in diversity cases."    *Walker v. Life Ins. Co. of N. Am.*, 59 F.4th 1176, 1194 (11th Cir. 2023) (citing *Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 572 n.4 (11th Cir. 1991)).    "In awarding post-judgment interest in a diversity case, the Court applies the federal interest statute, 28 U.S.C. § 1961(a)."    *Keen v. Bovie Med. Corp.*, No. 8:12-cv-305-T-

24-EAJ, 2013 WL 12159333, at *1, *2 (M.D. Fla. Aug. 20, 2013) (citation omitted).

The federal interest statute provides that "[i]nterest shall be allowed on any money

judgment in a civil case recovered in a district court."   28 U.S.C. § 1961(a).   In the

absence of any objection, the undersigned will therefore also recommend that

Plaintiff be awarded post-judgment interest in the rates provided by 28 U.S.C. §

1961(a).

  C. *Attorneys' Fees and Costs*

   The last category of damages Plaintiff seeks is $1,300,000.00 in attorneys' fees

and costs.   Doc. No. 403, at 2, 25-28.   Plaintiff contends that it is entitled to fees and

costs as to its breach of contract claims (Counts II and III) under Delaware law

pursuant to a fee shifting provision contained in the 2017 Agreement.   *Id.*, at 25-28.

That provision provides, in sum, that AM will enforce a Compliance Agreement

which requires the non-compete provisions of the 2017 Agreement to be fully

enforceable upon any affiliate of AM, and if AM refuses to enforce the Compliance

Agreement, that Plaintiff may do so at AM's expense.   Doc. No. 424-10, at 7-8.

   As discussed previously, Judge Mendoza held Plaintiff is entitled to default

judgment on all claims, to include the breach of contract claims against AM, and the

alter ego and successor in liability claims against AMS and Soufleris.   Doc. No. 395.

As such, the undersigned also finds that Plaintiff is entitled to an award of fees and

costs for Defendants' breach of the 2017 Agreement.   The undersigned further

finds that Delaware law recognizes fee-shifting contractual provisions, and will permit a party to recover its reasonable fees and costs incurred during litigation over a breach of contract claim.   *See Mahani v. Edix Media Group, inc.*, 935 A.2d 242, 245 (Del. 2007).

In its renewed memorandum, Plaintiff represented that Defendants were challenging Plaintiff's entitlement to attorneys' fees, but agreed that $1,300,000.00 would be a reasonable amount of fees and costs.   Doc. No. 403, at 27.   Defendants did not address fees and costs in either their initial or post-hearing filings.   Doc. Nos. 407, 431.   During the evidentiary hearing counsel for Defendants stated that "the defendants were not conceding entitlement, nor formally opposing it; just simply leaving out that the Court has not determined entitlement yet so we're not comfortable acknowledging it."   Tr., 232-33.   Counsel further acknowledged that if the Court were to find entitlement, there is an agreement to the amount of fees such that a lodestar analysis is unnecessary under either Delaware or Florida law. Tr., 233.   In other words, Defendants have not and will not raise any objections to an award of attorneys' fees in this case.   Tr., 233.

Given the lack of objection, the November 22, 2023 order on liability, applicable Delaware precedent, and the lengthy history of this case, the undersigned will recommend that the Court award Plaintiff fees and costs in the

amount of $1,300,000.00 as damages for Counts II and III.[37]    *See In re Prodigy
Commc'ns Corp. S'holders Litig.*, No. CIV.A. 19113, 2002 WL 1767543, at *6 (Del. Ch.
July 26, 2002) (noting that a court "will also give weight to the agreement reached
by the parties in relation to fees").

## V.    CONCLUSION AND RECOMMENDATION

For the reasons discussed above, it is hereby **ORDERED** that Plaintiff
NuVasive, Inc.'s Motion in Limine to Exclude Defendants' Exhibits at Damages
Hearing (Doc. No. 421) is **GRANTED IN PART AND DENIED IN PART.**  Dr.
Paul Sawin's February 1, 2020 declaration and December 17, 2020 arbitration
testimony have been admitted solely for use as impeachment evidence against
Plaintiff's expert.   The exhibits are otherwise excluded as inadmissible hearsay.

The undersigned **RESPECTFULLY RECOMMENDS** that the Court **GRANT**
Plaintiff NuVasive, Inc.'s Renewed Memorandum of Damages (Doc. No. 403) and
award to Plaintiff and against Defendants Absolute Medical, LLC, Greg Soufleris,
and Absolute Medical Systems, LLC, jointly and severally, total damages in the

---

[37] Attorneys' fees and costs are also recoverable under FDUTPA, however such fees
and costs may only be awarded following the exhaustion of all appeals.  Fla. Stat. §
501.2105(1) (emphasis supplied).   Because no final judgment has been entered, and thus
the time for appeal has not yet expired, any request for fees under FDUTPA at this time
would be premature.  *See Citibank (S. Dakota) N.A. v. Nat'l Arbitration Council, Inc.*, Nos.
3:04-cv-1076-J-32MCR, 3:04-cv-1205-J-20MCR, 2006 WL 2691528, at *7 (M.D. Fla. Sept. 19,
2006) (denying without prejudice a FDUTPA-based motion for fees and costs, subject to
renewal after either the expiration of the time to appeal or the conclusion of an appeal).

amount of $19,361,057.00, broken down as follows:

1.    $13,645,938.00 in lost profits under Delaware law for the breach of
      contract claims (Counts II and III);

2.    $4,415,119.00 in pre-judgment interest under Delaware law for the
      breach of contract claims, with additional interest accruing daily at a
      rate of $2,524.00 through the entry of judgment; and

3.    $1,300,000.00 in attorneys' fees and costs under Delaware law for the
      breach of contract claims.

The undersigned further recommends that final judgment be entered on all claims in accordance with this report and recommendation and the Court's November 22, 2023 Order (Doc. No. 395).

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from the date the Report and Recommendation is served to serve and file written objections to the Report and Recommendation's factual findings and legal conclusions.  Failure to serve written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   11th Cir. R. 3-1.

Recommended in Orlando, Florida on January 17, 2025.

LESLIE HOFFMAN PRICE
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy